UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 21-1186
_____
_____

UNITED STATES,
Appellee,

v.

CHRISTOPHER CANTWELL,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
_____

BRIEF OF DEFENDANT-APPELLANT
CHRISTOPHER CANTWELL
_____

<div style="margin-left:50%">

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................ 1

STATEMENT OF THE CASE ........................................................... 2

    I.   The Charged Conduct. ................................................... 3

    II.  The Charges ................................................................. 8

    III.  Trial .......................................................................... 9

    IV.  Sentencing. ................................................................ 15

SUMMARY OF ARGUMENT ......................................................... 16

ARGUMENT ............................................................................ 18

    I.   In its closing argument, the government plainly erred by
        improperly using hearsay evidence that was admissible only
        for context as though it had been admitted for its truth. ................... 18

        A.  The standard of review ......................................... 20

B.    Ms. Fry's statements were not admissible for their truth. ..............22

C.    The government's closing improperly treated Ms. Fry's statements as though they were admissible for their truth. ...........23

D.    The government's impermissible use of Ms. Fry's statements was plain error that likely affected the outcome of trial. ...............25

II.    The district court erred by instructing the jury that provocation was not a defense. ......................................................................29

A.    Standard of Review .................................................................32

B.    The anti-provocation instruction tended to confuse and mislead the jury and impaired Mr. Cantwell's constitutional right to present a defense. ...................................................34

III.    The district court erred by not granting a downward departure based on §5K2.10. ......................................................................40

A.    Standard of review. ................................................................42

B.    Provocation was sufficient to merit downward departure. ...........43

CONCLUSION ................................................................................45

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................46

CERTIFICATE OF SERVICE ............................................................47

ii

## TABLE OF AUTHORITIES

**Page**

**Cases**

*California v. Trombetta,*
    467 U.S. 479 (1984) ..................................................................37

*Crane v. Kentucky,*
    476 U.S. 683 (1986) ..................................................................37

*Crawford v. Washington,*
    541 U.S. 36 (2004) ....................................................................29

*Rosales-Mireles v. United States,*
    --- U.S. ---, 138 S. Ct. 1897 (2018) ........................................21

*United States v. Baird,*
    712 F.3d 623 (1st Cir. 2013) ...............................................39, 40

*United States v. Battle,*
    637 F.3d 44 (1st Cir. 2011) .......................................................42

*United States v. Belanger,*
    890 F.3d 13 (1st Cir. 2018) .......................................................22

*United States v. DeCologero,*
    530 F.3d 36 (1st Cir. 2008) ..................................................36, 37

*United States v. Dixon,*
    548 U.S. 1 (2006) ......................................................................35

*United States v. Duarte,*
    246 F.3d 56 (1st Cir. 2001) .......................................................21

*United States v. Fernandez,*
    94 F.3d 640 (1st Cir. 1996) (unpublished) .................................25

*United States v. Georgiadis,*
    819 F.3d 4 (1st Cir. 2016) .................................................33

*United States v. Jadlowe,*
    628 F.3d 1 (1st Cir. 2010) .................................................33

*United States v. Latorre-Cacho,*
    874 F.3d 299 (1st Cir. 2017) .............................................21

*United States v. Leahy,*
    473 F.3d 401 (1st Cir. 2007) .......................................35, 36

*United States v. Maguire,*
    752 F.3d 1 (1st Cir. 2014) .................................................42

*United States v. Mejia-Lozano,*
    829 F.2d 268 (1st Cir. 1987) .............................................21

*United States v. Montañez,*
    105 F.3d 36 (1st Cir. 1997) ...............................................40

*United States v. Olano,*
    507 U.S. 725 (1993) .........................................................21

*United States v. Peake,*
    804 F.3d 81 (1st Cir. 2015) ...............................................39

*United States v. Pérez-Rodríguez,*
    13 F.4th 1 (1st Cir. 2021) ..............................21, 27, 28, 33

*United States v. Pérez-Vásquez,*
    6 F.4th 180 (1st Cir. 2021) ...............20, 21, 22, 25, 28

*United States v. Prigmore,*
        243 F.3d 1 (1st Cir. 2001) ...............................................................33, 39, 40

*United States v. Rodriguez,*
        759 F.3d 113 (1st Cir. 2014) ........................................................................23

*United States v. Sepulveda,*
        15 F.3d 1161 (1st Cir. 1993) ........................................................................39

*United States v. Smith,*
        982 F.2d 681 (1st Cir. 1993) ........................................................................25

*United States v. Symonevich,*
        688 F.3d 12 (1st Cir. 2012) ..........................................................................33

*United States v. Walker,*
        434 F.3d 30 (1st Cir. 2006) ..........................................................................22

*United States v. Walker-Couvertier,*
        860 F.3d 1 (1st Cir. 2017) ......................................................................21, 25

*United States v. Wihbey,*
        75 F.3d 761 (1st Cir. 1996) ..........................................................................22

## Constitutional Provisions

U.S. Const., Amend. V .............................................................................32, 36, 37

U.S. Const., Amend VI .......................................................................28, 32, 36, 37

**Statutes**

18 U.S.C. §875....................................................................................8, 9, 12

18 U.S.C. 2261....................................................................................9

18 U.S.C. §3231....................................................................................1

28 U.S.C. §1291....................................................................................1

28 U.S.C. §3742....................................................................................1

**Rules and Guidelines**

Fed. R. Evid. 801 ...........................................................................18, 22, 23

Fed. R. Evid. 802 ...........................................................................25

Fed. R. Evid. 803 ...........................................................................23

Fed. R. Evid. 804 ...........................................................................23

Fed. R. Evid. 807 ...........................................................................23

U.S.S.G. §5K2.10 ........................................... 2, 15, 17, 40, 41, 42, 43, 44

**Other**

Merriam-Webster Online Dictionary,
       available at merriam-webster.com/dictionary ......................................34

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which

grants the district courts exclusive jurisdiction over all offenses against the

laws of the United States.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which

confers jurisdiction to review all final decisions of the district courts, and

§3742, which provides jurisdiction to review a sentence.

The district court entered final judgment on March 5, 2021, and a

timely notice of appeal was filed the same day. Add.21; J.A.II 1199.[1]

## ISSUES PRESENTED FOR REVIEW

1. Whether the government plainly erred in closing argument by

impermissibly asking the jury to rely on hearsay that was admissible to put

Mr. Cantwell's statements in context as though it had been admitted for its

truth?

---

[1] Citations are as follows: J.A.X refers to Volume X of the Joint Appendix;
S.A. is the Sealed Appendix; Add. is the addendum to this brief; and D.E.
refers to a district court docket entry.

2. Whether the district court erred by instructing the jury that provocation is not a defense where Mr. Cantwell did not present an affirmative justification defense, but argued that the government could not prove the elements of the offense?

3. Whether the district court abused its discretion by refusing to depart downward under §5K2.10 given that "the victim's wrongful conduct contributed significantly to provoking" the charged conduct?

## STATEMENT OF THE CASE

This case is a creature of the internet and arose in one of its fringe corners. Christopher Cantwell, a media personality who hosted a white nationalist call-in show online, was convicted of extorting Benjamin Lambert/Cheddar Mane, a member of an extremist white nationalist virtual group called the Bowl Patrol.[2] In late 2017/early 2018, Mr. Cantwell and the Bowl Patrol interacted online. S.A. 4-11. In late 2018, they had a falling out, and Bowl Patrol members began a campaign of prank calls to

---

[2] Before this case, Mr. Cantwell knew Mr. Lambert only by his internet alias, Cheddar Mane. J.A.I 356, 393; J.A.II 768, 1095-96. The Bowl Patrol took its name from the hairstyle of Dylann Roof, who shot and killed nine Black parishioners in a church in Charleston, South Carolina in 2015. J.A.I 143, 156, 362, 492-93.

disrupt Mr. Cantwell's show and tampered with his website. *Id.* After

months of this harassment and unsuccessful efforts to stop it, Mr. Cantwell

allegedly tried to extort Mr. Lambert to obtain the identity of Vic Mackey,

the Bowl Patrol's leader, so that Mr. Cantwell could "dox" Mackey.[3] *Id.*

## I.     The Charged Conduct.[4]

In 2018, Mr. Cantwell was a media personality in the white

nationalist community.[5] J.A.I 142-43, 155-56. Using his true name, he ran an

online call-in show called Radical Agenda, had a website, and hosted a

podcast.[6] J.A.II 761-67, 780-81. In late 2017 or early 2018, Mr. Cantwell

---

[3] "Dox" is internet slang that means to publicly reveal someone's private information, such as their name or address. J.A.I 230-31.

[4] The facts are largely undisputed. Mr. Cantwell's central defense was that given the context of this case, he did not threaten or intend to extort. J.A.I 154-65; J.A.II 1005-17.

[5] Mr. Cantwell attained some notoriety when he was arrested after the Unite the Right rally in Charlottesville Virginia in 2017. The government highlighted this event in its detention motions, D.E. 14 at 5-7, but the court excluded all mention of Virginia from trial. J.A.I 108-10; D.E. 77.

[6] Mr. Cantwell began building his social media presence when he ran for the United States House of Representatives in New York. J.A.II 760-61. His show was called Some Garbage Podcast before he rebranded it as Radical Agenda. J.A.II 761-64. Initially he had an extreme libertarian stance, but as he interacted with callers, his political views shifted "substantially rightward." J.A.II 763-65. His show was meant to be shocking and uncensored, and he and his callers used profane and derogatory language. J.A.II 765-66. He also started an edited podcast, Outlaw Conservative, that

3

began to interact with members of a white-nationalist group called the

Bowl Patrol, including Mr. Lambert.[7] J.A.II 767-71. The Bowl Patrol existed

virtually, on platforms like Telegram,[8] and its members used aliases and

typically did not know each other. J.A.I 361-62. This extremist,

accelerationist[9] group idolized Dylann Roof, espoused mass shootings, and

reveled in the use of racist, derogatory, inflammatory, and often violent

language. J.A.I 216, 362-64. Its leader used the alias Vic Mackey. J.A.I 216,

220-21, 397-98.

 In late 2018, Mr. Cantwell parted ways with the Bowl Patrol after the

group endorsed a mass shooting at the Tree of Life Synagogue in

Pittsburgh. J.A.II 854, 1101-03; S.A. 4. Bowl Patrol members concluded that

Mr. Cantwell "had shifted his ideology," did not "actually believe what he

was saying," and was just acting "for financial gain." J.A.I 411, 517. These

---

"would eliminate the profanity, the racial content, and the fantasy violence
themes." J.A.II 780-82.

[7] At Mr. Lambert's invitation, Mr. Cantwell was a guest on the first episode
of BowlCast, the Bowl Patrol's podcast. J.A.I 217, 398-401.

[8] Telegram is "an online instant message platform" known in part for its
security features. J.A.I 218-19. Users can create "channels," which look like
Facebook or social media feeds with posts and comments. J.A.I 218-21.

[9] In the context of white nationalism, accelerationists promote violence and
terrorism and seek to cause or speed government collapse so that they can
form a new society. J.A.I 373; J.A.II 642, 805, 1077.

members, including Mr. Lambert, began to disrupt Mr. Cantwell's show by making prank calls. J.A.I 411-17. In February 2019, members defaced his website by posting pornography, as well as material espousing support for the man charged with the Pittsburgh shooting. J.A.I 221, 417; S.A. 4. After his website was defaced, Mr. Cantwell reported the harassment to the FBI. J.A.I 224-26; J.A.II 1101-03. The FBI did not respond, and Mr. Cantwell reported the harassment to local police in May 2019. J.A.I 287-88, 290-91. Mr. Cantwell also tried to block the prank calls. J.A.II 789-92.

In March 2019, Mr. Cantwell told Mr. Lambert that if he did not stop the prank calls, Mr. Cantwell would dox him. J.A.I 417-25. Mr. Lambert knew that Mr. Cantwell had access to his personal information. In November 2018, Mr. Cantwell's then-girlfriend, Katelyn Fry/Peach, visited Mr. Lambert.[10] J.A.I 401-11; J.A.II 810. She knew Mr. Lambert's address and had pictures of his family, some he sent her and some she took. J.A.I 401-

---

[10] Ms. Fry knew Mr. Lambert as Cheddar Mane through social media, specifically a Bowl Patrol member named Tom Gipson/Hardmous. Mr. Gipson was Mr. Lambert's real-world friend, J.A.I 393-94, and had worked for Mr. Cantwell. J.A.I 395; J.A.II 809-10. His name is spelled "Gibson" in the transcript, but the PSR contains the correct spelling. S.A. 8

11. After Mr. Cantwell said he would dox him, Mr. Lambert apparently stopped making prank calls and encouraged others to stop. J.A.I 422-25.

On June 15, 2019, Ms. Fry forwarded Mr. Cantwell a message she had received. J.A.II 1148-58; D.E. 123 at 9-10. The messages said in part: "So why did you take pictures of those kids?...Do you think we're going to forget?" D.E. 123 at 9-10. Neither Ms. Fry nor Mr. Cantwell knew who sent these messages. J.A.II 1150. Mr. Cantwell understood the messages to be referencing pictures Ms. Fry took while with Mr. Lambert but did not initially think that Mr. Lambert sent them.[11] J.A. 1150-52, 1175-77. Mr. Cantwell saw these messages as threatening Ms. Fry. J.A.II 1184-86.

Later that day, Mr. Lambert[12] entered Mr. Cantwell's invitation-only chatroom. J.A.I 426-28; J.A.II 823-27. When Mr. Cantwell noticed, he ejected Mr. Lambert from the chatroom and sent him a personal message. J.A.I 428; J.A.II 827. The conversation that followed was the basis for the charges, and

---

[11] Mr. Lambert denied sending these messages. J.A.I 510; J.A.II 1150.
[12] Mr. Lambert was using the alias Cheddy Blac, which was recognizable as belonging to the same person as Cheddar Mane. J.A.I 553. ("[A]nybody who knew who Cheddar Mane was would know that Cheddy Blac was also Cheddar Mane.").

the entire conversation appears at J.A.II 1063-70.[13] During this
conversation, Mr. Cantwell said that he would ruin Mr. Lambert's life, dox
Mr. Lambert, tell the FBI that he was a drug user who owned guns, and tell
Child Protective Services (CPS) that Mr. Lambert's children were in danger
unless Mr. Lambert gave him Vic Mackey's personal information. J.A.II
1063-70. When Mr. Lambert said he knew the pictures Mr. Cantwell had
came from Ms. Fry and that Mr. Cantwell must not "care what happens to
her," Mr. Cantwell responded: "As a matter of fact, I don't. So if you don't
want me to come and fuck your wife in front of your kids, the you should
make yourself scarce." J.A.II 1065. Both men used profane and derogatory
language throughout the conversation. J.A.II 1063-70.

Mr. Lambert posted this conversation, with his personal information
and photographs redacted, to the Bowl Patrol chat. J.A.I 458-62; J.A.II 862-
66. Mr. Cantwell then posted an unredacted version on his Telegram
channel. J.A.II 862-66. Mr. Cantwell called the Missouri Department of
Social Services, who determined that there was no need to investigate Mr.
Lambert. J.A.I 188-89; J.A.II 866. Mr. Lambert made one final call to Mr.

---

[13] These screenshots show the conversation as it would have appeared on
Mr. Cantwell's phone. J.A.I. 212.

7

Cantwell's show, but the men had no other contact after the charged conversation. J.A.I 480-83; J.A.II 866-68. Mr. Lambert did not contact law enforcement. J.A.I 365, 478-80; J.A.II 569. Mr. Cantwell reported Bowl Patrol's harassment to the FBI in February 2019, and to the local police in May 2019. S.A. 4. In September 2019, the FBI talked to Mr. Cantwell. J.A.I 355-36; S.A. 7-8. In October 2019, four months after the conversation, the FBI interviewed Mr. Lambert. J.A.I 365-66; S.A. 7-8. Mr. Cantwell was charged in January 2020. J.A.I 18-19.

## II.    The Charges

The superseding indictment charged Mr. Cantwell with four counts related to this conversation. J.A.I 20-23. Count 1 charged extortionate interstate communications in violation of 18 U.S.C. §875(b), based on messages that said: "So if you don't want me to come and f*ck your wife in front of your kids, then you should make yourself scarce[.] Give me Vic, it's your only out." *Id.* Mr. Cantwell was convicted of this count after trial. J.A.II 1057. Count 2 charged a threatening interstate communication in violation of 18 U.S.C. §875(c), based on the same messages. J.A.I 20-23. The government dismissed this count shortly before trial. J.A.I 11-12 (D.E. 91).

Count 3[14] alleged that Mr. Cantwell threatened to injure property or

reputation in violation of 18 U.S.C. §875(d) when he sent these messages:

> "Get a f*cking life or I will ruin the one you have"; ". . . you are going
> to lose everything you have"; "Next time I post that photo, the faces
> won't be blurred, and they you're going to start getting unexpected
> visitors"; ". . . you're the one who's gonna suffer cause you're the one
> who I can get"; "You think the FBI would take issue with an LSD
> user owning guns around kids?"; "On Tuesday I'm going to send
> every episode of BowlCast along with your identifying information
> to whatever the local equivalent of CPS is in your jurisdiction"; "But
> I'm pretty sure once that visit comes, you'll understand that this is
> serious"; and "Tell [Vic Mackey] that if he gives himself up, he can
> save your family."

J.A.I 21-22. Mr. Cantwell was convicted of this count after trial. J.A.II 1057.

Count 4[15] charged Mr. Cantwell with cyberstalking in violation of 18 U.S.C.

§2261(A)2. J.A.I 22-23. He was acquitted of this charge. J.A.II 1057.

## III.    Trial

The government's main witness was Mr. Lambert. He testified that

he lived in Missouri with his wife and three children, and that he was a

prominent, core member of the Bowl Patrol from early 2018 until fall 2019.

J.A.I 391-98, 488. He discussed his pseudonyms and described Bowl Patrol

---

[14] Because count 2 from the superseding indictment was dismissed, this
charge was called count 2 at trial. J.A.I 12.
[15] Because count 2 from the superseding indictment was dismissed, this
charge was called count 3 at trial. J.A.I 12.

avatars, which often included Dylann Roof's distinctive bowl haircut. J.A.I 391, 396-97, 489-95; J.A. 1095-96. Vic Mackey's avatar included this haircut and the word "rape." J.A.I 495. He acknowledged that the BowlCast podcast included violent and rape-related content that was meant to be humorous, and that he participated in these exchanges. J.A.I 503-07; J.A.II 1099-100.

At the time of the charged conversation, no one in Mr. Lambert's family or community knew that he was part of the Bowl Patrol, and he did not want to be exposed.[16] J.A.I 422-24, 436. Mr. Lambert denied that his statement "Guess that means you [don't] care what happens to [Ms. Fry] either" was a threat. J.A.I 445-46, 558-61. He said that when Mr. Cantwell mentioned his wife and kids he became "angry," "scared," and "felt as though a line had been crossed." J.A.I 447. He said he "put up a front" and taunted Mr. Cantwell, but felt scared and angry. J.A.I 454-56.

Mr. Lambert posted redacted screenshots of the conversation in the Bowl Patrol chat to show "the type of person that Cantwell is." J.A.I 458-59; J.A.II 1063-70. He told his wife that someone might have made a report to

---

[16] Once his community learned about his online activities, Mr. Lambert was no longer allowed to coach kids' hockey. J.A.II 664-66.

CPS, but not about the rest of the messages or the purported threats to her. J.A.I 474-75, 563. He purchased a motion-activated camera, but never used it. J.A.I 485-86. He deleted his social media accounts. J.A.I 486. He did not report the interaction to law enforcement. J.A.I 478-80, 569.

The government called Paul Nehlen, a former Congressional candidate and prominent figure in the white nationalist community. J.A.I 439, 457-58; J.A.II 688. Mr. Nehlen knew Mr. Cantwell and Mr. Lambert online. J.A.II 681-883. While exchanging messages with Mr. Cantwell, Mr. Lambert contacted Mr. Nehlen. J.A.I 439, 457-58. As an active member of the online far-right community, Mr. Nehlen said he did not see Mr. Cantwell's messages as a joke and felt his statement about Mr. Lambert's wife and children was "over the line." J.A.II 687-89.

The rest of the government's witnesses were law enforcement personnel. FBI Special Agent Shane Tongbua explained that when an analyst gave him screenshots of these messages in July 2019, the FBI was already investigating Mr. Cantwell. J.A.I 207-09, 284-85. Special Agent Tongbua compiled photographs from a pole camera to show that Mr. Cantwell was in New Hampshire when the messages were sent. J.A.I 248-

11

52. He described the FBI's interviews with Mr. Cantwell and Mr. Lambert. J.A.I 253-55, 365-76.

New Hampshire State Trooper Kevin LeBlanc, a sergeant task force officer with the FBI, helped interview Mr. Cantwell in October 2019. J.A.II 702-03. He reported that Mr. Cantwell said: "he had been told by other people that [threatening to dox Cheddar Mane] was extortion, so he didn't really want to talk about it too much."[17] J.A.II 708-10.

Brett Fernald, a Manchester Police Department employee and task force officer, introduced portions of jail calls in which Mr. Cantwell discussed the charges against him.[18] J.A.II 731-45 1090-03.[19] He also introduced a call between Mr. Cantwell and Ms. Fry that Mr. Cantwell recorded and gave the FBI. J.A.II 744-45, 1082-89. As will be discussed

---

[17] Mr. Cantwell explained he was concerned about extortion at that time because of something his systems administrator told him. J.A.II 875-79.

[18] The original indictment charged extortionate interstate communications and threatening interstate communications in violation of 18 U.S.C. §875(b) and (c) related to Mr. Cantwell's statements about Mr. Lambert's wife. J.A.I 18-19. It did not charge threatening to injure property or cyberstalking. *Compare id. with* J.A.I 21-23. These calls were made before the superseding indictment. J.A.II 741-43.

[19] Audio recordings were introduced as Exhibit #X. Transcripts of the recordings were introduced as Exhibit #XA.

below, in one excerpt, Ms. Fry said: "Okay, but you threatened Cheddar Mane and said you are going to come and rape his wife." J.A.II 1082-83.

The Deputy Director of the Missouri Department of Social Services Children's Division authenticated Mr. Cantwell's call about Mr. Lambert. J.A.I 177-78, 196; J.A.II 1074-81. She explained that although this type of call could lead to the removal of children from the home, an agent decided Mr. Cantwell's report did not require investigation. J.A.I 188-94. She said that although some callers are warned that malicious reporting can be a crime, Mr. Cantwell was not. J.A.I 195.

Mr. Cantwell testified in his own defense. He explained that the Bowl Patrol was more extreme and edgier than he was. J.A.II 770. He described how he broke with the Bowl Patrol and how its campaign of prank calls and harassment disrupted his show and business.[20] J.A.II 771-72, 781-92, 814-15. When Mr. Lambert entered the invitation-only chat room, Mr. Cantwell had just seen the anonymous messages Ms. Fry received, and he believed that she was being harassed by someone who knew she had taken pictures at Mr. Lambert's house. J.A.II 820-28.

---

[20] A sample of some of these calls was introduced as Exhibit B5-a. J.A.II 785-86, 1094.

During the charged chat, Mr. Lambert said ""Guess that means you [don't] care what happens to [Ms. Fry] either." J.A.II 1063-70. Mr. Cantwell said his statement about Mr. Lambert's wife and children was an angry retort to this threat. J.A.II 832-37. These comments were separate from his efforts to get Vic Mackey's personal information. J.A.II 855-57. He did not mean it as a threat, or expect it to be taken as such, but was trying to "say something profoundly unpleasant" to insult Mr. Lambert. J.A.II 855-57, 887. He described it as a ridiculous statement within the realm of fantasy violence that was meant to be "sick." J.A.II 911-18.

Mr. Cantwell gave the FBI much of the evidence that was used against him, including the recording of his call with Ms. Fry. J.A.II 879-86. He gave them this recording because the FBI had visited Ms. Fry, she was afraid to talk to them, and Mr. Cantwell wanted the agents to leave her alone. J.A.II 882-84. He said this call was the first time he had heard anyone characterize part of the conversation as a "rape threat," and that before the FBI visited her, Ms. Fry had not used that characterization. J.A.II 885-87.

Mr. Cantwell acknowledged that doxing carries the potential for violence, that he could have traveled to Mr. Lambert's house, and that he knew the possible consequences of calling child protective services. J.A.II

14

899-900, 911-12, 939-41. Mr. Cantwell did not "want to destroy Benjamin Lambert;" he "wanted to destroy Cheddar Mane." J.A.II 951.

After jury instructions and closing arguments, the jury convicted Mr. Cantwell of extortionate interstate communications and threatening interstate communications. J.A.II 1057. It acquitted him of cyberstalking. *Id.*

## IV.   Sentencing.

The PSR calculated that Mr. Cantwell was in criminal history category III and that his offense level was 20, yielding a Guidelines range of 41-51 months of incarceration. S.A. 21. The parties agreed that this calculation was correct. J.A.II 1112. The government asked for a high-end sentence of 51 months. J.A.II 1159. Mr. Cantwell urged a time-served sentence and argued for a downward departure because the criminal history category overrepresented the seriousness of that history and Mr. Lambert contributed to the offense by provoking the charged conduct. Dkt. 123 (citing §5K2.10); J.A.II 1112-13.

The district court adopted the PSR's calculation, denied a downward departure, and sentenced Mr. Cantwell to 41 months of incarceration on count 1 concurrent to 24 months on count 2, followed by 2 years of supervised release. J.A.II 1190-96.

15

## SUMMARY OF ARGUMENT

Part of Mr. Cantwell's defense was that his words would not have been understood as a threat within this extremist community. *See, e.g.*, J.A.I 154-65; J.A.II 1005-17. In closing, the government countered that members of the extremist community found his words threatening. J.A.II 996-97. In support, it cited the testimony of Mr. Lambert and his friend, Mr. Nehlen, as well as a recorded statement made by Ms. Fry. *Id.* Ms. Fry's statement was admissible only because it provided context for what Mr. Cantwell said; it was not admissible for its truth. The government improperly used her statement as though it was admissible for its truth—to show that Ms. Fry believed Mr. Cantwell had committed the crime charged in count 1. *Id.* This egregious misuse of hearsay was plain error.

Mr. Cantwell's defense also entailed describing the events that preceded this conversation, specifically Mr. Cantwell's ongoing harassment by Bowl Patrol members. *See, e.g.*, J.A.I 154-65; J.A.II 1005-17. This context was meant to rebut the elements of the offense—that he made threats and that he intended to extort. *Id.* Mr. Cantwell argued that the Bowl Patrol's provocation showed that the government could not prove its case. *Id.* He did not argue that this provocation meant that the jury could acquit him

16

even if it found that the government had proved the elements. Over Mr.

Cantwell's objection, the court told the jury that provocation was not a

defense. J.A.II 1045-46. This instruction had the tendency to confuse and

mislead the jury on issues at the heart of Mr. Cantwell's defense.

The history of the relationship between Mr. Cantwell and the Bowl

Patrol was also relevant at sentencing. Mr. Cantwell requested a

downward departure under §5K2.10 because Mr. Lambert's conduct

contributed to the offense by provoking the charged conduct. D.E. 123;

J.A.II 1113, 1156-57, 1191-93. The court denied this request and focused on

its conclusion that Mr. Lambert did not provoke Mr. Cantwell immediately

before the charged conduct. J.A.I 82-84. The district court abused its

discretion. Immediately before Mr. Cantwell made the statement about Mr.

Lambert's wife and children (which carried a significantly higher possible

sentence), Mr. Lambert threatened Mr. Cantwell's ex-girlfriend. J.A.II 1063-

70. Mr. Cantwell responded in kind, and the departure was appropriate.

## ARGUMENT

**I.  In its closing argument, the government plainly erred by improperly using hearsay evidence that was admissible only for context as though it had been admitted for its truth.**

One of the key figures at trial was Mr. Cantwell's ex-girlfriend, Katelyn Fry/Peach. She met Mr. Lambert in person, gave Mr. Cantwell his personal information and photographs, and Mr. Lambert threatened her in the charged chats. J.A.I 236, 265-66, 401-11; J.A.II 828-31. Ms. Fry did not testify, but the jury heard her voice. J.A.II 1082-89. Mr. Cantwell gave the FBI a recording of a conversation he had with Ms. Fry. J.A.I 278-81. The government introduced some of Mr. Cantwell's statements during this conversation as statements of a party opponent under Rule 801(d)(2). J.A.I 201-04. Ms. Fry's side of the conversation was included for context.[21]

The following exchange was part of one of the excerpts:

CC[22]: The only choices that I have are to go to law enforcement or to go to hunt this fucking assholes down and commit a crime myself. Those are the two choices that I have.
KF: How can you say that?

---

[21] Mr. Cantwell objected to the introduction of these excerpts under Rule 106. J.A.I 201-04, 266-69, 334-49. The court denied his request to introduce the entire call, but required the government to expand two of the excerpts. *Id*. Counsel did not otherwise object to the admission of these recordings.
[22] CC is Mr. Cantwell and KF is Ms. Fry.

CC: No, because, well because those are my two choices. I can say
that and I can say that to the fucking FBI. That's why I go to the FBI,
right? That's why I go to the government so that I don't have to
commit a crime. You know, it's not a matter of I think they are on my
side or not, it's these guys broke the law and the only remedy I have
is law enforcement.
KF: *Okay, but you threatened Cheddar Mane and said you are going to
come and rape his wife.*
CC: I didn't say I was going to go rape his wife, okay? I fucking left
that out there, okay?

J.A.II 1082-83 (emphasis added).

To prove count 1, the government had to prove that Mr. Cantwell

threatened to injure another and that he intended to extort. J.A.II 1039-40.

In closing, the government argued that the opinion of members of the

white nationalist community, including Ms. Fry, showed that Mr.

Cantwell's statements were threats. J.A.II 992-98; J.A.II 997 ("Mr. Cantwell

also wants you to believe that this is just the way these two talk to each

other, this is normal within their community."). It noted that Ms. Fry was

"someone he trusts, someone he asks to marry him, someone he confides

in," and then played Exhibit 105. J.A.II 997, 1082-83. Immediately after

playing it, the prosecutor said:

But you've heard from people within that community. Both Ben
Lambert and Paul Nehlen testified about this. They talk about
violence generally, there's no denying that, but going after someone's
spouse crosses a line, and you know, based on Mr. Cantwell's

19

reaction after making these statements, that this crossed a line even in their community. He told you he became worried after his tech, Ryan, told him not to blackmail people. *And then you've heard Ms. Fry's reaction to it.* People within his own community thought that this crossed the line.

*Id.* (emphasis added).

This argument improperly treated Ms. Fry's statements as though they were admitted for their truth—to show that Ms. Fry viewed Mr. Cantwell's messages as a rape threat. However, her statements were not admissible for their truth, and the government could not argue that this call was evidence of what Ms. Fry thought about whether Mr. Cantwell made the threat charged in count 1. Mr. Cantwell did not object to the government's closing, but the use of these hearsay statements from a non-testifying witness constitutes plain error, and this Court should vacate Mr. Cantwell's conviction on count 1.

### A.    The standard of review.

Mr. Cantwell did not object to the government's closing, so this claim is subject to plain-error review. *United States v. Pérez-Vásquez*, 6 F.4th 180, 201 (1st Cir. 2021). To establish plain error, he must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness,

20

integrity, or public reputation of judicial proceedings." *United States v. Pérez-Rodríguez*, 13 F4th 1, 16 (1st Cir. 2021) (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001)). Error is the "'[d]eviation from a legal rule.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 725 (1993)). The error must be "clear or obvious," *Rosales-Mireles v. United States*, --- U.S. ---, 138 S. Ct. 1897, 1904 (2018). "To establish the third prong, the appellant must show that 'it is reasonably probable that the…error affected the result of the proceedings.'" *Pérez-Rodríguez*, 13 F.4th at 16 (quoting *United States v. Latorre-Cacho*, 874 F.3d 299, 303 (1st Cir. 2017)). The final prong implicates the "fundamental concern with 'the public legitimacy of our justice system….'" *Id.* (quoting *Rosales-Mireles* 138 S.Ct. at 1908).

In the context of plain error in closing, this Court "must determine 'whether the challenged comment [was] obviously improper,' and, if so, 'whether the comment "so poisoned the well that the trial's outcome was likely affected."'" *Pérez-Vásquez*, 6 F.4th at 201 (quoting *United States v. Walker-Couvertier*, 860 F.3d 1, 10 (1st Cir. 2017) (quoting *United States v. Mejia-Lozano*, 829 F.2d 268, 274 (1st Cir. 1987))). It considers: "'"(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred;

21

(3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants."'" *Id.* (quoting *United States v. Belanger*, 890 F.3d 13, 34 (1st Cir. 2018) (quoting *United States v. Wihbey*, 75 F.3d 761, 772 (1st Cir. 1996))).

### B.    Ms. Fry's statements were not admissible for their truth.

The government introduced Mr. Cantwell's side of this conversation as non-hearsay statements of a party opponent under Rule 801(d)(2). J.A.I 204. This rule enabled the government to introduce Mr. Cantwell's own out-of-court statements against him. Fed. R. Evid. 801(d)(2). It did not permit the admission of Ms. Fry's statements. When the government offers a conversation between the defendant and a non-party, the non-party's statements are not admissible for their truth, but can be introduced as "'reciprocal and integrated utterance(s)'" to contextualize the party-opponent's words. *See Pérez-Vásquez*, 6 F.4th at 197-98 (quoting *United States v. Walker*, 434 F.3d 30, 33-34 (1st Cir. 2006) (admitting cooperating witness's statements because they "had a nonhearsay purpose—namely, they were offered not for the truth of the matter asserted, but to provide context for" defendant's admissions)).

At trial there was no discussion about why Ms. Fry's statements were admissible. However, there is no reason to believe that her statements were admissible for any reason other than to provide context for Mr. Cantwell's statements. There is no hearsay exception that would permit their admission for their truth. *See* Fed. R. Evid. 801, 803, 804, 807. It does not matter that the jury was not instructed that Ms. Fry's words were admitted for a limited purpose. *Cf. United States v. Rodriguez*, 759 F.3d 113, 121-22 (1st Cir. 2014) (noting that defense may have strategic reasons not to request limiting instruction). The absence of a limiting instruction does not convert a hearsay statement into non-hearsay that can be considered for its truth. Ms. Fry's statements were not admissible for their truth.

### C.    The government's closing improperly treated Ms. Fry's statements as though they were admissible for their truth.

In closing, the government treated Ms. Fry's statements as if they had been introduced for their truth. It argued that the language Mr. Cantwell used was a threat, not normal sparring within the white nationalist community. J.A.II 992-98. In support, it played Mr. Cantwell and Ms. Fry's conversation. J.A.II 997. It argued that "[p]eople within his own

community thought that this crossed the line," and cited Mr. Lambert's and Mr. Nehlen's testimony as well as Ms. Fry's recorded statement. *Id.*

Mr. Lambert and Mr. Nehlen testified about their perception of Mr. Cantwell's statements. J.A.I 447, 454-56; J.A.II 687-89. Ms. Fry did not testify. The government's closing rests on the understanding that when Ms. Fry said "you threatened Cheddar Mane and said you are going to come and rape his wife," she had read Mr. Cantwell's words and believed that they constituted a rape threat. J.A.II 1082-83. This argument assumes the truth of her statement, which was not admissible. There was no evidence of Ms. Fry's beliefs, and the government impermissibly asked the jury to make inferences from hearsay that was not admissible for its truth.

Mr. Lambert and Mr. Nehlen were government witnesses with potential biases against Mr. Cantwell. J.A.I 516-18, 549-50, 561, 568; J.A.II 635-40, 693-99. Ms. Fry, as the government reminded the jurors immediately before playing the recording, was someone Mr. Cantwell "trusts, someone he asks to marry him, someone he confides in." J.A.II 997. The government improperly used Ms. Fry's hearsay statements to argue that even Mr. Cantwell's friends believed his conduct was criminal.

**D.    The government's impermissible use of Ms. Fry's statements was plain error that likely affected the outcome of trial.**

The government's improper closing constitutes plain error. The four factors articulated in *Pérez-Vásquez* favor relief for Mr. Cantwell. *See* 6 F.4th at 201. This error was severe and deliberate. The rule that out-of-court statements cannot be admitted for their truth absent an exception is fundamental. Fed. R. Evid. 802. Ms. Fry's statements were not admissible for their truth, and the government erred by using them for that purpose. *See Walker-Couvertier*, 860 F.3d at 10 ("It is elementary that cases should be tried and decided based on the evidence before the jury…."); *United States v. Fernandez*, 94 F.3d 640, *8 (1st Cir. 1996) (unpublished) (concluding prosecutor erred in closing by using hearsay evidence admitted for limited purpose as though it was admitted for its truth); *see also United States v. Smith*, 982 F.2d 681, 683 (1st Cir. 1993) ("[I]t is plainly improper for a prosecutor to imply reliance on knowledge or evidence not available to the jury….").

Trial rulings reinforced the bedrock principle that Ms. Fry's opinion was inadmissible for its truth. Shortly before giving the closing argument, one of the prosecutors asked Mr. Cantwell about Ms. Fry's opinion of the

alleged rape threat. J.A.II 922-24. After establishing that Ms. Fry was part of Mr. Cantwell's "inner circle" and involved in the white nationalist community, the prosecutor asked: "And she viewed this as a rape threat?" *Id.* The judge sustained Mr. Cantwell's objection. *Id.*

The overall context of the case also supports Mr. Cantwell's claim. The government repeatedly tried to insert the hearsay opinion of a non-testifying witness to show that even Mr. Cantwell's friends thought that he had crossed the line—first by asking Mr. Cantwell about her opinion and then by using her statement improperly in closing. J.A.II 922-24, 997. It knew that Ms. Fry's statement was not admissible for anything other than contextualizing Mr. Cantwell's statements, and its use of her words in closing was an egregious impropriety. *See* J.A.II 922-24.

There was no curative instruction about Ms. Fry's statements or the prosecutor's use of them during closing. The court's general instructions that arguments are not evidence and that the jurors' memory of the evidence controlled were not sufficient to address this impropriety. J.A.II 1032-33. The hearsay rules are routine for lawyers but unfamiliar to jurors, and without instructions the jury had no way to know that the government asked them to do something impermissible.

Finally, the case against Mr. Cantwell was not overwhelming. The facts were mostly undisputed. The dispute concerned Mr. Cantwell's intent and how his statements would have been understood within this fringe community. Mr. Lambert testified that he believed this was a threat, J.A.I 447-49, but there was contrary evidence. Mr. Lambert had been party to jokes about rape. J.A.I 503-07; J.A.II 1099-100. He did not report the conversation with Mr. Cantwell to the authorities, and he warned his wife about the potential for a child protective services investigation, but not the purported threats to her personally. J.A.I 474-75, 563. A few days after the conversation, Mr. Lambert dismissed it as a "pathetic dox," and said he was "[s]till waiting for [child protective services] to show up so we can have a good laugh and glass of lemonade together." J.A.II 1097-98. Mr. Cantwell testified about his intent and his understanding of his words. J.A.II 832-37, 855-57, 887, 911-18. The government tried to use Ms. Fry's hearsay statement to address these contested issues on which evidence was not overwhelming.

Mr. Cantwell also meets the traditional plain-error standard. *Pérez-Rodríguez*, 13 F.4th at 16. As discussed above, the government's use of

27

hearsay evidence for its truth was clear error. The statements were "obviously improper." *See Pérez-Vásquez*, 6 F.4th at 201.

Whether the standard is phrased as requiring a showing that the prosecutor's remark likely affected the outcome or that it was reasonably probable the error affected the outcome, Mr. Cantwell can show that the error had the required impact on his conviction on count 1. *See Pérez-Vásquez*, 6 F.4th at 201; *Pérez-Rodríguez*, 13 F.4th at 16. The government used Ms. Fry's statement to suggest that even someone close to Mr. Cantwell thought he made a criminal threat. J.A. 997. Ms. Fry did not testify and could not be questioned about what she meant or what she thought about the charged conduct. The defense centered on Mr. Cantwell's intent and on the likely understanding of his words within the context of this extremist community. *See, e.g.*, J.A.I 154-55, 159-60, 525; J.A.II 976-77, 1007-08. Implying that Ms. Fry agreed that the conduct charged in count 1 was a rape threat was an important part of the government's argument, and there was a likelihood and a reasonable probability that the error affected the outcome as to that count.

The error seriously impaired the fairness of the judicial process. The Sixth Amendment right of a defendant to confront the witnesses against

28

him is a "bedrock procedural right." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). Ms. Fry did not testify, and her words were introduced for context. Mr. Cantwell had no opportunity to ask her what she meant or thought. Nonetheless, the government represented to the jury that Ms. Fry, a close confidant of Mr. Cantwell, believed that he committed the charged crime. J.A. 997. The government knew that her statement was not admissible for its truth, and its use of her statement in closing was plain error that seriously impacted the fairness of this proceeding.

The government's closing argument was plain error that likely impacted the outcome of trial. This Court should vacate Mr. Cantwell's conviction on count 1.

## II.    The district court erred by instructing the jury that provocation was not a defense.

Mr. Cantwell's defense was that given the context of his interactions with Mr. Lambert and the norms of their extremist community, the government could not prove the essential element of intent—that he intended to extort or threatened to injure a person or reputation. *See, e.g.*, J.A.I 154-55, 159-60, 525; J.A.II 976-77, 1007-08. Part of that context was his ongoing harassment by Bowl Patrol members, including Mr. Lambert. *See,*

*e.g.*, J.A.I 154-59; J.A.II 1017. Also relevant was the violent and extremist rhetoric used by this community. *See, e.g.*, J.A.I 165; J.A.II 1007-08, 1010-11. In opening, counsel argued that Mr. Cantwell did not "seriously threaten to injure" or intend to extort and that "His intent was simple. Leave me alone." J.A.I 154. Counsel argued that Mr. Cantwell and Mr. Lambert were engaged in "bluster and exaggeration and mutual linguistic combat," and that no "true threat to injure or rape" was made. J.A.I 159.

After opening, the court stated that it needed to instruct the jury that "provocation is not a defense" (an "anti-provocation" instruction), J.A.I 268, 310-11, 318, and the government requested such an instruction.[23] D.E. 107. Throughout trial, the court reiterated that the defense's arguments necessitated this instruction. *See, e.g.*, J.A.I 268, 310, 318-23, 341-42; J.A.II 616, 825. The defense affirmed that it was arguing that the context negated the elements, not raising a provocation defense. J.A.I 318, 323. In closing, counsel repeated the argument that Mr. Cantwell did not have the necessary intent and highlighted the "unhealthy and abnormal" online space these men inhabited. J.A.II 1005-08.

---

[23] The court and government were aware of this defense before trial. J.A.I 56, 74-78.

The court explained its belief that an anti-provocation instruction was

necessary:

> But why I needed to do a provocation charge became apparent
> to me in the opening statement, when the defendant made an
> opening statement that was obviously crafted as a direct appeal to a
> non-existent provocation defense, and at that point the jury would
> have been impossibly confused if I were to instruct without giving
> any kind of provocation instruction.
> The need for it became even more apparent when the
> defendant insisted on the introduction of evidence, over the
> government's objection, that was minimally relevant for any other
> purpose than provocation but that directly addressed a potential
> provocation defense. I nevertheless erred on the side of caution and
> admitted that evidence, because I've always been sensitive to the
> need to allow the defendant a full and fair opportunity to develop
> context evidence. But because I did that, and because that evidence
> that otherwise wouldn't have been admissible but for the defendant's
> insistence in its minimal relevance for a legitimate purpose, it also
> carried with it a potential for an improper purpose, and so I have to
> give this instruction over the defendant's objection.

J.A.II 986.

Over Mr. Cantwell's objection, the court gave this instruction:

> You have heard evidence that Victim 1 and others have
> engaged in behavior that disrupted the defendant's live call-in radio
> show. You have also heard evidence that Vic Mackey or others may
> have engaged in behavior that disrupted the defendant's website.
> You may consider such evidence for the purpose of understanding all
> of the circumstances surrounding the making of the communications
> at issue in this case, including, for example, the language, specificity
> and frequency of the communications, the context surrounding the
> communications, the relationship between the defendant and Victim
> 1, Victim 1's response, any previous communications between the

31

defendant and Victim 1 and whether you believe the person making the communication was serious, as distinguished from mere idle and careless talk, exaggeration or something said in a joking manner. You may not consider this evidence for any other purpose.

Remember, the defendant cannot be found guilty of any charge unless the government proves every element of the charge beyond a reasonable doubt. That burden never switches to the defendant. If, however, the government proves every element of a charge beyond a reasonable doubt, evidence of provocation, justification or self defense does not negate the defendant's criminal culpability with respect to that charge.

J.A.II 1045-46. Before and after the court gave this instruction, Mr. Cantwell objected to its inclusion. J.A.II 957, 971-80, 985-88, 1049.

This instruction tended to confuse and mislead the jury and impaired Mr. Cantwell's constitutional right to present a defense. *See* U.S. Const. Amend. V & VI. The court abused its discretion by giving this instruction, and this Court should vacate Mr. Cantwell's convictions and remand for a new trial.

### A.    Standard of Review

This Court reviews preserved claims of instructional error under a two-tiered standard: it considers "'de novo whether an instruction embodied an error of law,'" and "for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'" *United States v.*

32

*Georgiadis*, 819 F.3d 4, 16 (1st Cir. 2016) (quoting *United States v. Symonevich*, 688 F.3d 12, 24 (1st Cir. 2012)). Instructional errors must be prejudicial, but the government bears the burden of showing that the error was harmless. *United States v. Jadlowe*, 628 F.3d 1, 21-22 (1st Cir. 2010). In this harmlessness inquiry, this Court considers the "evidence as a whole and not in the light most favorable to the government." *United States v. Prigmore*, 243 F.3d 1, 4 (1st Cir. 2001). This instruction tended to confuse or mislead the jury on a key part of Mr. Cantwell's defense, and its inclusion was prejudicial.

Mr. Cantwell preserved this argument. *See Pérez-Rodríguez*, 13 F.4th at 16, 32-35. The charge conference was off the record. J.A.II 957. The next morning, Mr. Cantwell reiterated his objection to the anti-provocation instruction. J.A.II 957, 971-81. He stated that the instruction "doesn't define provocation" or "defense," and is "confusing" and "misleading as to the correct standard of the law or at least does not adequately inform the jury on the law." J.A.II 971. The court acknowledged that Mr. Cantwell preserved the "argument that there should be no word about provocation in the instructions," but ordered him to propose a "better" instruction. J.A.II 971-81. Counsel complied with the order by suggesting changes to the anti-provocation instruction. D.E. 115; J.A.II 985-89, 1104-09. The court

33

recognized that Mr. Cantwell maintained his objection to the inclusion of an anti-provocation instruction. J.A.II 985-89, 1049. After instructing the jury, the court said: "I want to note for the record that the defendant has objected to my provocation instruction. The defendant has argued that, even with the suggested changes, that I should not give any provocation instruction, and that objection is preserved for the purposes of appeal." J.A.II 1049. Mr. Cantwell said he had no "other objections." *Id.*

**B.    The anti-provocation instruction tended to confuse and mislead the jury and impaired Mr. Cantwell's constitutional right to present a defense.**

In a non-legal context, "to provoke" can mean "to call forth," "to stir up purposely," or "to incite to anger." *See* Merriam-Webster Online Dictionary, available at merriam-webster.com/dictionary/provoke. In this sense, this case involved provocative conduct. Mr. Cantwell and Mr. Lambert acknowledged that they deliberately said provocative things to each other and on white nationalist internet platforms. *See, e.g.,* J.A.I 538-39, 584-85; J.A.II 645, 765-66, 833-35, 911-19. Bowl Patrol members tried to provoke Mr. Cantwell by prank calling his show and tampering with his website. J.A.I 538-39. The defense argued that given this context, Mr. Cantwell did not threaten to injure or intend to extort. *See, e.g.*, J.A.I 154-55,

34

159-60, 525; J.A.II 976-77, 1007-08, 1017. It argued that this community used such extreme rhetoric that its members would not have viewed Mr. Cantwell's words as a threat. It argued that Mr. Cantwell did not intend to extort, but was reacting to and trying to end the Bowl Patrol's harassment.

"Provocation" can also be a legal term of art. Legal provocation is a variation of a justification defense like self-defense, duress, and necessity. *See United States v. Leahy*, 473 F.3d 401, 405-09 (1st Cir. 2007) (noting "confusion over nomenclature" related to these common law defenses (at 406) and that "different factual scenarios may require variations in the phrasing" of justification defense standard (at 409)); *see also* J.A.I 74 (prosecutor saying provocation is not "admissible affirmative defense" in this case). These affirmative defenses do not "disprove any element of the charged crime;" they excuse the commission of a crime even if the elements have been met. *Leahy*, 473 F.3d at 408. To prevail on one of these defenses, the defendant must show, inter alia and to a preponderance, that he faced an "unlawful and imminent threat" of "death or serious bodily injury" and "had no reasonable, legal alternative." *United States v. Dixon*, 548 U.S. 1, 4-5, n.2 (2006); *see Leahy*, 473 F.3d at 409 (adopting framework from *Dixon*).

35

Mr. Cantwell did not present a provocation-based justification defense or other affirmative defense. J.A.I 318, 323. He did not argue that if the jury found all the elements against him, it could still acquit him because he was provoked. Instead, Mr. Cantwell argued that the context of this case, which included provocation in the non-legal sense, negated the elements. *See, e.g.*, J.A.I 154-55, 159-60, 525; J.A.II 976-77, 1007-08, 1017. This Court has recognized the difference between these approaches. In *Leahy*, this Court held that a defendant charged with being a felon in possession could raise a justification defense, and that he carried the burden of proving such a defense by a preponderance. 473 F.3d at 409. The Court included a caveat:

> [T]his holding is limited to justification defenses that do not go to the elements of the felon-in-possession offense. We leave open the possibility that a defense within the rubric of justification might negate an element of the felon-in-possession offense. In that event, the burden of disproving the defense would rest on the prosecution.

*Id.*

Mr. Cantwell had a Constitutional right to present a defense. *United States v. DeCologero*, 530 F.3d 36, 72 (1st Cir. 2008) ("'Whether rooted directly in the Due Process Clause of the [Fifth] Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the

36

Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)))). He articulated this defense in opening and closing, J.A. 154-65, 1005-17, and the court understood it. *See, e.g.*, J.A. 977 ("His anger is not a defense. It doesn't undermine the charge, but the context in which this entire communication occurred, including Mr. Cantwell's anger, should be considered by the jury in determining whether a person in the position of the victim would reasonably understand the communications at issue to be qualifying communications.").[24] His defense was that, given the context of these communications and white nationalist community, the government

---

[24] The court said it did not understand Mr. Cantwell's defense and could only articulate it at the end of trial. J.A.II 975-77. However, the court summarized the defense pretrial. J.A.I 56 ("[Y]our kind of principal legal defense is, when you learn the context in which this was made you will see that the defendant did not commit a crime either because the communications are not ones that can be criminal, the acts, his spoken acts are not criminal, or the defendant did not have a criminal intent, or some combination of the two."); J.A.I 77 ("[The] defense is that when you understand the context in which Mr. Cantwell made the statements that are attributed to him, it will become clear that Mr. Cantwell was not trying to extort, was not trying to threaten, that in context the jury will understand that these communications were not made with criminal intent.").

could not meet its burden of proving that he made threats or intended to extort. *See, e.g.*, J.A.I 154-55, 159-60, 525; J.A.II 976-77, 1007-08, 1017.

The court's instruction tended to confuse and mislead the jury on this central defense theory. The challenged instruction reiterated the government's burden and stated that evidence of provocation was admissible for some purposes. J.A.II 1045-46. However, it also said that evidence of provocation could not "negate" guilt. *Id.* Essentially, the court instructed that despite the evidence of "provocation" in the non-legal sense, no affirmative justification defense had been presented. This message was unnecessary, confusing, and misleading. Mr. Cantwell did not suggest that evidence of provocation "negated" culpability, that the jury could acquit him even if the government proved all the elements, or that the provocation evidence was meant for anything other than context. The court needlessly inserted the specter of an affirmative provocation defense into this case, tending to mislead the jury as to the validity of Mr. Cantwell's central defense. The government repeated this misleading message in its rebuttal closing. J.A.II 1025-27 ("I want to emphasize one other thing, and that is that provocation is not a defense.").

38

Cases discussing theory of defense instructions are instructive. This Court has held that a defendant is entitled to a theory of defense instruction if the theory is "valid" and supported by record evidence. *United States v. Peake*, 804 F.3d 81, 98 (1st Cir. 2015); *United States v. Baird*, 712 F.3d 623, 627 (1st Cir. 2013). Mr. Cantwell did not request a theory of defense instruction. However, his objection to the anti-provocation instruction was based on a similar principle: he did not want the court to give an instruction that tended to negate his valid, evidence-based defense. The court's decision to give this instruction despite his objection was error.

Mr. Cantwell did not ask the jury to nullify or to apply an impermissible affirmative defense. *Contrast United States v. Sepulveda*, 15 F.3d 1161, 1189 (1st Cir. 1993) (counsel told jury to "send out a question" about nullification). He presented a valid defense arguing that the government had not met its burden, and the court's instructions branded this defense as improper. His defense included explaining that the Bowl Patrol had been harassing him. He did not argue that these circumstances justified criminal conduct, but rather that they negated elements of the offense. The court's anti-provocation instruction was unnecessary and did not clarify the law of the case. *Cf. Prigmore*, 243 F.3d at 17 ("[I]n some

39

instances, attempts to clarify inherently nebulous concepts can do more harm than good."). Instead, it tended to confuse and mislead the jury as to how and why they could consider the provocation that was part of the context at the heart of Mr. Cantwell's defense.

By tending to negate a central aspect of Mr. Cantwell's defense, the instruction infringed on his constitutional rights and prejudiced him. *See Baird*, 712 F.3d at 633 (finding court impaired defendant's ability to present a defense where it refused to give instruction encapsulating "only case he put on"); *United States v. Montañez*, 105 F.3d 36, 39-40 (1st Cir. 1997) (finding failure to give entrapment instruction impaired defendant's ability to present a defense where his "only realistic hope of acquittal" hinged on showing improper inducement). This Court should vacate his convictions and remand for a new trial.

## III.    The district court erred by not granting a downward departure based on §5K2.10.

The PSR calculated that Mr. Cantwell was in criminal history category III and that his offense level was 20, yielding a Guidelines range of 41-51 months of incarceration. S.A. 21. Mr. Cantwell accepted this calculation. J.A.II 1112. He argued that a below-Guidelines sentence was

40

appropriate because his criminal history category overrepresented the

seriousness of that history and he deserved a downward departure under

§5K2.10, which states:

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:
>
>> **(1)** The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.
>> **(2)** The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.
>> **(3)** The danger reasonably perceived by the defendant, including the victim's reputation for violence.
>> **(4)** The danger actually presented to the defendant by the victim.
>> **(5)** Any other relevant conduct by the victim that substantially contributed to the danger presented.
>> **(6)** The proportionality and reasonableness of the defendant's response to the victim's provocation.
>
> Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses. There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

U.S.S.G. §5K2.10.

The court sentenced him to 41 months. J.A.II 1190. It explained that although the threats were "horrendous," it applied the bottom of the range. J.A.II 1191. The court agreed that Bowl Patrol members, including Mr. Lambert, "were trying to drive [Mr. Cantwell] crazy," "deprive him of his ability to earn a living," and "disrupt his program." *Id.* The court agreed that Mr. Lambert's statements during the chat "impl[ied] a threat against" Ms. Fry. J.A.II 1192. However, it concluded that the departure was inappropriate because "the immediate incident" was not "precipitated by any provocation by" Mr. Lambert. J.A.II 1191-93.

## A.    Standard of review.

This Court "reviews the reasonableness of a sentence 'under a deferential abuse-of-discretion standard.'" *United States v. Battle*, 637 F.3d 44, 50-51 (1st Cir. 2011). It determines whether the sentencing court made any procedural errors before considering whether the sentence was substantively reasonable. *Id.* "Under the advisory guidelines, discretionary refusals to vary or depart are open to reasonableness review in accordance with an abuse of discretion standard." *United States v. Maguire*, 752 F.3d 1, 7 (1st Cir. 2014).

42

**B.    Provocation was sufficient to merit downward departure.**

Section 5K2.10 applies most clearly to a situation in which a defendant used physical force against a victim who also used physical force against the defendant. The listed factors contemplate reciprocal or mutual physical violence. §5K2.10. However, the rule acknowledges that the departure may be appropriate in cases that do not involve physical force or violence. *Id.* It should have been applied here.

The court's refusal to grant this departure hinged on its belief that Mr. Lambert did not provoke Mr. Cantwell immediately before the charged conversation. This perspective is too narrow. The rule contemplates that non-violent conduct may merit its application where "an extended course of provocation and harassment" led to the defendant's conduct. *Id.* That is what happened here. Bowl Patrol members, including Mr. Lambert, had been harassing Mr. Cantwell for months. S.A. 4-5. This harassment included conduct that made Mr. Cantwell believe that Ms. Fry was in danger. J.A.II 1192. He tried to stop this harassment—by going to the FBI, to the local police, and by blocking the prank calls. J.A.I 224-26, 287-88, 290-91; J.A.II 789-92, 1101-02. Mr. Lambert's appearance in Mr. Cantwell's private chatroom cannot be separated from this context.

43

The §5K2.10 departure is particularly appropriate in connection with the alleged rape threat. Without the conviction for extortionate interstate communications, Mr. Cantwell was only subject to a maximum penalty of 2 years imprisonment. S.A. 1. Mr. Cantwell made the statement charged as a rape threat in response to Mr. Lambert's threatening Ms. Fry. J.A.II 832-37, 855-57, 1063-70, 1192. This threat to Ms. Fry came after months of ongoing harassment in which Mr. Lambert had participated. S.A. 4. Mr. Lambert made this statement the same day that Mr. Cantwell learned about anonymous threats to Ms. Fry that seemed related to her visit to Mr. Lambert's house. J.A.II 1148-58; D.E. 123 at 9-10. Mr. Lambert's threat to Ms. Fry during the charged conversation was immediate provocation. Mr. Cantwell's response was more explicit and offensive, but he responded to a threat to someone he loved with a threat to someone Mr. Lambert loved. They were interacting over the internet, making physical characteristics irrelevant. Further, Mr. Cantwell had tried to end the harassment many times before this conversation. J.A.I 224-26, 287-88, 290-91; J.A.II 789-92, 1001-02. These circumstances merited the §5K2.10 departure. The district court abused its discretion by refusing to apply it. This Court should vacate Mr. Cantwell's sentence.

44

## CONCLUSION

For the foregoing reasons, Mr. Cantwell asks this Court to vacate his conviction on count 1 or counts 1 and 2 and to remand for a new trial. He also asks this Court to vacate his sentence and remand for resentencing.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: October 29, 2021

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      32(a)(7)(B) because:

            this brief contains 9,595 words, excluding the parts of the brief
            exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
      because:

            this brief has been prepared in a proportionally spaced typeface
            using Microsoft Word and 14-point Book Antiqua font.

                              */s/ Christine DeMaso*
                              Christine DeMaso

                              Attorney for Christopher Cantwell

                              Dated: October 29, 2021

46

**CERTIFICATE OF SERVICE**

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Seth R. Aframe, John Staige Davis, and Anna Z. Krasinski, as identified on the Notice of Electronic Filing on October 29, 2021.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

## ADDENDUM – TABLE OF CONTENTS

Excerpt from Jury Trial Transcript—
   Government's Closing Argument (9/25/20) ................................Add. 1

Excerpts from Jury Trial Transcript—
   Jury Instructions (9/25/20) .............................................................Add. 5

Excerpt from Sentencing Hearing Transcript (2/24/21) .....................Add. 14

Judgment ....................................................................................................Add. 21

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE
 2

 3    * * * * * * * * * * * * * * * * * *
                                        *
 4    UNITED STATES OF AMERICA          *
                                        *
 5                                      *  No. 1:20-cr-00006-PB
                   v.                   *  September 25, 2020
 6                                      *  1:15 p.m.
                                        *
 7    CHRISTOPHER CANTWELL,             *
                                        *
 8                    Defendant.        *

 9    * * * * * * * * * * * * * * * * * *

10

11      TRANSCRIPT OF DAY FOUR OF JURY TRIAL - AFTERNOON SESSION

12           BEFORE THE HONORABLE PAUL J. BARBADORO

12

13
      APPEARANCES:
14

15    For the Government:      AUSA John S. Davis
                               AUSA Anna Z. Krasinski, Esq.
16                             U.S. Attorney's Office

17    For the Defendant:       Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
18                             Federal Defender Office

19

20    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
21                             United States District Court
                               55 Pleasant Street
22                             Concord, NH 03301
                               (603) 225-1454
23

24

25
```

1    defendant who's now been charged with a threat.  He has nowhere

2    else to go but to try to dismiss this as fanciful.  But here's

3    where it's not.  It's focused on a specific individual, it's

4    coupled with threats that Mr. Cantwell actually carried out,

5    and it's coupled with a demand for something:  Give me Vic,

6    it's your only out.

7            And as you're thinking about whether or not he

8    intended this statement to reflect violence, think about his

9    previous statements on doxing, that it's helpful to think of

10    doxing as a form of violence.  Do you really think that he

11    intended his threat to dox, to convey some sort of form of

12    violence, but he didn't intend for this statement to convey a

13    form of violence?  No.  That's not plausible.  He testified

14    that he has two incel listeners, and he testified that they're

15    pathetic.  He's trying to make his later statements, that, One

16    of my incel listeners would love to give her a baby, somehow is

17    less ominous than it really was.  And then he told you, Well, I

18    only thought incel listeners were dangerous sometime after I

19    sent this exchange.  But then you heard that well before this

20    exchange he had written an article about a number of people

21    that were identified as mass murderers and were incels.

22            The statements weren't a joke.  There's zero

23    entertainment value.  There's no audience.  It's not idle talk.

24    He carried out some of his threats.  It's not a political

25    statement, it's not exaggeration.  It was designed and planned

**Add. 2**

1   to get something, to get Vic's information.

2        And think back to Mr. Cantwell's testimony.  Think

3   back to what he said about Katelen Fry.  This is someone he

4   trusts, someone he asks to marry him, someone he confides in,

5   and he tells her about what he meant, and we're going to play a

6   portion of Government's 105.

7                    (Audio recording played)

8        MS. KRASINSKI:  I left that out there.  I didn't say

9   it; I implied it.  Mr. Cantwell also wants you to believe that

10  this is just the way these two talk to each other, this is

11  normal within their community.  But you've heard from people

12  within that community.  Both Ben Lambert and Paul Nehlen

13  testified about this.  They talk about violence generally,

14  there's no denying that, but going after someone's spouse

15  crosses a line, and you know, based on Mr. Cantwell's reaction

16  after making these statements, that this crossed a line even in

17  their community.  He told you he became worried after his tech,

18  Ryan, told him not to blackmail people.  And then you've heard

19  Ms. Fry's reaction to it.  People within his own community

20  thought that this crossed the line.

21       And you know that trash talk is normal in certain

22  contexts.  For example, trash talk is normal in sports, right?

23  Michael Jordan trash-talked Patrick Ewing in the Nicks, but he

24  didn't say, Throw the next game or I'll fuck your wife.

25  There's a difference.  And you have all of the communications.

**Add. 3**

1    You can see the foul words that they sling back and forth at
2    each other, but there is nothing between these two people when
3    they're talking that comes close to this threat of sexual
4    violence.

5         Now, I want to be clear, in America everybody has the
6    right to their beliefs, even despicable beliefs.  We have a
7    First Amendment, and for better or worse people have the right
8    to express reprehensible beliefs.  There's a difference to
9    making appalling, racist statements on a podcast no matter how
10   offensive and private threats issued with the purpose of
11   getting something.

12        Now, I'm not here to condone Ben Lambert's involvement
13   in the Bowl Patrol, I'm not here to condone his personal
14   beliefs, but even people who believe or say appalling things
15   can be victims of crime, and the fact that Ben Lambert
16   expressed these beliefs under a pseudonym is what made him the
17   target.  It's precisely why Mr. Cantwell chose him as a victim.
18   It's why Mr. Cantwell believed Ben Lambert could give him what
19   he wanted.  Mr. Cantwell wasn't going to be able to get Vic
20   Mackey's identity from a Boy Scout; he could only get Vic
21   Mackey's identity from someone else within the Bowl Patrol.
22   And the fact that Ben Lambert used a pseudonym, that's what
23   gave Mr. Cantwell leverage, especially because Chris Cantwell
24   knew that Ben Lambert had a family, had kids and had something
25   to lose.

**Add. 4**

1                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    *  No. 1:20-cr-00006-PB
                    v.               *  September 25, 2020
6                                    *  1:15 p.m.
                                     *
7    CHRISTOPHER CANTWELL,           *
                                     *
8                    Defendant.      *

9    * * * * * * * * * * * * * * * * *

10

      TRANSCRIPT OF DAY FOUR OF JURY TRIAL - AFTERNOON SESSION
11
            BEFORE THE HONORABLE PAUL J. BARBADORO
12

13
     APPEARANCES:
14

15   For the Government:        AUSA John S. Davis
                                AUSA Anna Z. Krasinski, Esq.
16                              U.S. Attorney's Office

17   For the Defendant:         Eric Wolpin, Esq.
                                Jeffrey S. Levin, Esq.
18                              Federal Defender Office

19

20   Court Reporter:            Brenda K. Hancock, RMR, CRR
                                Official Court Reporter
21                              United States District Court
                                55 Pleasant Street
22                              Concord, NH 03301
                                (603) 225-1454
23

24

25

# Add. 5

2

1                              I  N  D  E  X

2                                                          Page
3    Closing Argument By Ms. Krasinski.........8
     Closing Argument by Mr. Wolpin............23
4    Rebuttal Closing Argument by Mr. Davis....36
     Jury Charge...............................45
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Add. 6**

3

```
 1                  P R O C E E D I N G S

 2            THE CLERK:  All rise for the Honorable Court.

 3            THE COURT:  First, the defendant has a categorical

 4    objection to any instruction on provocation.  I understand that

 5    objection.  Let me briefly explain why I feel compelled to give

 6    an instruction on the concept of provocation.

 7            As I've noted, I've struggled during the course of

 8    pretrial preparation to understand the defendant's defense.

 9    I've repeatedly inquired of defense counsel to ask them to

10    explain the defense so that I could prepare properly.  I worked

11    hard to develop a proposed charge that I submitted to the

12    parties well in advance of the trial.  I made clear to them

13    when I thought a provocation defense would be needed I believe

14    on the first day of trial, once I heard their opening

15    statement.  I submitted a proposed provocation charge which

16    came from the government because the defendant didn't submit

17    any alternative charge.

18            I then met with counsel at about 5:00 last night and

19    heard proposed changes to the entire charge, including the

20    provocation charge.  I made certain changes to the provocation

21    charge at the defendant's request.

22            I showed up at 8:10 this morning, and I had delivered

23    the proposed charge to defense counsel as modified at 8:00.  I

24    came down and talked to the parties about the proposed charge

25    this morning.
```

**Add. 7**

1          It is, frankly, a little bit frustrating for me to be

2     forced to delay the jury while we continue to evaluate an issue

3     that, frankly, should have been resolved long ago, given the

4     many opportunities I have given counsel to present this issue

5     to me.  But why I needed to do a provocation charge became

6     apparent to me in the opening statement, when the defendant

7     made an opening statement that was obviously crafted as a

8     direct appeal to a non-existent provocation defense, and at

9     that point the jury would have been impossibly confused if I

10    were to instruct without giving any kind of provocation

11    instruction.

12         The need for it became even more apparent when the

13    defendant insisted on the introduction of evidence, over the

14    government's objection, that was minimally relevant for any

15    other purpose than provocation but that directly addressed a

16    potential provocation defense.  I nevertheless erred on the

17    side of caution and admitted that evidence, because I've always

18    been sensitive to the need to allow the defendant a full and

19    fair opportunity to develop context evidence.  But because I

20    did that, and because that evidence that otherwise wouldn't

21    have been admissible but for the defendant's insistence in its

22    minimal relevance for a legitimate purpose, it also carried

23    with it a potential for an improper purpose, and so I have to

24    give this instruction over the defendant's objection.

25         Now, I have tried to craft a modified instruction that

**Add. 8**

1    very closely tracks the defendant's proposal but is in my own

2    words and tries to address a couple of things.  One, I am

3    sensitive to the need to make sure that there is absolutely no

4    doubt that the burden of proof remains with the government as

5    to each element of the charge at all times, that it never

6    switches to the defendant.  I've tried to build that into the

7    proposed charge in even stronger terms than the defense has

8    proposed.

9         Second, I'm aware of the context defense, and although

10   I gave the context instruction earlier in the case, I'm

11   prepared to repeat it here.

12        So, let me read the proposed instruction, and I,

13   again, remain open to hearing suggestions from the parties as

14   to how to improve it.

15        "You have heard evidence that Victim 1 and others have

16   engaged in behavior that disrupted the defendant's live call-in

17   radio show.  You have also heard evidence that Vic Mackey or

18   others may have engaged in behavior that disrupted the

19   defendant's website.  You may consider such evidence for the

20   purpose of understanding all of the circumstances surrounding

21   the making of the communications at issue in this case,

22   including, for example, the language, specificity and frequency

23   of the communications, the context surrounding the

24   communications, the relationship between the defendant and

25   Victim 1, Victim 1's response, any previous communications

**Add. 9**

1   between the defendant and Victim 1, and whether you believe the

2   person making the communications was serious, as distinguished

3   from mere idle or careless talk, exaggeration or something said

4   in a joking manner.  You may not consider this evidence for any

5   other purpose.  Remember, the defendant cannot be found guilty

6   of any charge unless the government proves every element of the

7   charge beyond a reasonable doubt.  That burden never switches

8   to the defendant.  If, however, the government proves every

9   element of the charge beyond a reasonable doubt, evidence of

10  provocation, justification or self defense does not negate the

11  defendant's criminal culpability with respect to that charge."

12      So, I have taken a little bit of the government's

13  proposed charge, I've taken a large part of the defendant's

14  proposed charge, and I put it into language that I believe

15  accurately describes the burden of proof, how this evidence can

16  be considered and the purpose for which it will not provide a

17  defense if the government proves every element of the charge

18  beyond a reasonable doubt.

19      What does the defendant want to say about how I could

20  improve the charge, understanding your view is I've

21  categorically erred in giving it and it can't be improved, but

22  if I ask you for suggestions, telling you I'm going to do it,

23  what else would you say to me?

24      MR. LEVIN:  We have no other suggestions, your Honor.

25  That's fine.

```
 1              THE COURT:  All right.  What does the government want
 2     to say?
 3              MR. DAVIS:  No objection.
 4              THE COURT:  All right.  So, we will incorporate that
 5     into the charge.  I'd ask my law clerk to -- is Lorraine back
 6     from her appointment?
 7              THE CLERK:  She might be.
 8              THE COURT:  I ask you to see if you can contact her
 9     and ask her to substitute this for the provocation and then
10     print up four copies of the jury charge, and if she can't
11     because she's not available, then I'll ask Caroline to do it
12     for me.  Okay?  All right.
13              All right.  Are we ready to bring the jury in?
14              MS. KRASINSKI:  Yes, your Honor.
15              THE COURT:  All right.  Let's bring the jury in.
16              THE CLERK:  Please remain standing for the jury.
17                  (The jury entered the courtroom)
18              THE CLERK:  Please be seated.  This hearing is back in
19     session.
20              THE COURT:  Sorry for the delay.  It's on me again.  I
21     apologize.  I apologize.  We are, though, ready for closing
22     arguments, so we'll hear the government's closing argument.
23              You can proceed when ready.
24              MS. KRASINSKI:  Thank you, your Honor.
25
```

**Add. 11**

1   these instructions.

2        To act with intent means to act voluntarily and

3   intelligently, not by ignorance, accident or mistake, and with

4   the specific intent or purpose of causing a desired result in a

5   particular individual.  It is not enough merely to foresee that

6   such a result is a likely consequence of repeated

7   communications.  Moreover, a bad motive of some other kind

8   standing alone is not enough.

9        "Intent to harass" means to act with the specific

10  intent or purpose of causing an adverse emotional reaction in a

11  specific person, not merely speech that happens to cause

12  annoyance or insult.

13       "Intent to intimidate" means to act with the specific

14  intent or purpose of putting a person in fear or apprehension

15  of injury inflicted by a particular person.

16       You have heard evidence that Victim 1 and others have

17  engaged in behavior that disrupted the defendant's live call-in

18  radio show.  You have also heard evidence that Vic Mackey or

19  others may have engaged in behavior that disrupted the

20  defendant's website.  You may consider such evidence for the

21  purpose of understanding all of the circumstances surrounding

22  the making of the communications at issue in this case,

23  including, for example, the language, specificity and frequency

24  of the communications, the context surrounding the

25  communications, the relationship between the defendant and

**Add. 12**

1    Victim 1, Victim 1's response, any previous communications

2    between the defendant and Victim 1 and whether you believe the

3    person making the communication was serious, as distinguished

4    from mere idle and careless talk, exaggeration or something

5    said in a joking manner.  You may not consider this evidence

6    for any other purpose.

7            Remember, the defendant cannot be found guilty of any

8    charge unless the government proves every element of the charge

9    beyond a reasonable doubt.  That burden never switches to the

10   defendant.  If, however, the government proves every element of

11   a charge beyond a reasonable doubt, evidence of provocation,

12   justification or self defense does not negate the defendant's

13   criminal culpability with respect to that charge.

14           The government is not required to prove that the

15   defendant knew that he was violating the law.  Ignorance of the

16   law is not a defense to the charges alleged in the indictment.

17           The principles of law set forth in these instructions

18   are intended to guide you in reaching a fair and just result in

19   this case, which is important to both of the parties.  You are

20   to exercise your judgment and common sense without prejudice,

21   without sympathy, but with honesty and understanding.  You must

22   be conscientious in your determination of a just result in this

23   case, because this is your highest duty as officers of this

24   court.

25           Remember also, the question before you can never be

**Add. 13**

```
                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE


    * * * * * * * * * * * * * * * * * * * *
                                          *
    UNITED STATES OF AMERICA              *
                                          *  20-cr-06-01-PB
                v.                        *  February 24, 2021
                                          *  10:05 a.m.
         CHRISTOPHER CANTWELL             *
                                          *
    * * * * * * * * * * * * * * * * * * * *


                TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE PAUL J. BARBADORO


    APPEARANCES:


    For the Government:      John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             U.S. Attorney's Office



    For the Defendant:       Jeffrey Levin, Esq.
                             Eric Wolpin, Esq.
                             Federal Defenders Office



    Probation:               Sean Buckley



    Court Reporter:          Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             603) 225-1453
```

**Add. 14**

```
 1   range is warranted.
 2          I do think that in this case the fact that the
 3   defendant threatened the victim's family member is an
 4   aggravating circumstance that would ordinarily justify a
 5   sentence higher than the bottom of the applicable range.  So
 6   why am I sentencing the defendant at the bottom of the range?
 7          The threats here that the defendant made are
 8   abhorrent, shocking, they are extremely damaging, and I don't
 9   diminish those, the seriousness of those threats to any
10   degree.  It's just horrendous threats.  So I want to make that
11   clear right from the outset.
12          Why then would I sentence at the bottom of the
13   range?  I want to evaluate the provocation argument that the
14   defendants put forth for a variance.
15          I don't believe that there was provocation in this
16   case that warrants a downward variance.  I largely accept the
17   revised chronology that the government has produced today as
18   being a correct description of what occurred here, and I do
19   agree with Mr. Cantwell's position to this extent.  I think
20   the members of the Bowl Patrol were trying to drive him crazy.
21   They were trying to deprive him of his ability to earn a
22   living, they were trying to disrupt his program, and Mr.
23   Cantwell chose a criminal and ultimately criminal and
24   certainly irresponsible way to respond to that effort, but I
25   don't believe it warrants a variance for provocation because I
```

**Add. 15**

 1    do believe that while the victim in this case was a

 2    participant with other Bowl Patrol members in some of the

 3    early trolling behavior that occurred here, I'm not satisfied

 4    that the immediate incident was precipitated by any

 5    provocation by the victim in this case.

 6              I don't believe and I'm not persuaded that the

 7    communication to Peach about the photo came from the victim.

 8    We don't know who communicated with Peach about that, but the

 9    defendant according to the screenshots did not believe that

10    Mr. Lambert was the source of that communication.

11              And what happened here, Mr. Lambert entered into

12    the Peaceful White Person site and that in and of itself is

13    not provocation under these circumstances to justify in any

14    way, shape, or form Mr. Cantwell's behavior.

15              I understand from your perspective you thought this

16    guy, you know, was part of a campaign to drive you crazy, and

17    I do not doubt that you were extremely agitated when you saw

18    him there and you disregarded his efforts to deescalate

19    because you determined he was part of a group of people that

20    were still out to get you, but I can't say that you were

21    provoked in any way in the immediate sense by what occurred

22    there.  You engaged in threatening behavior to Mr. Lambert and

23    he responded in a way that was unacceptable in my view and

24    does imply a threat against someone you care deeply about.

25    And then you escalate it further, and that's where you engaged

# Add. 16

1    in the conduct that resulted in your presence here today, and

2    I don't believe that that is provocation that justifies a

3    sentence below the bottom of the applicable range.

4         But I do understand the human circumstances you

5    were in.  You felt these people were trying to destroy you,

6    they were trying to drive you crazy, you were extremely

7    agitated, you thought Mr. Lambert was a part of that group.

8         And there was a pattern in your interactions with

9    him in which you both had become desensitized to the

10   horrendous nature of your interactions with each other, and

11   that's the only reason that I'm not giving you a sentence

12   above the top of the range, that I'm not in fact varying

13   upward in this case, because the conduct you engaged in in my

14   mind is so serious and so damaging that it ordinarily warrants

15   an even higher sentence than the one that I have imposed here.

16   But I've tried to understand your circumstances and why you

17   ended up where you did, and I tried to take that into account

18   as best I could, and given the totality of those circumstances

19   I've decided not to sentence you at the top of the range, not

20   to vary above the range, but to give you a guideline sentence

21   which still is a very significant period of incarceration.  I

22   understand that and I believe that the interests of justice

23   require it.

24         In developing a sentence here I have to consider

25   what a just sentence is, and as I said, the nature of your

**Add. 17**

```
 1   behavior is so serious, so egregiously wrong that justice
 2   requires a significant prison sentence.
 3            And I think both individual and general deterrence
 4   require a significant prison sentence here, and that's why I'm
 5   imposing it.
 6            I believe that I'm avoiding unwarranted sentencing
 7   disparity by sentencing the defendant to a term of
 8   imprisonment within the guideline range.
 9            So I am going to impose a sentence of imprisonment
10   of 41 months, which is the bottom of the applicable range.
11            I want to reserve the right to consult with the
12   parties about the Internet supervision condition in a later
13   telephone conference, because I want to make every effort to
14   craft a condition that serves the government's interests while
15   also protecting the defendant's ability to engage in lawful
16   business activities using the computer when he completes his
17   sentence.
18            Let me read the sentence as I propose to give it:
19            Pursuant to the Sentencing Reform Act of 1984, and
20   having considered the sentencing factors enumerated at 18
21   U.S.C. Section 3553(a), it is the judgment of the Court that
22   the defendant is hereby committed to the custody of the Bureau
23   of Prisons to be imprisoned for a term of 41 months.  This
24   term consists of a term of 41 months on Counts 1 and 2 to be
25   served concurrently.
```

**Add. 18**

1          Upon release from imprisonment the defendant shall

2     be placed on supervised release for a term of two years.  This

3     term consists of two years on Count 1 and a term of one year

4     on Count 2, such terms to be served concurrently.

5          Within 72 hours of release from the custody of the

6     Bureau of Prisons the defendant shall report in person to the

7     district to which the defendant is released.

8          While under supervision the defendant must comply

9     with the standard conditions that have been adopted by this

10    court and the defendant must comply with the mandatory and

11    proposed special conditions attached to the presentence report

12    except for the computer monitoring condition which we will

13    have a further discussion about and it will eventually get

14    incorporated in the judgment in an effort to try to address

15    the specific concerns raised in the defendant's memorandum.

16         It is ordered that the defendant shall pay to the

17    United States a special assessment of $200.  It shall be due

18    in full immediately.

19         The Court will waive the fine in this case as the

20    defendant does not appear to have the financial ability to pay

21    one.

22         The defendant is remanded to the custody of the

23    United States Marshal.

24         Are there any objections from the government to

25    this proposed sentence other than the ones raised during the

**Add. 19**

1    course of this hearing?

2         MS. KRASINSKI:  Your Honor, I think as it relates

3    to Count 2 the statutory maximum is 24 months of imprisonment.

4    So I think -- if I heard the Court correctly --

5         THE COURT:  Why did I miss that?  I'm sorry.

6         MS. KRASINSKI:  -- I think you said 41 months of

7    imprisonment on both, but I think it should be 41 months on

8    Count 1 and then 24 months on Count 2.

9         THE COURT:  That I think is a mistake.  I

10   apologize.

11        Yes.  So Count 2 is a 24-month sentence to run

12   concurrently with the 41-month sentence imposed on Count 1.

13        Thank you, counsel, for drawing that to my

14   attention.  I apologize.

15        All of the defendant's objections as stated in his

16   memorandum and during this hearing are preserved for purposes

17   of appeal.

18        Beyond that, is there anything else you need to

19   bring to my attention?

20        MR. WOLPIN:  No, your Honor.

21        THE COURT:  All right.

22        I'll impose the sentence as I've read it.

23        So you went to trial in this case.  You have a

24   right to appeal.  To perfect that appeal, you need to file a

25   Notice of Appeal within 14 days or you lose your right to

**Add. 20**

AO 245B   Judgment in a Criminal Case
NHDC 2/18   Sheet 1

# UNITED STATES DISTRICT COURT

District of New Hampshire

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| Christopher Cantwell | Case Number:  20-cr-6-01 PB |
| | USM Number:  00991-509 |
| | Jeffrey Levin, Eric Wolpin |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   Count 1 of Superseding Indictment, Count 2 of Redacted Superseding Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 875(b) | Extortionate Interstate Communications | 06/06/2019 | 1s |
| 18 U.S.C. § 875(d) | Threatening to Injure Person or Reputation | 06/06/2019 | 2rs |
| | | | |

    The defendant is sentenced as provided in pages 1 through   7   of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   Count 3rs

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

☐ Count(s)

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/24/2021

Date of Imposition of Judgment

/s/ Paul Barbadoro

Signature of Judge

Paul J. Barbadoro  U.S. District Judge

Name and Title of Judge

March 5, 2021

Date

# Add. 21

AO 245B    Judgment in Criminal Case
NHDC 2/18    Sheet 2 — Imprisonment

Judgment — Page    2    of    7

DEFENDANT:   Christopher Cantwell
CASE NUMBER:   20-cr-6-01 PB

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

41 months on Count 1s and 24 months on Count 2rs, all to be served concurrently.

☐   The court makes the following recommendations to the Bureau of Prisons:

☑   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at  _____  ☐ a.m.  ☐ p.m.    on    _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on    _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

# Add. 22

AO 245B
NHDC 2/18

Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page  3  of  7

DEFENDANT:  Christopher Cantwell
CASE NUMBER:  20-cr-6-01 PB

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

2 years on Count 1s, and a term of 1 year on Count 2rs, such terms to run concurrently.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(Check, if applicable.)*

4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3363 and 3663A or any other statute  authorizing a sentence of restitution. *(Check, if applicable.)*

5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(Check, if applicable.)*

7.  ☐ You must participate in an approved program for domestic violence. *(Check, if applicable.)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add. 23

AO 245B    Judgment in a Criminal Case
NHDC 2/18    Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT:  Christopher Cantwell
CASE NUMBER:  20-cr-6-01 PB

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4. You must answer truthfully the questions asked by your probation officer.

5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature _____    Date _____

# Add. 24

AO 245B    Judgment in a Criminal Case
NHDC 2/18    Sheet 3D — Supervised Release

DEFENDANT:  Christopher Cantwell
CASE NUMBER:  20-cr-6-01 PB

Judgment—Page    5    of    7

# SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a substance use treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.

2. You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.

3. You must submit to substance abuse testing to determine if you have used a prohibited substance. You shall pay for the cost of testing to the extent you are able, as determined by the probation officer. You must not attempt to obstruct or tamper with the testing methods.

4. You must not use or possess alcohol.

5. You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

6. You must not go to, or remain at, any place where you know controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

7. You must participate in a mental health evaluation and participate and follow the rules and regulations of any recommended program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.

8. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030 (e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

9. You must provide the probation with a list of all of your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, and you must keep the list current. You must submit your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search.  A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that a computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner. You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. You must not use any third party's computers or devices, such as an employer's computer or devices, for personal reasons.

# Add. 25

AO 245B    Judgment in a Criminal Case
NHDC 2/18    Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __7__

DEFENDANT:  Christopher Cantwell
CASE NUMBER:  20-cr-6-01 PB

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment * | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| TOTALS | $ 0.00 | $ 0.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Add. 26**

AO 245B       Judgment in a Criminal Case
NHDC 2/18     Sheet 6 — Schedule of Payments

Judgment — Page   __7__   of   __7__

DEFENDANT:   Christopher Cantwell
CASE NUMBER:   20-cr-6-01 PB

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☑   Lump sum payment of $ __200.00__      due immediately, balance due

     ☐   not later than _____ , or
     ☐   in accordance   ☐ C,   ☐ D,   ☐   E, or   ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk, U.S. District Court, 55 Pleasant Street, Room 110, Concord, N.H. 03301. Personal checks are not accepted.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# Add. 27