UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 21-1186
_____

UNITED STATES,
Appellee,

v.

CHRISTOPHER CANTWELL,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
_____

JOINT APPENDIX
VOLUME I
_____


Christine DeMaso                         Seth R. Aframe
Assistant Federal Public Defender        Assistant U.S. Attorney
Federal Public Defender Office           U.S. Attorney's Office
51 Sleeper Street, 5th Floor             53 Pleasant St., 4th Floor
Boston, MA 02210                         Concord, NH 03301
617-223-8061                             603-225-1552


For Christopher Cantwell                 For the United States

# TABLE OF CONTENTS

## <u>VOLUME I</u>

District Court Docket Sheet ..........................................................................J.A. 1

Indictment ....................................................................................................J.A. 18

Superseding Indictment................................................................................J.A. 20

Telephone Conference Transcript (9/8/20)...............................................J.A. 24

Motion Hearing (9/18/20).........................................................................J.A. 68

Trial Transcript Day 1—Morning (9/22/20) ..........................................J.A. 118

Trial Transcript Day 1—Afternoon (9/22/20)........................................J.A. 199

Trial Transcript Day 2—Morning (9/23/20) ..........................................J.A. 332

Trial Transcript Day 2—Afternoon (9/23/20)........................................J.A. 467

## <u>VOLUME II</u>

Trial Transcript Day 3—Morning (9/24/20) ..........................................J.A. 595

Trial Transcript Day 3—Afternoon (9/24/20)........................................J.A. 725

Trial Transcript Day 3—Afternoon,
    Cantwell Testimony (9/24/20)...........................................................J.A. 755

Trial Transcript Day 4—Morning,
    Cantwell Testimony (9/25/20)...........................................................J.A. 849

Trial Transcript Day 4—Morning (9/25/20) ..........................................J.A. 955

Trial Transcript Day 4—Afternoon (9/25/20).........................................J.A. 983

Trial Transcript Day 5 (9/28/20) ........................................................J.A. 1056

Trial Exhibit 100.................................................................................J.A. 1063

Trial Exhibit 102.................................................................................J.A. 1071

Trial Exhibit 103A ..............................................................................J.A. 1074

Trial Exhibit 105* ...............................................................................J.A. 1082

Trial Exhibit 105A ..............................................................................J.A. 1083

Trial Exhibit 106* ...............................................................................J.A. 1084

Trial Exhibit 106A ..............................................................................J.A. 1085

Trial Exhibit 108* ...............................................................................J.A. 1086

Trial Exhibit 108A ..............................................................................J.A. 1087

Trial Exhibit 109* ...............................................................................J.A. 1088

Trial Exhibit 109A ..............................................................................J.A. 1089

Trial Exhibit 110* ...............................................................................J.A. 1090

Trial Exhibit 110A ..............................................................................J.A. 1091

Trial Exhibit 111* ...............................................................................J.A. 1092

Trial Exhibit 111A ..............................................................................J.A. 1093

Trial Exhibit B-5a* .............................................................................J.A. 1094

Trial Exhibit C-2 ................................................................................J.A. 1095

Trial Exhibit C-17 ............................................................... J.A. 1096

Trial Exhibit C-19 ............................................................... J.A. 1097

Trial Exhibit E-41* .............................................................. J.A. 1099

Trial Exhibit E-43* .............................................................. J.A. 1100

Trial Exhibit G .................................................................... J.A. 1101

Assented to Motion to Complete the Record (D.E. 115) .................... J.A. 1104

Sentencing Transcript (2/24/21) ............................................ J.A. 1110

Notice of Appeal (D.E. 133) .................................................. J.A. 1199

\* Listings marked with an asterisk are audio recordings that can be found on the disc accompanying this Joint Appendix.

APPEAL,CLOSED

# U.S. District Court
## District of New Hampshire (Concord)
## CRIMINAL DOCKET FOR CASE #: 1:20-cr-00006-PB-1

Case title: USA v. Cantwell                    Date Filed: 01/22/2020
                                               Date Terminated: 03/05/2021

Assigned to: Judge Paul J. Barbadoro

Appeals court case number: 21-1186 First Circuit
Court of Appeals

**Defendant (1)**

**Christopher Cantwell**                 represented by   **Eric Wolpin**
*TERMINATED: 03/05/2021*                                 Federal Defender's Office
                                                         The Ralph Pill Bldg
                                                         22 Bridge St
                                                         Concord, NH 03301
                                                         603 226-7360
                                                         Email: eric_wolpin@fd.org
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Designation: Public Defender or Community Defender*
                                                         *Appointment*

                                                         **Jeffrey S. Levin**
                                                         Federal Defender's Office
                                                         The Ralph Pill Bldg
                                                         22 Bridge St
                                                         Concord, NH 03301
                                                         603 226-7360
                                                         Email: jeff_levin@fd.org
                                                         *ATTORNEY TO BE NOTICED*

**Pending Counts**                                       **Disposition**

18 U.S.C. 875(b) Extortionate Interstate
Communications
(1)

18 U.S.C. § 875(b) - Extortionate Interstate            41 months on Count 1s and 24 months on Count 2rs,
Communications                                          all to be served concurrently; 2 years supervised
(1s)                                                    release; $200 special assessment.

18 U.S.C. 875(c) Threatening Interstate
Communications
(2)

18 U.S.C. § 875(d) - Threat to Injure Property or       41 months on Count 1s and 24 months on Count 2rs,
Reputation                                              all to be served concurrently; 2 years supervised
(2rs)                                                   release; $200 special assessment.

18 U.S.C. § 875(c)- Threatening Interstate
Communications
(2s)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

**J.A. 1**

18 U.S.C. § 2261A(2)- Cyberstalking (3rs)

Acquitted.

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Interested Party**

**Ian Freeman**   represented by **Ian Freeman**
PRO SE

**Plaintiff**

**USA**   represented by **Anna Z. Krasinski**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Email: anna.krasinski@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**John S. Davis**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 230-2574
Email: john.davis8@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2020 | 1 | **INDICTMENT as to Christopher Cantwell (1) count(s) 1, 2. *Original document available in clerks office.*(kad)** (Entered: 01/23/2020) |
| 01/22/2020 | 3 | MOTION TO SEAL AT LEVEL II: INDICTMENT, ARREST WARRANT, THIS MOTION, & DOCKET TEXT ENTRIES until defendant is taken into custody by USA as to Christopher Cantwell. (kad) (Entered: 01/23/2020) |
| 01/22/2020 | | **ENDORSED ORDER granting 3 MOTION TO SEAL AT LEVEL II: INDICTMENT, ARREST WARRANT, THIS MOTION, & DOCKET TEXT ENTRIES as to Christopher Cantwell (1). *Text of Order: Granted.* So Ordered by Magistrate Judge Daniel J. Lynch. (kad)** (Entered: 01/23/2020) |
| 01/22/2020 | 4 | Praecipe for Warrant by USA as to Christopher Cantwell. (kad) (Entered: 01/23/2020) |
| 01/22/2020 | | Arrest Warrant Issued as to Christopher Cantwell. Original warrant and copies to US Marshal and US Probation. (kad) (Entered: 01/23/2020) |
| 01/23/2020 | | Arrest of Christopher Cantwell.(kad) (Entered: 01/23/2020) |
| 01/23/2020 | | NOTICE to Attorneys of Record: Defendant taken into custody. The case has been unsealed. All future pleadings shall be filed in accordance with this district's Supplemental Rules for Electronic Case Filing. (kad) (Entered: 01/23/2020) |
| 01/23/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Initial Appearance/Arraignment set for 1/23/2020 03:00 PM before Magistrate Judge Andrea K. Johnstone. (kad) (Entered: 01/23/2020) |
| 01/23/2020 | 5 | Arrest Warrant Returned Executed on 1/23/2020 as to Christopher Cantwell.(vln) (Entered: 01/23/2020) |

**J.A. 2**

| | | |
|---|---|---|
| 01/23/2020 | 6 | MOTION to Appoint Counsel with Financial Declaration by Christopher Cantwell. (Attachments: # 1 Financial Affidavit) *Document available in clerks office.* (kad) (Entered: 01/24/2020) |
| 01/23/2020 | | **ENDORSED ORDER approving 6 Motion to Appoint Counsel. Eric Wolpin appointed in the case as to Christopher Cantwell (1).** *Text of Order: Request approved. Appoint counsel.* **So Ordered by Magistrate Judge Andrea K. Johnstone.** (kad) (Entered: 01/24/2020) |
| 01/23/2020 | | Minute Entry for proceedings held before Magistrate Judge Andrea K. Johnstone: INITIAL APPEARANCE and ARRAIGNMENT as to Christopher Cantwell (1) Count 1,2 held on 1/23/2020. Defendant advised of rights & charges, waived reading of indictment, and pled not guilty. Court approves financial affidavit. Trial Date: 3/3/2020, 4 days. Defendant ordered temporarily detained pending a detention hearing set for 1/28/2020 at 2:00 p.m. (Tape #3:07) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin) (USP: Janice Bernard)(Total Hearing Time: 6 min.) (kad) (Entered: 01/24/2020) |
| 01/23/2020 | 7 | **ORDER OF TEMPORARY DETENTION as to Christopher Cantwell. Detention Hearing set for 1/28/2020 02:00 PM before Magistrate Judge Andrea K. Johnstone. So Ordered by Magistrate Judge Andrea K. Johnstone.** (kad) (Entered: 01/24/2020) |
| 01/24/2020 | | TRIAL NOTICE: Jury Selection/Trial set for two week period beginning 3/3/2020 09:30 AM before Judge Paul J. Barbadoro. Final Pretrial Conference set for 2/25/2020 02:30 PM before Judge Paul J. Barbadoro. Any motion to continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (vln) (Entered: 01/24/2020) |
| 01/24/2020 | 8 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey S. Levin appearing for Christopher Cantwell *as co-counsel*. Attorney Jeffrey S. Levin added to party Christopher Cantwell(pty:dft).(Levin, Jeffrey) (Entered: 01/24/2020) |
| 01/27/2020 | 9 | STIPULATION TO DETENTION and WAIVER of Detention Hearing without prejudice as to Christopher Cantwell. Approved by Magistrate Judge Daniel J. Lynch. (vln) (Entered: 01/27/2020) |
| 02/03/2020 | 10 | Assented to MOTION for Protective Order by USA as to Christopher Cantwell. (Attachments: # 1 Proposed Order) (Krasinski, Anna) (Entered: 02/03/2020) |
| 02/05/2020 | | **ENDORSED ORDER granting 10 Assented to Motion for Protective Order as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.** (js) (Entered: 02/06/2020) |
| 02/05/2020 | 11 | **PROTECTIVE ORDER as to Christopher Cantwell. So Ordered by Judge Paul J. Barbadoro.** (js) (Entered: 02/06/2020) |
| 02/13/2020 | 12 | Assented to MOTION for Detention *Hearing* by Christopher Cantwell. (Wolpin, Eric) (Entered: 02/13/2020) |
| 02/14/2020 | | **ENDORSED ORDER granting 12 Motion for Detention Hearing as to Christopher Cantwell (1).** *Text of Order: The clerk's office shall schedule a detention hearing. Probation should be notified of the pertinent components of defendant's proposed release plan sufficiently in advance of the detention hearing to permit timely investigation.* **So Ordered by Magistrate Judge Andrea K. Johnstone.** (vln) (Entered: 02/14/2020) |
| 02/14/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Detention Hearing set for 2/20/2020 11:00 AM before Magistrate Judge Andrea K. Johnstone. (vln) (Entered: 02/14/2020) |
| 02/18/2020 | | TRIAL REMINDER: There is an upcoming trial in this case. Any Motion to Continue shall be filed 1 week before the Final Pretrial Conference or the Final Pretrial will be held as scheduled. (vln) (Entered: 02/18/2020) |
| 02/19/2020 | 13 | Assented to MOTION to Continue Trial for 30 days (Waiver of Speedy Trial to be filed conventionally) by Christopher Cantwell. Waiver of Speedy Trial due 2/26/2020. (Wolpin, Eric) (Entered: 02/19/2020) |
| 02/19/2020 | 14 | MOTION for Detention by USA as to Christopher Cantwell.Follow up on Objection on 3/4/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit 1-Recognizance Bond, # 2 Exhibit 2-Virginia Courts Case Information System, # 3 Exhibit 3-Motion to Revoke Bond, # 4 Exhibit 4-Sentence) (Krasinski, Anna) (Entered: 02/19/2020) |
| 02/20/2020 | | RESCHEDULING NOTICE OF HEARING as to Christopher Cantwell. TIME CHANGE ONLY. Detention Hearing reset for 2/20/2020 03:00 PM before Magistrate Judge Andrea K. Johnstone. (kad) (Entered: 02/20/2020) |
| 02/20/2020 | 15 | **ORDER granting 13 Motion to Continue Trial in the interest of justice as to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. Final Pretrial Conference set for 3/25/2020 02:30 PM before Judge Paul J. Barbadoro. Jury Selection/Trial set for two week period beginning 4/7/2020 09:30 AM before Judge Paul J. Barbadoro. Waiver of Speedy Trial due 3/25/2020.** (vln) (Entered: 02/20/2020) |
| 02/20/2020 | | Set Deadline(s) as to Christopher Cantwell: Waiver of Speedy Trial due 3/4/2020. (vln) (Entered: 02/20/2020) |
| 02/20/2020 | | Minute Entry for proceedings held before Magistrate Judge Andrea K. Johnstone: DETENTION HEARING as to Christopher Cantwell held on 2/20/2020. Evidence introduced. Witnesses: Brett Fernald. At the request of defendant the detention hearing is continued to 2/25/2020 at 10 a.m. (Tape #3:08, 5:13) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin) (USP: Janice Bernard)(Total Hearing Time: 1 hr. 49 min.) (kad) (Entered: 02/20/2020) |

**J.A. 3**

| | | |
|---|---|---|
| 02/20/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Detention Hearing set for 2/25/2020 10:00 AM before Magistrate Judge Andrea K. Johnstone. (kad) (Entered: 02/20/2020) |
| 02/24/2020 | 16 | WAIVER of Speedy Trial by Christopher Cantwell. (js) (Entered: 02/24/2020) |
| 02/24/2020 | 17 | ADDENDUM re: 12 Assented to MOTION for Detention *Hearing* by Christopher Cantwell. (Attachments: # 1 Exhibit Virginia Documents)(Wolpin, Eric) (Entered: 02/24/2020) |
| 02/25/2020 | | Minute Entry for proceedings held before Magistrate Judge Andrea K. Johnstone: DETENTION HEARING as to Christopher Cantwell held on 2/25/2020. Defendant detained, order to issue. (Tape #10:08) (Govt Atty: Anna Krasinski & John S. Davis) (Defts Atty: Eric Wolpin & Jeffrey Levin) (USP: Janice Bernard)(Total Hearing Time: 57 Minutes) (bt) (Entered: 02/27/2020) |
| 02/25/2020 | 18 | EXHIBIT LIST by USA as to Christopher Cantwell. (bt) (Entered: 02/27/2020) |
| 02/25/2020 | 19 | EXHIBIT LIST by Christopher Cantwell. (bt) (Entered: 02/27/2020) |
| 02/27/2020 | 20 | **ORDER OF DETENTION PENDING TRIAL as to Christopher Cantwell. So Ordered by Magistrate Judge Andrea K. Johnstone.** (bt) (Entered: 02/27/2020) |
| 03/17/2020 | | Reset Trial Deadline(s) in case as to Christopher Cantwell DUE TO STANDING ORDER NO. 20-4 Final Pretrial Conference set for 5/19/2020 02:30 PM before Judge Paul J. Barbadoro. Jury Selection/Trial set for two week period beginning 6/2/2020 09:30 AM before Judge Paul J. Barbadoro. (vln) (Entered: 03/17/2020) |
| 03/23/2020 | 21 | **STANDING ORDER 20-10 Speedy Trial Act Findings as to Christopher Cantwell So Ordered by Judge Paul J. Barbadoro.** (vln) (Entered: 03/24/2020) |
| 03/25/2020 | 22 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Detention Hearing held on 2/20/20. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/15/2020. Redacted Transcript Follow Up 4/27/2020. Release of Transcript Restriction set for 6/22/2020. (vln) (Entered: 03/25/2020) |
| 03/25/2020 | 23 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Detention Hearing, Day 2 held on 2/25/2020. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/15/2020. Redacted Transcript Follow Up 4/27/2020. Release of Transcript Restriction set for 6/22/2020. (vln) (Entered: 03/25/2020) |
| 04/29/2020 | 24 | MOTION to Continue Trial for 30 days (Waiver of Speedy Trial to be filed conventionally)by USA as to Christopher Cantwell.Follow up on Objection on 5/13/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). Waiver of Speedy Trial due 5/6/2020. (Davis, John) (Entered: 04/29/2020) |
| 05/04/2020 | 25 | OBJECTION by Christopher Cantwell re 24 MOTION to Continue Trial for 30 days (Waiver of Speedy Trial to be filed conventionally) . (Wolpin, Eric) (Entered: 05/04/2020) |
| 05/06/2020 | | NOTICE OF HEARING ON MOTION as to Christopher Cantwell re: 24 MOTION to Continue Trial for 30 days<br><br>**Motion Hearing set for 5/21/2020 11:00 AM before Judge Paul J. Barbadoro.** (vln) (Entered: 05/06/2020) |
| 05/13/2020 | 26 | **ORDER as to Christopher Cantwell re: STANDING ORDER 20-18 SPEEDY TRIAL ACT FINDINGS**<br><br>**( Final Pretrial Conference set for 6/26/2020 03:15 PM before Judge Paul J. Barbadoro; Jury Selection/Trial set for two week period beginning 7/7/2020 09:30 AM before Judge Paul J. Barbadoro.) So Ordered by Judge Paul J. Barbadoro.** (vln) (Entered: 05/14/2020) |
| 05/14/2020 | | Reset Hearing(s) as to Christopher Cantwell: Final Pretrial Conference set for 6/26/2020 03:30 PM before Judge Paul J. Barbadoro. (vln) (Entered: 05/14/2020) |

**J.A. 4**

| 05/18/2020 | 27 | Assented to MOTION to Withdraw Document 24 MOTION to Continue Trial for 30 days (Waiver of Speedy Trial to be filed conventionally) by USA as to Christopher Cantwell. (Davis, John) (Entered: 05/18/2020) |
|---|---|---|
| 05/19/2020 | | **ENDORSED ORDER granting 27 Motion to Withdraw 24 Motion to Continue as to Christopher Cantwell (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 05/19/2020) |
| 05/22/2020 | 28 | MOTION for Bail , *Review and Revocation of Detention Order* by Christopher Cantwell. **HEARING REQUESTED.**Follow up on Objection on 6/5/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Wolpin, Eric) (Entered: 05/22/2020) |
| 05/26/2020 | 29 | **STANDING ORDER 20-19 Clarifying Speedy Trial Act Findings in Response to Exigent Circumstances Created by COVID -19.**<br><br>**Within seven (7) days of the date this order is docketed, any defendant who has an individualized concern not addressed by this order may file a motion for a determination regarding his or her rights under the Speedy Trial Act, and the court will consider the ends of justice finding as to that defendant de novo.**<br><br>**So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 05/27/2020) |
| 06/05/2020 | 30 | OBJECTION by USA as to Christopher Cantwell re 28 MOTION for Bail , *Review and Revocation of Detention Order* . (Krasinski, Anna) (Entered: 06/05/2020) |
| 06/15/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 6/18/2020 01:00 PM before Judge Paul J. Barbadoro. The court will contact the parties with dial-in information.(vln) (Entered: 06/15/2020) |
| 06/17/2020 | 31 | **ORDER as to Christopher Cantwell re: STANDING ORDER 20-22 SPEEDY TRIAL ACT FINDINGS**<br><br>**Jury Selection/Trial set for two week period beginning 8/4/2020 09:30 AM before Judge Paul J. Barbadoro., Telephone Conference set for 7/23/2020 10:00 AM before Judge Paul J. Barbadoro. The court will provide call-in details to counsel by email. So Ordered by Judge Paul J. Barbadoro. (vln)** Modified on 6/19/2020 to correct spelling error (vln). (Entered: 06/19/2020) |
| 06/18/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 6/18/2020. The clerk to set a hearing on the pending motion. (Govt Atty: John Davis) (Defts Atty: Eric Wolpin) (USP: Janice Benard)(Total Hearing Time: 0:10) (vln) (Entered: 06/19/2020) |
| 06/19/2020 | | NOTICE OF HEARING as to Christopher Cantwell. VIDEO Hearing on 28 MOTION for Bail, Review and Revocation of Detention Order set for 6/26/2020 10:00 AM before Judge Paul J. Barbadoro. (vln) (Entered: 06/19/2020) |
| 06/23/2020 | | **NOTICE re: Bail Hearing. Exhibits List and Witness List due by June 24, 2020. as to Christopher Cantwell.** (vln) (Entered: 06/23/2020) |
| 06/24/2020 | 32 | REPLY TO OBJECTION to Motion by Christopher Cantwell re 28 MOTION for Bail , *Review and Revocation of Detention Order* . (Attachments: # 1 Exhibit June Telegram Communication Transcript)(Wolpin, Eric) (Entered: 06/24/2020) |
| 06/26/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: BAIL HEARING as to Christopher Cantwell held on 6/26/2020. Motion taken under advisement. (Court Reporter: Susan Bateman) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin) (USP: Janice Benard)(Total Hearing Time: 1:50) (vln) (Entered: 06/26/2020) |
| 07/08/2020 | 33 | **SUPERSEDING INDICTMENT as to Christopher Cantwell (1) count(s) 1s, 2s, 3s, 4s. *Original document available in clerks office.***(vln) Modified on 7/13/2020 to CORRECT DATE FILED. (vln). (Entered: 07/13/2020) |
| 07/08/2020 | 35 | Praecipe for Warrant by USA as to Christopher Cantwell. (vln) (Entered: 07/13/2020) |
| 07/09/2020 | | Arrest Warrant Issued as to Christopher Cantwell. Original warrant and copies to US Marshal and US Probation. (vln) (Entered: 07/13/2020) |
| 07/13/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Arraignment via video conference set for 7/24/2020 10:00 AM before Magistrate Judge Andrea K. Johnstone. (bt) (Entered: 07/13/2020) |
| 07/13/2020 | 36 | Arrest Warrant Returned Unexecuted as to Christopher Cantwell. Defendant in DOC custody. (vln) (Entered: 07/13/2020) |
| 07/16/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference re: AUGUST TRIAL set for 7/17/2020 02:00 PM before Judge Paul J. Barbadoro. The court will email parties dial-in information.(vln) (Entered: 07/16/2020) |
| 07/17/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 7/17/2020. (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin)(Total Hearing Time: 0:25) (vln) (Entered: 07/21/2020) |
| 07/21/2020 | 37 | MOTION for Protective Order by USA as to Christopher Cantwell.Follow up on Objection on 8/4/2020. The court |

| | | |
|---|---|---|
| | | only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Proposed Order) (Krasinski, Anna) (Entered: 07/21/2020) |
| 07/22/2020 | 38 | **ORDER denying 28 Motion for Bail as to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 07/22/2020) |
| 07/22/2020 | 39 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Christopher Cantwell. (kad) (Entered: 07/22/2020) |
| 07/23/2020 | | **ENDORSED ORDER as to Christopher Cantwell re: 39 Waiver of Presence at Arraignment.** *Text of Order: Waiver approved.* **So Ordered by Magistrate Judge Andrea K. Johnstone. (kad)** (Entered: 07/23/2020) |
| 07/23/2020 | 40 | Assented to MOTION to Continue Trial for 30 days, until second jury term in September 2020 (Waiver of Speedy Trial to be filed conventionally) by Christopher Cantwell. Waiver of Speedy Trial due 7/30/2020. (Levin, Jeffrey) (Entered: 07/23/2020) |
| 07/24/2020 | 41 | RESPONSE to Motion by Christopher Cantwell re 37 MOTION for Protective Order , *Notice of Non-Objection to Government's Motion, filed without prejudice to the raising of future objections.* (Wolpin, Eric) (Entered: 07/24/2020) |
| 07/25/2020 | 42 | **ORDER granting 40 Motion to Continue Trial in the interest of justice as to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. Final Pretrial Conference set for 8/31/2020 01:00 PM before Judge Paul J. Barbadoro. Jury Selection/Trial set for two week period beginning 9/15/2020 09:30 AM before Judge Paul J. Barbadoro. (vln)** (Entered: 07/27/2020) |
| 07/27/2020 | 43 | **ORDER granting 37 Motion for Protective Order as to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 07/27/2020) |
| 07/30/2020 | 45 | WAIVER of Speedy Trial by Christopher Cantwell. (vln) (Entered: 08/03/2020) |
| 07/31/2020 | 44 | Assented to MOTION to Continue Trial to 9/22/20 (Waiver of Speedy Trial to be filed conventionally)by USA as to Christopher Cantwell. (Davis, John) (Entered: 07/31/2020) |
| 08/03/2020 | | **ENDORSED ORDER granting 44 Motion to Continue Trial in the interest of justice as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Jury Selection/Trial set for two week period beginning 9/15/2020 09:30 AM before Judge Paul J. Barbadoro. Jury Trial set for two-week period beginning 9/22/2020 09:00 AM before Judge Paul J. Barbadoro. (vln)** (Entered: 08/03/2020) |
| 08/04/2020 | 46 | WAIVER of Speedy Trial by Christopher Cantwell. (vln) (Entered: 08/04/2020) |
| 08/05/2020 | 47 | SEALED MOTION for Disclosure of Confidential Witness by Christopher Cantwell.Follow up on Objection on 8/19/2020. T (vln) (Entered: 08/05/2020) |
| 08/05/2020 | 48 | MOTION to Seal 47 SEALED MOTION for Disclosure of Confidential Witness at Level I by Christopher Cantwell.Follow up on Objection on 8/19/2020. (vln) (Entered: 08/05/2020) |
| 08/05/2020 | | Notice of ASSENT by USA as to 48 MOTION to Seal Document 47 SEALED MOTION Disclosure of Confidential Witness at Level I. (Krasinski, Anna) (Entered: 08/05/2020) |
| 08/06/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 8/11/2020 10:00 AM before Judge Paul J. Barbadoro. The court will email call-in information to counsel.(vln) (Entered: 08/06/2020) |
| 08/11/2020 | | **ORAL ORDER granting 48 Motion to Seal : 47 MOTION for Disclosure of Confidential Witness as to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 08/11/2020) |
| 08/11/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell re September Trial held on 8/11/2020. (Govt Atty: Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:10) (vln) (Entered: 08/11/2020) |
| 08/11/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 8/24/2020 11:00 AM before Judge Paul J. Barbadoro. The court will email call-in information to counsel. (vln) (Entered: 08/11/2020) |
| 08/12/2020 | 49 | SEALED OBJECTION by USA as to Christopher Cantwell re 47 SEALED MOTION Disclosure of Confidential Witness. (vln) (Entered: 08/13/2020) |
| 08/12/2020 | 50 | Assented to MOTION to Seal Document 49 Objection to Motion by USA as to Christopher Cantwell. (vln) (Entered: 08/13/2020) |
| 08/14/2020 | | **ENDORSED ORDER granting 50 Motion to Seal Document: 49 Objection to Motion as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 08/17/2020) |
| 08/19/2020 | 51 | NOTICE of Filing Proposed Pretrial Order by USA as to Christopher Cantwell. (Attachments: # 1 Proposed Order - Pretrial Order)(Krasinski, Anna) (Entered: 08/19/2020) |
| 08/24/2020 | 52 | Proposed Jury Instructions by USA as to Christopher Cantwell.(Krasinski, Anna) (Entered: 08/24/2020) |

**J.A. 6**

| 08/24/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 8/24/2020. Pretrial order to issue. (Court Reporter: Sus) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:10) (vln) (Entered: 08/24/2020) |
|---|---|---|
| 08/24/2020 | 53 | **Final Pretrial Order. So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 08/24/2020) |
| 08/25/2020 | 54 | SEALED SUPPLEMENT TO 47 MOTION FOR DISCLOSURE OF CONFIDENTIAL WITNESS by Christopher Cantwell (vln) (Entered: 08/26/2020) |
| 08/26/2020 | 55 | EXHIBIT LIST re 47 SEALED MOTION Disclosure of Confidential Witness by Christopher Cantwell. (vln) (Entered: 08/27/2020) |
| 08/27/2020 | 56 | Proposed Jury Instructions by Christopher Cantwell.(Levin, Jeffrey) (Entered: 08/27/2020) |
| 08/28/2020 | 57 | SEALED EXHIBITS B and C re: 47 SEALED MOTION for Disclosure of Confidential Witness by Christopher Cantwell. (Attachments: # 1 EXHIBIT C)(vln) (Entered: 08/28/2020) |
| 08/28/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Christopher Cantwell held on 8/28/2020 re 47 SEALED MOTION Disclosure of Confidential Witness. Joint filing due by Monday, August 31, 2020. (Court Reporter: Liza Dubois) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:40) (vln) (Entered: 08/28/2020) |
| 08/28/2020 | 58 | FINAL WITNESS LIST by USA as to Christopher Cantwell.(Davis, John) (Entered: 08/28/2020) |
| 08/28/2020 | 60 | Assented to MOTION to Seal Document 59 Government's Proposed Witness list (Unredacted), at Level I by USA as to Christopher Cantwell. (vln) (Entered: 08/31/2020) |
| 08/31/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 9/8/2020 10:00 AM before Judge Paul J. Barbadoro. The court will email dial-in information to counsel of record. (vln) (Entered: 08/31/2020) |
| 08/31/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 9/18/2020 11:00 AM before Judge Paul J. Barbadoro. The court will email dial-in information to counsel of record. (vln) (Entered: 08/31/2020) |
| 08/31/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 8/31/2020. The clerk to scheduled telephone conferences to discuss jury instructions and pretrial motions. (Court Reporter: Susan Bateman) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 0:25) (vln) (Entered: 08/31/2020) |
| 08/31/2020 | 61 | SEALED 2nd Supplement to 47 Motion for Disclosure of Confidential Witness, at Level I, by Christopher Cantwell. (vln) (Entered: 08/31/2020) |
| 08/31/2020 | 62 | SEALED Government's NOTICE of Proposed Procedure in Response to 47 Motion for Disclosure of Confidential Witness, filed at Level I, by filed by USA (vln) (Entered: 08/31/2020) |
| 09/01/2020 | | **ENDORSED ORDER granting 60 Motion to Seal: 59 Government's Unredacted Proposed Witness List at Level I as to Christopher Cantwell (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/02/2020) |
| 09/02/2020 | 63 | JUROR QUESTIONNAIRES: Access to this document is available to the Court and temporarily available to counsel for USA, Christopher Cantwell only. Note: This document contains questionnaires available at the time of filing. Any additional questionnaires collected will be provided to counsel of record by electronic supplement prior to jury selection.<br><br>**The retrieval or viewing of these questionnaires constitutes confirmation that you will adhere to L.R. 47.1, which requires that any individual given access to the questionnaires shall not disclose the questionnaires, or information contained therein, to anyone other than the attorneys, their agents, or the parties involved in trial. Violation of this rule may be treated as contempt of court.**(vln) (Entered: 09/02/2020) |
| 09/02/2020 | 64 | JURY SELECTION LIST: Access to this document is available to the Court and temporarily available to counsel for USA, Christopher Cantwell only.<br><br>**Any individual given access to the list shall not disclose the information contained therein, to anyone other than the attorneys, their agents, or the parties involved in trial. Violation of this rule may be treated as contempt of court.**(vln) (Entered: 09/02/2020) |
| 09/02/2020 | | **ENDORSED ORDER re 47 MOTION for Disclosure of Confidential Witness as to Christopher Cantwell (1). *Text of Order: The clerk shall set an ex parte telephone conference with Government counsel and the confidential witness. I will question the witness under oath on matters related to the defendant's motion in the manner proposed by the government. Defense counsel shall submit questions it would like me to put to the witness. I will disclose all portions of the hearing transcript to the parties that will not tend to identify the confidential witness and I will then hold a further hearing on the motion to disclose.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/02/2020) |
| 09/03/2020 | 65 | **ORDER as to Christopher Cantwell.** |

J.A. 7

| | | *It is hereby ordered that the jurors and alternates selected in this case are to be held in partial sequestration pursuant to 28 U.S.C. § 1871(e).* |
| --- | --- | --- |
| | | **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/03/2020) |
| 09/03/2020 | 66 | MOTION in Limine re: Victim's Political Beliefs etc. by USA as to Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Davis, John) (Entered: 09/03/2020) |
| 09/03/2020 | 67 | MOTION in Limine re: Other Acts of 3d Parties by USA as to Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Davis, John) (Entered: 09/03/2020) |
| 09/03/2020 | 68 | MOTION in Limine re: To Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein by Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Wolpin, Eric) (Entered: 09/03/2020) |
| 09/03/2020 | 69 | MOTION in Limine re: To Exclude References to Charlottesville, Virginia, & the Unite the Right Rally by Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Wolpin, Eric) (Entered: 09/03/2020) |
| 09/03/2020 | 70 | DEFENDANT'S PROPOSED QUESTIONS RE re: 47 Motion for Disclosure of Confidential Witness at Level I. (vln) (Entered: 09/03/2020) |
| 09/03/2020 | 71 | MOTION in Limine re: To Exclude Evidence of Firearms, Controlled Drugs, & Prior Convictions by Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Wolpin, Eric) (Entered: 09/03/2020) |
| 09/03/2020 | 72 | MOTION in Limine re: To Exclude Witness by Christopher Cantwell.Follow up on Objection on 9/17/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Wolpin, Eric) (Entered: 09/03/2020) |
| 09/04/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Ex Parte Telephone Conference set for 9/8/2020 11:00 AM before Judge Paul J. Barbadoro. The court will email counsel call-in information. (vln) (Entered: 09/04/2020) |
| 09/04/2020 | 73 | FINAL WITNESS LIST by Christopher Cantwell.(Wolpin, Eric) (Entered: 09/04/2020) |
| 09/08/2020 | 74 | ADDENDUM re: 68 MOTION in Limine re: To Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein by Christopher Cantwell. (Wolpin, Eric) (Entered: 09/08/2020) |
| 09/08/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE re Jury Instructions as to Christopher Cantwell held on 9/8/2020. (Court Reporter: Brenda Hancock) (Govt Atty: Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:15) (vln) (Entered: 09/08/2020) |
| 09/08/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: Ex Parte TELEPHONE CONFERENCE as to Christopher Cantwell held on 9/8/2020. (Court Reporter: Brenda Hancock) (Govt Atty: Anna Krasinski)(Total Hearing Time: 0:25) (vln) (Entered: 09/08/2020) |
| 09/08/2020 | 75 | Proposed Voir Dire by Christopher Cantwell.(Levin, Jeffrey) (Entered: 09/08/2020) |
| 09/08/2020 | 76 | Objection to the Government's Trial Exhibit List by Christopher Cantwell (Wolpin, Eric) (Entered: 09/08/2020) |
| 09/08/2020 | 79 | SEALED Supplement to 68 Motion in Limine to Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein. (Attachments: # 1 Exhibit List, # 2 Exhibit B - Calls from Cheddarmane to Cantwell's Show)(vln) (Entered: 09/08/2020) |
| 09/08/2020 | 80 | Assented to MOTION to Seal 79 SEALED Supplement to 68 Motion in Limine to Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein, by Christopher Cantwell. (vln) (Entered: 09/09/2020) |
| 09/09/2020 | 77 | RESPONSE to Motion by USA as to Christopher Cantwell re 69 MOTION in Limine re: To Exclude References to Charlottesville, Virginia, & the Unite the Right Rally . (Krasinski, Anna) (Entered: 09/09/2020) |
| 09/09/2020 | 78 | RESPONSE to Motion by USA as to Christopher Cantwell re 71 MOTION in Limine re: To Exclude Evidence of Firearms, Controlled Drugs, & Prior Convictions . (Krasinski, Anna) (Entered: 09/09/2020) |
| 09/09/2020 | 81 | NOTICE of Regarding Witness I.D. and COVID-19 Protocols by USA as to Christopher Cantwell. (Krasinski, Anna) (Entered: 09/09/2020) |
| 09/09/2020 | 82 | AMENDED WITNESS LIST by USA as to Christopher Cantwell.(Krasinski, Anna) (Entered: 09/09/2020) |
| 09/09/2020 | 83 | MOTION (redacted) for Rule 15 Deposition by USA as to Christopher Cantwell.Follow up on Objection on 9/23/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Krasinski, Anna) (Entered: 09/09/2020) |

**J.A. 8**

| 09/09/2020 | 85 | Assented to Motion to Seal Unredacted Motion for Deposition at Level I, by USA as to Christopher Cantwell. (vln) (Entered: 09/09/2020) |
|---|---|---|
| 09/09/2020 | 86 | SEALED UNREDACTED AMENDED WITNESS LIST filed by USA (vln) (Entered: 09/09/2020) |
| 09/09/2020 | 87 | Assented to MOTION to Seal Document 86 UNREDACTED AMENDED WITNESS LIST at Level I by USA as to Christopher Cantwell. (vln) (Entered: 09/09/2020) |
| 09/09/2020 | 88 | SEALED TRANSCRIPT of Proceedings for EX PARTE TELEPHONE CONFERENCE - COURT EXAMINATION OF CONFIDENTIAL INFORMANT held on 9/8/2020. Sealed at Level I. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. (vln) (Entered: 09/09/2020) |
| 09/10/2020 | 89 | OBJECTION by Christopher Cantwell re 83 MOTION (redacted) for Rule 15 Deposition . (Levin, Jeffrey) (Entered: 09/10/2020) |
| 09/10/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference re 83 Motion for Rule 15 Deposition set for 9/10/2020 02:30 PM before Judge Paul J. Barbadoro. (vln) (Entered: 09/10/2020) |
| 09/10/2020 | | **ORAL ORDER denying without prejudice 83 MOTION (redacted) for Rule 15 Deposition as to Christopher Cantwell (1). *Denied for reasons explained on the record.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/10/2020) |
| 09/10/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 9/10/2020. MOTION for Rule 15 Deposition (doc. no. 83) DENIED for the reasons explained on the record. (Court Reporter: Liza Dubois) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:25) (vln) (Entered: 09/10/2020) |
| 09/10/2020 | | **ENDORSED ORDER granting 80 Motion to Seal Document No. 79; granting 85 Motion to Seal Document No 84; granting 87 Motion to Seal Document No 86. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/11/2020) |
| 09/14/2020 | 90 | OBJECTION by USA as to Christopher Cantwell re 72 MOTION in Limine re: To Exclude Witness . (Krasinski, Anna) (Entered: 09/14/2020) |
| 09/14/2020 | 91 | MOTION to Dismiss *Count Two of the Superseding Indictment* by USA as to Christopher Cantwell.Follow up on Objection on 9/28/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Krasinski, Anna) (Entered: 09/14/2020) |
| 09/14/2020 | 92 | AMENDED WITNESS LIST by USA as to Christopher Cantwell.(Krasinski, Anna) (Entered: 09/14/2020) |
| 09/14/2020 | 93 | Proposed Jury Instructions by USA as to Christopher Cantwell.(Krasinski, Anna) (Entered: 09/14/2020) |
| 09/15/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: Conference re jury voir dire as to Christopher Cantwell held on 9/15/2020 (Court Reporter: Liza Dubois) (Govt Atty: John Davis) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 0:17) (vln) (Entered: 09/15/2020) |
| 09/15/2020 | | **ORAL ORDER granting 91 Motion to Dismiss as to Christopher Cantwell (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/15/2020) |
| 09/15/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY SELECTION - Day 1 as to Christopher Cantwell held on 9/15/2020.. (Court Reporter: Liza Dubois) (Govt Atty: John Davis) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 2:15) (vln) (Entered: 09/15/2020) |
| 09/15/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 9/17/2020 01:30 PM before Judge Paul J. Barbadoro. (vln) (Entered: 09/15/2020) |
| 09/15/2020 | | NOTICE OF VIDEO HEARING ON ALL PENDING MOTIONS as to Christopher Cantwell. <br><br> Motion Hearing set for 9/18/2020 11:00 AM before Judge Paul J. Barbadoro. (vln) (Entered: 09/15/2020) |
| 09/15/2020 | | ORAL MOTION in Limine to Bar CPS Witness by Christopher Cantwell. (vln) (Entered: 09/15/2020) |
| 09/15/2020 | 94 | Objection to Defendant's Proposed Trial Exhibits by USA as to Christopher Cantwell (Krasinski, Anna) (Entered: 09/15/2020) |
| 09/15/2020 | | **Redacted Indictment (Counts)as to Christopher Cantwell (1): Former count 3s is now count 2rs. Former count 4s is now count 3rs.. (vln)** (Entered: 11/05/2020) |
| 09/16/2020 | 95 | OBJECTION by Christopher Cantwell re 67 MOTION in Limine re: Other Acts of 3d Parties . (Wolpin, Eric) (Entered: 09/16/2020) |
| 09/16/2020 | 96 | OBJECTION by USA as to Christopher Cantwell re 68 MOTION in Limine re: To Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein . (Davis, John) (Entered: 09/16/2020) |
| 09/16/2020 | 97 | OBJECTION by USA as to Christopher Cantwell re MOTION in Limine re: to Bar CPS Witness . (Krasinski, Anna) (Entered: 09/16/2020) |

J.A. 9

| | | |
|---|---|---|
| 09/17/2020 | 98 | OBJECTION by Christopher Cantwell re 66 MOTION in Limine re: Victim's Political Beliefs etc. . (Wolpin, Eric) (Entered: 09/17/2020) |
| 09/17/2020 | 99 | MOTION for Two-Way Video Testimony *(REDACTED)* by USA as to Christopher Cantwell.Follow up on Objection on 10/1/2020. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Krasinski, Anna) (Entered: 09/17/2020) |
| 09/17/2020 | 100 | SEALED UNREDACTED MOTION for Two-Way Live Video Testimony of Victim's Spouse, by USA as to Christopher Cantwell. (vln) Modified on 9/18/2020 to add: UNREDACTED(vln). (Entered: 09/17/2020) |
| 09/17/2020 | 101 | Assented to MOTION to SEAL 100 UNREDACTED MOTION for Two-Way Live Video Testimony, by USA as to Christopher Cantwell. (vln) (Entered: 09/17/2020) |
| 09/17/2020 | | NOTICE OF VIDEO HEARING ON 99 MOTION for Two-Way Video Testimony. Motion Hearing set for 9/21/2020 11:00 AM before Judge Paul J. Barbadoro. (vln) (Entered: 09/17/2020) |
| 09/17/2020 | | RESCHEDULING NOTICE OF VIDEO HEARING ON re: 99 MOTION for Two-Way Video Testimony **TIME CHANGE ONLY** Motion Hearing set for 9/21/2020 10:00 AM before Judge Paul J. Barbadoro. (vln) (Entered: 09/17/2020) |
| 09/17/2020 | 102 | SEALED Reply to Objection to Motion re: 68 Motion in Limine re: To Admit Evidence of the Bowl Patrol & Bowlcast & the Alleged Victim's Involvement Therein (vln) (Entered: 09/17/2020) |
| 09/17/2020 | 103 | Assented to MOTION to Seal Document 102 SEALED Reply to Objection to Motion, by Christopher Cantwell. (vln) (Entered: 09/17/2020) |
| 09/17/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 9/17/2020. (Court Reporter: Brenda Hancock) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 0:15) (vln) (Entered: 09/17/2020) |
| 09/18/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Christopher Cantwell held on 9/18/2020 on pending motions in limine. (Court Reporter: Susan Bateman) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 1:20) (vln) (Entered: 09/18/2020) |
| 09/18/2020 | | **ORAL ORDER taking under advisement 66 MOTION in Limine re: Victim's Political Beliefs etc; taking under advisement 67 MOTION in Limine re: Other Acts of 3d Parties; mooting 69 MOTION in Limine re: To Exclude References toCharlottesville, Virginia, & the Unite the Right Rally; mooting 71 MOTION in Limine re: To Exclude Evidence ofFirearms, Controlled Drugs, & Prior Convictions; denying without prejudice [] ORAL MOTION in Limine re: to Bar CPS Witnessas to Christopher Cantwell (1). So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/18/2020) |
| 09/18/2020 | | **ENDORSED ORDER granting 101 Motion to Seal Document: 100 UNREDACTED MOTION for Two-Way Live Video Testimony as to Christopher Cantwell (1); granting 103 Motion to Seal Document: 102 Sealed REPLY as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/21/2020) |
| 09/20/2020 | 104 | OBJECTION by Christopher Cantwell re 99 MOTION for Two-Way Video Testimony *(REDACTED)* . (Levin, Jeffrey) (Entered: 09/20/2020) |
| 09/21/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Christopher Cantwell held on 9/21/2020 re 99 MOTION for Two-Way Video Testimony *(REDACTED)*. Motion taken under advisement. Counsel to contact case manager regarding decision to re-empanel jury by 4pm. (Court Reporter: Liza Dubois) (Govt Atty: Anna Krasinski) (Defts Atty: Jeffrey Levin)(Total Hearing Time: 1:17) (vln) (Entered: 09/21/2020) |
| 09/21/2020 | 105 | STIPULATION re: Authenticity of Exhibits by USA as to Christopher Cantwell *(Joint Stipulation)*. (Davis, John) (Entered: 09/21/2020) |
| 09/21/2020 | 106 | Objection to Supplemental Defense Exhibits by USA as to Christopher Cantwell (Krasinski, Anna) (Entered: 09/21/2020) |
| 09/21/2020 | | NOTICE: Trial to proceed as scheduled as to Christopher Cantwell. (vln) (Entered: 09/21/2020) |
| 09/22/2020 | 107 | Proposed Jury Instructions by USA as to Christopher Cantwell.(Krasinski, Anna) (Entered: 09/22/2020) |
| 09/22/2020 | 108 | MOTION to Waive Mask Requirement, by Ian Freeman (vln) (Entered: 09/22/2020) |

**J.A. 10**

| | | |
|---|---|---|
| 09/22/2020 | | **ORAL ORDER denying 108 MOTION to Waive Mask Requirement as to Christopher Cantwell (1). *Denied for reasons explained on the record*. So Ordered by Judge Paul J. Barbadoro. (vln)** Modified on 9/22/2020 to correct grammatical error. (vln). (Entered: 09/22/2020) |
| 09/22/2020 | 109 | OBJECTION & MOTION to RECONSIDER, by Ian Freeman (vln) (Entered: 09/22/2020) |
| 09/22/2020 | | **ORAL ORDER denying 109 OBJECTION and Motion to Reconsider (1).**<br><br>***Denied for reasons explained on the record.***<br><br>**So Ordered by Judge Paul J. Barbadoro. (vln)** Modified on 9/23/2020 to add: ORAL (vln). (Entered: 09/22/2020) |
| 09/22/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 1 as to Christopher Cantwell held on 9/22/2020. Evidence introduced. Witnesses Appearing: Sarah Smith, Shane Tongbua. (Court Reporter: Susan Bateman (morning); Brenda Hancock (afternoon)) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 6:30) (vln) Modified on 9/24/2020 to correct date (vln). (Entered: 09/23/2020) |
| 09/23/2020 | | **ORAL ORDER denying 99 MOTION for Two-Way Video Testimony *(REDACTED)* as to Christopher Cantwell (1). *Denied for reasons explained on the record*. So Ordered by Judge Paul J. Barbadoro. (vln)** Modified on 9/23/2020 to add: (vln). (Entered: 09/23/2020) |
| 09/23/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 2 as to Christopher Cantwell held on 9/23/2020. Evidence introduced. Witnesses Appearing: Shane Tongbua, Benjamin Lambert. (Court Reporter: Liza Dubois (morning); Susan Bateman (afternoon)) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 6:20) (vln) (Entered: 09/24/2020) |
| 09/24/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 3 as to Christopher Cantwell held on 9/24/2020. Evidence introduced. Witnesses Appearing: Benjamin Lambert, Paul Nehlen, Kevin Lablanc, Brett Fernald, Christopher Cantwell. (Court Reporter: Brenda Hancock (morning); Liza Dubois (afternoon)) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 6:40) (vln) (Entered: 09/25/2020) |
| 09/24/2020 | | ORAL MOTION for Acquittal Pursuant to Rule 29, by Christopher Cantwell. (vln) (Entered: 09/25/2020) |
| 09/24/2020 | | **ORAL ORDER denying [] ORAL MOTION for Acquittal pursuant to Rule 29 as to Christopher Cantwell (1). *Denied for reasons explained on the record*. So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/25/2020) |
| 09/25/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 4 as to Christopher Cantwell held on 9/25/2020. Evidence introduced. Witnesses Appearing: Christopher Cantwell. Closing arguments. Court charges jury. Jury retires to deliberate. Renewed Rule 29 Motion denied for reasons explained on the record. (Court Reporter: Susan Bateman (morning); Brenda Hancock (afternoon)) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 7:05) (vln) (Entered: 09/28/2020) |
| 09/28/2020 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 5 as to Christopher Cantwell held on 9/28/2020. Jury returns verdict. (Court Reporter: Liza Dubois) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 0:10) (vln) (Entered: 09/28/2020) |
| 09/28/2020 | 110 | FINAL EXHIBIT LIST by USA as to Christopher Cantwell.(vln) (Entered: 09/28/2020) |
| 09/28/2020 | 111 | FINAL EXHIBIT LIST by Christopher Cantwell.(vln) (Entered: 09/28/2020) |
| 09/28/2020 | 112 | Attorney Certification of Electronic Exhibits Submitted for Presentation Using the Jury Evidence Recording System (JERS)(vln) (Entered: 09/28/2020) |
| 09/28/2020 | 113 | Court Instructions as to Christopher Cantwell.(vln) (Entered: 09/28/2020) |
| 09/28/2020 | 114 | JURY VERDICT as to Christopher Cantwell (1). (Attachments: # 1 UNREDACTED JURY VERDICT) *Document available in clerks office.*(vln) (Entered: 09/28/2020) |
| 09/28/2020 | | NOTICE OF HEARING as to Christopher Cantwell. Sentencing set for 1/4/2021 11:00 AM before Judge Paul J. Barbadoro.*The court has allotted 1/2 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(vln) (Entered: 09/28/2020)** |
| 09/28/2020 | 115 | Assented to MOTION to Complete the Record by Christopher Cantwell. (Attachments: # 1 Exhibit A: Excerpt from Court's draft jury instructions, # 2 Exhibit B: Defendant's proposed alternate language for "Provocation - Not a Defense" jury instruction) (Levin, Jeffrey) (Entered: 09/28/2020) |
| 09/29/2020 | 116 | Assented-to Motion to Seal at Level I an Unredacted Version of Government's Exhibits by USA as to Christopher Cantwell (Krasinski, Anna) Modified on 9/30/2020 to CORRECT FILING EVENT TO MOTION(vln). (Entered: |

**J.A. 11**

| | | |
|---|---|---|
| | | 09/29/2020) |
| 09/29/2020 | | **ENDORSED ORDER granting 115 Assented to MOTION to Complete the Record as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/30/2020) |
| 09/29/2020 | | **ENDORSED ORDER re pending motions in limine as to Christopher Cantwell.**<br><br>*Text of Order: All trial motions not acted upon at trial are denied as moot.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/30/2020) |
| 09/30/2020 | | **ENDORSED ORDER granting 116 Motion to Seal at Level I an Unredacted Version of Government's Exhibits as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 10/01/2020) |
| 12/08/2020 | 118 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Excerpt of Trial Testimony of Christopher Cantwell held on 9/25/2020. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password may purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/29/2020. Redacted Transcript Follow Up 1/8/2021. Release of Transcript Restriction set for 3/5/2021. (vln) (Entered: 12/08/2020) |
| 12/09/2020 | 119 | TRANSCRIPT of Proceedings as to Christopher Cantwell for EXCERPT OF JURY TRIAL DAY 4 TESTIMONY OF CHRISTOPHER CANTWELL held on 9/24/2020. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/30/2020. Redacted Transcript Follow Up 1/11/2021. Release of Transcript Restriction set for 3/8/2021. (vln) (Entered: 12/09/2020) |
| 12/22/2020 | 122 | Assented to MOTION to Continue Sentencing Hearing by Christopher Cantwell. (Wolpin, Eric) (Entered: 12/22/2020) |
| 12/23/2020 | | **ENDORSED ORDER granting 122 Assented to MOTION to Continue Sentencing Hearing as to Christopher Cantwell (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Sentencing set for 1/22/2021 10:30 AM before Judge Paul J. Barbadoro.** *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.** **(vln) (Entered: 12/23/2020)** |
| 01/07/2021 | | NOTICE OF HEARING as to Christopher Cantwell. COUNSEL ONLY Telephone Conference set for 1/11/2021 11:00 AM before Judge Paul J. Barbadoro. The court will email call-in information to counsel of record. (vln) (Entered: 01/07/2021) |
| 01/11/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 1/11/2021. Defendant's objection to court's proposed continuance due by 1/15/2021. (Court Reporter: Susan Bateman) (Govt Atty: Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin)(Total Hearing Time: 0:07) (vln) (Entered: 01/11/2021) |
| 01/11/2021 | | NOTICE OF HEARING as to Christopher Cantwell. Sentencing set for 2/24/2021 10:00 AM before Judge Paul J. Barbadoro. *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.** **(vln) (Entered: 01/11/2021)** |
| 02/16/2021 | 123 | SENTENCING MEMORANDUM by Christopher Cantwell. (Attachments: # 1 Exhibit A-HuffPost Article, # 2 Exhibit B-Albemarle Circuit Court Virginia Sentencing Doc, # 3 Exhibit C-Albemarle Circuit Court Virginia Charging Docs, # 4 Exhibit D-"Peach" Communication, # 5 Exhibit E-PACER Report, NH, 18 USC 875(b) Cases, # 6 Exhibit F-PACER Report, NH, 18 USC 875(b) Cases, # 7 Exhibit G-PACER Report, MA, 18 USC 875(b) Cases, # 8 Exhibit H-PACER Report, MA, 18 USC 875(b) Cases, # 9 Exhibit I-Commission's Data Analyzer Tool Rept, # 10 Exhibit J-Commission's Data Analyzer Rept)(Wolpin, Eric) (Entered: 02/16/2021) |

| | | |
|---|---|---|
| 02/19/2021 | 126 | SENTENCING MEMORANDUM by USA as to Christopher Cantwell. (Attachments: # 1 Exhibit 1 - Notice of Conventional Filing, # 2 Exhibit 2 - Judgment)(Davis, John) (Entered: 02/19/2021) |
| 02/22/2021 | 127 | Assented to MOTION to allow the victim to attend the sentencing hearing by video(redacted) by USA as to Christopher Cantwell. (Krasinski, Anna) (Entered: 02/22/2021) |
| 02/22/2021 | 128 | SEALED UNREDACTED MOTION to allow victim to appear by video, filed by USA (vln) (Entered: 02/22/2021) |
| 02/23/2021 | | **ENDORSED ORDER granting 127 Assented to MOTION to allow the victim to attend the sentencing hearing by video(redacted) as to Christopher Cantwell (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/23/2021) |
| 02/24/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: SENTENCING held on 2/24/2021 for Christopher Cantwell (1) Sentenced to 41 months imprisonment. Fine waived due to inability to pay. Appeal rights to defendant. (Court Reporter: Susan Bateman) (Govt Atty: John Davis, Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin) (USP: Sean Buckley)(Total Hearing Time: 3:00) (vln) (Entered: 02/24/2021) |
| 02/24/2021 | | NOTICE OF HEARING as to Christopher Cantwell. Telephone Conference set for 2/25/2021 03:00 PM before Judge Paul J. Barbadoro. The court will email dial-in information to counsel of record. (vln) (Entered: 02/24/2021) |
| 02/24/2021 | 131 | ACKNOWLEDGMENT of Sentencing Options by Christopher Cantwell. (vln) (Entered: 02/24/2021) |
| 02/25/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TELEPHONE CONFERENCE as to Christopher Cantwell held on 2/25/2021. (Court Reporter: Liza Dubois) (Govt Atty: Anna Krasinski) (Defts Atty: Eric Wolpin, Jeffrey Levin) (USP: Sean Buckley)(Total Hearing Time: 0:45) (vln) (Entered: 02/26/2021) |
| 03/05/2021 | 132 | **JUDGMENT as to Christopher Cantwell (1), Count(s) 1s, 2rs, 41 months on Count 1s and 24 months on Count 2rs, all to be served concurrently; 2 years supervised release; $200 special assessment; Count(s) 3rs, Acquitted. So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 03/05/2021) |
| 03/05/2021 | 133 | NOTICE OF APPEAL by Christopher Cantwell re 132 Judgment,. (No fee paid, USA or IFP.). [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Levin, Jeffrey) (Entered: 03/05/2021) |
| 03/08/2021 | 134 | Appeal Cover Sheet as to Christopher Cantwell re 133 Notice of Appeal (vln) (Entered: 03/08/2021) |
| 03/08/2021 | 135 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals as to Christopher Cantwell to USCA re 133 Notice of Appeal. A copy of the Notice of Appeal mailed to all parties this date. (vln) (Entered: 03/08/2021) |
| 03/09/2021 | | Appellate Case Number: First Circuit Court of Appeals 21-1186 for 133 Notice of Appeal, filed by Christopher Cantwell. (vln) (Entered: 03/09/2021) |
| 05/03/2021 | 136 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Initial Appearance/Arraignment held on 1/23/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/25/2021. Redacted Transcript Follow Up 6/4/2021. Release of Transcript Restriction set for 7/30/2021. (vln) (Entered: 05/05/2021) |
| 05/03/2021 | 137 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Bail Hearing held on 6/26/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |

J.A. 13

| 05/03/2021 | 138 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference held on 8/24/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
|---|---|---|
| 05/03/2021 | 139 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Final Pretrial Conference held on 8/31/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
| 05/03/2021 | 140 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Motion Hearing held on 9/18/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
| 05/03/2021 | 141 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 1 (Morning Session) held on 9/22/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
| 05/03/2021 | 142 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 2 (AFTERNOON Session) held on 9/23/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) Modified on 5/5/2021 to add: AFTERNOON (vln). (Entered: 05/05/2021) |
| 05/03/2021 | 143 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 4 (Morning Session) held on 9/25/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who |

J.A. 14

purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021)

| 05/03/2021 | 144 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference held on 1/11/2021. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
| --- | --- | --- |
| 05/03/2021 | 145 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Sentencing held on 2/24/2021. Court of Appeals Docket Number 21-1186. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/24/2021. Redacted Transcript Follow Up 6/3/2021. Release of Transcript Restriction set for 7/29/2021. (vln) (Entered: 05/05/2021) |
| 05/12/2021 | 147 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference held on 9/10/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| 05/12/2021 | 148 | TRANSCRIPT of Proceedings for JURY SELECTION held on 9/15/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, At the discretion of the presiding judge, the transcript of jury selection may not be available for public inspection. To the extent the jury selection is available for public inspection at the Clerk's Office, it may not be copied or otherwise reproduced for a period of 90 days. Only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| 05/12/2021 | 149 | TRANSCRIPT of Proceedings as to Christopher Cantwell for MOTION HEARING held on 09/21/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. |

**J.A. 15**

NOTICE: Any party who requests an original transcript has 21 days from this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.

Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021)

| 05/12/2021 | 151 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 2 (Morning Session) held on 09/23/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| --- | --- | --- |
| 05/12/2021 | 152 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 3 (afternoon session) held on 09/24/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| 05/12/2021 | 153 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 5 (VERDICT) held on 09/28/20. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| 05/12/2021 | 154 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference held on 02/25/21. Court of Appeals Docket Number 21-1186. Court Reporter: Liza Dubois, Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 6/2/2021. Redacted Transcript Follow Up 6/14/2021. Release of Transcript Restriction set for 8/9/2021. (vln) (Entered: 05/13/2021) |
| 05/18/2021 | 155 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference re: Jury Instructions and Motions in Limine held on 9/8/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** |

## J.A. 16

Redaction Request Follow Up 6/8/2021. Redacted Transcript Follow Up 6/18/2021. Release of Transcript Restriction set for 8/13/2021. (vln) (Entered: 05/18/2021)

| | | |
|---|---|---|
| 05/18/2021 | 156 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Telephone Conference held on 09/17/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/8/2021. Redacted Transcript Follow Up 6/18/2021. Release of Transcript Restriction set for 8/13/2021. (vln) (Entered: 05/18/2021) |
| 05/18/2021 | 157 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 1 (afternoon session) held on 09/22/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/8/2021. Redacted Transcript Follow Up 6/18/2021. Release of Transcript Restriction set for 8/13/2021. (vln) (Entered: 05/18/2021) |
| 05/18/2021 | 158 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 3 (morning session) held on 09/24/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/8/2021. Redacted Transcript Follow Up 6/18/2021. Release of Transcript Restriction set for 8/13/2021. (vln) (Entered: 05/18/2021) |
| 05/18/2021 | 159 | TRANSCRIPT of Proceedings as to Christopher Cantwell for Jury Trial - Day 4 (afternoon session) held on 09/25/2020. Court of Appeals Docket Number 21-1186. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/8/2021. Redacted Transcript Follow Up 6/18/2021. Release of Transcript Restriction set for 8/13/2021. (vln) (Entered: 05/18/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/13/2021 10:47:16 | | |
| **PACER Login:** | chrissiedemaso | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cr-00006-PB |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

**J.A. 17**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 1:20-cr-** 06-01-PB |
| **CHRISTOPHER C. CANTWELL,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>INDICTMENT</u>

**The Grand Jury charges:**

### <u>COUNT ONE</u>
### 18 U.S.C. § 875(b)
### Extortionate Interstate Communications

On or about June 16, 2019, within the District of New Hampshire and elsewhere, the

defendant,

## CHRISTOPHER C. CANTWELL,

with intent to extort from Victim 1 a thing of value, namely, personal identifying information for

a man known by the on-line pseudonym "VM," and for the purpose of issuing a threat and with

knowledge that the communications would be viewed as a threat, transmitted a communication

in interstate commerce containing a threat to injure the person of another.  The defendant sent an

instant message through the Telegram Messenger app to Victim 1 stating, "So if you don't want

me to come and f\*ck your wife in front of your kids, then you should make yourself scarce[.]

Give me Vic, it's your only out."

In violation of Title 18, United States Code, Section 875(b).

**J.A. 18**

**COUNT TWO**
**18 U.S.C. § 875(c)**
**Threatening Interstate Communications**

On or about June 16, 2019, within the District of New Hampshire and elsewhere, the

defendant,

**CHRISTOPHER C. CANTWELL,**

for the purpose of issuing a threat and with knowledge that the communications would be viewed

as a threat, transmitted a communication in interstate commerce containing a threat to injure the

person of another.  The defendant sent an instant message through the Telegram Messenger app

to Victim 1 stating, "So if you don't want me to come and f*ck your wife in front of your kids,

then you should make yourself scarce."

In violation of Title 18, United States Code, Section 875(c).


A TRUE BILL



Date:  January 22, 2020                                    /s/ Foreperson_____
                                                                        Foreperson



            SCOTT W. MURRAY
            United States Attorney


By:      /s/ John S. Davis_____
            John S. Davis
            Anna Krasinski
            Assistant United States Attorneys


**J.A. 19**

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:20-cr-06-PB** |
| **CHRISTOPHER C. CANTWELL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT ONE
### 18 U.S.C. § 875(b)
### Extortionate Interstate Communications

On or about June 16, 2019, within the District of New Hampshire and elsewhere, the

defendant,

## CHRISTOPHER C. CANTWELL,

with intent to extort from Victim 1 a thing of value, namely, personal identifying information for

a man known by the on-line pseudonym "VM," and for the purpose of issuing a threat and with

knowledge that the communications would be viewed as a threat, transmitted a communication

in interstate commerce containing a threat to injure the person of another. The defendant sent an

instant message through the Telegram Messenger app to Victim 1 stating, "So if you don't want

me to come and f*ck your wife in front of your kids, then you should make yourself scarce[.]

Give me Vic, it's your only out."

In violation of Title 18, United States Code, Section 875(b).

# J.A. 20

**COUNT TWO**
**18 U.S.C. § 875(c)**
**Threatening Interstate Communications**

On or about June 16, 2019, within the District of New Hampshire and elsewhere, the

defendant,

**CHRISTOPHER C. CANTWELL,**

for the purpose of issuing a threat and with knowledge that the communications would be viewed

as a threat, transmitted a communication in interstate commerce containing a threat to injure the

person of another. The defendant sent an instant message through the Telegram Messenger app

to Victim 1 stating, "So if you don't want me to come and f*ck your wife in front of your kids,

then you should make yourself scarce."

In violation of Title 18, United States Code, Section 875(c).

**COUNT THREE**
**18 U.S.C. § 875(d)**
**Threat to Injure Property or Reputation**

Between on or about June 15, 2019, and on or about June 17, 2019, within the District of

New Hampshire and elsewhere, the defendant,

**CHRISTOPHER C. CANTWELL,**

with intent to extort from Victim 1 a thing of value, namely, personal identifying information for

a man known by the on-line pseudonym "VM," knowingly transmitted in interstate and foreign

commerce communications containing a threat to injure the reputation of Victim 1 and a threat to

accuse Victim 1 of a crime. Specifically, the defendant sent instant messages through the

Telegram Messenger app to Victim 1 stating, "Get a f*cking life or I will ruin the one you have";

". . . you are going to lose everything you have"; "Next time I post that photo, the faces won't be

**J.A. 21**

blurred, and they you're going to start getting unexpected visitors"; ". . . you're the one who's gonna suffer cause you're the one who I can get"; "You think the FBI would take issue with an LSD user owning guns around kids?"; "On Tuesday I'm going to send every episode of BowlCast along with your identifying information to whatever the local equivalent of CPS is in your jurisdiction"; "But I'm pretty sure once that visit comes, you'll understand that this is serious"; and "Tell [VM] that if he gives himself up, he can save your family."

In violation of Title 18, United States Code, Section 875(d).

## COUNT FOUR
### 18 U.S.C. § 2261A(2)
### Cyberstalking

Between in or about June 15 and June 17, 2019, within the District of New Hampshire and elsewhere, the defendant,

## CHRISTOPHER C. CANTWELL,

with the intent to harass and intimidate Victim 1, did use facilities of interstate and foreign commerce, including electronic communication services and telephone facilities, to engage in a course of conduct that placed Victim 1 in reasonable fear of serious bodily injury to Victim 1's spouse, and that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to Victim 1 and Victim 1's spouse. The defendant's course of conduct included (1) on or about June 15-16, 2019, threatening to rape Victim 1's wife, threatening to "dox" Victim 1 by publishing on the internet Victim 1's identifying information, and threatening to report Victim 1 to Child and Protective Services, by sending instant messages through the Telegram Messenger app to Victim 1 stating, "Get a f*cking life or I will ruin the one you have"; ". . . you are going to lose everything you have"; "Next time I post that photo, the faces won't be blurred, and they you're going to start getting unexpected visitors"; ". . . you're the one who's gonna suffer cause you're the one who I can get"; ". . . but if you give me

## J.A. 22

fake info, then your wife is gonna have trouble sleeping at night until she leaves you and takes your kids away"; "So if you don't want me to come and f*ck your wife in front of your kids, then you should make yourself scarce"; "I bet one of my incel listeners would love to give her another baby"; "You think the FBI would take issue with an LSD user owning guns around kids?"; "On Tuesday I'm going to send every episode of BowlCast along with your identifying information to whatever the local equivalent of CPS is in your jurisdiction"; "But I'm pretty sure once that visit comes, you'll understand that this is serious"; and "Tell [VM] that if he gives himself up, he can save your family."; (2) on or about June 17, 2019, doxing Victim 1 by posting Victim 1's state, town, and street and photographs of Victim 1 and Victim 1's wife and children on the Radical Agenda account on Telegram Messenger, and writing "that's [Victim 1], and tomorrow morning, I'm calling CPS to [give] them every episode of BowlCast, and inform them that this acid dropping fake Nazi is endangering those children with his behavior"; and (3) on or about June 17, 2019, telephoning the child abuse and neglect hotline in Victim 1's state and making a report against Victim 1.

In violation of Title 18, United States Code, Section 2261A(2).


A TRUE BILL


Date: July 8, 2020                                      /s/ Foreperson
                                                       Foreperson


SCOTT W. MURRAY
United States Attorney


By:   /s/ John S. Davis
      John S. Davis
      Anna Krasinski
      Assistant United States Attorneys


# J.A. 23

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA         *
                                     *
5                                     * No. 1:20-cr-00006-PB
               v.                     * September 8, 2020
6                                     * 10:02 a.m.
                                     *
7    CHRISTOPHER CANTWELL,            *
                                     *
8                     Defendant.      *

9    * * * * * * * * * * * * * * * * *

10

   TRANSCRIPT OF TELEPHONE CONFERENCE RE: JURY INSTRUCTIONS AND
11                      MOTIONS *IN LIMINE*

12            BEFORE THE HONORABLE PAUL J. BARBADORO

13

14   APPEARANCES:

15
     For the Government:      AUSA Anna Z. Krasinski, Esq.
16                            (Via telephone)
                              U.S. Attorney's Office
17
     For the Defendant:       Eric Wolpin, Esq.   (Via telephone)
18                            Jeffrey S. Levin, Esq. (Via telephone)
                              Federal Defender Office
19

20
     Court Reporter:          Brenda K. Hancock, RMR, CRR
21                            Official Court Reporter
                              United States District Court
22                            55 Pleasant Street
                              Concord, NH 03301
23                            (603) 225-1454

24

25

**J.A. 24**

1                        P R O C E E D I N G S

2            THE CLERK:  For the record, the Court is in session

3    and has for consideration a telephone conference in the United

4    States of America versus Christopher Cantwell, criminal case

5    number 20-cr-06-01-PB.

6            THE COURT:  Okay.  I'll remind the parties we're on

7    the record.

8            All right.  Let me tell you what's on my agenda and

9    what I want to talk about, and then, after we run through my

10   agenda, anything that anyone else wants to cover I'm happy to

11   take up.  I want to talk to you about voir dire; I want to talk

12   to you about the way I'm going to proceed with respect to the

13   informant, the conference I'm going to have later today on

14   that; I want to talk to you about the jury instructions; and,

15   if we have time, maybe we can start talking about the motions

16   *in limine*.

17           So, let's start with voir dire.  Have the parties

18   submitted proposed in-court voir dire?

19           MR. WOLPIN:  The deadline's today.  We haven't

20   submitted ours yet.

21           THE COURT:  Okay.  So, you are probably not going to

22   have a chance to talk to me between now and next Tuesday,

23   unless it's some kind of emergency, because I'm trying to take

24   my first time off in about 18 months.  So, if you want to raise

25   issues with me on voir dire in a general sense now, I'm happy

1  to hear what you have to say, and then I'll, obviously, be

2  reading your proposed voir dire and putting together mine when

3  I show up on Tuesday.

4  Let's take the government first and then the defense.

5  Does the government have anything you want to say about the

6  voir dire?

7  MS. KRASINSKI:  I don't think so.  Attorney Davis and

8  I talked about it, and I think we actually were not planning on

9  submitting any voir dire questions.

10  THE COURT:  Okay.  And how about the defense?

11  Anything you want to tell me in general about it, understanding

12  you'll be submitting your specific requests at the end of the

13  day?

14  MR. WOLPIN:  It's hard to talk about it in a general

15  sense.  I mean, we'll present our proposal.  I guess we would

16  ask for a limited amount of time before we actually begin to

17  address them, but, you know, I think there are things that

18  people could expect and anticipate as far as what we want

19  brought up with these particular jurors.

20  THE COURT:  Okay.  Well, again, I'm not sure how much

21  time I'm going to have to speak to you in advance, but I

22  obviously have a lot of experience doing voir dire, and I'll

23  look carefully at your proposals and ask the ones that I think

24  are appropriate, and you'll have an opportunity to object and

25  ask me to do further voir dire before I complete it.  So, we'll

**J.A. 26**

 1   cover it then.

 2          Okay.  So, the informant, I will be questioning the

 3   informant, and I intend to cover most but not every single one

 4   of the defendant's questions.  I will not proceed in the order

 5   in which they're being asked.  I will not ask them verbatim,

 6   but I will cover the vast majority of things that the defendant

 7   wants me to cover.  There are a couple of things that I don't

 8   intend to cover, unless something comes up in the questioning

 9   that makes them relevant.  I don't think this should be an

10   opportunity to develop impeachment information about the

11   informant.  Obviously, if something comes up, I may need to

12   question on those subjects, and I don't see at the present time

13   any reason to question about gun usage.  The focus is going to

14   be what do you know about Cheddar Mane's use of drugs, and how

15   do you know it, and I'll develop some context about their state

16   of their interactions and knowledge, and I'll probe deeply

17   about what he knows about drug usage and how he knows what he

18   knows about drug usage.  That's what I intend to do.

19          Does either party want to say anything to me about

20   that, starting with the government?

21          MS. KRASINSKI:  No, your Honor.

22          MR. LEVIN:  Just to be clear, your Honor, we have it

23   on our calendar as scheduled for 11:00, an *ex parte* phone

24   conference.  So, how will that -- will you be on that call with

25   a court reporter, or will it just be you and the informant?

1          THE COURT:  Yeah.  No, I would never talk to anybody

2     like this without a court reporter.  My intention is to conduct

3     the questioning under oath.  The government will be permitted

4     to attend but not to question, and I will make a transcript of

5     the conversation available to the defense.  That's my plan.

6     Obviously, if he blurts out something that's identifying that I

7     determine isn't appropriate for you to see, I'll redact that

8     and note that I've redacted it and give you an opportunity to

9     object and ask that it be disclosed.  But you'll get a

10    transcript that will fully disclose everything I've asked the

11    informant.

12          MR. NEWMAN:  Understood.

13          THE COURT:  All right.  Anything else you want to know

14    about that?

15          MR. WOLPIN:  No, your Honor.

16          THE COURT:  Okay.  All right.  So, let's chat about

17    jury instructions, and let me emphasize this is a preliminary

18    chat.  I view it as kind of a brainstorming session so that you

19    have an opportunity to try to educate me on the instructions.

20    I am not going to take any firm positions on issues like

21    instructions, but I will be continuing to think about it and

22    drafting proposed instructions, and I'll be talking to you

23    about it again; and, of course, I'll present you with any

24    instructions I intend to give prior to giving them at an

25    appropriate time and give you a full and fair opportunity to

1    comment on them.  So, at this stage I'm just trying to figure

2    out where you differ on the instructions and how your views

3    square with my understanding of the relevant law.

4        I have spent several hours looking at the relevant

5    statutes, at the indictment and at the parties' proposed

6    instructions and at some of the case law addressing issues that

7    the instructions raise.  But I'm not in a position today to

8    make any definitive ruling today.  I won't require the parties

9    to take any definitive position on it.  I'm more trying to just

10   get your general thoughts about it.

11       So, let's start with the government's proposed

12   instructions, and let me hear if the defendants see anything in

13   those instructions in particular they want to draw my attention

14   to that they think is problematic, and then we'll do the same

15   things with respect to the defendant's instructions.

16       So, what is the government proposing in their

17   instructions that the defense is concerned about?

18       MR. LEVIN:  I think in terms of proposed jury

19   instruction 1 the government noted that in the Eighth Circuit

20   pattern jury instructions and also Fourth Circuit case law that

21   this particular statute does not -- I'm sorry -- that this

22   particular statute contains an explicit requirement regarding

23   the defendant's subjective intent.  So, we added in our

24   instruction the elements that indicate that the communication

25   was transmitted for the purpose of issuing a true threat.

**J.A. 29**

1    Those are not in the government's instruction.

2         And I would just note that in the indictment in Count

3    One it's indicted as for the purpose of issuing a threat and

4    with knowledge that it would be viewed as a threat.  So, the

5    subjective element is actually in the indictment itself.

6         THE COURT:  Yeah.  So, feel free to do this as we go

7    through this, to highlight where your instruction includes

8    something that's not in the government's instruction, because I

9    think it will help us get to the heart of the difference.

10        So, I think one of the issues I have, at least in my

11   initial thinking about this, is that 875(b) and 875(d) are

12   quite different statutes from 875(c), in that (b) and (d) are

13   extortion statutes and (c) is a threat statute, and the key

14   question for me is Elonis answers the question as to how a

15   threat statute in (c) should be instructed, but, as far as I

16   can tell, every court post Elonis that has looked at the

17   question has concluded that (b) and (d) are quite different

18   statutes and don't require the subjective intent to threaten as

19   a distinct element, because the *mens rea* specified in (b) and

20   (d) is an intent to extort, and so my inclination is to

21   instruct on the statute and use the -- and follow the case law

22   in other jurisdictions.  It's not just pattern instructions.

23   There's, as far as I can tell, an abundance of case law that

24   distinguishes post Elonis (b) and (d) from (c).  Do you have

25   any case law that says Elonis applies in the same way to (b)

**J.A. 30**

1    and (d) as it does to (c)?

2         MR. LEVIN:  No, and I don't think there's any case law

3    on point in the First Circuit that I've been able to find.

4         THE COURT:  Let me, just so you guys know what I'm

5    thinking of, I've read United States against White, 810 F.3d

6    212, a Fourth Circuit decision; I've read United States versus

7    Killen, 729 Federal Appendix 703, a decision of the Eleventh

8    Circuit; I've read United States against White, reported at 654

9    Federal Appendix 956, another Eleventh Circuit decision; I've

10   read Hopkins versus United States, reported at 2018 Westlaw

11   1911805, a Northern District of Illinois decision; and I've

12   read United States against Godwin-Painter, reported at 2015

13   Westlaw 5838501.  All of those cases take the position that

14   either 875(b) or 875(d) -- there's also a Third Circuit

15   decision that I think I've misplaced -- post Elonis to suggest

16   that the subjective intent to threaten component of 875(c) does

17   not apply as a distinct instruction for 875(b) and (d).  So, my

18   inclination is not to include it.  To the extent that the

19   indictment includes additional mental state beyond that which

20   is required, it's kind of surplusage, the way I would

21   ordinarily think of it.

22        So, I'm inclined to craft my instructions to

23   definitely require a mens rea requirement there that it

24   requires a specific intent to extort something of value from a

25   person.  So, my inclination on that one is to track something

**J.A. 31**

1   like the government's instruction on that particular point.  If

2   you have other issues I'm certainly interested in hearing them.

3        MR. LEVIN:  That was the main difference.  It does

4   indicate in the government's proposed jury instruction 2 --

5   yeah, okay -- so that does reference the language about a

6   threatening, a serious statement expressing an intent to injure

7   that's also included in ours.  Would that also be included in

8   the Court's?

9        THE COURT:  Something like that as I'm currently

10  thinking that that would be to define it in the way the

11  government is proposing.  The difference is really is there a

12  distinct element of subjective intent to threaten that is a

13  component of the (c) charge but is not a distinct element of

14  the (b) and (d) charge.  So, I think I'm going to track -- I'm

15  inclined, and, again, I'm just starting to get into this, to do

16  what you and the government are suggesting about the two

17  definitions, so I think that should be fine for you.  It's

18  really more the subjective intent to threaten as a distinct

19  element.

20        Anything else in 2 or 1 or 2 that you wanted to call

21  to my attention right now as we're thinking through this,

22  understanding that you'll have a chance to say whatever you

23  want to say about the instruction I'm giving?  But this is your

24  first chance to try to influence me, so it's helpful, if you

25  have something, to lay it out for me.

1          MR. LEVIN:  Nothing with regard to that.

2          MR. WOLPIN:  I guess on that specific issue, I mean,

3    my looking at it originally had at least been that (c) is

4    essentially the identical language with the additional element

5    of extort in (b).  So, if you read (b) and (c) next to each

6    other, everything tracks identically, except for the fact that

7    (b) has the intent to extort with it.  The remainder of the

8    language involving what a threat -- what that threat is in

9    interstate commerce, the reason I think we're asking for that

10   mental state to track all along is because there is the same

11   sort of criminal conduct as far as the threat.  It's just

12   whether your threat includes an additional element of intent to

13   extort.  So, I view (c) as sort of more in line with (b) than

14   (b) and (d) to be in line, because (c) is essentially a lesser

15   included of (b), as I read it.

16         THE COURT:  One can question the government's strategy

17   in pursuing (c) at all, because the government's case is really

18   an extortionate threat case.  It certainly just complicates the

19   instructions to charge every possible statutory theory one can

20   charge.

21         But I would ask you to go back and reread _Elonis_, and

22   if you read the cases that I mentioned to you, you'll see that

23   those courts see the distinction between (c) and (b) and (d) as

24   fundamentally what was the problem in _Elonis_.  The problem in

25   _Elonis_, as seen by the Court, was that there was no _mens rea_

**J.A. 33**

1    specified in the statute, and so the Court had to infer a *mens*
2    *rea* for the statute, and it inferred one of subjective intent.
3    And the court, in fact, in <u>Elonis</u> distinguished (b) from (c)
4    precisely by noting that (b) has a specified *mens rea* element.
5    So, to apply an additional *mens rea* element, when one is
6    already specified in the statute, is quite a different judicial
7    act than to apply one when one is not specified.  The Court
8    routinely, as you know, reads into statutes without a *mens rea*
9    some kind of *mens rea* requirement.  (c) doesn't have a *mens rea*
10   requirement, and that's, I think, what is motivating the
11   Court's conclusion in <u>Elonis</u> to infer one, and I think the
12   comparison with (b) and (d) that have an expressed specific
13   intent *mens rea* requirement justifies treating the two cases
14   differently, as all courts that I've found have done it.
15          Okay.  Anything else on that particular issue?
16          MR. LEVIN:  No.
17          THE COURT:  No?  Okay.  Let's go into 3, because I've
18   got a bit of a problem with 3, and then the defense can add
19   anything it wants.  I don't know.  Ms. Krasinski, do you want
20   to try to tell me why you're trying to sneak in a recklessness
21   requirement here, when no one other than Justice Alito appears
22   to like that?
23          MS. KRASINSKI:  I'm certainly not trying to sneak it
24   in, your Honor.
25          THE COURT:  I'm not implying you're doing anything

**J.A. 34**

1    deliberately -- deceptively, but you get my point.  In *Elonis*

2    there is a majority opinion that says what (c) requires and

3    says we don't decide on reckless, and Justice Alito likes

4    reckless, but I haven't found any court that has endorsed

5    reckless.  Have you found any?

6         MS. KRASINSKI:  I haven't, your Honor.  I just, when I

7    read *Elonis*, you know, they say that, at a minimum, we know

8    that sending the communication for the purpose of issuing a

9    threat and/or with knowledge that the communication would be

10   viewed as a threat, that those are submissions.  And you're

11   right.  They decline to address whether reckless disregard

12   would be sufficient.

13        I just read Justice Alito's dissent to kind of go one

14   step further than the majority opinion.  As you know, Justice

15   Alito says, well, this would be the minimum *mens rea*.  But I

16   have not found any additional case law post *Elonis*, so I

17   certainly understand that the Court is hesitant to put it in,

18   but I don't think the majority opinion should be viewed as

19   precluding it.

20        THE COURT:  I mean, I'll express my bias here.  My

21   bias is that *Elonis* was wrongly decided, and that the I think

22   eight or nine circuits that have reached a different conclusion

23   about the need for a subjective intent element, including the

24   First, were right and the Supreme Court is wrong in *Elonis*, and

25   I think they were motivated by a concern and an inability to

**J.A. 35**

1   resolve the Constitutional question that, in fact, the parties

2   presented.  The statutory construction question in Elonis was

3   never even presented to the Supreme Court.  It crafted the

4   decision itself I think because it wasn't ready to take on the

5   true threat, First Amendment question, and I believe that the

6   preexisting circuit law, which was nearly unanimous -- I think

7   there was one circuit that went a different way -- was right in

8   not requiring a subjective intent requirement.  But I'm a

9   faithful lieutenant to the Supreme Court, but I also am not

10  someone who is just trying to push the outer boundaries of

11  whatever opinion can be pushed.  I don't see any particular

12  basis in the text of the statute to infer recklessness, and I

13  don't have quite the self confidence that the United States

14  Supreme Court has that they can just remake statutes to fit

15  whatever it is they feel should be in the statute.

16          So, I'm not inclined to give a recklessness

17  instruction with respect to (c).

18          So, that's basically my concern about the third

19  instruction.  Does the defendant have any problem with the

20  third instruction other than what I've just raised?

21          MR. LEVIN:  Well, again, you know, in the indictment

22  they've charged interstate and foreign commerce, so we added

23  that language to our instruction.  I think that was the main

24  difference --

25          THE COURT:  So, let me just look at.

**J.A. 36**

1          MR. LEVIN:  -- other than excising the reckless

2     standard.

3          THE COURT:  I'm just getting my -- a quick look at the

4     statute.  Yeah.  The communication under (c) does have to be

5     transported in interstate or foreign commerce, so I'm sure I'll

6     give something along those lines.

7          Anything else in 3 that anyone wants to bring to my

8     attention?

9          MS. KRASINSKI:  So, I think one of the main

10    differences between the government's instruction and the

11    defendant's instruction is that with the *mens rea*, where the

12    government's instruction says that the defendant sent the

13    communication for the purpose of issuing the threat -- and I'm

14    just going to move the "or" here, since we're taking

15    recklessness out, or with knowledge that the communication

16    would be viewed as a threat, that in the defendant's

17    instruction it appears that there's an "and" rather than an

18    "or," so it would require the government to prove both that

19    this defendant had the purpose of issuing the threat and had

20    the knowledge that the communication would be viewed as a

21    threat, and I just don't think that's a correct application of

22    Elonis.  I think Elonis requires one or the other and not both.

23    So, I think "or" is the appropriate word there.

24          MR. LEVIN:  And, again, we were tracking the

25    indictment, which has a threat to injure the reputation of the

1     victim and a threat to accuse the victim of a crime.

2          THE COURT:  Yeah.  So, Mr. Levin, and I know you're

3     such an experienced defense attorney you probably, I'm sure

4     you're aware of this, but the indictment-drafting strategy that

5     the government uses in cases like this is to use the

6     conjunctive instead of the disjunctive in indicting because of

7     existing case law that allows them to treat it as disjunctive.

8     So, if you've got an argument based not on what the statute

9     actually requires but what because they alleged in the

10    indictment they have to stick with it, you should be prepared

11    to give me some case law on that.  I haven't gone back and

12    researched it, but it's my understanding generally, as I

13    suggested, to the extent that they allege with knowledge and

14    purpose and recklessly that you can disregard the surplusage

15    part of it and just treat whatever the *mens rea* is that the

16    statute actually requires.  But if I'm wrong on that you'll

17    present me with a good legal memo that will direct me to the

18    case law that makes clear to me that I'm wrong on it.  I'm

19    operating under that assumption, that just because they used

20    the conjunctive in the indictment that they're bound to -- that

21    I must instruct the jury in the conjunctive, I don't understand

22    that to be consistent with what the law requires.  If I'm wrong

23    on that, you'll tell me.  You don't have to do it today.  Okay?

24          MR. LEVIN:  Okay.

25          THE COURT:  All right.  So, other things about 3 that

1    anyone wants to talk to me about?

2         MS. KRASINSKI:  So, again, I'll just sort of highlight

3    one difference, particularly as it relates to government's

4    instruction 3 and contrasting it with defendant's instruction

5    number 2, which is that the defendant's instructions tends to

6    use this term "true threat," a phrase "true threat," whereas

7    the government's instructions generally use the word "threat,"

8    and I think that's something that is just sort of different

9    throughout our instructions.

10        My take on it, which appears to be what the Fifth

11   Circuit, the First Circuit pattern instructions and the Eighth

12   Circuit pattern instructions is not to use the phrase "true

13   threat," because the statute itself doesn't use that phrase.  I

14   think the better practice is to use the language of the statute

15   and then sort of include the definition of what a "true threat"

16   is sort of into the definition of "threat."  But that's just a

17   difference that I would highlight in our two instructions.

18        THE COURT:  I can tell you, and I've been thinking

19   about this, my general view is that it is usually a mistake to

20   take labels that lawyers use when speaking to each other and

21   try to build them into jury instructions.  The labels don't

22   have a lot of meaningful context.  Labels have to be defined,

23   and here the statute talks about a threat, and I will instruct

24   on what a Constitutionally sufficient threat is, but I don't

25   prefer to use the language "true threat" because it doesn't

**J.A. 39**

1    convey meaningful information, and it tends to raise potential

2    for confusion; like when someone says "true threat," does that

3    mean that they actually mean that the speaker of the threat

4    must intend to carry out the threatened behavior?  It's not

5    true if you don't intend to actually do it.  That's one meaning

6    of "true threat."  Another meaning of "true threat" might mean

7    he might objectively intend to threaten.  But that issue has

8    not been authoritatively resolved by either the U.S. Supreme

9    Court or the First Circuit, as far as I can tell.  And I think

10   that it doesn't produce any clarity, it potentially produces

11   confusion, and I think the better approach is to use the

12   statutory term and then define it in a way that it can be

13   understood by a layperson.

14        Now, whether in defining it I might add the word

15   "true" in front of "threat" just to satisfy the defendant -- I

16   mean, I know that I approach these things rationally and I know

17   that lawyers like to use not just reason but also emotion to

18   present argument, that true sounds like it's a much higher

19   standard than a threat, but that is a kind of, I don't know, a

20   gut reaction kind of thing.  It's not something that is really

21   reasonable.  I'll hear the defense on it.

22        At the end of the day I don't think it should be in

23   there.  If I were writing for the Court of Appeals I wouldn't

24   put the term 'threat' in there in an instruction to the jury,

25   but whether I put it in just to avoid the Court of Appeals

1  having to take some additional time to explain why it can be

2  sufficient not to have the word "true" in there, I'll have to

3  think about that.  But I'm not inclined to caption the

4  instruction or the element as "true threat;" I'm inclined to

5  define the threat and possibly, I'm still thinking about it,

6  put the word "true" in when defining what the statutory threat

7  is.

8       But anything the defense wants to say in support of

9  why I should use "true threat"?

10       MR. LEVIN:  Your Honor, I would just, as background,

11  and I'm not suggesting it's binding on the Court in any way,

12  but in the case of Matthew Oliver, which was recently tried in

13  this court, the government proposed that language and it was

14  adopted by the Court, and that's docket number 19-cr-40, one of

15  Judge Laplante's cases.

16       THE COURT:  Was that an 875(c) case?

17       MR. LEVIN:  That was a (c) case, yes.

18       THE COURT:  Was that in front of Judge Laplante?

19       MR. LEVIN:  In front of Judge Laplante, yes.

20       THE COURT:  He's the expert on cyberstalking and

21  criminal threatening.  I'm just going to follow him.  So, I'll

22  get a copy of the Oliver instruction and read it over

23  carefully.  Obviously, I have a tremendous regard for Judge

24  Laplante.

25       MR. LEVIN:  The parties submitted joint jury

**J.A. 41**

1    instructions that were drafted by the government, and that was

2    where that language came from, I believe.

3            THE COURT:  I'll take a look at Oliver.

4            But, go ahead.  What did you want to say in response?

5            MS. KRASINSKI:  Just that, as much respect as I have

6    for Attorney Kinsella, it's my position that the term "true

7    threat" shouldn't be in the instruction regardless of what he

8    submitted in the Oliver case.

9            THE COURT:  I mean, if I put it in, it's not

10   reversible error; it's a judgment call about how you can most

11   clearly describe the elements of the charge.  I agree that the

12   word "true" in front of "threat" doesn't convey clear content

13   to a lay juror.  "True" in front of "threat" conveys

14   information to a lawyer who studied the First Amendment,

15   because that's how the Supreme Court defined the kinds of

16   threats that by themselves can be sufficient to support a

17   criminal-threatening-type charge, but it doesn't convey

18   information useful to a juror.  But I'll think it through, and

19   I'll look at Oliver, and I have tremendous regard for Judge

20   Laplante.  And I also just -- to me, whether I put it in or not

21   put it in, I can't imagine the Court of Appeals figuring out

22   that that's some kind of a legal error on my part, but

23   sometimes you just say, well, all right, if the defense wants

24   it and it doesn't muck up the charge too much, maybe I'll put

25   it in.  And, of course, I will only instruct the jury on what

**J.A. 42**

1    the legally sufficient and necessary elements of the charge are

2    as I determine it, but there are elements of judgment involved

3    in how you express what is legally sufficient and legally

4    required, and I will try to do it in a way that's as clear as

5    possible for the jury, having had a lot of experience in

6    instructing juries and speaking to them afterwards about the

7    instructions that I've given them.

8           Okay.  Anything else on 3 that anybody wants to talk

9    about?  Okay.  Let's go on to 4.  I think the defense has the

10    same concerns about 4 that you had with respect to 2.  Anything

11    new and specific with respect to (d)?

12           MR. LEVIN:  No, your Honor.

13           THE COURT:  Okay.  And cyberstalking.  How do you feel

14    about the cyberstalking instruction that the government is

15    proposing?

16           MR. LEVIN:  Hold on a second.

17           THE COURT:  Again, Judge Laplante is the expert here.

18    He did Ackell, which is the leading First Circuit case on the

19    cyberstalking statute.

20           MR. LEVIN:  Right.  And I think that's one that we

21    looked at as well.  I can't remember how it shapes up, but

22    ours, obviously, has more I think elements than the

23    government's does; that there has to be a course of conduct,

24    that the intent to harass and intimidate we broke out, that the

25    course of conduct placed another person in reasonable fear of

**J.A. 43**

1    serious bodily injury, that the course of conduct caused,

2    attempted to cause and would be reasonably expected to cause

3    substantial emotional distress.  So, I think there are

4    additional elements that aren't in the government's and then I

5    think also additional definitions.  A complicated statute.

6         THE COURT:  Yeah.  Okay.  So, as I said, I'm inclined

7    to follow -- Ackell was a charge that was examined by the First

8    Circuit.  I'm inclined to start with Judge Laplante's

9    instruction in Ackell as a baseline and work off of that in

10   light of what you are each proposing.  So, I will look at the

11   Ackell instruction and the Oliver instruction, because I

12   haven't instructed on either of these statutes before, and I'll

13   start with that as guidance.  And then, to the extent you have,

14   and you have cited in footnotes a number of decisions, I will

15   look at those cases when considering your specific requests to

16   the extent that they deviate from or add to what was instructed

17   in Ackell.

18        Okay.  Does the government want to say anything about

19   this cyberstalking instruction?

20        MS. KRASINSKI:  A couple of things.  The first is, in

21   looking at it yesterday as I was preparing for today, I need to

22   submit a revised instruction on this, because I did not include

23   that one of the means that's charged is that it placed the

24   other person in reasonable fear of serious bodily injury to

25   that person or that person's spouse.  So, I need to update this

**J.A. 44**

1    and submit an updated version to the Court.

2         But, separately, kind of one of the main differences

3    between our instruction is whether or not the jury is required

4    to agree unanimously on the acts that constitute the course of

5    conduct.  So, the defense has submitted an instruction that

6    they must unanimously agree on which two or more text messages

7    or things constituted the course of conduct.

8         THE COURT:  Could I just interrupt you?

9         MS. KRASINSKI:  Sure.

10         THE COURT:  In Ackell the First Circuit resolved that

11    in your favor, didn't the Court?

12         MR. LEVIN:  Yes, I believe that's right.

13         MS. KRASINSKI:  Yes, your Honor.

14         THE COURT:  Yeah.  So, I guess they're requesting it

15    for purposes of preserving it for a Supreme Court appeal for an

16    en banc review, but I lack the power to disregard a controlling

17    First Circuit case.  So, on that issue I don't even consider it

18    an open question in my mind.  I'm going to instruct the way the

19    First Circuit said I should instruct.

20         And so, Mr. Levin, you agree with that, right?

21         MR. LEVIN:  Well, I don't think the First Circuit said

22    you have to instruct that way.  I think they said it wasn't

23    error not to instruct that way.  So, I think that's, you know,

24    a critical difference.  But I agree that was the outcome.

25         THE COURT:  Okay.  So, on that particular issue I'm

**J.A. 45**

1   not inclined to deviate from what Judge Laplante did in Ackell

2   that was found to be appropriate or lawful or permissible by

3   the First Circuit.  There is one part of Ackell that I do or

4   one part of Judge Laplante's charge in Ackell that I have some

5   concern about, and that is -- I don't know.  I'll have to look

6   at the government's instruction.  Give me one second here.

7   Yeah.  I'm a little bit concerned about the "attempted to

8   cause" language in that instruction, because I am inclined to

9   say, and this is something that the Court in the First Circuit

10  in Ackell noted, as did Judge Laplante, was the kind of oddity

11  about the statute, and I agree that it's odd and I think it

12  could mislead a jury.  I think it has to cause or would

13  reasonably be expected to cause, and it has to be undertaken

14  with the intent to harass or intimidate another person.  So,

15  I'm not sure how you have a distinct act of liability for

16  attempting to cause.  And this is discussed in the Ackell First

17  Circuit decision, and I'm inclined to omit that attempts to

18  cause.

19          I assume the defense would like that.  I don't know if

20  you've focused on that, Mr. Levin.

21          MR. LEVIN:  No, no, but that sounds right.

22          THE COURT:  You agree to Ackell, and if you want to

23  press that argument with me I'll give the government a chance

24  to respond on it, but when I read that reference, I know Judge

25  Laplante -- that's an example, that's what made me bring it up,

**J.A. 46**

1    is that's an example of where the Court said it was not error

2    to track the statutory language, but, in fact, I think tracking

3    the statutory language there might be more confusing to the

4    jury than clarifying, because if you act with the requisite

5    intent and you engage in action that would be reasonably

6    expected to cause, it doesn't have to cause, so it just has to

7    either actually cause or reasonably be expected to cause.

8    That, I think, is what the focus is on that element.

9         The government can think about that.  If you want to

10   tell me it would be reversible error for me to take out the

11   "attempt to cause," you could build a good legal argument,

12   citing case law and reasoned argument, other than, well, it's

13   in the statute and the First Circuit didn't reverse Laplante on

14   that basis, if you can give me a different, a better-reasoned

15   argument, you could persuade me to leave it in, but I didn't

16   see how it clarifies the jury's obligation to leave it in.

17        MS. KRASINSKI:  I will, your Honor.

18        THE COURT:  It's in the statute, Judge, and if the

19   Court said it was okay in Ackell, is there anything else you

20   wanted to add now?  You can do it later, after you've had a

21   chance to develop a more reasoned argument.

22        MS. KRASINSKI:  No.  I'll have to go back and look at

23   it, your Honor.

24        THE COURT:  All right.  Take a look at it and let me

25   know what you think.  Otherwise, I don't think the statute is

**J.A. 47**

1    all that complicated.  We all do this for a living, and so we

2    all take a statute and we diagram it and we ask what's the *mens*

3    *rea* element, and what are the *actus reus* elements, we kick down

4    those, then we look at how you would logically structure an

5    instruction.  Then we read all the case law, the controlling

6    Supreme Court, First Circuit case law to determine whether

7    things like what the Court did in <u>Elonis</u>, where the Court reads

8    things into the statute that aren't there, and we add those in,

9    or where the Court puts a gloss on something that isn't

10   apparent to us when we do the diagramming, and then we try to

11   translate guidance we get from the Courts of Appeals and the

12   Supreme Court into language that a jury can understand and is

13   faithful to the precedent that controls us, and that's how we

14   put an instruction together.

15        It seems to me a fairly simple instruction, but I will

16   look at what Judge Laplante did in <u>Ackell</u>, I will build off of

17   what the defense and the government are suggesting, and put

18   something together for you probably by the time you start

19   evidence.

20        MS. KRASKINSKI:  Your Honor, I think there's sort of

21   just one other general difference between the cyberstalking

22   instructions, and that's sort of the extent of the course of

23   conduct.  The defendant's instructions limit the course of

24   conduct to the communication between the victim and the

25   defendant themselves, whereas the government's instructions and

**J.A. 48**

1    I think the indictment includes the defendant communication

2    both to the Child Abuse and Neglect Hotline to sort of this

3    broader telegram chat.  And so, that's just sort of one other

4    difference between the two instructions on the cyberstalking

5    count.

6         THE COURT:  All right.  So, Mr. Levin, if you're going

7    to oppose that, that seems sensible to me, but to the extent

8    that you're going to oppose that, give me some case law.  It

9    does make sense to me that the course of conduct is not limited

10   to communications that are directly made from the defendant to

11   the alleged victim.  If the defendant acts with the *mens rea*

12   required and with the intention of prompting a third party to

13   engage in the conduct that is intimidating, that seems logical

14   to me that that could be part of the course of conduct, but I

15   have not researched the issue.

16        MR. LEVIN:  Right.  Well, again, I'm tracking the

17   statute, which talks about intent to harass and intimidate

18   victim 1, but if the government is suggesting that to expand

19   the proof that the defendant intended to harass and intimidate

20   the victim's spouse, we wouldn't object to that.  I don't think

21   the evidence supports that.

22        THE COURT:  No.  I think she means something

23   different.

24        Ms. Krasinski, if I've gotten you wrong you'll

25   interrupt me and tell me, but I think what she's saying is, We

**J.A. 49**

1   want the course of conduct instruction to be broad enough to

2   encompass the defendant's communications directly with Cheddar

3   Mane and the defendant's actions that the government says are

4   part of a course of conduct to intimidate and harass Cheddar

5   Mane, such as contacting Child and Family Services with the

6   intent to get them to come out and potentially remove Cheddar

7   Mane's children, right?  Is that what you're getting out,

8   Ms. Krasinski?

9       MS. KRASINSKI:  Yeah.  And I can direct everyone to a

10  case, it's a Fourth Circuit case, U.S. v. Bartley, 711 Federal

11  Appendix 127, and it essentially says that the acts that

12  constitute the course of conduct can include acts directed at

13  third parties, you know, as long as those acts, the defendant

14  intended those acts to harass or intimidate the victim.  So,

15  that's all we're suggesting, is that the course of conduct also

16  can include acts directed at third parties, as long as those

17  acts are committed with the requisite intent.

18      THE COURT:  Well, are you saying, though, that what

19  you're telling me is communication -- I thought you were

20  focusing on, like, the Child and Family Services stuff.

21      MS. KRASINSKI:  Yes, yes.

22      THE COURT:  Are you including something else in there

23  that I'm not understanding?

24      MS. KRASINSKI:  So, there are two things that are

25  charged in the indictment that are acts directed at third

**J.A. 50**

1    parties.  The first is the call to the Child Abuse and Neglect

2    Hotline, and the second is, separate from the communications

3    directly between Cheddar Mane and the defendant, the defendant

4    also sort of publicly posted a photograph of Cheddar Mane's

5    family on a group Telegram chat.  So, that would be an

6    additional act sort of directed at third parties that are both

7    charged in the indictment and we submit are part of the course

8    of conduct.

9         THE COURT:  Correct.  But it's harassing Cheddar Mane

10   by taking action with respect to a third party.

11        MS. KRASINSKI:  Yes.

12        THE COURT:  So, you're not trying to bring in another

13   victim.  You're trying to say, when you do something like

14   posting information on a public website, that Cheddar Mane

15   would understand it's harassing and intimidating him, and a

16   reasonable person in his position would understand that; the

17   act of doing that action with a third party can be part of the

18   course of conduct, right?

19        MS. KRASINSKI:  Correct.

20        THE COURT:  Okay.

21        MR. LEVIN:  I understand that, but I don't understand

22   where that's not reflected in the competing proposed jury

23   instructions.  It seems like both instructions get to that.

24        THE COURT:  All right.  Well, I'll take a close look

25   at it.  I get what counsel's saying, and I will look at it.

**J.A. 51**

1    And I understand your response, but, again, I'll take a look at

2    the case she cites, but if you could also come up with any case

3    law to support any different view, and I'll look at which

4    language makes the most sense to me and adopt it.

5          Anything else from the government on the proposed

6    instructions?

7          MS. KRASINSKI:  Sort of the only other kind of big

8    issue is that it's just the appropriate definition of -- I'm

9    sorry, where am I -- substantial emotional distress.  You know,

10    I think we can sort of come to one definition, as opposed to

11    defining it in five or six different ways, three or four

12    different ways, but I suspect it's something we can work

13    through.

14          THE COURT:  I'll work on that.  I think I've gotten

15    out -- is there anything -- I think the government has raised

16    concerns with the defendant's instructions in ways that I can

17    understand.  Is there anything you wanted to say about the

18    defendant's instructions that you haven't already said?

19          MS. KRASINSKI:  No.  Thank you.

20          THE COURT:  Okay.  So, this has been helpful.  I think

21    we've sort of fleshed out some of the major differences.

22    Everybody's rights are preserved to object to whatever I decide

23    to do, but you've given me some stuff to work with, and I've

24    alerted you to some of my tentative thinking, and so you'll

25    come armed with case law if you think that my tentative

1    thinking on those subjects is incorrect.  So, that was helpful

2    to me.  Thank you.

3         Let's talk in general about motions *in limine*.  I

4    understand the parties haven't had chances to respond to them

5    yet, but, again, you're probably not going to talk to me before

6    jury selection.  So, if there's anything you want to say about

7    the specific motions *in limine*, feel free to raise them.

8         We'll start with the defense.  You filed most of them.

9    Why don't you tell me whatever it is you want to talk to me

10   about with the motions *in limine*.

11        MR. WOLPIN:  I think the primary one is the one

12   addressing the victim's motive and bias to lie.  I'm intending

13   to submit a supplement today to that to more directly address

14   the question.  They are public statements about the awareness

15   of their own liability, so they talk about something called

16   "fed posting," which is essentially their understanding that

17   the FBI and federal law enforcement is listening to what they

18   say because it is so violent and dangerous and puts them at

19   risk of prosecution.  So, adding to this understanding of why

20   he fears his own prosecution, it's quite clear and evident and

21   publicly stated that they were aware of that, worried about

22   that, and the specific context of that is an example that

23   involves Cheddar Mane threatening to and Patriots having a

24   segment about threatening to kill and rape a specific FBI agent

25   and then discussing how that said posting and how that could

1    get that intention.  We then have, obviously, the FBI itself

2    coming to investigate him or speak with him.  He knows they've

3    listened to the recordings.  Part of the recordings is

4    threatening to rape and kill an FBI agent.

5         And there's other evidence that I will note in that

6    motion that similarly addresses Cheddar Mane specifically in

7    the role of making similar statements, including calling in to

8    Chris's show and discussing his interest in causing harm to an

9    FBI agent and similar things.  So, ultimately I wanted to flesh

10   out the content that this individual was well aware of his own

11   liability before the FBI arrived at his door, which is then

12   followed up by his acknowledgment that they held that liability

13   over his head, and then, when you read the text of the

14   interviewer or the interview the FBI conducted, it was a very

15   terrible strong arm in the sense of, Here is what we want to

16   hear, we're taking this seriously, there's threats on your

17   life.  That's why they approached him, is an effort to

18   ultimately address that issue and making it clear what issue

19   they want to address, according to Cheddar Mane, make it very

20   clear to him that they are holding Bowl Control over his head

21   to get his cooperation in the prosecution of Cantwell.  The

22   motion goes through that in more detail.  The supplement

23   attempts to flesh out his state of mind.

24        But we think there's sort of no credible argument at

25   this point, when it lines up that way, that this was an honest

```
 1   mind when the FBI got there, that he wasn't motivated by his
 2   own criminal liability, and that the FBI wasn't telling him
 3   what they were there to do, and, as he said himself, holding
 4   his past over his head and the FBI's statements, discuss how
 5   Cheddar Mane could disappear into sort of internet oblivion and
 6   he can go back to being Mr. Lambert instead.  So, it was made
 7   evident to him that there's benefits to his participation.  So,
 8   ultimately, and the government will respond as it responds, but
 9   I think a compelling and direct argument similar to the one
10   that was made in relation to the confidential informant issue
11   before the Court.  So, that is ultimately issue number one.  I
12   think the others are more sort of more clear relevance or
13   609-type issues.
14            THE COURT:  Well, let's talk about 1.  So, this
15   evidence to me is intentionally relevant for two purposes.  One
16   is to show Cheddar Mane's bias by his motive to satisfy the
17   government and avoid criminal liability for his own actions,
18   right?  I think you have given me a tremendous amount of detail
19   on that.  I don't know how much more in your supplement you can
20   do, but go ahead and do it.  But I'm always inclined, when it
21   comes to evidence of that sort, to give the defense a fairly
22   wide scope here.  It's important to make sure that any
23   potential motives to falsify are brought out in front of the
24   jury.  So, that's always important, and I think it's important
25   here, and I'm inclined to let you pursue that.  I think the
```

**J.A. 55**

1    question is in what ways and to what degree.

2            You also have a second argument.  And I understand

3    your principal defense here is not that I didn't make the

4    communication.  It's that the communication doesn't qualify as

5    a criminal act, right?  Your argument is that this was not a

6    crime.  And so, you have one, your kind of principal legal

7    defense is, when you learn the context in which this was made

8    you will see that the defendant did not commit a crime either

9    because the communications are not ones that can be criminal,

10   the acts, his spoken acts are not criminal, or the defendant

11   did not have a criminal intent, or some combination of the two.

12   That seems to me to be what your core defense is.  Do I have

13   that right?

14           MR. WOLPIN:  I think you do.

15           THE COURT:  Okay.  And so, some of this may be

16   admissible as context to give you a fair opportunity to

17   establish that defense, and the other part of it is don't

18   believe anything Cheddar Mane says, and then there's kind of a

19   third portion, which you may or may not sign up for, but which

20   I am quite confident is part of your thinking, which is, if we

21   can show that Cheddar Mane is such a repugnant person, that he

22   associates with such horrible persons, that these people

23   deserve each other and I'm not going to find him guilty, that

24   may be something you're hoping will happen as a result of that

25   effort.

**J.A. 56**

1          The third thing is not really a legitimate basis for

2     admitting evidence that is not otherwise admissible, but I

3     think the two principal reasons and permissible reasons to want

4     to inquire into some of this evidence is to establish bias and

5     to provide context for your principal theory of defense, and I

6     think you should be given some scope and opportunity to pursue

7     both of those issues.  The question is how far, how much.  And,

8     certainly, and I can't make any definitive ruling now,

9     certainly interactions, actual interactions between Cheddar

10    Mane and the FBI are entirely fair game.  They're entirely fair

11    game.  What they said to him, what he said in response, what he

12    did, what he thought when they were contacting him, all of

13    those things are fair game.  So, where we start to have -- I

14    start to have less clarity in my thinking is with respect to

15    interactions that people other than Cheddar Mane had with

16    people other than the defendant, and what they do and say and

17    believe.  To me at some point that starts to become evidence

18    that should be excluded under Rule 403.  So, just how far do

19    you intend to go?

20          MR. WOLPIN:  Well, I think to address that in a couple

21    of ways, one, I think --

22          MS. KRASINSKI:  Your Honor, can I just interrupt?

23          THE COURT:  Stop for a second.  Yes?

24          MR. WOLPIN:  Understood.

25          MS. KRASINSKI:  I just want to point out that I know

1   that this is something that Attorney Davis has been handling

2   and working on, this motion *in limine*, in particular, so just

3   for the purposes of the discussion now --

4          THE COURT:  I won't make up my mind without giving

5   Mr. Davis a chance to weigh in personally, okay?

6          MS. KRASINSKI:  Thank you.

7          THE COURT:  I'm just trying to get an understanding of

8   what the defendant wants to do.

9          MS. KRASINSKI:  Thank you, your Honor.

10          THE COURT:  I understand.  You haven't responded yet.

11   Mr. Davis isn't on the call.  This is his major area.  You did

12   the instructions, he's doing the *in limine*.  I'll give him a

13   chance to be heard.  But let me just spend a few more minutes

14   on it so that I understand the defendant's position.

15          MR. WOLPIN:  All right.  So, I think there's a lot in

16   there, that question, but I think the -- I'll start with I

17   think the jury needs to understand what was said to understand

18   why he has liability.  I mean, you can't make an argument that

19   someone has potential liability without some evidence of what

20   that liability is.  We're in the unique position of the

21   liability largely comes from recordings that exist and are

22   undeniably him, and so we don't have sort of trials within

23   trials about whether, you know, identification or the other

24   issues that would maybe jumble that along.  Very clear to say,

25   you know, there is a discussion he has online as Cheddar Mane

1   discussing how people should basically take up the role of mass

2   shooters, that he can't do that because he has children, and he

3   can't do that because he has other obligations, but others need

4   to do that and that should happen.  There's the threats to the

5   FBI agent where he's involved in and they discuss all as a

6   group about threatening to rape and murder a particular FBI

7   agent.  I'm not saying it needs to go on for days, and it's not

8   my style to do that, but the jury needs to hear it enough to

9   understand why he would be legitimately concerned that the FBI

10   could prosecute him.

11          THE COURT:  Let me step back.  So, I'm imagining here

12   that there's going to be some information that's going to come

13   out during the government's direct case about your client -- I

14   don't know, I don't pay attention to it -- but he basically has

15   some kind of a podcast or a YouTube channel or something where

16   he makes money off of doing -- saying extreme things.

17          MR. WOLPIN:  I mean, so obviously people, different

18   people, characterize him differently, so take that with a grain

19   of salt.  But Cheddar Mane describes him as a shock jock with

20   white nationalist tendencies, so he's someone who has an open

21   forum radio show that is online, not on sort of normal radio,

22   for two hours at a chunk, and people call in and they talk

23   about things and, you know, white nationalists, slash,

24   all-white, slash, Trump kind of discussions are pretty common.

25          THE COURT:  But I'm trying to find out.  It seems to

**J.A. 59**

1    me that it's going to be hard for a lot of this not to spill

2    into the case as part of the government's effort to prove its

3    charge, right?  There's going to be evidence that he's a white

4    nationalist shock jock, right?  There's going to be evidence

5    that there's this entity called the Bowl Patrol that at some

6    point decides it doesn't like him.  There's going to be

7    evidence that Cheddar Mane is part of this Bowl Patrol, right?

8    And there's going to be evidence of what the defendant does to

9    try to find out Cheddar Mane's -- excuse me -- not Cheddar

10   Mane, the ultimate Bowl Patrol guy who they think is heading up

11   this effort to, I don't know, damage the defendant's shock jock

12   ability.

13          MR. WOLPIN:  They make it basically a concerted

14   effort, which he'll fully admit to, I believe, based on his

15   prior testimony, that they intended to harass him, they

16   intended to make him angry, their goal was to make him angry,

17   they called his show dozens upon dozens upon dozens of times,

18   and there's even discussion on another broadcast hoping that

19   that ultimately shut down his broadcast service, radio show

20   format for Cheddar Mane.

21          THE COURT:  So, you agree that you don't have any

22   problem with that all coming into evidence in the government's

23   case?

24          MR. WOLPIN:  No.

25          THE COURT:  A white nationalist shock jock, that he

**J.A. 60**

1   has some kind of interaction with the Bowl Patrol, that the

2   Bowl Patrol decides it doesn't like him, that the Bowl Patrol

3   does some things to try to damage his ability to do what he

4   does, that he gets mad about it and wants to out somebody in

5   the Bowl Patrol, I don't know who it is, and he wants to find

6   that person's -- and he wants to -- excuse me.  Yeah, yeah, and

7   he wants to find -- force Cheddar Mane to give him that

8   person's identity, right?  You agree that's going to be the

9   core part of the government's case?

10          MR. WOLPIN:  Yes.  I don't see that either side can

11  ever effectively tell their version of events without having

12  some portion of that and most of what you just talked about in

13  evidence.  It's entirely wrapped up with the actual exchange.

14          THE COURT:  Let me ask Ms. Krasinski.  Again, I know

15  Mr. Davis is here, so you might not be able to answer, but it

16  would seem to me that some of this stuff is going to be coming

17  in just in part of your case, right, so that the jury can

18  understand what's happening?

19          MS. KRASINSKI:  I think some of it will.  I think

20  there are two -- so, first, Attorney Davis, one of the motions

21  *in limine* that he filed is to exclude evidence of acts of third

22  parties other than Cheddar Mane and Vic Mackey to cause

23  disruption of the defendant's entertainment and media -- so,

24  that is a motion *in limine* that Attorney Davis has filed.  I do

25  think some of it, you know, the fact that Cheddar Mane crank

**J.A. 61**

1    calls Mr. Cantwell's show, I mean, that's certainly going to

2    come in.  There are things that Vic Mackey did or at least that

3    Cantwell accused Vic Mackey of doing, like posting spam on Mr.

4    Cantwell's website, that I think will come in, but Attorney

5    Davis has filed a motion *in limine* to exclude some of these

6    other acts.

7            THE COURT:  I think you're getting off the topic that

8    I'm concerned about right now, which is, I understand, you

9    know, if other people were trying to harass him and -- if he

10   testified he might be allowed to say some of that, some not.

11   I'm more interested in, basically, I think what the defense

12   wants to try to do is to make the jury think that Cheddar Mane

13   is, and he may be thinking this, I don't know, that Cheddar

14   Mane wants to kill blacks and Jews and that he wants to try to

15   get that out in addition to general setting the stage for this,

16   which is this is one white nationalist who is being -- thinks

17   he's being harassed by another white nationalist group, and he

18   tries to force a member of that group to out somebody in the

19   group.  That all has to come in, I think, but how much of the

20   communications where third-party members of the group are

21   talking about killing black people and Jews, I'm not sure how

22   that -- that seems to go too far under a Rule 403 analysis.

23   That's what I'm focused on now, not the question of what

24   actions by members of the Bowl Patrol against the defendant

25   come in or out.

**J.A. 62**

1          MS. KRASINSKI:  I think the line that I anticipate

2     Attorney Davis will draw or attempt to, at least, is that I

3     think Cheddar Mane's statements that relate to rape, that might

4     show that he regarded the threat to rape as a joke might be

5     relevant and might be admissible if the defendant can show that

6     that statement was made before the exchange, that the statement

7     was, in fact, Cheddar Mane's, and that the defendant knew of

8     that statement so that he did something that would have

9     factored into Mr. Cantwell's intent.  I think that's sort of

10    the line that we would argue applies, and that whether or not

11    Cheddar Mane or members of his group made comments about race

12    or ethnicity or things like that, that's kind of separate as to

13    whether or not a discussion about f-ing someone in front of her

14    children would be taken as a rape threat.  Sort of our position

15    is that any of those statements really have to be centered

16    around the context here, which is rape.

17         THE CLERK:  Judge, this is Vinny.  We have the CI

18    probably going to call in very soon.  I just want to let you

19    know.

20         THE COURT:  Well, we have to stop.  We'll stop now,

21    then, and come back to this next week.  So, just so you're

22    understanding, what I'm looking for guidance on is where to

23    draw the line here.  I'm inclined to allow the defense to --

24    substantial latitude in pursuing bias arguments that Cheddar

25    Mane is a biased witness.  I'm inclined to allow evidence in

**J.A. 63**

1    about the nature, the general nature of what the Bowl Patrol is

2    and why it has had interaction with the defendant.  That will

3    inevitably involve some discussion of what the defendant's

4    business is.  I am inclined to allow liberal examination about

5    communications to which Cheddar Mane was a party that could

6    arguably suggest that he viewed the comments -- that in that

7    context those comments would reasonably be viewed as not a

8    threat of rape but merely a way of, I don't know, signalling

9    or -- it's hard for me to even describe what these people do,

10    but a sort of like chest-thumping kind of thing, and I'm

11    inclined to allow substantial latitude to do that.  I'm not

12    inclined to allow extensive examination on unrelated positions

13    taken by other members of the Bowl Patrol about African

14    Americans or Jews or whatever other groups, other than to note

15    that they are a white nationalist organization and probably

16    allow you to say how did they get the name "Bowl Patrol," but

17    beyond that I don't want to be spending days hearing about

18    every outrageous thing that the Bowl Patrol people ever did or

19    said.

20        MR. WOLPIN:  I can say, strategically, I don't find

21    that effective.  I mean, my goal is to find examples that make

22    the point and then move on to the next questioning, and that's

23    sort of where I am right now.  But I think some of it is

24    understanding, you know, we're in one of these kinds of cases

25    where these people exist in a unique ecosystem where language

1    that's used is simply different than any other group might use.

2    So, I don't intend to do lengthy discussions of what other

3    people say.  I do need to make clear to the jury, however, what

4    the Bowl Patrol is, what kind of language the group uses on a

5    regular basis, because that's the only way our client knows

6    them.  It's not like these guys were friends in person.

7        THE COURT:  I've got to stop, because I've got to get

8    on to my other business.

9        MR. WOLPIN:  Okay.

10        THE COURT:  We'll revisit this, but I am laying out

11    some very tentative thinking that I'm not inclined to allow

12    substantial examination beyond getting out what the Bowl Patrol

13    is, how it got its name, that it's generally a white

14    nationalist, racist, anti-Semitic organization that advocates

15    violence against minorities and not go into every instance in

16    which they've said outrageous claims, but things that suggest

17    that a statement from your client that, "I'm going to rape your

18    wife in front of your children," is just a joke, I'm going to

19    allow you to do that.  Of course, to me the principal problem

20    with the case is the statement itself appears on its face to be

21    extortionate, and in order to be extortionate the threat to

22    rape has to convey some meaning other than a joke.  So, you

23    come up with an explanation for that and you may have a valid

24    defense, but without that that's the fundamental problem I have

25    with this idea, but you're, of course, free to try whatever

1    defense you want.  I'm inclined to give you a fair amount of

2    space in which to try to present that.  Not an unlimited

3    amount.  Rule 403 in the end does require that we keep the

4    focus on evidence that's not cumulative, that's not so

5    prejudicial as to substantially outweigh probative value, and

6    I'll find that line, but I'll be looking for guidance as we go

7    along.

8          All right.  I've got to terminate this call, because

9    I've got to start on my next thing.  So, we'll talk again.

10    Probably on Wednesday after jury selection we can start to hone

11    in on some of these issues in greater detail.  Okay.  Thank

12    you.  That ends the call.  Bye.

13          (WHEREUPON, the proceedings adjourned at 11:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 66**

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of the

8   within proceedings.

9

10

11

12

13   Date:  ___5/17/21_____              /s/ *Brenda K. Hancock*
                                         Brenda K. Hancock, RMR, CRR
14                                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**J.A. 67**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   20-cr-06-01-PB
            v.                          \*   September 18, 2020
                                        \*   11:01 a.m.
     CHRISTOPHER CANTWELL               \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO


APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           U.S. Attorney's Office



For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defenders Office



Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

**J.A. 68**

```
1                        P R O C E E D I N G S
2              THE COURT:  There's been a request from the media
3    to view this Zoom hearing.  The hearing is on motions in
4    limine.  Several of the motions make reference to matters that
5    are filed under seal.  In fact, several of the motions may
6    themselves have been filed under seal.
7              I'm asking the parties' position as to whether the
8    hearing will inevitably involve discussion of sealed matters.
9    Starting with the government and then hear from the defense on
10   that issue.
11             You're muted, Mr. Davis.
12             MR. DAVIS:  The government's argument does not
13   require discussion of specific sealed matters that I know of.
14   We would defer to the Court and the defense.  We wouldn't
15   object to sealing at least a portion of the hearing if
16   specific sealed matters need to be discussed, but I don't
17   think we are going to be straying into sealed matters in any
18   argument.
19             THE COURT:  All right.  Mr. Levin or Mr. Wolpin,
20   one of you, what's your position?
21             MR. WOLPIN:  I guess -- is Mr. Cantwell on?  I
22   mean, to some degree I know what my position would be, but if
23   his right to a fair and open public trial I think is
24   implicated, I would like to have a moment with him, if I
25   could, before I respond.
```

**J.A. 69**

```
1              THE COURT:  All right.
2              Why don't you move Mr. Cantwell and his lawyers
3     into a breakout room and let them discuss the matter.
4              MR. WOLPIN:  Thank you.
5         (Attorney Wolpin and Attorney Levin and defendant go into
6     a breakout room)
7              THE COURT:  All right.  Mr. Wolpin, what's your
8     position?
9              MR. WOLPIN:  Our preference would be that the
10    hearing be open to the public.
11             To the extent we wish to address the sealed
12    filings, we would ask that portion be sealed.
13             To the extent that some of it we can discuss -- I
14    mean, the two things that we brought up that would be sealed,
15    some of it we can discuss not using the agent's name, for
16    example, in one of the motions, which is how -- what we sealed
17    I didn't feel appropriate putting the name in the motion
18    publicly.
19             And then the other documents I think can be either
20    referenced separately under seal or I know the Court will have
21    read them and I can reference them in a generic sense.
22             So those are the ways we could deal with it.
23             THE COURT:  All right.  I would ask my case
24    manager, has the reporter been informed of his or her
25    obligations with respect to participation by Zoom, that is,
```

```
 1   that they are barred from recording any of the proceedings and
 2   that they may not appear visually or speak, they can simply
 3   observe, make notes, and report on what they observed?  Has
 4   that reporter been advised of that?
 5             THE CLERK:  Yes, your Honor.
 6             THE COURT:  Okay.  And can you give that reporter a
 7   Zoom link?
 8             THE CLERK:  Yes, I can.
 9             THE COURT:  All right.
10             So the government does not oppose granting the
11   reporter a link.  The defendants request that there be a Zoom
12   link provided for the reporter.  The defendant has a right to
13   a public trial.  In addition, there's a public right to a
14   public trial that goes beyond even the defendant's rights.
15             I do have some concern about the extent to which we
16   discuss motions in limine and I were to grant requests to
17   limit testimony, and then there is public reporting about
18   matters that I have excluded from the trial.  There are added
19   risks that one or more jurors will become inadvertently
20   exposed to that which I am ordering should not be in the
21   trial.
22             But given that the defense wants it in the public
23   record, I will accommodate that request.  The parties just
24   need to be mindful of the risks that result from that, and
25   we'll have to rely on the jurors to follow my instructions and
```

1  not expose themselves to any discussions of the case in the

2  media.

3          So given the fact that the defendant wants the

4  matters in the public record, the government doesn't object,

5  given the defendant's right to a public trial and the public's

6  interest in a public trial, and the fact that we can discuss

7  the motions without referencing sealed materials, and to the

8  extent that the parties want to discuss sealed materials, they

9  can ask that we conduct a portion of the proceeding under

10  seal, if I agree to do that, the reporter will be moved back

11  into the waiting room for the sealed portion of the hearing

12  and brought back after the sealed material is properly

13  evaluated.

14          Does everybody understand how I propose to proceed?

15  Any objection?  No objection.

16          Please give the reporter a link and he or she can

17  observe the hearing.

18          THE CLERK:  Okay.

19          THE COURT:  All right.  I have everybody on.  The

20  case manager will call the case.

21          THE CLERK:  The Court is in session and has for

22  consideration motion hearing in United States of America

23  versus Christopher Cantwell, criminal case

24  number 20-cr-6-1-PB.

25          THE COURT:  All right.  I'm holding this hearing on

```
 1   motions in limine.  I remind the parties that if they intend
 2   to discuss any matters that are not appropriate for the public
 3   record, they should ask to conduct a portion of the hearing
 4   under seal, and I will rely on the parties to make sure that
 5   we don't inappropriately comment on any sealed materials.
 6            There are several motions in limine pending.  I'll
 7   hear the government first on any motions in limine it has and
 8   then hear from the defendants.  You can take up -- to the
 9   extent you have multiple requests, you can take them up in
10   whatever order you choose.
11            So whatever the government wants to say in support
12   of any motions it has filed, identify the motion you're
13   addressing and present your argument, I'll hear from the
14   defense, and then provide any guidance that I feel I can
15   provide after hearing it.
16            MR. DAVIS:  Your Honor, I'll address two motions in
17   limine filed by the government and also, because it's I think
18   related, the objection to the defendant's motion in limine
19   No. 1.
20            The first motion in limine is to exclude evidence
21   of political opinions or endorsements of violence or racist or
22   anti-Semitic statements attributed to the victim or the
23   victim's associates.
24            We filed that and it is our conviction that this
25   case is not about the Bowl Patrol's various rants and
```

1    despicable statements that they made in a number of podcasts.

2    Many of which included the victim in the case.  The defendant

3    wants to make this case about those statements, but they're

4    not relevant.

5            This is not a case that's about self-defense.  It's

6    not a case where provocation is an admissible affirmative

7    defense.  It's not a case where the jury could or should

8    acquit the defendant because of its belief that the victim has

9    such horrible beliefs that the evidence should be effectively

10   nullified.

11           The government does not see that the political

12   views or statements by the Bowl Patrol is relevant.  And if

13   the Court permits the defendant to go there, there is a real

14   risk of undue prejudice against the victim and a great risk

15   that the trial itself will be derailed into long excursions

16   about what was meant when and what was performance art and

17   what wasn't, and whether the defendant was involved at the

18   time or whether he knew about it at the time, whether the

19   victim knew about it or was involved, et cetera.

20           This case is not about those things and so we have

21   filed that motion.

22           The second motion in limine is --

23           THE COURT:  Let me stop you and let's talk a little

24   bit about that, okay?

25           MR. DAVIS:  Okay.

**J.A. 74**

```
 1              THE COURT:  I have difficulty in seeing how you are
 2    going to be able to present your case without any reference to
 3    communications between the defendant and the alleged victim
 4    which were communications that I understand occurred in a
 5    Telegram chat session or sessions involving the defendant, the
 6    alleged victim, and members of the Bowl Patrol.
 7              I may have the facts wrong.  Can you help?
 8              MR. DAVIS:  That's not entirely correct, Judge.
 9              And a key part of this case is that the actual
10    threatening communications were private; that is, these
11    threats were not made as part of some sort of entertainment
12    back and forth.  The defendant went after the victim in
13    private communications that just the two of them received and
14    saw.
15              THE COURT:  All right.  Again, I know nothing about
16    the case.  You know all the facts of the case.
17              I do recall because I was asked to rule on a matter
18    dealing with the Telegram chat sessions that were on Mr.
19    Cantwell's phone.
20              Do you know what I'm talking about?
21              MR. DAVIS:  I think so.  The Telegram chat sessions
22    between the victim and Mr. Cantwell which are the subject of
23    the indictment?  Yes.
24              THE COURT:  I thought that they were also
25    communications that involved not just the two of them on his
```

1  phone.  There were other communications over Telegram that

2  involved -- some involved Mr. Cantwell, some involved the

3  alleged victim, and some involved others as well who are part

4  of the Bowl Patrol.

5           MR. DAVIS:  So Judge, after the communications were

6  made -- and again, they were private when made.  They were

7  between two people only.

8           THE COURT:  I get that part.  But again, with

9  respect, the way it's been presented to me over and over again

10 in our communications is that there was a relationship, online

11 relationship here that resulted from interactions that Mr.

12 Cantwell was having with members of the Bowl Patrol.  Am I

13 just making that up?  I mean, never happened?  Don't know

14 anything about it?

15          MR. DAVIS:  No.

16          THE COURT:  It sounds like this is shocking to you,

17 that this is something that you don't even understand what I'm

18 saying.

19          I'm sorry to be so ill-informed, but please -- if I

20 am not ill-informed, please get to the point and acknowledge

21 what we know to be the case.

22          MR. DAVIS:  Okay.

23          Judge, immediately after the private

24 communications both --

25          THE COURT:  Let me stop you.  There were no

**J.A. 76**

1    communications involving Mr. Cantwell, the alleged victim, and

2    the Bowl Patrol prior to what you say are the threats?  Is

3    that what you're telling me?

4            MR. DAVIS:  No, I'm not telling you that at all,

5    Judge.

6            THE COURT:  Well, that's what I'm trying to get at.

7    There are in fact a whole raft of communications between Mr.

8    Cantwell and members of the Bowl Patrol, and some of those

9    communications involve the alleged victim as well.  Right or

10   wrong?

11           MR. DAVIS:  Yeah, that's correct.  There was a --

12           THE COURT:  Okay.  So the -- just bear with me and

13   let me ask my questions and I'll give you an unlimited

14   opportunity to say whatever you want to say for as long as you

15   want to say it.

16           But the defense, as you well know because they've

17   raised this with me in multiple court hearings, has said we

18   have a defense to this charge, Judge.  Our defense is that

19   when you understand the context in which Mr. Cantwell made the

20   statements that are attributed to him, it will become clear

21   that Mr. Cantwell was not trying to extort, was not trying to

22   threaten, that in context the jury will understand that these

23   communications were not made with criminal intent.

24           Mr. Wolpin, is that part of your defense?

25           MR. WOLPIN:  Yes.  That's fair.

```
 1              THE COURT:  Okay.  So you understand that's his
 2   defense.  So let's not pretend like it doesn't exist.
 3              And his whole argument is we have a series of
 4   communications in which the defendant and Mr. Cantwell to
 5   which they were parties before these threats were made, and
 6   some of that is going to have to come out during the trial.
 7              I thought you would be readily acknowledging to me,
 8   of course, Judge, in order for me to prove my case I've got to
 9   talk about the Bowl Patrol because otherwise none of this will
10   make any sense to anybody.
11              I mean, do I have that elemental part of this what
12   I understand to be your case wrong?  I mean, are you telling
13   --
14              MR. DAVIS:  No, I agree.
15              THE COURT:  Let me just finish my -- wait till I
16   stop and then you can say what you want to say.
17              MR. DAVIS:  Okay.
18              THE COURT:  But it seems to me quite obvious that
19   even in your case for context there's going to have to be some
20   evidence about how these people came into contact with each
21   other and what Mr. Cantwell was trying to get Cheddar Mane to
22   do.
23              And in order to explain your argument about
24   extortion there's going to have to be some evidence of Mr.
25   Cantwell's white nationalist views and what the Bowl Patrol is
```

J.A. 78

1  and how these people interacted over the Bowl Patrol and how

2  Cheddar Mane came to have some interactions with Mr. Cantwell.

3          That seems to me to be like basic step one in your

4  prosecution.  For you to present your theory, some of that is

5  going to have to come in.  For the defense to present its

6  theory, some of that is going to have to come in.

7          So it's not a case where the motion in limine is

8  sanitize this case to the point that no one knows that anybody

9  has any white nationalist views here because I don't think I

10  can do it and I don't even think you're asking me to.

11          Are you asking me to do that?

12          MR. DAVIS:  I'm not.

13          THE COURT:  Okay.  That's what I'm trying to

14  establish here.  It's not a case of absolute exclusion.  It's

15  a case of line drawing.  How much do you allow.  Is that not

16  right?

17          MR. DAVIS:  I think it is right, Judge.

18          THE COURT:  Okay.  So help me draw the line.  What

19  do you think you should be able to do and what do you think

20  the defense should be able to do that involves expressions of

21  white nationalist views, expressions of violence, expressions

22  of extreme kind of offensive behavior?  What do you think

23  should be allowed to come in on that?

24          And then I'll hear from the defense.

25          MR. DAVIS:  So Judge, I think the key distinction

**J.A. 79**

1   here is between -- the communications between the victim and

2   the defendant, which are quite limited and quite discrete and

3   I agree are relevant and admissible, the communications

4   between the victim and the defendant.

5           And the separate category, which is basically 80

6   percent of the defense exhibit list, which is simply the Bowl

7   Patrol's various expressions in their podcasts which are not

8   communications with Cantwell.

9           THE COURT:  All right.  Let me stop you.

10          Do you agree that any evidence they have that is

11  otherwise admissible because there's a foundation that's been

12  laid for it that involves a communication in which Mr.

13  Cantwell was a party and Cheddar Mane was a party, that those

14  communications are not subject to your motion in limine where

15  both of them are on together exchanging information?

16          Are you trying to limit the defense's ability to

17  introduce evidence of those interactions if there are any

18  apart from the ones that you say are the criminal

19  communications?

20          MR. DAVIS:  So I don't mean to be lawyerly about

21  it.  I can imagine there might be a communication or two that

22  involves both Cantwell and the victim that is highly

23  inflammatory as to both the victim and the defendant and shows

24  nothing about the mindset of the two related to the charged

25  offense where it still would be proper to exclude under 403.

1          But in general -- for instance, there is a record

2    of calls by the victim to the defendant's show.  Both parties

3    have prepared those records, and I agree that records of the

4    victim calling the defendant's show and when those happened

5    and when they stopped happening is relevant, sure, but --

6          THE COURT:  Let me stop you.

7          This illustrates why judges do not make rulings in

8    advance of trial on evidentiary questions that are as involved

9    as this, right?  You're essentially asking me to limit

10   evidence before I even know what the case is about.  This

11   illustrates why this is usually such a waste of time for

12   judges to get involved in efforts to limit evidence before

13   they even know what the case is about.

14         I'm doing this as a courtesy to both of you.  I'm

15   going to tell you quite simply unless you can satisfy me that

16   I have a full and complete understanding of all relevant

17   information that I need to make a reliable ruling, I will

18   simply refuse to rule and let it evolve the way cases

19   ordinarily evolve, which is the judge learns about the case,

20   hears the evidence, decides based on the evidence that's come

21   in what limitations should be made on additional evidence.

22         So you're telling me, though, there were a series

23   of call-ins to the defendant's Internet whatever it is, radio

24   show, whatever you want to call it, between Cheddar Mane and

25   the defendant, and you are not seeking to limit the use of

```
 1   those calls, right?
 2            MR. DAVIS:  Correct.
 3            THE COURT:  There are also some private Telegram
 4   communications between the defendant and Cheddar Mane, and
 5   you're not seeking to limit those?
 6            MR. DAVIS:  Correct.
 7            THE COURT:  There will also be evidence in your own
 8   case about the Bowl Patrol, what it is, why it has the name
 9   Bowl Patrol, what its general views are.  Is that not right?
10   I mean, how do you keep that out?
11            MR. DAVIS:  There will be some limited evidence,
12   Judge, yes.
13            THE COURT:  Okay.
14            MR. DAVIS:  I certainly don't -- I'm not going to
15   ask the victim to accurately set forth the views of the Bowl
16   Patrol.  I was not going to ask him that.
17            THE COURT:  Right, but it's going to come out what
18   the Bowl Patrol is.
19            MR. DAVIS:  Yes.  I think that's true, yes.
20            THE COURT:  It will have to come out what the Bowl
21   Patrol is for this to make any sense, and we can't so sanitize
22   a trial that the jury can't even understand the context in
23   which things are happening.
24            Now, hypothetically if there were communications in
25   which Cheddar Mane was found to be joking about raping
```

1  somebody's spouse, that would become relevant, right, in

2  understanding the context for these particular communications?

3          MR. DAVIS:  So Judge, I think it probably would,

4  yes.  That is --

5          THE COURT:  Because it's clear based on the

6  context -- if somebody threatened somebody and there have been

7  back and -- use of communication that I would think is

8  threatening, but it's clear that they've been joking with each

9  other about engaging in that behavior for years, that would be

10 useful information in evaluating a charge threat, right?

11         MR. DAVIS:  I think that's right.

12         What I've said I think in both pleadings is as long

13 as the defense can show the communication involves the victim

14 and not some other person and that the communication occurred

15 before and not after the threats in June '19, and most

16 importantly, that the defendant knew about the joking about

17 rape, if that's what it is, I think if those things can be

18 shown, I think the government likely would not object.

19         THE COURT:  All right.  That's what I'm trying to

20 get from you.  It's like pulling teeth unfortunately, but I

21 think now I understand your position.

22         Let me turn to Mr. Wolpin and ask the other side of

23 this.

24         Mr. Wolpin, you have acknowledged to me on many

25 occasions that it is not your intention to waste the jury's

```
1   time with hours and hours of review of shocking communications

2   by members of the Bowl Patrol.  Just like if your client had

3   engaged in hours and hours of shockingly bad statements, you

4   would not want the jury to be hearing that, and I would not

5   allow that.

6              I think you have suggested to me that you also will

7   readily acknowledge that this isn't an unlimited opportunity

8   for you to spend hours and hours reviewing every outrageous

9   thing that the Bowl Patrol people may have said, right?  Do

10  you agree with that as a basic proposition?

11             MR. WOLPIN:  I do.  I do.

12             THE COURT:  You've said that to me many times.

13             So this was really a question about line drawing,

14  what kinds of communications should the jury be able to hear.

15             I believe Mr. Davis has said, if I'm understanding

16  him correctly, evidence of communications by Cheddar Mane that

17  are communicated directly to your client or that you can show

18  by some means that he was aware of prior to the time he had

19  his private communications with Cheddar Mane that are the

20  subject of these charges, that Mr. Davis would agree that

21  those communications in all likelihood should be fair game if

22  you can lay the appropriate foundation for their admission.

23             He also I think acknowledges that there will have

24  to be some references to the Bowl Patrol and essentially what

25  it is.  So I think that much doesn't appear to be in dispute.
```

```
 1              I think you acknowledge that there are limits on
 2    the usefulness of evidence for the jury about the Bowl Patrol
 3    saying outrageous things about unrelated matters in which
 4    neither the victim nor your client were present when they were
 5    said, right?  Do you agree with that?
 6              MR. WOLPIN:  Yes.
 7              THE COURT:  Okay.  So let's then try to narrow down
 8    this universe and have you specify for me exactly what it is
 9    that you think you need to get in about outrageous statements
10    by the Bowl Patrol, and then we can maybe -- I can maybe give
11    you some guidance about them.
12              MR. WOLPIN:  So as the Court has noted, the context
13    of this begins long before June 2019.  For us it begins
14    certainly in the fall of the year before.
15              That was a time when the relationship between Mr.
16    Cantwell and those in the Bowl Patrol was deteriorated.  The
17    Bowl Patrol made a conscious effort to harass, disrupt,
18    whatever you want to call it, but essentially repeatedly and
19    incessantly call his show, call him a fed in public, suggest
20    he's a federal informant, say things they thought would bring
21    federal attention to his show.
22              The issue with that is it's a cluster kind of bomb
23    situation where they purposely don't use their own identities
24    frequently, they operate under pseudonyms, and so I --
25              THE COURT:  Are you not seeing us?
```

**J.A. 85**

```
 1              MR. WOLPIN:  I'm just getting frozen.  I was just
 2    worried.
 3              And so there are times when Chris can't tell who's
 4    committing this act, who's saying the things they're saying,
 5    but we have Cheddar Mane and Vic Mackey, the two primary
 6    people involved, discussing publically this intentional
 7    campaign and what their purpose is and why they're doing it
 8    and then replaying them on their own podcasts as sort of a way
 9    to further mock and harass Chris.
10              THE COURT:  Let me stop you.
11              Mr. Davis, I assume that you will agree that some
12    evidence of Cheddar Mane's attempts to contact Mr. Cantwell's
13    show and engage in this kind of disruptive behavior from
14    Cantwell's perspective is stuff that will come into evidence
15    in the case.
16              Do you disagree with that?
17              MR. DAVIS:  I do agree.  Cheddar Mane made a number
18    of prank calls and will readily admit that.
19              He also will say that those prank calls ended some
20    months before the threats in this case; that is, he
21    deliberately stopped prank calling Cantwell in approximately
22    January of 2019, and it was in June of 2019 that Cantwell
23    threatened him.
24              THE COURT:  All right.  Can I stop you?
25              Will you also agree that -- would Cheddar Mane if
```

**J.A. 86**

```
1    questioned acknowledge that he was coordinating this effort

2    with this other person who Mr. Wolpin refers to as Mackey?

3              MR. DAVIS:  I think he'll acknowledge he

4    participated.  I don't know that he coordinated.  He was not

5    the leader of the group, I don't think.

6              THE COURT:  But you'll acknowledge there was this

7    effort by Mackey and others and he participated in it?

8              MR. DAVIS:  Yes, he did.

9              THE COURT:  On the defendant's show and

10   obstructed --

11             MR. DAVIS:  Yes.

12             THE COURT:  -- because of some disagreement between

13   them.

14             Okay.  So that's not going to be a problem.

15             So far, Mr. Wolpin, you'll be able to, through

16   cross-examination and any additional evidence you want to

17   introduce in your own case be able to establish that your

18   client has an Internet radio show, that he had interactions

19   with the Bowl Patrol, that at some point those interactions

20   deteriorated.  The Bowl Patrol began a -- Mr. Mackey and

21   others, including Cheddar Mane, began calling in to his show

22   in an effort to obstruct his ability to conduct his show.  All

23   right?  So that part is not problematic.

24             Now let's go on.

25             MR. WOLPIN:  Okay.  So we get to another situation
```

**J.A. 87**

```
 1    where this -- I think some context is necessary, so I'll try
 2    to be brief, but this exchange happened in June.  The
 3    individual known as Cheddar Mane doesn't report this to the
 4    police, you know, doesn't present this to anybody.  The FBI is
 5    ultimately the one who approaches him four months later.  The
 6    FBI does not approach him without some ammunition to point out
 7    to him that he has liability.  So they make it clear to him
 8    that they are interested in prosecuting Chris Cantwell for
 9    these things from months ago and that they are well aware of
10    his public persona, who he is, they listened to everything he
11    said on online, and we are aware from what Mr. -- the
12    individual behind the name Cheddar Mane has said to others
13    that this was viewed by him as an effort to gain his
14    cooperation, this potentially liability and exposure.
15            And so from our perspective, you know, the
16    government has responded by saying objectively there was no
17    concern he should have had for his prosecution, which I think
18    is simply not true.  I think objectively there was, and those
19    are the documents I submitted under seal which I can address
20    in a moment, but it's clear that he had those concerns.
21            And for example -- I mean, it's obvious --
22            THE COURT:  Let me stop you because I think you're
23    straying into another area here.
24            You have a set of arguments about your ability to
25    pursue certain lines of inquiry to establish a claim that
```

**J.A. 88**

1    Cheddar Mane is providing false information in an effort to

2    curry favor with the government and avoid his own criminal

3    liability.

4              MR. WOLPIN:  Yes.

5              THE COURT:  And we haven't talked about that yet.

6    I have made clear that I intend to give you a substantial

7    amount of leeway in trying to establish arguments of that

8    type.  I don't think that is at the core of what Mr. Davis's

9    motion is dealing with.  So why don't you set that aside for a

10   moment and focus on what I understand to be the core of his

11   argument, which is, Judge, they want to just present to the

12   jury every bad thing that they can identify that any member of

13   Bowl Patrol presented at any point to any person, and 99

14   percent of that stuff is irrelevant and prejudicial.  It's an

15   attempt to do exactly what defense lawyers often accuse the

16   government of doing, which is a kind of garbage dump on a

17   defendant, which I know you would vehemently object to if the

18   government tried to do it to your client.

19             So that's what I want you to focus on.  To what

20   extent are you going to do what the government fears you're

21   going to do, which is try to elicit from witnesses and in your

22   own case every piece of evidence you can introduce about every

23   bad thing any member of the Bowl Patrol ever said?  That's

24   what I'm focused on now.

25             So tell me exactly what you're proposing to do so I

**J.A. 89**

```
 1   can determine whether I'll allow you to do it.
 2              MR. WOLPIN:  First of all -- I mean, the government
 3   repeatedly cited how many exhibits we sent.  I would caution
 4   the Court -- I told them -- explained to them in a phone call
 5   that because of the timing of things I gave them everything
 6   that I had listened to in preparation for doing a
 7   cross-examination.
 8              It's clearly not going to be 168 exhibits.  That
 9   was made clear.  So, no, I'm not going to do a dump.
10              The goal is to understand two things.  One is the
11   type of joking language used that could be related to this
12   content.  So there will be a handful of clips that address
13   that.
14              The next issue is --
15              THE COURT:  I need to better understand when you
16   say -- is there joking about the specific types of acts that
17   are the subject of these communications?
18              MR. WOLPIN:  There's joking about rape.  There's
19   joking about murder.  There's joking about violence as
20   something that one can talk about in a way that is obviously
21   not -- or I guess, I don't know, I don't see it as humorous,
22   but who in this group sees as humor and so --
23              THE COURT:  Again, I need to understand.
24              Are these communications that either your client
25   was a party to or that you're going to show through some
```

**J.A. 90**

1  evidence that your client was aware of or that Cheddar Mane

2  was a party to?

3          MR. WOLPIN:  These are almost entirely from the

4  Bowlcast episodes, which is a podcast of which Cheddar Mane

5  was one of the usually three to four hosts.

6          I don't know if there's anything I have in that

7  regard that doesn't have him as a party to it in that sense,

8  that he's participating in that.  The majority of them are his

9  own words or Vic Mackey's words.  I don't think there's a

10  whole lot outside of that.

11          THE COURT:  And was your client -- are you going to

12  show that your client was involved in those communications or

13  was aware of them before he --

14          MR. WOLPIN:  He was made aware of them.  So he has

15  heard or had heard certain of the episodes but to my knowledge

16  not all, but it was repeatedly brought to his attention.  I

17  mean, this was a small community.  They know what the groups

18  are saying.

19          So I can't represent that he's heard every single

20  thing I would consider, but he is well aware of that type and

21  that manner of conversation.  That's what they do.

22          THE COURT:  Give me from your perspective the

23  strongest, clearest example of a piece of evidence that you

24  think you should be allowed to introduce that the

25  government -- that you think is subject to the government's

**J.A. 91**

1     motion in limine.  Give me a concrete specific example of what

2     you're proposing to do that you think the government is

3     seeking to prevent you from doing.

4          MR. WOLPIN:  I think what the government is

5     proposing to exclude are evidence of these two types, and I'll

6     get to the detail in a minute, the joking type and the serious

7     type.  Those are two types that I think are relevant.

8          The joking type is the type that gets to context.

9     The serious type is the type that gets to liability.

10         As to the serious type, this individual, Cheddar

11    Mane himself, the things that will be presented on that are

12    things that he said that would have given him the liability.

13    In discussing how people need to step up and commit mass

14    murder, statements that he's involved in this group with the

15    threats against the FBI agent, those are directly involving

16    him, and his statements that are on the Bowlcast that talk

17    about why people should commit mass murder, which is our --

18         THE COURT:  Can I stop you again?  It's like you

19    want rulings without giving me any actual evidence to

20    evaluate.  So I'm not going to engage in this hypothetical

21    exercise anymore, and I'm simply going to end the hearing and

22    tell you to show up at trial and I'll rule when I have actual

23    evidence to consider if you can't give it to me, okay?

24         Give me a specific piece of evidence that you think

25    the government is seeking to exclude that you think should be

**J.A. 92**

1    introduced.

2         MR. WOLPIN:  I think that what should be introduced

3    are exhibits that I've submitted to them that are audio clips

4    of the Bowlcast episode of Cheddar Mane discussing that people

5    should fear being shot and killed, him talking about that

6    people should accept their role in committing mass murder.

7    Those are specific examples of things that he has said that I

8    believe give him reason to fear liability.  Those are clips

9    that have been provided and that exist.

10        THE COURT:  Let me stop you again.

11        Okay.  It's your -- you're sort of bouncing back

12   and forth between two different things.  All right?  I need

13   you to focus so that I can try to rule.

14        Again, if you don't give me what I need, I'm going

15   to stop the hearing and say show up at trial and let's see how

16   it goes, okay?

17        You've now shifted back into I want to show that

18   the defendant, excuse me, that Cheddar Mane made statements

19   that could cause him to fear criminal investigation, and I

20   want to elicit those statements when cross-examining him so

21   that the jury can understand that he has a motive to falsify

22   to curry favor with the government to avoid his own

23   investigation.

24        I get that.  I see that.  Statements that Cheddar

25   Mane makes himself that you say could cause him to fear

**J.A. 93**

 1  investigation and perhaps prosecution potentially give him the

 2  motive to falsify.

 3          MR. WOLPIN:  Yes.

 4          THE COURT:  What we were focused on before you took

 5  us down that track was your other argument, which I thought

 6  you were trying to make, which is I have certain evidence that

 7  shows that there was a joking environment here where people

 8  joke about things that ordinarily people would find abhorrent

 9  but they're just joking.  And so when my client made

10  statements that many people would find abhorrent, he was just

11  joking and the jury needs to understand that.

12          You are making that argument, aren't you?

13          MR. WOLPIN:  I am, and I have --

14          THE COURT:  Let's get specific on that, okay?

15          MR. WOLPIN:  Okay.  So I have -- and I'll be honest

16  here.  I've gone through the portion of my cross and laid out

17  the ones as far as the liability.  My task for the rest of

18  today was to narrow down this list I have as ones that go to

19  context.  So that's why I'm a little less clear of the exact

20  ones I've used.

21          I have ones labeled things like Cheddar Joking

22  About Raping Kessler, Cheddar Joking About Raping Yentas,

23  which is a name for Jewish women.  Those are the titles of the

24  clips.

25          I don't want to do what they're saying, which is

**J.A. 94**

1    play a hundred of these.  So I don't want to go through -- but

2    those are the clips I have that I'm narrowing down to try to

3    get as representative samples rather than overload.

4           THE COURT:  Let me stop you again, okay?

5           Now you're talking about Cheddar making statements.

6    I don't think the government is seeking to preclude you from

7    evidence about joking statements about foreign subjects that

8    Cheddar Mane himself made at least to the extent they preceded

9    the contacts or the communications that are the subject of the

10    prosecution and that you can show your client was made aware

11    of.

12           Right, Mr. Davis?  If he has evidence that Cheddar

13    Mane made a joking statement about raping someone that Mr.

14    Cantwell was aware of, you would not seek to exclude that?

15           MR. DAVIS:  I would not object to a question on

16    cross of the victim about that statement.

17           THE COURT:  Okay.

18           MR. DAVIS:  I draw a --

19           THE COURT:  I think what you're concerned about,

20    and it's not clear yet to me that the defendant is even going

21    to do it because I've repeatedly asked for a proffer on it and

22    I'm not getting it, is -- what you don't want is completely

23    unrelated discussions by the Bowl Patrol about killing Jews or

24    attacking blacks or things like that that are just

25    disconnected from this case completely, right?  You want to

**J.A. 95**

1    keep that kind of stuff out?

2         MR. DAVIS:  And I don't want extrinsic evidence

3    where there's no reason under the rules of evidence to admit

4    it; that is, this defendant has a full right to cross-examine

5    this victim, and the cross-examination I think is going to be

6    wide-ranging and properly so.

7         What we are very concerned about is the defendant's

8    further ability to introduce extrinsic evidence and to keep

9    playing tapes over and over in a situation where the victim

10   concedes, yeah, in the Bowl Patrol we did joke about rape.

11        I think a lot here depends on what the victim says

12   on cross, and I'm only saying what I expect him to say but --

13   and I sympathize with the Court about the motion in limine

14   issue.  I think a lot of this is not going to be clear until

15   the cross.

16        THE COURT:  What is clear to me is I -- what I

17   wanted to -- even why I'm even entertaining this, and this

18   effort on my part is convincing me that I should never do this

19   with lawyers again, I wanted to help you in structuring your

20   opening statements so that you can both give some general idea

21   for the jury about what the case is all about.

22        I am not in a position to rule before trial as to

23   whether the defense in its own case should be able to

24   introduce extrinsic evidence of bad statements by the Bowl

25   Patrol that are not otherwise tied to Cheddar Mane or Mr.

**J.A. 96**

1    Cantwell.  I just can't do that.

2          But what I can say to you is it seems to me quite

3    clear that both the government and the defendant in their

4    opening statements should be able to provide context for what

5    the case will be about, and it seems to me entirely

6    appropriate for either or both the government and the

7    defendant in their opening statements to identify the fact

8    that Mr. Cantwell has an Internet radio program.  That in that

9    radio program he frequently makes statements that some would

10   interpret as white nationalist statements, that some would

11   interpret as offensive statements.  That there's another group

12   called the Bowl Patrol and that they have expressed similar

13   kinds of views, and that Mr. Cantwell was originally in some

14   kind of cooperative relationship with members of the Bowl

15   Patrol and that at some point that relationship broke down and

16   members of the Bowl Patrol tried to flood Mr. Cantwell's show

17   with calls in ways to disrupt it.  And that this person Mackey

18   was one of the people who was behind that effort, and this

19   person Cheddar Mane was engaged in that effort, and that both

20   Mr. Cantwell's show and the Bowl Patrol frequently espoused

21   views that many would consider outrageous and offensive.  That

22   that effort by the Bowl Patrol to disrupt Mr. Cantwell's show

23   upset him and he attempted to obtain identifying information

24   for Mr. Mackey, and he had these conversations with Cheddar

25   Mane and that those are the communications that give rise to

1    the charges here.

2           The parties should be able to do that in their

3    opening statements.

4           Does anybody disagree with what I've said so far?

5           MR. DAVIS:  No.

6           MR. WOLPIN:  No.

7           THE COURT:  No.  Okay.

8           I also think it's clear that in examining Cheddar

9    Mane -- in cross-examining Cheddar Mane the defense should be

10   allowed to question him about matters that suggest he might

11   have a reason to falsify his testimony in an effort to curry

12   favor with the government.

13          And so I expect during cross-examination that

14   Cheddar Mane will be questioned by the defense about his own

15   communications in which he suggests violent -- that people

16   engage in violent conduct or criminal conduct in ways that

17   could cause him to fear that he could be the subject of

18   government investigation if he didn't win the prosecutors

19   over.

20          So things that he actually said that were publicly

21   available that suggest that he might have reason to fear

22   investigation or prosecution by the federal government likely

23   will be a fair subject of cross-examination.  I think that

24   will need to evolve during the cross, and I can't give a more

25   precise guidance to you about that until I see the direct and

1  the cross unfold.

2           So I don't expect in the opening statements for the

3  defense to be getting up and reading a list of every

4  outrageous statement that it might seek to go into on

5  cross-examination because you run the risk that I don't admit

6  that evidence and you get a negative instruction from me that

7  you referred to things in the opening statement that you did

8  not end up putting into evidence.

9           So I expect in the openings that you should be

10  given an opportunity to develop some background about the case

11  to lay the foundation for one of your defenses, which is Mr.

12  Cantwell didn't mean this in the way that the government says

13  he meant it and we'll explain why that is so.  You should be

14  able to say in your opening statement that the evidence will

15  show that the alleged victim here is someone who's made a

16  number of statements that caused him to reasonably fear

17  prosecution by the government and provided him with a motive

18  to falsify his testimony in this case in an effort to curry

19  favor with the government.

20           I don't expect you to be reading transcripts of

21  Bowl Patrol statements over Telegram that are just generalized

22  statements by other members of the Bowl Patrol.  Whether

23  you're allowed to do that as the case develops will depend

24  upon the evidence at that time.  And beyond that, I don't

25  really think that I could give you much in the way of

**J.A. 99**

```
 1  guidance.
 2            I see, Mr. Cantwell, you have your hand up.  Do you
 3  want to speak privately with your lawyers?  Yes.  He's nodding
 4  his head yes.  All right.
 5            Could you move Mr. Cantwell and his lawyers back
 6  into the -- well, before we do, let me just --
 7            Mr. Davis, do you understand what I'm saying?
 8            MR. DAVIS:  Yes.
 9            THE COURT:  Do you have any objection to me
10  allowing those generalized statements in the opening statement
11  and reserving any decision on specific evidence about Bowl
12  Patrol offensive statements for when they arise during
13  cross-examination and the defendant's case-in-chief?
14            MR. DAVIS:  No.
15            THE COURT:  Okay.
16            Mr. Wolpin, do you understand what I'm saying?
17            MR. WOLPIN:  Yes.
18            THE COURT:  Do you have any problem with my
19  proposal, which is that you lay the foundation for your case
20  in your opening statement by using generalized statements and
21  refraining from pulling out explicit statements that you may
22  or may not ultimately be allowed to introduce and reserving
23  efforts with respect to those statements until you intend to
24  introduce them?  Do you have any problem with that?
25            MR. WOLPIN:  No.  I understand that.
```

**J.A. 100**

```
 1                THE COURT:  Okay.

 2                All right.  Now you can then let the defendant

 3   speak privately with his lawyers, and we'll come back.

 4                (Attorney Wolpin and Attorney Levin go into a

 5   breakout room with the defendant)

 6                THE COURT:  All right.  Are we ready to resume?

 7                MR. WOLPIN:  Yes.

 8                THE COURT:  Okay.  Did you want to say anything,

 9   Mr. Wolpin, after speaking to your client?

10                MR. WOLPIN:  No, your Honor.

11                THE COURT:  Okay.  All right.

12                So here's what I propose to do with respect to the

13   government's motion in limine and the defendant's

14   corresponding motion in limine.

15                I'm not able to make a definitive ruling on those

16   motions at the present time.  I have attempted to provide

17   general guidance as to how I expect the parties to conduct

18   themselves during opening statements.

19                I anticipate that the government will in its

20   opening statement provide information about how the

21   relationship developed here between Mr. Cantwell and the

22   alleged victim, how that relationship broke down, and how it

23   led to the private messages that contain the threats that are

24   the subject of the charges.

25                And I expect that the defendant in its opening
```

1  statement will provide some context that identifies in general

2  terms what Mr. Cantwell's Internet radio program is all about

3  and how Mr. Cantwell came to have interactions with the Bowl

4  Patrol, in general what the Bowl Patrol's views are, what kind

5  of a group it is, and how his relationship with that group

6  developed and how it led to efforts to obstruct his program,

7  and how it led to frustrations on his part, and how it led to

8  the interactions that give rise to the charges.

9        I also expect that the defendant in its opening

10 statement will identify that Cheddar Mane -- there will be

11 evidence that will show that Cheddar Mane had very good reason

12 to fear that he would be the subject of investigation unless

13 he was able to win the government over to his side, and that

14 therefore he has a motive to testify falsely, and that you

15 have to view his testimony with that kind of caution that you

16 need to view testimony from someone who has a motive to

17 falsify.

18       I don't expect in the opening statements to hear

19 quotations from specific communications that are -- and in

20 particular don't expect to hear communications being discussed

21 involving the Bowl Patrol and its views in circumstances where

22 there's no evidence that Cheddar Mane was a participant and

23 that were not communicated to the defendant prior to the time

24 he made these threats.

25       Those kind of specific matters should be reserved

**J.A. 102**

1   for cross-examination or they should be offered in the

2   defendant's case-in-chief.

3           If and when they are offered, they can be the

4   subject of objection, and I will give the parties a ruling at

5   the time when the evidence is being offered.  And until then,

6   I can't give you more specific guidance.

7           I can tell you that I will enforce Rule 401 and

8   Rule 403.  I will not allow evidence to be introduced if the

9   prejudicial effect of that evidence substantially outweighs

10  its probative value.

11          I will not allow evidence that is so cumulative

12  that its cumulativeness substantially outweighs its probative

13  value, and beyond that I can't give you further guidance

14  because that is a highly context-specific ruling.

15          All right?  So that's my ruling on the government's

16  motion in limine addressing the issues we've been discussing

17  and the defendant's corresponding motions.

18          In order to preserve any argument you have

19  regarding the admissibility of evidence on this subject, you

20  need to object at the time the evidence is being offered.  I

21  need to hear your objection and I need to be able to evaluate

22  it in context.  Beyond that, I can't give you further guidance

23  and I will not be bound -- I am not making any ruling and I

24  will not be bound by anything I have said.  It is incumbent

25  upon you to object when the evidence is offered if you don't

1  want it to be admitted.  And I'm not restricting you from

2  trying to offer evidence.  I'm merely instructing you that if

3  it is the subject of a motion in limine, you should inform the

4  Court before you seek to introduce the evidence so that we can

5  evaluate it appropriately.  All right?

6          Anybody need to be heard -- otherwise heard on this

7  particular issue?  Anything more from the government?

8          MR. DAVIS:  No.

9          THE COURT:  Anything from the defense?

10          MR. WOLPIN:  (Nods negatively.)

11          THE COURT:  No.  Okay.

12          All right.  What's the government's next motion?

13          MR. DAVIS:  Judge, the only other thing -- the

14  other motion, which is largely what we've discussed here, is a

15  motion to exclude evidence of other acts of third parties.

16          And the only thing I want to say is that we are

17  going to be careful in our objections to make sure that the

18  defense lays a predicate that what they're trying to ask about

19  or introduce extrinsically is something that either the victim

20  did or that in some cases Vic Mackey did, but it's not just

21  anything and everything that ever happened to Mr. Cantwell.

22          There is a real danger here that Mr. Cantwell will

23  assign to the Bowl Patrol various grievances that he has

24  without being able to show that they are the Bowl Patrol, and

25  some of his exhibits show that.  They have nothing to do with

**J.A. 104**

```
 1    either Vic Mackey or the victim.

 2              Anyway, the reason for that motion is to say, yes,

 3    in many cases communications or actions by the victim or Vic

 4    Mackey are relevant in this extortion case, but all the other

 5    things that Mr. Cantwell wants to complain about are not

 6    and --

 7              THE COURT:  These would be things such as acts that

 8    other members of the Bowl Patrol may have taken that upset Mr.

 9    Cantwell.  Efforts to block his show?  I'm trying to figure

10    out what it is that we're talking about.

11              MR. DAVIS:  Yes, or calls, prank calls from other

12    people that are not in the Bowl Patrol.

13              THE COURT:  Yeah, and I think in general it's not a

14    defense to these charges to show that Mr. Cantwell was

15    provoked.  There's no provocation defense here that I'm aware

16    of.

17              Certainly I will allow some evidence about why it

18    was that Mr. Cantwell became frustrated, but I don't see

19    evidence that is unconnected to either Mackey or Cheddar Mane

20    as having substantial relevance in the case.

21              In other words, I have no problem with evidence

22    being introduced as a general proposition saying, look, this

23    is why I went to the lengths that I went to here because I was

24    extremely frustrated because people were obstructing my show,

25    but -- and I think that's -- it's not -- provocation isn't a
```

**J.A. 105**

1   defense, but in order to make any sense of evidence the jury

2   needs to have some context about what's happening.

3          So you can allow evidence that's admissible for

4   contextual purposes that is otherwise of minimal relevance,

5   but you don't have an unlimited right to spend countless hours

6   reviewing grievances that are completely unrelated to the

7   case.

8          So to the extent I can give guidance to the defense

9   on this, I understand that you want to try to provide some

10  context for why it is that Mr. Cantwell acted in the way he

11  did, but we all need to recognize that provocation isn't a

12  defense.  The relevance of that evidence is limited in my mind

13  to context, not -- it doesn't have any independent value as a

14  defense, and at some level it could have prejudicial effect,

15  and it certainly would have waste of time that would

16  substantially outweigh any minimal probative value.

17         So I can't rule on your motion any more

18  specifically than this, Mr. Davis.

19         I am inclined to allow some evidence to explain why

20  Mr. Cantwell was frustrated and sought to undertake the

21  actions that he undertook.  At some level that evidence -- if

22  it is of minimal relevance to establish context, it isn't

23  otherwise relevant in my view to the defense, and therefore at

24  some level I will have to rule under Rule 403 that the

25  prejudicial effect or the waste of time involved substantially

**J.A. 106**

```
 1   outweighs probative value.
 2            The defense should be mindful of that, but I'm not
 3   going to impose any actual limits on the defense at this
 4   point.  I'm just providing general guidance.  It's up to you
 5   to decide how far to go, and Mr. Davis to object, and at that
 6   point I'll rule on any objection on this subject.  And frankly
 7   I don't anticipate that the defense is going to be wasting the
 8   jury's time on a lot of that kind of evidence.
 9            So I won't make any further ruling on that, but I
10   understand the issue and I've tried to give you guidance to
11   the extent I can.
12            All right.  Does that cover your motions, Mr.
13   Davis?
14            MR. DAVIS:  (Nods affirmatively.)
15            THE COURT:  Okay.  Good.
16            Mr. Wolpin or Mr. Levin, what do you want to say in
17   support of any motion you want to discuss?
18            MR. WOLPIN:  There's a motion in limine regarding
19   drugs and firearms which the government is not objecting or
20   not attempting to introduce.  So No. 71 is agreed upon so I'm
21   not going to address it.
22            THE COURT:  I would say it's moot because the
23   government has represented that it doesn't intend to introduce
24   that evidence.
25            MR. WOLPIN:  Correct.
```

**J.A. 107**

1          There's filing No. 69 which was the motion in

2   limine with reference to Charlottesville.  The government

3   responded that it would essentially agree to avoid the word

4   Charlottesville but would present information about Virginia.

5   Our position is that it opens up the same Pandora's box by

6   talking about 2017 Virginia.  I don't see that there's any

7   need to have that specific location mentioned.

8          THE COURT:  All right.  Can I stop you and find out

9   from Mr. Davis what he's intending, or Ms. Krasinski, whoever

10  is going to speak?

11         MS. KRASINSKI:  Your Honor, there's one exhibit,

12  it's identified right now as Government's Exhibit 502, and it

13  is an e-mail from the defendant to the FBI.  In part of that

14  e-mail he talks about his interaction with the victim, and he

15  also talks about Bowl Patrol generally.

16         And what he says in that is:  As for whether I know

17  them, that depends on how loosely we define "know."  As I

18  mentioned at the outset, these guys were in my online social

19  orbit when I was in Virginia.  I've given you the real names

20  that I have, but I couldn't pick most of them out of a lineup

21  and most of these guys probably couldn't pick each other out

22  of a lineup.

23         So the government --

24         THE COURT:  Could we agree to redact the reference

25  to the word Virginia and otherwise put the e-mail in?

**J.A. 108**

```
1              Would that satisfy you, Mr. Wolpin, if we did that?
2              MR. WOLPIN:  Yes.  I just didn't -- there's plenty
3    of other redactions in that e-mail.  I don't see why that
4    needs to be contained.
5              THE COURT:  Do you have a specific reason why you
6    need the reference to Virginia in there?
7              MS. KRASINSKI:  Simply that it ties it to timing.
8    You know, I don't think -- I wouldn't expect any testimony to
9    be, well, he was in Virginia for the Charlottesville rally.
10   He was in Virginia for an extended period of time, you know, I
11   think that someone could say.
12             So the Bowl Patrol and Mr. Cantwell became friendly
13   at some point in late 2017 to late 2018 when Mr. Cantwell was
14   in Virginia.  You know, it's just the government's position
15   that mentioning a state that, you know, the name of the
16   Commonwealth of Virginia in and of itself without any other
17   context about any relationship to Charlottesville or the Unite
18   the Right rally is not unfairly prejudicial under 403.
19   Particularly given that it's the defendant's own words.
20             THE COURT:  So the problem with that is you say
21   that Virginia provides information that's useful to the jury
22   because it helps the jury understand that the relationship
23   developed in the past, but that only is useful to the extent
24   that the jurors identify the reference to Virginia to the
25   Charlottesville rally because otherwise they wouldn't know
```

**J.A. 109**

```
1   anything about when he was in Virginia, and so that
2   essentially is -- it's useful because the jurors will know
3   when Charlottesville was, and that defeats the purpose.
4           I don't see much relevance to having the word
5   Virginia in there given the defense's concern about it and
6   your agreement not to reference Charlottesville.  I don't see
7   any reason why we shouldn't redact it.
8           Just brief response and then I'll rule.
9           MS. KRASINSKI:  That's fine, your Honor.  The
10  government can submit a redacted version.
11          THE COURT:  So we'll take out the reference to
12  Virginia and submit a redacted version, and that's the only
13  reference to Charlottesville.  So the motion is otherwise moot
14  because the government has agreed to take out the word
15  Virginia from that e-mail.
16          What else do you have, Mr. Wolpin?
17          MR. WOLPIN:  Let's see.  What is left is, if we're
18  going to address it today, the government's motion regarding
19  the CPS worker from Missouri and our motion regarding --
20  excluding the wife which I mean maybe we should take -- I
21  don't know whether the Court wants to take that up today or
22  when we take up the appearing by video question.
23          THE COURT:  I think it's better to do that one on
24  Monday because I agreed to give you additional time on that.
25          The CPS worker is -- you're seeking to bar her from
```

**J.A. 110**

```
 1    testifying on relevance grounds?
 2              MR. WOLPIN:  Yes.
 3              THE COURT:  I think I understand your argument on
 4    that, but whatever else you want to say about that, and then
 5    I'll hear from Mr. Davis.  I do have some questions about it.
 6              MR. WOLPIN:  All right.
 7              The short version is essentially, which we've gone
 8    through a little bit, that Mr. Cantwell knew what he knew or
 9    whatever he did know about what effects there could be to this
10    call when he made it.
11              The person they're intending to call has nothing to
12    do with Chris Cantwell in particular.  It's a generic worker
13    who would say, we could do X, Y, and Z.  Whether the
14    defendant -- whether she can or can't do those things is
15    ultimately irrelevant.  The question in this instance is what
16    the defendant's intent was at the time, what did he know.
17    There's plenty of evidence, as the government has cited, as to
18    what Chris Cantwell said about this call and why he made it
19    and what the consequences could be.
20              THE COURT:  Well, at the risk of sounding pedantic
21    here, let's go back to law school.  I mean, every crime has a
22    mens rea component and an actus reus component.  You're
23    focused on the mens rea component, but there's an actus reus
24    component to these charges as well, isn't there, and isn't it
25    incumbent upon the government to demonstrate that this
```

**J.A. 111**

```
 1    communication qualifies as a threat, and does not the
 2    definition of threat require proof of a serious statement
 3    expressing an intent to injure another person which under the
 4    circumstances would cause apprehension in a reasonable person
 5    as distinguished from a political statement, idle talk,
 6    exaggeration, or something said in a joking manner?
 7              Isn't the CPS testimony relevant on the actus reus
 8    component here as to whether this communication does qualify
 9    as a threat?
10              Wholly apart, I agree there's also a mens rea
11    component that you've been focused on.
12              MR. WOLPIN:  I don't think so because in this
13    instance there is no follow up.  They're not bringing someone
14    in to say here's what actually happened as far as an action
15    that we took.  The action that they took was nothing, so it
16    ends at the call.
17              To come in and say hypothetically we could have
18    done X, Y and Z in a case if we so chose isn't at that point
19    part of the actus reus because it didn't happen.  It then
20    reflects back on intent rather than addressing what actually
21    happened as far as the offense.
22              THE COURT:  Well, he has to act with intent but he
23    also has to send a communication that would again cause
24    apprehension in a reasonable person, not what your client --
25    it's not enough that your client intends to threaten.  If the
```

**J.A. 112**

1    communication -- even if he has the criminal intent if what he

2    exchanges is not something that would cause apprehension in a

3    reasonable person, he's not guilty of the crime.  It's a mens

4    rea plus actus reus requirement.

5         And so the government has to prove not just what

6    your client intended by his action but by what he in fact did

7    and whether what he did meets the definition of a threat, and

8    on that score it seems to me to be highly relevant what a

9    reasonable person would understand a threat to report someone

10   to CPS to mean.

11        I assume that's what the government wants this

12   witness to testify to, not -- because I don't think they

13   did any -- they never did contact Cheddar Mane or his spouse,

14   but explaining what happens when someone does what this threat

15   says seems to me to be relevant.  That's my initial reaction.

16        A brief response from you, and then I'll hear from

17   Mr. Davis or Ms. Krasinski.

18        MR. WOLPIN:  Obviously Cheddar Mane can testify to

19   what his response was to that or what it meant to him in that

20   sense as far as that goes.  To then bring in this third party

21   I think becomes irrelevant and unnecessary.

22        THE COURT:  Okay.  I get it.  I think your focus

23   and -- you know, maybe notwithstanding my instructions the

24   jury focuses on what you want them to focus on.  It isn't

25   Cheddar Mane's response here that is the issue.  It's whether

**J.A. 113**

```
 1    a reasonable person would view it as a threat.

 2            Mr. Davis, have I figured out what you are trying

 3    to get from this CPS worker correctly?

 4            MR. DAVIS:  Yes.

 5            THE COURT:  Okay.  So your view is you want to try

 6    to -- the jury needs to be informed.  So that they can

 7    understand how a reasonable person would view this particular

 8    communication they need to understand what CPS is and what CPS

 9    does and what happens when somebody reports somebody to CPS,

10    right?

11            MR. DAVIS:  Correct.

12            THE COURT:  Okay.  I understand Mr. Wolpin's

13    argument, but I find it to be unpersuasive here.  I do think

14    the CPS worker has relevant testimony to provide and that the

15    relevance of that testimony is not substantially outweighed by

16    the danger of unfair prejudice, waste of time, or any other

17    reason why it should be excluded pursuant to Rule 403.

18            I will -- of course I don't know what the exact

19    content of the testimony will be.  There may be aspects of the

20    testimony that should be excluded.  And so, Mr. Wolpin, you

21    remain free and should object to any portion of the testimony

22    that you believe is inadmissible, and I will rule on your

23    request at that time.  But as a general matter, it does appear

24    to me likely that this witness will have relevant information

25    to provide and that the relevance of that is not outweighed by
```

**J.A. 114**

```
 1    any reason identified in Rule 403 as a permissible reason for
 2    exclusion.
 3              So I'm going to deny your motion without prejudice
 4    to your right to object to individual answers to questions as
 5    they come up to the extent you have a legitimate basis for
 6    interposing an objection.
 7              All right.  What else have you got, Mr. Wolpin?  Is
 8    there anything else?
 9              MR. WOLPIN:  I believe that completes what we have
10    for today.
11              THE COURT:  All right.  I have everything from the
12    government and everything from the defense.
13              What's left is the government's proposal to elicit
14    video testimony from the victim's spouse, and I gave the
15    defense some additional time to prepare for that so we'll
16    discuss that at our conference on Monday.  You can present
17    both the argument that your client does not waive his
18    confrontation rights as to that witness and any argument you
19    have that the spouse's testimony is irrelevant or should be
20    excluded under Rule 403.  All right?
21              So we'll take that up on Monday.  Otherwise
22    everybody -- everything is proceeding appropriately and the
23    parties will be ready for trial on Tuesday morning.  All
24    right?  Anything else before I adjourn the hearing?
25              MR. WOLPIN:  No.  Thank you.
```

**J.A. 115**

1              THE COURT:  Okay.  Thank you.  I'll talk to you

2    again on Monday.

3              (Conclusion of hearing at 12:20 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 116**

1                   C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5   foregoing transcript is a true and accurate transcription of

6   the within proceedings, to the best of my knowledge, skill,

7   ability and belief.

8

9

10  Submitted: 5-4-21        /s/   Susan M. Bateman
                             SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 117**

```
               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE


 * * * * * * * * * * * * * * * * * * *
                                     *
UNITED STATES OF AMERICA             *
                                     *   20-cr-06-01-PB
            v.                       *   September 22, 2020
                                     *   9:38 a.m.
    CHRISTOPHER CANTWELL             *
                                     *
 * * * * * * * * * * * * * * * * * * *
```

<u>TRANSCRIPT OF JURY TRIAL</u>
<u>DAY ONE - MORNING SESSION</u>
<u>BEFORE THE HONORABLE PAUL J. BARBADORO</u>


<u>APPEARANCES</u>:


<u>For the Government</u>:     John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             U.S. Attorney's Office


<u>For the Defendant</u>:     Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defenders Office


<u>Court Reporter</u>:     Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             (603) 225-1453

```
                    I N D E X


                                                    Page

OPENING STATEMENT BY MR. DAVIS:                     22


OPENING STATEMENT BY MR. WOLPIN:                    37



WITNESS:          Direct        Cross      Redirect      Recross

SARAH SMITH


By Mr. Davis        60                       78

By Mr. Levin                     73



EXHIBITS:                                  FOR ID      IN EVD

Government's Exhibit No. 103.                           79
```

```
 1                      P R O C E E D I N G S

 2              (IN COURT - NO JURY AND NO COURT PRESENT)

 3              THE CLERK:  In the case of the United States of

 4    America versus Christopher Cantwell, criminal case number

 5    20-cr-06-01-PB, the government has premarked Exhibits 100

 6    through 700.  All exhibits are marked for identification and

 7    shall remain marked for ID at this time.

 8              The defendants have premarked Exhibits A through J.

 9    All exhibits are marked for identification and shall remain

10    marked for ID at this time.

11              (IN COURT - NO JURY PRESENT)

12              THE CLERK:  Court is in session and has for

13    consideration the jury trial in United States of America

14    versus Christopher Cantwell, criminal case number

15    20-cr-6-1-PB.

16              THE COURT:  Good morning.  I wanted to talk to you

17    about a couple of matters before we begin.

18              First, a person presented himself at the door today

19    and asked to enter and not be required to wear a mask.  That

20    person claims to have some kind of condition that prevents him

21    from being able to wear a mask.  He's unwilling to come in

22    wearing a mask so I can't evaluate his request in person.

23              I instructed the staff to give that person the

24    option of submitting a written request, and I believe that

25    person has done so, but I'm not going to delay the trial while
```

**J.A. 120**

1   I wait to evaluate that.  Instead, I intend to proceed.

2           And when I get to a break, we'll give the jury a

3   break, hopefully by that point I'll have a chance to review

4   that matter with you, hear any views that you have on the

5   subject and make a ruling on it, but I won't be able to do

6   that until the first break.  So that's the first thing that I

7   wanted to address with you.

8           The second thing was to follow up on an issue that

9   we discussed during our video hearing yesterday and that is

10  the issue that arose during the impanelment process.  And I

11  won't go through and describe in detail what that issue is

12  because I laid it out for the parties over the video

13  conference, but essentially it is that we agreed to use a

14  prescreening procedure for selection of jurors in which the

15  parties were given an opportunity to review juror

16  questionnaires, including a non-case specific supplemental

17  questionnaire that was submitted to jurors, and they were

18  permitted -- counsel was permitted to meet and confer and

19  agree on jurors who would be excused for cause.  The Court

20  accepted their agreed excusals, and a number of potential

21  jurors were excused before the impanelment process began.

22          As I reflected on this and discussed the issue with

23  colleagues, it became apparent to me that there was a

24  potential issue with the use of that prescreening process that

25  arises based on Rule 43 of the Rules of Criminal Procedure.

**J.A. 121**

1          Just to quote to you the relevant part of that

2     rule, it provides, "Unless this rule, Rule 5, or Rule 10

3     provides otherwise, the defendant must be present at every

4     trial stage, including jury impanelment and the return of the

5     verdict."

6          I explained to the parties that the case law on

7     this is somewhat less than clear on whether the prescreening

8     process that we used here is a trial stage that is part of

9     impanelment at which the defendant would have a right to be

10    present or not.

11         In light of that uncertainty and because the

12    parties hadn't raised it with me, I felt it was important to

13    raise it on my own with the parties.

14         I presented the issue to the parties.  I did not

15    require them to take a position on it immediately.  Instead, I

16    asked the defendants -- defense counsel to meet and confer,

17    consult with their client, and I made clear to the parties

18    that I was inclined, if the defendant wanted it, to re-impanel

19    an entirely new jury with a new jury panel to ensure that any

20    right the defendant may have to be physically present during

21    that prescreening process was fulfilled, and I explained how

22    that would work.

23         I was informed later in the day that the defendant

24    does -- and I explained further that that impanelment would

25    incur at the next jury draw which would be in approximately

**J.A. 122**

```
 1   two weeks.
 2              So I essentially gave the defendant the option to
 3   do that, and I asked counsel to confer and tell me whether the
 4   defendant wanted to proceed with the jury that has been
 5   selected or whether the defendant wanted to select a new jury
 6   with a new impanelment process, and I was inclined to defer to
 7   the defendant's request on that.
 8              I asked counsel to confer, consult with their
 9   client.  The message I got back was they have conferred and
10   counsel is not seeking to have a new jury impaneled.
11              I simply want to verify with Mr. Cantwell that that
12   is in fact your desire here, that is, that we not proceed with
13   a new impanelment and instead it is your preference that we
14   proceed with the jury that has been selected.
15              Mr. Cantwell, can you just tell me, have I got that
16   right?  Is it your desire here to proceed with the jury that
17   has been selected rather than to seek a new jury impanelment?
18              THE DEFENDANT:  It is, Judge.
19              THE COURT:  All right.  Thank you.  I appreciate
20   that.
21              I appreciate the parties working with me on these
22   issues.  These are challenging times in which to conduct a
23   trial, and we want to be sure we're doing it the right way.
24   We want to make sure that the defendant's constitutional
25   rights are respected, and I'm erring on the side of caution
```

1    here.  That's why I was willing to offer a new impanelment,

2    but the defendant has thought about the issue, consulted with

3    counsel and made a decision on it, and I'm perfectly fine in

4    proceeding as we have scheduled.

5              So I'm ready to bring the jury in.  Are there other

6    issues that the parties need to take up with me before we

7    bring the jury in?

8              MR. WOLPIN:  Just one brief issue in relation to

9    opening, your Honor.

10             I've had obviously some conversations in the last

11   either phone or Zoom meeting about what was and wasn't

12   presentable within the opening.  We talked about audio and

13   transcripts and the like not being quoted verbatim, but

14   discussions were had and I took that to heart.

15             The only exhibit I intended to display was a

16   physical exhibit which was the alleged victim's avatar or his

17   public presentation of himself that my client would have been

18   familiar with at the time of the alleged statements.

19             And so from our perspective this is evidence that

20   is relevant and is coming in.  I don't intend to do more with

21   it than show it to them so they understand within the context

22   of my opening who that person presented themself to be, and I

23   certainly expect that to be admitted.

24             I notified this morning the government of my

25   intent, I wasn't looking to surprise anybody and, you know,

1    the government does not think that should be showed at this

2    time.  I think it should, and I think rather than --

3            THE COURT:  Let me stop you and step back because I

4    want to make sure that you don't have a misimpression about my

5    position with respect to opening statements.

6            I'm not saying that there is a blanket prohibition

7    on quoting from transcripts of documents that the parties have

8    a reasonable basis to believe will be admitted into evidence.

9            For example, I would be surprised if the government

10   didn't intend to quote from transcripts of communications that

11   are the communications at issue here.

12           It's more about the issue of line drawing about

13   when information becomes either so prejudicial or so unduly

14   repetitive and a waste of time that I might not allow it, and

15   I've just informed the parties that I intend to postpone

16   decision-making on those line-drawing questions until the

17   evidence is being offered.

18           So I don't want voluminous detailed statements in

19   the openings about evidence that may never get to the jury.

20   That's where I'm drawing the line here for openings, and I'm

21   reserving the right to make a final decision on how far I'm

22   going to let the parties go until I have to make that decision

23   when the evidence is actually offered.

24           Now, the avatar.  Just refresh my memory.  What is

25   the avatar like, why do you want to bring it out in the

1    opening, and then I'll hear from the government as to why they

2    don't think it should be permitted.

3             MR. WOLPIN:  So the avatar was Cheddar Mane's

4    public presentation within the Bowl Patrol.  So I think we can

5    actually put it up for the Court to see.  It is how he

6    presented himself online.  Again, it is something that

7    predates I believe -- I have reason to believe predates the

8    interaction in this case.  That is how my client knew this

9    individual, not as Ben Lambert or not as some other entity,

10   but as this individual.

11            Obviously the Court through other hearings is aware

12   of the importance of context, of reasonability, of intent, and

13   a number of these statutes, and so from our perspective the

14   jury is going to see this.  Seeing this now allows them to

15   understand in a way that -- you know, I can go on for a

16   paragraph about what it looks like, but I have the thing.  And

17   the reason we present evidence is so that the jury can see

18   what actually was known and available.

19            THE COURT:  So I don't -- I am not a person who

20   engages in any kind of interactions on social media, so you'll

21   just tell me.  The avatar is a way in which people like your

22   client and Cheddar Mane present themselves to the Internet

23   world?  They take an image and that is available when they

24   make entries under their own name?  Is that what happens?

25            MR. WOLPIN:  It depends on the platform, but you

```
1   can present yourself through any photograph or visual
2   representation along with your name.  This is one that this
3   individual chose to use to represent himself online.
4              THE COURT:  Did he represent himself in that way on
5   platforms that will be discussed in evidence that will involve
6   communications in which Cheddar Mane and the defendant were
7   engaged?
8              MR. WOLPIN:  I certainly have reason to believe so,
9   but if I could just have a moment.
10             (Attorney Wolpin confers with the defendant)
11             MR. WOLPIN:  Okay.  Alternatively, could you bring
12  up Bates 6.
13             You can see this is another version of the avatar
14  that was in fact posted on Mr. Cantwell's website.  There will
15  be no dispute, I believe, of his familiarity with it.  It's
16  the same basic premise.  Machine guns or Mane on the chest.
17             (Court Reporter asks Attorney Wolpin to turn his
18  microphone on)
19             MR. WOLPIN:  Oh, excuse me.
20             This was presented on Telegram through the Bowlcast
21  website, which is something the jury is going to see and hear
22  about.  This is dated July 4, 2018, so we know a date from
23  that.  We know when that date occurred and that it predated
24  the relevant act in this case from 2019.
25             So this one I can show for certain.  I know exactly
```

**J.A. 127**

1    where it was presented.  It was presented on the Bowlcast

2    website through Telegram.  It was presented and familiar to

3    Mr. Cantwell prior to the interaction.

4            THE COURT:  And what's the theory under which you

5    say it would be relevant?

6            MR. WOLPIN:  In the same manner that other evidence

7    is relevant.  For two reasons.  One being that the defendant's

8    understanding of how this person presented themselves, what

9    language they used, what imagery they used, how they wanted

10   themselves to be seen matters in understanding what intent one

11   would need to have to threaten someone whose public persona

12   and efforts are alike.

13           Additionally, within the cyberstalking statute

14   there's a reasonability question of the person receiving it as

15   far as whether you would expect a reasonable person in that

16   position to have emotional distress.  When this person is

17   presenting themself like this, it's a far different

18   expectation about how that person is going to respond than

19   maybe if it's someone who, you know, presents in a more

20   conventional way.

21           So I think it certainly is going to be relevant

22   from a trial perspective and something that I expect the jury

23   to see in this case.

24           THE COURT:  All right.  I understand your point,

25   counsel, and I'm not going to make any definitive ruling on

**J.A. 128**

```
 1   the admissibility of the avatar in a trial.  But if it is
 2   relevant, it strikes me as being minimally relevant, and so
 3   I'm not going to -- I'm going to instruct you not to refer to
 4   it in the opening statement.  I need to make that relevance
 5   call when the evidence is offered so that I can understand
 6   better how it supports your case.
 7              So I am going to sustain the government's objection
 8   to referencing it in the opening statement, but I want to be
 9   clear.  I am not trying to restrict your ability to describe
10   the Bowl Patrol and Cheddar Mane and what the evidence will
11   show about that, and I believe you can fairly and fully
12   present your argument about context initially in the opening
13   statement and when the time comes through evidence.
14              But I just am having trouble seeing how an image
15   like that really conveys information that bears on your
16   defense.  That's how I have trouble seeing it at the present
17   time.
18              Look, I appreciate you refrain from eye-rolling
19   when I say things that you don't like.  Of course, counsel,
20   your job is to basically make your arguments by speaking.  And
21   when I rule, you accept them and then reverse me on appeal,
22   which is fine, but don't eye-roll, you know, don't take that
23   kind of reaction when I explain my rulings, okay?
24              Do you understand?
25              MR. WOLPIN:  Yes, I understand.  I apologize.
```

```
 1                    THE COURT:  Okay.  Good.  Thank you.

 2               So I sustain the government's objection to the use

 3    in the opening statement without prejudice to the defendant's

 4    right to elicit the information during the course of the

 5    trial.

 6                    MR. WOLPIN:  Thank you.

 7                    THE COURT:  All right.  Is there anything else we

 8    need to take up?

 9               Okay.  We can bring the jury in.

10                    MR. DAVIS:  Judge, there is one other matter.  I'm

11    sorry.

12                    THE COURT:  Logistics are difficult enough.  If I

13    ask you if there's anything else, tell me.

14                    MR. DAVIS:  I apologize.

15                    THE COURT:  All right.  What's up?

16                    MR. DAVIS:  The first witness will be in Missouri

17    by live two-way video.

18                    THE COURT:  This is one that's done by agreement --

19                    MR. DAVIS:  Correct.

20                    THE COURT:  -- with a waiver by the defendant of

21    any confrontation clause rights that he may have to the

22    presentation of that testimony.

23               There is another witness who the government wants

24    to testify by two-way.  The defendant is fully preserving his

25    rights under the confrontation clause to object to that.
```

**J.A. 130**

```
 1              I have that matter under advisement and hope to
 2    give a ruling soon.  I'm reading the cases that the parties
 3    have presented me.
 4              So just let me be clear.  The defendant is not
 5    waiving any confrontation clause rights he has to any other
 6    video testimony by any other witness.
 7              But Mr. Cantwell, I want to just make sure with
 8    respect to this witness and this witness only, do you agree to
 9    waive any rights under the confrontation clause to have that
10    witness testify in person and instead agree that that witness
11    can testify by two-way video?
12              THE DEFENDANT:  I do, Judge.
13              THE COURT:  And I want to be clear.  You have a
14    really important argument with respect to another witness.
15    You are preserving all of your rights with respect to that
16    other witness.
17              THE DEFENDANT:  I completely understand that,
18    Judge.  Thank you.
19              THE COURT:  Okay.  Thank you.  You can be seated.
20              All right.  I'll instruct the jury on this, that
21    they will be receiving this witness testimony by two-way
22    video.
23              (IN COURT - JURY PRESENT)
24              (Deputy clerk swears in the jury)
25              THE COURT:  Good morning, members of the jury.
```

**J.A. 131**

1      I'm sure you don't necessarily feel this way, but

2   this is the first time I've been in court with a jury since

3   March, and it's a good thing for me to be back here conducting

4   jury trials again.

5      I've spent a good chunk of the last 40 years of my

6   life in courtrooms in different places, the last 28 years

7   here, and this is going to be different in some ways from the

8   ways in which we conduct trials.  Please bear with us.  We're

9   going to do everything we can to make this an experience

10   that's comfortable for you in which you feel safe and in which

11   you can evaluate the evidence that you're going to be hearing

12   over the next few days and that you can render a verdict that

13   is true and honest and fair to the defendant and to the

14   government.

15      There are going to be some differences.  Some of

16   these are obvious.  Jurors are seated in a different

17   configuration from the way in which we ordinarily have jurors

18   sit, we're all wearing masks, and there will be times in which

19   I may be interacting with the lawyers using a headset like you

20   did during the jury selection process where I will be

21   communicating with the lawyers and they can hear me and I can

22   hear them, but you won't be able to hear what we're saying.

23   In a non-pandemic trial that would be done at sidebar, but we

24   won't have the lawyers come up to sidebar.  So if we do have

25   to speak with them -- if I do have to speak with them on the

1    headset, just bear with us as you ordinarily would at a

2    sidebar conference.

3          I know you're all carefully following the court

4    staff's instructions with regard to social distance, and I

5    would ask you to please follow those instructions throughout

6    the trial for your safety and the safety of the other members

7    of the jury.

8          Other than that I'm going to try to have this run

9    very much like a regular trial.

10          So how's it going to work?  Well, we're going to

11   start, like we do with all trials, with opening statements.

12   So that's going to happen in just a couple of minutes.

13          The lawyers will have an opportunity -- each side

14   will have an opportunity to speak with you and give you kind

15   of a preview of what they expect the evidence in the case will

16   show.

17          After we complete the opening statements, the

18   prosecutors will present their evidence through a series of

19   witnesses and exhibits.

20          The prosecutors will have a chance to ask questions

21   called direct examination of witnesses.  The defense will have

22   an opportunity to cross-examine witnesses.

23          After the defense is completed, the prosecution

24   will have a brief opportunity to ask redirect questions, and

25   generally speaking we'll be done with those witnesses at that

**J.A. 133**

1    point.  I don't generally allow multiple rounds of

2    examination.  I will make exceptions in unusual circumstances.

3           We will then proceed one at a time through the

4    government's witnesses.  And when the government has offered

5    all of the evidence it wants to offer, the government will

6    rest its case and the defense will have an opportunity to

7    present any evidence it chooses to present.

8           I want to remind you of something that we talked

9    about during the jury instructions.  The burden of proof in

10   this case is on the government, as it always is, to prove

11   every element of every charge beyond a reasonable doubt.

12   Unless the government proves the defendant's guilt beyond a

13   reasonable doubt, the defendant must be found not guilty.

14          The defendant is entitled to a presumption of

15   innocence.  Until and unless the government proves his guilt

16   beyond a reasonable doubt, the defendant remains innocent and

17   you cannot find him guilty unless the government proves guilt

18   beyond a reasonable doubt.

19          The defendant has no obligation to present any

20   evidence or to testify.  The defendant has a constitutional

21   right to remain silent and you can't -- if the defendant

22   elects not to produce evidence or not to testify, you can't

23   hold that against him in any way.  The government has the

24   burden of proof here, not the defense.

25          But if the defendant elects to produce any

**J.A. 134**

1    evidence, it will come in in the same way that the

2    government's evidence came in.  Each defense witness will

3    testify, the defense will ask questions, the government will

4    cross-examine, the defense will have an opportunity to ask

5    redirect, and that will be the end of those witnesses.

6            When the defendant's case is completed, I will give

7    you jury instructions on the law.  So we're both judges here,

8    you and I, but we have different roles.  I'm the judge of the

9    law.  I tell you what the law is that you will apply in

10   deciding this case, and that's my job.

11           Your job is to find the facts and determine whether

12   the government has proved the defendant's guilt beyond a

13   reasonable doubt given the instructions on the law that I will

14   give you.

15           Before I give you those instructions, the parties

16   will have an opportunity to make their closing arguments.  So

17   each side will present a closing argument, and the government

18   may have a brief rebuttal argument, and then I'll instruct on

19   the law.  When that's all done, that's when your job of

20   deliberations begins, okay?

21           So there are some important things to keep in mind

22   here.

23           First, you need to keep an open mind.  You can't

24   make up your mind about the guilt or innocence of this

25   defendant until you've heard all the evidence and really until

**J.A. 135**

1    you've heard the arguments, closing arguments, and my

2    instructions because you won't really know the law that you'll

3    be applying here until I give it to you at the end of the

4    case.  So keep an open mind throughout the entire trial, all

5    right?

6            Your verdict in this case has to be based entirely

7    on what happens here in court.  You will hear testimony from

8    witnesses, you will receive exhibits, and you will be able to

9    use your common sense and draw reasonable inferences from that

10   witness testimony and those exhibits.  That's something we

11   call circumstantial evidence.  And you will have to base your

12   verdict on all of that, what happens here in court.

13           I've reminded you not to go out and expose yourself

14   to any discussions of the case in the media.  I've reminded

15   you not to go out and conduct any kind of investigation about

16   this case or even about what your responsibilities are as

17   jurors.

18           Everything you need to decide this case will be

19   provided to you here in court, all right?  So please remember

20   those instructions throughout the case.

21           We'll go for about an hour and a half, usually not

22   much longer than that, and take a break.  We'll take a break

23   at lunch.  We're going to bring your lunch in to you.  You'll

24   have a chance during the break to get outside if you need to

25   take the mask off for a little bit, and we want to make sure

1  you have a good time for lunch but we'll probably just take a

2  one hour break, just get your lunch, the lawyers get their

3  lunch, and then we move right back in for the afternoon.

4  We'll take a break in the middle of the afternoon.

5          You aren't really allowed to speak out.  So as a

6  general matter, you have to sit and remain silent during the

7  proceedings.  But if somebody needs a break for some reason,

8  you know, you need to use the restroom and you can't wait or

9  you need something, just raise your hand and I'll ask you if

10  you need to take a break, okay?

11          I don't have a problem if somebody has a bad back

12  and they want to stand and stretch a little bit, that's fine

13  too.  Feel free to do that.  Just try not to obstruct any

14  other juror's view.

15          Generally speaking, you will see the exhibits

16  displayed on a screen.  It's possible though that there will

17  be times where an exhibit is being displayed but only the

18  lawyers and the judge and the witness can see it, not you.

19  Don't worry about that because sometimes exhibits are not

20  fully admitted.  Until they're fully admitted, they can't be

21  shown to you.  But if you think you should be seeing something

22  and you're not by chance, again raise your hand.  I'll ask you

23  if there's a concern about that.

24          That light on there tells me -- if you look on the

25  front of the bench there behind some of you in the very front

**J.A. 137**

1    row, it tells that you're seeing what I'm seeing.  So if that

2    light is on, I know that you should be seeing what I'm seeing.

3    If it's not on, it's probably because you shouldn't be seeing

4    the exhibit.  But if you have some concern about that, let me

5    know.

6            You also have notebooks.  I want to tell you about

7    what your general responsibilities are with respect to

8    note-taking.

9            First of all, you do not have to take any notes,

10   all right, no obligation to take notes whatsoever.  You're

11   free to take notes if you choose, but if you take notes, don't

12   let it detract from your responsibility as a juror.  You need

13   to be watching the witnesses, listening to the witnesses,

14   looking at exhibits.

15           Your job is not to transcribe what happens in

16   court.  We fortunately have a very highly-trained, skilled

17   person here who will take care of that for us, and you don't

18   need to make a transcript, all right?  So don't get distracted

19   with note-taking.  But if you want to take notes, feel free to

20   do that.

21           There are a couple of things to keep in mind about

22   notes.  First, no one but you will ever see your notebook.  At

23   the end of every day you're going to put it in an envelope.

24   The envelopes will be collected.  Nobody is going to look at

25   them.  It will be given back to you the next day.  At the end

**J.A. 138**

```
 1   of the case your notebooks will be destroyed.  So you can
 2   write what you want in your notebook, but I instruct you, you
 3   can't show your notebook to other people, other jurors.  The
 4   purpose of the notebook is not to help convince other jurors
 5   of something.  It's to help refresh your memory if you find it
 6   helpful in doing so.
 7              So feel free to take notes if you want.  You don't
 8   have to take notes.  Don't show your notes to anybody else.
 9   Don't read from your notes to anybody during deliberations.
10   We will collect the notes at the end of the day and destroy
11   them at the end of the trial.
12              So those are some general instructions about how to
13   proceed, and I think unless --
14              Does counsel need to see me with respect to any
15   additional matters before we go to opening statements?
16              No.  Okay.  Thank you.  Let's proceed right to
17   opening statements.  The government will go first.
18              MR. DAVIS:  Good morning.
19              This is an extortion case.  It's about the
20   defendant, Christopher Cantwell, a white nationalist radio
21   personality in New Hampshire who wanted to get something.
22              It's about the victim, Benjamin Lambert, known
23   online as Cheddar Mane, who is a Missouri husband and father
24   also involved in white nationalism and who had what the
25   defendant wanted.
```

**J.A. 139**

```
 1              And it's about the private threats the defendant
 2   made in writing and the actions he took against the victim and
 3   his family over the course of a few days in June of 2019 all
 4   to get what he wanted.
 5              So what did the defendant want so badly?  He wanted
 6   the personal information of a third white nationalist who went
 7   by the name Vic Mackey.  The defendant wanted Vic Mackey's
 8   name, address, and identifying information so he could dox Vic
 9   Mackey.  That's D-O-X, dox.
10              You'll hear a lot about doxing in this trial.
11   Doxing happens when an online person using a pseudonym is
12   outed on the Internet when the actual name, actual address,
13   and actual identifiers of an anonymous social media figure are
14   suddenly revealed for all the world to see.
15              When a person is doxed, the real world can come
16   crashing down on him.  Particularly when its target has said
17   things that are abhorrent and condemned.  Doxing can wreck a
18   person's reputation, ruin his ability to function in society,
19   causing him to lose his employment and result in threats and
20   even violence from hostile members of the public.
21              The defendant who knew all of this detested Vic
22   Mackey and he wanted to destroy him by doxing him.  And so
23   when the defendant saw a golden opportunity to extort Ben
24   Lambert, a/k/a Cheddar Mane, in Missouri into giving him Vic
25   Mackey's identifying information, he took it.
```

**J.A. 140**

1          The indictment contains three charges or counts.  I
2    apologize in advance for the coarse language.  All the counts
3    in the indictment name the defendant and pertain to the same
4    time period, mid June of 2019, around the Father's Day
5    weekend.
6          Count 1 alleges that the defendant, with the intent
7    to extort from the victim personal identifying information for
8    Vic Mackey, transmitted a communication in interstate commerce
9    containing a threat to injure the victim's wife.
10         The defendant sent a message through the Telegram
11   app stating:  So if you don't want me to come and fuck your
12   wife in front of your kids, then you should make yourself
13   scarce.  Give me Vic.  It's your only out.
14         Count 2 charges that the defendant again with
15   intent to extort personal identifying information for Vic
16   Mackey knowingly transmitted in interstate commerce
17   communication containing a threat to injure the victim's
18   reputation and a threat to accuse the victim of a crime by
19   doxing the victim.  Meaning posting photos of the victim and
20   his family and disclosing the victim's home address in
21   Missouri and by reporting the victim as a dangerous and
22   drug-using father to Child Protective Services and to law
23   enforcement.
24         The final count, Count 3, charges cyberstalking.
25   It says that the defendant with the intent to harass and

 1    intimidate the victim used the telephone and the Internet to

 2    engage in a course of conduct that placed the victim in

 3    reasonable fear of serious bodily injury to his wife and

 4    caused or would be reasonably expected to cause substantial

 5    emotional distress to the victim and his wife.

 6            The course of conduct included three separate

 7    actions:

 8            First, the private Telegram messages in which the

 9    defendant threatened to dox the victim, report the victim to

10    Child and Protective Services, and rape the victim's wife.

11            Second, the defendant actually doxed the victim by

12    posting the victim's address information along with photos of

13    the victim, his wife, and their three small children on the

14    Internet.

15            And third, telephoning the Child Abuse and Neglect

16    Hotline in Missouri and making a report against him.

17            So that's the indictment.

18            The government expects the evidence will show the

19    following:

20            By the year 2018 Christopher Cantwell was a known

21    media personality in the white nationalist movement.  From his

22    residence in Keene he had a live call-in radio show called

23    Radical Agenda and he was active as a blogger and in various

24    chat groups.

25            Initially, Mr. Cantwell was on friendly terms with

1    a far-right Internet chat group called the Bowl Patrol.  The

2    Bowl Patrol was an association of men who espoused extreme

3    views.

4           Vic Mackey was the founder and the leader of the

5    Bowl Patrol, and the victim who used the name Cheddar Mane was

6    a member of the chat group.

7           The Bowl Patrol was named after the distinctive

8    bowl haircut of Dylann Roof, a man who murdered nine people in

9    2015 in an African American church in Charleston, South

10   Carolina, and was later convicted and sentenced to death.

11          The Bowl Patrol's product, other than their

12   Internet chats and memes, was the Bowlcast, a series of nine

13   podcasts featuring offensive humor and the endorsement of

14   sexism and racism and anti-Semitism and violence.

15          On the first Bowlcast in 2018 the defendant was a

16   special guest, and Bowl Patrol members, including the victim

17   in this case, sometimes called into the defendant's radio show

18   and contributed.

19          But at the end of 2018 relations between the

20   defendant and the Bowl Patrol began to sour.  Bowl Patrol

21   members started making prank calls in to the show in which

22   they imitated voices or made stupid jokes.

23          In February 2019 someone defaced the defendant's

24   website by posting spam and crude images on it.

25          The defendant filed a complaint with the FBI's

**J.A. 143**

1  Internet Crime Complaint Center and identified two Bowl Patrol

2  members as the culprits, Vic Mackey and another man named

3  Mosin-Nagant, and the defendant declared on the Internet that

4  he was going to ruin the Bowl Patrol.  In one post he wrote:

5  I have dox on several of these Bowl Patrol idiots and I'm

6  going to start dropping them until they rat-out Vic.

7              In the meantime, the defendant came into possession

8  of some of the victim's personal information, including his

9  home address in Missouri, as well as photos of the defendant

10  and his wife and the children.

11             The defendant received the photos and information

12  from his ex-girlfriend, a woman known as Peach, who along with

13  another Bowl Patrol member visited Mr. Lambert at his home in

14  Missouri around Thanksgiving of 2018.  After that visit the

15  defendant stored the materials on his computer until he was

16  ready to use them.

17             In March of 2019 the defendant overtly threatened

18  the victim with doxing.  In a chat the defendant told Cheddar

19  Mane to, stay the fuck away from me and my platforms or I'll

20  dox your stupid ass.  When you get doxed, it's all because of

21  Vic, remember that, the defendant said.

22             The defendant definitely got the victim's

23  attention, and after that Cheddar Mane did not contact the

24  defendant.  He also asked his Bowl Patrol associates to do

25  likewise.  The victim did not want to be doxed since no one in

**J.A. 144**

1    his community knew about his online moniker or his association

2    with the Bowl Patrol.

3           A few months went by with the feud seemingly over

4    between Cheddar Mane and the defendant, but on June 15, 2019,

5    an incident happened that changed everything.  The victim,

6    Cheddar Mane, clicked on a link that someone else posted and

7    found himself in a chat group where Chris Cantwell was

8    present.  After a short time the victim left the chat or was

9    excluded from the chat, but Cantwell had noticed him.

10          Mr. Cantwell acted immediately.  Over the next 24

11   hours in a series of direct messages to the victim's Telegram

12   account, the defendant sent the private threats described in

13   this indictment.

14          The defendant's Telegram message, much like a

15   private text message, came in to the victim, the first one, at

16   about 8 o'clock p.m. Central Time on June 15th:  I guess you

17   forgot the lesson which kept you away for a short while, do

18   you need to be reminded, the defendant said.

19          The victim did not initially respond, but after a

20   half hour the defendant wrote the name of the defendant's

21   street in Missouri -- I'm sorry, the name of the victim's

22   street in Missouri.  That's all he wrote, just the street.

23          Then the victim did respond:  What are you talking

24   about?  What do you even stand to gain here?  Every time you

25   think someone you think is in the Bowl Patrol talks shit about

**J.A. 145**

1    you, a public figure, you threaten to dox me?  I honestly

2    don't know what I even did.  I followed the link into a group

3    I didn't even know you were in.  That's what the victim said.

4          The victim was trying to be reasonable, but he was

5    scared and worried about being doxed.  He was so worried that

6    he wrote drafts of possible replies to the defendant's threat

7    and he took screenshots of them.

8          He sent those screenshots to a mentor of his named

9    Paul Nehlen and he asked Nehlen for his advice.  He also

10   telephoned Nehlen to discuss the situation and how to respond.

11         Finally the victim -- the defendant finally replied

12   around 3 o'clock a.m. Central Time on June 16th.  He said:

13   Get a fucking life or I will ruin the one you have.

14         The victim wrote back that afternoon:  All I can do

15   is just leave you alone and tell other people to do the same,

16   which I have done.  Seriously, man, I couldn't care less about

17   what you're trying to do these days.

18         The defendant replied the victim was a fucking liar

19   and that he was going to lose everything you have.  The

20   defendant threatened to post a photo after which he said:

21   You're going to start getting unexpected visitors.  And the

22   defendant wrote:  And I don't care if it's you causing the

23   trouble.  You're the one who's going to suffer because you're

24   the one I can get.

25         Then at 3:47 p.m. on June 16th the defendant

**J.A. 146**

1  revealed his purpose.  Vic Mackey.  If you want to dox Vic, he

2  said, he's a better target, but if you give me fake info, then

3  your wife is going to have trouble sleeping at night until she

4  leaves you and takes your kids away.  So if you don't want me

5  to come and fuck your wife in front of your kids, then you

6  should make yourself scarce.  Give me Vic.  It's your only

7  out.  And after a pause the defendant wrote:  I guess I'm

8  going to have to prove my seriousness.

9          The victim asked the defendant to show him the

10  picture he had.  The defendant sent it.  It was a photo of the

11  defendant's wife at Christmastime in her kitchen smiling and

12  holding an infant with the defendant's two other small

13  children nearby.  More where that came from, the defendant

14  wrote, and then the defendant added, I bet one of my Incel

15  listeners would love to give her another baby.

16          Incel is Internet slang for voluntarily celibate

17  men who cannot find a sexual partner.

18          Next the defendant wrote:  You think the FBI would

19  take issue with an LSD user owning guns around kids?  And he

20  followed up with another photo, this of the victim with strips

21  of cardboard on his tongue.  Give me Vic, the defendant

22  directed.

23          When the victim still refused to supply Vic

24  Mackey's personal information, the defendant spelled out his

25  plan:  All right.  Since you're obviously not understanding

1   the severity of this, I'll do you a favor.  On Tuesday I'm

2   going to send every episode of Bowlcast along with your

3   identifying information to whatever the local equivalent of

4   CPS is in your jurisdiction, but I'm pretty sure once that

5   visit comes you'll understand that this is serious.  If that

6   doesn't work, I'll escalate until I get what I want.  Tell Vic

7   if he gives himself up, he can save your family.  CPS will

8   visit you soon.

9          Although Mr. Lambert, the victim, put up a brave

10  face and he even taunted the defendant, he took the threat

11  seriously and not as a joke.  He lost sleep for a while.

12         With Paul Nehlen he decided to post the entire

13  threatening exchange after covering up his address and

14  covering up the pictures of his family, but to post that in

15  the Bowl Patrol's chat group so his associates would know

16  exactly what the defendant was doing to him.

17         And on June 18th the victim even sought the advice

18  of his lawyer asking whether he should contact the county

19  sheriff in case the defendant actually went through with his

20  threat.

21         In the meantime, the defendant did follow through.

22  On June 17th to the 293 members of the Radical Agenda chat

23  group the defendant doxed the victim just as he had

24  threatened.  He posted for everyone to see two photographs of

25  the victim's wife and children and a photo of the victim and

1    the address, and then he added as commentary:  That's Cheddar

2    Mane, a/k/a Cheddy Blac, and tomorrow morning I'm calling CPS

3    to give them every episode of Bowlcast and inform them that

4    this acid-dropping fake Nazi is endangering these children

5    with his behavior.

6         The defendant identified the victim's home town and

7    street saying:  If I could just drive down to that street and

8    town in Missouri and shoot this idiot, I would, but I can't so

9    I'll let the law do it.  I think when CPS hears that fucking

10   podcast he hosts, they'll pay his fucking criminal ass a

11   visit.

12        And the last thing in that doxing:  I hope the CPS

13   workers in Missouri will break every rule and destroy this

14   scumbag's life.

15        And so the defendant doxed Cheddar Mane and his

16   family all because he wouldn't supply him with Vic Mackey's

17   information so the defendant could dox Vic Mackey.

18        Later that same day, June 17th, the defendant

19   dialed up the Missouri Child Abuse and Neglect Hotline and

20   made a complaint about the victim.  You'll hear a recording of

21   that call in the trial.

22        The defendant said that Cheddar Mane was

23   potentially putting the child in danger.  The defendant

24   identified Cheddar Mane, the father of the children, as a Bowl

25   Patrol member and a drug user and offered to send the Missouri

**J.A. 149**

```
 1   agency all of the Bowlcast recordings.  I think this guy is a
 2   problem and the thing is that what he does to the best of my
 3   understanding is not a criminal act.  I am looking to make
 4   this guy uncomfortable is the truth of the matter.  I think he
 5   is bad for my cause, and so I said what can I do about this,
 6   and so I called you.
 7           Although it documented the defendant's call, the
 8   Missouri agency determined that the call did not rise to the
 9   level of a report of abuse or neglect.  Ultimately, the agency
10   did not investigate the defendant's complaint.
11           Two days later on June 19th the defendant (sic)
12   called the victim's (sic) radio show directly:  I just wanted
13   to thank you very much for posting pictures of my wife and --
14   but the defendant immediately cut off the call, gave no
15   explanation for it to his listeners, and moved on as if
16   nothing happened.
17           After that there were no more communications
18   between the defendant and the victim, Cheddar Mane, Ben
19   Lambert.
20           The FBI learned about the defendant's threats and
21   extortion in July of 2019.  They interviewed the defendant in
22   September.  The defendant admitted that he had threatened to
23   dox Cheddar and call CPS if Cheddar did not provide Mackey's
24   information.  He also admitted that he had called CPS in
25   Missouri.  He explained that he felt that he did not have
```

protection from law enforcement and that he had to take action
himself, but the defendant said nothing about the rape threats
and claimed that he had deleted the chats and not retained any
records of his communications with the victim.

In a second shorter interview with the FBI in
October of 2019, the defendant was shown screenshots of his
Telegram messages with the victim, and he admitted he sent
them.

But the defendant knew he had a problem.  He knew
he had committed extortion.  In a telephone call with his
former girlfriend in December 2019 the defendant explained:
The thing that there's liability on is, like I said, give me
Vic's information, you know, to prevent me from doing
something.

In another call in February of 2020 with a
different woman the defendant explained:  What I threatened to
do is dox this fucking asshole, and then I end up fucking
adding CPS to the fucking mix, and I called CPS and they've
got the phone call of that.  So, like, you know, that's a
different category of -- you know, it's not legal to do that.

And in another call in March the defendant
explained:  You can harm someone's reputation, you can dox
them, but if you say give me something in exchange for it,
give me something to prevent me from doing that, then that's a
crime.

```
 1              On January 23rd of 2020, the defendant was arrested
 2   at his residence in Keene, and the FBI executed search
 3   warrants.  On several computer devices, including his cell
 4   phone, the FBI found that the defendant had stored records of
 5   his threatening text exchange with the victim as well as the
 6   personal information and photographs of the victim and his
 7   family that he collected.
 8              That's a summary of the evidence.  You'll hear a
 9   lot of bad language in this trial and you will see and hear
10   images you may find appalling and offensive.
11              The key will be to focus not on the atmosphere but
12   on the actual charges in the indictment, the actual elements
13   of the offenses, and the actual evidence that proves them.
14              I'll ask you to use your common sense and your
15   experience, ask yourself whether the evidence is corroborated
16   by other evidence, and listen and read the defendant's own
17   words as he wrote them and spoke them.
18              I emphasize writing.  The distinctive thing about
19   this crime is it's all written down or recorded.  You will be
20   asked to return again and again to the defendant's written
21   threats on the Telegram message app.  Note that they occurred
22   over the course of many hours with long gaps in between with
23   time to consider and reconsider and write and rewrite and then
24   push send.  What do those writings tell you about the
25   defendant's intent?
```

1          In the end the evidence will prove beyond any

2    reasonable doubt that the defendant sent a communication

3    containing a threat to injure the victim's wife with intent to

4    extort something he wanted to get.  That he also sent a

5    communication containing a threat to injure the victim's

6    reputation and accuse him of a crime again with intent to

7    extort that same thing of value to him.

8          And finally, that with intent to harass and

9    intimidate the victim he engaged in a course of conduct that

10   placed the victim in reasonable fear of serious bodily injury

11   to his wife or caused or would reasonably be expected to cause

12   substantial emotional distress to the victim or his wife.

13         I'm confident you'll listen carefully and follow

14   the Court's instructions.

15         At the close of the evidence Ms. Krasinski and I

16   will ask you to return a verdict of guilty as charged.

17         Thank you.

18         THE COURT:  Thank you.  We'll hear from the defense

19   now.

20         Mr. Wolpin.

21         MR. WOLPIN:  Thank you.

22         THE COURT:  I need to explain.  We have a little

23   bit of a break here because one of our staff is disinfecting

24   surfaces that someone else will have to touch.  So just bear

25   with us while we do that.  It happens very quickly and

1  unobtrusively.

2        (Podium and microphone are disinfected)

3        THE COURT:  Thank you.

4        Mr. Wolpin, you can go ahead.

5        You'll see us doing that when witnesses get off the

6  stand as well.  We just want to make sure that any surface

7  that someone is touching gets disinfected before somebody else

8  touches it.

9        Go ahead.

10        MR. WOLPIN:  Thank you.

11        Chris Cantwell wanted to be left alone.  Chris had

12  been pushed, taunted, and harassed for months to make him

13  angry, to wind him up, to provoke a bigger and bolder

14  response.

15        After asking his harassers to stop, after asking

16  law enforcement to help make it stop, after posting online

17  that he had talked to the FBI to try to make it stop, after

18  months of harassment continued, it did not stop.

19        Chris responded in kind.  He responded crudely with

20  insults and anger with the only type of language his harasser

21  would understand, but he did not seriously threaten to injure

22  and he did not intend to extort.  His intent was simple.

23  Leave me alone.  Just leave me alone.

24        Chris Cantwell did not threaten to injure, he did

25  not intend to extort, and he did not cyberstalk.  He is not

1    guilty.

2            Before we get to what happens in this case, I want

3    to point out the following:  The prosecution has asked you

4    largely to focus on a tiny snapshot, that June 15th, June 17th

5    time frame, and then for all kinds of malice on the part of

6    Chris, a true threat to injure and intent to extort in that

7    brief window of time.

8            But this case is a movie, not a snapshot.  You need

9    to see, hear, and understand a longer story, a bigger

10    landscape, the men's relationship over months, the language

11    they used with each other and the language they used in

12    public.  To understand Chris's intent, to understand why he

13    felt he had to use the words he used in order to be left

14    alone, you need to see the movie and not the snapshot.

15            Chris Cantwell, over here in blue, came to Keene,

16    New Hampshire, because of our Live Free or Die motto and our

17    libertarian ideals.  He created a website and hosted an online

18    radio show with callers.  He did so under his own name.  The

19    website was christophercantwell.com.  It was his public

20    platform.  It was his business.  It was how he supported

21    himself.  How he paid the rent.

22            He operated like a white nationalist shock jock

23    Howard Stern.  That was his thing.  Callers would call in and

24    chat about everything from mainstream conservative politics,

25    Trump, the Democrats, to far-right, far-fringe white

1    nationalist ideas.

2           The show was uncensored.  His callers used crude

3    and derogatory language.  Chris said outrageous things, used

4    filthy and sometimes racist language.  He has significant

5    notoriety because of his show.

6           He knows that many will not like him because of

7    what he has said.  He knows that you may not like him because

8    of what he has said.  But he says what he says under his own

9    name.  He doesn't hide behind a mask or fake name or online

10   anonymity.  Chris Cantwell stands in public for better or

11   worse as Christopher Cantwell.

12          Now, you will also hear from Ben Lambert.  He is

13   the alleged victim in this case, but to Chris he was never Ben

14   Lambert.  To Chris he was Cheddar Mane or Cheddy Blac or some

15   other moniker meant to hide Ben Lambert's true identity.

16          Ben Lambert was part of a group who hid behind

17   nicknames and labels and characters who called themselves the

18   Bowl Patrol.  As the government explained, the Bowl Patrol

19   honors the hairstyle of their self-chosen saint, the person

20   they idealized, Dylann Roof, the mass murderer of nine black

21   church-goers in South Carolina.

22          And Cheddar Mane and the Bowl Patrol used

23   disturbing humor and talk and repetition to discuss rape and

24   murder and hate and genocide over and over again.

25          In the fall of 2018 the Bowl Patrol and Cheddar

**J.A. 156**

1   Mane developed a new hobby.  The hobby was to troll Chris for

2   sport.  To push him, enrage him, destroy his show.  Basically

3   ruin him.

4            Chris had a brief relationship with the group

5   online, but that quickly soured and to the Bowl Patrol Chris

6   was a phony, a fake, a sellout, and whatever other word they

7   could come up with.  Not one of them.

8            So Cheddar Mane and the Bowl Patrol called Chris's

9   show incessantly from different phone numbers and different

10  characters to interrupt and to disrupt, and you will hear some

11  of these calls.  You will hear what they said, how angry they

12  made Chris, how Cheddar Mane would laugh and discuss them on

13  his own podcast about how their goal was to really piss him

14  off.

15           What Cheddar Mane wanted was how far can I push

16  Chris?  How angry can I make him?  How outrageous a reaction

17  can I trigger?

18           What Chris wanted from Cheddar Mane and the Bowl

19  Patrol was just leave me alone.  Chris tried to make it stop.

20  He contacted phone companies and Internet hosts to try to

21  block their calls so at least they couldn't call in and ruin

22  his show.  He blocked Ben Lambert's phone at one point.  That

23  didn't work.  They didn't leave him alone.

24           In February 2019 after four months of this, four

25  months, the Bowl Patrol defaced his website with pornography

1    and violent content and Chris reached a breaking point.

2    Enough.  He reported his cyber harassers to the FBI in

3    February.

4            What did the FBI do with that report of crimes

5    against Chris Cantwell?  They did nothing.

6            So Chris went online and he said to the world and

7    he posted on an online post:  I reported the Bowl Patrol to

8    the FBI for harassing me.  Stop.  Just leave me alone.

9            But they didn't stop.  They didn't leave him alone.

10   The Bowl Patrol -- to the Bowl Patrol this only proved that

11   Chris was the worst kind of white nationalist, a snitch, a

12   rat, a federal informant who works with the FBI.

13           In March, another month later after Chris's plea

14   for help from the FBI, Chris and Cheddar Mane were in an

15   online chat.  Chris told Cheddar Mane in that chat he would

16   release his true identity, his Ben Lambert identity, if he

17   didn't leave him alone.

18           The online Cheddar Mane calls for mass murder of

19   children, but offline Ben Lambert has a wife and kids.  Online

20   Cheddar Mane jokes about rape and murder.  While offline Ben

21   Lambert hides himself from his wife and family and community.

22           Chris thinks in March by warning him, not by doing

23   anything, by just saying I could release your identity, he

24   loses power of anonymity.  He would stop.  The harassment

25   would stop.  Leave me alone.

```
1              In June 2019 Cheddar Mane and others from the Bowl
2    Patrol enter a chat room of Chris's and they started in with
3    their usual business, but this time instead of being some
4    other anonymous name Cheddar Mane was Cheddy Blac, and Chris
5    recognized it was Cheddar Mane once again and so Chris sent
6    Cheddar Mane a private message, again as the government noted,
7    referencing the prior time:  Didn't you learn your lesson?  I
8    told you leave me alone.
9              And the two are quickly off and running.
10             You are going to see the full transcript of that
11   back and forth over two days.  It is ugly and crude.  Both men
12   are trafficking in the type of language that Cheddar Mane and
13   Chris use.
14             Chris says nasty things about Cheddar Mane's wife.
15   Says:  If you don't want me to come and fuck your wife in
16   front of your kids, then you should make yourself scarce.
17   Make yourself scarce.  Leave me alone.
18             But it was never a true threat.  It was bluster and
19   exaggeration and mutual linguistic combat.  There was no true
20   threat to injure or rape.  The word rape was never used.
21             And thus, Chris is certainly not guilty of the
22   first count the government discussed with you.
23             Now, Cheddar Mane being Cheddar Mane decides at
24   some point to egg Chris on, to wind him up.  He suggests
25   something bad will happen to Chris's ex-girlfriend:  I guess
```

1   you don't care what happens to her.

2            And he starts into his usual business:  Ha, ha, ha.

3   Oh, no.  I'm super scared.  Do your best.  You are hilariously

4   pathetic.

5            And the conversation ends with the capstone, the

6   Bowl Patrol's favorite piece of humiliation, a naked

7   photograph of Chris Cantwell -- or in this case a naked

8   drawing of Chris Cantwell.

9            Cheddar Mane knew at the time that this was

10  over-the-top bluster, and he responded in kind because it was

11  not a true threat.  He pushed it along trying, as he had so

12  many times before, to make the pot boil.

13           And when it was all done, Cheddar Mane did not call

14  the police out of fear for his safety.  He called Chris's live

15  show online to see if he can provoke an on-air dispute for his

16  friends' entertainment.  He does not after the exchange is

17  over forward it to law enforcement.  What did he do with it?

18  He gets ready to post it online within hours.  Again, with the

19  naked picture of Chris over the top of his own family, and

20  within hours this private chat has been posted to the Bowlcast

21  website.  Within days Cheddar Mane is online calling Chris a

22  fed, snitch, nigger, kike.  This was not serious.  This was

23  not a crime.

24           And Chris, now that Cheddar Mane has made this all

25  public, feels the pressure to follow through.  His outrageous

1    insults, his private bluster, begin to reign down on him

2    again.  If he doesn't called CPS, if he doesn't follow

3    through, what then?

4           So he posts a picture on a website frequented by a

5    few hundred people, not CNN, not New York Times.  Cheddar

6    Mane's response online is this is "a pathetic dox."  That's

7    how he saw it.

8           Being egged on and being boxed in, Chris called

9    CPS.  You're going to hear that call my guess is in a few

10   minutes.  He gave his name.  He gave his address.  He told

11   them who he was.  He says why he's calling.

12          It wouldn't stop.  Maybe this will work.  Maybe

13   they will leave me alone.

14          And the storm does temporarily pass at that point

15   between Chris and Cheddar Mane.  A number of months go by,

16   July, August, September.  In any of those months did Cheddar

17   Mane go to the police?  No.  Why would he?  Chris is

18   "hilariously pathetic."

19          And the two men do not communicate again.  No

20   calls.  No texts.  No chats.  One chapter in what is a long

21   saga between Bowl Patrol and Chris Cantwell.

22          Child Protective Services doesn't show up at his

23   house and the men move on.

24          So how do we get here then with a witness list full

25   of FBI agents, with you in court, with Chris in court, if

**J.A. 161**

1  Cheddar Mane never thought this was such a real thing that he

2  should go to the police?

3        I'll take you back a few months in the story, back

4  to February when Chris made his complaint to the FBI about

5  them that they never looked into.

6        Chris goes to his local police department in May in

7  Keene, a detective.  He talks to him.  The Keene detective

8  helps him get in touch with the FBI.  And in September, seven

9  months after he asked for help, he showed up to meet with the

10  FBI to in his mind talk about the harassment and cyber crimes

11  that happened to him.

12        He shows up with no protections, no promises, no

13  lawyer thinking and hoping he'll be treated like anyone else

14  complaining of a crime committed against him.  He knows he's

15  not the most likable person.  He understands that there's a

16  risk that they will not see him as a crime victim, and what he

17  found was the FBI's interest was in prosecuting Chris Cantwell

18  and not investigating the crimes against him.

19        Chris begins to panic.  He begins to worry and

20  wonder, did I in fact do something illegal in June in that

21  interaction?  He never in a million years thought he made a

22  threat to rape, but what about the Child Protective Service

23  thing?  What about the part about asking for the identity of

24  the Bowl Patrol member?

25        And so he does what we all do now, the worst idea

1  we all have, which is to go to the Internet.  Try to figure it

2  out.  Try to understand what he did.  Try to figure out

3  whether it's a crime.

4          And you'll hear several recordings, as the

5  government noted, of him talking with his friends, stumbling

6  and bumbling over statute numbers and legal terms, things he

7  wasn't even charged with at the time, trying to figure out and

8  explain what might give him liability.

9          The government will call these confessions, but

10  listen carefully.  Consider his fits and starts.  Consider how

11  he tries to piece together some way he might be liable.

12          So Chris meets with them in September thinking he's

13  going to meet with them about this harassment, but it becomes

14  about the interaction with Cheddar Mane.

15          And so after the meeting the FBI goes on down to

16  Missouri to meet with Ben Lambert not really to look into

17  Chris's complaint.  The FBI had made a decision.  Its purpose

18  was to get what they needed out of Ben Lambert to prosecute

19  Chris Cantwell.  To get Ben Lambert on board.

20          They made their interest clear to Ben Lambert right

21  from the beginning.  They are the one that told him this

22  threat was serious, not the other way around.  They told him

23  that the FBI was not "letting this go."

24          Ben Lambert was presented with a clear and obvious

25  choice.  If you give us what you want, if you say this is

**J.A. 163**

1  serious, then Cheddar Mane, the FBI said, can go off into

2  oblivion and disappear.

3          The converse was true, too.  If you don't get on

4  board, they make it very clear we know who you are online.

5  We've listened to the Bowlcast episodes, we know what you say,

6  and they hold that over his head.

7          To understand what that means -- to understand what

8  it meant, excuse me, to Ben Lambert to have the FBI hold the

9  Bowlcast over his head to get his cooperation, you need to

10  understand a little bit about what was on those podcasts.

11          Ben Lambert will explain that as part of Bowl

12  Patrol they tried to go to the edge of illegality.  That fine

13  line between when something is legal and something is illegal

14  without crossing over it.  But when you repeatedly go to the

15  edge, sometimes you're going to cross that line.

16          Sometimes, as you will hear, the humor fades away

17  and the true incitement to violence, the true terrorism that

18  is the Bowl Patrol comes out.

19          He crossed that line, and the FBI told him if he

20  said what they needed him to say, Cheddar Mane could go off

21  into oblivion.  That is how the FBI held Bowl Patrol over his

22  head.

23          Ben Lambert knows what he said.  He knows what now

24  to say, and he told the FBI what they wanted to hear, and that

25  is now why we're here.  Chris as a criminal defendant.  Ben

**J.A. 164**

```
 1    Lambert as an alleged victim.

 2              Now, you will hear from us just like the government

 3    will approach you at the end and have a further discussion

 4    when we have the Judge's instructions of the law.  At that

 5    time we'll go through in far finer detail the law of the case,

 6    but this is the broader picture.  This is the greater story

 7    you will need to understand to understand that law, to

 8    understand why Chris Cantwell is not guilty.

 9              What Chris wanted was for Cheddar Mane to leave me

10    alone.  How do you say leave me alone to someone whose entire

11    identity is wrapped up in trolling and violence and threats

12    and harassment?  He said what he said to be left alone.

13              Chris Cantwell is not guilty.

14              Thank you.

15              THE COURT:  Thank you, counsel.

16              Members of the jury, our first witness, let me

17    verify this, will be testifying by two-way video.

18              Is that correct?

19              MR. DAVIS:  Correct, Judge.

20              THE COURT:  All right.  I think it's a good time

21    for us to take our mid morning break now so we can set up the

22    video testimony and have it ready for you.  So we'll take a

23    short break.

24              I also -- I have another matter related to this

25    case that I have to attend to, so the break may stretch a
```

 1   little longer than I would otherwise like.  I'll try to do it

 2   as quickly as I can.  But in some way trials are like a play

 3   where you go to the theater where you see what's on the stage,

 4   but there's a lot of stuff going on behind the scenes that you

 5   don't necessarily see, and I've got to attend to a lot of

 6   different kinds of things to keep this all moving.  So bear

 7   with me.

 8         We'll take a break.  I'll get back to you as soon

 9   as I can.  We'll go on and we'll probably go till 12:30 and

10   try to take a hard break at 12:30 for lunch, okay?

11         Yes, ma'am.

12         THE JUROR:  I'll need to see the jury clerk.

13         THE COURT:  I'm sorry?

14         THE JUROR:  I will need to see the jury clerk.

15         THE COURT:  You can speak to the court manager

16   here.  All right.  Thank you.

17         (RECESS)

18         (IN COURT - NO JURY PRESENT)

19         THE COURT:  I have two issues.

20         A juror after hearing opening statements claims to

21   have knowledge about the case and Mr. Cantwell.  I want to

22   bring the juror in, ask her some brief questions, excuse her,

23   ask the parties for their views, and we'll proceed from there.

24         Does anybody have a problem with that?

25         MR. LEVIN:  No, your Honor.

**J.A. 166**

```
 1              MR. DAVIS:  No.

 2              THE COURT:  Then I will address the issue of the

 3    member of the public who wants to enter the courthouse without

 4    a mask.

 5              So if we could bring the juror in and seat her at

 6    the witness stand.

 7              (Juror enters the courtroom)

 8              THE COURT:  So good morning, ma'am.

 9              I want to assure you you've done nothing wrong,

10    everything is fine, and you did exactly the right thing by

11    asking to speak to the case manager.

12              Could you briefly just tell us here in court what

13    you told the case manager?

14              THE JUROR:  Okay.  Good morning still.

15              So when we were in initial jury selection last

16    Tuesday morning we had video conferencing audio that read the

17    defendant's name, and I thought I heard Cantrell.  We only

18    heard it once.

19              After that we went through jury selection and I did

20    not see the defendant except from finally the back right-hand

21    side of the court or back left-hand side at a diagonal.  I did

22    not recognize him as Chris Cantwell from the incident in

23    Charlottesville, Virginia, my home town, and where I was

24    actually after the event the Emergency Manager for the

25    University of Virginia that developed the AAR evaluating the
```

**J.A. 167**

1   events, known associates of those individuals involved in the

2   murder of Heather Heyer, and subsequently a computer software

3   program known as Veoci.  It is an incident management and

4   clearance platform.

5          THE COURT:  All right.  So you have prior knowledge

6   of Mr. Cantwell and his association with the Charlottesville's

7   incident?

8          THE JUROR:  Correct.  And I have concerns that I

9   would not be truly non-prejudicial towards him that, that I

10  could not be absolutely fair with that prior knowledge and

11  exposure, pretty intimate exposure to --

12         THE COURT:  Have you discussed your familiarity

13  with Mr. Cantwell with any member of the jury?

14         THE JUROR:  No.  I have said nothing, nor to family

15  members or anyone knowing I was on jury duty.

16         THE COURT:  All right.  Thank you, ma'am.

17         The clerk will take you to step outside for just a

18  moment, and then I'll bring you back in in a second, okay?

19         THE JUROR:  Okay.

20         (IN COURT - NO JUROR PRESENT)

21         THE COURT:  For the person who just called in by

22  video, you're going to be muted in a second and then we'll

23  start you when we're ready to go.

24         All right.  So this doesn't seem to be a close call

25  to me.  I think we can all agree that the juror should be

**J.A. 168**

```
 1   excused.
 2           I'm confident that she has not disclosed any of her
 3   information to any member of the jury.  If anyone would like
 4   me to conduct any further examination, I will, or if anyone
 5   wants to object, I'll hear that, but it seems to me obvious.
 6           I want to thank her for her service and excuse her.
 7   Does anybody disagree?
 8           MR. LEVIN:  No, your Honor.
 9           MR. DAVIS:  No.
10           THE COURT:  All right.  Thank you.
11           Can we bring the juror back in.
12           (IN COURT - JUROR PRESENT)
13           THE COURT:  All right, ma'am.  I'm sorry to have
14   inconvenienced you.  You did exactly the right thing.
15           It's a challenge when you want to select a jury
16   that doesn't know anything about something like
17   Charlottesville but also making sure that those that do can
18   associate the person with this case.  We didn't succeed
19   perfectly with you, and that's more on us than it is on you.
20   You've done exactly what you should do.  You disclosed.
21           We do not want to have people on the jury who are
22   familiar with Mr. Cantwell's past association with
23   Charlottesville, so I'm going to have to excuse you from
24   service.
25           Thank you again, and you're done.  You're released
```

1  from your oath and you can do whatever you want with respect

2  to the trial.

3           Do you have anything in the jury room?

4           THE JUROR:  No.

5           THE COURT:  You've got everything with you?  Good.

6           Sorry.  I won't even allow you to go back in and

7  say anything to anybody.

8           The clerk will help you out, and we'll get going

9  with the trial.

10          Thank you for your service.

11          THE JUROR:  Thank you all and good luck.

12          (IN COURT - NO JUROR PRESENT)

13          THE COURT:  All right.  Be seated again.

14          So now let me take up the issue of the member of

15 the public that would like to be admitted to the court without

16 a mask.

17          I've asked the member of the public who wants

18 admission without a mask to submit a written request.  He's

19 done so.  You have a copy of it.  He's someone who's on the

20 defense list of people to be brought into the courtroom, so

21 I'll hear from the defendant first.

22          What, if anything, do you want to say to me with

23 respect to this particular issue?

24          MR. WOLPIN:  From our perspective ideally this

25 person could come in and witness the trial.  As the Court

```
 1  noted, he is on Mr. Cantwell's list of three individuals he
 2  asked to be here as a support person in this case.
 3           I understand maybe it's somewhat lacking in detail
 4  as to what the medical condition would be that would allow the
 5  Court to make the necessary finding.
 6           THE COURT:  Yeah, the chief deputy clerk told me
 7  that he refused to provide any additional detail regarding his
 8  medical condition.
 9           MR. WOLPIN:  Ultimately -- I mean, I guess I'll see
10  what the government's position is and what the Court says.  I
11  mean, we would like to find a way for him to be admitted but
12  understand the Court has authority to make certain rules and
13  requirements.
14           THE COURT:  All right.  Thank you.  I appreciate
15  that.
16           The government's position?  Do you have a view?
17           MR. DAVIS:  Judge, I guess we oppose the motion.
18           The court has safety rules that should be followed
19  and applied, and I think the Court has the right under the
20  circumstances of the pandemic to enforce those.
21           The only thing I can think of is, if it were
22  readily doable, to set up a private room where the video feed
23  that is going to the -- you know, there could be essentially a
24  different room for overflow viewing that would just have this
25  petitioner sitting in it.  And if he would be willing to wear
```

1  a mask entering the courtroom, courthouse, going all the way

2  through the public areas and then be seated there, he could

3  take off his mask sitting alone in his room.  I don't think we

4  would object to that, but I don't know that that's feasible at

5  all and it hasn't been raised ahead of time so the motion as

6  has been made we oppose.

7          THE COURT:  All right.  So let me just lay a little

8  groundwork here and explain my ruling.

9          So as the parties know, we're among the first

10 federal courts in the country to resume holding jury trials

11 during the pandemic.  We've done that after very careful

12 evaluation of risks and benefits.  We're mindful of the -- our

13 defendants who are charged with crimes have a right to a

14 speedy trial.  The public has a right to have criminal charges

15 heard against people who have been charged.  We want to have

16 trials as soon as we can hold them safely.

17         Developing a mitigation plan for conducting trials

18 was central to the work that we've done in preparation for the

19 trial we're holding here today.  I can't tell you how many

20 hundreds of hours have gone into the preparation of our

21 mitigation plan.  We have consulted with an expert.  We have

22 made physical changes to the courtroom.  We have tried to

23 acquaint ourselves with the most recent information regarding

24 how COVID-19 is spread.  And I have to say that mask wearing

25 is one of the central aspects of our mitigation plan and we

 1  simply cannot lightly deviate from that aspect of the

 2  mitigation plan.

 3          Now, Mr. Cantwell has a right to a public trial.

 4  The general public has a constitutional interest in public

 5  trials that have to be respected.  I would not do anything

 6  lightly to interfere with the ability of the public to attend

 7  these proceedings.  We have made space in this courtroom for

 8  as many members of the public as we can safely accommodate.

 9  We have an overflow courtroom where people who might want to

10  attend can observe the proceedings through live streaming.

11          We cannot allow someone without a mask into the

12  courtroom here or the overflow courtroom without endangering

13  the safety of the people who are required to be here and who

14  want to be here.

15          And so I recognize that there is an important

16  constitutional right of access.  I also note that this member

17  of the public claims to be a minister and that mask wearing is

18  inconsistent with his religious views.  And clearly there are

19  First Amendment rights that people have that need to be

20  respected even when they come into the courthouse, and I'm

21  mindful of those rights, but neither the right of public

22  access to a trial nor any free expression rights a member of

23  the public may have are absolute.

24          I simply do not believe that under these

25  circumstances I can accommodate this person's request by

1    allowing him into the courthouse without a mask.

2          I also note that although he was requested to

3    explain his medical condition so that I could evaluate it and

4    to the extent to which it supported his claim that he couldn't

5    wear a mask, he's refused to do that.  He also has provided me

6    with no supporting information regarding his religious views,

7    so I'm really in no position to evaluate those either.  But

8    even if he provided that information, I have to be very

9    cautious about granting any exceptions to mask wearing.  We

10   have been open to considering limited exceptions for people

11   who are actually testifying while they're actually testifying

12   or lawyers who are questioning while they're questioning,

13   we've considered those kinds of issues, but we have to

14   strictly limit that if we allow them at all.

15         So I simply don't believe at the present time

16   there's any way that I can accommodate his request, and I

17   don't believe he has sufficiently documented it or justified

18   it.

19         Now, Mr. Davis, you present an interesting

20   solution.  If he wears a mask to come into the courthouse and

21   we can arrange a separate room for him to take a stream, I

22   don't know how feasible that would be.  I would have to

23   evaluate it with my staff.  I'm certainly not in a position to

24   do it now.  I'm willing to consult with them about it.  And

25   we'll take the member of the public's name and contact

```
 1   information and if we can feasibly arrange something like that
 2   without compromising public safety, I'm willing to consider
 3   that, but that's something we haven't built into our plan and
 4   I would need to investigate.
 5           He can't go into the overflow courtroom because
 6   there are other members of the public that might wind up in
 7   there, and I can't allow him to put them at risk because he
 8   doesn't have the ability or doesn't want to wear a mask.
 9           So I'm going to deny the person's request at this
10   moment.  I'm going to ask the chief deputy clerk to take the
11   contact information for the individual.  I will consult with
12   my staff about whether it is possible to consider the
13   request -- the suggestion that Mr. Davis has made.  And if it
14   is, we'll contact him and try to set it up, but that too would
15   require me to very carefully analyze the safety implications
16   of that kind of practice, because we really require members of
17   the public who come into our building to be wearing masks at
18   all times when they're in public spaces and all of our staff
19   does when they enter into public spaces as well.
20           So I'm willing to consider that, but I can't do it
21   now and I don't want to delay the trial further.
22           So I would instruct the chief deputy clerk to tell
23   the witness I've heard his request.  I've reviewed it with
24   counsel and with the defendant present.  I've denied the
25   request.  I'm evaluating whether there's any alternative that
```

1   we can provide him that is consistent with our need to protect

2   public safety.  And if we should decide there is a way to

3   accommodate him, I will have you notify him.  And if not, he

4   simply has to take the ruling and decide what if any action he

5   wants to take next, okay?

6          All right.  Thank you.

7          Are we ready to bring the jury in?  I propose to

8   say nothing to the jury about the juror who has left.

9          Does anybody want me to say anything?

10          MR. DAVIS:  No.

11          MR. WOLPIN:  (Nods negatively.)

12          THE COURT:  No?  Okay.  Thank you.

13          (IN COURT - JURY PRESENT)

14          THE COURT:  All right.  Our first witness is going

15   to be testifying by video.  You should be able to see the

16   witness testifying and hear the witness testifying.

17          The witness will be under oath and you may consider

18   the witness's testimony in the same way you would consider any

19   other evidence presented live from the witness stand here in

20   court.

21          So this is a sworn witness testifying in the same

22   way the witness would testify in court and you can consider

23   that testimony in the same way you would consider the

24   testimony of any other witness.

25          If you're ready to proceed, the clerk should

**J.A. 176**

```
 1  administer an oath and we will proceed with the direct
 2  examination.
 3                      SARAH SMITH
 4        having been duly sworn, testified as follows:
 5            THE CLERK:  Would you please state your name and
 6  spell your last name for the record?
 7            THE WITNESS:  Sarah Smith, S-M-I-T-H.
 8            THE CLERK:  Thank you.  You may be seated.
 9            THE COURT:  All right.  Did I see -- is our IT
10  person here, Mr. Chiavaras?
11            THE CLERK:  He just stepped out.
12            THE COURT:  Would you grab him a second?
13            I'm just wondering if there's a way to display the
14  witness's box on a full screen rather than counsel.
15            All right.  You can proceed, Mr. Davis, and we'll
16  see.  It would be preferable if I could get the witness up on
17  a full screen image rather than a split screen.
18                   DIRECT EXAMINATION
19  BY MR. DAVIS:
20      Q.    How are you employed?
21      A.    I'm the Deputy Director of the Missouri Children's
22  Division.
23      Q.    And are you in the Missouri Department of Social
24  Services?
25      A.    I am.
```

**J.A. 177**

```
1      Q.    And would you summarize briefly, please, your
2   experience working for Department of Social Services in
3   Missouri?
4      A.    I've worked with the Department of Social Services
5   Children's Division since April of 2006.  I did investigations
6   and then also out-of-home investigations, worked at the
7   hotline, which is our centralized unit for the state of
8   Missouri.  I was also a unit manager of the hotline and have
9   been a Deputy Director with Children's Division since January
10  of 2020.
11             THE COURT:  Excuse me, ma'am.  This is the judge.
12             I can't see well enough to know.  Is there a
13  microphone in front of you or is it a remote mic?
14             Now I'm not hearing you at all.  Ma'am, can you
15  speak again, please?
16             All right.  I think what we need to do is take
17  another break and see if we can set this up so it's working.
18             MR. DAVIS:  Are you on mute, Ms. Smith?
19             MR. LEVIN:  Your Honor, we just wanted to renew our
20  oral motion to exclude this witness.
21             THE COURT:  The one you made previously?
22             MR. LEVIN:  Yes.
23             THE COURT:  And the same grounds you identified for
24  me previously?
25             MR. LEVIN:  Yes.
```

**J.A. 178**

```
 1              THE COURT:  Your objection is noted and preserved
 2   for the record.
 3              MR. LEVIN:  Thank you.
 4              THE COURT:  All right.  I think we need -- the
 5   screen is frozen and we need to take a break.  I'll remain in
 6   the courtroom and bring you back in as soon as I can.
 7              (IN COURT - NO JURY PRESENT)
 8              (IN COURT - JURY PRESENT)
 9              THE COURT:  Sorry about that, folks.  I wanted you
10   to be able to see the witness better by having her on the full
11   screen, and then we had a problem with our audio system.  We
12   had to reboot it.  I think we're ready to go now.
13              I would ask the witness to please speak loudly.
14              Mr. Davis, go ahead.
15              MR. DAVIS:  Shall I start again, your Honor?
16              THE COURT:  Please feel free.
17        Q.   How are you employed?
18        A.   I'm the Deputy Director with Children's Division
19   within the Missouri Department of Social Services.
20              THE COURT:  Hang on a second.
21              MR. LEVIN:  I don't believe the witness can see the
22   attorney.  That's the only thing I want to point out on the
23   screen.
24              THE COURT:  All right.  Let me ask the witness.
25              What do you see on your screen, ma'am?
```

**J.A. 179**

```
 1              THE WITNESS:  You, your Honor.

 2              THE COURT:  Me.  Okay.

 3              Could we switch the view to the counsel?

 4              Good.  I think we're good to go.

 5              Thank you, Mr. Levin.

 6      Q.    How long have you worked, Ms. Smith, for the

 7  Missouri Department of Social Service?

 8      A.    Since 2006.

 9      Q.    Sorry?

10      A.    Since 2006.

11      Q.    2006?

12      A.    Yes.

13              THE COURT:  Just shout out your answers, ma'am,

14  okay?

15              THE WITNESS:  Okay.

16      Q.    And when did you become a supervisor?

17      A.    I've been with the Children's Division since 2006

18  as an investigator, then a supervisor in 2008, and then after

19  that a unit manager, and then I've been Deputy Director of

20  Children's Division since January 2020.

21      Q.    And would you briefly summarize, please, your

22  duties of Deputy Director of Children's Division?

23      A.    Yes.  My duties entail everything on the front end

24  of the child welfare system, so before a child comes into

25  care.  That would include the Child Abuse and Neglect Hotline,
```

**J.A. 180**

 1  investigations, and family-centered services that we offer.

 2      Q.   Okay.  And do your duties include the hotline that

 3  the Missouri department runs for child abuse and neglect?

 4      A.   That's correct.

 5      Q.   All right.  I have a few questions about the

 6  specific recording in this case.

 7           Are you familiar with a recorded telephone call

 8  from Christopher Cantwell to the Missouri Child Abuse and

 9  Neglect Hotline that occurred on June 17th of 2019?

10      A.   I am.

11      Q.   All right.  And do you recall approximately when

12  you became aware of that call?

13      A.   It was the fall of 2019, probably October, when I

14  was contacted by the FBI.

15      Q.   All right.  And did you play a role in actually

16  finding that recording in archives and providing it to the

17  FBI?

18      A.   I did.

19      Q.   And did you find it and send it to FBI?

20      A.   Yes.

21      Q.   And did you listen to the call?  Are you familiar

22  with it?

23      A.   I have listened to it since then.  I did not listen

24  to it prior to providing it to the FBI.

25      Q.   Okay.  Now, just a few questions about how calls

**J.A. 181**

```
 1   are categorized.  When someone calls in and makes a report to
 2   the Child Abuse and Neglect Hotline in Missouri, what are the
 3   basic ways the call that be categorized?
 4        A.   The calls that are received at the Missouri Child
 5   Abuse and Neglect Hotline can be sent out to the field as an
 6   investigation or an assessment or screened out as a documented
 7   call.
 8        Q.   All right.
 9        A.   There are also referrals that we would send out
10   that do not meet the criteria for a --
11        Q.   Speak a little more slowly, Ms. Smith.  The
12   criteria at the end, what did you say?
13        A.   A referral.
14        Q.   Okay.
15        A.   It would either be a report or a referral or a
16   documented call.  Those are our three categories.
17        Q.   Okay.  Now a report did you say can be either an
18   investigation or an assessment?
19        A.   That's correct.
20        Q.   And is an investigation or assessment the highest
21   level of reports that come in to child abuse and neglect?
22        A.   An investigation would be the highest report that
23   would come into the hotline in Missouri.
24        Q.   Okay.  In investigations -- once a call is treated
25   as an investigation, what role does law enforcement have?
```

1          A.    Sure.  In Missouri state statute requires law
2    enforcement to co-investigate all investigations.
3          Q.    Okay.  So when you say co-investigate, does that
4    mean your agency notifies law enforcement and invites them to
5    participate in the investigation?
6          A.    That's correct.
7          Q.    Okay.  And what's the difference between an
8    investigation and an assessment?
9          A.    An investigation is typically something that would
10   be criminal in nature, and then an assessment is more
11   something that the family receives in services.
12         Q.    Okay.  So an assessment is about basically finding
13   services that could help the child in the situation?
14         A.    That's correct.
15         Q.    All right.  Now, when you do either an
16   investigation or an assessment, to what extent is a
17   walk-through of the home required?
18         A.    Sure.  Our policy requires that a walk-through of
19   the home is done to ensure that it's safe for the child and
20   children on every report.  So that would include an
21   investigation or an assessment.
22         Q.    All right.  And how soon does a walk-through occur
23   after a report is received?
24         A.    Typically within 72 hours of the report being
25   received a walk-through is completed.  Depending on the

**J.A. 183**

```
 1   allegations, it could be within the first three hours of
 2   receiving a report.  It depends on the specific circumstances.
 3       Q.   And when a walk-through occurs, what actually
 4   happens?
 5       A.   An investigator would go to the home with law
 6   enforcement if there is an investigation or without law
 7   enforcement potentially for an assessment.
 8            THE COURT:  Excuse me, ma'am.  This is the judge
 9   again.
10            We're having a little trouble hearing everything
11   you say.  So I'm going to ask you to speak a little slower
12   because you tend to go quickly.  It's common for people
13   testifying to move quickly, but I would ask you to try to
14   speak slower.  I would ask you to try to speak as loudly as
15   you can.  Even if it seems a little unnatural for you, to
16   shout out your answers.  And particularly at the end of your
17   answers you tend to trail off a little bit, and that's when we
18   have the most difficulty hearing you.  All right?  So just try
19   to bear in mind those things.
20            Counsel, could you put the question to the witness
21   again?
22       Q.   What actually occurs on a walk-through?
23       A.   On a walk-through of the home the Children's
24   Division usually arrives at the home and ensures that it's a
25   safe environment for children.
```

**J.A. 184**

1          Q.    And does law enforcement also participate in a

2    walk-through if law enforcement is co-investigating?

3          A.    Yes, they do.

4          Q.    All right.  And to what extent is the parent

5    notified that the walk-through is going to occur?

6          A.    Children's Division wants to make sure that the

7    home is safe whenever we arrive, and so we typically do not

8    give notice that we're coming to the home.

9          Q.    All right.  So you show up without notice?

10         A.    Correct.

11         Q.    All right.  Now, when the Children's Division does

12    an investigation or an assessment, to what extent do you

13    interview children?

14              THE DEFENDANT:  We're required to interview

15    children on each investigation or report and make contact and

16    ensure that they're safe, and so we do that typically outside

17    of the home setting if we can in a safe environment.

18         Q.    And does that sometimes require interviews of

19    children in schools?

20         A.    Yes, it does.

21         Q.    All right.  Now, do you sometimes -- as part of

22    reports to Child Abuse and Neglect Hotline, do you receive

23    complaints that a parent is a drug user?

24         A.    Yes, we do.

25         Q.    And how are those reports handled in terms of

**J.A. 185**

1  investigation or assessment?

2      A.    When a Children's Service worker at the hotline is

3  screening the call, they really look at the impact to the

4  child from parental drug use, look and see how often a parent

5  may or may not be using, if they're using around the child or

6  children, and if there are any impacts.

7      Q.    Okay.  Do you also evaluate the potential impact of

8  firearms in the home in addition to drugs?

9      A.    Yes.  On each report or referral that we send out

10 there's a closing script that asks about potentially dangerous

11 weapons, drugs, animals around the home since our worker will

12 be responding to the home.

13     Q.    All right.  Now, if the Children's Division has a

14 concern that a child is not safe in the home, can you request

15 removal of the child?

16     A.    Yes.

17     Q.    And how does that work?  Briefly.

18     A.    In Missouri Children's Division cannot take custody

19 of a child.  We would request that from the juvenile office

20 and they would contact the court.  So the juvenile office, law

21 enforcement, or a physician can take custody in the state of

22 Missouri.

23     Q.    And when a child is removed from the home, what are

24 the restrictions on the parent, including the right to visit?

25     A.    That's a case-by-case basis.  A team decides that

**J.A. 186**

1  made up of the juvenile office, the courts, and they would

2  evaluate the safety factors and then they would set up

3  visitation for a family depending on what the specific

4  allegations are.

5      Q.   Okay.  And as of right now in Missouri,

6  approximately how many children are in care and have been

7  removed from their homes?

8      A.   In Missouri it's approximately 13,000 children.

9      Q.   And all of those have been the subject of court

10  involved removal?

11     A.   Yes.

12     Q.   Okay.  Is there also something called a Missouri

13  Central Registry?

14     A.   Yes.

15     Q.   Can you explain what that is and how that can

16  become involved with a report to the child and abuse -- Child

17  Abuse and Neglect Hotline?

18     A.   The Missouri Central Registry is something that an

19  alleged perpetrator's name goes on when an investigation is

20  substantiated.  Central Registry checks are conducted for

21  those that want to work or volunteer around children.  And

22  once their name goes on and they've exhausted their appeal

23  process, it remains on indefinitely.

24     Q.   And when you say the name remains on the Missouri

25  Central Registry indefinitely, do you mean for life?

**J.A. 187**

1       A.    I do.

2       Q.    And is there an appeal process or a way for a

3  parent to get his or her name removed from the Missouri

4  Central Registry?

5       A.    They can.

6       Q.    Can you explain briefly how they can do that?

7       A.    Within the first 30 or 60 days of receiving notice

8  of a report that has been substantiated the alleged

9  perpetrator can either appeal directly to the circuit court or

10 select an administrative review through the division.

11      Q.    Okay.  And can the division also refer complaints

12 directly to prosecutor's offices for consideration for

13 criminal prosecution?

14      A.    Yes.  It's our policy that any substantiated report

15 is sent over to the prosecuting attorney's office.

16      Q.    Okay.  So referring back to the call from Mr.

17 Cantwell to the Child Abuse and Neglect Hotline on June 17th

18 of 2019, how was that call categorized?

19      A.    That call was classified as a documented call.

20      Q.    And again, what does that mean?

21      A.    It was not referred to field staff for follow up.

22      Q.    And why was it not referred to field staff for

23 follow up, briefly?

24      A.    Whenever the person that was screening the call

25 reviewed the allegations, there was not a known impact to the

```
1    child or children involved.

2         Q.    Do you have to have a known alleged impact to the

3    child to actually get action from the division?

4         A.    Typically that's something that we would look for.

5         Q.    Okay.  And do you -- as the deputy director, do you

6    agree with how this particular call was handled?  Was it

7    handled in accordance with your criteria?

8         A.    Yes, I agree with the classification.

9         Q.    Okay.

10             MR. DAVIS:  If I may have just a moment.

11             (Attorney Davis confers with Attorney Krasinski)

12             MR. DAVIS:  No further questions.

13             Thank you, Ms. Smith.

14             THE COURT:  Thank you.

15             Cross-examination.

16             Again, we just need to take a brief moment to

17   disinfect the questioning area.

18             Oh, are you going to go from the back?

19             MR. LEVIN:  As long as she can see me.

20             THE COURT:  All right.

21             Ma'am, can you see the defense lawyer who is

22   standing in the back?

23             THE WITNESS:  I can, your Honor.

24             THE COURT:  All right.  He can question from the

25   back then.
```

**J.A. 189**

```
 1                    CROSS-EXAMINATION

 2   BY MR. LEVIN:

 3       Q.    Good morning, Ms. Smith.

 4       A.    Good morning.

 5       Q.    So you are familiar with the call that Mr. Davis

 6   was questioning you about; is that right?

 7       A.    Yes.

 8       Q.    And you're familiar with what actions, if any, were

 9   taken following the call?

10       A.    Yes.

11       Q.    And you agree that this was recorded as a

12   documented call; is that right?

13       A.    That is correct, sir.

14       Q.    It did not rise to the level of a report?

15       A.    That's correct.

16       Q.    And it wasn't a referral either?

17       A.    Correct.

18       Q.    And that determination was actually made while the

19   caller was on the line; is that right?

20       A.    Yes, sir.  The majority of calls that are screened

21   in the Missouri hotline the decision is made while they're on

22   the call.

23       Q.    The person who answers the call spoke to his or her

24   supervisor and indicated to the caller that the call would be

25   documented but that no further action would be taken?
```

**J.A. 190**

```
 1          A.    That's correct.  That's what I heard on that call
 2   as well.
 3          Q.    Now, it's quite common obviously for this hotline
 4   to get complaints; is that right?
 5          A.    Yes.
 6          Q.    That's what the hotline is set up for?
 7          A.    Yes.
 8          Q.    To get reports of abuse to elders and children?
 9          A.    Just children, sir.
10          Q.    Okay.  So -- but is the -- the hotline -- when the
11   person answers the hotline, do they say child abuse hotline or
12   do they say child/elder abuse hotline?
13          A.    Missouri Child Abuse and Neglect Hotline is
14   typically how they would answer the phone.
15          Q.    So it's just for children?
16          A.    Yes, sir.
17          Q.    And those calls come in from anonymous people at
18   times?
19          A.    Yes.  If someone is not a mandated reporter, then
20   they can report anonymously.
21          Q.    So there are anonymous calls that are made?
22          A.    Yes.
23          Q.    There are also calls that are not anonymous that
24   are made by mandated reporters?
25          A.    Correct.
```

**J.A. 191**

```
 1          Q.    And those would be teachers and doctors and people
 2    who are mandated by law to report child abuse when they come
 3    across it in their professional lives or even in their
 4    personal lives?
 5          A.    That's correct, sir.
 6          Q.    And then there are citizens that aren't mandated
 7    reporters who also call the hotline and give their names and
 8    addresses and telephone numbers in connection with their
 9    complaint; is that right?
10          A.    That's correct.
11          Q.    In this case you listened to the call?
12          A.    Yes.
13          Q.    Does the caller identify himself?
14          A.    Mr. Cantwell did identify himself.
15          Q.    Did he give his name?
16          A.    Yes.
17          Q.    And his telephone number and address?
18          A.    I believe so.
19          Q.    And did he give information about children that he
20    thought might be in danger?
21          A.    He did.
22          Q.    Did he indicate that those children might be
23    exposed to drugs?
24          A.    He did.
25          Q.    Might be exposed to violent ideology?
```

**J.A. 192**

```
 1        A.    He did.
 2        Q.    And you don't have any information that any of the
 3   information that Mr. Cantwell left on -- or left with the
 4   person who answered the hotline was false or untruthful in any
 5   way?
 6        A.    No, sir.
 7        Q.    Your agency didn't refer him to law enforcement,
 8   for example, for making false or untrue reports?
 9        A.    We did not further that information to law
10   enforcement.
11        Q.    Now, you indicated that it didn't again rise to the
12   level of a report.  So nothing was done in response to this
13   call; is that right?
14        A.    Not from the Children's Division.  No, sir.
15        Q.    There was no further investigation of the
16   allegation?
17        A.    Not from Children's Division.
18        Q.    No home visit?
19        A.    No, not from Children's Division.
20        Q.    No phone call?
21        A.    Not from Children's Division, sir.
22        Q.    No referral to any other agency?
23        A.    Not from the division.
24        Q.    Now, you indicate -- you keep saying not from the
25   division.  Are you aware of any other follow up that was done
```

**J.A. 193**

```
 1   by anyone else with regard to this?
 2        A.   I think I recall hearing in the recording Mr.
 3   Cantwell had mentioned contacting the FBI with concerns, but
 4   besides that I'm not aware.
 5        Q.   But the Children's Division didn't do anything to
 6   follow up on that?
 7        A.   The Children's Division did not follow up on the
 8   allegations.
 9        Q.   Mr. Cantwell offered more information; is that
10   right?
11        A.   That is correct.
12        Q.   And there was no follow up with regard to that?
13        A.   The hotline in Missouri does not receive -- the
14   camera is -- okay.
15             I mean, the Children's Division hotline typically
16   does not receive evidence.  Once the allegations are screened,
17   that information is then provided to the field.  So if we
18   would have alerted that call to the field, then we would have
19   encouraged Mr. Cantwell to contact the investigator on the
20   case to share those files that he referenced.
21        Q.   Now, was -- to the best of your knowledge, Mr.
22   Cantwell didn't insist on an investigation; is that right?
23        A.   That's correct.
24        Q.   He was cordial with the person who answered the
25   phone?
```

**J.A. 194**

```
 1        A.    He was.

 2        Q.    He didn't mention the name Vic Mackey, did he?

 3        A.    Not that I recall.

 4        Q.    He didn't mention demanding something of value?

 5        A.    Not that I recall.

 6              MR. LEVIN:  Thank you very much.

 7              THE COURT:  Redirect?

 8              MR. DAVIS:  Briefly, your Honor.

 9                      REDIRECT EXAMINATION

10   BY MR. DAVIS:

11        Q.    Ms. Smith, I think you said that the call was not

12   referred to harassment; is that right?

13        A.    That's correct.

14        Q.    Is there something called -- or something that the

15   division recognizes as harassment that can be related to a

16   call to the Child Abuse and Neglect Hotline?

17        A.    If the person that is screening the call feels that

18   the allegations are being made maliciously, we do have a

19   script that is read that mentions that that person could be

20   charged with a Class A misdemeanor.

21        Q.    So a malicious report in Missouri is actually a

22   crime; is that right?

23        A.    That's correct.

24        Q.    All right.  But that referral was not made here?

25        A.    Correct.
```

**J.A. 195**

```
 1              MR. DAVIS:  All right.  Nothing further.  Thank
 2   you.
 3              THE COURT:  Anything else from you?
 4              MR. LEVIN:  No, your Honor.
 5              THE COURT:  Thank you.
 6              Ma'am, thank you for your help here.  You're
 7   excused.
 8              We can terminate the video link at this time and
 9   you can call your next witness.
10              THE WITNESS:  Thank you, your Honor.
11              MR. DAVIS:  Your Honor, at this time the government
12   moves to admit Exhibit 103 and play Exhibit 103 with Exhibit
13   103A, which is the transcript.  This is the actual call.
14              THE COURT:  All right.  Subject to your original
15   objection to the witness's last testimony, do you have any
16   other objection?
17              MR. LEVIN:  No, your Honor.
18              THE COURT:  All right.  So it will be admitted.
19   The defendant's previous objection expressed outside of court
20   is preserved.  Otherwise, there's no other objection.  It's
21   admitted and it may be played.
22              MR. DAVIS:  Thank you.
23              (Government's Exhibit No. 103 Admitted)
24              (Government's Exhibit No. 103 played)
25              THE COURT:  All right.  What's your next witness?
```

**J.A. 196**

```
 1              MR. DAVIS:  The next witness is Shayne Tongbua of
 2    FBI and will be a lengthy witness, your Honor.
 3              THE COURT:  All right.  Let's take our lunch break.
 4              Let me ask my case managers.  We have lunch.  Would
 5    it already have arrived?
 6              THE CLERK:  Yes.
 7              THE COURT:  Is it reasonable to think we could do
 8    the jury lunch break in 45 minutes rather than an hour?
 9              THE CLERK:  I would assume so, your Honor, yes.
10              THE COURT:  All right.
11              Can the lawyers get their lunch and be back here in
12    45 minutes?  Okay.  Let's try to get going again at 1:15,
13    okay?
14              We'll take a break until 1:15, members of the jury.
15              (RECESS)
16
17
18
19
20
21
22
23
24
25
```

**J.A. 197**

1                    C E R T I F I C A T E

2

3

4         I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings, to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted: 5-4-21        /s/   Susan M. Bateman _____
                              SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE

2

3   * * * * * * * * * * * * * * * * *
                            *

4   UNITED STATES OF AMERICA    *
                            *

5                          * No. 1:20-cr-00006-PB
            v.         * September 22, 2020

6                          * 1:18 p.m.
                          *

7   CHRISTOPHER CANTWELL,        *
                            *

8               Defendant.    *

9   * * * * * * * * * * * * * * * * *

10

     TRANSCRIPT OF DAY ONE OF JURY TRIAL - AFTERNOON SESSION

11         BEFORE THE HONORABLE PAUL J. BARBADORO

12

13

   APPEARANCES:

14

15   For the Government:    AUSA John S. Davis
                        AUSA Anna Z. Krasinski, Esq.

16                     U.S. Attorney's Office

17   For the Defendant:     Eric Wolpin, Esq.
                        Jeffrey S. Levin, Esq.

18                     Federal Defender Office

19

20   Court Reporter:        Brenda K. Hancock, RMR, CRR
                        Official Court Reporter

21                     United States District Court
                        55 Pleasant Street

22                     Concord, NH 03301
                        (603) 225-1454

23

24

25

**J.A. 199**

1                          I  N  D  E  X

2    WITNESSES:          DIRECT    CROSS    REDIRECT    RECROSS

3    **SHAYNE TONGBUA**
     By Ms. Krasinski      8
4    By Mr. Levin                    86

5

6                      E  X  H  I  B  I  T  S

7
                    Govt's                    In Evd.
8
                    100........................14
9                   113........................25
                    112........................26
10                  304........................32
                    101........................34
11                  301........................37
                    302........................39
12                  102........................40
                    400........................46
13                  600........................51
          601, 603,605,608....................53
14                  200........................58
                    201 thru 226...............78
15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.

3              Please remain standing for the jury.

4                      (The jury entered the courtroom)

5              THE CLERK:  Please be seated.  This hearing is back in

6      session.

7              THE COURT:  All right.  Please call your next witness.

8              MS. KRASINSKI:  The United States calls Special Agent

9      Tongbua.

10             THE COURT:  Yes.  Hang on a second.

11             MR. WOLPIN:  Could we have a brief sidebar, your

12     Honor?

13             THE COURT:  Yes.  So, the lawyers and I are going to

14     put the headsets on.

15     (SIDEBAR CONFERENCE AS FOLLOWS):

16             THE COURT:  Go ahead, Counsel.

17             MR. WOLPIN:  The government noted to us that with this

18     witness it intends to play jail call recordings of our client

19     specifically in relation to, I believe, a handful but one, in

20     particular.  They spliced out very small sections of that

21     recording.  We objected under rule of completeness, Rule 106,

22     to it being played and presented in that manner.  We have the

23     full recording in an exhibit within our exhibit list as B16,

24     and before they get prepared to present that, I would ask that

25     the Court listen to the recording in its entirety to understand

4

1   why it's necessary to understand the context in which he's

2   speaking.  It can't just be isolated that way.  It's misleading

3   to do that, but I think the best way to do that, rather than

4   have me recharacterize it, is to listen.

5         THE COURT:  Well, all right.  In the future, if you've

6   got a problem like this, present it to me before the jury is

7   brought back in.  I don't want to be constantly sending the

8   jury in and out to address these kinds of problems, and I don't

9   want them sitting here while I listen to a recording unless

10   it's more than a few seconds long.  I need the government to

11   tell me what you're doing and why you wouldn't just play the

12   whole call.

13         Yours is still off.  You've got to turn it on.

14         THE CLERK:  She needs to talk into the microphone.

15         THE COURT:  Just talk into the microphone.

16         MS. KRASINSKI:  I also only got about half of the

17   audio there.  It's not a jail call, your Honor.  It's a call

18   that Mr. Cantwell recorded between himself and a friend of his,

19   an ex-girlfriend, and then emailed to law enforcement.  The

20   government has made, I believe, five or four or five clips from

21   that call.

22         THE COURT:  How long is the call?

23         MS. KRASINSKI:  The call itself is a few minutes.

24         THE COURT:  What's the problem with playing the whole

25   call?

**J.A. 202**

1          MS. KRASINSKI:  Well, I think the portions of the call

2     -- I'm sorry.  The audio for me keeps going out.  The portions

3     of the call are inadmissible, self-serving hearsay and should

4     not be allowed under 801, so the government intends to

5     introduce portions.

6          THE COURT:  All right.  I can't evaluate that argument

7     without listening.  I'm going to apologize to the jurors.

8     Don't put me in this position again.  If the parties have

9     objections like this, don't just wait until the jury is brought

10    in and raise them; raise them before the jury comes back in so

11    I can address the problem.

12    (END OF SIDEBAR CONFERENCE)

13         THE COURT:  I'm sorry, Members of the Jury, I've got

14    to excuse you again.  Please be patient with us.  As the

15    lawyers adjust to this new system I think we'll be more

16    efficient, and I'll do my best to make sure things run

17    efficiently, but I've got to take another short break, okay?

18    We'll bring you back in as soon as we can.

19         THE CLERK:  All rise.

20              (The jury exited the courtroom)

21         THE COURT:  All right.  So, you don't want to play the

22    whole call, not because of its length, but because you think

23    there are things in there that you don't think the jury should

24    hear in the call; is that right?

25         MS. KRASINSKI:  Yeah, your Honor.

1          THE COURT:  All right.  And the call's about a couple

2     of minutes long?

3          MR. WOLPIN:  It's about seven, total.

4          THE COURT:  Do you have a transcript of it?

5          MR. WOLPIN:  I do not.

6          MS. KRASINSKI:  We only have a transcript of --

7          THE COURT:  What's in it that's in there that you

8     don't think the jury should hear?

9          MS. KRASINSKI:  So, I don't think the jury should be

10    able to hear Mr. Cantwell discussing how what he thinks he's

11    trying to do is solve a crime.  I don't think the jury should

12    hear from us.  We're not using it against the defendant.  The

13    defendant's talking about other members of Bowl Patrol

14    harassing him.  801 specifically defines something as not

15    hearsay as a party statement used against that party, and we

16    don't intend to use those portions against Mr. Cantwell.  There

17    are other ways to remedy.

18          THE COURT:  You understand the rule of completeness,

19    right?

20          MS. KRASINSKI:  I do, your Honor.

21          THE COURT:  All right.  So, that's his argument.

22    What's your response?

23          MS. KRASINSKI:  So, the rule of completeness I think

24    only applies if the segment is misleading in some way.  So,

25    having a question and an answer, that's not misleading, and so

**J.A. 204**

1    the portions that the government intends to introduce aren't

2    misleading in a way that would make the rule of completeness

3    overrule the hearsay rules.  In the government's response to

4    the defendant's supplemental objections we cited --

5         THE COURT:  Do you have a written excerpt of the

6    portions -- this is going to take ten minutes.  Do not do this

7    to me again.  We have got to move more efficiently through

8    these proceedings.  The defendant should have raised this

9    objection with me earlier.  We need to be more efficient.  All

10   right?  So, you're on notice.  I first have to listen to your

11   proposed excerpts, then I have to listen to the whole call,

12   then I will make my ruling.  There's no other way I can do it,

13   and you've just wasted another 15 or 20 minutes of the jury's

14   time, which is not acceptable to me.  So, you're all on notice

15   I will not tolerate it.

16        MS. KRASINSKI:  Your Honor, I don't intend for this to be

17   the first thing to go through with the witness.  There's a lot

18   to go through with the witness.  This is something that I can

19   wait until after -- we can address this on a break, give the

20   Court time to listen to it all.  I can start with the witness

21   on a number of other topics.

22        THE COURT:  Can you go until quarter of 3:00 without

23   covering this?

24        MS. KRASINSKI:  Probably, your Honor.

25        THE COURT:  All right.  Let's get the witness in, and

**J.A. 205**

```
 1   let's get going.

 2              THE CLERK:  All rise for the jury.

 3                   (The jury entered the courtroom)

 4              THE CLERK:  Please be seated.

 5              THE COURT:  All right.  Call your witness.

 6              MS. KRASINSKI:  The United States calls Special Agent

 7   Tongbua.

 8              SHAYNE TONGBUA, duly sworn by the Clerk.

 9              THE CLERK:  Thank you.  Would you please state your

10   name and spell your last name for the record.

11              THE WITNESS:  Shayne Tongbua, S-h-a-y-n-e,

12   T-o-n-g-b-u-a.

13                        DIRECT EXAMINATION

14   BY MS. KRASINSKI:

15   Q.   Agent Tongbua, by whom are you employed?

16   A.   The Federal Bureau of Investigation.

17   Q.   How long have you served the FBI?

18   A.   Since 2009.

19   Q.   And what is your current role?

20   A.   I am a Special Agent.

21   Q.   How long have you been a Special Agent?

22   A.   Since 2016.

23   Q.   Are you assigned to a particular location?

24   A.   Yes, to the FBI Boston Office.  More specifically, I work

25   here in New Hampshire.
```

**J.A. 206**

1    Q.    And what did you do before you were a special agent with

2    the FBI?

3    A.    I also served in the Army from 2003 to 2009.

4    Q.    And within the FBI, before you became a special agent,

5    what did you do?

6    A.    So, including my military time, I've been a certified bomb

7    technician since 2004.  So that's the job I was originally

8    recruited to do in the Bureau, but the seven years before I was

9    an agent also included two years when I was a digital forensic

10   examiner.

11   Q.    Can you generally briefly describe your training to become

12   a digital forensic examiner?

13   A.    It's a set pipeline or training path, if you will.  I'm

14   not exactly sure today what those courses entail, but it's

15   generally between 10, 12, 14 weeks of different training that

16   you have to complete in order to get your certification to be

17   an examiner, and that does include various industry IT

18   certifications.

19   Q.    And can you briefly describe the training to become a

20   special agent?

21   A.    Again, I'm not sure what it is today, but the time I went

22   through it was 21 weeks at the FBI Academy in Quantico,

23   Virginia.

24   Q.    Now, let's dive into what brings us here today.  In July

25   of 2019 did you receive information about messages that

**J.A. 207**

1    appeared to be sent by Mr. Cantwell to someone else?

2    A.   Yes.

3    Q.   How did you receive that information?

4    A.   Those, that message exchange, those screenshots were first

5    relayed to a handful of us here in New Hampshire via an intel,

6    an intelligence analyst at our headquarters in Washington, D.C.

7    Q.   So, when you received the screenshots of this message

8    exchange, what did it look like?

9    A.   Like a website.  So, kind of akin to Facebook, how you

10   would just see messages posted there, almost like a blog, and

11   so there was a series of them.  They looked like an exchange

12   between two people.

13   Q.   So, if I'm understanding you correctly, it looked like an

14   exchange between two people had been publicly posted?

15   A.   That's correct.

16   Q.   Did you look at the exchange between two people?

17   A.   Yes.

18   Q.   And did it look like text messages, like what it would

19   look like on your phone?

20   A.   Yes.  That's a very accurate description.

21   Q.   And so, did you review the messages contained in that

22   exchange?

23   A.   Yes.

24   Q.   How many parties to that exchange were there?

25   A.   Two.

1   Q.   And during the course of the investigation did you

2   identify the two parties to that exchange?

3   A.   Yes.

4   Q.   Who were they?

5   A.   The defendant, Mr. Christopher Cantwell, and the alleged

6   victim in the exchange went under the pseudonym Cheddy Blac,

7   and that is associated with a Benjamin Lambert.

8   Q.   Generally speaking, how did you identify Christopher

9   Cantwell as one of the parties to this conversation?

10  A.   Due to familiarity with his Telegram account which was

11  used in that, in addition to Mr. Cantwell's own statements when

12  he admitted having that exchange.

13  Q.   And what about Mr. Lambert?  How did you identify that he

14  was a party to the exchange?

15  A.   After we identified Mr. Lambert he admitted that he was a

16  part of that same message exchange, that he was the user known

17  as Cheddy Blac.

18  Q.   So, we're talking about messages between two people, so if

19  I'm sending you text messages, for example, did it look like --

20  would there be sort of two mirror images of that?

21  A.   Correct.  There would be, basically, like if you and I

22  were having a conversation there would be my side and your side

23  where all the content is the same, basically.  If you guys are

24  familiar with texting, the layout would just be flipped.

25  Q.   So, there are essentially two mirror images of this

**J.A. 209**

```
 1   conversation?

 2   A.    Correct.

 3   Q.    One from one party's phone or side?

 4   A.    Correct.

 5   Q.    And one from the other's?

 6   A.    Yes.

 7   Q.    So, the first message exchange, the version that you first

 8   received, whose side of the conversation did that appear to be

 9   from?

10   A.    That would be Mr. Lambert's.

11   Q.    And during the course of the investigation did you find

12   the mirror image, the images as they would have appeared from

13   Mr. Cantwell's side of the conversation?

14   A.    Yes, I did.

15   Q.    Tell us about that.

16   A.    The only place I located the entire set was on

17   Mr. Cantwell's phone.

18   Q.    How is it that you came to look at the information on

19   Mr. Cantwell's phone?

20   A.    So, that device and a number of others were seized

21   pursuant to a search warrant which was executed at

22   Mr. Cantwell's residence in January 2020, on the same day of

23   his arrest.

24   Q.    So, the device that we're talking about where you found

25   these images, what device was that?
```

J.A. 210

```
 1    A.    It was a Samsung phone.  I believe we took three that day,

 2    and this particular one was discovered on a small side table,

 3    basically a bedside stand, in Mr. Cantwell's bedroom.

 4    Q.    Now, you mentioned that you executed this warrant and

 5    seized these devices from Mr. Cantwell's residence.  Where is

 6    that residence?

 7    A.    In Keene, New Hampshire.

 8    Q.    Did anyone else live there at the time?

 9    A.    Not in that apartment.

10    Q.    And was anyone else there at the time you executed the

11    warrant?

12    A.    No.

13    Q.    This cell phone, was it forensically downloaded?

14    A.    Yes.

15    Q.    And after the forensic extraction did you review the data

16    from the phone?

17    A.    Yes.

18    Q.    And is that where you found the mirror image,

19    Mr. Cantwell's side of this conversation?

20    A.    Yes.

21    Q.    Can you describe how that was in the phone?

22    A.    I'm sorry?

23    Q.    Can you describe sort of the file type that it was found?

24    A.    Basically, they were screenshots, so it would look the

25    way, you know, the display on your phone would look.
```

**J.A. 211**

1          MS. KRASINSKI:  So, I want to show the witness only

2     what has been marked for identification as Government's Exhibit

3     100.

4     Q.   Is that on your screen, Agent Tongbua?

5     A.   No, it is not.  Yes, it is now.

6     Q.   Do you recognize that?

7     A.   Yes.

8     Q.   What is it?

9     A.   This would be the first in the series of messages that we

10    were just describing as they would have appeared on Mr.

11    Cantwell's phone.

12         MS. KRASINSKI:  And, Ms. Sheff, would you please

13    scroll through Exhibit 100 so Agent Tongbua can see all of the

14    pages.

15    Q.   Now that you've had a chance to look at all of it, is it

16    the entire conversation between Mr. Cantwell and Mr. Lambert?

17    A.   Yes.

18         MS. KRASINSKI:  Your Honor, I move to strike the

19    identification on Exhibit 100.

20              THE COURT:  Is there an objection?

21              MR. LEVIN:  No objection.

22              THE COURT:  Without objection, it will be admitted as

23    a full exhibit.

24         (Government's Exhibit No. 100 received into evidence)

25         MS. KRASINSKI:  Permission to publish, your Honor?

```
1              THE COURT:  Yes.
2              MS. KRASINSKI:  Could we please display Government's
3    100 to the jury?
4    Q.   Now, Agent Tongbua, at the top of the page you see the
5    name Cheddy Blac?
6    A.   Yes.
7    Q.   And tell us again what you learned about that.
8    A.   There was an individual who goes by different pseudonyms,
9    Cheddy Blac, Cheddarman and Cheddar Mane, and that individual
10   was identified as a Mr. Benjamin Lambert.
11   Q.   And you said the other party to this conversation is the
12   defendant, Christopher Cantwell, correct?
13   A.   Correct.
14   Q.   And, generally, who is Mr. Cantwell?
15   A.   Mr. Cantwell, who you see here in the courtroom, is a
16   self-professed Nazi podcaster and blogger.
17   Q.   Now, the screen in front of you should allow you to make
18   markings on it.  Would you please go ahead and mark a "C" next
19   to the messages that are attributed to Mr. Cantwell.
20   A.   Is there a marking tool?
21   Q.   You should just be able to use your finger, Agent Tongbua.
22              THE COURT:  Go up and help him.
23              THE CLERK:  I'm not getting a menu.
24                        (Pause)
25              MS. KRASINSKI:  It looks like I can annotate.  Can we
```

J.A. 213

```
 1    try this a different way?
 2    Q.   Agent Tongbua, I'm going to put something next to the
 3    messages, and can you confirm for me whether or not they are
 4    attributed to Mr. Cantwell?
 5    A.   Yes.
 6    Q.   So, I've marked four Xs next to sort of the green, the
 7    text in green boxes.  Are those the conversations, the messages
 8    attributed to Mr. Cantwell?
 9    A.   Yes.
10    Q.   Now, what's the date of this exchange?
11    A.   June 15th, 2019.
12    Q.   And what is the first message that Mr. Cantwell sends?
13    A.   I guess you forgot the lesson which kept you away for a
14    short while.  Do you need to be reminded?  Twin Creek Road.
15    Q.   What time was the first message?
16    A.   9:00 p.m.
17    Q.   And did Mr. Lambert respond to that message?
18    A.   No.
19    Q.   And you read the second message, "Twin Creek Road."  What
20    time was that message sent?
21    A.   9:29 p.m.
22    Q.   So, almost a half an hour after the first one?
23    A.   Correct.
24    Q.   During the course of your investigation did you learn what
25    Twin Creek Road is?
```

**J.A. 214**

```
 1    A.    Yes.  That is the known address of the Lambert family's
 2    house.
 3    Q.    How do you know?
 4    A.    Through verification record checks and having personally
 5    visited that location.
 6    Q.    When you visited the location did you interact with
 7    anyone?
 8    A.    Yes.
 9    Q.    Who?
10    A.    Pam Lambert, Ben's wife, she was there with the three
11    children.  She greeted us and spoke with us when we arrived.
12    Q.    So, this address, you learned that a Ben Lambert does live
13    there?
14    A.    Yes.
15    Q.    Along with his wife and children?
16    A.    Yes.
17    Q.    Now, I want to next talk about a statement that would be
18    attributed to Mr. Lambert.  Do you see the statement that
19    begins, Let's think about this?
20    A.    Yes.
21    Q.    Can you read that, please?
22    A.    Let's think about this.  Every time someone you think is
23    in BP talks shit about you, a public figure, you threaten to
24    dox me.  Say you did.  What then?
25    Q.    Now, during the course of your investigation did BP come
```

J.A. 215

```
 1   to have any meaning for you?
 2   A.   Yes.  It's understood to be an abbreviation for the Bowl
 3   Patrol.
 4   Q.   And what is Bowl Patrol?
 5   A.   It is a group of online individuals who basically espouse
 6   hate and violence, and they affiliate with the white
 7   supremacists' extremist ideology.
 8   Q.   Now, did you learn about a relationship between Mr.
 9   Cantwell and Bowl Patrol?
10   A.   Yes.
11   Q.   Can you describe that for us?
12   A.   It appears that they had a historical relationship going
13   back a few years ago.  They appeared to be colleagues,
14   like-minded individuals, and it seemed as though Mr. Cantwell
15   basically helped give them a platform where they were just kind
16   of getting started as a place to post some of their online
17   content.
18   Q.   What do you mean by "give them a platform"?
19   A.   A foothold.  Because he was an established individual, he
20   has websites, he has his podcasts and regular shows, they
21   really didn't have that platform.  So, if you're starting out,
22   if you can latch onto someone who's established, they can sort
23   of vouch for you, you can post onto their websites, maybe
24   feature on their shows, and so it's a way to help bring in new
25   people into those types of arenas.
```

**J.A. 216**

1   Q.   And so, did Bowl Patrol create a podcast of sorts?

2   A.   Yes.

3   Q.   What was that called?

4   A.   The BowlCast.

5   Q.   And where was that initially hosted?

6   A.   On a few different places.  Radio Werewolf, as we've

7   mentioned already, and I know that Mr. Cantwell hosted some of

8   their content on his sites as well.

9   Q.   And was Mr. Cantwell ever involved in the BowlCast?

10  A.   Yes.  He was actually the special guest on the very first

11  episode.

12  Q.   The members of Bowl Patrol, do they use pseudonyms?

13  A.   Yes.

14  Q.   Why?

15  A.   Apparently to protect their true identities, to maintain

16  anonymity online so they -- to say things that they felt they

17  could say safely without being exposed.

18  Q.   Is that uncommon in this white nationalist community?

19  A.   No.  It's very common.

20  Q.   And at some point did that relationship sour?

21  A.   It appears so.

22  Q.   When did that relationship sour?

23  A.   Approximately late 2018, it appears.

24  Q.   Now, below that message there's a new date.  Did this

25  conversation continue into the following day?

**J.A. 217**

```
 1   A.   Yes.

 2   Q.   And so, what was the next day?

 3   A.   June 16th, 2019.

 4   Q.   And let's look now at the last two messages on this page

 5   sent by Mr. Cantwell.  Can you please read those for us?

 6   A.   Get a fucking life or I will ruin the one you have.  Don't

 7   bother anyone.  Then you won't have to worry about crossing me.

 8   Q.   And before we continue did you learn what platform these

 9   messages were sent on?

10   A.   Yes.  These were all sent on Telegram.

11   Q.   What's Telegram?

12   A.   It's an online instant messaging platform.  It has a lot

13   of other capabilities, like Voice over IP, file sharing, things

14   like that.  It's widely regarded because of the simplicity,

15   ease of use and the security features.  It has encryption,

16   secret chats, private channels, things like that.

17   Q.   What's a "channel"?

18   A.   So, as opposed to like we were saying, you can do direct

19   messages between two people.  A "channel" would be a place

20   where you can post content, almost like a page or a blog.

21   Typically, only a person with admin. rights to that channel

22   would be able to post there.  Subscribers could belong to that

23   channel; then they can follow the posts.  Corresponding with

24   that, they usually can set up a discussion group, and then in a

25   discussion group you can have sidebar conversations where
```

**J.A. 218**

1   anyone who participates in that channel can participate in the

2   discussion groups.

3   Q.   So, on Telegram you can have sort of a channel or a blog,

4   a group chat, and you can also send private messages?

5   A.   Correct.

6   Q.   What are these?

7   A.   These are direct messages, so one-to-one exchange.

8   Q.   So, what's the sort of physical act that you need to do to

9   send a message?

10  A.   Generally speaking, you'd select the user that you intend

11  to message, you open a box, type -- think about what you want

12  to say, type your box, depending on your platform might spell

13  check, and then you push "Send" or "Transmit."

14  Q.   Now, let's turn to the next page of Government's Exhibit

15  100.  And, again, I'm going to mark next to some

16  communications, and after that can you confirm whether those

17  are the communications attributed to Mr. Cantwell?

18  A.   Yes.

19  Q.   Are those Mr. Cantwell's statements?

20  A.   Yes.

21  Q.   Okay.  Let's look at these four main messages sent by

22  Mr. Cantwell.  We can look at them all at once.  Agent Tongbua,

23  can you read the first message for us.

24  A.   You're a fucking liar.  You came here with your loser

25  fucking pals because you have the attention span of a nigger

1    and the morals of a kike, and because of that fact you're going

2    to lose everything you have.

3    Q.    And what time was that sent?

4    A.    I think that's 4:15 p.m.

5    Q.    And how long after sending that message did Mr. Cantwell

6    send the next message?

7    A.    In approximately a half an hour.

8    Q.    What's that next message?

9    A.    Next time I post that photo, the faces won't be blurred,

10   and then you're going to start getting unexpected visitors.

11   Q.    And the next two?

12   A.    And I don't care if it's you causing the trouble, you're

13   the one who's gonna suffer, 'cause you're the one who I can

14   get.  If you want to dox Vic, he's a better target, but if you

15   give me fake info, then your wife is going to have trouble

16   sleeping at night until she leaves you and takes your kids

17   away.

18   Q.    So, let's break this down a bit, and let's focus on the

19   last message first, If you want to dox Vic...  During the

20   course of this investigation did you learn who "Vic" referred

21   to?

22   A.    Yes.  That's a reference to an individual who goes by "Vic

23   Mackey," who is known to be the sort of ringleader of Bowl

24   Patrol.

25   Q.    Is Vic Mackey a true name or a pseudonym?

**J.A. 220**

1    A.    A pseudonym.

2    Q.    And you mentioned before a bit about the Bowl Patrol's

3    relationship with Mr. Cantwell.  Did you learn about Vic

4    Mackey's relationship with Mr. Cantwell specifically?

5    A.    A little bit.

6    Q.    What did you learn?

7    A.    Again, Mr. Cantwell told us basically the same thing, that

8    Vic was known to be the ringleader.  At one point Mr. Cantwell

9    had given Vic admin. credentials to his website so that he

10   could post some of the Bowl Patrol content there.  Ultimately,

11   the two had a falling out, didn't see eye to eye, and there

12   appeared to be a lot of animosity between the two.

13   Q.    So, let's talk about that animosity and what caused that.

14   Did you learn about anything that Mr. Cantwell believed that

15   Vic had done to him?

16   A.    Yes.  He believed that Vic was the primary instigator, I

17   think is what he called him, of a harassment campaign against

18   him.

19   Q.    And did Mr. Cantwell believe that Vic Mackey had done

20   anything to his website?

21   A.    Yes.  We ultimately learned -- Mr. Cantwell had filed a

22   complaint with us, and in that he named Vic Mackey as having

23   posted unauthorized content that defaced his website.

24   Q.    Let's look at some of Mr. Cantwell's statements about Vic.

25         MS. KRASINSKI:  Can we please show the witness only

**J.A. 221**

1    what's been marked for identification as Government's Exhibit

2    113.

3         THE CLERK:  Can the witness put the screen back on?

4         THE WITNESS:  Oh, I'm sorry.

5         THE CLERK:  Thank you.

6         MS. KRASINSKI:  If I'm the one doing the marking can

7    the witness leave the privacy screen on?

8         THE CLERK:  Yes, absolutely.

9    Q.   Agent Tongbua, what is that?

10   A.   This is an article that was posted to Mr. Cantwell's

11   website.

12   Q.   How do you know?

13   A.   I personally have viewed it there, and it's also of the

14   same format which I'm familiar with, which most of his articles

15   where he would list the title, list the date, list the author

16   and then the article.

17   Q.   And who is the listed author?

18   A.   It lists as Chris.

19   Q.   And did you determine that Mr. Cantwell authored this?

20   A.   Yes.

21   Q.   How do you know?

22   A.   So, again, he's the only admin. I know of on his site that

23   lists Chris as the author.  I'm not sure what else you're

24   asking.

25        MS. KRASINSKI:  Your Honor, I move to strike the

1   identification on Government's Exhibit 113.

2         THE COURT:  Any objection?

3         MR. LEVIN:  No objection.

4         THE COURT:  Without objection, it will be admitted.

5         (Government's Exhibit No. 113 received into evidence)

6         MS. KRASINSKI:  Permission to publish, your Honor?

7         THE COURT:  Yes.

8   Q.    Agent Tongbua, what is the title and date of this web

9   posting?

10  A.    Sorry for spam posts, February 11, 2019.

11  Q.    And can you read that for us, please.

12  A.    Yes.  Last night, a bunch of posts were made to this

13  website which may have seemed out of character.  That is

14  because they were made without authorization.  Back in 2018, I

15  gave an author's account to a guy who goes by the name of Vic

16  Mackey.  The site was not hacked.  All of your data is safe.  I

17  just hadn't deleted Vic's account on the site because he never

18  really contributed much content in the first place, and it

19  slipped my mind.  Eventually these losers will overdose on

20  drugs or find a new man crush.  Until then, I ask for your

21  patience as I deal with what amounts to a spam problem.

22  Q.    He called this a "spam problem"?

23  A.    Correct.

24  Q.    Any references to Cheddar Mane in this posting?

25  A.    No.

**J.A. 223**

1    Q.   Any references to Cheddy Blac?

2    A.   No.

3    Q.   Any references to Mr. Lambert?

4    A.   No.

5         MS. KRASINSKI:  Let's look at another one of

6    Mr. Cantwell's statements about Vic Mackey.  Can we display for

7    the witness only what has been marked for identification as

8    Government's Exhibit 112.

9    Q.   Agent Tongbua, do you recognize that?

10   A.   Yes.

11   Q.   What is it?

12   A.   This is a post by Mr. Cantwell via his Gab account.

13   Q.   How do you know?

14   A.   Again, it's the same format known for Mr. Cantwell's Gab

15   posts.  You have the name there, Christopher Cantwell,

16   @Cantwell, and this also corresponds to the previous article

17   and the previous FBI complaint he made to us about his website.

18        MS. KRASINSKI:  Your Honor, I move to strike the

19   identification on Government's Exhibit 112.

20        THE COURT:  Any objection?

21        MR. LEVIN:  No objection.

22        THE COURT:  Without objection, it will be admitted.

23        MS. KRASINSKI:  Permission to publish, your Honor?

24        THE COURT:  Yes.

25        (Government's Exhibit No. 112 received into evidence)

1   Q.   Agent Tongbua, can you read what Mr. Cantwell wrote on his

2   Gab account?

3   A.   Today I submitted a criminal complaint to the FBI naming

4   Vic Mackey and Mosin-Nagant for defacing my website last night.

5   Q.   Any references to Cheddarman?

6   A.   No.

7   Q.   To Cheddy Blac?

8   A.   No.

9   Q.   To Ben Lambert?

10  A.   No.

11  Q.   During the course of the investigation did you determine

12  whether Mr. Cantwell had filed a complaint with the FBI

13  regarding vandalism to his website?

14  A.   Yes, he did.

15  Q.   When was that report made?

16  A.   The report was made on February 11, 2019.

17  Q.   Did you learn what happened to that complaint, how it was

18  filed?

19  A.   I did.

20  Q.   Can you describe that to us, please?

21  A.   So, it came in through our Internet Crimes Complaint

22  Center, they call it the IC3, which means he basically

23  submitted it online as opposed to calling, like, an 800 number.

24  We did not receive that here in New Hampshire.  I actually did

25  not see that until Mr. Cantwell emailed that to us in July of

```
1    2019.

2    Q.    Have you since reviewed that complaint?

3    A.    Yes.

4    Q.    Did Mr. Cantwell complain that individuals had vandalized

5    his website?

6    A.    He did.

7    Q.    Did he name anyone?

8    A.    He did.

9    Q.    Who did he name?

10   A.    He specified the same two individuals here, Vic Mackey and

11   Mosin-Nagant.

12   Q.    That complaint he sent to the FBI, did it include any

13   mention of Cheddar Mane?

14   A.    No.

15   Q.    Any mention of Cheddy Blac?

16   A.    No.

17   Q.    Any mention of Ben Lambert?

18   A.    No.

19   Q.    And you said that was made in February of 2019?

20   A.    Correct.

21        MS. KRASINSKI:  So, let's take a look at one of Mr.

22   Cantwell's statements shortly after that.  I want to show to

23   the witness only what has been marked for identification as

24   Government's Exhibit 303.

25   Q.    Do you recognize that?
```

**J.A. 226**

```
 1    A.    Yes.

 2    Q.    What is it?

 3    A.    This is a Telegram chat featuring Mr. Cantwell and a

 4    couple of other --

 5           MR. LEVIN:  I'm going to object to this on relevance,

 6    your Honor.

 7           THE COURT:  This has been for identification only at

 8    this point.

 9           So, lay the foundation without getting into the

10    content, and then I'll hear the objection.

11    A.    It's a conversation on Telegram with Mr. Cantwell and a

12    couple of others regarding this dispute with Bowl Patrol.

13    Q.    Where did this come from?

14    A.    This was located on one of Mr. Cantwell's devices.

15    Q.    What device was it located on?

16    A.    I'm drawing a blank off the top of my head.  It was either

17    a desktop computer or an external hard drive recovered in his

18    residence.

19    Q.    But in either regard it came from one of Mr. Cantwell's

20    devices?

21    A.    Correct.

22    Q.    And without getting into the content of the statements,

23    how do you attribute the statements, some of these statements,

24    to Christopher Cantwell?

25    A.    Again, it was located on one of his devices.  It lists the
```

**J.A. 227**

1    user name, "Christopher Cantwell," it lists his known icon

2    there, and the subject matter is consistent with other

3    conversations on this matter.

4            MS. KRASINSKI:  Your Honor, I would move to admit

5    Government's Exhibit 303.

6            THE COURT:  Do you have a relevance objection?

7            MR. WOLPIN:  Yes, your Honor.  It's undated.  We don't

8    know who Kaiser Peezy is, we don't know who the other people

9    are and what they're referring to.

10           THE COURT:  All right.  I am going to instruct you to

11   go on to a different subject.  We can revisit this at the next

12   break, if you remind me to do that.

13           MS. KRASINSKI:  Yes, your Honor.

14   Q.   I'm going to show you what's been marked, the witness

15   only, what's been marked as Government's Exhibit 304.  Do you

16   recognize that?

17   A.   Yes.

18   Q.   What is it?

19   A.   It is another Gab post by Mr. Cantwell.

20   Q.   How do you attribute that to Mr. Cantwell?

21   A.   So, again, the same format, same user icon, same name.  It

22   also contains the blue checkmark verification there.

23   Q.   What is the blue checkmark verification?

24   A.   As you see, well, it's also labeled a PRO account, and

25   those PRO accounts come with a variety of enhanced features,

```
 1    one of which is user verification.

 2    Q.   And is this from the Gab platform?

 3    A.   Yes.

 4    Q.   And where was this found?

 5    A.   Again, on one of Mr. Cantwell's devices.

 6    Q.   Agent Tongbua, would looking at a chart of images found on

 7    Mr. Cantwell's electronic devices that you prepared help

 8    refresh your recollection --

 9    A.   Yes.

10    Q.   -- as to where this came from?

11         MS. KRASINSKI:  If we could please display for the

12    witness only what's been marked for identification as

13    Government's Exhibit 300.

14    Q.   Agent Tongbua, please take a look at that, and when you're

15    ready we'll switch back to Exhibit 304.

16    A.   (Witness complied).  Okay.

17    Q.   Does that refresh your recollection as to where

18    Government's Exhibit 304, what device that came from?

19    A.   Yes.

20         MS. KRASINSKI:  All right.  If we could please, again,

21    display for the witness only Government's Exhibit 304.

22    Q.   So, where did this come from?

23    A.   This was found both on Mr. Cantwell's phone as well as an

24    external hard drive that was found in a backpack in his

25    bedroom.
```

**J.A. 229**

1    Q.   And in reviewing the data associated with this on

2    Mr. Cantwell's phone, were you able to identify a creation

3    date?

4    A.   Yes.

5    Q.   And what was that?

6    A.   It was listed as March 17th, 2019.

7            MS. KRASINSKI:  Your Honor, I move to admit

8    Government's Exhibit 304.

9            THE COURT:  Any objection?

10           MR. LEVIN:  Objection.  Relevance.  Another undated

11   post.  The screenshot may have been created on March 17th, but

12   the post itself is undated.

13           THE COURT:  All right.  The objection is overruled.

14   It may be admitted.

15           (Government's Exhibit No. 304 received into evidence)

16           MS. KRASINSKI:  Permission to publish, your Honor?

17           THE COURT:  Yes.

18   Q.   And let's enlarge the one posting.  Agent Tongbua, can you

19   read Mr. Cantwell's Gab statement here?

20   A.   I have dox on several of these Bowl Patrol idiots, and I'm

21   gonna start dropping them until they rat out Vic.

22   Q.   Now, we've seen the term "dox" now twice, once in

23   Government's Exhibit 100, and we've seen it now here.  Can you

24   tell us what that term means?

25   A.   "Doxing" is an online practice of researching and publicly

**J.A. 230**

1   releasing an individual's private information, typically with

2   malicious intent.

3   Q.   And during your investigation did you determine whether or

4   not Mr. Cantwell has made any public statements about doxing?

5   A.   Yes.

6   Q.   Showing you, the witness now only, what has been marked as

7   Government's Exhibit 101, can you please take a look at that.

8   Agent Tongbua, do you recognize it?

9   A.   Yes.

10   Q.   What is it?

11   A.   It is an article authored by Mr. Cantwell to his website

12   regarding doxing and anonymity.

13   Q.   What's the date of the article?

14   A.   April 8th, 2018.

15   Q.   And that's before the exchange that took place between

16   Mr. Cantwell and Mr. Lambert?

17   A.   Correct.

18   Q.   And how do you attribute this to Mr. Cantwell?

19   A.   Well, it's listed as, you know, ChristopherCantwell.com.

20   I personally viewed it on that website.  It's in the same

21   format, with Christopher Cantwell at the top, Radical Agenda,

22   lists the article title, date and author.

23        MS. KRASINSKI:  Your Honor, I move to admit

24   Government's Exhibit 101.

25        THE COURT:  Any objection?

**J.A. 231**

1    MR. LEVIN:  Objection.  Relevance.  This is from a

2    year before the incident.  It has nothing to do with the

3    incident, nothing to do with the facts of this case.

4    THE COURT:  Overruled.  It may be admitted.

5    (Government's Exhibit No. 101 received into evidence)

6    MS. KRASINSKI:  Now, permission to publish, your

7    Honor?

8    THE COURT:  Yes.

9  Q.  Let's go to the second page of this and the fourth

10   paragraph that begins with, In this sense... Agent Tongbua,

11   can you read Mr. Cantwell's statement about doxing here?

12  A.   In this sense, it helps to think of doxing as a form of

13   violence.  It certainly carries the potential for violence to

14   result, it is typically seen as a last resort, and, most

15   importantly, real men understand that it is sometimes

16   necessary.

17  Q.  And can we turn to page 8 of Mr. Cantwell's article on

18   doxing.  And there's a bold sentence in the middle of that

19   page.  Agent Tongbua, can you read that for us?

20  A.   Doxing is serious business.

21  Q.  Now, let's go back to Government's Exhibit 100, the

22   exchange between Mr. Cantwell and Mr. Lambert, and we were on

23   page 2 of that exchange.  Mr. Cantwell's second message on this

24   page that begins with, Next time, Next time I post that photo,

25   the faces won't be blurred, is public posting of photos, is

1  that a form of doxing?

2  A.   Absolutely.

3  Q.   Now, Mr. Cantwell's next statement in that includes,  And

4  I don't care if it's you causing the trouble.  You're the one

5  who's gonna suffer 'cause you're the one who I can get.  During

6  the course of your investigation did you understand what

7  "causing the trouble meant," the trouble that Mr. Cantwell was

8  referring to?

9  A.   I believe so.  I believe it's the what he considered

10  harassment that he thought was basically orchestrated by Vic

11  Mackey.

12  Q.   Now, let's move on to the next page in this exchange, and,

13  again, I'll just mark a number of messages here and ask you to

14  confirm are those the statements made by Mr. Cantwell?

15  A.   Yes.

16  Q.   And what was Mr. Cantwell's first message on this page of

17  the exchange?

18  A.   Fuck around and I'll remind you the hard way.

19  Q.   And let's look at Mr. Cantwell's next three messages.

20  Agent Tongbua, can you read that first message for us?

21  A.   As a matter of fact, I don't.  So if you don't want me to

22  come and fuck your wife in front of your kids, then you should

23  make yourself scarce.

24  Q.   What time did Mr. Cantwell send that message?

25  A.   6:41 p.m.

**J.A. 233**

```
 1   Q.   Did Mr. Lambert respond directly to that message?
 2   A.   No.
 3   Q.   How long between when Mr. Cantwell sent that message and
 4   when Mr. Cantwell sent the next message?
 5   A.   Approximately a half an hour.
 6   Q.   And what was the next message that Mr. Cantwell sent?
 7   A.   Give me Vic, it's your only out.
 8   Q.   Did Mr. Lambert respond to that message?
 9   A.   No.
10   Q.   How long after Mr. Cantwell said, Give me Vic, it's your
11   only out, did Mr. Cantwell send the next message?
12   A.   Approximately another hour.
13   Q.   And what was Mr. Cantwell's message then?
14   A.   I guess I'm going to have to prove my seriousness.
15   Q.   Let's move to the next page of Government's Exhibit 100,
16   and is this a continuation of what was on the previous page?
17   A.   Yes.
18   Q.   And, again, I will -- I've marked a number of statements.
19   Are those the statements that Mr. Cantwell made?
20   A.   Yes.
21   Q.   The image that you see here, the picture, what is that?
22   A.   That is a picture of the Lambert family minus Mr. Lambert.
23   Q.   And if we go back to the messages, what is the message
24   that Mr. Cantwell writes just after sending the image of Mrs.
25   Lambert and her children?
```

1    A.    More where that came from.

2    Q.    More where that came from.  During the course of the

3    investigation did you learn whether Mr. Cantwell did, in fact,

4    have more pictures of Mr. Lambert or pictures of his family?

5    A.    He did.

6    Q.    How did you learn that?

7    A.    They were discovered on his digital devices.

8    Q.    Showing the witness only what has been marked for

9    identification purposes as Government's Exhibit 301, Agent

10   Tongbua, do you recognize that?

11   A.    Yes.

12   Q.    What is it?

13   A.    That is a selfie or a digital photo of three individuals

14   it looks to be at the Lambert residence.

15   Q.    And so, is Mr. Lambert in this image?

16   A.    Yes.

17   Q.    And where was this image found?

18   A.    On Mr. Cantwell's devices.

19          MS. KRASINSKI:  Your Honor, I move to admit

20   Government's Exhibit 301.

21          THE COURT:  Any objection?

22          MR. LEVIN:  No objection.

23          THE COURT:  Without objection, it will be admitted.

24      (Government's Exhibit No. 301 received into evidence)

25          MS. KRASINSKI:  Permission to publish, your Honor.

**J.A. 235**

```
1              THE COURT:  Yes.
2    Q.   Agent Tongbua, can you describe to us who's in the
3    picture?
4    A.   As you look at the picture, on the far left is Ben
5    Lambert, a/k/a Cheddar Mane, Cheddy Blac; in the middle is an
6    individual named Katelen Fry, who goes by the online pseudonym
7    of Peach; and on the right is Thomas Gibson, who goes by
8    Hardmous or DJ Hardmous.
9    Q.   And did you learn who Ms. Fry was in relation to
10   Mr. Cantwell?
11   A.   We did.
12   Q.   And tell us about that.
13   A.   During an interview with Mr. Cantwell, he told us that she
14   was a former girlfriend of his, and at this time she had gone
15   to visit Mr. Lambert at his residence.
16   Q.   Do you know approximately when this visit took place?
17   A.   Yes.  It was around Thanksgiving 2018.  I believe this
18   photo is actually dated November 30th.
19   Q.   And I'd like to show the witness only now what's been
20   marked for identification purposes as Government's Exhibit 302.
21   Agent Tongbua, do you recognize that?
22   A.   I do.
23   Q.   What is it?
24   A.   Again, it's another digital photo or selfie of Mr.
25   Lambert.
```

**J.A. 236**

1    Q.    And where was this image found?

2    A.    Again, on the same digital devices, Mr. Cantwell's phone

3    and the backup hard drive.  I believe it was dated December

4    1st, 2018.

5         MS. KRASINSKI:  Your Honor, I move to admit

6    Government's Exhibit 302.

7         MR. LEVIN:  No objection.

8         THE COURT:  It will be admitted, and it may be

9    published.

10        MS. KRASINSKI:  Thank you, your Honor.

11        (Government's Exhibit No. 302 received into evidence)

12   Q.    And, again, Agent Tongbua, who is in this picture?

13   A.    That is Mr. Benjamin Lambert.

14   Q.    So, in addition to the two images we've just looked at of

15   Mr. Lambert that were found on Mr. Cantwell's devices, did you

16   learn whether Mr. Cantwell had other images of Mrs. Lambert?

17   A.    He did.

18   Q.    And did you learn what he did with those images?

19   A.    He retained them.  Ultimately, he did end up sending those

20   to us.  On at least one it shows the family in the kitchen of

21   the residence.

22   Q.    Did he ultimately use them to dox Mr. Lambert?

23   A.    Yes.

24        MS. KRASINSKI:  I'd like to show the witness only what

25   has been marked for identification purposes as Government's

**J.A. 237**

1   Exhibit 102.

2   Q.   Agent Tongbua, do you recognize that?

3   A.   Yes.

4   Q.   What is it?

5   A.   It is a post to the, what do you call it, Radical Agenda

6   Telegram channel discussion group in which Mr. Cantwell posted

7   unredacted photos of the Lamberts.  This is the morning

8   following the Telegram message exchange.

9   Q.   The morning following the Telegram message exchange.  So,

10  would that be June 17th, 2019?

11  A.   Yes, early in the morning on the 17th.

12  Q.   And how do you attribute this to Mr. Cantwell?

13  A.   Again, this is his Radical Agenda Telegram channel.  You

14  have his same icon, his same user name, and this is the channel

15  of which he was known to be administrator.

16  Q.   And did he also provide you with copies of the images that

17  you see here?

18  A.   Yes, he did.

19       MS. KRASINSKI:  Your Honor, I move to admit

20  Government's Exhibit 102.

21       THE COURT:  Any objection?

22       MR. LEVIN:  No objection.

23       THE COURT:  It will be admitted and may be displayed.

24       MS. KRASINSKI:  Thank you, your Honor.

25       (Government's Exhibit No. 102 received into evidence)

**J.A. 238**

1    Q.    Now, I want to focus first on the top.  You've mentioned

2    that this was the Radical Agenda Telegram channel.  What is

3    Radical Agenda?

4    A.    That is both a website and a podcast that is hosted by

5    Mr. Cantwell.

6    Q.    Now, looking at what's next to Radical Agenda, do you see

7    a number there?

8    A.    Yes.

9    Q.    What is that?

10    A.    It says "293 ME" dot, dot, dot.  It's generally a

11    reference to 293 members.

12    Q.    So, it's 293 members of that group?

13    A.    Yes, at that moment in time.

14    Q.    And what does Mr. Cantwell say before posting these

15    images?

16    A.    Here's the redacted parts.

17    Q.    Now, we've discussed this first photo.  Is that the same

18    photo of Mrs. Lambert that Mr. Cantwell had sent to Mr. Lambert

19    in their private exchange?

20    A.    Yes.

21    Q.    And so, what's the next image?

22    A.    That's the photo I was referring to previously again of

23    Mrs. Lambert with her children in their own kitchen.

24    Q.    And let's go to the second page of Government's Exhibit

25    102.  And is there a third image that Mr. Cantwell posted?

**J.A. 239**

```
 1   A.   Yes.

 2   Q.   And who is depicted in that image?

 3   A.   That's Ben Lambert.

 4   Q.   And I want to briefly look at the bottom statement of

 5   Mr. Cantwell that begins with, Like I said...  Can you please

 6   read that to us.

 7   A.   Like I said, if I could just drive down to Twin Creek Road

 8   in Winfield, Missouri and shoot this idiot, I would.  But I

 9   can't, so I'll let the law do it.

10   Q.   And, again, what is Twin Creek Road in Winfield, Missouri?

11   A.   That's the street on which the Lamberts live.

12   Q.   I'd like to go back now to Government's Exhibit 100.  We

13   were on page 4 of that exhibit.  So, we just discussed more

14   where that came from.  What's Mr. Cantwell's next post --

15   message.  Excuse me.

16   A.   I bet one of my incel listeners would love to give her

17   another baby.

18   Q.   Are you familiar with the term "incel"?

19   A.   I am.

20   Q.   What does it mean?

21   A.   It's an online slang term used to -- it's short for

22   "involuntary celibate."  It's a subculture of individuals,

23   typically male, who can't find romantic or sexual success, even

24   though they desire it, and they're often associated with

25   repression, anger, aggression.  They typically resent the
```

1    objects of their affection, and they promote violence towards

2    those who find romantic or sexual success.

3    Q.    You've reviewed -- you've looked at Mr. Cantwell's

4    website?

5    A.    Yes.

6    Q.    Before the date that he sent these messages in June of

7    2019 had Mr. Cantwell ever publicly on his website discussed a

8    link between those who believe the incel ideology and violence?

9    A.    Yes.  He actually posted an article, I believe it was

10    around April 2018, titled "Saints and Sinners," in which he

11    discusses incels.

12    Q.    And did he mention that there is a real world thing to

13    violence?

14    A.    Yes.  He names a handful of individuals who have all

15    committed heinous acts and who are self-proclaimed incels.

16    Q.    Back to this post, I'd bet one of my incel listeners would

17    love to give her another baby, what does "listeners" refer to?

18    A.    So, again, referring to his followers, people who

19    subscribe to his channels, listen to his shows.

20    Q.    And what is Mr. Cantwell's last statement on this page?

21    A.    You think the FBI would take issue with an LSD user owning

22    guns around kids?

23    Q.    Let's go to page 5 of Government's Exhibit 100.  And,

24    again, I will -- I've marked five messages, four messages and

25    one image.  Were those messages and image sent by Mr. Cantwell?

```
 1    A.   Yes.

 2    Q.   And we've seen that image before.  What is that?

 3    A.   Again, that's Mr. Lambert.

 4    Q.   And what does Mr. Cantwell say after he sends the image of

 5    Mr. Lambert?

 6    A.   Give me Vic.

 7    Q.   And what are the remainder of Mr. Cantwell's messages on

 8    this page?

 9    A.   LOL.  Okay.  I guess you're not going to give me what I

10    want.  Fine.  Good luck.

11    Q.   Let's move on to page 6 of Government's Exhibit 100.  Are

12    all but one of these messages sent by Mr. Cantwell?

13    A.   Yes.

14    Q.   The only message sent by Mr. Lambert is, I don't even have

15    his dox?

16    A.   Correct.

17    Q.   So, let's go through Mr. Cantwell's statements on this

18    page of Government's Exhibit 100.  What's Mr. Cantwell's first

19    message?

20    A.   Guess you're fucked then.

21    Q.   Does Mr. Lambert respond directly to that message?

22    A.   No.

23    Q.   How long between after writing that does Mr. Cantwell send

24    his next message?

25    A.   A little over half an hour.
```

**J.A. 242**

1    Q.   And what's that next message?

2    A.   All right.  Since you're obviously not understanding the

3    severity of this, I'll do you a favor.

4    Q.   What does Mr. Cantwell write next?

5    A.   On Tuesday I'm going to send every episode of BowlCast

6    along with your identifying information to whatever the local

7    equivalent of CPS is in your jurisdiction.

8    Q.   Now, did you learn whether Mr. Cantwell had, in fact,

9    called Child Protective Services?

10   A.   He did.

11   Q.   And this message says, I'm going to send every episode of

12   the BowlCast...  Did you determine whether or not Mr. Cantwell

13   did have copies of the BowlCast?

14   A.   He did.

15        MS. KRASINSKI:  I'd like to show the witness only what

16   has been marked for identification purposes as Government's

17   Exhibit 400.

18   Q.   What is this?

19   A.   So, this is a screenshot I took from one of our digital

20   analysis software programs that lists the file names of the

21   eight BowlCast episodes as well as created, accessed, modified

22   date, times for them.

23   Q.   And it's a screenshot you took from where?

24   A.   From our digital review network.

25   Q.   And what were you reviewing?

**J.A. 243**

1    A.    Mr. Cantwell's digital devices.

2    Q.    So, this is a screenshot from the content of one of

3    Mr. Cantwell's electronic devices?

4    A.    Correct.

5    Q.    And does it show a complete set of the BowlCast as you

6    knew it to have existed at that point in time?

7    A.    Yes.

8         MS. KRASINSKI:  Your Honor, I move to admit

9    Government's Exhibit 400.

10        THE COURT:  Any objection?

11        MR. LEVIN:  No objection.

12        THE COURT:  Without objection, it will be admitted and

13   can be displayed.

14        MS. KRASINSKI:  Thank you, your Honor.

15   (Government's Exhibit No. 400 received into evidence)

16   Q.    Now, if we look at the created date for most of these,

17   Episodes 2 through 6, what is the created date of BowlCast

18   Episodes 2 through 6?

19   A.    On June 17th, 2019.

20   Q.    And did that date have any relationship to this

21   investigation?

22   A.    Yes.  That's the same date that Mr. Cantwell called CPS in

23   Missouri.

24   Q.    Now, only one of these episodes, BowlCast Episode 1, has

25   any type of date associated with it that predates June 17th,

```
 1    2019.  What's the modified date of BowlCast 1?

 2    A.    April 5th, 2018.

 3    Q.    Did you find any evidence on any of Mr. Cantwell's devices

 4    that he had any of these BowlCast episodes other than BowlCast

 5    Episode 1 before June 17th, 2019?

 6    A.    No.

 7    Q.    And BowlCast Episode 1, is that the episode that

 8    Mr. Cantwell, himself, contributed to?

 9    A.    Yes, it was.

10    Q.    And other than the statements he made to Mr. Lambert in

11    the private message about calling CPS and the CPS call itself,

12    Mr. Cantwell made additional public statements about calling

13    Child Protective Services.  Is that fair?

14    A.    Yes.

15    Q.    Let's go back to Government's Exhibit 102, and let's go to

16    the second page of that exhibit.  Agent Tongbua, can you read

17    Mr. Cantwell's statement right after he posted the picture of

18    Mr. Lambert.

19    A.    That's Cheddar Mane a/k/a Cheddy Blac, and tomorrow

20    morning I'm calling CPS to give them every episode of BowlCast

21    and inform them that this acid-dropping fake Nazi is

22    endangering those children with his behavior.

23    Q.    Now, let's look at the third page of Government's Exhibit

24    102, and let's call out Mr. Cantwell's next statements.  Agent

25    Tongbua, can you read that for us, please.
```

1    A.    I think when CPS hears that fucking podcast he hosts,

2    they'll pay his fucking criminal ass a visit.  He's had ample

3    warning, so I'm sure he'll get rid of the drugs before then and

4    come up with suitable lies.

5    Q.    And if we could call out Mr. Cantwell's final statement,

6    can you please read that for us, Agent Tongbua.

7    A.    I hope every CPS worker in Missouri is a Jew or a nigger,

8    and I hope they break every rule and destroy this scumbag's

9    life.

10    Q.    Now, FBI obtained a record of the call that Mr. Cantwell

11    did make to the Missouri Child and Protective Services,

12    correct?

13    A.    Correct.

14    Q.    During the course of the investigation did you find any

15    other copies of that recorded call?

16    A.    Yes.

17    Q.    Where?

18    A.    I also found a copy on one of his devices.

19    Q.    So, Mr. Cantwell recorded a copy of that conversation?

20    A.    Correct.

21    Q.    Let's go back to page 6 of Government's Exhibit 100.  So,

22    we've just talked a bit about the message that Mr. Cantwell

23    sent at 9:18, the first message he sent at 9:18 p.m.  Agent

24    Tongbua, can you take us through the rest of those messages,

25    please.

**J.A. 246**

 1    A.   By Tuesday you should be able to talk to your wife and

 2    kids and get them to all have their stories straight, get

 3    anything incriminating out of the house.  But I'm pretty sure

 4    once that visit comes, you'll understand that this is serious.

 5    If that doesn't work, I'll escalate until I get what I want.

 6    Tell Vic that if he gives himself up, he can save your family.

 7    He won't do it, but at least then you'll know certain that you

 8    chose the wrong side.

 9    Q.   Let's look at the next page of the messages between

10    Mr. Cantwell and Mr. Lambert.  I've placed an X next to four

11    messages that all appear in green boxes.  Are those Mr.

12    Cantwell's messages?

13    A.   Yes.

14    Q.   Agent Tongbua, can you take us through those messages,

15    please.

16    A.   Okay, you got it.  Tomorrow then, no sense in waiting

17    until Tuesday.  CPS will visit you soon, I'm not talking about

18    listeners.  Good luck.

19    Q.   And let's look at the final page of this exchange.  I'm

20    attempting to clear my earlier -- there we go.  Are there two

21    messages sent by Mr. Cantwell on this page?

22    A.   Yes.

23    Q.   Both appear in green boxes?

24    A.   Yes.

25    Q.   And what's Mr. Cantwell's first message on this page?

**J.A. 247**

1    A.    Dumb niggers like you never are, until it's too late.

2    Have a goodnight.

3    Q.    And after that Mr. Lambert responds with an offensive

4    image?

5    A.    Yes.

6    Q.    Now, let's talk briefly about where Mr. Cantwell was when

7    he sent these messages.  Was there a pole camera installed

8    outside of Mr. Cantwell's apartment?

9    A.    There was.

10    Q.    And, again, where was Mr. Cantwell's apartment?

11    A.    In Keene, New Hampshire.

12    Q.    What is a pole camera?

13    A.    It's pretty much what it sounds like.  It's a stationary

14    camera placed in an area that's generally to take advantage of

15    a public vantage point, so it's not aimed at anything private.

16    It's not aimed to look into a person's residence, for example.

17    It basically would have the same vantage point as an individual

18    citizen or a law enforcement officer either walking down the

19    street or standing on the sidewalk would have.

20    Q.    And was it in operation between June 15th and June 17th of

21    2019?

22    A.    Yes, it was.

23    Q.    And why was there a pole camera there?

24    A.    Because there was already an ongoing investigation

25    unrelated to this matter involving Mr. Cantwell.

**J.A. 248**

```
1    Q.   So, in preparation for your testimony today did you review

2    the data that the pole camera captured between June 15th and

3    June 17th of 2019?

4    A.   I did.

5    Q.   And did you create screenshots from that footage?

6    A.   I did.

7    Q.   Showing the witness only what has been marked for

8    identification purposes as Government's Exhibit 600, Agent

9    Tongbua, do you recognize that?

10   A.   I do.

11   Q.   What is it?

12   A.   That's Mr. Cantwell's known vehicle.  It's a black 2013

13   Ford Taurus.

14   Q.   Is this a screenshot you took from the pole camera footage

15   from outside of his apartment?

16   A.   Yes.

17   Q.   And is this from around the time of this exchange?

18   A.   Yes.  It's dated June 14th.

19        MS. KRASINSKI:  Your Honor, I move to admit

20   Government's Exhibit 600.

21        MR. LEVIN:  No objection.

22        THE COURT:  It will be admitted, and it may be

23   displayed.

24        (Government's Exhibit No. 600 received into evidence)

25   Q.   Agent Tongbua, can you take a minute to orient us here,
```

**J.A. 249**

1    first.  What do we see?

2    A.    So, the bottom of the screen you have, again,

3    Mr. Cantwell's known vehicle.  This would be the driveway to

4    the residence.  Generally speaking, that's probably eastbound,

5    but the driveway goes up.  There's a parking area, which you

6    can sort of see behind the trees, and the actual residential

7    building would be on the side where the trees are just out of

8    view.

9    Q.    So, we can't see the actual apartment?

10   A.    Correct.

11   Q.    And the area that I'm circling right here, is that what

12   you were mentioning as the parking area?

13   A.    Yes.

14   Q.    Now, what was the date and time of this image?

15   A.    It's June 14th, 2019, approximately 1:42 p.m.

16   Q.    And you said that this is Mr. Cantwell's known vehicle.

17   What vehicle is it?

18   A.    Again, it's a black Ford Taurus.  It's the vehicle that's

19   registered to him with the New Hampshire Department of Motor

20   Vehicles.  It's the only vehicle we've ever seen him drive,

21   seen it frequently at the residence.

22   Q.    Have you ever seen anyone else drive that vehicle?

23   A.    No.

24   Q.    Let's turn -- actually, if you could look at -- I'll show

25   the witness only what's been marked as Government's Exhibit

**J.A. 250**

1    601, and then Government's Exhibit 603, Government's Exhibit

2    605, and Government's Exhibit 608.

3         Agent Tongbua, are all of those images that you just

4    looked at, Government's Exhibit 601, 603, 605 and 608,

5    screenshots of the pole camera footage that you took?

6    A.   Yes.

7    Q.   And are all of those from the pole camera that was outside

8    of Mr. Cantwell's residence --

9    A.   Yes.

10   Q.   -- within this June 15th - June 17th, 2019 time frame?

11   A.   Yes.

12        MS. KRASINSKI:  Your Honor, I move to admit

13   Government's exhibits 601, 603, 605 and 608.

14        MR. LEVIN:  No objection.

15        THE COURT:  They will be admitted and may be

16   displayed.

17   (Government's Exhibit Nos. 601, 603, 605 and 608 received into

18   evidence)

19   Q.   So, we'll just -- we'll work with -- we're looking at 601.

20   What's the date and time of this?

21   A.   June 15th, 2019, just after noon.

22   Q.   And what do you see?

23   A.   You can make out the back rear right tire of Mr.

24   Cantwell's vehicle, and that's in his usual parking spot, the

25   very first spot.

**J.A. 251**

1    Q.    So, let's turn quickly to Government's Exhibit 603, and

2    looking at Government's Exhibit 603 what do you see here?

3    A.    Again, similar picture, same vehicle, but this is on the

4    evening of June 16th, 2019, which was that Sunday, Father's

5    Day, and this was approximately 5:19 p.m.

6    Q.    And Government's Exhibit 605?

7    A.    Again, similar, except for this one the vehicle is

8    arriving, and this is on Monday, June 17th, 2019 at

9    approximately or just after 5:00 a.m.

10   Q.    And, finally, Government's Exhibit 608.

11   A.    Same again.  Vehicle departing on Monday, June 17th, 2019

12   approximately 1:17 p.m.

13   Q.    So, is it fair to say between June 14th, 2019 and June

14   17th, 2019 the pole camera captured Mr. Cantwell's vehicle

15   coming and going from his residence in Keene, New Hampshire?

16   A.    Yes.

17   Q.    All right.  Let's switch gears.  In September of 2019 did

18   you interview Mr. Cantwell?

19   A.    Yes, I did.

20   Q.    And where did that take place?

21   A.    At the Keene, New Hampshire Police Department.

22   Q.    Who was there?

23   A.    Myself, Task Force Officer Kevin LeBlanc and Sergeant Joel

24   Chidester of Keene PD.

25   Q.    And how was this interview arranged?

**J.A. 252**

1    A.    In coordination with Mr. Cantwell, both via email and both

2    through Sergeant Chidester, who also had a dialogue with Mr.

3    Cantwell, that was the location that he was most comfortable

4    with.  He didn't want to come to our office.  And we worked

5    around his schedule.  At that time he was traveling back and

6    forth frequently between New Hampshire and Maryland, and that

7    was the date we worked out with him.

8    Q.    Was the interview recorded?

9    A.    No, it was not.

10   Q.    Why not?

11   A.    So, both sides expressed interest in recording it.  We had

12   a brief conversation beforehand.  The room we were in had

13   recording capabilities.  Mr. Cantwell requested if he could get

14   a copy of it that day.  We told him, because it was an ongoing

15   investigation, it might be a little bit of time before he could

16   get a copy.  He wasn't really comfortable with that.  He

17   requested to record with his own equipment.  We weren't

18   comfortable with that.  So, the mutual agreement was that we

19   would not record the interview.

20   Q.    Now, when you met with Mr. Cantwell in September of 2019

21   did you provide him sort of any guidelines before you spoke?

22   A.    Again, it was a brief conversation, but we reiterated that

23   he was there voluntarily and we were there to take his

24   complaint and receive information from him, he was not being

25   held against his will, he was not under arrest, therefore, he

**J.A. 253**

1    was not read his rights, but he was free to talk as much or as

2    little as he wanted, and he could terminate the conversation

3    any time he wanted and not talk about anything he didn't want

4    to talk about.

5    Q.   Now, during this interview did Mr. Cantwell talk about

6    Bowl Patrol?

7    A.   He did.

8    Q.   What did he say about their relationship?

9    A.   Similar to what I've already explained.  They had a, I

10   wouldn't call it "partnership," but they were associates at one

11   point before it went bad, and then now they had an ongoing

12   dispute.

13   Q.   Did he make any statements about Vic Mackey?

14   A.   He did.

15   Q.   What did Mr. Cantwell say about Vic Mackey?

16   A.   At that time he did not know Vic Mackey's true identity.

17   He believed him to be the ringleader of Bowl Patrol.  He

18   thought he was the main orchestrater, basically, of a

19   harassment campaign against him.  He said at one point he had

20   given Vic admin. credentials to his website.  He'd never

21   received any direct threats from Vic, even though they didn't

22   get along.  They had no ongoing communications, and Mr.

23   Cantwell had not retained copies of any of their previous

24   communications.

25   Q.   And at this point did Mr. Cantwell talk about Cheddar Mane

**J.A. 254**

1    or Cheddy Blac?

2    A.    He did.

3    Q.    And what did Mr. Cantwell say about Cheddar Mane or Cheddy

4    Blac?

5    A.    So, again, at that time he did not know his true identity.

6    He admitted to us that previously he had asked Cheddar for

7    Vic's info and threatened to dox him and call CPS if he didn't

8    provide it.  He expressed that he later learned from others

9    that that was extortion.  He relayed to us that the photos he

10   used in that exchange were actually provided by Katelen Fry,

11   who we previously discussed.  And, similarly, he said he had

12   not, you know, received any direct threats from Cheddar, did

13   not have any ongoing communications with Cheddar, and he denied

14   having records of any of their previous communications.

15   Q.    How long did that interview take?

16   A.    Approximately three hours.

17   Q.    In how much of that interview did Mr. Cantwell discuss

18   Cheddar Mane or Cheddy Blac?

19   A.    It was pretty brief, probably five or ten minutes at the

20   most.  We talked about a wide variety of individuals during

21   that time.

22   Q.    Now, you've mentioned that Mr. Cantwell said he did not

23   retain any records of their communications.

24   A.    Correct.

25   Q.    Let's take a look at some of what you found on Mr.

**J.A. 255**

1   Cantwell's phone.

2        MS. KRASINSKI:  Can we please show the witness what

3   has been identified as Government's Exhibit 200, and we'll take

4   a minute and scroll through that so Agent Tongbua has a chance

5   to look at it.

6   Q.   Do you recognize Government's Exhibit 200?

7   A.   I do.

8   Q.   What is it?

9   A.   It's essentially like a spreadsheet.  It's basically an

10  excerpt from a report generated from our forensic analysis

11  software, and in the report it's showing digital images, so

12  files obtained from Mr. Cantwell's cell phone.

13  Q.   And how was this report generated?

14  A.   Through the forensic analysis software.  You basically can

15  go through and flag items of interest or evidentiary items, and

16  then you go back and generate a report and export those items.

17  Q.   And so, the data that's in this chart, the creation date,

18  time, the file name, where does that all come from?

19  A.   From the phone, from the device.

20        MS. KRASINSKI:  Your Honor, I move to admit

21  Government's Exhibit 200.

22        THE COURT:  Any objection?

23        MR. LEVIN:  Without objection, your Honor.

24        THE COURT:  No objection, it will be admitted.

25      (Government's Exhibit No. 200 received into evidence)

**J.A. 256**

1          MS. KRASINSKI:  Permission to publish, your Honor?

2          THE COURT:  Yes.

3    Q.   So, Agent Tongbua, let's go through some of these, and

4    first let's start with the headings.  The first one is "Created

5    date/time."  What is that?

6    A.   That's the way that the phone time stamped when that

7    particular file was created.

8    Q.   And the image, is it a copy of the image itself?

9    A.   Yes.

10   Q.   "File name."  What's that?

11   A.   Again, it's whatever, however the device was -- or the

12   file was labeled inside the device.  Excuse me.

13   Q.   And external -- "_external files."  What does that mean?

14   A.   It's a similar reference to where the item was stored

15   within the device.

16   Q.   And sort of generally, is it fair to say that the images

17   that have been marked for identification as Government's

18   Exhibit 201 through 226 are sort of the clear, more clear

19   versions of the image as it is in this report?

20   A.   Yes.

21   Q.   So, let's go through this first image.  What's the date,

22   the creation date and time?

23   A.   Are you looking at the image?  Okay, the image.  It's June

24   16th, 2019, approximately 8:27 p.m.

25   Q.   Now, this first image is text, right?  What is that text?

1    A.    So, the very first one is actually Mr. Lambert's address.

2    Q.    And what type of file was that?

3    A.    They're all JPEGs.

4    Q.    What generally is a JPEG?

5    A.    It's a digital image, a photo.

6    Q.    And the next image?

7    A.    That's Mr. Lambert.

8    Q.    And what's the creation date and time of that?

9    A.    It's the same, June 16th at 8:27 p.m.

10   Q.    And what's the third image?

11   A.    That is basically a screenshot of like a map plotting that

12   address at the top, the Lambert address.

13   Q.    Is that something that Mr. Cantwell had sent to Mr.

14   Lambert?

15   A.    No.

16   Q.    But it does show a way to get to Mr. Lambert's address?

17   A.    Yes.  That's an accurate representation.

18   Q.    Let's go to the next page of this.  And are these the two

19   images of Mrs. Lambert that Mr. Cantwell published -- excuse

20   me -- publicly posted on the Radical Agenda Telegram group?

21   A.    Yes.

22   Q.    And the creation date and time of these images on

23   Mr. Cantwell's phone?

24   A.    So, again, June 16th, 2019, 8:27 p.m.

25   Q.    And let's go to the next page.  These identical images

**J.A. 258**

1    that we've seen before are again created in Mr. Cantwell's

2    phone?

3    A.    Yes.   They appear to be redundant images.

4    Q.    So, multiple copies of the same image?

5    A.    Yes, it appears so.

6    Q.    And the next page, again, more copies of the same images?

7    A.    Yes.

8    Q.    With approximately the same date and time, June 16th,

9    2019?

10    A.    Yes, within a couple of minutes.

11    Q.    And the next page.   Again, more copies?

12    A.    Yes.

13    Q.    With a similar creation date and time?

14    A.    Yes.

15    Q.    Now, if we go to the next page, what are the images we see

16    here?

17    A.    So, these images are labeled as Screenshots, and they are

18    similar to the very first set that we saw depicting the direct

19    message Telegram exchange between Mr. Lambert and Mr. Cantwell.

20    Q.    What is a "screenshot"?

21    A.    It's capturing exactly what is on the screen at a given

22    point in time.

23    Q.    So, it's the user capturing what is on the user's screen?

24    A.    Yes.

25    Q.    And so, the first two images that we see on this page, on

1    page 6 of Government's Exhibit 200, are those the first two

2    portions of the messages between Mr. Cantwell and Mr. Lambert?

3    A.   Yes, I believe so.  The print's pretty small, but it looks

4    right.

5    Q.   What's the creation date and time of those?

6    A.   June 16th of 2019, 9:42 p.m.

7    Q.   And when did the exchange between Mr. Cantwell and

8    Mr. Lambert end?

9    A.   It concluded almost exactly that same time, on the same

10   date.

11   Q.   So, almost immediately after that conversation ended

12   screenshots of the conversation from Mr. Cantwell's side were

13   taken from Mr. Cantwell's phone?

14   A.   It appears so.

15   Q.   Let's go to page 7 of Government's Exhibit 200.  Are those

16   more screenshots of the same conversation?

17   A.   Yes.

18   Q.   Again, with the same creation date and time?

19   A.   Very close, yes.

20   Q.   Immediately after the conversation ended?

21   A.   Yes.

22   Q.   And page 8 of Government's Exhibit 200?

23   A.   More of the same, yes.

24   Q.   So, more screenshots of the conversation between Mr.

25   Cantwell and Mr. Lambert?

```
 1   A.   Correct.
 2   Q.   And Government's Exhibit page 9 -- page 9 of Government's
 3   Exhibit 200?
 4   A.   More of the same, yes.
 5   Q.   More screenshots?
 6   A.   At the exact same time.
 7   Q.   More screenshots from Mr. Cantwell's phone of his
 8   conversation with Mr. Lambert?
 9   A.   Correct.
10   Q.   Let's go to Government's -- excuse me -- page 10 of
11   Government's Exhibit 200.  What are we looking at here?
12   A.   So, this would be, as we mentioned before, sort of the
13   mirror image.  These are identical to the screenshots that were
14   actually posted online by Mr. Lambert.
15   Q.   So, this is the conversation from Mr. Lambert's side, from
16   Mr. Lambert's phone?
17   A.   Correct, with little stickers added over the faces of his
18   family.
19   Q.   We'll go through this, and then we'll look at those a bit
20   more clearly.  What's the creation date and time of those?
21   A.   This would be on Monday, June 17th, 2019, at approximately
22   1:28 a.m.
23   Q.   And so, if we go to page 11 of Government's Exhibit 200,
24   what are those two images?
25   A.   Additional screenshots in the same series.
```

1    Q.    The conversation from Mr. Lambert's phone?

2    A.    Correct.

3    Q.    And, again, created on --

4    A.    As they were posted publicly online.

5    Q.    And, again, created on Mr. Cantwell's phone on June 17th,

6    2019?

7    A.    Correct.

8    Q.    And if we look at the next page of Government's Exhibit

9    200, what are those first two images?

10    A.    A continuation of that same conversation.

11    Q.    And I want to briefly go through the last few pages of

12    this chart, this report generated from -- the cell phone

13    extraction from Mr. Cantwell's phone.  Are there more images of

14    the exchange of these messages as it would have appeared on

15    Mr. Cantwell's phone?

16    A.    Yes, there were more taken at random dates and times, but

17    they were kind of individualized screenshots versus like the

18    whole set taken at once.

19    Q.    Are these a different file types than the screenshots?

20    A.    No.  They're still JPEGs.

21    Q.    Are they in a different file?

22    A.    They're labeled different.  They're not actually called

23    "screenshots," so it's more like how they would appear if they

24    were attachments to Telegram messages.

25    Q.    And are these duplicates, essentially copies?

**J.A. 262**

1    A.    Yes.

2    Q.    So, Mr. Cantwell actually had multiple copies of this

3    conversation?

4    A.    Yes.

5         THE COURT:  Ms. Krasinski, I'm going to need to be

6    taking a break sometime in the next five minutes or so, so if

7    you want to go on you can, or we can take a break.  It's up to

8    you.

9         MS. KRASINSKI:  Now would be a good time, your Honor.

10         THE COURT:  All right.  So, Members of the Jury, we'll

11   take a break right now.  I've got to give the court reporter a

12   little bit of a rest, and then I've got to listen to something

13   before I bring you back in, so it might be a little longer than

14   our normal break.  I'd ask my case manager, it's such a

15   beautiful day, if any of you want to go outside and take your

16   mask off, they can arrange for that to happen.  I'll bring you

17   back here as soon as I can after giving the court reporter a

18   bit of a rest, and then I have to listen to the document they

19   want me to listen to.  So, we'll take a break right now.

20         THE CLERK:  All rise.

21             (The jury exited the courtroom)

22         THE COURT:  Just be seated for a second.  So, my plan

23   is to take a ten-minute break till 5 after 3:00, come back, and

24   I'll listen -- first I want to listen to the excerpts that you

25   propose to introduce as an exhibit; then I want to hear the

1   full audio exhibit; then I'll hear the defense argument as to

2   why the rule of completeness requires that it all be played at

3   one time and then your response.  Okay?  All right.  We'll

4   break for ten minutes.

5           THE CLERK:  All rise.

6           (Recess taken from 2:54 p.m. to 3:07 p.m.)

7           THE CLERK:  All rise for the Honorable Court.

8           THE COURT:  Before I listen to the exhibits, I

9   received a motion to reconsider from Mr. Freeman, who is the

10  person from the public who wants to attend.  I considered the

11  proposal presented by the government, reviewed it with the

12  staff and with my colleagues, and they were willing to allow

13  Mr. Freeman to come into the building with a mask on and wear a

14  mask in the public areas.  He could then be escorted to a

15  private room, where he could watch a live feed without his mask

16  on, but he would have to agree to wear the mask when he's in

17  the public areas.  He is either not able or not willing to

18  comply with that request, and he's asked me to reconsider my

19  decision.

20          I thought about the matter carefully.  I don't see any

21  basis on which to reconsider the decision, and I am going to

22  deny his request.  He's asked me to provide a written ruling,

23  but I don't have time to write a written ruling, I'm in the

24  middle of a trial, and I've asked the Chief Deputy Clerk to

25  communicate the ruling to him and explain the ruling, to

**J.A. 264**

1    explain that I've made a ruling and analyzed the issue on the

2    record in court so there is a record of my decision should he

3    try to take some action to challenge it.

4          The next step for him would be, if he wanted to, would

5    be to file a motion for writ of mandamus with the Court of

6    Appeals.  He's welcome to do that, but I do not have the time

7    to sit down and write a written order in the middle of a trial,

8    so I can't accommodate that request.  But I am denying his

9    original motion and his motion to reconsider, and he has

10   rejected the option that I have given him, which is the only

11   other alternative that I feel is appropriate and available to

12   me under the circumstances.  So, that's how I address that

13   issue.

14         Now I'd like the government to play the short excerpts

15   that it wishes to play of the -- and just to give me the

16   background again on this, this is a telephone call that was

17   recorded between the defendant and some romantic relationship?

18         MS. KRASINSKI:  So, Mr. Cantwell recorded a

19   conversation of himself with I believe at the time his

20   ex-girlfriend.  Her name is Katelen Fry.

21         THE COURT:  Is this the person referred to as "Peach"?

22         MS. KRASINSKI:  Yes, your Honor.

23         THE COURT:  Okay.

24         MS. KRASINSKI:  And it is, for the Court's knowledge,

25   how Mr. Cantwell got this information that he used to then dox

**J.A. 265**

1      Mr. Lambert.  He got the address on some of the photographs

2      from Ms. Fry.

3              THE COURT:  When was the phone call made?

4              MS. KRASINSKI:  It was December of 2019, your Honor,

5      and Mr. Cantwell recorded this conversation of himself and then

6      emailed that conversation to the FBI.

7              THE COURT:  Okay.  So, he recorded the full

8      conversation and emailed the full conversation to the FBI?

9              MS. KRASINSKI:  Correct, your Honor.  And, in fact, he

10     sent two versions to the FBI, one sort of as it was recorded,

11     and one he tried to enhance the audio so that the sound was

12     better.

13             THE COURT:  Which version are you playing?

14             MS. KRASINSKI:  I think the enhanced.

15             THE COURT:  Excerpts from the enhanced version?

16             MS. KRASINSKI:  I believe so, your Honor.

17             THE COURT:  So, this is what exhibit number?

18             MS. KRASINSKI:  So, this is Exhibits 105, 106, 107,

19     108 and 109.

20             THE COURT:  So, each excerpt is listed as a full

21     exhibit?

22             MS. KRASINSKI:  Correct, your Honor.

23             THE COURT:  All right.  So, you're going to play each

24     of those exhibits in sequence?

25             MS. KRASINSKI:  Correct, your Honor.

**J.A. 266**

```
 1              THE COURT:  All right.  Go ahead.

 2              MR. DAVIS:  Your Honor, would you like the

 3    transcripts?

 4              THE COURT:  Oh, you have transcripts?

 5              MS. KRASINSKI:  They're rolling on the call.  We don't

 6    have transcripts of the full call, but we have transcripts of

 7    the --

 8              THE COURT:  All right.  I'll watch the rolling

 9    transcripts as they come up.

10                   (Audio recording played)

11              THE COURT:  Play the next exhibit.

12                   (Audio recording played)

13              THE COURT:  And the next one.

14                   (Audio recording played)

15              THE COURT:  And is there another?  Okay.

16                   (Audio recording played)

17              THE COURT:  All right.  Now can you play the whole

18    call?

19                   (Audio recording played)

20              THE COURT:  All right.  So, let me start by saying I

21    could only make out one out of every three or four words that

22    Peach was saying, so I have no idea what she was saying,

23    because I can't tell based on what's been played for me as the

24    full conversation, so I can't really comment on anything that

25    she has said.  Things that he has said, there may be one or two
```

**J.A. 267**

1   lines that, in fairness, ought to be included in the excerpt,

2   but I need a full transcript.  So, the defense has to produce a

3   full transcript and show me line by line.

4        I do not agree to the extent the defense says the

5   entire conversation needs to be played.  No, it does not.  It

6   simply is Mr. Cantwell providing his justification for what

7   he's doing.  Some of it that the government hasn't played is

8   arguably more damaging to Mr. Cantwell than what the government

9   has played, but for reasons that aren't apparent to me the

10  government hasn't played those parts, and Mr. Cantwell wants to

11  play them.

12       But, again, I think the parties have to bear in mind

13  that it is not a defense to these charges to say, I was

14  provoked.  There's no provocation defense here.  So, to the

15  extent the parties are fighting about, Oh, I don't want the

16  jury to hear that Mr. Cantwell was provoked, or, I don't want

17  to the jury to hear that Mr. Cantwell was provoked, it's not a

18  defense.  So, I don't know why you're trying to keep it out and

19  they're trying to put it in.  In fact, the jury has already

20  heard in the opening statements that Mr. Cantwell feels that he

21  was provoked and he may well have been prompted to do these

22  things in part by communications.

23       So, my reaction is I cannot rule on the completeness

24  objection without seeing a transcript, because the ruling that

25  I am inclined to make based on one quick listen is that there

**J.A. 268**

1    may be two or three lines in there that you didn't include that

2    probably should be included.  The rest is just him providing

3    his explanation as to why he went to the FBI, and that isn't

4    necessary for the rule of completeness at all.

5          So, I'm going to suggest -- I will give the defense

6    until tomorrow morning to present me with a full transcript of

7    the entire communication, at which point the defense shall be

8    prepared to argue with me line by line over what portions of

9    the call should also be played out of the rule of completeness,

10   and there may be a few sentences that I am willing to include,

11   but the vast majority of the rest of it is not necessary to be

12   played under the rule of completeness.  Whether it can come in

13   in the defense case for some other purpose I will reserve

14   judgment on, but as simply a Rule 106 objection, it's quite

15   clear to me that there's no reason to play the entire call to

16   satisfy Rule 106, but there are likely some portions of the

17   call that should be played.  All right?

18         So, tomorrow morning -- don't put the excerpts in now.

19   Tomorrow morning the parties will -- Mr. Levin can be here at

20   9:00.  Be here at 9:00, be prepared to argue that with me at

21   9:00 so I can get a ruling on it before the jury comes in.

22   Anybody have anything they want to say?

23         MS. KRASINSKI:  Only, your Honor, could I have Agent

24   Tongbua authenticate them?  We obviously will not play them.

25   We'll just say where they came from, generally that they are --

**J.A. 269**

1          THE COURT:  He's going to be gone tomorrow, is your

2     hope?

3          MS. KRASINSKI:  He'll be here, your Honor, but we hope

4     his testimony to be concluded.

5          THE COURT:  Okay.  Yeah, so we can do the

6     authentication parts of it, and you can have him refer to

7     exhibit number, not only to your exhibit numbers but also the

8     additional exhibit number that the defendant wants to play, and

9     just say, You've listened to 106 for identification.  What is

10    it?  That's the full conversation.  And Exhibits 1, 2, 3 and 4,

11    what are those?  Those are excerpts from the larger exhibit.

12    And did you listen to the entire thing, and those are what you

13    say?  And then he can go off today, and then tomorrow I'll rule

14    on which additional portions should be played, and the

15    additional portions should be played all at one time.

16         But the defense may have to be -- we may have to -- if

17    I'm not likely to rule on the entire conversation being

18    admissible under the rule of completeness, we're going to need

19    to have the capacity to identify certain lines that might have

20    to be played.  Do you see what I'm saying?  If I had a

21    transcript I could point the parties to them, but they're just

22    coming in and going by.  I can't identify it without a

23    transcript.  But you're going to have to be able to play for me

24    -- if I say that three lines from the defense exhibit are

25    necessary for context, you're going to have to be able to play

**J.A. 270**

1    those three lines.  That's what I'm saying.  All right?

2            Anything from the defense before we move on?

3            Mr. Davis, you want to say something?

4            MR. DAVIS:  It's possible that Ms. Sheff has already

5    typed a transcript of the full call.  She needs to go upstairs

6    to find out.

7            THE COURT:  Could you provide it to me tonight?  I

8    could read it overnight and hear you in the morning on it.

9    That would be good.

10            MR. DAVIS:  Have we provided it to the defendant?

11            MR. WOLPIN:  Not that I saw.

12            MS. SHEFF:  I'll go check.  I thought I did.

13            THE COURT:  She'll check and let us know, and if it

14    is, that will be helpful to me, but I also need a printed out

15    transcript of your excerpts so I can compare the two, because

16    what I basically will do is, I'll look at the excerpts you want

17    to play.  Then I'll go to the whole transcript, and I'll move

18    above and below it and highlight anything that I think needs to

19    come in under the rule of completeness.

20            MS. KRASINSKI:  Your Honor, do you mind if I put hand

21    sanitizer on my hands and remove the transcripts from my

22    binder?

23            THE COURT:  Do you have the actual clips in your

24    binder?

25            MS. KRASINSKI:  From the --

1          THE COURT:  Yeah, that's fine.  Hand them to the

2     clerk.  I'll read them tonight.

3          MR. DAVIS:  Last thing, Judge.  I just suggest if we

4     resolve what additional sentences, say, are added, with another

5     24 hours, and I'm sure we'll still be in trial, we could then

6     make new clips, new transcripts and bring them in and play them

7     all --

8          THE COURT:  That would be the cleanest way to do it,

9     if you are willing to delay the actual introduction until you

10    get it all put together in a nice little package.  I just want

11    to make sure that anything the defendants are entitled to have

12    in that package is there.  And then I have no objection to the

13    defendant being able to, if they have some other theory under

14    getting it in in their case or for something, they can try to

15    do that, but generally speaking a person's, a defendant's --

16    statements that the defendant records himself and wants to

17    introduce in his own case don't generally come in.  So, if it's

18    not admissible under the rule of completeness there may be some

19    other theory under which he can get it in, but I'm not ruling

20    on that.  I'm just saying the rule of completeness allows this

21    but not the rest.  All right?

22         Anything else?  I want to bring the jury back in and

23    get as much testimony in as I can today.

24         MS. KRASINSKI:  You asked us to remind you you wanted

25    to go back to Government's 303.  Would you like to do that now?

**J.A. 272**

1          THE COURT:  Yes.  I didn't understand the -- I don't

2     have it in front of me, but it references certain individuals.

3     I didn't know who they were and how that was tied to this case.

4     Can you put the exhibit -- you don't have your assistant here.

5          MS. KRASINSKI:  Again, your Honor, I can put a copy of

6     it somewhere.

7          THE COURT:  Yeah, hand it up to me.

8          MS. KRASINSKI:  303.  Excuse me.  So, it appears

9     that --

10         THE COURT:  Wait just a second.

11                         (Pause)

12         THE COURT:  Okay.  So, who are Vanderguard (ph) and

13    Heel (ph)?

14         MS. KRASINSKI:  My understanding is they are other

15    groups or online platforms that were associated with the Bowl

16    Patrol.

17         THE COURT:  All right.  And so, what you understand

18    this communication to be is not only that he intends to go

19    after the Bowl Guard but he intends to go after Vanguard (ph_

20    and Heel (ph) as well.  You want to get that in?

21         MS. KRASINSKI:  No.  I think the relevancy for this is

22    more motive of his desire to go after Bowl Patrol members that

23    he believed harmed him.  The only reference to Vanguard (ph)

24    and the other platform is because they were associated with the

25    Bowl Patrol.

**J.A. 273**

1        THE COURT:  You've got abundant evidence already in

2   the record that he's upset with the Bowl gang, Bowl Patrol, and

3   he hasn't denied it.  He's saying he was upset with the Bowl

4   Patrol, so this doesn't add anything to the discussion at all.

5   I think to the extent it's relevant at all for that purpose,

6   its cumulativeness substantially outweighs its probative value,

7   and so I'm going to sustain the relevance objection.  I'm going

8   to add to the relevance objection and say under Rule 403 the

9   cumulativeness of it outweighs any, substantially outweighs any

10  possible relevance.  So, I will sustain the defendant's

11  objection to this exhibit.

12       MS. KRASINSKI:  Yes, your Honor.  And because we don't

13  have Ms. Sheff back, the thing that I was going to do next with

14  Agent Tongbua was have him review a group exhibit and in

15  conjunction with discussing it with counsel have him review

16  them and admit them as a group.  Is it possible --

17       THE COURT:  I shouldn't have let her leave the room,

18  should I?

19       MS. KRASINSKI:  So, again, I do have hard copies

20  outside of the presence of the jury.  I'd be happy to, again,

21  sanitize my hands.

22       THE COURT:  These are admitted -- these are ID

23  exhibits or admitted exhibits?

24       MS. KRASINSKI:  They are ID exhibits.  I think what we

25  had discussed was having the agent go through them.  It's a

1  grouping of them, 201 through 226, with the agent.  We would

2  ask the agent to review them and authenticate them as a group.

3  So, I can ask him to do that with a hard copy here so that we

4  can get the jury back in and get going.

5       THE COURT:  Yeah, I guess so.  So, bring the jury back

6  in.  They aren't going to be shown to the jury at this point.

7       MS. KRASINSKI:  Correct.  And, with the Court's

8  permission, I can take them up to the witness now.

9       THE COURT:  Yes, hand them up now.

10      MS. KRASINSKI:  Thank you, your Honor.

11      THE COURT:  All right.  Now we can bring the jury in.

12      But at this point they're just going to do it for ID,

13  so I'm fine with it.

14      So, my case manager notes that, if you want, once they

15  are admitted, you can use the document camera and display the

16  hard copy exhibit to the jury using the document camera if your

17  paralegal isn't back by then.

18      MS. KRASINSKI:  Okay.  Thank you, your Honor.

19      THE CLERK:  All rise for the jury.

20          (The jury entered the courtroom)

21      THE CLERK:  Please be seated.  This hearing is back in

22  session.

23      THE COURT:  Please proceed.  Ms. Krasinski, I see your

24  paralegal is back, so you can use the camera if you want.

25  Q.   Agent Tongbua, you are looking at what has been marked for

**J.A. 275**

1    identification purposes only as Government's Exhibit 201 to

2    226.  Why don't you take a minute and flip through those and

3    let me know when you're done.

4    A.    (Witness complied).  Okay.

5    Q.    Are those the images that are included in Government's

6    Exhibit 200, the report generated from the defendant's cell

7    phone extraction of images from his phone?

8    A.    Yes.

9    Q.    And are those true and accurate copies of the images from

10   the defendant's cell phone?

11   A.    Yes.

12        MS. KRASINSKI:  Your Honor, I move to admit

13   Government's Exhibits 201 through 226.

14        THE COURT:  Any objection?

15        MR. LEVIN:  No objection, your Honor.

16        THE COURT:  They'll be admitted and can be displayed

17   using the computer evidence presentation system.

18   (Government's Exhibit Nos. 201 through 226 received into

19   evidence)

20        MS. KRASINSKI:  Thank you, your Honor.

21   Q.    We're only going to look at a few of them right now.

22   Let's start by looking at Government's Exhibit 218.  Agent

23   Tongbua, what is this?

24   A.    So, again, this is the other version of the Telegram

25   message exchange between Mr. Cantwell and Mr. Lambert.  This

**J.A. 276**

1    would be as Mr. Lambert viewed it, and this would be the copy

2    that was posted publicly, because it contains the stickers that

3    covers up private information.

4    Q.    Now, you say, Stickers that covers up private information.

5    Are you talking about here this square that says, I believe,

6    Sassy, sassiest boys?

7    A.    Yes.  Yeah, a sticker, a little picture, icon, whatever

8    you want to call it.

9    Q.    And essentially is that an attempt to redact personal

10    information?

11    A.    Correct.

12    Q.    And other than these sort of redactions, are the messages

13    themselves the same as from Cantwell's side of the exchange?

14    A.    Yes.

15    Q.    And so, if we look, for example, at Government's Exhibit

16    214, again, is this a portion of the exchange from Mr. Lambert

17    as it would have been on Mr. Lambert's phone?

18    A.    Yes.

19    Q.    And you see the images that cover up Mrs. Lambert's face?

20    A.    Yes.

21    Q.    And the children's faces?

22    A.    Yes.

23    Q.    Those would not have appeared in the original?

24    A.    Correct.

25    Q.    And so, did Mr. Cantwell have a complete set of the mirror

1    image, the conversation, the messages as they would have

2    appeared on Mr. Lambert's phone?

3    A.   Yes.

4    Q.   Now, I want to -- we're going to briefly discuss a

5    telephone -- a copy of a recorded call that you received.

6    During the course of this investigation did Mr. Cantwell email

7    you a recording?

8    A.   He did.

9    Q.   And generally, without telling us the contents of that

10   recording, who were the parties to it?

11   A.   It was Mr. Cantwell and Katelen Fry.

12   Q.   And who recorded the conversation?

13   A.   I believe Mr. Cantwell did.

14   Q.   So, Mr. Cantwell sent you a recording of a conversation

15   with him and Ms. Fry?

16   A.   Correct.

17   Q.   How did he send that to you?

18   A.   I believe it was via email.

19   Q.   And did you listen to the entire call between Mr. Cantwell

20   and Ms. Fry?

21   A.   Yes.

22   Q.   And have you also reviewed what has been marked for

23   identification as Government's Exhibit 105?

24   A.   Would you refresh my memory what that is?

25            MS. KRASINSKI:  Can we show the witness only what has

**J.A. 278**

1    been marked for identification as Exhibit 105A?

2            THE COURT:  Are you going to try to deal with the

3    excerpts from the audio call?  Is that what you're trying to

4    do?

5            MS. KRASINSKI:  Yes, your Honor.

6            THE COURT:  All right.  Maybe we can do this in a

7    shorthand way.  We simply want the witness to identify the fact

8    that he has listened to the entire call, he has listened to the

9    excerpts, and each of the excerpt exhibits is, in fact, a

10   portion of the telephone call which is -- what's the exhibit

11   that has the entire call on it?

12           MR. WOLPIN:  B16, your Honor.

13           THE COURT:  I'm sorry?

14           MR. WOLPIN:  B16, your Honor.

15           THE COURT:  B16?

16           MR. WOLPIN:  Correct.

17           THE COURT:  So, Exhibit B16 is the entire recorded

18   telephone call, and then we have a series of government

19   exhibits, which are what?

20           MS. KRASINSKI:  105, 106, 107, 108 and 109.

21           THE COURT:  Can we stipulate that those excerpts are,

22   in fact, excerpts of the larger, the full call that is the

23   defense exhibit?

24           MR. WOLPIN:  Yes, your Honor.

25           THE COURT:  So, the parties have stipulated to that.

**J.A. 279**

1    So, I'm trying to save everyone some time here, Members of the

2    Jury.  What has happened is there is a full recording of the

3    telephone call that has been marked as a defense exhibit, there

4    are excerpts of that phone call, a series of them, that are

5    government exhibits, and the parties have stipulated that the

6    excerpts, the government exhibits that are excerpts are, in

7    fact, excerpts of the full call.

8         So, if you can just establish and authenticate that

9    this witness is familiar with the full call, then we can move

10   on and deal with what we play, if at all, to the jury of that

11   call tomorrow after we've had a chance to finish our review.

12        MS. KRASINSKI:  Thank you, your Honor.

13   Q.   The call between Mr. Cantwell and Ms. Fry, do you

14   recognize any voices in that call?

15   A.   Yes.

16   Q.   Tell us about that.

17   A.   I recognize Mr. Cantwell's voice from hearing it many

18   times in his different shows and speaking with him in person,

19   and the recording was provided to us by him, and in his

20   admission he indicated --

21   Q.   I don't want to go into the contents of the call.

22   A.   No.  I was just going to say that the person he is

23   speaking with was Katelen Fry.

24   Q.   Okay.  And you may not know the exhibits numbers, but

25   you've reviewed all of the government's portions of that call?

**J.A. 280**

```
 1    A.    Correct.

 2    Q.    And, again, they just involve Mr. Cantwell and Ms. Fry?

 3    A.    Correct.

 4    Q.    And approximately when did you receive the email

 5    containing this recorded call from Mr. Cantwell?

 6    A.    This would have been in early December 2019.

 7    Q.    Thank you.  Now, the last thing I want to talk with you

 8    about is what's been marked for identification as Government's

 9    Exhibit 700.  Agent Tongbua, do you recognize that?

10    A.    I do.

11    Q.    What is it?

12    A.    So, this is basically a chronological timeline that I

13    created, which is a composite of information obtained from

14    Mr. Cantwell's digital devices with the addition of, obviously,

15    the last column just to document items that he provided to us.

16    Q.    And so, where does the information in this demonstrative

17    exhibit come from?

18    A.    The factual information, such as the date, time, the file

19    names, which is under an event artifact, or the sources would

20    be primarily digital evidence, but there is also sprinkled in a

21    few items such as surveillance notes, but those are dictated or

22    labeled as appropriate.

23    Q.    And you prepared this chart?

24    A.    Correct.

25          MS. KRASINSKI:  Your Honor, I move to admit
```

**J.A. 281**

1    Government's Exhibit 700.

2            THE COURT:  Is there objection?

3            MR. LEVIN:  Yes, your Honor.  I object under Rule

4    1006.  Under Rule 1006, a proponent may use a summary chart or

5    calculation to prove the content of voluminous writings,

6    recordings or photographs that cannot be conveniently examined

7    in court.  The items on this list are discrete enough that they

8    can be.  I don't think a chart is necessary.  So, we would

9    object pursuant to that rule.

10           THE COURT:  Are those items, in fact, in evidence at

11   this point?

12           MS. KRASINSKI:  Many of the items -- some of these

13   items are in evidence at this point, some are not, your Honor.

14           THE COURT:  All right.  I will reserve judgment on

15   this.  I will hear argument on it from the parties after we

16   finish with the evidence for the day.  To the extent it is

17   admitted into evidence, it could be allowed to be displayed to

18   the jury as a chalk, but if it is, in fact, a summary of

19   voluminous documents, I may admit it as a full exhibit, but I

20   need to know more about it, and I don't want to take the time

21   to do it now.

22   Q.   When you reviewed Mr. Cantwell's cell phone did you also

23   review call data?

24   A.   I did.

25   Q.   And did you note any calls that occurred around the time

1  of the message exchange between Mr. Cantwell and Mr. Lambert or

2  after?

3  A.   I noted calls around the time of the exchange.  I do not

4  recall calls between Mr. Lambert and Mr. Cantwell.

5  Q.   And did Mr. Cantwell tell you where he got the information

6  to dox Mr. Lambert?

7  A.   He indicated he got the photos and the address from

8  Katelen Fry.

9  Q.   Are there any calls between Mr. Cantwell and Ms. Fry?

10  A.   Yes.

11  Q.   Tell us about that.

12  A.   Specifically I know there was a call on the morning of

13  June 17th, early that morning, approximately 1:27, 1:28 a.m.

14  It's just before the creation times that you see for the set of

15  images as they were posted online publicly.

16  Q.   So, right around the time the images, the messages as they

17  would appear on Mr. Lambert's phone were created on Mr.

18  Cantwell's phone he has a call with his Ms. Fry?

19  A.   Correct.

20          MS. KRASINSKI:  The Court's indulgence for one moment.

21                  (Pause)

22          MS. KRASINSKI:  I have nothing further, your Honor.

23          THE COURT:  Thank you.  If we need to have further

24  direct testimony about the chart that's the subject of the past

25  objection, I can receive it later on.  With that, we'll allow

**J.A. 283**

1    cross-examination.

2              Mr. Levin.

3              MR. LEVIN:  Thank you, your Honor.

4              THE COURT:  Are you going to examine from the back?

5              MR. LEVIN:  I'm going to move to this podium right

6    next to me.

7              THE COURT:  Perfect.

8                        CROSS-EXAMINATION

9    BY MR. LEVIN:

10   Q.   Agent Tongbua -- is it Tongbua?

11   A.   Yes, that's correct.

12   Q.   The events described in the indictment, the alleged

13   threats and cyberstalking, those are alleged to have occurred

14   in June 2019; is that right?

15   A.   Yes.

16   Q.   So, this wasn't this past summer but the summer before; is

17   that right?

18   A.   Correct.

19   Q.   And at that time Chris Cantwell was already on your radar;

20   is that right?

21   A.   Yes.

22   Q.   You had been investigating him prior to that?

23   A.   Yes.

24   Q.   You had surveilled him; is that right?

25   A.   Yes.

1    Q.   In fact, even before you knew about the incidents that are

2    described in the indictment you were surveilling him?

3    A.   Yes.

4    Q.   Is that right?  You had set up pole cameras outside his

5    house; is that right?

6    A.   Yes.

7    Q.   You had subpoenaed various documents relating to him?

8    A.   Yes, we had.

9    Q.   And that investigation had gone back six, seven months

10   prior to June 2019?

11   A.   It went back further than that.  That's when I took over

12   as the lead case agent, yes.

13   Q.   That's when you took over the investigation?

14   A.   Correct.

15   Q.   So, that would have been towards the end of 2018?

16   A.   Correct.

17   Q.   In fact, Mr. Cantwell was observed on the days of the

18   alleged incidents, on June 15th, 16th and 17th, by your people;

19   is that right?

20   A.   Yes.

21   Q.   Actually surveilled with the pole cameras?

22   A.   Correct.

23   Q.   And prior to June of 2019 Bowl Patrol was also on the

24   FBI's radar; is that right?

25   A.   How do you mean?

**J.A. 285**

1  Q.   Well, individual members of the Bowl Patrol were known to

2  the FBI?

3  A.   Yes, that's fair to say.

4  Q.   And individual members of Bowl Patrol were persons of

5  interest to the FBI?

6  A.   Yes, that's fair.

7  Q.   And particularly as it relates to investigations of white

8  supremacists and domestic terrorists?

9  A.   Yes, that's fair.

10  Q.   Now, white racially motivated extremism, that's a subject

11  of interest, a current priority for the FBI; isn't that right?

12  A.   I believe so.

13  Q.   And something which the FBI Director has testified about

14  in Congress?

15  A.   He has.

16  Q.   And that's your area; is that right?

17  A.   Not specifically, not solely that.

18  Q.   You're not assigned to the Joint Terrorism Task Force?

19  A.   I am.

20  Q.   You are?  So, that's your area, is that not?

21  A.   It's one of them.

22  Q.   Yeah.  You indicated that with regard to the Bowl Patrol

23  that Vic Mackey was known as the leader of the Bowl Patrol; is

24  that right?

25  A.   Yes.

```
1    Q.   And Cheddar Mane was known as a member of the Bowl Patrol;
2    is that right?
3    A.   Yes.
4    Q.   Now, prior to June of 2019 you were aware that Mr.
5    Cantwell was communicating with local law enforcement about
6    harassment he received?
7              MS. KRASINSKI:  Objection.
8              THE COURT:  Basis?
9              MS. KRASINSKI:  Relevance and hearsay.
10             THE COURT:  Overruled at this point.  We'll go
11   question by question.
12   Q.   You had been in contact with the Keene Police Department;
13   is that right?
14   A.   Yes.
15   Q.   You were in contact with Sergeant Joel Chidester?
16   A.   Yes.
17   Q.   You knew that Mr. Cantwell had approached local law
18   enforcement about harassment he had received?
19   A.   Yes.
20   Q.   You understood that Mr. Cantwell had approached the Keene
21   Police Department about harassment by members of the Bowl
22   Patrol?
23   A.   Up to that point he spoke with Keene PD about a lot of
24   harassment.  I don't know that a lot of that information was
25   focused on Bowl Patrol, but I'm sure some of it was.
```

**J.A. 287**

1    Q.    Information communicated by Mr. Cantwell with Keene Police

2    Department about attacks on his website?

3    A.    Sure, yes.

4    Q.    About anonymous phone calls that he got that were clogging

5    up the lines to his shows?

6    A.    Yes.

7    Q.    And you indicated in your testimony that Mr. Cantwell had

8    also made a complaint to the FBI online about harassment by the

9    Bowl Patrol?

10    A.    Right, which I had not learned about at that time, not

11    prior to June.

12    Q.    Excuse me?

13    A.    I had not learned about that prior to June in 2019.

14    Q.    You didn't know about that?

15    A.    Correct.

16    Q.    That information had not come back to you?

17    A.    Correct.

18    Q.    But you subsequently learned that he had made a complaint

19    to the FBI about harassment by the Bowl Patrol in February of

20    2019?

21    A.    Yes.

22    Q.    Now, you indicated that during that period you were

23    investigating Mr. Cantwell?

24    A.    Correct.

25    Q.    And during the same period that you were investigating

**J.A. 288**

1    Mr. Cantwell he's making complaints to the FBI; is that right?

2    A.    He made a complaint that I'm aware of.

3    Q.    Right.  But that information never made it back to you?

4    A.    That's correct.

5    Q.    There's no system within the FBI, when a person that

6    you're investigating actually approaches the FBI for help, to

7    funnel that information back to the person who's investigating?

8    A.    It is possible.  Sometimes that does happen.  It did not

9    happen in this case.

10    Q.    It didn't happen in this case.  Now, you understood before

11    June of 2019, you knew that Mr. Cantwell had been in touch with

12    Keene PD?

13    A.    Correct.

14    Q.    And Keene PD was in touch with you about their contacts

15    with Mr. Cantwell?

16    A.    Correct.

17    Q.    And ultimately Officer Chidester referred Mr. Cantwell to

18    the FBI; is that right?

19    A.    Yes, when the matter exceeded his normal capacity.

20    Q.    When the matter exceeded his normal capacity.  So, when

21    Sergeant Chidester realized that Mr. Cantwell was complaining

22    about threats and harassment coming from outside the state, he

23    suggested to Mr. Cantwell that he not -- that he might want to

24    seek the help of the FBI?

25          MS. KRASINSKI:  Objection.  Hearsay.

**J.A. 289**

1          THE COURT:  Sustained.  There hasn't been a basis of

2     knowledge elicited.

3     Q.   When you indicated, When it exceeded his capacity, what

4     did you mean by exceeded his capacity?

5          THE COURT:  First demonstrate that the witness has

6     personal knowledge of that which he's speaking about.

7     Q.   Okay.  Did you have communications with Sergeant Chidester

8     about Mr. Cantwell?

9     A.   Yes.

10    Q.   Prior to June of 2019?

11    A.   Yes.

12    Q.   Did you understand from Sergeant Chidester that Chris

13    Cantwell was having issues with harassment and defacement of

14    his website?

15    A.   I recall exchanging emails with Joel, and I recall

16    receiving information about harassment.  I cannot definitively

17    say that the website defacement was relayed to us.  I know

18    that, again, it was a lot of different harassment, did involve

19    spam phone calls, some of which, though, could be attributed to

20    local folks around the Keene area.  And so, again, it wasn't

21    till around the summertime they began to talk about Bowl Patrol

22    and other things.

23    Q.   So, how is it that you understood that Sergeant Chidester

24    had reached his capacity?

25    A.   Because at that time he was talking about things that

**J.A. 290**

```
 1    might have involved an interstate nature, because at that time,

 2    around June, June, July is when he started to mention things

 3    like the Bowl Patrol.

 4    Q.   And that's when he referred Chris Cantwell to the FBI?

 5    A.   Correct.

 6    Q.   And encouraged Chris Cantwell to contact the FBI?

 7    A.   I wouldn't say "encourage."  He just provided -- depending

 8    on his seriousness and how far he was willing to pursue it,

 9    there's only so much the Keene Police Department could do for

10    him.

11    Q.   And ultimately Mr. Cantwell did contact the FBI?

12    A.   Actually, we contacted him.

13    Q.   You contacted him?

14    A.   Yes.

15    Q.   Called him on his phone?

16    A.   Yes.

17    Q.   And had a phone conversation with him?

18    A.   Yes.

19    Q.   And then there was an email exchange, was there not?

20    A.   Yes.

21    Q.   And then at some point there was an in-person interview?

22    A.   Yes.

23    Q.   And at that interview, that was in September of 2019, Mr.

24    Cantwell was accompanied -- that interview took place at the

25    Keene Police Department; is that right?
```

1    A.    Correct.

2    Q.    And Sergeant Chidester was at that interview as well?

3    A.    Yes, he was.

4    Q.    And are you aware of whether Mr. Cantwell asked him to be

5    present there?

6    A.    I believe so.  I believe that was the agreement.  Either

7    that or Sergeant Chidester offered to be there.  I don't really

8    remember exactly how it happened.

9    Q.    Now, in his complaint, his online complaint in February

10    2019, Mr. Cantwell named the Bowl Patrol member who went by the

11    name of Vic Mackey as someone he suspected of harassing him; is

12    that right?

13    A.    I missed the first part.  That was the IC3 complaint in

14    February?

15    Q.    Yeah, the online FBI complaint.

16    A.    Yes, that's correct.

17    Q.    And also a person who went by the name of Mosin-Nagant; is

18    that right?

19    A.    Correct.

20    Q.    M-o-s-i-n, N-a-g-a-n-t?

21    A.    Yes.

22    Q.    So, at the same time that Mr. Cantwell was talking to you

23    and other members of the FBI, the Bedford office, talking to

24    Sergeant Joel Chidester about harassment and pranks by unknown

25    persons as well as members of the Bowl Patrol, at the same time

```
 1   that was going on you were also investigating him; is that
 2   right?
 3   A.   Yes.
 4   Q.   Prior to the June 19th incident and then after the June
 5   19th incident?
 6   A.   Correct.
 7   Q.   And you had no problem with the concept that Mr. Cantwell
 8   might also have been a victim of harassment; is that right?
 9   A.   Yes.  It's not impossible for a person to be both a
10   subject and a victim at the same time.
11   Q.   And you took his complaints seriously as a victim of
12   harassment?
13   A.   We did.
14   Q.   And you had email exchanges with him about harassment and
15   attacks?
16   A.   Yes, we did.
17   Q.   You tried to get more information from him about the
18   individuals that he believed were attacking him and attacking
19   his website?
20   A.   We did.
21   Q.   And ultimately you did determine that there had been
22   harassment of Chris Cantwell by members of the Bowl Patrol?
23   A.   We determined there was definitely a back and forth; there
24   was definitely a running dispute between both parties.
25   Q.   You found evidence of actual harassment, though; is that
```

```
 1    right?
 2    A.   We definitely have call logs.  I mean, there were spam
 3    calls.  We have his record of his website defacement.  I'm not
 4    sure what specific harassment you're referring to.
 5    Q.   You testified in the grand jury on January 22nd of 2020;
 6    is that right?
 7    A.   Yes.
 8    Q.   I'm going to show you an excerpt from your --
 9              MR. LEVIN:  If I could use the ELMO?
10              THE COURT:  I wonder does that need to be disinfected?
11              MR. LEVIN:  I won't touch it.
12              THE COURT:  Well, I think if we have to set it up you
13    probably do.  Did anybody from the government touch the
14    document camera?  All right.  So, you can go up to the document
15    camera and manipulate it as necessary to display what you want
16    to display.  Are you asking to show him something that's not in
17    evidence for purposes of impeachment?
18              MR. LEVIN:  Yes.
19              THE COURT:  So, this could be shown to the witness
20    only.  Go ahead.
21    Q.   I just want you to, if you could, read to yourself the
22    question and then the answer.  Are you able to see that?
23    A.   Yes.  So, you want me to read the question first?
24    Q.   Just to yourself.
25    A.   Okay.
```

**J.A. 294**

```
 1   Q.   There's a question and then there's two answers.
 2   A.   (Witness complied).
 3   Q.   Tell me when you're at the bottom of the page.
 4   A.   Okay.  I'm good.
 5   Q.   And just the end of the -- just up to the bottom of that
 6   answer.
 7   A.   (Witness complied).  Okay.
 8   Q.   So, when you testified in the grand jury you were asked,
 9   were you not, whether you found evidence of actual threats
10   against Cantwell by members of the Bowl Patrol; is that right?
11   And you answered, No direct threats, but there were phone
12   calls, there was harassment; is that right?
13   A.   Yes.
14   Q.   And you testified that they made memes and edited
15   different photos of him making fun of him; is that right?
16   A.   Yes.
17   Q.   And made a song about him?
18   A.   Yes.  And all of that I believe can be attributed to Bowl
19   Patrol.
20   Q.   What's that?
21   A.   I believe those items can be attributed to Bowl Patrol --
22   Q.   Right.
23   A.   -- not some of the other harassment.
24   Q.   And then people calling food delivery services to have
25   them delivered to him while he was recording his show?
```

**J.A. 295**

```
 1    A.    Right.  Things like that, we can't attribute to who did

 2    that.

 3    Q.    You couldn't attribute all of those to the Bowl Patrol, is

 4    what you said; is that right?

 5    A.    That's correct.

 6    Q.    But you were in the course of your investigation able to

 7    determine that there had been harassment of Chris Cantwell by

 8    members of the Bowl Patrol?

 9    A.    Sure.

10    Q.    And, in fact, you spoke to people who admitted to that?

11    A.    They admitted to pranking, making prank calls, making

12    jokes.

13    Q.    Now, you interviewed -- the FBI, I should say, interviewed

14    members of the Bowl Patrol; is that right?

15    A.    Yes, we did.

16    Q.    They interviewed Cheddar Mane or a man named Ben Lambert

17    who also goes by the name of Cheddar Mane; is that right?

18    A.    Yes.

19    Q.    They interviewed Uncle Paul, who is a person named Paul

20    Nehlen?

21    A.    Correct.

22    Q.    Someone who goes by the name in the group as Hardmous or

23    DJ Hardmous, who is Thomas Gibson?

24    A.    Yes.

25    Q.    Were there others that were interviewed as well?
```

**J.A. 296**

```
 1    A.    As a part of the inquiry into this harassment or just in
 2    general?
 3    Q.    About the Bowl Patrol harassment of Cantwell.
 4    A.    I believe those were the only ones specifically about the
 5    harassment.
 6    Q.    What about Robert Moeller, Tactical BowlCut?
 7    A.    I don't recall -- we didn't interview him, this office.
 8    Q.    Jeffrey Clark of DC Bowl Gang?
 9    A.    Again, not this office.
10    Q.    Ronald Evans, who's also known as Uncle Dad?
11    A.    No.
12    Q.    Dallas Medina, who's known as Mosin-Nagant?
13    A.    Dallas Medina has been interviewed by the FBI on multiple
14    occasions, not by our office.
15    Q.    He has been?
16    A.    Not by our office.
17    Q.    And not about harassment of Chris Cantwell?
18    A.    He was approached in this time frame.  I don't think -- he
19    chose not to speak with us, and he was not compelled to do so,
20    but he also has a history of interactions with Mr. Cantwell on
21    his own.
22    Q.    What about a gentleman known as Wignasty, who is also
23    known as David Fassler?
24    A.    He was not interviewed by us.
25    Q.    Or Mark Reardon, who is also known as Illegal Aryan?
```

**J.A. 297**

```
 1    A.    No.

 2    Q.    What about Andrew Casarez, also known as Vic Mackey?

 3    A.    He was identified over the course of this investigation by

 4    our office, and we pushed very hard to have him interviewed,

 5    but ultimately we lost that battle because it requires

 6    coordination with other offices.  Very few of the people you're

 7    mentioning were mentioned by Mr. Cantwell in his harassment

 8    complaint, which is also why a lot of them weren't approached

 9    unless we had definitive information that they were

10    participating.

11    Q.    Was Vic Mackey interviewed by any FBI agent?

12    A.    Not to my knowledge, not as part of this harassment

13    complaint.

14    Q.    Was he interviewed during this period about anything else

15    where they --

16             MS. KRASINSKI:  Objection.  Relevance.

17             MR. LEVIN:  I'll just finish my question.

18             THE COURT:  Finish the question, but don't answer it.

19    Q.    Was he interviewed during this period, during the period

20    of investigation of Mr. Cantwell, and not asked about the

21    investigation into Cantwell?

22             THE COURT:  Sustained.

23    Q.    Now, it was during your investigation of Chris Cantwell

24    that the FBI came across the text exchange that's the subject

25    of this criminal case; is that right?
```

**J.A. 298**

 1   A.   Yes.

 2   Q.   And this wasn't a complaint that the FBI received from

 3   Cheddar Mane, slash, Ben Lambert?

 4   A.   Correct.

 5   Q.   This was something that the FBI stumbled across while an

 6   intelligence analyst was monitoring the Bowl Patrol account; is

 7   that right?

 8   A.   Correct.

 9   Q.   And intelligence analysts in Washington D.C. were assigned

10   to monitor the Bowl Patrol; is that right?

11   A.   I can't definitively say that.

12   Q.   You can't say that?

13   A.   I don't know what their assignment was exactly.  I know

14   they observed this threat on that channel, and they relayed it

15   to us.

16        THE COURT:  Agent, you can only testify to what you

17   have personal knowledge of.  If you don't have personal

18   knowledge, you can so state.

19   Q.   You don't have personal knowledge of that.  You testified

20   in the grand jury on January 2nd -- 22nd, 2020; is that right?

21   A.   Yes, I did.

22        MR. LEVIN:  Can I approach the monitor, your Honor?

23        THE COURT:  Yes, you may, any time you want.

24   Q.   And if you see at the bottom this answer, could you just

25   read that to yourself.

1    A.    (Witness complied).  Okay.

2    Q.    In January of this year you testified, did you not, that

3    intelligence analysts were assigned to monitor or investigate a

4    group called the Bowl Patrol; is that right?

5              MS. KRASINSKI:  Objection.  Misstates the transcript.

6              THE COURT:  Wait a sec, wait a sec.

7              MR. LEVIN:  I'll rephrase the question.

8              THE COURT:  Wait a second.

9              MR. LEVIN:  Sorry.

10             THE COURT:  Okay.  Put the headsets on.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12             THE COURT:  All right.  It's not clear to me that this

13   witness has personal knowledge of the thing that the witness is

14   being asked to testify about.  As, of course, we know,

15   witnesses can testify in the grand jury without having personal

16   knowledge about the matters on which they're testifying; so to

17   establish that a witness testified to the grand jury on a

18   particular matter does not establish that the witness has

19   personal knowledge.  If he knows that there was an

20   investigation because somebody told him that there was an

21   investigation, it isn't based on personal knowledge, it's

22   hearsay.  So, you need to lay a foundation for what you're

23   doing.  Merely showing that he was asked a question and gave an

24   answer in the grand jury doesn't establish the basis of his

25   knowledge.

1          MR. LEVIN:  Understood.

2          THE COURT:  Okay.

3     (END OF SIDEBAR CONFERENCE)

4     Q.   Agent Tongbua, you testified to matters in the grand jury

5     regarding the initial discovery of the text messages exchange

6     that's at issue in this case; is that right?

7     A.   Yes.

8     Q.   And you testified that the initial discovery was by one of

9     your intelligence analysts at FBI headquarters in D.C.; is that

10    right?

11    A.   That's correct.

12    Q.   And I believe you testified to that today here, too, in

13    your direct testimony.

14    A.   Yes.

15    Q.   Do you know what caused the intelligence analysts in D.C.

16    to stumble on those text messages, what they were doing when

17    they stumbled -- do you have personal knowledge or any kind of

18    knowledge of what the FBI was doing when they stumbled across

19    those text messages?

20    A.   I have an understanding that someone was reviewing that

21    channel, but I don't have definitive knowledge of why and what

22    their specific assignment was.

23    Q.   Okay.  So, when you testified in the grand jury to what

24    you thought was happening, you didn't have any knowledge of

25    that?

**J.A. 301**

1    A.    I said that was my understanding in the grand jury.  I

2    said I believe that an analyst was monitoring that channel.

3              THE COURT:  I just want to be clear so there's no any

4    misleading going on here.  What somebody can testify to in the

5    grand jury is quite different, as you know, from what a person

6    can testify to in public.  So, that someone can testify to

7    something in the grand jury doesn't mean that they can testify

8    in public about the same matter, so I just want to make that

9    clear.

10   Q.    And is it your understanding that when the analysts in

11   Washington came across this text exchange, that was in July of

12   2019; is that right?

13   A.    That is my understanding.  That's correct.

14   Q.    And that was about several weeks to a month after the

15   alleged events?

16   A.    Correct.

17   Q.    Now, I just want to make it clear, because there was some

18   testimony about items that were found on Mr. Cantwell's phone,

19   items that were found on Mr. Cantwell's computer, these items

20   were seized from Mr. Cantwell, and you testified that on the

21   cell phone and on the computer that were in Mr. Cantwell's

22   residence that there were photographs of Ben Lambert's family;

23   is that right?

24   A.    Correct.

25   Q.    But isn't it also true that in August of 2019 Mr. Cantwell

**J.A. 302**

1    sent emails to the FBI?

2    A.    That's correct.

3    Q.    And attached to the emails were the same photographs of

4    Mr. Lambert's wife and children that he had obtained?

5    A.    That's correct, and all of those photos were in the same

6    directories.  Both the photos of the family and this Telegram

7    message exchange were all found in the same folders.

8    Q.    Right.  And those same photographs that were emailed to

9    the FBI were later found on his phone and on his computer?

10   A.    Correct.

11   Q.    But he had shared those with the FBI in --

12   A.    He did not share any of the rest of the threat exchange,

13   images.

14   Q.    He shared the images of Cheddar Mane's wife and children;

15   is that right?

16   A.    He did.

17   Q.    He shared the photograph of Cheddar Mane or Ben Lambert

18   with what appeared to be strips of LSD on his tongue?

19   A.    Yes, the picture with something on his tongue.  Yes.

20   Q.    He shared Cheddar Mane's address in Missouri?

21   A.    Correct.

22   Q.    He admitted contacting Cheddar Mane to get Vic Mackey's

23   information?

24   A.    Correct.

25   Q.    Then he admitted that he threatened to expose Cheddar

1   Mane's identity if he continued harassing and defaming him; is

2   that right?

3           MS. KRASINSKI:  Objection.

4           THE COURT:  Basis?

5           MS. KRASINSKI:  Misstates testimony and facts not in

6   evidence.

7           THE COURT:  Lay a foundation for that, Mr. Levin.  I

8   don't recall it.

9           MR. LEVIN:  Okay.

10          MS. KRASINSKI:  And, your Honor, hearsay if it's

11  offered for the truth of the matter.

12          THE COURT:  All right.  I have already instructed him

13  how to proceed.

14  Q.   Okay.  I just want to show you page 14 of your grand jury

15  testimony from Wednesday, January 22nd, 2020 in which you are

16  describing an email, the email that we're discussing.  This is

17  the question and the answer.  Does that sound familiar?

18  A.   Yes.

19  Q.   Is that an email that -- is that text from an email that

20  the FBI received?

21  A.   Yes, I believe so.

22  Q.   And in that email he admitted that he threatened to expose

23  his identity if he continued harassing and defaming me?

24          MS. KRASINSKI:  Objection, your Honor.  Hearsay.

25          THE COURT:  All right.  You folks have completely lost

**J.A. 304**

1   me.  I don't understand what you're doing, and I'm speaking to

2   both sides here.

3          Unfortunately, Members of the Jury, I can't untangle

4   this without having extensive discussions with the parties.  I

5   hoped to be able to continue until 4:30 before I dismissed you,

6   but if I tried to keep you here I would just be wasting your

7   time.  So, I'm going to excuse you for the day while I work

8   with counsel to understand what's happening here.

9          I will remind you of my general instructions.  Keep an

10  open mind.  Don't discuss the case with anybody else.  Don't go

11  out and try to do any investigation.

12         And we're agreeing to start at 9:30.  Is that right?

13         Please come back a little before 9:30.  I'm going to

14  meet with the parties beforehand and do everything I can to

15  make sure that tomorrow's testimony flows as efficiently as

16  possible.

17         Have a good evening.  We'll see you tomorrow morning.

18         THE CLERK:  All rise for the jury.

19             (The jury exited the courtroom)

20         THE COURT:  Sir, you can step down, but why don't you

21  just stay in the courtroom in case we need you, okay?

22         THE WITNESS:  Yes, your Honor.

23         THE COURT:  All right.  Be seated.

24         Mr. Levin, I want to give you as wide a scope for

25  cross-examination as possible, but I don't really understand

**J.A. 305**

1    what's happening right now.  Can you explain to me what you're

2    getting at here?

3            MR. LEVIN:  Your Honor, I guess what I'm getting at is

4    that there was I think an impression created during the direct

5    of Agent Tongbua that this evidence was seized from Mr.

6    Cantwell, and I'm trying to establish that Mr. Cantwell

7    provided this evidence to the FBI.

8            THE COURT:  Are you referring to the time when he sat

9    down in the interview with this agent?

10           MR. LEVIN:  This happened before that.  This happened

11    maybe a month before the sit-down interview.  He was having an

12    email exchange with the FBI.

13           THE COURT:  That's where I'm confused.  What testimony

14    did the government elicit on this particular point?

15           MS. KRASINSKI:  Agent Tongbua testified both that he

16    found these items on the defendant's hard drives, but I believe

17    he also testified that Mr. Cantwell provided them to him.

18           THE COURT:  That slipped by me, so I need to

19    understand better the sequencing here.  So, you tell me what

20    you think happened on direct in sequential order about how the

21    case agent came to learn of this -- of the emails and the

22    interaction.

23           MS. KRASINSKI:  So, when we were going through

24    Government's Exhibit 100 there's Mr. Cantwell's statement after

25    he sends the picture of Ms. Lambert and three of her children.

**J.A. 306**

1    He says, More where that came from, and so I asked Agent

2    Tongbua --

3            THE COURT:  No.  I'm asking you to tell me about the

4    sequence by which Agent Tongbua first acquired information

5    about this email exchange and these photographs, and I want you

6    to tell me about what the evidence was on direct about the

7    first time he learned of these exhibits and when he

8    subsequently got them off of the phone.  And I apologize,

9    because if you said you elicited I don't doubt you, but its

10    significance did not register with me at the time, so I need

11    you to tell me exactly what you think was elicited on direct

12    about this.

13            I recall there was an interview where there was a

14    discussion where Mr. Cantwell was quite frank in discussing

15    what he had done, but it did not register with me that there

16    was an email that preceded that interview where Mr. Cantwell

17    volunteered all of this, this entire exchange to the FBI, and

18    if that's all that Mr. Levin's trying to do there is a way to

19    do that, and I don't understand why you would be objecting to

20    it.

21            So, I thought he was trying to do something completely

22    different, and part of it is the methodology that Mr. Levin is

23    using, which is one I'm not familiar with.  Showing someone

24    grand jury testimony without -- again, you can help educate me.

25    In my experience witnesses can testify about what they know

**J.A. 307**

1    based on personal knowledge.  They can't testify about what

2    other people -- there's no, like, case agent exception to the

3    hearsay and personal knowledge rule, where the government or

4    the defense can ask the case agent, What did other guys down in

5    Washington a year before you got involved with the case, what

6    were they doing?  Why were they doing that?  What did they

7    learn?  That can't come in in an ordinary case.

8            Grand jury testimony, you can't just throw up grand

9    jury testimony to a witness and ask him to read it to himself

10   and then question him about it.  That isn't how I understand

11   the *Rules of Evidence*.  So, when that happens sometimes there's

12   no objection, sometimes there's objection, it becomes almost

13   impossible to untangle.  So, I think part of my confusion stems

14   from the method you were using, but part of it is, if the

15   government elicited this in their direct case and all they're

16   trying to do, all Mr. Levin is trying to do is establish, Hey,

17   before he even sat down with you he volunteered this stuff to

18   you in an email, he should be allowed to do that, and why

19   shouldn't he?

20           MS. KRASINSKI:  I don't have any objection to that at

21   all, your Honor.  My objection is to when he's going into and

22   asking questions about the contents of an August 28th email

23   that Mr. Cantwell sent to the FBI.  If Mr. Levin wants to say,

24   On August 28th, 2019, before you seized the electronic devices,

25   didn't Mr. Cantwell provide you with copies of these photos, I

**J.A. 308**

1    don't have any objection to that, your Honor.

2         But when Mr. Levin is asking -- is referring to

3    portions of Mr. Cantwell's email, the email Mr. Cantwell says

4    in the email, Since I have this information about him I

5    threatened to expose his identity if he continues harassing and

6    defaming me, asking about that statement is hearsay. So, if

7    Mr. Levin --

8         THE COURT: Doesn't that help you and hurt him? I

9    don't even understand what you're doing. Why are you doing

10   what you're doing? It doesn't make any sense to me. So, it's

11   really hard when I'm operating in kind of an *Alice in*

12   *Wonderland* world, where the government is trying vigorously to

13   keep out things that are damaging to the defendant and the

14   defendant is trying to elicit them. So, it's not making any

15   sense to me, so help me. I don't have the email. I don't know

16   what the email says. I don't know why you're trying so

17   vociferously to keep it out. I don't know if you're trying to

18   get into it. If all you want to do is establish, Isn't it

19   true, Case Agent, that before you even sat down to interview

20   Mr. Cantwell he sent you an email and in that email he attached

21   the very same documents that are being used to prosecute him --

22   is that what you want to say?

23        MR. LEVIN: That's it.

24        THE COURT: Go for it.

25        You don't have a problem with that.

1          MS. KRASINSKI:  I don't have an objection to that.

2          THE COURT:  So, go for it.  That is fine, absolutely.

3          MR. LEVIN:  The email, by the way, is a government

4     exhibit.  That's what I was just referring to.

5          THE COURT:  I'm not sure, and I guess maybe it would

6     help me if I could understand the government's theory.  You

7     seem bound and determined to try to prevent Mr. Cantwell from

8     eliciting testimony that he felt he was being harassed by these

9     people.  You seem like you really want to do that, but I don't

10    even understand why, because it's not a defense to the crime.

11         MS. KRASINSKI:  So, I think there's a line.  I don't

12    think we are trying to exclude evidence that he felt harassed.

13    I think evidence that he tried to report that to law

14    enforcement, his conversations with law enforcement, I don't

15    think that's relevant to whether or not his intent was to

16    extort.

17         THE COURT:  Is this your fear, so that I can at least

18    understand your thinking?  Your thinking is, even though

19    provocation is not a defense, even though it's not a defense to

20    say, Well, I tried to go to law enforcement so I had to take

21    the law into my own hands, isn't a defense, you think it's

22    really damaging to your case to hear from the jury that Mr.

23    Cantwell was frustrated that the FBI wasn't doing what he

24    wanted them to do.

25         What's not resonating with me is the way I understand

**J.A. 310**

1    the law, and if you had requested an instruction on this I

2    would give it, is that provocation is not a defense, and that

3    the government didn't investigate what Mr. Cantwell wanted him

4    to would not excuse his conduct if it was otherwise criminal.

5    Is that the law, or have I got that wrong?

6         MS. KRASINSKI:  It is the law.  And, actually, your

7    Honor, this morning I did file an instruction, request for an

8    instruction.

9         THE COURT:  So, why are you so concerned about it,

10   then?

11        MS. KRASINSKI:  I just think at some point this

12   becomes about Mr. Cantwell complaining to the FBI, and when

13   you're looking at 403, when you're looking at the fact that

14   it's not relevant to a defense --

15        THE COURT:  But in order to make -- okay.  This is

16   when I talk to you about context and why I have to allow the

17   defense to allow the full context for what's happening to come

18   in, and you, yourself, have acknowledged, I believe.  Mr. Davis

19   did in his opening statement, that this came about because Mr.

20   Cantwell was complaining to the FBI, and he was frustrated that

21   Bowl Patrol people were defacing his site and trying to

22   interrupt his ability to conduct his business, and he

23   eventually complained to the FBI, and when he felt the problems

24   were continuing he took these additional measures, which he

25   acknowledges that he did, and it's those additional measures

**J.A. 311**

1   that are the criminal acts that comprise the charges here.  And

2   I'm just having a lot of trouble making sense of what's

3   happening.

4         But, Mr. Levin, your point is -- I want to be very

5   clear.  You have every right to elicit in cross-examination

6   from the agent that Mr. Cantwell produced these very same

7   exchanges that are the subject of these charges to the FBI.

8         MR. LEVIN:  That's right.  My problem with it is that

9   I feel like what the government's trying to do is say he was

10  hiding this stuff and that's consciousness of guilt, when, in

11  fact, he was giving it to them.  They're statements that he

12  makes that they want to characterize as admissions.  They're

13  actually him complaining about what happened to him.  They're

14  not admissions.  So, I think context matters in this

15  circumstance as well.

16        THE COURT:  So, the government clearly wants to elicit

17  some evidence that he failed to disclose certain things, right,

18  because you reference that in your opening statement?

19             (Attorney Krasinski nodded)

20        THE COURT:  What exactly is it that he didn't disclose

21  that you think tells us something about his guilt?

22        MS. KRASINSKI:  So, he disclosed the actual

23  photographs of Mrs. Lambert and Mr. Lambert, and he disclosed

24  their address.  What he did not disclose and what he told the

25  FBI he retained no records of were the messages themselves.  He

**J.A. 312**

```
1    told the FBI that he did --
2            THE COURT:  Well, let me stop.  Again, the parties
3    have not done a great job of educating me about exactly what
4    the evidence in this case is, so I'm learning it as it's coming
5    out.  But there is this Telegram app, and on this Telegram app
6    you can do a variety of things:  you can direct message
7    somebody, you can host a blog, you can host a discussion group.
8    And the statements that comprise the -- give rise to the
9    charges in this case occurred primarily through direct
10   messages, right?
11           MS. KRASINSKI:  Correct, your Honor.
12           THE COURT:  Is the evidence in this case that Mr.
13   Cantwell -- did he ever disclose voluntarily those direct
14   messages to the FBI?
15           MS. KRASINSKI:  He did not, your Honor.
16           THE COURT:  Okay.  What Mr. Levin is referring to is
17   not the direct messages; he's referring to something else,
18   right?
19           MS. KRASINSKI:  Correct, your Honor.
20           THE COURT:  What do you say he's referring to?
21           MS. KRASINSKI:  You can look at it, your Honor.  If we
22   could display Government's Exhibit 501, I think that maybe will
23   help your Honor.
24           MR. LEVIN:  502 I think it was.
25           MS. KRASINSKI:  Sorry?
```

**J.A. 313**

1          MR. LEVIN:  502 I think it was.

2          MS. KRASINSKI:  The images were attached to a separate

3     email, Government's Exhibit 501.

4          MR. LEVIN:  Oh.

5          MS. KRASINSKI:  So, he provided the actual family

6     photographs and the address information.  That is what he

7     provided.  And so, the images attached to Government's Exhibit

8     501 are included in that email.

9          THE COURT:  When he was complaining about Cheddar Mane

10    because that was identifying information he had about Cheddar

11    Mane?  That's what I'm not -- what I'm not getting is that I

12    think the government's position is -- well, let me ask you to

13    do it this way:  Tell me exactly what it was that he did not

14    disclose that you feel he should have disclosed and, because he

15    didn't, it suggests that he understood that those

16    communications were problematic.  Is it only the direct

17    messages?

18         MS. KRASINSKI:  Correct, your Honor, both versions of

19    the direct messages.

20         THE COURT:  All right.  Did he in the email he

21    submitted beforehand to the FBI say anything about threatening

22    to have sex with Cheddar Mane's wife in front of his children?

23         MS. KRASINSKI:  He did not, your Honor.

24         THE COURT:  All right.  Did he say anything about

25    reporting Cheddar Mane to CPS?

**J.A. 314**

1          MS. KRASINSKI:  Yes, your Honor.

2          THE COURT:  All right.  So, some of it he did

3    disclose, and some of it he didn't disclose.  Is that fair to

4    say?

5          MS. KRASINSKI:  Yes.  What I'm saying he didn't

6    disclose is the actual Government's Exhibit 100, the actual

7    screenshots of the messages.

8          THE COURT:  He discloses the content.  To rebut your

9    theory that he's trying to conceal all this, it's very

10   important for the jury to hear what, in fact, he did disclose,

11   and then you can make your argument about what he didn't

12   disclose.  Mr. Levin is fully entitled to say that some of the

13   conduct that comprises these charges was, in fact, disclosed to

14   the FBI by Mr. Cantwell in an email on a particular date,

15   right?  And you don't disagree with that.

16         MS. KRASINSKI:  No, I agree with that.  I agree with

17   what you're saying.

18         THE COURT:  Okay.  So, the CPS stuff -- how about the

19   stuff, I'm going to dox you?

20         MS. KRASINSKI:  I agree that that's --

21         THE COURT:  Was that also disclosed?  All right.

22         MR. LEVIN:  It was.

23         THE COURT:  So, what wasn't disclosed was the alleged

24   threat to have sex with his wife in front of his children?

25         MS. KRASINSKI:  Correct, your Honor.

1          THE COURT:  Was there anything else in that exchange?

2     I know your point is the screenshots weren't disclosed, but

3     what matters is the content of the communications.  If they

4     were disclosed through another means, that tends to support his

5     argument that Mr. Cantwell didn't conceal the information and

6     undermine your argument that he's concealing the evidence of

7     his criminal conduct, and he needs to be able to do that.  So,

8     what have I got wrong in what we have just been talking about?

9          MS. KRASINSKI:  I agree with everything you just said,

10    your Honor.

11         THE COURT:  Okay.  So, what is it in this email that

12    you don't think is fair game?

13         MS. KRASINSKI:  So, I don't think that the defendant

14    should be able to introduce his self-serving hearsay statements

15    characterizing what Cheddar Mane was doing as harassing and

16    defaming.  There's no evidence that Cheddar Mane did anything

17    defamatory.  There's evidence of prank calls, but there's no

18    evidence of defamation, and so I think the government wants to

19    be careful about having cross-examination be used as a platform

20    to allow the defendant to introduce his own --

21         THE COURT:  Are you trying to get into the content of

22    Cheddar Mane's email to the FBI apart from showing that he

23    disclosed these communications?

24         MR. LEVIN:  This is Cantwell.  This is Cantwell's

25    email to the FBI.

**J.A. 316**

```
1          THE COURT:  I'm sorry.  I meant Cantwell's
2    communication to the FBI.
3          MR. LEVIN:  That in August of 2019, before he sat down
4    with the FBI, he admitted to them that he threatened to expose
5    Cheddar Mane's real name if Cheddar Mane continued harassing
6    and defaming him; that he did expose him after offering him the
7    out of identifying Vic Mackey, which he declined; that he
8    called CPS in his area to warn that he was involved in a white
9    supremacist terror group, which, in combination with a photo
10   that appears to show LSD on his tongue, could put him in
11   danger; that this was information that the FBI received from
12   Cantwell before they even sat down with him.
13         THE COURT:  Would you be willing to do it in just that
14   way?
15         MR. LEVIN:  Sure.
16         THE COURT:  Mr. Case Agent, you know that the FBI got
17   an email from Cantwell well before you sat down to interview
18   him, right?  And in that email Mr. Cantwell did, in fact,
19   disclose that he had made this statement about Cheddar Mane,
20   and he did disclose that he was threatening to report him to
21   the FBI.
22         You don't have any problem with them doing that, do
23   you?
24         MS. KRASINSKI:  No, as long as they leave out the --
25         THE COURT:  Okay, yeah.  What you're so concerned
```

**J.A. 317**

1    about I think is almost inconsequential, because it doesn't

2    provide any defense, and, as a result, it's creating tremendous

3    confusion.

4         But, Mr. Levin, unless I'm wrong about this,

5    provocation is not a defense to these charges, and if I get a

6    request for instruction on it, I'll give an instruction on

7    that, unless you can convince me that it is --

8         MR. LEVIN:  We're not asking for a provocation

9    instruction, your Honor, but there is a criminal intent element

10   to this offense.

11        THE COURT:  But if he did it with criminal intent

12   because he was provoked or because he felt, in his words, I

13   have to commit a criminal act if the FBI won't do it, that

14   isn't a defense.

15        MR. LEVIN:  Right.

16        THE COURT:  The FBI wouldn't investigate, so I had to

17   go out and commit a crime, that isn't a defense.

18        MR. LEVIN:  Right.  And our point is it's incongruous

19   that somebody has a criminal intent when he's telling the FBI,

20   This is what I'm doing.  This is what I did.

21        THE COURT:  That's why I'm suggesting that you should

22   be able to fully do what you want to do, and I'm suggesting --

23   surprised that the government is so repeatedly asserting these

24   objections about trying to keep the jury from hearing that Mr.

25   Cantwell was frustrated.  The jury will know that Mr. Cantwell

**J.A. 318**

1    was frustrated, because that very evidence of frustration is

2    the evidence you want to introduce as motive, right?  You're

3    trying to show why he's trying to do this, and the reason he's

4    trying to do it is because he was damn mad at these people

5    because he felt they were ruining his business, and you

6    introduced evidence yourself that the FBI isn't doing anything

7    and that's aggravating his frustration.  That's your case,

8    isn't it?  That's the motive for committing the crime from your

9    perspective, isn't it?  That's what I'm not understanding.

10        MR. DAVIS:  I think it's subtle, your Honor, and I

11   understand your frustration.  The defense now is this whole

12   thing was a primal scream by Mr. Cantwell, Leave me alone,

13   leave me alone.  What the defense is saying is that in that

14   exchange Mr. Cantwell did not intend to issue a threat and did

15   not intend to extort the information of Vic Mackey, and those

16   are the specific intents we have to prove.

17        THE COURT:  Excuse me a second.  I'm just sort of

18   mindful of what the law is and how I intend to instruct the

19   law.  The way I understand the law, that he wanted to be left

20   alone is understandable but not a defense to criminal behavior;

21   that he wanted these people to stop attacking his site is

22   understandable but not a defense to criminal behavior; that the

23   FBI didn't act the way he thought they should act in response

24   to his threat is understandable but is not a defense; that he's

25   really, really mad when he does his acts doesn't mean it's not

**J.A. 319**

1    a crime.

2         If he undertakes conduct with the requisite criminal

3    intent, and the conduct is sufficient if undertaken with that

4    intent to be criminal, the jury will be told to return a

5    verdict of guilty.  That he wants to be left alone and is

6    really, really frustrated, and it's a shame that the FBI didn't

7    investigate as aggressively, it doesn't lead anywhere.  It

8    doesn't in any way undermine your case.  That's what I'm trying

9    to understand.  It's almost as if you have a deep fear that the

10   jury won't follow my instructions and that they will basically

11   engage in jury nullification, maybe?  Is that what you're

12   mostly concerned about, that they'll be really upset at the FBI

13   and really sympathetic to Mr. Cantwell, and they'll ignore the

14   law and find him not guilty, even though the evidence points to

15   guilt?  Is that what your fear is?  I'm just trying to

16   understand what this is all about, and I'm not getting it.

17        I'll go back to this particular email.  All right.

18        So, Ms. Krasinski, I am going to allow Mr. Levin to

19   cross-examine about this email.  I agree with you that he can't

20   use his client's own statements that you haven't sought to

21   introduce to establish anything, because anything that would

22   otherwise be hearsay remains hearsay when the defendant seeks

23   to introduce it.

24        So, if he goes in and says, And in this email you said

25   my client said he did X to try to prove that he, in fact, did

**J.A. 320**

1    X, that would be hearsay and would be inadmissible, but I

2    haven't yet heard Mr. Levin do that, and I think he is entirely

3    within his rights to rebut or eliminate confusion about one

4    argument you're trying to make.  You're trying to make a narrow

5    argument that is there were certain screenshots on his phone

6    that he didn't disclose.  Yeah, he did tell the FBI, in fact,

7    he, unsolicited, produced a lot of these conversations, which

8    is entirely relevant to your defense that your client lacked

9    criminal intent, because if he had criminal intent why would he

10   disclose these things?  That makes perfect sense to me, and you

11   should be given full opportunity to pursue that aggressively.

12   All right?  But if he tries to get into specific statements in

13   the email that Mr. Cantwell made in the email that are

14   admissible only if the hearsay rule can be overcome and there's

15   no other exception to the hearsay rule that applies, then you

16   have a valid hearsay objection that Mr. Cantwell's self-serving

17   statements admitted for the truth of those statements in an

18   email that he sent to the FBI is inadmissible hearsay.  So, I

19   accept that.

20          Now, let's just go back over a couple of other things,

21   because, again, I'm having trouble in ruling consistently and

22   clearly, and that's this idea of a kind of case agent exception

23   to the personal knowledge requirement.  And this is what

24   happens in the grand jury, and I'm sure you don't like it, but

25   in the grand jury the agent comes in, and he's like the summary

**J.A. 321**

1    witness for the entire investigation.  He tells the grand jury

2    everything that his agents are doing that he read about in

3    reports and everything else.  But that he did that doesn't mean

4    that he can do that in court.  He couldn't do it for the

5    government, and he can't do it for you.  He can testify based

6    on personal knowledge to things that are not inadmissible

7    hearsay.  All right?

8         So, I need you both to be careful when dealing with

9    witnesses -- and I find this is the most misunderstood and most

10   important rule in the *Rules of Evidence*, is that you have to

11   have personal knowledge about that which you are testifying,

12   and you have to lay the foundation for that so that the

13   reviewing judge can know is that admissible or not.  So, lay

14   that foundation.

15        Second, when can you use transcripts of grand jury

16   testimony or deposition testimony?  You can use it to impeach

17   when there's inconsistency; you can use it to refresh memory

18   when there's no recollection, the witness says, I can't

19   remember, but you can't just say, Let me show you some grand

20   jury material.  Didn't you say in front of the grand jury X?

21   That is not an acceptable way to proceed.  So, establish a lack

22   of memory and then you can show it to him and ask, Having read

23   that, is your recollection refreshed?  Or if he says black when

24   it's white, you can say, Didn't you say white when you

25   testified in the grand jury?  Other than that, I don't think

1    you can use the grand jury testimony for any other purposes.

2          So, do those kind of things.  I'll better understand

3    what you're doing.

4          I understand your basic point is correct that the

5    defendant cannot elicit in documents his own hearsay statements

6    that you haven't gone into.  I agree with that.  Unless under

7    the rule of completeness or something it comes in, you can't do

8    that.  But he certainly can establish that these things were,

9    in fact, disclosed by him, because that's one of his central

10   arguments he's going to make in closing argument, he should

11   make.  Half of the government's case Mr. Cantwell sent to the

12   FBI in an unsolicited way.  How is that consistent with

13   somebody who is acting with a criminal intent?  That I

14   completely, completely understand.  But I just want to be

15   clear, and if you've got law on this, tell me, but I don't

16   understand provocation as a defense, I don't understand the

17   failure of the government to investigate his own complaints

18   vigorously as a defense, and it doesn't undermine the

19   government's case that he acted with criminal intent.

20         MR. LEVIN:  Right.  We're not raising a provocation

21   defense.  We don't believe one exists, and so we're not raising

22   it.

23         THE COURT:  Because evidence that he was really mad at

24   these guys and wanted to get back at them is the motive, isn't

25   it?  As far as I could see, why is he doing what he's doing?

**J.A. 323**

1    Because he's really mad at this guy and wants to get back at

2    him.  That's the motive.  So, it's rare that the government is

3    objecting vigorously, trying to keep out motive evidence that

4    supports the charge, and that's where I'm having a little bit

5    of trouble.  So, maybe you can think about that as well.

6         All right.  Now, the exhibits with the excerpts, do I

7    have a transcript of the full call?

8         MR. LEVIN:  Yes.  Ms. Sheff did provide one.

9         THE COURT:  All right.  We've got a full call.  And do

10   I have the transcripts of the excerpts you want introduced?

11        MS. KRASINSKI:  I think those may have been returned.

12   I don't know if copies have been made.

13        MR. LEVIN:  Those were Governments Exhibits 105 to

14   109.

15        THE COURT:  What I need to read tonight are both of

16   them, because what I'm going to do is I'm going to make a copy

17   of what I get for the full transcript; then I'm going to go

18   through and highlight exactly where the excerpts are; and then

19   I'm going to read the whole transcript and decide what else

20   beyond those excerpts, if anything, should come in under the

21   rule of completeness; and then I will tell you tomorrow morning

22   what it will be; and then you can put together a new composite

23   exhibit that satisfies the rule of completeness.

24        Did Mr. Wolpin leave?

25        MR. LEVIN:  No, he's here.

**J.A. 324**

1          THE COURT:  If he needs to go for child care -- you
2     can go.
3          MR. WOLPIN:  The afternoon's good.
4          THE COURT:  Okay.  It's just the morning that's the
5     problem?
6          MR. WOLPIN:  Right.  Thank you.
7          THE COURT:  All right.  So, that's what I'm going to
8     do on that issue.  On the government's request to call a video
9     deposition of the victim's spouse, if there's still an issue
10    with respect to that, there's a confrontation clause objection,
11    I've got materials, I'm reading those opinions, and I should be
12    able to give you a decision tomorrow on that.  So, I'll give
13    you a ruling on that tomorrow.
14         Mr. Wolpin, you're standing.  Do you have something?
15         MR. WOLPIN:  Yes.  I had approached Clerk Negron about
16    this issue.  If the Court ultimately rules in favor of the
17    government, I think that the lesson of this morning for us is
18    that, for purposes of preservation, how that appears is not
19    going to be visible on the transcript, and so my concern was
20    how can we preserve what that actually, that testimony actually
21    looks like in the courtroom for appeal, or else we're just
22    looking at a transcript of someone like we had this morning,
23    and it really wouldn't show what it really looked like.
24         THE COURT:  So, I strongly defend the proposition that
25    the official record of the proceeding is what the court

1    reporter transcribes.  I'm ordinarily very reluctant to admit

2    any record of anything that happens in court other than

3    testimony of a witness or the court reporter transcript, but

4    your argument may be the one case where it makes a difference,

5    so if I were to allow it and there is a way to record it, we

6    would make a recording of it and keep it for purposes of

7    appeal.  The video today was not ideal; I think we can all

8    agree to that.  It was in my mind sufficient, especially since

9    the witness's testimony, frankly, was of limited relevance and

10   not contested, but I will assure you that if there's going to

11   be a -- I would not let an important witness like the victim's

12   spouse testify unless I was confident that the quality of the

13   image and the sound was clear enough that you guys could have a

14   fair shot at it on cross, okay?  Because if that's as good as

15   we could do, I would not allow that witness to testify by

16   video.  But we can do better, and we have done better, and I've

17   seen it countless times.  We did it better 20 years ago on

18   9/11, when I had a witness testify from a courthouse in

19   Chicago.  So, we can do it.  I won't let it happen unless we

20   can, in fact, do it in this case, and I think we should make a

21   record of it so that, if there's some argument that, Hey, I

22   couldn't see the person's lips moving, the jury couldn't make

23   any credibility assessment, that would be all vitally

24   important.  But there are threshold questions about the

25   admissibility of the testimony that we may not even get there.

**J.A. 326**

1    I have to rule on that tonight.

2           All right.  So, tell me about -- and I'm sorry to keep

3    you, but I want to keep the testimony -- I want a full day of

4    testimony tomorrow.  So, what does the government anticipate

5    putting on tomorrow?

6           MR. DAVIS:  We anticipate calling the victim, Cheddar

7    Mane, Mr. Lambert.

8           THE COURT:  Okay.  And so this agent, finishing the

9    cross and redirect, and then Mr. Lambert will be a big chunk of

10   the day tomorrow?

11          MR. DAVIS:  Yes.

12          THE COURT:  And then how much more do you have to put

13   on by way of evidence?

14          MR. DAVIS:  I think we have maybe five witnesses, none

15   long, but --

16          THE COURT:  Another day, perhaps?

17          MR. DAVIS:  Yes.  I think we rest -- today's Tuesday.

18   I think we certainly rest by close of business Thursday, unless

19   something strange happens.

20          THE COURT:  Okay.  And I know, of course, you can't

21   make any prediction about anything, but if the defendant were

22   to testify, that would increase the length of the trial by at

23   least a day, which he might do, or he might exercise his right,

24   which he's entitled to do, which would take a day away from it.

25   Do you anticipate, regardless of what you're seeing now, that

**J.A. 327**

1    there's a possibility for more days of defense testimony?

2         MR. LEVIN:  Other than Friday?

3         THE COURT:  Yeah.

4         MR. LEVIN:  No.  I mean, I don't think so, no.

5         THE COURT:  Okay.  So, we're still within the realm of

6    being on schedule here; is that fair to say?

7         MR. DAVIS:  Yes.

8         THE COURT:  All right.  Does anyone have anything else

9    that they want to take up with me before I let you go for the

10   day?

11        MS. KRASINSKI:  Your Honor, the defense has rule of

12   completeness objections to two other audio exhibits of the

13   government's, so two jail calls.  I have the transcripts of the

14   portions of the jail calls that the government intends to

15   introduce.

16        Ms. Sheff, do you know if we have complete transcripts

17   of either of the jail calls?

18        MS. SHEFF:  I do not think we do.

19        THE COURT:  How long are they?  Who are they with?

20   So, let me just review with you my basic thinking about the

21   rule of completeness for the defense.  Of course, you can

22   preserve any objection you want, but I don't think the mere

23   fact that relevant information is elicited in a telephone call

24   that is replete with all kinds of other self-serving, unrelated

25   stuff that that means the rule of completeness requires the

1    whole call to come in.  That's not the standard.  All right?

2    So, are you going to be arguing that the entire phone

3    calls should come in or --

4    MR. WOLPIN:  We just widened the window is essentially

5    what we did.

6    THE COURT:  All right.  Can you try to get someone in

7    your office to produce a transcript of the portion that you

8    think should be widened so you can say to me, Judge, here's

9    what they want to produce, here's what I think should come in

10    under the rule of completeness?  Then I can do that same

11    exercise that I'm doing here, and I can do it more efficiently

12    if you give me that transcript first.

13    MR. WOLPIN:  Understood.

14    THE COURT:  So, if you could try to produce that

15    tomorrow so that I can effectively rule, that would be very

16    helpful.  So, I'll then take your exhibits and their request

17    for a wider exhibit, I'll read them and figure out what should

18    come in.  All right.  Is there anything else?

19    MR. LEVIN:  No, your Honor.

20    THE COURT:  Let me just say one thing.  I have really

21    high standards for what I expect to happen in my court, because

22    I have such high regard for the legal profession, and I want

23    you to understand I am not being critical of the lawyers in

24    this courtroom.  I think the lawyers in this courtroom are

25    fantastic lawyers, very good lawyers, and they're doing a very

**J.A. 329**

1    good job here.  So, don't misunderstand when I say I'm

2    confused, or I'm frustrated, or I need more to rule.  It's not

3    a criticism.  You're doing what you're supposed to be doing,

4    and I think you're doing it well, but I'm going to keep pushing

5    ahead doing what I need to do to make sure I maximize the

6    chance that I rule correctly on the issues that the parties

7    present to me.

8            Okay.  So, tomorrow morning come at 9:00.  I hope to

9    have a ruling on the first rule of completeness problem.  I may

10   have a ruling on the video deposition.  But we're going to

11   start at 9:30 sharp and put in a good, full day.  Okay?

12           THE CLERK:  All rise.

13       (WHEREUPON, the proceedings adjourned at 4:56 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of the

8     within proceedings.

9

10

11

12

13     Date: ___5/17/21_____          /s/ *Brenda K. Hancock*
                                       Brenda K. Hancock, RMR, CRR
14                                     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**J.A. 331**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:20-cr-6-01-PB
            v.                      *   September 23, 2020
                                    *   9:08 a.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 2
MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:        John S. Davis, AUSA
                          Anna Z. Krasinski, AUSA
                          United States Attorney's Office

For the Defendant:         Eric Wolpin, Esq.
                          Jeffrey S. Levin, Esq.
                          Federal Defender's Office

Court Reporter:            Liza W. Dubois, RMR, CRR
                          Official Court Reporter

```
 1                           I N D E X

 2

 3

 4    WITNESS:               Direct  Cross    Redirect  Recross

 5

      SHAYNE TONGBUA
 6    By Mr. Levin                    22
      By Ms. Krasinksi                         46
 7    By Mr. Levin                                       56

 8

      BENJAMIN LAMBERT
 9    By Mr. Davis           60

10

11    EXHIBITS                        FOR ID          IN EVD

12    Government's Exhibit 116                         107

13    Government's Exhibit 117                         107

14    Defendant's Exhibit B-20                          88

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          (Sealed portion filed under separate cover.)
 3          THE CLERK:  That's done.
 4          THE COURT:  Okay.  Super.  I'll just give the public
 5   a moment to come in.
 6          Okay.  I can't -- could you call the case again,
 7   Vinny, if you haven't already.  I can't remember whether you've
 8   done it.
 9          THE CLERK:  Court is in session and has for
10   consideration a jury trial in United States of America vs.
11   Christopher Cantwell, criminal case number 20-cr-6-01-PB.
12          THE COURT:  All right.  I want to begin by noting
13   that I began today's proceedings with a sealed hearing.  I
14   needed to discuss certain matters that can't be included in the
15   public record.
16          During that hearing I ruled on the government's
17   motion for live two-way video testimony of what we've been
18   referring to here as the victim's spouse.  I heard the
19   government's motion, the parties' views on that matter, and I
20   denied the motions for reasons that I specified on the record.
21   But that need to be, in part, under seal.
22          So before we bring the jury in, there's one other
23   issue I want to discuss with the parties.
24          During the testimony yesterday, the defense objected
25   to a government proposal to introduce certain excerpts from a
```

```
 1   telephone call in which the defendant was allegedly a
 2   participant and the defendant objected to the government's
 3   effort to introduce those excerpts invoking what I refer to as
 4   the rule of completeness.  That is a rule of evidence that
 5   suggests that under certain circumstances where a party wants
 6   to introduce some portions of a document or a recording, the
 7   opposing party may be entitled to have more of the recording
 8   played.
 9            I understand that the defense has a -- an objection
10   to -- and wants the entire recording played.  I am not prepared
11   to grant that objection.  I've reviewed the transcript of the
12   entire recording and don't believe that the defendant's
13   entitled to have the entire recording prepared -- excuse me --
14   played.  If the defendant wants to make arguments as to
15   specific portions of that call that should be included with the
16   excerpts, I'll hear you on that, but if your argument is all or
17   nothing, Judge, either we want the entire thing played or we
18   don't have any specific argument for any parts of it, then we
19   can just move on.
20            But do you want to make an argument that certain
21   portions should be played?
22            MR. WOLPIN:  Yes, your Honor.
23            THE COURT:  All right.  Go ahead.
24            MR. WOLPIN:  Before I begin, because we're working
25   in partly a paper world and partly --
```

**J.A. 335**

```
 1            THE COURT:  I'm sorry.  I -- on my standing desk is
 2   a copy of the -- the entire transcript of the entire call.
 3   It's got some color-coding on it that we've done to try to
 4   identify the excerpts.  If somebody could bring it down to me.
 5   I'm sorry.  I just forgot to bring it.
 6            But you can go ahead while we're -- sorry.
 7            MR. WOLPIN:  I just wanted to make -- just for
 8   purposes of the record to confirm whether a copy of this has
 9   gone to the Court as a -- essentially an exhibit for the
10   purposes of this hearing.
11            THE COURT:  We'll mark the -- the transcript of the
12   entire call as a defendant's exhibit -- the next defendant's
13   exhibit for identification and the transcript of the -- of
14   the -- the redacted portions that -- the portions that the
15   government proposes to play, I also have those.  I don't know
16   if they're already marked as a government's exhibit or not.
17            MS. KRASINSKI:  They are, your Honor.
18            THE COURT:  Okay.  So you can refer to the
19   government's exhibit if you want to talk about the excerpts.
20            And does the clerk have a number for the defendant's
21   exhibit for the entire transcript?
22            THE CLERK:  I don't have their exhibit list right
23   here, your Honor.
24            THE COURT:  All right.  Well, he'll get it, but you
25   can just refer to it as the entire transcript for now and the
```

**J.A. 336**

```
 1   record will reflect that that's the exhibit that will be marked
 2   as the next defendant's exhibit.
 3          MR. WOLPIN:  So what I would begin with is referring
 4   the Court to the second page of the transcript we have.
 5          Obviously the argument we're making is a Rule 106
 6   argument, which is addressed under the following:  When a
 7   writing or recorded statement or part thereof is introduced by
 8   a party, an adverse party may require the introduction at that
 9   time.  Any other part of any other writing or recorded
10   statement ought to -- in fairness to be considered
11   contemporaneously with it.  So it's a fairness consideration.
12          As noted in the First Circuit case, United States v.
13   Bucci, B-u-c-c-i, that may at times, the First Circuit case
14   allow for the admission of otherwise inadmissible evidence.  So
15   it's not simply a question of whether the evidence -- the other
16   portions would be inadmissible; it's an a question of whether
17   in fairness they need to be played with it.
18          What I'm going to ask that the Court consider is
19   page 2, beginning with "the only choices."  And --
20          THE COURT:  All right.  I'll have my transcript in a
21   minute, but why don't you just first read me the closest
22   excerpt or the excerpt that you think relates most closely to
23   what you want to add.
24          MR. WOLPIN:  Okay.  So the government's highlighted
25   portion in 107 is:
```

**J.A. 337**

```
 1              "Okay.  But you threatened Cheddar Mane and said you

 2    were going to come rape his wife.

 3              "I didn't say I was going to rape his wife.

 4              "Okay."

 5              I fucking left that out there.

 6              Okay.

 7              So what we're seeking to get in is the portion just

 8    above that.

 9              THE COURT:  Okay.  Could you read that for me?

10              MR. WOLPIN:  Yes.

11              "The only choices I have here are go to law

12    enforcement or to go hunt this fucking asshole down and commit

13    a crime myself.  Those are the two choices I have.  Because

14    those are my two choices, I can say that" --

15              THE COURT:  I'm sorry.  Could you find Jen?  I did

16    have it in my pile of documents.  I apologize.  Tell her I'm

17    sorry to make her run up the stairs.  Okay.

18              MS. KRASINSKI:  Your Honor, I have another copy

19    and --

20              THE COURT:  I -- I have it.  They're all -- no,

21    these are my -- we'll have to get a -- I've already marked mine

22    up.  We need an unmarked copy of this.  So you'll provide it

23    and it will be the next --

24              THE CLERK:  It'll be marked as Exhibit A.

25              THE COURT:  All right.  So, again, I'm sorry.  I
```

```
 1   just come down with a pile of materials.

 2              All right.

 3              MR. WOLPIN:  If the Court has it in front of it, it

 4   is the second page.  The Court can read --

 5              THE COURT:  Yeah, I've got it.  So you want to have

 6   beginning what?

 7              MR. WOLPIN:  The top of the page.

 8              THE COURT:  With "the only choices that I have"?

 9              MR. WOLPIN:  Yes.  So -- and I can explain the

10   reasoning why, though, we believe those two things are

11   connected.

12              THE COURT:  But are -- is that what you want, you

13   want to start with "the only choices I have"?

14              MR. WOLPIN:  Correct.

15              THE COURT:  Okay.  Let me just read this again.

16              Okay.  This is part of this Alice in Wonderland

17   feeling I have about this case where the strongest evidence the

18   government has against your client on motivation is the very

19   evidence that the government's trying to keep out and you're

20   trying to introduce.  So it's really -- it's like a -- it's

21   hard for me to even understand why you would want to introduce

22   evidence where the defendant talks about planning to commit the

23   crime that he's charged with.

24              Why do you feel you want to introduce evidence in

25   front of the jury that would tend to show that your client had
```

```
 1   a strong motivation and --
 2           I'm sorry.  Vinny didn't find you?  I sent him back
 3   up to get you.  I had it.  I'm sorry.
 4           So help me understand that, because it's a -- it's a
 5   bizarre trial world I'm living in.  I see that statement as
 6   among the strongest pieces of evidence the government has
 7   against your client, but the government wants to keep it out
 8   and you want to put it in.  How -- help me make sense of that.
 9           MR. WOLPIN:  Okay.  So the reasoning why it's
10   relevant in this context is what he is telling this other
11   individual is that I don't intend to commit a crime, I'm not
12   going to commit a crime; I have two choices, to go to the FBI
13   or to commit a crime --
14           THE COURT:  But let's not -- let's not deny reality.
15   The evidence in this case will be undisputed that he felt he
16   did exercise those choices; they didn't produce fruit and so
17   he -- he went and did what he said next, commit a crime.
18           MR. WOLPIN:  Well --
19           THE COURT:  That's how I -- how does that help you?
20           MR. WOLPIN:  In our position to the jury, he did not
21   commit a crime in that incident involving June 16th, 17th.  Our
22   argument is that our client had a choice, which was to commit a
23   crime or go to law enforcement.  He went to law enforcement and
24   continued to go to law enforcement; went to them in May, went
25   to them in September, continued that process.  He never
```

**J.A. 340**

```
1    abandoned that process and decided to commit a crime.

2           THE COURT:  What would you say -- what would you ask

3    the jury to think if in its rebuttal closing if the government

4    got up and quoted this and says, this is the game plan; try to

5    go -- get him to stop, go to the police to get him to stop, and

6    if that doesn't work, commit a crime and that's what he did.

7    How -- are you worried at all that if the jury hears that that

8    that's what they're going to conclude?

9           MR. WOLPIN:  I think it's an argument between both

10   sides.  Our argument is, again, that he has continued to go to

11   the police for help throughout this process.  That was never

12   abandoned.  It was never his intent to commit a crime.  What

13   the government is doing is isolating the one section where he

14   says, well, maybe that was something.

15          THE COURT:  All right.  Let me try -- let me try the

16   government.

17          They want to put this in.  It seems to me obvious

18   that that's strong evidence of a motive on your client's -- on

19   the defendant's behalf.  Why do you want to keep it out?

20          MS. KRASINSKI:  Your Honor, we're trying to just

21   keep the case clean.  There's a statement that is directly

22   about a comment whether or not something is a rape threat or

23   whether it's a joke or whether it's --

24          THE COURT:  I know, but this argument doesn't go to

25   the it's-all-a-joke.  This argument -- I mean, I don't even,
```

**J.A. 341**

 1  frankly, understand what the defendant's argument is, but it
 2  doesn't go to a it's-all-a-joke argument; it's more about this
 3  nonexistent provocation defense that they say they're not
 4  presenting, but if it helps the defense, it only helps if
 5  there's a provocation defense, which there isn't.
 6         So I -- I just -- I'm sorry, but the whole thing is
 7  not making any sense to me.
 8         MS. KRASINSKI:  Our intent was simply to limit it to
 9  the exact portion where Mr. Cantwell is discussing his
10  statement, "so if you don't want me to come and fuck your wife
11  in front of your kids" -- I can't remember the exact words he
12  uses after that.
13         MR. DAVIS:  You need to make yourself --
14         MS. KRASINSKI:  "You need to make yourself scarce."
15         That is exactly what those two lines refer to, that
16  statement.  You threatened Cheddar Mane and you said you were
17  going to come rape his wife.  And Mr. Cantwell responds, "I
18  didn't say I was going to rape his wife.  Okay?  I fucking left
19  that out there.  Okay?"
20         So we were just trying to limit it to the exact
21  statement about that --
22         THE COURT:  Other than saying -- other than just
23  wanting to be -- and I applaud brevity and precision and I -- I
24  like all of that.  But other than that, is there any other
25  reason why I shouldn't allow that portion in, somehow that it's

**J.A. 342**

```
 1   unfairly prejudicial to you?
 2           MS. KRASINSKI:  I don't think it's unfairly
 3   prejudicial, no, your Honor, particularly if the Court grants
 4   the government's request to include in its jury instructions an
 5   instruction that provocation is not a defense.
 6           THE COURT:  Yeah.  Well, I'm inclined, based on
 7   reading this transcript if the government requests it, to add
 8   an instruction -- an instruction to that effect, that
 9   provocation's not a defense, nor is ignorance of the law a
10   defense.  And they aren't defenses to these charges.  And I --
11   because there's another excerpt in here where maybe he's -- has
12   some argument as to why he didn't think it was a legally
13   sufficient threat, but that isn't a defense to the charge
14   either.
15           But so -- okay.  So, as I said, I'm inclined to --
16   unless the defense presents me with evidence, a reason to think
17   that I'm wrong about the law and the government requests a
18   no -- provocation not a defense instruction, I'm inclined to
19   grant that request.  I don't believe the government would be
20   unfairly prejudiced by it.
21           So what I'm going to suggest is, Mr. Wolpin, we
22   start with "the only choices" and go down to the end of the
23   government's first excerpt, 105A.  Is that what you want to do?
24           MR. WOLPIN:  Yes.
25           THE COURT:  All right.  I grant the defendant's
```

**J.A. 343**

13

```
 1   request.
 2            MR. WOLPIN:  I believe it's 107.
 3            THE COURT:  I don't know.  I had my clerk mark
 4   these.  She marked it as 105A.
 5            "Okay.  But you threatened Cheddar Mane."
 6            That statement, right?
 7            MR. WOLPIN:  It might be my mistake.
 8            THE COURT:  It might be my clerk's.  I don't know.
 9            MS. KRASINSKI:  No, it's 105, your Honor.
10            THE COURT:  105A, the excerpt should start with "the
11   only choices that I have" and it should end where the
12   government proposes 105A to end.  Okay?
13            What's the next one, if there is one, that you want?
14            MR. WOLPIN:  We are now on page 3.  This one, I
15   believe, is the 107A.  The government has isolated near the
16   bottom of the page "the thing that there's liability on is,
17   like I said, give me Vic's information."
18            THE COURT:  Right.
19            MR. WOLPIN:  That one.  We would ask that that start
20   basically a sentence or two before with the word are, a-r-e,
21   three-quarters across --
22            THE COURT:  If that comes in and the government
23   requests an instruction that ignorance of the law is not a
24   defense, do you have any disagreement with that legal
25   principle?
```

**J.A. 344**

1          MR. WOLPIN:  Well, I would have to consider whether

2     I think it should be something instructed.  As far as whether

3     that legal principle is correct, that -- yes.  But as mental

4     state is at issue --

5          THE COURT:  Right.

6          MR. WOLPIN:  -- I think it can be interpreted in

7     several ways and we're not going to argue that he was -- you

8     know, committed a crime but didn't know it at the time.  That's

9     not going to be our argument to the jury.

10          THE COURT:  Right.  And I think the now is probably

11    not.  When we actually listen to the transcript, I suspect it

12    says here "that's not, you know, I understand the definition of

13    threat legally, okay, so that's now what it is."

14          MR. WOLPIN:  Not what it is.

15          THE COURT:  I think that's "not what it is."

16          MR. WOLPIN:  Correct.

17          THE COURT:  So when you do present a transcript,

18    unless the parties hear that differently, I would -- in

19    context, that word now should be not.  But that clearly

20    implicates an ignorance-of-the-law problem, which if I allow

21    that evidence in, I would have to grant a request for

22    instruction from the government that ignorance of the law is

23    not an excuse, a defense.

24          I would also consider, of course, some additional

25    language that the defense would propose such as you still have

1    to prove criminal intent and context is important and, you

2    know, I -- I would -- I understand how you would not want the

3    jury to be confused about what ignorance of the law means.  The

4    defendant still must act with the requisite criminal intent.

5    That he doesn't know that acting with that intent is a crime is

6    not a defense to the crime.  I think those are basic legal

7    principles that we would all agree on.

8         MR. WOLPIN:  Yes, but --

9         THE COURT:  All right.  You don't have to take a

10   position on the instruction.  I'm just advising you that if

11   that comes in, in my mind, it brings directly to bear a

12   question about how should the jury evaluate an assertion by the

13   defendant that I know what a legally sufficient threat is and

14   that isn't one.  And that -- that's -- so it will increase the

15   likelihood that I will have to instruct on that point.  But I

16   don't have any problem with an excerpt that would be -- I'll

17   hear what the government says, but start with I didn't -- 106A,

18   that combines 106A and 107A and includes the one sentence in

19   between 106A and 107A so that the -- what would be admitted

20   would read, "I didn't threaten to rape his wife.  What I said

21   was F-ing you don't want me to put this out there.  One of my

22   incell listeners would love to give her a kid.  Okay?

23        "Not -- you know, I understand the definition of

24   threat legally, okay, and that's not what that is.  The thing

25   that they're -- the thing that there's a like -- a liability on

J.A. 346

1    is, like I said, give me Vic's information, you know, to

2    prevent me from doing something.  Okay?"

3              So that's what the -- it would be one excerpt,

4    combining those two with the one sentence the government

5    omitted.  Is that clear?

6              MR. WOLPIN:  Yes.

7              THE COURT:  I'll hear the government as to why I

8    shouldn't do that.

9              MS. KRASINSKI:  So, your Honor, this call is from

10   December 5th, 2019.  There is nothing to suggest that before he

11   made the statements to Cheddar Mane in June of 2018 that he

12   researched, knew about, had any understanding of what

13   constituted a legal -- a threat legally.

14             And so I think to include this statement that was

15   made more than a year after he made the statements to --

16             MR. DAVIS:  Six months.

17             MS. KRASINSKI:  -- excuse me, six months after he

18   sent the messages to Mr. Lambert, I think it's confusing.  We

19   don't know what he knew about the law, even if he misunderstood

20   it at the time, and so because it was made so far after, it

21   doesn't have any bearing on what he knew or thought at the time

22   he made those statements.

23             THE COURT:  But it -- it's really just like cutting,

24   pasting, like taking out portions -- one sentence out of an

25   exchange he has where you want to put in what's above it and

**J.A. 347**

```
 1   what's below it and I -- that's exactly what Rule 106 is
 2   designed to address.  So you don't have to introduce that
 3   exhibit -- those excerpts.  If you don't like that sentence so
 4   much, don't introduce those two excerpts.  But if you want to
 5   introduce them, introduce them as a combined exhibit with 106A,
 6   107A and the sentence in between.  And, as I said, if the
 7   government requests an instruction on ignorance of the law and
 8   it's properly drafted, in light of that statement coming in,
 9   I'm inclined to admit an instruction on that and permit
10   argument on that so that the government is free to pull this
11   out and say, here's that statement on his part, but you'll hear
12   the judge instruct on that point and ignorance of the law is
13   not a -- is not a defense.  So whether he, in fact, thought
14   that or not, it's not a defense.  All right?
15          So I -- I guess I have more faith that jurors follow
16   what I tell them than the lawyers do.  And I -- I recognize
17   that's a fairly commonly held belief that jurors just disregard
18   what judges tell them, but I've done hundreds -- well over a
19   hundred trials as a judge and I -- I'm absolutely convinced
20   that jurors follow my instructions.  So I -- I don't believe
21   you'll be harmed in any way.
22          Is there anything else that the defense wants?
23          MR. WOLPIN:  No, your Honor.
24          THE COURT:  All right.  So that -- that's what we'll
25   do on those exhibits.  Otherwise, you can play your excerpts as
```

**J.A. 348**

1    you propose.  You can choose to play some and not others, but

2    if you play the -- the two that we've addressed here, you need

3    to make the modifications that I've proposed.  Okay?

4            MS. KRASINSKI:  Yes, your Honor.

5            THE COURT:  So the motion from the defense is

6    granted in part and denied in part.

7            Are we ready to bring the jury in?

8            MS. KRASINSKI:  I guess just one sort of practical

9    question, your Honor.

10           We will obviously have to create new clips.  That

11   takes some time.

12           THE COURT:  Right.  You can introduce them out of

13   sequence even if it's after your case if you need to.  I'll let

14   you put it in and we won't need the -- the foundation for the

15   admission of the statements has already been laid through the

16   prior witness, so you're not going to need to recall somebody.

17   If you want to recall him to do it, you can, but you don't need

18   to.

19           MS. KRASINSKI:  And the only other sort of related

20   issue is we had talked a little bit about Government's Exhibit

21   700 yesterday, which is the summary chart.  So, again, I

22   know --

23           THE COURT:  Ah, yes.  So does somebody have that

24   summary chart?  Is it --

25           MS. KRASINSKI:  I think we can display it.

**J.A. 349**

1           MR. DAVIS:  700.

2           MS. KRASINSKI:  It's 700.

3           THE COURT:  Okay.  What -- the objection is that

4    this doesn't qualify for admission under Rule 1006 because the

5    summarized documents are not so voluminous as to justify the

6    resort to the rule.  That's what I understand.  Is that what

7    the defense's --

8           MR. LEVIN:  That's correct, your Honor.

9           THE COURT:  All right.  So let's go through each of

10   these documents and why doesn't the government explain to me

11   its view as to why this is -- documents are so voluminous that

12   they have to be summarized.

13          MS. KRASINSKI:  So what it compiles is dates and

14   times from a large amount of different sources.  So there are

15   sources from Mr. Cantwell's radio shows; there's sources from

16   the pole camera surveillance; there's sources from the cell

17   phone extraction; there's --

18          THE COURT:  Which of these exhibits -- which of

19   these references is not something that is in evidence?

20          MS. KRASINSKI:  There are only two right now where

21   there has not been either an exhibit or testimony about.  The

22   first one, the June 14th, 2019, Radical Agenda introduction

23   stating that the defendant is in Keene, New Hampshire, and the

24   June 17th, 2019 Radical Agenda introduction saying that, again,

25   the defendant is in Keene, New Hampshire.

**J.A. 350**

```
 1              THE COURT:  Are those going to come into evidence?
 2              MS. KRASINSKI:  I anticipate that they will, your
 3    Honor, yes.
 4              THE COURT:  Yeah.  Well, then we can -- we can use
 5    it as a chalk.  You can show it to -- it'll be marked for
 6    identification.  It could be displayed to the jury, including
 7    during closing argument, and it should include the exhibit
 8    numbers that you're referencing and then you can put it up in
 9    front of the jury and go through, say, when you look at the
10    exhibits, I want to run through and tell you what each of these
11    things show.
12              So it -- it's -- it isn't -- doesn't strike me that
13    it's a Rule 1006 -- and I've written on this for the
14    First Circuit.  If you go back and read the 1006 cases in the
15    First Circuit, you'll see one that I've written on for the
16    Circuit and I -- my view is that there's nothing wrong with
17    using this as a chalk, but it really isn't a 1006 exhibit that
18    goes to the jury.
19              If you want to -- I mean, did you find the case that
20    I wrote on this?
21              MS. KRASINSKI:  We found a case affirming your
22    Honor --
23              THE COURT:  Okay.
24              MS. KRASINSKI:  -- but --
25              THE COURT:  Sorry.  Maybe I'm confused.  I may
```

```
 1    have -- I just may have been affirmed on it.
 2           Okay.  So, in any event, that's my basic approach.
 3    We won't admit it as an exhibit at this time, but it can be
 4    marked for identification and if you need to modify it, you
 5    can, and when you want to display it during a -- a closing
 6    argument, you could, or if you were wanting to go through with
 7    a witness and show them the exhibit, it can be displayed to the
 8    jury.  The difference is it doesn't carry evidentiary quality
 9    on its own, but it can be used to -- as a way you could -- you
10    could write this up on a chart during an argument if you needed
11    to.
12           Okay.  So that's a ruling on that.  Are we ready to
13    bring the jury in?
14           THE CLERK:  Yes, Judge.
15           THE COURT:  Okay.  Let's go.
16                    WITH THE JURY PRESENT
17           THE COURT:  Good morning, members of the jury.
18    Sorry to keep you waiting.  I want you to know I -- we try to
19    get in here at 9:00 and do all our little cleanup before you
20    start, but -- everything we do is designed to make things run
21    more smoothly during the course of the trial, so hopefully
22    we've done some things to keep this thing moving for you.
23           We're ready for your next witness, so if you could
24    call your witness -- or did we finish cross?  I'm sorry.  I
25    can't --
```

**J.A. 352**

```
 1              MR. LEVIN:  No, your Honor.

 2              THE COURT:  All right.  So the witness should be

 3    recalled.

 4              Sir, you understand you're still under oath.

 5              THE WITNESS:  Yes, your Honor.

 6              THE COURT:  All right.  Go ahead, Counsel.

 7              MR. LEVIN:  Thank you, your Honor.

 8                     CONTINUED CROSS-EXAMINATION

 9    BY MR. LEVIN:

10        Q.    Agent Tongbua, yesterday toward the end of the day

11    we were talking about sort of how the -- how the investigation

12    proceeded.

13              Just to refresh some of the facts, you indicated

14    that you had been investigating Mr. Cantwell from the end of

15    2018, beginning of 2019; is that right?

16        A.    Correct.  That's when I took over the investigation.

17        Q.    That's when you took over the investigation.

18              And in June -- in -- and so leading up to the

19    June 2019 events that are the basis of this case, you were

20    surveilling him?

21        A.    Yes.

22        Q.    You were investigating certain records?

23        A.    Yes.

24        Q.    And then in June 2019 are the events that you

25    testified about previously, the screenshots that went into
```

**J.A. 353**

23

```
 1   evidence; is that right?
 2        A.    Correct.
 3        Q.    And after June 2019, the FBI started to communicate
 4   with Mr. Cantwell?
 5        A.    Correct.
 6        Q.    And in September 2019, you actually met with
 7   Mr. Cantwell --
 8        A.    Correct.
 9        Q.    -- is that right?
10        A.    Yes.
11        Q.    So in August of 2019, the FBI did receive emails
12   from Mr. Cantwell; is that right?
13        A.    Yes, we did.
14        Q.    And it was your understanding that he was
15   complaining about the pranking and harassment by members of the
16   Bowl Patrol in those emails?
17        A.    Yes.
18        Q.    And he attached to those emails photographs of
19   Cheddar Mane's family; is that right?
20        A.    He did.
21        Q.    A picture of Cheddar Mane appearing to have strips
22   of LSD on his tongue?
23        A.    Strips of something on his tongue, yes.
24        Q.    Cheddar Mane's address?
25        A.    Yes.
```

**J.A. 354**

```
 1        Q.    Those were provided to the FBI in August of 2019; is

 2   that right?

 3        A.    Correct.

 4        Q.    And those were attached to -- those -- and

 5   accompanying those or around the same time frame, there was

 6   also an email that he sent to the FBI where he did admit that

 7   he had threatened to expose Cheddar Mane's real identity if he

 8   continued to harass and defame him?

 9        A.    Yes.

10        Q.    And that he did expose him after offering him the

11   out of identifying Vic Mackey, which he declined?

12        A.    Correct.

13        Q.    And that he had called CPS in his area to warn that

14   Cheddar Mane was involved in a white supremacist terror group

15   which in combination with a photo appearing to show LSD on his

16   tongue might put his children in danger?

17        A.    Correct.

18        Q.    So that was all information that was provided to the

19   FBI by Mr. Cantwell even before you met with him; is that

20   right?

21        A.    Correct.

22        Q.    And then you met with him in September 2019.  That

23   was at the Keene Police Department, right?

24        A.    Correct.

25        Q.    That was a voluntary meeting; he walked in and
```

**J.A. 355**

```
 1   walked out?

 2         A.   Correct.

 3         Q.   The meeting lasted about three hours?

 4         A.   Yes.

 5         Q.   You've described it previously in testimony as being

 6   a productive, constructive meeting?

 7         A.   Absolutely.

 8         Q.   You were present along with Kevin LeBlanc; is that

 9   right?

10         A.   Correct.

11         Q.   And Joel Chidester?

12         A.   Correct.

13         Q.   And this was the Keene Police Department where Joel

14   Chidester works and he helped to facilitate the meeting?

15         A.   He did.

16         Q.   During that meeting, there was a discussion about

17   members of the Bowl Patrol?

18         A.   There was.

19         Q.   There was -- he talked about Cheddar Mane, Ben

20   Lambert?

21         A.   At that time, he did not know Mr. Lambert's

22   identity.

23         Q.   But he talked about Cheddar Mane; is that right?

24         A.   Right.

25         Q.   And, again, during that meeting he admitted that he
```

**J.A. 356**

```
 1   had asked Cheddar Mane for Vic Mackey's information?
 2        A.   I believe so.
 3        Q.   And that he had threatened to dox Vic Mackey?
 4        A.   He threatened to dox Cheddar.
 5        Q.   But he wanted -- he wanted Vic Mackey's dox from
 6   Cheddar; is that right?
 7        A.   Yes.
 8        Q.   And that he admitted to -- to threatening -- he
 9   admitted to calling CPS if Cheddar Mane didn't provide Vic
10   Mackey's information?
11        A.   Correct.
12        Q.   And during that meeting with you and Sergeant
13   Chidester, he admitted that he did these things because he felt
14   he had to take action for himself on his own behalf; is that
15   right?
16        A.   I believe so.
17        Q.   He mentioned Katelen Fry, otherwise known as Peach?
18        A.   He did.
19        Q.   And said she might be able to provide details as
20   well?
21        A.   Correct.
22        Q.   And he indicated to you that she was also an
23   associate of Cheddar Mane and his friend Hardmous; is that
24   right?
25        A.   Correct.
```

**J.A. 357**

```
 1        Q.    And that she had visited them in Missouri and that
 2   she had sent pictures of Cheddar Mane's family or she had sent
 3   the pictures of Cheddar Mane's family; is that right?
 4        A.    Correct.
 5        Q.    She had relayed those to Mr. Cantwell.
 6              Now, you learned about -- from Mr. Cantwell and
 7   others about the history of Mr. Cantwell's relationship with
 8   the Bowl Patrol; is that right?
 9        A.    I'm sorry.  Could you repeat that?
10        Q.    You learned about the history of Mr. Cantwell and
11   the Bowl -- and members of the Bowl Patrol; is that right?
12        A.    Mr. Cantwell, is that what you were --
13        Q.    Yes.
14        A.    Yes, correct.
15        Q.    Mr. Cantwell and members of the BowlCast or the Bowl
16   Patrol.
17        A.    Correct.
18        Q.    That they were sort of colleagues at first?
19        A.    Sure.
20        Q.    That Mr. Cantwell was a guest speaker on an episode
21   of the BowlCast?
22        A.    He was.
23        Q.    That over time the relationship between Mr. Cantwell
24   and the members of the BowlCast soured?
25        A.    I believe so.
```

**J.A. 358**

1      Q.   And there was a falling out?

2      A.   Yes.

3      Q.   And a divergence of views on certain matters?

4      A.   Yes.

5      Q.   And you learned that in the course of your

6  investigation that Cheddar Mane and some of his associates

7  started prank-calling Mr. Cantwell's shows and doing things

8  like that?

9      A.   Correct.

10     Q.   They would -- you learned that they had posted

11  insulting pictures of Mr. Cantwell?

12     A.   Correct.

13     Q.   And that they thought this was funny --

14     A.   Correct.

15     Q.   -- this was a joke.

16          And you learned that Mr. Cantwell had told them to

17  knock it off?

18     A.   Correct.

19     Q.   And that -- you learned that even earlier in 2019,

20  in January or February, he had threatened to dox or release

21  information about Cheddar Mane related to that harassment?

22     A.   Correct.

23     Q.   And you learned from Mr. Cantwell that it was his

24  perception that Cheddar Mane had continued to harass him and

25  that led to the exchange at issue in this case?

**J.A. 359**

```
 1                    MS. KRASINSKI:  Objection, your Honor.

 2                    THE COURT:  Basis?

 3                    MS. KRASINSKI:  Relevance.

 4                    THE COURT:  Hang on just a second.

 5                    MS. KRASINSKI:  And hearsay.

 6                    THE COURT:  Overruled.

 7          Q.    In fact, in the exchange between Mr. Cantwell and

 8    Cheddar Mane, the first sentence of that exchange in those

 9    screenshots is, "I guess you forgot the lesson which kept you

10    away for a short while.  Do you need to be reminded?"

11                    Is that right?

12          A.    It is.

13          Q.    And that refers to -- is it your understanding that

14    that refers to Mr. Cantwell's referencing the earlier

15    harassment, his earlier threat, and the fact that Mr. Cheddar

16    Mane had kept away for a short while?

17          A.    Correct.

18          Q.    And Mr. Cantwell's perception that Mr. Cheddar Mane

19    had forgotten the lesson which kept him away for a short while

20    and needed to be reminded; is that right?

21          A.    That's how it reads.

22          Q.    Now, you would agree that Mr. Cantwell is a public

23    figure; is that right?

24          A.    Indeed.

25          Q.    That what he does is public under his own name?
```

**J.A. 360**

```
 1          A.    It is.

 2          Q.    His true name?

 3          A.    It is.

 4          Q.    He had a website, christophercantwell.com, you're

 5   familiar with that website?

 6          A.    I am.

 7          Q.    Pictures of Mr. Cantwell are the real Mr. Cantwell,

 8   pictures that are presented on the Internet?

 9          A.    (Nods head.)

10          Q.    Is that right?

11          A.    Fairly speaking, yes.

12          Q.    He doesn't hide behind an avatar or some symbol;

13   he's out there as himself, his own identity, his own persona.

14   Is that right?

15          A.    Yes, for the most part.

16          Q.    Members of the Bowl Patrol, however, that's not

17   true, is it?  They are presenting themselves as aliases?

18          A.    For the most part, yes.

19          Q.    Pseudonyms?

20          A.    Correct.

21          Q.    The photographs they use are not their real

22   photographs?

23          A.    I don't believe so, yes.

24          Q.    The avatars are either artistic representations, is

25   that right --
```

**J.A. 361**

```
 1        A.   Yes.

 2        Q.   -- sometimes incorporating the bowl haircut style of

 3   Dylann Roof; is that right?

 4        A.   Yes.

 5        Q.   Sometimes incorporating other sort of ghoulish

 6   elements, skeleton faces?

 7        A.   Sure.

 8        Q.   Sometimes incorporating photographs of weapons?

 9        A.   Yes.

10        Q.   And the Bowl Patrol, is it your understanding and I

11   believe it was your testimony, they worship Dylann Roof, who is

12   a mass murderer of nine black parishioners in a church in South

13   Carolina?

14        A.   That's fair to say.

15        Q.   And they have other people that they similarly have

16   canonized; is that right?

17        A.   Yes.

18        Q.   Robert Bowers, who killed a number of people in a

19   synagogue in Pittsburgh, Pennsylvania?

20             MS. KRASINSKI:  Objection, relevance.

21             THE COURT:  Sustained.

22        Q.   The Bowl Patrol -- Dylann Roof is not the only

23   serial killer that the Bowl Patrol deifies or worships; is that

24   right?

25             MS. KRASINSKI:  Objection, relevance.
```

```
 1                  THE COURT:  Sustained.
 2        Q.    Members of the Bowl Patrol did not want their real
 3   identities to become known; is that right?
 4        A.    That's fair to say.
 5        Q.    The fear of being doxed is the fear of having your
 6   true identity exposed?
 7        A.    Yes.
 8        Q.    And, particularly, they do not want their true
 9   identities connected with the contents of the BowlCast
10   episodes; is that right?
11                  MS. KRASINSKI:  Objection, foundation.
12                  MR. LEVIN:  If he knows.
13                  THE COURT:  I mean, the jury can draw the conclusion
14   you want them to draw based on the testimony you've already
15   elicited, so just move on.
16        Q.    You've listened to episodes of the BowlCast?
17        A.    Pieces, yes.
18        Q.    And is it fair to say that the BowlCast contains
19   extreme language?
20        A.    That's fair to say.
21        Q.    Racist language?
22        A.    That's fair.
23        Q.    Homophobic language?
24                  MS. KRASINSKI:  Objection, relevance.
25                  THE COURT:  Overruled.  I'm going to allow -- I'm
```

```
 1   going to allow you to describe in general terms, but I'm not
 2   going to spend hours and hours going through every outrageous
 3   thing the BowlCast does.
 4          So you can -- the objection's overruled, but I'm
 5   putting you on notice that there will come a time where I will
 6   say we've heard enough and we need to move on.
 7          MR. LEVIN:  Thank you, your Honor.  I just want to
 8   point out that these -- the same language that I'm using was in
 9   the government's opening and in the --
10          THE COURT:  And I said I'm allowing you to proceed
11   and I'm telling you that there's a point at which it will
12   become a waste of time and I will have to, because I have to
13   control the trial, decide when we've heard enough.  All right?
14          MR. LEVIN:  Thank you.
15          THE COURT:  So the objection was overruled and you
16   may continue.
17      Q.   Misogynistic language?
18      A.   Yes.
19      Q.   Anti-Semitic language?
20      A.   Yes.
21      Q.   And it's understandable why a person would not their
22   real identity associated with that; is that right?
23      A.   I can't speak for other's opinions, but ...
24      Q.   So you don't know why members of the Bowl Patrol are
25   fearful of having their identities exposed?
```

**J.A. 364**

```
 1         A.    That's their own personal opinions.  I can't answer

 2   for them.

 3         Q.    Now, in October 2019, you went to Missouri to see

 4   Cheddar Mane; is that right?

 5         A.    Correct.

 6         Q.    This was four months after the events of June 2019

 7   that are the basis of this prosecution; is that right?

 8         A.    Correct.

 9         Q.    And, again, Cheddar Mane had not contacted the

10   FBI --

11         A.    Correct.

12         Q.    -- about that exchange, had not contacted law

13   enforcement about that exchange?

14         A.    Not to my knowledge.

15         Q.    And your visit to Cheddar Mane, Mr. Lambert, was a

16   surprise visit; is that right?

17         A.    How do you mean exactly?

18         Q.    You hadn't contacted him ahead of time to say, we're

19   coming out to see you?

20         A.    Correct.

21         Q.    And you, on October 17th, 2019, drove up to his

22   house; is that right?

23         A.    Repeat the date, please.  I'm sorry.

24         Q.    October 17th, 2019.

25         A.    I don't recall the specific date.  If you could
```

**J.A. 365**

```
 1   refresh my memory.
 2        Q.   Excuse me?
 3        A.   I don't recall the specific date.  If you could
 4   refresh my memory.
 5        Q.   Would it --
 6             THE COURT:  Hang on just a second, sir.  I'm having
 7   just a little trouble hearing you.  Your voice is dropping off
 8   towards the end of your statements.  So just speak a little
 9   louder.  Okay?
10             THE WITNESS:  Yes, your Honor.
11             THE COURT:  Go ahead.
12        Q.   Would it refresh your recollection to look at a
13   report that you authored about this visit?
14        A.   Yes, it would.  Thank you.
15             MR. LEVIN:  If I could have the ELMO.
16             THE COURT:  Can you enable the ELMO?
17             MR. LEVIN:  You can show this to just the witness.
18             THE COURT:  I'm sorry.  Hang on just a second.  All
19   right.
20             We have to -- it's going to take us just a second.
21   Okay?  Now it's okay.
22        Q.   This is a report that's dated at the top
23   November 5th, 2019; is that right?
24        A.   Correct.  That's the date of entry.
25        Q.   And the -- and the -- at the bottom it says
```

```
 1    investigation on October 17th, 2019.

 2         A.    That's correct.

 3         Q.    Is that the day that you appeared at Mr. Lambert's

 4    house?

 5         A.    Yes.

 6         Q.    And there were a number of agents with you at that

 7    time; is that right?

 8         A.    There were a few of us, yes.

 9         Q.    It was you, Mr. Fernald -- Brett Fernald;

10    is that correct?

11         A.    Correct.

12         Q.    Kevin LeBlanc; is that correct?

13         A.    Yes.

14         Q.    And Keith Kohne, K-o-h-n-e?

15         A.    Correct.

16         Q.    And Mr. -- Mr. Cheddar Mane was not present at the

17    residence; is that right?

18         A.    Correct.  He had just left for work.

19         Q.    You later located him at his job; is that right?

20         A.    That's correct.

21         Q.    And there were four agents that appeared at his

22    work; is that right?

23         A.    Well, two -- two agents and two task force officers,

24    but, yes, there were --

25         Q.    Two agents and two task force officers.
```

1          And you told Mr. Lambert and his employer that there

2   had been a threat to his family; is that right?

3       A.   I believe so.  I wasn't part of that conversation.

4       Q.   Now, this wasn't a new threat.  This is the same

5   alleged threat from June 2019; is that right?

6       A.   Correct.

7       Q.   And this would have been something that Mr. Lambert

8   was already aware of; is that right?

9       A.   Correct.

10      Q.   And he agreed to go voluntarily with you to the

11  Lincoln County Sheriff's Department; is that right?

12      A.   He did.

13      Q.   And when you -- and he drove in a vehicle with two

14  agents to the Lincoln County Sheriff's Department?

15      A.   Correct.

16      Q.   And there was a conversation between those two

17  agents, one of which was yourself, right?

18      A.   Correct.

19      Q.   And Mr. Lambert on the ride over --

20      A.   Yes.

21      Q.   -- is that right?  And that was not recorded; is

22  that right?

23      A.   No, because it was kept to be -- we didn't really

24  discuss the subject.  We told him, you know, we'd really wait

25  to talk about the issue when we sat down.

```
 1        Q.    And then when you met with him, there were six

 2   agents present; is that right?  Yourself, Mike Gibeley, Keith

 3   Kohne, an Officer Cochrane, Fernald, and LeBlanc?

 4        A.    In the initial interview with Mr. Lambert?

 5        Q.    Yes.

 6        A.    There were only two of us in that room.  It was

 7   myself and Officer Fernald.  And there's a video recording of

 8   that interview.

 9        Q.    I may have been mistaken about that.

10              So you say there were only two people at that

11   interview?

12        A.    Yes.

13        Q.    Yourself and who else?

14        A.    Officer Brett Fernald.

15        Q.    Officer Brett Fernald.  And he is a task force

16   officer; is that right?

17        A.    Correct.

18        Q.    Now, when you first -- when you encountered

19   Mr. Lambert, Mr. Cheddar Mane, he was actually wearing a shirt

20   with a Bowl Patrol emblem on it; is that correct?

21        A.    He was.

22        Q.    A skull and crossbones with a Dylann Roof bowl cut?

23              MS. KRASINSKI:  Objection, relevance.

24              THE COURT:  Overruled.

25        Q.    Now, when you met with Mr. Lambert, you took his
```

```
 1   phone away; is that right?
 2        A.   Yes.
 3        Q.   You told him you didn't want him reaching out to
 4   anybody?
 5        A.   That was not our facility, so that was done with the
 6   officers there.  It was a controlled area.  I didn't physically
 7   take it from him.
 8        Q.   Who took it from him?  Who physically took it from
 9   him?
10        A.   I don't recall.
11        Q.   Who told him, we just don't want you reaching out to
12   anybody just yet?
13        A.   That -- it would have been the locals.
14        Q.   Were the locals involved in the interview?
15        A.   No, but it was their facility.  It was their
16   policies to state.
17        Q.   When you met with Mr. Lambert, you told him that
18   there was a threat against his family?
19        A.   We discussed the threat, yes.
20        Q.   Those were your words, right?
21        A.   He was aware of it.  He was party to it.
22        Q.   But -- but you told him, in your own language, that
23   you considered it a threat?
24        A.   Sure.
25        Q.   And you told him you were taking it seriously?
```

**J.A. 370**

```
 1          A.    Absolutely.

 2          Q.    And you told him you were not letting it go?

 3          A.    We were concerned for the welfare of his family.

 4          Q.    Did you tell him you were not letting it go?

 5          A.    I don't recall my exact words, but, again, there's a

 6   recording.  If that's what I said, that's what I said.

 7          Q.    Now, in the course of your investigation, you

 8   learned that the exchange between Cantwell and Cheddar Mane was

 9   initially a private text exchange; is that right?

10          A.    Correct.

11          Q.    And that Cheddar Mane took screenshots of that

12   exchange; is that right?

13          A.    Correct.

14          Q.    And released it in a public forum, a public chat

15   group; is that right?

16          A.    I don't know that he posted them himself, but that's

17   ultimately where they ended up.

18          Q.    And there were stickers over the -- certain aspects

19   of the exchange; is that right?

20          A.    Yes.

21          Q.    And did you determine who put those stickers on

22   there?

23          A.    Mr. Lambert told us that he did.

24          Q.    And some of those stickers that were placed over the

25   exchange are images of Mr. Cantwell; is that right?
```

```
1          A.   Correct.

2          Q.   Derogatory images of Mr. Cantwell?

3          A.   Sure.

4          Q.   Now, after you met with Mr. Lambert, a/k/a Cheddar

5     Mane, you met with Chris Cantwell again; is that right?

6          A.   I did not.

7          Q.   You did not.  You were not present for that?

8          A.   Correct.

9          Q.   You -- you testified about certain slang terms and

10    concepts that are used in white supremacist extremist circles;

11    is that right?

12         A.   Yes.

13         Q.   You testified about incels --

14         A.   I did.

15         Q.   -- that that refers to someone who's involuntarily

16    celibate --

17         A.   Correct.

18         Q.   -- is that right?  Men who have not had romantic

19    success, correct --

20         A.   Yes.

21         Q.   -- and consider themselves involuntarily celibate.

22    And as part of that stigma, they embrace resentment and anger

23    towards women; is that right?

24         A.   Correct.

25         Q.   You testified about what an avatar is; is that
```

**J.A. 372**

42

1   right?

2        A.   I remember discussing avatars.  I don't know if I

3   specifically defined it, but yes.

4        Q.   Are you familiar with the term cuckold or cuck?

5        A.   I've seen it and heard it quite a bit, yes.

6        Q.   Related to white supremacist circles?

7        A.   Yes.

8        Q.   Do you have -- do you know what it means?

9        A.   I don't have a good definition, but it's certainly

10  intended to be derogatory, it appears.

11       Q.   What about accelerationism?  Have you heard that

12  term?

13       A.   I have.

14       Q.   And what does that mean?

15       A.   It's a general theory.  It's a little more

16  aggressive in wanting to bring about change to society

17  politically and it's basically -- as opposed to bringing that

18  about through productive political change, it's rather just

19  that the government collapses and then you just start over with

20  a new one that hopefully you can design the way you want it.

21       Q.   Is it your understanding that the Bowl Patrol has an

22  accelerationist philosophy?

23            MS. KRASINSKI:  Objection, relevance.

24            THE COURT:  Overruled.

25       A.   That's my understanding.

**J.A. 373**

43

```
1          Q.    Now, when you met with Ben Lambert or Cheddar Mane,
2    you made it clear to him, did you not, that he could help
3    himself by cooperating with this investigation?
4          A.    How do you mean?
5          Q.    That he had some liability potentially.
6          A.    No, there were no promises there.  There was no
7    insinuation of criminal behavior on his part.
8          Q.    No insinuation of criminal behavior on his part?
9          A.    No.  We were there to address the threat and there
10   were no -- we told him he was not under investigation, he was
11   not charged with any crime.
12         Q.    Do you remember telling Mr. Lambert that he could
13   put Cheddar Mane behind him and go on into the world as Ben
14   Lambert?
15         A.    I don't remember saying that specifically, but that
16   seems like a logical statement.
17         Q.    Is that along the lines of the conversation you had
18   with him?
19         A.    With myself and Officer Fernald?  It's along the
20   lines, but that doesn't necessarily represent excuse for any
21   potential criminal behavior.
22         Q.    You've had numerous contacts with Mr. Lambert
23   between first meeting him in October 2019 and today; is that
24   right?
25         A.    Yes, a few.
```

**J.A. 374**

44

```
 1          Q.    Conversations with him on the telephone?

 2          A.    A few times, yes.

 3          Q.    Meetings with him in person?

 4          A.    Once or twice, I believe, since then.

 5          Q.    Did you ever offer him any financial assistance?

 6          A.    Absolutely not.

 7          Q.    What about victim services?

 8          A.    We discussed it, because at that point he is

 9   classified as a victim in this case.

10          Q.    Did you tell him --

11          A.    He was made aware --

12          Q.    I'm sorry.  Go ahead.

13          A.    He was made aware that those services are available

14   to him and his family.

15          Q.    And would those services include financial

16   assistance?

17          A.    I can't speak to those.  I'm not a victim/witness

18   coordinator or specialist.  So my office has those, as does the

19   U.S. Attorney's Office, and those are the people that handle

20   those matters.

21          Q.    Is that a conversation you ever had with him?

22          A.    I just made him aware that those services were

23   available and I gave him some contacts.  He said he was fine,

24   but he understood how to get those services if he needed them.

25          Q.    Did you talk to him about being a paid confidential
```

**J.A. 375**

```
 1   informant?
 2         A.    No.
 3         Q.    When this case is over, that -- or during the case
 4   or when the case is over, that he could get compensation for
 5   being a paid confidential informant?
 6         A.    No, he was never explicitly recruited.  I think we
 7   left -- as we generally do, we leave that door open unless
 8   there's a reason to specifically preclude someone from being a
 9   source.
10         Q.    Did you ever have that conversation with him?
11         A.    No.  Again, not specifically.  No, we never said,
12   hey, would you like to be an informant for the --
13         Q.    What about in general terms?
14         A.    -- FBI.
15               He may have interpreted it that way.  I can't say.
16   Because, again, we left it open.  We didn't take it off the
17   table.  So only he can answer, you know, if he felt that we
18   were trying to recruit him.
19         Q.    So you put it on the table and left it out there?
20         A.    Again, I didn't specifically offer it to him.
21         Q.    Right.  But in general terms?
22         A.    Sure.  I mean, I don't know how to -- that's done
23   generally, but yes.
24               MR. LEVIN:  Thank you.
25               THE COURT:  All set?
```

```
 1              MR. LEVIN:  Yes.

 2              THE COURT:  All right.  Redirect?

 3              MS. KRASINSKI:  Thank you, your Honor.

 4                    REDIRECT EXAMINATION

 5  BY MS. KRASINSKI:

 6        Q.    Agent Tongbua, on your cross-examination you briefly

 7  mentioned some of the many complaints that Mr. Cantwell was

 8  raising with law enforcement.

 9              Was Mr. Cantwell complaining about what he deemed

10  harassment from SHARP, Skinheads Against Racial Prejudice?

11        A.    I'm sorry.  I didn't catch the very last -- was he

12  complaining about?

13        Q.    I apologize.  Can you hear me better if I --

14        A.    Yes.

15        Q.    -- stand closer to the microphone?

16              Was he complaining about harassment that he claimed

17  was by SHARP, Skinheads Against Racial Prejudice?

18        A.    I don't recall that, that name specifically --

19        Q.    Did he --

20        A.    -- that group.

21        Q.    Did he complain about harassment from skinheads?

22        A.    He complained about harassment from a variety of

23  sources.  I don't remember that specifically.

24        Q.    What variety of sources do you remember?

25        A.    So, again -- so are we speaking to the FBI or to law
```

**J.A. 377**

1    enforcement in general?

2        Q.    Anything that you have personal knowledge of.

3        A.    So I would do a summary of all his reporting to law

4    enforcement.  We did cover it.  We had the IC3 complaint to the

5    FBI in February of 2019, which we did not see until

6    Mr. Cantwell provided that.

7            That, again, specifically referenced one single

8    incident and it referenced two members of the Bowl Patrol.  It

9    referenced the defacement of Mr. Cantwell's website.  And in

10    that same report, he acknowledged that one of the two

11    individuals had an author's account to that website at one

12    point.

13            I would also say that while Mr. Cantwell might not

14    have approved that content, he would certainly admit that most

15    of the content on his website is offensive to other people.  So

16    I don't know that that was -- would have even been noticed by

17    anyone other than Mr. Cantwell.

18        Q.    Before you continue, you mentioned that that

19    complaint, the February 2019 complaint, complained of one

20    single incident and Mr. Cantwell identified two individuals.

21    Who were those individuals again?

22        A.    So that was Vic Mackey and a user named Mosin

23    Nagant.

24        Q.    And no reference to Cheddar Mane in that complaint?

25        A.    No.

1    Q.   Okay.  Please continue.

2    A.   So, again, the other individual he referenced was

3   Mosin -- an individual that went by the name Mosin Nagant.  He

4   did not identify him in that complaint, but he alluded to the

5   fact that we knew who that was.  We did know who that was at

6   the time and Mr. Cantwell did ultimately dox him weeks after

7   that -- that complaint to us.

8         So I don't know if Mr. Cantwell had that information

9   at that time, but he didn't provide it to us at that time or

10   subsequent to that complaint when he -- whenever he did obtain

11   that information.  So if it was vital to that report, he didn't

12   provide it to us.  Up until that and following that we had no

13   other complaints from Mr. Cantwell until July.

14         Concurrently over that time frame he did have an

15   open dialogue with the Keene Police Department, as we've

16   established.  I have been privy to a lot of that reporting, not

17   necessarily all of it, just through information sharing between

18   agencies and, frankly, most of that was not relevant to our

19   investigation.  From my review of what I've seen, that

20   information spanned a number of things and it spanned

21   harassment from a number of different sources, most of which

22   appeared to be local which would be under the local

23   jurisdiction of the Keene Police Department.

24         As far as I can recall, the first that I have seen

25   record -- unless I'm mistaken or I have not seen it -- the

1    first record that I can cite of information provided by -- from

2    Mr. Cantwell to the Keene Police Department citing Bowl Patrol

3    was an email on Friday June 21st, 2019, when he included the

4    Cheddar.zip file that he also sent to us in August.

5         Q.    So I just want to -- I want to make sure I

6    understand that.

7              So you said that you have reviewed a lot of the

8    reports to Keene Police; is that fair?

9         A.    A good amount.

10        Q.    You can't definitively say you've reviewed all of

11   them?

12        A.    Absolutely.

13        Q.    But that the first reference in anything that you've

14   seen to Bowl Patrol occurs on June 21st, 2019?

15        A.    The first that I can recall.

16        Q.    And that --

17        A.    That would be after the threat exchanged with

18   Mr. Lambert had already -- or Cheddar Blac -- Cheddy Blac had

19   already occurred.

20        Q.    Please continue.

21        A.    Again, that would have been the end of that same

22   week after the incident occurred and it essentially was the

23   same email that he ultimately forwarded to us later in August.

24              So that information was relayed to us shortly after

25   that happened, but obviously at that time we were not aware of

1    the exchange between the two and we were already -- or soon

2    after that because it was of an interstate nature is when

3    Mr. Cantwell was referred to us by Keene Police Department.

4           Now, they had had a discussion about referring the

5    matter to us and Mr. Cantwell was amenable to that, but I will

6    say that we were the ones who reached out to him in July.  He

7    ultimately did not reach out to us.  And it took almost two

8    months to the day for us to schedule an interview for him.  We

9    did not sit down with him until September 17th, when the

10   call -- when I spoke to him the first time was in July 17th.

11          In the first weeks and even over a month that we

12   communicated, it was very one-directional and we essentially

13   just received whatever information Mr. Cantwell felt was

14   pertinent.  We were not able to really ask a lot of questions

15   and really drive the investigation in the way that we normally

16   would and I couldn't glean information from him that I would

17   from a normal complainant or victim that came to us for help.

18          And so while he did provide the pictures to us in

19   late August 2019, if you follow the email chain, that was

20   actually in response to an email I sent him because we weren't

21   getting very far.  He constantly referred to these people in a

22   manner that seemed like they were known to him, that they were

23   acquaintances, but the information he was providing us wasn't

24   helping us to identify them.  So I specifically asked him if he

25   had identifying information that could help us identify these

1   people and it was in response to that that he actually sent us

2   the photos of Mr. Lambert.

3        Q.    Now, did you take Mr. Cantwell's complaints

4   seriously?

5        A.    Absolutely.

6        Q.    So, for example, you did mention that Mr. Cantwell

7   sent you the complaint that he had previously made in February

8   of 2019?

9        A.    He did.

10       Q.    And so when you reviewed it, did it include two IP

11  addresses?

12       A.    It did.

13       Q.    Did you follow up on that at all?

14       A.    I did.

15       Q.    What'd you learn?

16       A.    They came back to a couple of different providers,

17  one of which was a company in -- I think it was based in Korea;

18  the other was based in New York and it's a cloud-based company.

19  So both of those -- none of those gave individual subscriber

20  information, which is not atypical if you look for information,

21  but it certainly didn't corroborate or point us in a single

22  direction to find a specific user.

23       Q.    Okay.  So you followed up on that and you weren't

24  able to develop evidence to substantiate the complaint?

25       A.    Correct.

**J.A. 382**

```
 1      Q.    What about Mr. Cantwell's other complaints?  Did you
 2  follow up on them?
 3      A.    We did.  Extensive phone analysis was done by our
 4  team, not necessarily by myself.  I know at some point he spoke
 5  with a cyber expert-type state trooper who took some other
 6  information and that was also looked into.  Every individual
 7  that he identified who could corroborate his harassment
 8  complaints we either interviewed or attempted to interview and
 9  it was up to those individuals whether they could provide
10  information or they wanted to speak with us.  Ultimately, none
11  of that was very fruitful.
12           I will say the single Bowl Patrol individual we were
13  able to identify off of information provided by Mr. Cantwell
14  was Cheddar Mane.
15      Q.    Now, you were able to identify some things that
16  Mr. Cantwell had discussed or that you found out, right?  You
17  were able to determine that someone from the Bowl Patrol made a
18  rap song about Mr. Cantwell?
19      A.    We did.
20      Q.    During the course of your investigation, did you
21  determine whether Mr. Cantwell made a response rap song?
22      A.    He did.
23      Q.    Tell us about that.
24      A.    That was discovered in reviewing his digital
25  devices.  I want to say it was titled "I'm a Jew, Yo" and it
```

**J.A. 383**

1   was set to a song by Billie Eilish.  I found multiple kind of

2   cuts or versions of it, edits, on one of Mr. Cantwell's

3   computers.

4        Q.    So things like that, the rap songs, that was a

5   back-and-forth?

6        A.    Absolutely.

7        Q.    Now, Mr. Levin was asking you about your

8   characterization of the exchange when you talked to

9   Mr. Lambert, but I want to talk to you about Mr. Cantwell's

10  characterization of the exchange when he emailed you in August

11  of 2019.

12            Mr. Levin asked you if in Mr. Cantwell's

13  August 28th, 2019, email if Mr. Cantwell said, "I threatened to

14  expose his identity."

15            The word threatened, was that your word or

16  Mr. Cantwell's?

17       A.    I believe that's the way the email read.

18       Q.    And so that would be Mr. Cantwell's word?

19       A.    Correct.

20       Q.    So he chose to characterize it as threatened?

21       A.    Correct.

22       Q.    And in that same email, let me see, that Mr. Levin

23  read to you -- quoted you from Mr. Cantwell said, "I did expose

24  him after offering him the out of identifying Vic?"

25       A.    Again, I believe that's the way the email reads.

54

1      Q.    And so it was Mr. Cantwell who described it as

2  offering Mr. Lambert the out of identifying Vic?

3      A.    Correct.

4      Q.    And you mentioned the June 21st, 2019, email from

5  Mr. Cantwell to Officer Chidester.  Have you reviewed that

6  email?

7      A.    I'm familiar with it, yes.

8      Q.    Okay.  And, again, in that email, does Mr. Cantwell

9  say, "I threatened to release one of their identities"?

10      A.    I believe so.

11      Q.    So that's Mr. Cantwell characterizing that exchange?

12      A.    Yes.

13      Q.    When you sat down with Mr. Cantwell in September of

14  2019, you asked Mr. Cantwell about who he then knew at the time

15  as Cheddar Mane, correct?

16      A.    Eventually.  At first we afforded him the

17  opportunity to speak about whatever he wanted.  I would say the

18  first hour of that was not even about Bowl Patrol.  He spoke

19  about a number of other individuals in the white nationalist

20  movement and once we finally got down to it, yes, we went

21  through a list of known Bowl Patrol affiliates to glean what

22  information he had on each one.

23      Q.    Who brought up the Bowl Patrol affiliates?

24      A.    I think we probably did.  I mean, that was sort of

25  the context of why we were there.

**J.A. 385**

```
1          Q.   So the FBI brought up the Bowl Patrol affiliates?

2          A.   Yes.

3          Q.   So after all of these emails, after all this

4    back-and-forth, you sit down with Mr. Cantwell on -- in

5    September of 2019?

6          A.   Correct.

7          Q.   And you essentially give him the floor at first?

8          A.   Yes.

9          Q.   And when you do that, he doesn't mention Bowl Patrol

10   at all?

11         A.   He wanted to give us a lot of historical perspective

12   first.

13         Q.   And so it's the FBI that directs the conversation to

14   Bowl Patrol; is that fair?

15         A.   Ultimately, yes.

16         Q.   And you asked him about Cheddar Mane, correct?

17         A.   We did.

18         Q.   Did you ask him whether he had ever been threatened

19   by Cheddar Mane?

20         A.   We did.

21         Q.   What did Mr. Cantwell say?

22         A.   He said, no, he'd received no direct threats.

23              MS. KRASINSKI:  Nothing further, your Honor.

24              THE COURT:  All set, Mr. Levin, or -- do you have a

25   few more?  I normally don't allow --
```

**J.A. 386**

1          MR. LEVIN:  I just have four areas and I'm done.

2    And it shouldn't take more than --

3          THE COURT:  Let me finish.  As I explained, I don't

4    usually allow recross, but this was an extensive redirect, so I

5    will allow you to follow up on matters that were covered in the

6    redirect.

7          MR. LEVIN:  Thank you, your Honor.

8                    RECROSS-EXAMINATION

9    BY MR. LEVIN:

10        Q.    Agent Tongbua, you indicated that the first

11   reference Mr. Cantwell made to Bowl Patrol was in July 2019.

12   That was your testimony just now?

13        A.    To us or to Keene Police Department?

14        Q.    To the FBI.

15        A.    Other than the IC3 complaint, which he -- I did not

16   see until July --

17        Q.    Right.

18        A.    -- and that is when we took up the matters with

19   him --

20        Q.    Right.

21        A.    -- regarding Bowl Patrol.

22        Q.    But you later became aware that he had made an

23   earlier complaint about the Bowl Patrol?

24        A.    Right, again which referenced that singular incident

25   to the website.  It was not about an ongoing campaign of

1    harassment.

2        Q.    Right.  And then you indicated that you reached out

3    to him in July 2019 and eventually scheduled a meeting in

4    September 2019?

5        A.    That's correct.

6        Q.    And you said that it was -- there was -- it was

7    one-sided communication up until that meeting.  I believe that

8    was your testimony.

9        A.    We exchanged emails, but the information flow, I

10   wasn't -- I was not able to ask questions or request specific

11   information.  It was a lot of Mr. Cantwell generally just

12   sending us volumes of information he felt was relevant.

13       Q.    Right.  But he was providing information to you --

14       A.    He was.

15       Q.    -- is that right?

16       A.    Yes.

17       Q.    And you were responding?

18       A.    Yes.

19       Q.    Okay.  You would agree, would you not, that much of

20   the evidence in this prosecution was provided by Chris Cantwell

21   to the FBI voluntarily.  Not all of it, but much of it.

22       A.    Some of it, yes.

23       Q.    In emails --

24       A.    Yes.

25       Q.    -- right?  Attachments to emails?

**J.A. 388**

```
 1        A.    Yes.

 2        Q.    His voluntary interview?

 3        A.    Yes.

 4        Q.    His voluntary disclosure of a recorded call between

 5   him and a friend --

 6        A.    Yes.

 7        Q.    -- is that right?

 8              And just one more question.  You -- your job is

 9   to -- you indicated that you talked to Mr. Cantwell about

10   different members of Bowl Patrol and tried to get some

11   intelligence from him about who these people might be; is that

12   right?

13        A.    Absolutely.

14        Q.    Your job investigating terrorism, domestic

15   terrorism, white supremacism extremist groups, it's made more

16   difficult, isn't it, by -- when people hide on the Internet,

17   when they don't have their real identities out there; is that

18   correct?

19        A.    Yes, that's fair.

20        Q.    Part of your job is to figure out who these people

21   are so you can keep an eye on them; is that right?

22        A.    Absolutely.

23        Q.    And that's in the interest of public safety; is that

24   correct?

25        A.    Yes.
```

**J.A. 389**

59

```
 1        Q.    That when people are on the Internet inciting
 2   violence, the FBI wants to know who those people are?
 3        A.    Absolutely.
 4        Q.    And they want to make sure they're not inciting
 5   people to commit acts of violence?
 6              MS. KRASINSKI:  Objection, relevance.
 7              THE WITNESS:  You're winding up?
 8              MR. LEVIN:  I'm winding up.
 9              THE COURT:  All right.  Wind up.
10        Q.    Is that correct?
11        A.    That's correct.
12        Q.    So that's in the public interest; is that right?
13        A.    It is.
14              MR. LEVIN:  Okay.  Thank you.
15              THE COURT:  Thank you, sir.  You can step down.
16                   (Witness excused.)
17              THE COURT:  Let me ask my reporter.  Can you go
18   other 15, till -- 10:45?
19              THE COURT REPORTER:  Sure.
20              THE COURT:  All right.  So we'll go a little bit
21   longer and try to break at 10:45.
22              You can call your next witness.
23              MR. DAVIS:  Benjamin Lambert.
24              THE COURT:  We just have to wait until the
25   disinfecting process is completed.
```

**J.A. 390**

```
 1              All set.  You can come up, sir, stand by the witness
 2    stand and raise your right hand, please.
 3              THE CLERK:  Please raise your right hand.
 4              BENJAMIN LAMBERT, having been first duly sworn,
 5    testified as follows:
 6              THE CLERK:  Thank you.  Would you please state your
 7    name and spell your last name for the record.
 8              THE WITNESS:  It's Benjamin Lambert, L-a-m-b-e-r-t.
 9              THE CLERK:  Thank you.  You may be seated.
10                       DIRECT EXAMINATION
11    BY MR. DAVIS:
12         Q.   Good morning, Mr. Lambert.  I'll ask you to speak
13    clearly and to use the microphone.
14         A.   (Nods head.)
15         Q.   Now, sir, what state do you live in?
16         A.   I live in Missouri.
17         Q.   All right.  And did you have an online name that you
18    used in this case?
19         A.   Yes.
20         Q.   As what is that name?
21         A.   I went by Cheddar Mane.
22         Q.   Cheddar Mane?
23         A.   Uh-huh.
24         Q.   And -- and please say yes or no, not --
25         A.   Yes.
```

**J.A. 391**

```
 1        Q.    -- uh-huh.

 2        A.    Yes.

 3        Q.    Okay.  And would you summarize briefly your

 4   educational background.

 5        A.    I have some college experience.  I've been trained

 6   in electromechanical field.

 7        Q.    All right.  And prior to the events of June 2019,

 8   what kind of jobs have you worked?

 9        A.    Mostly in manufacturing surgical devices, medical

10   devices.  I made calibration devices for linear accelerators

11   for cancer treatment.  So mostly technological things.

12        Q.    Okay.  And are you married?

13        A.    Yes.

14        Q.    And how long have you been married?

15        A.    For -- since 2009, so what would that be?  Eleven

16   years.

17        Q.    All right.  And what does your wife do for work?

18        A.    She is a nurse, pediatric nurse.

19        Q.    And do you live with her in Missouri?

20        A.    Yes.

21        Q.    Do you have children?

22        A.    Yes.

23        Q.    How many children?

24        A.    Three.

25        Q.    And what are their ages now?
```

```
 1        A.   Nine, six, and three.

 2        Q.   And are you now expecting another child?

 3        A.   We are.

 4        Q.   And have you lived with your wife and your children

 5   since you got married?

 6        A.   Yes.

 7        Q.   Do you know the defendant, Christopher Cantwell?

 8        A.   I know who he is.  I've never been in the same room

 9   with him, but yes.

10        Q.   Until today --

11        A.   Until today.

12        Q.   -- right?

13             And have you seen photographs and video of him?

14        A.   Yes.

15        Q.   And do you recognize him now in the courtroom?

16        A.   Yes.

17        Q.   And would you point him out, please, for the jury?

18        A.   He's wearing the blue shirt and the maroon tie.

19             MR. DAVIS:  Let the record reflect, your Honor, the

20   witness has identified the defendant.

21             THE COURT:  Yes.

22        Q.   When did you first make his acquaintance,

23   understanding you didn't sit in the same room with him?

24        A.   Well, I reached out to him over the Internet.  I

25   have a friend who was helping him with his radio server and
```

**J.A. 393**

```
 1   working with him on other things like that.

 2        Q.   All right.  And who is that friend?

 3        A.   His name is Tom Gibson.

 4        Q.   And was he a Bowl Patrol member at least at some

 5   point?

 6        A.   At some point he was, yeah.

 7        Q.   And did he go by his own nickname on the Internet?

 8        A.   Yes.

 9        Q.   And what was that?

10        A.   Hardmous.

11        Q.   All right.  So I asked you when you made the

12   acquaintance of Mr. Cantwell and you started talking about your

13   friend.  When was it?

14        A.   I would say that it was in the middle of 2019, I

15   want to say maybe.  No, I've got think about it.

16        Q.   So just to orient you, the charges in this case

17   relate to --

18        A.   Right.

19        Q.   -- June of 2019.

20        A.   Right.  So it would have been the middle of 2018.

21        Q.   Okay.  So a year earlier or so?

22        A.   Yes, approximately.

23        Q.   All right.  And how was it that you made his

24   acquaintance?

25        A.   Well, I don't recall actually, you know, ever having
```

**J.A. 394**

64

```
1    an at-length conversation with him over the Internet, but I
2    knew of his radio program, so that's basically how I made his
3    acquaintance.
4         Q.    Okay.  And did you know that Mr. Cantwell lived in
5    New Hampshire?
6         A.    Yes.
7         Q.    And did you start to listen to some of his podcasts?
8         A.    I did.
9         Q.    Including the Radical Agenda show?
10        A.    Yes.
11        Q.    And what was your -- you've mentioned your friend
12   before, Tom Gibson?
13        A.    Uh-huh.  Yes.  Sorry.
14        Q.    All right.  Very good.
15              All right.  And the -- why did your -- why did --
16   what does Tom Gibson have to do with your interest in
17   Mr. Cantwell?
18        A.    He had been helping -- well, Tom helped build his
19   radio server and had been working on a VPN service with him.
20        Q.    With Mr. Cantwell?
21        A.    Correct.
22        Q.    And you knew that your friend was working with
23   Cantwell at least for a little while?
24        A.    Yes.
25        Q.    And -- okay.  So did you call in to -- and listen to
```

```
 1   every show or just when you could?
 2        A.   When I could, or I would listen to the rebroadcast.
 3        Q.   All right.  And did you sometimes actually call in
 4   to participate?
 5        A.   Yes.
 6        Q.   Okay.  Now, were you also a member of the Bowl
 7   Patrol?
 8        A.   Yes.
 9        Q.   What is the Bowl Patrol?
10        A.   It's a chat room and it's people who have -- make
11   memes and have reverence for Dylann Roof.
12        Q.   All right.  Are you still a member of the Bowl
13   Patrol?
14        A.   No.
15        Q.   Over what period were you a member, in your own
16   mind?
17        A.   It would have been early 2018 through -- I think I
18   left the chat in the fall of 2019.
19        Q.   All right.  So at the time of the charges in this
20   case in June of 2019, you still considered yourself a Bowl
21   Patrol member?
22        A.   Yes.
23        Q.   All right.  Now, explain to the jury where the name
24   Bowl Patrol comes from.
25        A.   Well, Dylann Roof had a bowl cut.
```

**J.A. 396**

```
 1        Q.    It is a haircut?

 2        A.    His hairstyle was a bowl cut and so it was just a

 3   play on that hairstyle, the bowl cut.

 4        Q.    Okay.  When you became associated with Bowl Patrol,

 5   did it already exist?  That is, were you a founding member?

 6        A.    No, I was not a founding member.

 7        Q.    All right.

 8        A.    It did exist.

 9        Q.    And do you recall how you actually decided to become

10   a member of Bowl Patrol?

11        A.    Well, the -- one of the people who was I would say a

12   founder who went by Tactical Bowlcut had videos on YouTube and

13   I came across one of the videos and then we became friends on

14   Facebook and just went from there.

15        Q.    All right.  Did Bowl Patrol have a founder?

16        A.    Yes.

17        Q.    And who was that?

18        A.    He went by Vic Mackey.

19        Q.    And to what extent was Vic Mackey the leader of the

20   Bowl Patrol?

21        A.    He referred to himself as the HBIC, which is Head

22   Bowl in Charge.

23        Q.    All right.  And did the other members generally

24   acknowledge him as the leader of Bowl Patrol?

25        A.    Yes.
```

**J.A. 397**

```
 1        Q.    And did he originally open up the chat room?
 2        A.    I believe so, but I don't know for sure.
 3        Q.    Okay.  But when you came in, Vic Mackey was running
 4   things?
 5        A.    Correct.
 6        Q.    All right.  And did the Bowl Patrol have a
 7   particular product?
 8        A.    Well, we made memes and we had a podcast which was
 9   called the BowlCast.
10        Q.    All right.  And the BowlCasts were kind of episodes?
11        A.    Correct.
12        Q.    How many BowlCasts were there?
13        A.    In all, there were 10.  One of them, episode 9, was
14   kind of a prank where it was just noise and -- yeah, that's it.
15        Q.    All right.  And do you recall approximately when the
16   first BowlCast was?
17        A.    I don't recall at this point.
18        Q.    All right.  And do you know whether Mr. Cantwell had
19   any role in the first BowlCast?
20        A.    He was the guest on the first episode of the
21   BowlCast.
22        Q.    And did you play a particular role in making that
23   happen?
24        A.    Yes.  I was the one who coordinated his appearance
25   on the show.  Basically, I helped put Cantwell in touch with
```

```
 1   Vic Mackey and that's how he was on there.
 2        Q.   All right.  Did you actually participate in the
 3   first BowlCast?
 4        A.   No.
 5        Q.   And did you participate in the second BowlCast?
 6        A.   No.
 7        Q.   So what BowlCast were you actually part of?
 8        A.   I was on episodes 3 through -- 3, 4, 5 and -- 3
 9   through -- I know the last one I did was in -- came out on
10   June 6th of 2019, so that would have been 3 through 8.
11        Q.   All right.
12        A.   Yes, 3 through 8.
13        Q.   Okay.  And was Vic Mackey involved in all of the
14   BowlCasts?
15        A.   Yes.
16        Q.   And was Vic Mackey his real name?
17        A.   No.
18        Q.   Was -- did people generally know who Vic Mackey
19   actually was?
20        A.   No.
21        Q.   And were people interested in knowing?
22        A.   Yes.
23        Q.   Okay.  Now, Mr. Cantwell, when you asked him to be
24   on the first BowlCast, was he helpful and generally friendly?
25        A.   Yes.
```

```
 1        Q.    And at that time, in 2018, were relations -- how
 2   would you describe relations between the Bowl Patrol and
 3   Mr. Cantwell?
 4        A.    They were -- we were on the same team, so to speak.
 5   We had a friendly relationship.
 6        Q.    Okay.  And did that friendliness continue for a
 7   period?
 8        A.    For a period, it did.
 9        Q.    All right.  And when did that change, just
10   approximately?
11        A.    It would have been sometime between very late 2018
12   and early 2019.
13        Q.    All right.  And so before very late 2018, were
14   you -- was the Bowl Patrol generally friendly with
15   Mr. Cantwell?
16        A.    Yes.
17        Q.    And during that period, did you continue to make
18   calls in to his show to contribute to his show?
19        A.    Yes.
20        Q.    Did you bear him any ill will --
21        A.    No.
22        Q.    -- at that time?
23        A.    No.
24        Q.    All right.  Now, let me direct your attention to --
25   this might be a good place to break, your Honor.
```

**J.A. 400**

```
 1                    THE COURT:  Yeah.  We're past the time I suggested.

 2              So let's take about a 15-minute break, members of

 3  the jury.

 4         (Recess taken from 10:50 a.m. until 11:05 a.m.)

 5              THE COURT:  The witness can come up and take the

 6  stand again.

 7              All right, Counsel.  You can go ahead.

 8     Q.    Directing your attention, Mr. Lambert, to

 9  Thanksgiving time of 2018, you recall that time?

10     A.    I do.

11     Q.    And did you get a visit from a woman and your friend

12  Tom Gibson?

13     A.    Yes.

14     Q.    And at that time, were you on bad terms with

15  Mr. Cantwell?

16     A.    No.

17     Q.    All right.  And what's the name of the woman?

18     A.    She went by Peach.

19     Q.    All right.

20     A.    Her real name's Katelen Fry.

21     Q.    And was she -- was this visit at your home in

22  Missouri?

23     A.    Yes.

24     Q.    Okay.  And Peach is a nickname; is that right?

25     A.    Yes.
```

**J.A. 401**

```
 1        Q.    All right.  And did you -- had you met Peach online?

 2        A.    Yes.

 3        Q.    And describe that briefly.

 4        A.    She was a member of the Radical Agenda Telegram chat

 5   and so was I.  And so that's how we met.

 6        Q.    All right.  And Radical Agenda was Mr. Cantwell's

 7   channel?

 8        A.    That's correct.

 9        Q.    And had you found out that Peach was originally from

10   the St. Louis area?

11        A.    Yes.

12        Q.    All right.  And so were your communications with her

13   ever romantic?

14        A.    No.

15        Q.    How was it that you came to have her come to your

16   house?

17        A.    Well, I just reached out.  And, you know, I knew

18   that she was from the same region that I was, so I said, you

19   know, if you're in town for a holiday or something like that,

20   you know, come up.

21        Q.    All right.  And what was Tom Gibson's role?

22        A.    Well, he -- he was romantically interested in her

23   or, you know, wanted to basically make Peach his girlfriend.

24        Q.    All right.  And he told you that?

25        A.    Yes.
```

**J.A. 402**

```
 1          Q.   And was Tom Gibson married?

 2          A.   No.

 3          Q.   All right.  And so was it planned that Tom Gibson

 4     and Peach would come to your house for a visit?

 5          A.   Yes.

 6          Q.   All right.  How many times did Peach come to your

 7     house?

 8          A.   Just the one time.

 9          Q.   And do you remember how long she was there?

10          A.   A couple hours tops.

11          Q.   All right.  Now, at some point did you find out that

12     Peach was either Chris Cantwell's girlfriend or his

13     ex-girlfriend?

14          A.   Yes.

15          Q.   And when did you find that out?

16          A.   Almost immediately after she got there.

17          Q.   So you didn't know until she actually came to your

18     house that she was -- that she had a relationship with

19     Cantwell?

20          A.   That's correct.

21          Q.   So during the visit of Peach, were there photographs

22     taken?

23          A.   Yes.

24          Q.   And was one of them a selfie?

25          A.   Yes.
```

**J.A. 403**

1        Q.    All right.  I'm showing you Government Exhibit 301,

2   which I believe is in evidence.

3              Do you recognize that photo?

4        A.    I do.

5        Q.    And who's in it?

6        A.    That is Tom on the right, Tom Gibson on the right,

7   that's Peach in the middle, and me on the left.

8        Q.    All right.  And where were you at that time?

9        A.    We were sitting on the couch in my living room.

10       Q.    And this is during that visit in Thanksgiving of

11  2018?

12       A.    Yes.

13             MR. DAVIS:  Your Honor?

14             THE COURT:  I'm just having my clerk enable my

15  screen.  You can continue.

16             MR. DAVIS:  Very good.

17       Q.    Now, before Peach came, did you actually send her

18  some pictures of your family?

19       A.    I did.

20       Q.    And why did you do that?

21       A.    Because my family is the most important thing in the

22  world to me and I am proud of them and I wanted to show them

23  off.

24       Q.    All right.  And so you just texted them to Peach

25  before the visit?

**J.A. 404**

1      A.    Either text or by way of Telegram Messenger.

2      Q.    All right.

3      A.    But directly, yes.

4      Q.    By way of Telegram?

5      A.    Yes.

6      Q.    And what's Telegram?

7      A.    Telegram, it's a messaging app.  You can create

8  public channels, public chats, private chats, or send direct

9  messages to people.

10      Q.    Okay.  So I'm showing you now Government

11  Exhibit 201.  Do you recognize that picture?

12      A.    I do.

13            MR. DAVIS:  And was -- is 201 in evidence?

14            So 201 in evidence, your Honor.

15            THE COURT:  All right.  So that can be shown to the

16  jury.

17      Q.    Now, who is in that picture, Mr. Lambert?

18      A.    That's my wife and three children.

19      Q.    All right.  And do you recognize where that picture

20  is taken?

21      A.    Yes.

22      Q.    Where is that?

23      A.    It's at my wife's aunt's house, aunt and uncle's

24  house, in the St. Louis area.

25      Q.    So that's also in Missouri?

**J.A. 405**

```
 1        A.    That's correct.
 2        Q.    And do you remember when the picture was taken?
 3        A.    That would be Christmas of 2017.
 4        Q.    So that's a Christmas photo you had?
 5        A.    Yes.
 6        Q.    All right.  And that's one of the ones you sent to
 7   Peach?
 8        A.    Yes.
 9        Q.    And then I'm showing you Government Exhibit 202,
10   also in evidence.  Do you recognize 202?
11        A.    Yes.
12        Q.    And what is that?
13        A.    That's another picture of my wife and three kids.
14        Q.    All right.  I'll ask you to speak a little louder.
15        A.    I said that's another photo of my wife and three
16   children.
17        Q.    Okay.  And do you recall who took that photo?
18        A.    Me.
19        Q.    And do you recognize where it is?
20        A.    Yes, it's in my kitchen.
21        Q.    And do you know when it was taken?
22        A.    I'm not sure.  I'm not positive.
23        Q.    Okay.  And so when you sent the photos to Peach, was
24   there any further discussion about how those were going to be
25   used?
```

**J.A. 406**

```
 1        A.    No.

 2        Q.    All right.  Now, let me -- were those the only two

 3   photos you sent to Peach?

 4        A.    Those were the only two photos of my family.  I

 5   don't recall whether I sent her other photos -- or it wasn't

 6   other photos, but I might have sent memes over or something,

 7   but nothing that would have been personally identifying that I

 8   can recall.

 9        Q.    All right.  And when you say a meme, what's a meme?

10        A.    It's a photo or a picture that has text in it that

11   is basically a joke or meant to, I guess -- you know, they use

12   memes for like political beliefs or just as jokes or -- you

13   know, there are memes on every topic, but it's kind of a -- I

14   guess a clever way to say something.

15        Q.    All right.  And are you -- are you particularly

16   interested in memes?  Do you like memes?

17        A.    I do, yes.

18        Q.    All right.  And did you, as part of your Bowl Patrol

19   association, like to make memes?

20        A.    Yes.

21        Q.    All right.  Now, let me show you another photo,

22   Government Exhibit 204, also in evidence, I believe.

23              Do you recognize 204?

24        A.    I do.

25        Q.    What is that?
```

1      A.    It's a picture of me that I took as a joke.  I was

2   pretending to be using drugs, but it was construction paper

3   from my daughter's -- from a notepad of construction paper of

4   hers.

5      Q.    You said window pad?

6      A.    No, it was construction paper from a -- my

7   daughter's notepad.

8      Q.    Notepad.

9      A.    Yeah.

10     Q.    All right.  So you took this as a joke?

11     A.    Yes.

12     Q.    And when you say you're pretending to be a drug

13  user, what kind of drugs are you pretending to use?

14     A.    Pretending to use LSD.

15     Q.    All right.  Are those actual LSD strips on your

16  tongue?

17     A.    No.

18     Q.    All right.  And did you -- is this a selfie or did

19  someone else take that?

20     A.    That's a selfie.  It's a selfie.

21     Q.    All right.  And what did you do with that selfie

22  after you took it?

23     A.    I don't recall exactly.  I probably posted it in a

24  chat as a joke.  I wouldn't have put that out publicly, but I

25  would imagine that I sent it to a chat just as a joke.

**J.A. 408**

78

```
 1         Q.   All right.  And when you say a chat, that's --
 2         A.   Like a --
 3         Q.   Go ahead.
 4         A.   I'm sorry.  A private Telegram chat or a -- yeah,
 5    private Telegram chat.
 6         Q.   All right.  And once that happens, then other people
 7    now have that photo?
 8         A.   Yes.
 9         Q.   Okay.  Do you know how Mr. Cantwell specifically got
10    that photo?
11         A.   No.
12         Q.   But you know you posted it on a chat at some point?
13         A.   Yes.
14         Q.   Okay.  Let me show you another one.  This is for
15    identification, I think, Government Exhibit 302.
16              302 is in evidence also, so that can be --
17              THE COURT:  That can be shown.
18              MR. DAVIS:  Yes.
19         Q.   You see 302, Mr. Lambert?
20         A.   Yes.
21         Q.   And do you recognize that?
22         A.   Yes.
23         Q.   And who is that?
24         A.   That's me.
25         Q.   And do you know what you did with that photo?
```

```
 1        A.   No, I don't recall.

 2        Q.   And do you have any idea how Mr. Cantwell got that

 3   photo?

 4        A.   I don't.

 5        Q.   All right.  Now, you said Peach was at your house

 6   for a couple of hours?

 7        A.   Yes.

 8        Q.   And when she left, did she -- did you have

 9   any conversation about that she was going to be letting

10   Mr. Cantwell know what your address was?

11        A.   No.

12        Q.   And did she have any conversation that she would

13   tell -- show Mr. Cantwell the photos that you had sent?

14        A.   No.

15        Q.   Did she actually take some photographs while she was

16   at your house?

17        A.   Yes.

18        Q.   And what do you remember about that?

19        A.   That she took photos of my kids.

20        Q.   All right.  And what did you think about that then?

21        A.   At the time that it was happening, I had just, you

22   know, figured that she thought, adorable kids, you know.  After

23   the fact, I -- it really bothered me.

24        Q.   But at that -- at that point, the visit ended and

25   things were fine; is that fair?
```

```
 1        A.    Correct, yes.
 2        Q.    Okay.  And did Mr. Gibson and Peach strike up a
 3   relationship?
 4        A.    No.
 5        Q.    That didn't go anywhere?
 6        A.    No.
 7        Q.    All right.  All right.  Now, at the end of 2018,
 8   you've already testified the relationship between the Bowl
 9   Patrol and Cantwell went south; is that right?
10        A.    Yes.
11        Q.    And what happened, in your words, between Cantwell
12   and Bowl Patrol?
13        A.    I think that many of the members of Bowl Patrol
14   thought that he had shifted his ideology and so it appeared
15   that he was trying to use his platform simply to make money and
16   not to, you know, actually -- he didn't actually believe what
17   he was saying; he was just doing it for financial gain.
18        Q.    That was an opinion in the Bowl Patrol among
19   members?
20        A.    Correct.
21        Q.    And what happened after that opinion began to take
22   root?
23        A.    Well, people started prank-calling the show.
24        Q.    All right.  So when you say prank-calling, what is
25   that?
```

```
 1        A.    It's when you call somebody and you either act like
 2   somebody else or do stupid things to try and, you know, make
 3   funny sound clips or make jokes at the expense of, you know,
 4   the person who's the host of the show or the person you're
 5   pranking.
 6        Q.    Okay.  And are you someone who's good at imitations?
 7        A.    Yes.
 8        Q.    You can do voices?
 9        A.    Yes.
10        Q.    So are you good at prank calls?
11        A.    I think so.
12        Q.    Even though they're stupid?
13        A.    Yes.
14        Q.    All right.  So did you make prank calls to the
15   Cantwell show?
16        A.    Yes.
17        Q.    And any idea how many you made?
18        A.    I would say overall it would be probably around 15
19   maybe, 10 or 15.  I don't know exactly.
20        Q.    All right.  So let's talk about that.  Were there --
21   were there times when you called the show and you actually got
22   on?
23        A.    Yes.
24        Q.    Were there other times you called and you were put
25   on hold and you didn't get on?
```

1          A.    Yes.

2          Q.    Were there other times you called and you got a busy

3    signal?

4          A.    Yes.

5          Q.    But you're thinking 15 times --

6          A.    Yeah.

7          Q.    -- you actually got on the show and did a prank

8    call?

9          A.    Correct.

10         Q.    And when you did a prank call, what did -- what did

11   you do?

12         A.    I would play different characters.  One of the ones

13   that I did was -- it was an imitation of somebody else's

14   imitation of a person that -- who goes by Fevs.

15         Q.    All right.  And Fevs, how do you spell that?

16         A.    F-e-v-s.

17         Q.    Okay.  So you would imitate someone who imitated

18   Fevs?

19         A.    Well, I would imitate Fevs, but I had never actually

20   heard him talk.  I had only heard others' imitations of him.

21   So my imitation was, therefore, an imitation of theirs.

22         Q.    All right --

23         A.    Which made it more ridiculous and funnier.

24         Q.    -- you thought it was funny, at least at the time?

25         A.    At the time I did.

```
 1        Q.    And how many times did you call Mr. Cantwell's show
 2   and pretend to be Fevs?
 3        A.    I don't know exactly.  I would say an estimate would
 4   be like seven, I would say, maybe six or seven.
 5        Q.    And when you called Mr. Cantwell's show and
 6   pretended to be Fevs, how did that end typically?
 7        A.    Typically, he did not enjoy it and would try and
 8   hang up on me quickly.
 9        Q.    All right.  So you knew he didn't like that, right?
10        A.    Yes.
11        Q.    Why did you keep doing it?
12        A.    Because it was funny.
13        Q.    All right.  Did you also call and pretend to be
14   someone else?
15        A.    Yes.
16        Q.    And who was that?
17        A.    I would -- I pretended I was George Knox, who is --
18   it's a Disney character from a movie called Angels in the
19   Outfield.  It's -- he -- it was Danny Glover, Danny Glover's
20   character.
21        Q.    And how many times did you call as George Knox, do
22   you know?
23        A.    I'm not positive, but not very many.  Maybe once or
24   twice.
25        Q.    And what other people did you call as?
```

**J.A. 414**

84

```
 1        A.    I think that was really it, to be honest with you.
 2        Q.    All right.  But Mr. Cantwell obviously did not
 3   welcome these calls, right?
 4        A.    Right.
 5        Q.    And did other people in the Bowl Patrol also call --
 6        A.    Yes.
 7        Q.    -- to your knowledge?
 8        A.    Yes.
 9        Q.    And how did you know that was happening?
10        A.    Because we would talk about it in the chat
11   afterwards.
12        Q.    All right.  And did you also talk about it in any
13   BowlCast, that you were calling and pranking the show?
14        A.    I don't recall.
15        Q.    All right.  But you certainly knew among the Bowl
16   Patrol that you were doing this?
17        A.    Yes.
18        Q.    So when was the first time, in your approximation,
19   that you prank-called Mr. Cantwell's show?
20        A.    It would have been -- I would say early 2019, very
21   early.
22        Q.    All right.  So January 2019?
23        A.    That sounds right, yeah.
24        Q.    Could it have been December of '18?
25        A.    It could have been.
```

**J.A. 415**

```
 1          Q.    And when was the last time you prank-called?

 2          A.    I believe it would have been February of 2019.

 3          Q.    All right.  And when you called Mr. Cantwell's show

 4    to prank him, did you use the same number?

 5          A.    I used my personal cell phone number, I used my

 6    business cell phone number, and then -- which was actually like

 7    an 866 number, and I used my business cell phone.

 8          Q.    All right.  And did you principally use your

 9    personal cell phone?

10          A.    Yes.

11          Q.    And was that number ███████1958?

12          A.    That's correct.

13          Q.    Is that still your cell phone number?

14          A.    Yes.

15          Q.    All right.  When you called Mr. Cantwell's show, did

16    you use fake numbers that masked what number it was?

17          A.    I did not, no.

18          Q.    All right.  So during your calls to the show, either

19    when you were friendly with Mr. Cantwell or when you were

20    prank-calling him, did you ever threaten him?

21          A.    No.

22          Q.    Did you ever try to get something from him?

23          A.    Never.

24          Q.    Did you ever threaten his family?

25          A.    Never.
```

**J.A. 416**

```
1          Q.   All right.  Were you aware of a -- or did you become

2    aware of an incident in February 2019 when Mr. Cantwell's

3    website was defaced?

4          A.   Yes.

5          Q.   And how did you become aware of that?

6          A.   After it had already happened, I saw -- I saw

7    archived copies of the -- of the website.

8          Q.   All right.  Did you play any role in that defacing?

9          A.   None whatsoever.

10         Q.   And do you know who did it?

11         A.   Not specifically.  I think I have an idea, but I

12   really don't know for sure.

13         Q.   Okay.  Did Mr. Cantwell ever accuse you of defacing

14   his website, to your knowledge?

15         A.   Not that I recall.  But I think that he saw Bowl

16   Patrol as, you know, one -- if one person was doing it,

17   everybody was responsible for it.

18         Q.   All right.  And the -- and the person, again, who

19   led the Bowl Patrol was who?

20         A.   Vic Mackey.

21         Q.   Okay.  Now, directing your attention to March of

22   2019, specifically March 17th of 2019, did Mr. Cantwell

23   threaten to dox you that month?

24         A.   Yes.

25              MR. WOLPIN:  Objection, your Honor; leading.
```

**J.A. 417**

```
 1                    THE COURT:  Overruled.
 2          Q.   Did you have a direct communication with
 3    Mr. Cantwell?
 4          A.   Yes.
 5          Q.   All right.  I'm showing you now defense Exhibit B-20
 6    for identification.  Mr. Lambert, do you recognize B-20?
 7          A.   Yes.
 8          Q.   And can we see the second page, too?  Do you see all
 9    of it?
10          A.   Yes.
11          Q.   All right.  So let's go back to the first page.
12               What is B-20?
13          A.   I'm sorry?
14          Q.   What is it?
15          A.   That's a screen cap of a conversation that I had
16    with Mr. Cantwell.
17          Q.   All right.  And in the course of that conversation,
18    does the subject of doxing -- is that discussed?
19          A.   Yes.
20               MR. DAVIS:  All right.  Your Honor --
21          Q.   And did you actually have this conversation with
22    Mr. Cantwell?
23          A.   Yes.
24               MR. DAVIS:  Your Honor, I'd move to strike the ID on
25    B-20.
```

**J.A. 418**

```
 1                 THE COURT:  Any objection?

 2                 MR. LEVIN:  No objection.

 3                 THE COURT:  Without objection, it'll be admitted and

 4     can be displayed.

 5                 (Defendant's Exhibit B-20 admitted.)

 6          Q.    So, Mr. Lambert, up in the top left it says

 7     Telegram.  What does that mean?

 8          A.    That the conversation took place on the Telegram

 9     app.

10          Q.    Okay.  And is this in a particular channel or

11     particular group chat?

12          A.    This was a direct message, so no.

13          Q.    Sorry?

14          A.    It was a direct message, so the answer is no.

15          Q.    All right.  So this is a private communication; is

16     that right?

17          A.    Yes.

18          Q.    And all these things on the left, Peaceful White

19     Folk and Outlaw Conservative and Radical Agenda, that -- that

20     doesn't mean they're reading this communication, right?

21          A.    Yes, that's correct.

22          Q.    This is you and Mr. Cantwell, right?

23          A.    Yes.

24          Q.    And do you recall what prompted this communication,

25     that is, what had happened on March 17th or around then that
```

89

```
 1   made this happen?
 2        A.   I'm not sure.
 3        Q.   You can't recall?
 4        A.   I can't.
 5        Q.   All right.  So let's just look at it.
 6             What does Mr. Cantwell say to start things off?
 7        A.   Stay the F away from me and my platforms or I
 8   will -- or I'll dox your stupid ass.
 9        Q.   Okay.  And the -- the pink ball and the thing that
10   says deleted, is that actually you?
11        A.   Yes.
12        Q.   So what did you say?
13        A.   I said, "why would you do a thing like that?"
14        Q.   All right.  And what did he say next?
15        A.   "Because I don't want you or your faggot ass friends
16   anywhere near me or my audience.  Try me and I'll do it."
17        Q.   All right.  And when you read "faggot ass friends,"
18   did you know who he was talking about or think you did?
19        A.   Yeah, I thought he was talking about Bowl Patrol.
20        Q.   All right.  And so what did you say in reply?
21        A.   I told him, "you've changed, buddy."
22             And then I said "okay."
23        Q.   All right.  And what did Mr. Cantwell say in
24   response to that?
25        A.   He said, "I'm not your buddy.  Stay away or I'll
```

**J.A. 420**

1    prove it."

2        Q.    And how did you reply?

3        A.    "I'm sure I will."

4        Q.    Now, when you say -- when you said, "I'm sure I

5    will," were you -- what did you mean then?

6        A.    That, you know, I thought that he probably would dox

7    me and so I'm sure that I would.

8        Q.    Why did you think he could dox you?

9        A.    Because I figured that, you know, because Peach had

10    been up to my house and that he had an ongoing relationship

11    with her that he probably did know who I was and where I lived.

12        Q.    All right.  So let's go to the second page, just to

13    see the end of it.

14            There's a long break, do you see that, between

15    almost 4:00 p.m. and then 6:30 p.m.?

16        A.    Yes.

17        Q.    And then what does Mr. Cantwell say to you?

18        A.    "When you get doxed, it's all because of Vic.

19    Remember that."

20        Q.    And when you -- when you saw "it was all because of

21    Vic," did you know who he was talking about?

22        A.    Yes, Vic Mackey.

23        Q.    All right.  No ambiguity about that?

24        A.    No.

25        Q.    All right.  So that's enough on B-20.

**J.A. 421**

```
 1              Did you take that seriously?

 2      A.    Yes.

 3      Q.    Why?

 4      A.    Because I -- like I said, I figured that he probably

 5   did it -- did know where I was, who I was, and so he had the

 6   ability to dox me.

 7      Q.    All right.  And what is doxing, briefly?

 8      A.    Doxing is the exposure of one's personal

 9   information, their -- you know, anything that they've got

10   related to their life, their address, their name, their place

11   of employment.  Usually it's in hopes that somebody will do

12   something bad to you, like get you fired from your job or, you

13   know, worst case scenario that somebody would attack you, maybe

14   commit some sort of act of violence or vandalism or anything

15   like that.  It's basically to try and ruin somebody's life.

16      Q.    All right.  So in your community in Missouri, as of

17   spring of 2019, did anyone know that you were part of the Bowl

18   Patrol chat group?

19      A.    Nobody in my community, no.

20      Q.    All right.  Tom Gibson knew?

21      A.    Tom knew, yes.

22      Q.    Anyone else?

23      A.    I think -- I think I probably told my brother about

24   it, but I'm not sure.

25      Q.    All right.  And did any of those people know that
```

**J.A. 422**

1    you were Cheddar Mane?

2        A.    Tom knew.  My brother or anybody else did not.

3        Q.    All right.  And did your employers know that you

4    were Cheddar Mane in the Bowl Patrol?

5        A.    No.

6        Q.    Did you want people to know that you were Cheddar

7    Mane in the Bowl Patrol?

8        A.    No.

9        Q.    Why not?

10        A.    Because the things that we were saying are not

11    things that are good.  It's terrible stuff that people would be

12    extremely offended by and it could cost me my job, it could

13    cost me friends, you know.  It would be very damaging if people

14    knew.

15        Q.    All right.  So after March 17th of 2019, did you

16    make any more prank calls?

17        A.    No.

18        Q.    Why not?

19        A.    Because I was worried that Cantwell would dox me.

20    And I went so far as to try and get other people to stop.

21        Q.    All right.  So tell about that.

22        A.    Well, I was the only one whose information that he

23    had and so I let everyone know in the Bowl Patrol chat to stop

24    messing with him, don't call him or anything like that because

25    it's going to affect my life and ruin my life and, you know,

1  that would be a bad thing, obviously.

2       Q.   All right.  You said you were the only one whose

3  info he had.  Did you know of someone who went by the name

4  Mosin Nagant?

5       A.   Yes.

6       Q.   And did you know what happened to Mosin Nagant?

7       A.   Yes.

8            MR. WOLPIN:  Objection, your Honor; relevance,

9  prejudice.

10           THE COURT:  I -- put the headset on.  I don't -- I

11  need to know more.

12                          AT SIDEBAR

13           THE COURT:  What does the government intend to do?

14           MR. DAVIS:  Just to ask if he was aware that

15  Mr. Cantwell doxed Mosin Nagant in February of 2019 and --

16           THE COURT:  Hasn't the jury already heard evidence

17  that Nagant was doxed by Mr. Cantwell?

18           MR. DAVIS:  Yes.  And the government asks this

19  witness that question because it bears on the reasonableness of

20  his apprehension about being doxed by Mr. Cantwell.

21           THE COURT:  All right.  The relevance objection is

22  overruled.

23                     CONCLUSION OF SIDEBAR

24       Q.   So, Mr. Lambert, you were aware what happened to

25  Mosin Nagant?

**J.A. 424**

1    A.    Yes.

2    Q.    And what was that, briefly?

3    A.    He was doxed by Cantwell.

4    Q.    All right.  And after he was doxed, was Mosin

5    Nagant's real name known to the world?

6    A.    Yes.

7    Q.    And after he was doxed, did Mosin Nagant have any

8    further role in the Bowl Patrol?

9    A.    No.

10    Q.    So you had seen that happen, right?

11    A.    Yes.

12    Q.    All right.  So you said you encouraged other people

13    in the chat to stop antagonizing Mr. Cantwell?

14    A.    Yes.

15    Q.    Was that completely successful?

16    A.    No.

17    Q.    And what do you mean by that?

18    A.    People still continued to try and do prank calls or,

19    you know, just mess with him in whatever way they could.

20    Q.    All right.  But you had stopped; is that right?

21    A.    Yes.

22    Q.    Any question about that in your mind?

23    A.    There is no question.

24    Q.    Okay.  So fast forward a few months to mid-June of

25    2019.  Do you recall then?

**J.A. 425**

```
1          A.    Yes.

2          Q.    And, particularly, June 15th of 2019, which was a

3    Saturday.

4          A.    Yes.

5          Q.    And do you recall that was Father's Day weekend?

6          A.    I do.

7          Q.    All right.  So did something happen on June 15th of

8    2019?

9          A.    Yes.

10         Q.    All right.  What was that?

11         A.    Well, I -- someone posted a link in the Bowl Patrol

12   chat to a Telegram group, not indicating what it was.  And so I

13   clicked the link and I noticed a few names in there that I had

14   known, Matt Heimbach, the guy from Maine, I forget his name,

15   Tom, something Polish.

16         Q.    Is it Tom Kawczynski?

17         A.    That's it.

18         Q.    And do you recall the name of this chat?

19         A.    It was called Peaceful White Folk.

20         Q.    And so there's a link, and do you know who posted

21   this link?

22         A.    I don't.

23         Q.    All right.  But you clicked on it?

24         A.    I did.

25         Q.    And you found yourself in a chat group?
```

**J.A. 426**

1      A.    Yes.  I joined the group and I, you know, said

2  something to Heimbach and then posted a couple stickers of

3  Heimbach and --

4      Q.    All right.  Can you -- do you remember what the

5  stickers looked like?

6      A.    Like him making funny faces, I think, that had been

7  from rallies that he had gone to and there were pictures of him

8  where he was fighting and making a really angry face, so I

9  posted a couple of photos of the stickers and then I was kicked

10 out of the chat.

11     Q.    When you say kicked out, what happened?

12     A.    One of the admins in the chat removes you from the

13 chat and it says this chat is no longer available.

14     Q.    Okay.  Now, while you were in the chat, you said you

15 noticed that Heimbach was there.

16     A.    Yes.

17     Q.    And is Heimbach someone who is pretty well known in

18 the far right wing?

19     A.    Yes.

20     Q.    And you also noticed Mr. Kawczynski?

21     A.    Yes.

22     Q.    And is he also well known?

23     A.    Yes.

24     Q.    And did you also notice that Mr. Cantwell was in the

25 same group?

**J.A. 427**

1          A.    I didn't.

2          Q.    All right.  So you did not know it was Cantwell's

3     chat -- chat group?

4          A.    No.  Because if I would have known that it was his,

5     I would have stayed out of it.

6          Q.    Okay.  So you posted a couple of stickers of

7     Heimbach, right?

8          A.    Uh-huh, correct.

9          Q.    Do you recall how Heimbach reacted to that?

10         A.    I didn't see a reaction before I was removed.

11         Q.    Okay.  All right.  So you're removed from the chat.

12    What happens next?

13         A.    Moments later I got a direct message from Cantwell

14    basically saying, I guess I need to remind you why you should

15    stay away, and then posted my -- the street that I live on.

16         Q.    Okay.  So let's turn to Exhibit 100 in evidence.

17               Do you recognize this?

18         A.    Yes.

19         Q.    And is this a version of the exchange that you had

20    with Mr. Cantwell on June 15th and June 16th of 2019?

21         A.    Yes.

22         Q.    All right.  And as we look at it, is the green the

23    messages from Mr. Cantwell?

24         A.    Yes.  This would be what he had and I'm on the left.

25         Q.    All right.  And so the white would be what you

**J.A. 428**

```
 1   wrote; is that right?
 2        A.   Correct.
 3        Q.   Now, the -- the heading says Cheddy Blac.  Is that
 4   something that's associated with you?
 5        A.   Yes, that was the name that I was going by on
 6   Telegram at that point.
 7        Q.   Okay.  And, once again, is this a -- is this a group
 8   communication?
 9        A.   No, it's a direct communication.
10        Q.   And is there anyone else participating other than
11   you and Mr. Cantwell?
12        A.   No.
13        Q.   All right.  One thing I forgot to ask you before I
14   just want to make sure to ask you, did -- had you told your
15   wife that you were Cheddar Mane?
16        A.   No.
17        Q.   Did she know that you were in a group called the
18   Bowl Patrol?
19        A.   No.
20        Q.   So as of this day, your own wife didn't know what
21   you were doing?
22        A.   Correct.
23        Q.   All right.  So another question about this.  Where
24   were you when you received it?
25        A.   I was in my kitchen, facing east, looking out the
```

1    window.

2        Q.    And so at your house in Missouri?

3        A.    Yes.

4        Q.    And do you remember what was going on that Saturday

5    night?

6        A.    My wife was at work and I had put the kids to bed or

7    I was in the process of putting the kids to bed.

8        Q.    All right.  So if this call is -- initial chat is

9    9:00 p.m. eastern, it's 8:00 p.m. central, right?

10       A.    Correct.

11       Q.    So why is your wife at work at 8:00 p.m. on a

12   Saturday night?

13       A.    She works every Friday, Saturday, and Sunday

14   night overnight from 7:00 a.m. -- or I'm sorry -- 7:00 p.m. to

15   7:00 a.m. the next day.

16       Q.    All right.  So she would have been out of the house

17   that Saturday night?

18       A.    Yes.

19       Q.    Okay.  Another question.  Some of these have check

20   marks on -- next to them.  Do you see those?

21       A.    Yes.

22       Q.    And are you familiar with what check marks mean in

23   the Telegram app --

24       A.    Yes.

25       Q.    -- system?  Okay.

**J.A. 430**

1     A.    One check mark means that your message has been

2  successfully sent and two check marks means that the person

3  that you've sent the message to has received it and seen it.

4     Q.    All right.  So it's a way of the sender to know that

5  the receiver has actually seen the message?

6     A.    Correct.

7     Q.    And did you have the same ability on your end to see

8  if Cantwell had seen your message?

9     A.    Yes.

10     Q.    And -- does Telegram app operate like a text, what

11  other people would just say is a text?

12     A.    I would say it's more like an instant messenger,

13  kind of, with the addition of the ability to make a channel or

14  host a group chat.

15     Q.    Okay.

16     A.    So essentially it can be used to perform the same

17  duty, yes.

18     Q.    Okay.  So you got the message at 9:00 p.m. eastern;

19  "I guess you forgot the lesson which kept you away for a short

20  while.  Do you need to be reminded?"

21          Do you see that?

22     A.    Yes.

23     Q.    And then there was a break of almost half an hour,

24  right?

25     A.    Uh-huh.  Yes.

**J.A. 431**

```
1        Q.   All right.  Now, when you got the initial message,
2   "I guess you forgot the lesson which kept you away for a short
3   while," what did you take that to mean?
4        A.   Well, that would refer to the threat to dox me from
5   before, from March.
6        Q.   So the lesson was you knew that he could dox you?
7        A.   Correct.
8        Q.   And -- and he referred to "kept you away for a short
9   while."
10            What did you take that to mean?
11       A.   That he had noticed that I had not been doing
12  anything to antagonize him.
13       Q.   All right.  So he says it right there, right?
14       A.   Yes.
15       Q.   Okay.  Do you remember getting that first message,
16  just the first message?
17       A.   Yes.
18       Q.   And you haven't even gotten "Twin Creek Road" yet,
19  right?
20       A.   Right.
21       Q.   How did you react when you got the first message?
22       A.   Well, I mean, I was scared.  I, you know, got
23  the feeling where you, you know -- you flush with heat and
24  you've -- you know, your stomach drops; you -- I -- it was
25  very, very unsettling.
```

**J.A. 432**

1       Q.    All right.  And why is it so unsettling?  You just

2   get a message from Chris Cantwell; why are you unsettled?

3       A.    Because, once again, he's holding the fact that he

4   can ruin my life over my head.

5       Q.    All right.  And then you -- but you don't reply,

6   right?

7       A.    Right.  I was busy trying to get the kids to bed.

8       Q.    And then he writes "Twin Creek Road."  That's all he

9   writes, right?

10      A.    Correct.

11      Q.    And was that your street?

12      A.    Yes.

13      Q.    And almost two more hours go by, right?

14      A.    Yes.

15      Q.    And then you replied?

16      A.    Uh-huh.  Yes.

17      Q.    And what did you say?

18      A.    "What are you talking about?  Some fag pretends to

19  be you, I told them to stop, they did.  What do you even stand

20  to gain here?  Let's think about this.  Every time you -- every

21  time someone you think is in BP," which is Bowl Patrol, "talks

22  shit about you, a public figure, you threaten to dox me?  Say

23  you did.  What then?"

24      Q.    All right.  So what were you doing in this -- in

25  these communications?  What were you trying to accomplish?

**J.A. 433**

```
1      A.   I didn't know -- I still didn't know at the time
2   what I had done.  I thought that he -- that somebody else
3   had -- well, I was aware of the fact that there were others
4   that had fake Chris Cantwell accounts on Telegram and so I
5   thought that maybe somebody with a fake account had, you know,
6   pretended to be him and that's what was triggering this.  And
7   it took me a little while to figure out what I actually did
8   that --
9      Q.   What you did was going into the Peaceful White Folk
10  chat group --
11     A.   Correct.
12     Q.   -- and meme Heimbach?
13     A.   That's right.
14     Q.   Okay.  Now, in the -- in the course of -- and as of
15  11:59 p.m. eastern, Mr. Cantwell had said nothing more, right,
16  than just send your street address --
17     A.   Yes.
18     Q.   -- right?
19          And then another half-hour goes by and the date
20  turns and now you -- now what do you say?
21     A.   "I honestly don't even know what I did.  I followed
22  a link into a group I didn't even know you were in."
23     Q.   All right.  Now, in the course of these responses --
24  and, again, this is just you with no reply from Mr. Cantwell,
25  right?
```

**J.A. 434**

```
 1        A.   Yes.

 2        Q.   Did you actually write some drafts?

 3        A.   Yes.

 4        Q.   All right.  Why did you write drafts?

 5        A.   Because I wanted to make sure that I was smart about

 6   what I said and that I didn't go over any lines legally.  I

 7   wanted to -- I didn't want to antagonize any more than I needed

 8   to.  That's pretty much it.

 9        Q.   Did you want to escalate the situation?

10        A.   No.

11        Q.   What did you want?

12        A.   I was trying to talk sense into him.  I was trying

13   to deescalate and, you know, show that I -- I really, you know,

14   didn't know what I had done that was wrong --

15        Q.   All right.

16        A.   -- and that, you know --

17        Q.   All right.  So after you got the "Twin Creek Road,"

18   did you initially reach out to someone?

19        A.   Yeah.  I called Tom Gibson.

20        Q.   All right.  You said you called.  Do you know if you

21   called or messaged?

22        A.   I contacted him.  I don't remember whether it was a

23   call or a message.

24        Q.   All right.  And if you'd messaged him, do you know

25   what channel you would have used?
```

**J.A. 435**

```
 1          A.   It would have been directly.
 2          Q.   All right.  But it -- would it have been -- did you
 3    have other ways to communicate with Tom Gibson?
 4          A.   Like -- it was likely a Signal message.
 5          Q.   All right.  And what did you tell Tom Gibson?
 6          A.   I told him that Cantwell's threatening to dox me
 7    again --
 8          Q.   All right.
 9          A.   -- and --
10          Q.   And did he give advice to you?
11          A.   I sent him a photo of the first two communications
12    and he said, "delete and report spam."
13          Q.   Delete and report spam?
14          A.   Yes.
15          Q.   And that was the advice you got from Tom Gibson?
16          A.   Yes.
17          Q.   Did you follow that?
18          A.   No.
19          Q.   Why not?
20          A.   Because if I would have done that, then I was
21    worried that it would -- the dox would just happen.  I was
22    hoping that maybe I could stop it from happening.
23          Q.   Okay.  So you said you'd actually written -- written
24    some drafts and taken screenshots.  Do you recall that?
25          A.   Yes.
```

**J.A. 436**

```
 1          Q.    Showing you Government Exhibit 116 for
 2    identification, so only you can see, do you recognize
 3    Exhibit 116?
 4          A.    Yes.
 5          Q.    And what is that?
 6          A.    This is a draft of what I was going to send to him.
 7          Q.    To send back to Mr. Cantwell?
 8          A.    To send to Cantwell, yes.
 9          Q.    And what time are you doing this draft in relation
10    to the communications from Mr. Cantwell?
11          A.    I believe it was around 11:00 p.m. that night.
12          Q.    All right.  So it's -- is it after you had written
13    "what do you even stand to gain here?"
14          A.    Yes.
15          Q.    But before saying anything else?
16          A.    That's right.
17          Q.    Okay.  And showing you 117 for identification, do
18    you recognize that?
19          A.    Yes.
20          Q.    And is that another draft of a potential response to
21    Mr. Cantwell that you did yourself that night?
22          A.    It's the same draft, but more of what I was going to
23    say.
24                MR. DAVIS:  Okay.  Your Honor, I move to admit 116
25    and 117 and strike the ID.
```

**J.A. 437**

```
 1              THE COURT:  Any objection?
 2              MR. WOLPIN:  No objection, your Honor.
 3              THE COURT:  It can be admitted.  It can be
 4    displayed.
 5         (Government's Exhibits 116 and 117 admitted.)
 6         Q.   So going back to 116, you said, "you specifically
 7    mention my kids."
 8              Do you see that?
 9         A.   Yes.
10         Q.   Okay.  Had he mentioned your kids at that point?
11         A.   No, not that I remember.
12         Q.   Did he mention your kids later?
13         A.   He did --
14         Q.   All right.
15         A.   -- but there's no -- there would have had to be some
16    reason that I said that.
17         Q.   All right.  So is it possible it was later in the
18    chain than the very first part?
19         A.   No.  There would have had to be some other time that
20    he had mentioned that, that he had -- because --
21         Q.   All right.
22         A.   Yeah.
23         Q.   Okay.  But you remember this as early on that you
24    wrote this?
25         A.   Yes.
```

**J.A. 438**

```
 1        Q.   And going to 117, you said, "you think you're gonna
 2   harm my family and I'm just gonna sit here and take that."
 3            Right?
 4        A.   Yes.
 5        Q.   All right.  And then you took -- what did you do to
 6   preserve these drafts?
 7        A.   I had two phones at the time.  I took a photo of one
 8   phone using the other phone.
 9        Q.   All right.  And so you made a screenshot by a
10   picture using a different phone?
11        A.   Correct.
12        Q.   All right.  And what did you do with those
13   screenshots?
14        A.   I sent them to Paul Nehlen.
15        Q.   Okay.  And who is Paul Nehlen?
16        A.   He was a congressional candidate in Wisconsin.  He
17   had been in the Bowl Patrol chat, although was never actually
18   what we would consider of being part of the Bowl Patrol.
19        Q.   All right.  And was he someone you looked up to?
20        A.   Yes.
21        Q.   And is Nehlen spelled N-e-h-l-e-n?
22        A.   Yes.
23        Q.   And did he give you some advice?  I won't ask what
24   it is at this point.
25        A.   Yes.
```

**J.A. 439**

```
 1        Q.   All right.  So we'll get to that in a bit.  So let's
 2   go back to 100.
 3             Okay.  So at 3:56 a.m. eastern, you hear back from
 4   Mr. Cantwell, right?
 5        A.   Yes.
 6        Q.   And what does he say?
 7        A.   "Get a fucking life or I will ruin the one have.
 8   Don't bother anyone, then you won't have to worry about
 9   crossing me."
10        Q.   Okay.  And can we go to the next part?
11             What time is the next reply?
12        A.   It's at 2:13 p.m.
13        Q.   All right.  So that's many hours, eleven hours or
14   so, after the prior communication, right?
15        A.   Correct.
16        Q.   Why did so much time go by?
17        A.   I just hadn't opened up my -- my phone yet.  I was
18   watching the kids because my wife had gotten off work that
19   morning and, you know, she was sleeping, so I would have been
20   busy watching the kids.
21        Q.   All right.  Did you forget about this?  Did you
22   think it was over?
23        A.   No.
24        Q.   All right.  But at 2:13 p.m., so that's 1:13 your
25   time, you get back on and get back to Cantwell, right?
```

**J.A. 440**

1    A.   Yes.

2    Q.   And what do you say?

3    A.   I say, "I haven't given you any thought and it was

4    an honest mistake.  Didn't even know you were in there or else

5    I'd have thought better of it.  Other than that, all I can do

6    is just leave you the fuck alone and tell other people to do

7    the same, which I have done.

8         "Seriously, man, I couldn't care less about what

9    you're trying to do these days."

10   Q.   All right.  So that's 2:13 p.m., and two more hours

11   go by, right?

12   A.   Yes.

13   Q.   Now, at this point, have you threatened

14   Mr. Cantwell?

15   A.   No.

16   Q.   Other than your F word there, have you used foul

17   language?

18   A.   No.

19   Q.   Had you threatened to dox him?

20   A.   No.

21   Q.   Had you -- were you still trying to deescalate?

22   A.   Yes.

23   Q.   And two more hours go by and then you hear from

24   Mr. Cantwell over a period of about half an hour, correct?

25   A.   Yes.

```
 1        Q.    And what does he tell you then?

 2        A.    He says:  You're a fucking liar.  You came here with

 3   your loser fucking pals because you have the attention span of

 4   an N and the morals of a K and because of that fact, you're

 5   going to lose everything you have.

 6              Next time I post that photo, the faces won't be

 7   blurred and then you're going to start getting unexpected

 8   visitors.

 9              And I don't care if it's you causing the trouble.

10   You're the one who's going to suffer because you're the one who

11   I can get.

12              If you wanna dox Vic, he's a better target.  But if

13   you give me fake info, then your wife is gonna have trouble

14   sleeping at night until she leaves you and takes your kids

15   away.

16        Q.    Okay.  So he brings up your wife, right?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    And he also brings up Vic, correct?

21        A.    Correct.

22        Q.    Had there been any mention of Vic Mackey before

23   4:47 p.m.?

24        A.    No.

25        Q.    He also says, "you're the one who's going to suffer
```

**J.A. 442**

1    because you're the one who I can get."

2            Right?

3    A.    Yes.

4    Q.    How did you understand that?

5    A.    That I -- I was the one whose information that he

6    had, so it didn't matter if it was me or not, but I was the one

7    who was going to suffer because of it.

8    Q.    All right.  And he says, "next time I post that

9    photo, the faces won't be blurred."

10            Do you see that?

11    A.    Yes.

12    Q.    When you saw that, did you know what he was even

13    talking about?

14    A.    No.

15    Q.    Why not?

16    A.    I had been blocked from the place that he posted

17    them and I was unaware that they had been posted.

18    Q.    All right.  So you don't even know that there's been

19    photos posted?

20    A.    Correct.

21    Q.    All right.  And is -- is it possible on the Internet

22    to blur faces of people and post photos?

23    A.    Yes.

24    Q.    Okay.  So you don't even know what that photo is at

25    this point?

**J.A. 443**

```
1         A.    No.

2         Q.    Okay.  So two more hours go by, right?

3         A.    Yes.

4         Q.    And then what do you say?

5         A.    "What picture are you even talking snout," which was

6    a typo, about.

7         Q.    Okay.  Now, he'd mentioned Vic.  Did you actually

8    have information about Vic?

9         A.    I did.

10        Q.    All right.  And what information was -- I won't ask

11   you what it is, but what kind of information did you have?

12        A.    Just very, very basic, not anything that would --

13   enough that if somebody tried, they would be able to figure out

14   who he was, but not anything as specific as like an address.

15        Q.    All right.  But did you have a name?

16        A.    Yes.

17        Q.    And did you know the area of the country where

18   Mr. Vic Mackey lived?

19        A.    Yes.

20        Q.    Okay.  So were you thinking about giving

21   Mr. Cantwell the information you had for Vic Mackey?

22        A.    No.

23        Q.    Why not?

24        A.    Because I felt like I owed -- that there was a

25   loyalty that -- you know, that's pretty much it.  I just didn't
```

**J.A. 444**

```
 1   want to throw a friend under the bus.
 2        Q.   You regarded Vic Mackey as a friend?
 3        A.   Yes.
 4        Q.   All right.  So Mr. Cantwell gets back to you and he
 5   says, "fuck around and I'll remind you the hard way."
 6             Right?
 7        A.   Yes.
 8        Q.   All right.  So let's go to the next page.
 9             And what did you write then?
10        A.   "So I'm assuming Peach took the picture.  Guess that
11   means you don't care what happens to her either."
12        Q.   Okay.  And why did you refer to Peach taking a
13   picture?
14        A.   Because I knew at the time, as did many members of
15   Bowl Patrol, that that's where he would have gotten the
16   pictures and that she would be implicated as the one who had
17   assisted in the dox.
18        Q.   Okay.  And when you said, "guess that means you
19   don't care what happens to her either," were you threatening
20   Peach?
21        A.   No.
22        Q.   What were you saying?
23        A.   Well, I knew that because the fact was known that
24   she would have been the source of the pictures that people
25   would be upset with her for, you know, participating in a dox
```

```
 1   because that's one of the worst things that you can do to
 2   somebody.
 3        Q.   One of the worst things you can do is what?
 4        A.   Is dox somebody or assist in doxing somebody.
 5        Q.   All right.  Okay.  So Mr. Cantwell replies to you
 6   soon after that, right?
 7        A.   Yes.
 8        Q.   And what does he write?
 9        A.   "As a matter of fact, I don't.  So if you don't want
10   me to come and fuck your wife in front of your kids, then you
11   should make yourself scarce.
12             "Give me Vic.  It's your only out.
13             "I guess I'm going to have to prove my seriousness."
14        Q.   All right.  So he talks about coming and fucking
15   your wife at 6:41 p.m., right?
16        A.   Yes.
17        Q.   You don't reply, right?
18        A.   Correct.
19        Q.   Half an hour goes by, right?
20        A.   Yes.
21        Q.   And then he comes back to you; "give me Vic, it's
22   your only out."
23        A.   Yes.
24        Q.   Right?
25        A.   Yes.
```

**J.A. 446**

1      Q.    And then another more than an hour goes by and he

2    comes back again, right?

3      A.    Yes.

4      Q.    And why weren't you replying to him once he'd said

5    this?

6      A.    At this point, I was -- I was still -- this would

7    have been at 5:41 p.m., 6:10 p.m., and 7:17 p.m. during my

8    time, which is -- my wife was going to be working that evening

9    and so we would have been having dinner with the kids and I

10   would have been helping her get out the door on time so she

11   could get to work.

12     Q.    So this is Father's Day dinner and you've got this

13   going on on your phone, right?

14     A.    Yes.

15     Q.    Did you take it as a joke when he said, "you don't

16   want me to come and fuck your wife in front of your kids"?  Was

17   that funny to you?

18     A.    Not at all.

19     Q.    How did it make you feel?

20     A.    I couldn't really believe that he said it at the

21   time, to be honest with you.  I was angry, I was scared about

22   what might happen, and I just -- I felt as though a line had

23   been crossed.

24     Q.    All right.  In all of your communications in the far

25   right world online, had anyone ever made a threat like that to

```
 1   your wife and kids?

 2       A.   No.

 3       Q.   And had you ever made a threat like that to someone

 4   else's wife and kids?

 5       A.   No.

 6       Q.   And were you aware of any such threat that ever

 7   occurred?

 8       A.   No.

 9            MR. WOLPIN:  I'm going to object, your Honor;

10   relevance, prejudice.

11            THE COURT:  Sustained on both grounds.  I mean,

12   excuse me.  Overruled on both grounds.

13            MR. DAVIS:  All right.

14            THE COURT:  The answer can stand.

15       Q.   You said that this had crossed a line.  Can you

16   explain that to the jury?

17       A.   Well, I think it's pretty universal that you can say

18   stuff about somebody, you can say things about somebody's mom,

19   you can say things about a lot of things, you know, but once

20   you bring wife and kids into it, and especially directly like

21   that, it's -- it's a whole nother level.

22       Q.   All right.  And is there a difference, in your view,

23   between a communication in a channel that lots of people are

24   seeing and a direct communication that is private between two

25   people?
```

**J.A. 448**

1      A.    Yes.

2      Q.    And what's that difference?

3      A.    The difference is that if it's on a channel, it can

4  still be construed as a joke.  I might be able to -- you might

5  be doing it for the entertainment of others.  But a direct

6  message like this is different than that.  It's a true threat.

7      Q.    All right.  All right.  So let's go back to the --

8  the larger shot.

9           It says, "I guess I'm going to have to prove my

10  seriousness."

11           Finally, at 8:21 p.m., what do you say?

12      A.    "Show me the picture you have."

13      Q.    Okay.  And he replies immediately what?

14      A.    "No."

15      Q.    But then you see a picture, right?

16      A.    Yes.

17      Q.    And that's the picture we've already seen of your

18  family at Christmas?

19      A.    Yes.

20      Q.    How did it make you feel to see that picture posted

21  in front of you?

22      A.    Well, a lot of different ways, to be honest with

23  you.  I was, of course, furious, but maybe even more than that

24  I was scared.  I thought about how stupid it was that I had

25  given anybody a picture of my family and -- but nothing about

1   it was funny.  Nothing about it was humorous at all.

2       Q.   All right.  And then after Mr. Cantwell sent you

3   that photo, he sends you a few more comments, right?

4       A.   Yeah.  Yes.

5       Q.   And what does he say?

6       A.   "More where that came from.

7            I'll bet one of my incell listeners would love to

8   give her another baby.

9            Do you think the FBI would take issue with an LSD

10  user owning guns around kids?"

11      Q.   Okay.  So let's talk about that.  What's an incell

12  listener?

13      A.   It would have been somebody who listened to his

14  program who was involuntarily celibate, which means that for

15  whatever reason, despite the fact that they wanted to have a

16  girlfriend or be with a woman, they couldn't.  So they were

17  celibate, but not by their own choice.

18      Q.   Okay.  So how is that different from the prior thing

19  where he says if you don't want me to come and F your wife in

20  front of your kids?

21      A.   Well, it's another form of a threat where he says --

22  you know, basically indicates that if he doesn't do something,

23  maybe somebody else will.

24      Q.   Okay.  And then three minutes after the incell

25  listeners, he talks about the FBI and LSD user owning guns

**J.A. 450**

```
 1   around kids, right?

 2        A.   Correct.

 3        Q.   All right.  And then does he send you another photo?

 4   Let's go on to that.

 5        A.   Yes.

 6        Q.   Okay.  Next slide.

 7             And do you recognize that photo?

 8        A.   Yes.

 9        Q.   And that's 8:31 p.m.?

10        A.   Yes.

11        Q.   And that's the -- you've already described that

12   photo?

13        A.   I have, yes.

14        Q.   Okay.  And what's the next message he sends you?

15        A.   Well, he says, "give me Vic."

16             And then I tell him that I don't own guns or do

17   drugs.  And so he says, "LOL --

18        Q.   Meaning laugh out loud?

19        A.   Correct.

20             "Okay.  I guess you're not going to give me what I

21   want.

22             "Fine.  Good luck."

23        Q.   Okay.  So it's 8:42 p.m.  This is more than 24 hours

24   after Mr. Cantwell first texted you, right?

25        A.   Yes.
```

**J.A. 451**

```
 1        Q.   Had you threatened him in any way?

 2        A.   No.

 3        Q.   Had you said anything disrespectful in any way?

 4        A.   No.

 5        Q.   Were you still trying to deescalate?

 6        A.   Yes.

 7        Q.   Okay.  So what happens after 8:42 p.m.?  What do you

 8   say?

 9        A.   Well, I tell him that I don't even have his dox --

10        Q.   Was that true?

11        A.   -- Vic Mackey's dox.

12        Q.   Sorry?

13        A.   I say I don't even have his dox, referring to Vic

14   Mackey.

15        Q.   All right.  Was that true?

16        A.   No.

17        Q.   Okay.  And then Mr. Cantwell describes -- gives you

18   more information, right?

19        A.   Yes.

20        Q.   And what does he tell you?

21        A.   He says, "guess you're fucked then.

22             "All right.  Since you're obviously not

23   understanding the severity of this, I'll do you a favor.

24             "On Tuesday I'm going to send every episode of

25   BowlCast along with your identifying information to whatever
```

**J.A. 452**

1    the local equivalent of CPS is in your jurisdiction."

2    　　Q.　Did you know what CPS was?

3    　　A.　Yes.

4    　　Q.　What is it?

5    　　A.　It's Child Protective Services.

6    　　Q.　Okay.  And what else did Mr. Cantwell write to you?

7    　　A.　"This way the information won't be public yet."

8    　　Q.　Okay.  And what next?

9    　　A.　"By Tuesday, you should be able to talk to your wife

10   and kids and to get them -- and get them to have all their

11   stories straight, get anything incriminating out of the house.

12   　　　　But I'm pretty sure once that visit comes, you'll

13   understand that this is serious.

14   　　　　If that doesn't work, I'll escalate until I get what

15   I want.

16   　　　　Tell Vic that if he gives himself up, he can save

17   your family."

18   　　Q.　Okay.  So that's 9:26 p.m. on June 16th, eastern,

19   right?

20   　　A.　Correct.

21   　　Q.　And then he makes one more comment?

22   　　A.　"He won't do it, but at least you'll know certain

23   that you chose the wrong side."

24   　　Q.　Okay.  So where does it go from there that Sunday

25   evening?

**J.A. 453**

```
 1        A.    At this point I just figured that there is nothing
 2   that I'm going to be able to do to talk him out of this, so I
 3   put up a front.  And, you know, I had kept my anger and
 4   everything under wraps until that point, so I basically wanted
 5   to tell him off, because I felt at that point that there was no
 6   getting out of it.
 7        Q.    And when you say getting out of it, what do you
 8   mean?
 9        A.    That he going to dox me.  He was going to do
10   something.
11        Q.    All right.  Were you angry?
12        A.    I was more scared than angry, but I was definitely
13   angry.
14        Q.    All right.  And so you wrote what you wrote, right?
15        A.    Correct.
16        Q.    And then he says, "tomorrow then, no sense in
17   waiting till Tuesday."
18              Tomorrow's Monday, right?
19        A.    Correct.
20        Q.    And are you taunting him at this point?
21        A.    Yes.
22        Q.    All right.  You say now, "go ahead"?
23        A.    Yes.
24        Q.    And then what does he say?
25        A.    "CPS will visit you soon.  I'm not talking about
```

**J.A. 454**

```
 1   listeners.
 2            "Good luck."
 3        Q.   All right.  And how did you take that when he said
 4   "I'm not talking about listeners."  Did you know what he meant?
 5        A.   Not exactly.  I -- I assume that he realized that he
 6   had crossed a line legally at that point and that he was trying
 7   to walk back --
 8            THE COURT:  Sustained.  Disregard the last comment,
 9   members of the jury.
10        Q.   Don't assume -- I guess I sort of asked you to.
11            Did you understand -- "I'm not talking about
12   listeners," how did you take that?
13            You're not sure?
14        A.   I don't know.
15        Q.   Okay.  All right.  So then you wrote, "laugh out
16   loud; oh, no, I'm super scared; I'm sure this is going to go
17   exactly as you think it will."
18            Correct?
19        A.   Correct.
20        Q.   All right.  And he replies as he does, correct?
21        A.   Yes.
22        Q.   And he says, "have a good night"?
23        A.   Yes.
24        Q.   All right.  And are these your replies, these
25   cartoons?
```

```
 1          A.    Yes.

 2          Q.    And why did you put those in there?

 3          A.    Just to mess with him.

 4          Q.    Okay.  And was that it?

 5          A.    That was it.

 6          Q.    So that's 8:42 p.m. central and this has happened,

 7    right?

 8          A.    Yes.

 9          Q.    Okay.  And, again, when it's all over, did you take

10    it as a joke?

11          A.    No.

12          Q.    Did you see anything to funny about the whole

13    exchange?

14          A.    No.

15          Q.    To your knowledge, was anyone being entertained by

16    it?

17                MR. WOLPIN:  Objection, your Honor; leading at this

18    point.

19                THE COURT:  Sustained.

20                MR. DAVIS:  All right.

21          Q.    And you've already talked about crossing a line,

22    correct?

23          A.    Yes.

24          Q.    And what effect, if any, did this exchange have on

25    your sleep, at least for a while?
```

**J.A. 456**

```
 1        A.   I didn't sleep that night.  I just was -- everything
 2   was very -- I was un -- it was unsettling.  I -- you know, it
 3   really affected me.
 4        Q.   All right.  Now, you've talked about before
 5   contacting Paul Nehlen.
 6        A.   Uh-huh.  Yes.
 7        Q.   How did you contact him, in what form?
 8        A.   I -- I sent him a text, but I called him as well.
 9        Q.   All right.  You actually had a telephone
10   conversation with him?
11        A.   Yes.
12        Q.   Do you remember exactly where it was in all of this
13   that you talked to Paul Nehlen?
14        A.   I'm not sure exactly what -- what time it was, but
15   the basic gist of the call was that he's going to do this at
16   some point anyway and so you might as well just, you know, say
17   to hell with it.  And, you know, that's when I started, you
18   know, talking a little trash to him and posting the stickers
19   and things.
20        Q.   All right.  So did Mr. Nehlen give you some advice?
21        A.   Yes.
22        Q.   And did you tell him what had happened?
23        A.   Yes.
24        Q.   And, again, why did you call Paul Nehlen in the
25   first place?
```

**J.A. 457**

1      A.    Because he was familiar with the situation -- with

2  the scene, I guess, of the far right on Telegram and because I

3  viewed him as somebody who would give me good advice and not

4  lead me the wrong way in this situation.

5      Q.    All right.  And when you called Paul Nehlen, were

6  you and he laughing about this?

7      A.    No.

8      Q.    All right.  Now, did you make a decision that same

9  night about posting what had happened?

10     A.    Yes.

11     Q.    All right.  And explain that decision.  What did you

12 decide to do?

13     A.    Well, I took screenshots of it and I sent it to the

14 Bowl Patrol chat.  And, you know, the idea was basically to

15 proliferate the screenshots to show the type of person that

16 Cantwell is.

17     Q.    All right.  So this is bad stuff that can happen to

18 you in these communications, right?

19     A.    Yes.

20     Q.    Why do you want to send them to other people to see?

21     A.    Because I knew that there might still be people who

22 followed him and maybe thought that he was a good person, but I

23 didn't want the same thing to happen to others.  I wanted to

24 show that, you know, the guy was not in his right mind at the

25 time, dangerous, and so I wanted to make sure that nobody did

1  anything like send him any sort of personal information or, you

2  know, even associate with him.

3      Q.    All right.  To what extent did sending that

4  information out to the Bowl Patrol help you, in your mind, with

5  your own security, if any?

6      A.    Well, it was a -- it was a record of what had

7  happened.

8      Q.    And explain that.

9      A.    Well, I -- you know, if I take the screen caps and

10  they go out, then there's a trail, basically.

11      Q.    Okay.  Now, let -- when you sent them out, did you

12  send them out so that the reader could see everything?

13      A.    Yes.

14      Q.    You -- but did you obscure some things?

15      A.    I obscured the photos of my family.

16      Q.    Okay.  And did you obscure your address?

17      A.    Yes.

18      Q.    Why?

19      A.    Because I didn't want that information to be out

20  there any more than it had to be.

21      Q.    Okay.  So let me show you a series of exhibits,

22  first Government Exhibit 214.  I believe that's in evidence.

23          Do you recognize that?

24      A.    Yes.

25      Q.    And explain briefly how 214 got to be the way it is.

**J.A. 459**

```
 1        A.   Well, I took the -- the screen cap that I had made

 2   and then I used some of the stickers to cover up the things

 3   that I didn't want to be out.

 4        Q.   Which include the faces of your family?

 5        A.   Correct.

 6        Q.   All right.  And so 214 is the first of your -- with

 7   the stickers on it?

 8        A.   Yes.

 9        Q.   And is this what you sent to the BowlCast?

10        A.   Yes.

11        Q.   Or the Bowl Patrol chat group?

12        A.   Yes.

13        Q.   Showing you now Government Exhibit 215 in evidence.

14   And that's another of your screenshots?

15        A.   Yes.

16        Q.   And there's nothing obscured in that one, correct?

17        A.   Correct.

18        Q.   And then 216 in evidence, another screenshot that is

19   not obscured, correct?

20        A.   Yes.

21        Q.   And then 217 in evidence.  And have you obscured

22   something there?

23        A.   Yes, I obscured my face.

24        Q.   All right.  So that's the picture of you that now

25   can't be seen?
```

**J.A. 460**

```
 1          A.    That's correct.
 2          Q.    All right.  And now 218 in evidence.  And is
 3   there -- that's actually the first of the series, correct?
 4          A.    Yes.
 5          Q.    And what's obscured there?
 6          A.    The name of my street.
 7          Q.    Okay.  And, finally, 219 in evidence.  Anything
 8   obscured there?
 9          A.    No.
10          Q.    So you -- other than what you obscured, you sent
11   everything out to the Bowl Patrol --
12          A.    Yes.
13          Q.    -- right?  And that happened on June 17th in the
14   early morning?
15          A.    Yes.
16          Q.    Okay.  Now, did -- at some point did someone write
17   an introduction about what had happened?
18          A.    Yes.
19          Q.    And do you recall what channel that was on and who
20   wrote it?
21          A.    It was on Uncle Paul's channel, which I understood
22   to be Paul Nehlen.
23          Q.    Paul Nehlen?
24          A.    Uh-huh.  Yes.
25          Q.    Okay.  And did you later write even a longer
```

**J.A. 461**

```
 1  statement of what had happened from your perspective?

 2       A.   Yes.

 3       Q.   And did you put that on the BowlCast?

 4       A.   Yes.

 5       Q.   Okay.

 6       A.   Well, I didn't put it, but I forwarded it in order

 7  for it to be put on the channel.

 8       Q.   Okay.  All right.  Now, at some point did you become

 9  aware that Mr. Cantwell had actually doxed you?

10       A.   Yes.

11       Q.   All right.  And --

12            THE COURT:  Just a notice, Mr. Davis.  I'm going to

13  stop for lunch no later than 12:30.  All right?

14            MR. DAVIS:  Very good.

15       Q.   And showing you Government Exhibit 102 in evidence,

16  do you recognize 102?

17       A.   Yes.

18       Q.   And is that a screenshot of the Radical Agenda

19  channel?

20       A.   Yes, the public channel.

21       Q.   All right.  And who took that screenshot?

22       A.   I did.

23       Q.   And when did you take it?

24       A.   March 16th, 2020.

25       Q.   Okay.  So you actually took it this year, right?
```

**J.A. 462**

```
 1          A.    Yes.

 2          Q.    That screenshot was still up on Radical Agenda in

 3   March of 2020?

 4          A.    Yes.

 5          Q.    And has it remained up since then?

 6          A.    To the best of my knowledge, it is still there.

 7                MR. WOLPIN:  Objection, your Honor.  Can we --

 8                THE COURT:  I -- sustained at the present time.

 9   Disregard the answer.

10          Q.    Okay.  But you can see the -- the date by the

11   messages; you can see June 17th, 2019, on the left, correct?

12          A.    Yes.

13          Q.    And this is Mr. Cantwell as the administer --

14   administrator writing, right?

15          A.    Yes.

16          Q.    All right.  So going back to the -- he says, "here's

17   the redacted parts."

18                Right?

19          A.    Correct.

20          Q.    And those are the same photos we've already seen

21   that he had sent you in his Telegram, right?

22          A.    Yes.

23          Q.    And then the next page, did you also take this

24   screenshot?

25          A.    Yes.
```

**J.A. 463**

1    Q.    And Mr. Cantwell is writing, "that's Cheddar Mane,

2  a/k/a Cheddy Blac."

3         Right?

4    A.    Yes.

5    Q.    And, again, those are your screen names?

6    A.    Yes.

7    Q.    And what does he tell his listeners at that point?

8    A.    He says that tomorrow morning he's calling CPS to

9  give them every episode of BowlCast and inform them that this

10 acid-dropping fake Nazi is endangering those children with his

11 behavior.

12   Q.    Okay.  And there's a redacted part and then what

13 does Mr. Cantwell say under that?

14   A.    "Like I said, if I could just drive down to Twin

15 Creek Road in Winfield, Missouri, and shoot this idiot, I

16 would.  But I can't, so I'll let the law do it."

17   Q.    Okay.  And is that the -- is that the end of the

18 doxing?

19   A.    Yes.

20   Q.    Okay.  Did Mr. Cantwell say anything in this public

21 dox about why he was doxing you?

22   A.    No, not that I'm aware of.

23   Q.    And any mention of he was trying to get Vic Mackey's

24 information?

25   A.    Not that I'm aware of.

**J.A. 464**

1       Q.    Okay.  And you took these screenshots, and what did

2   you do with them?

3       A.    I sent them to law enforcement.

4       Q.    Okay.  You sent them to the FBI?

5       A.    Yes.

6       Q.    Okay.  Now, at some point soon after the Telegram

7   messages with Mr. Cantwell, did you talk to your wife about

8   CPS?

9       A.    Yes.

10      Q.    Tell the jury what you remember about that.

11            MR. WOLPIN:  Objection, your Honor; hearsay.

12            MR. DAVIS:  It's not for the truth, your Honor.

13            THE COURT:  I'm sorry.  Repeat the first -- the

14   prior question.

15            MR. DAVIS:  Did you -- did you talk to your wife

16   about CPS.

17            THE COURT:  And -- all right.  Let's take our lunch

18   break now.  I'll -- I'll discuss this with counsel when we

19   return.

20            So, counsel, be back here at -- let's see.  We'll do

21   45 minutes.  So counsel be back here at 1:10 and we'll resume

22   with the jury at 1:15.

23            All right?

24            (Lunch recess taken at 12:29 p.m.)

25

**J.A. 465**

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5/12/21         */s/  Liza W. Dubois*
                                 LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
            v.                      *   September 23, 2020
                                    *   1:16 p.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY TWO - AFTERNOON SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:       John S. Davis, AUSA
                          Anna Z. Krasinski, AUSA
                          U.S. Attorney's Office



For the Defendant:        Eric Wolpin, Esq.
                          Jeffrey S. Levin, Esq.
                          Federal Defenders Office




Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

**J.A. 467**

```
                    I N D E X

WITNESSES:              Direct    Cross    Redirect      Recross

BENJAMIN LAMBERT


By Mr. Davis            8


By Mr. Wolpin                      21



EXHIBITS                                   FOR ID      IN EVD

Government's Exhibit No. 119.                            10

Government's Exhibit Nos. 104 and 104A.                  16

Defendant's Exhibit C-7.                                 25

Defendant's Exhibit A-6.                                 29

Defendant's Exhibit B-41.                                38

Defendant's Exhibit I2E.                                 49

Defendant's Exhibit C-2.                                 88

Defendant's Exhibit C-19.                               102
```

**J.A. 468**

```
 1                    P R O C E E D I N G S
 2                (IN COURT - NO JURY PRESENT)
 3          THE COURT:  Mr. Davis, make a proffer as to what
 4   question you're going to ask and what you expect the answer to
 5   be.
 6          MR. DAVIS:  Judge, I'll ask if the witness raised
 7   with his wife -- I believe on the Monday after the threats,
 8   this would have been June 17th, he decided that he wanted to
 9   give her a heads-up regarding the potential that someone had
10   threatened to call CPS.
11          And so what I expect him to say, and he's in the
12   courtroom, your Honor, I expect the witness to say I felt like
13   I should advise my wife and what I said was someone may call
14   CPS about our family.  I don't know whether he'll do it or
15   not, but if he does, I want you to know and not be blindsided.
16   Something to that effect.
17          THE COURT:  And he's going to say I looked at her
18   and she was visibly upset?
19          MR. DAVIS:  No.  I wasn't even going to ask that,
20   no.
21          THE COURT:  Okay.
22          MR. DAVIS:  But I suppose I could.
23          THE COURT:  I'm not inviting you to.  Believe me.
24          What is it important for?
25          MR. DAVIS:  It shows the seriousness with which he
```

1  took this exchange with Mr. Cantwell and he was worried enough
2  about it that something he's --
3          THE COURT:  Well, you're not offering it to try to
4  establish the commission of the crime here --
5          MR. DAVIS:  Correct.
6          THE COURT:  -- because the wife was upset.
7          MR. DAVIS:  Correct.  And I'm not going to ask
8  about the wife being upset.
9          THE COURT:  Okay.  So thankfully you seem to -- in
10  light of my ruling on the denial of your request to have video
11  conference testimony, you're abandoning any theory you might
12  have of proving this charge solely because -- what's your
13  name, sir, Lambert -- Mr. Lambert's wife got upset when she
14  was told about the CPS investigation?
15          MR. DAVIS:  Honestly, your Honor, I don't think we
16  finally decided, but it's possible we will ask Task Force
17  Officer LeBlanc, who's the last witness, about his interview
18  with Pam Lambert and --
19          THE COURT:  All right.  We don't have to deal with
20  that now.  I've got to tell you that's at the outer limit of
21  how I could construe your indictment and how you could prove
22  the charge, and I'm unlikely to allow you to get into any
23  evidence on that point since the principal evidence is the
24  response of the victim testifying to it.  I've not allowed her
25  to be testifying by video.  But for reasons that I will

```
 1    explain to you that will take a very substantial period of
 2    time, because of the way you've indicted this case you've --
 3    it is an extremely complex indictment in which by using the
 4    prosecutor's conjunctive form you have in disjunctive form
 5    said I could prove the case by this or this, this, this or
 6    this, this, this or this, this or this.  At the very end of
 7    the chain is because she got subjectively -- she was upset
 8    even though no one else was.
 9           Now, you're not going to -- you don't need that.
10    There is a substantial question in my mind as to whether
11    that's a reasonable way to construe the indictment because the
12    person that you -- it seems to me the person you are alleging
13    Mr. Cantwell was trying to cause distress to was not the
14    victim's spouse.  It was the victim.  That's why you call him
15    the victim, and that's why you call in the indictment the
16    victim's spouse.  You don't call her victim too.  You call her
17    the victim's spouse.  Because your allegation is that the
18    intention that Mr. Cantwell had was to cause distress to Mr.
19    Lambert, right?
20           MR. DAVIS:  Right.
21           THE COURT:  Okay.  And if we were to pursue this
22    kind of chart theory about all of the alternative methods, you
23    would be asking me to say the jury should convict the
24    defendant if they believe he was trying to cause upset to Mr.
25    Lambert, but he didn't cause any upset to Mr. Lambert and a
```

```
 1   reasonable person in Mr. Lambert's position wouldn't have been
 2   upset, and a reasonable person and a victim -- Mr. Lambert's
 3   spouse wouldn't be upset, but she was upset.
 4         Do you see the problem with that?  I understand
 5   your idea as a prosecutor that I should charge every possible
 6   theory that I can conceivably come up with and write the
 7   indictment to give me the maximum amount of discretion, but
 8   there's a real problem with even going on that theory and it
 9   is -- I mean, if you stop and think about it, I think you will
10   realize there's no way that could ultimately be the basis on
11   which this jury would convict or acquit, and therefore why are
12   you pursuing it?
13         So you think about that.  We don't have to get into
14   it now, but I do think it is relevant as to this -- the person
15   you've charged as the victim, what his emotional response is,
16   why he had to tell his wife, but not her reaction to what he
17   said to her.
18         And I am advising you that at the current time I'm
19   not inclined to charge a theory under which Count 3 could be
20   proved on the theory that Mr. Cantwell intended to harm Mr.
21   Lambert.  He didn't harm Mr. Lambert.  No reasonable person
22   would think that he was harming Mr. Lambert.  No reasonable
23   person would think he's harming Mrs. Lambert, but Mrs. Lambert
24   was subjectively upset.
25         Do you see that, how strained that theory is?
```

**J.A. 472**

```
 1              MR. DAVIS:  Yes, your Honor.
 2              THE COURT:  I'm not requiring you to give it up
 3   now, but you reflect on that.  I'm just advising you if you
 4   want an instruction on what I think is a very strained theory
 5   of liability, you better come loaded for bear when we get to
 6   the jury instructions because based on what I know so far I'm
 7   not inclined to allow it.
 8              So what I propose to do is take the simple question
 9   and answer, did you tell her, what did you tell her, why did
10   you tell her, but no questioning about her reaction.
11              That having been said, does the defense have any
12   objection?
13              MR. WOLPIN:  As long as the witness isn't going to
14   then explain her statements in response.
15              THE COURT:  Mr. Lambert, I'm instructing you, do
16   not in responding to questions from counsel discuss your
17   wife's reaction, whether she was upset or not.  Just listen to
18   his questions and answer the question that he's asking you.
19              Do you understand?
20              THE WITNESS:  Yes, your Honor.
21              THE COURT:  All right.  We can bring the jury back
22   in.  We'll reserve judgment on this other issue until later.
23              (IN COURT - JURY PRESENT)
24              THE COURT:  All right.
25              Go ahead, counsel.
```

**J.A. 473**

```
 1           CONTINUED DIRECT EXAMINATION OF BENJAMIN LAMBERT
 2   BY MR. DAVIS:
 3        Q.    Good afternoon, Mr. Lambert.
 4              When we broke, I was asking whether you had spoken
 5   to your wife about the subject of a call to CPS.
 6        A.    Yes, I did.
 7        Q.    All right.  And when did that happen in this
 8   chrono?  Do you recall?
 9        A.    It was -- it would have been Monday afternoon.
10        Q.    So that would have been Monday, June 17th, 2019?
11        A.    Yes.
12        Q.    And why did you mention something to your wife
13   about CPS?
14        A.    Well, I took the threat seriously enough that I
15   wanted to let her know so if CPS did show up, that we wouldn't
16   be blindsided by it.  That she would know that, you know, it
17   could happen.  I didn't know for sure.  She just needed to
18   know.
19        Q.    All right.  And were you intending to tell her then
20   a full confession about your being in Bowl Patrol and your
21   being Cheddar Mane?
22        A.    No.
23        Q.    But you did want to tell her about the potential of
24   CPS?
25        A.    Yes.
```

**J.A. 474**

```
 1        Q.   So what did you say to your wife?

 2        A.   I'm paraphrasing, but the gist of it was somebody

 3   online made a threat that they were going to call CPS, which

 4   it's called DCFS in Missouri.  So I let her know that I didn't

 5   know whether it was going to happen or not, but I felt like

 6   she needed to know so she wouldn't be blindsided by it if

 7   somebody were to show up.

 8        Q.   All right.  And in fact you didn't know that Monday

 9   afternoon that a call to CPS had already happened, did you?

10        A.   No.

11        Q.   Okay.  Now, the next day, June 18th of 2019, do you

12   recall contacting your lawyer?

13        A.   Yes.

14        Q.   And did you actually write a note to your lawyer?

15        A.   Yes.  It was sent via text message.

16        Q.   All right.  And what was your purpose in contacting

17   your lawyer?

18        A.   I wanted to know if I should let the county sheriff

19   know that there had been a threat so there could be some

20   record of the situation just to put it out there I guess.  I

21   wanted to know what he had to say about it.

22        Q.   Okay.  And this is June 18, 2019?

23        A.   Yes.

24        Q.   And did you make screenshots of your communication

25   with your lawyer?
```

```
 1        A.    Yes.

 2        Q.    And showing you now Government Exhibit 119 for

 3   identification, do you recognize that item?

 4        A.    Yes.

 5        Q.    And does this item have the response from your

 6   lawyer redacted?

 7        A.    It does.

 8        Q.    So what is in blue is just what you wrote; is that

 9   correct?

10        A.    That's correct.

11        Q.    And is this an accurate copy of the message you

12   wrote to your lawyer on June 18th of 2019 about this

13   situation?

14        A.    Yes.

15             MR. DAVIS:  Your Honor, I move to admit Exhibit 119

16   in evidence.

17             THE COURT:  Is there objection?

18             MR. WOLPIN:  No, your Honor.

19             THE COURT:  It will be admitted and may be

20   displayed to the jury.

21             (Government's Exhibit No. 119 admitted)

22        Q.    Can you read that, Mr. Lambert?

23        A.    "I had a guy say he was going to call DCFS and tell

24   them I am some kind of drug user and potential terrorist and

25   then posted pictures of my family from Pam's Facebook.  I
```

**J.A. 476**

1   think he is full of shit, but in this case" (redacted) "and a

2   lunatic.  Should I contact the county sheriff and let him know

3   what's going on in case he actually goes through with the

4   threat?  I'm mostly only worried about the DCFS thing.  I

5   think he is bluffing, but I also think he has violated the law

6   saying that he was going to rape my wife in front of my kids

7   and hope that people would take my address and pay me a visit

8   and saying things like I wish I could drive to Winfield and

9   kill this idiot myself.  I'm so sorry to bother you with this

10  gay bullshit.  Really just wondering if I should call cops or

11  not."

12      Q.   And did you get some advice from your lawyer and

13  then write him again?

14      A.   Yes.

15      Q.   And can you read what you wrote after that?

16      A.   "I wouldn't put it past him.  That being said, I

17  have nothing to hide, but DCFS is who he says he's going to

18  call and that scares me because I have heard horror stories,

19  but Pam also says they never take kids away unless it's

20  extreme abuse in her experience.  There's nothing close to

21  actionable going on up here."

22      Q.   All right.  So again, why did you send that to your

23  lawyer on June 18th?

24      A.   Because I was worried about whether the defendant

25  would go through with the threats or not.

```
 1        Q.   And you were actually thinking about calling the
 2   sheriff about this?
 3        A.   Yes.
 4        Q.   All right.  Did you ultimately decide not to call
 5   the sheriff?
 6        A.   Correct.
 7        Q.   Why?
 8        A.   For a few reasons or a couple reasons.  Reason
 9   number one being that in this world of the far-right calling
10   the police on somebody is one of the most taboo things that
11   you can do, so I didn't want to be a snitch, and number two,
12   he told me that --
13             MR. WOLPIN:  Object, your Honor.  Hearsay.
14             THE COURT:  Let's stop.  Disregard the statement
15   "he told me that."
16             If you want to put another question, you can, and
17   I'll hear your objection.
18        Q.   Based on advice from your lawyer, did you decide
19   not to contact the police or the sheriff?
20        A.   That's correct.  I did not contact them based on
21   advice from my lawyer.
22        Q.   All right.  And can you -- without saying what your
23   lawyer said, can you explain what your thinking -- you said
24   you didn't want to be a snitch, right?
25        A.   Correct.
```

```
 1        Q.    That was one reason.  What's the other reason you
 2   didn't want to contact the sheriff?
 3        A.    He essentially told me that --
 4              THE COURT:  No, not what he told you.  What you
 5   concluded after talking to him was your motivation.
 6              THE WITNESS:  Okay.
 7        A.    What I concluded after talking to him was that it
 8   wasn't necessary to do that.
 9        Q.    Okay.  And can you explain that further?  Again, if
10   you can't without talking about what he told you, then don't
11   do it.
12        A.    It's hard to say without saying what he said.
13              THE COURT:  All right.  Let me just try to give you
14   some clarification here as to what I'm looking for.
15              I do not want you to testify to what your lawyer
16   said to you, but after your lawyer said something to you, you
17   apparently formed a view as to why you should not contact the
18   sheriff.  You explained one reason why.
19              THE WITNESS:  Uh-huh.
20              THE COURT:  Mr. Davis is asking you about whether
21   there was another reason why.  That reason could be because
22   you formed a view about something based on what your lawyer
23   said.  I just don't want you to say the words that your lawyer
24   said.
25              THE WITNESS:  Understood.
```

**J.A. 479**

```
 1        A.   My view, based on what he told me, was that I was
 2   not a hundred percent certain that a call was going to be
 3   made, so therefore there was no reason for me to have to
 4   contact the sheriff.
 5        Q.   Okay.  And again, on June 18th you didn't even know
 6   that Mr. Cantwell had called already on June 17th, right?
 7        A.   That's correct.
 8        Q.   Okay.  Now the next day, June 19th of 2019, did you
 9   actually call in to Mr. Cantwell's show?
10        A.   I did.
11        Q.   And what was the name of that show?  Do you recall?
12        A.   The Outlaw Conservative.
13        Q.   And that show aired on Wednesdays?
14        A.   That's correct.
15        Q.   Okay.  And did you actually review a recording of
16   that show and pull the clip of where you called in?
17        A.   Yes.
18        Q.   All right.  So you're familiar with the show and
19   your conversation and what Mr. Cantwell does, correct?
20        A.   Yes.
21        Q.   All right.  Now, tell the jury, why did you call in
22   to Outlaw Conservative on June 19th?
23        A.   I called because I wanted to confront him.  I felt
24   as though I had been wronged and that I was -- I wanted to put
25   him in an uncomfortable situation.
```

**J.A. 480**

```
 1        Q.    All right.  Were you going to threaten him?
 2        A.    Absolutely not.
 3        Q.    Okay.  And when you called in, were you going to
 4   pretend to be someone else?
 5        A.    No.
 6        Q.    Okay.  And when you called in on June 19th, did you
 7   know that you already had been doxed?
 8        A.    By Cantwell?
 9        Q.    Yes.  Did you know that --
10        A.    Yes.  He had already posted pictures and the
11   address was already out there, yes.
12        Q.    So you knew that the photos of your family had
13   already been presented to the chat group, right?
14        A.    Yes.
15        Q.    Okay.  So showing you Government Exhibit 104 and
16   104A, is that a recording of the brief call that you made that
17   day?
18        A.    It's not up there.
19              THE COURT:  It's been admitted?
20              MR. DAVIS:  It has not been admitted yet.
21              THE COURT:  All right.  So stop the jury from
22   seeing it.
23              He has.  Now you can put up the exhibit.
24        Q.    And do you recognize now the brief dialogue from
25   that call-in?
```

**J.A. 481**

```
 1        A.   Yes.
 2        Q.   And is that the complete dialogue you had that day?
 3        A.   Yes.
 4             MR. DAVIS:  Your Honor, I move to admit 104 and
 5   104A and play it.
 6             THE COURT:  Is there objection?
 7             MR. WOLPIN:  No objection.
 8             THE COURT:  Without objection it will be admitted
 9   and can be played for the jury.
10             (Government's Exhibit Nos. 104 and 104A admitted)
11        Q.   This is June 19th, correct?
12        A.   Correct.
13             (Government's Exhibit No. 104 played for the jury)
14        Q.   Was that it?
15        A.   That was it.
16        Q.   Did you try to call back to Mr. Cantwell on that
17   show?
18        A.   No.
19        Q.   Did you harass him after that?
20        A.   No.
21        Q.   All right.  And on that show did he say anything to
22   explain what you were calling about?
23        A.   I don't know because I didn't listen.
24        Q.   All right.  But that was it?
25        A.   That was it.
```

```
 1          Q.   Okay.  To your knowledge did you ever call him
 2   again or call his show again after that?
 3          A.   I don't remember doing so, no.
 4          Q.   Okay.  Now, I direct your attention finally to June
 5   20th of 2019.  Do you recall whether you wrote a message that
 6   was posted on the Bowl Patrol channel?
 7          A.   Yes.
 8          Q.   And what was that message about?
 9          A.   It was basically my take on what had happened.
10          Q.   All right.  So I'm not going to ask to introduce
11   this, but I will ask you to identify it.
12               Showing you Defense Exhibit C-19 for
13   identification, do you recognize C-19?
14          A.   Yes.
15          Q.   And that's dated June 20th; is that correct?
16          A.   That's correct.
17          Q.   And it's on the Bowlcast forwarded from Uncle Paul,
18   correct?
19          A.   Yes.
20          Q.   And it starts from Cheddar Mane, right?
21          A.   That's correct.
22          Q.   Okay.  And can you look at the second page also?
23   Do you see that?
24          A.   Yes.
25          Q.   And do you recognize this as the full and complete
```

```
1   statement that was your account of what had happened that you
2   wrote and posted on June 20th?
3        A.   Yes.
4        Q.   Okay.  And why again -- that's all I have on that.
5             Why did you write an account and post it?
6        A.   To eliminate any question as to what had
7   transpired.  It was my take on what had happened, and so I
8   wanted to -- I just wanted to get it out there.
9        Q.   Okay.  All right.  Now, afterwards -- the FBI
10  didn't come to talk to you until October of 2019, correct?
11       A.   Yes.
12       Q.   Did you ever get a call from Child Protective
13  Services?
14       A.   No.
15       Q.   Or DCFS in Missouri?
16       A.   No, I didn't.
17       Q.   And so no one came and visited your house?
18       A.   Correct.
19       Q.   And have you ever as a parent had any issue with
20  Child and Protective Services?
21       A.   No.
22       Q.   Okay.  After the exchange you had with Chris
23  Cantwell how, if at all, did you change your own situation?
24       A.   Well, I took steps to protect myself to, you know,
25  make sure that we were secure at home.
```

```
 1         Q.    All right.  Do you carry a firearm?

 2         A.    Yes.

 3         Q.    And is your wife also able to carry a firearm?

 4         A.    We have constitutional carry in Missouri so she

 5   could if she wanted to, usually she doesn't, but she knows how

 6   to operate a firearm, yes.

 7         Q.    Okay.  Did you take any steps to drive your wife

 8   anywhere?

 9         A.    Yes.  I drove her back and forth to work a few

10   times right around that period.

11         Q.    Okay.  And then you stopped doing that?

12         A.    That's correct.

13         Q.    Okay.  Do you recall a so-called trail camera?

14         A.    Yes.

15         Q.    And what was the trail camera and what happened

16   with that?

17         A.    A trail camera is a motion activated camera that

18   takes a photo when it's triggered by motion and stores it on

19   an SD card so you can review it later.

20         Q.    Okay.  Now, did you get a trail camera?

21         A.    I did.

22         Q.    And did you get it after the exchange with Mr.

23   Cantwell?

24         A.    I did.

25         Q.    And did you have that up and operating in October
```

1   of 2019?

2        A.    By the end of October 2019 it was operating.

3        Q.    But when the FBI came, you had not turned it on; is

4   that correct?

5        A.    Not yet.  That's correct.

6        Q.    Why not?

7        A.    Well, for -- mostly because I just -- by that point

8   I didn't think that anybody was going to actually show if they

9   hadn't shown themselves by then and because we didn't have a

10  whole bunch of extra money sitting around for me to be able to

11  buy batteries and an SD card.

12       Q.    Did you not have an SD card at that point?

13       A.    I had an SD card -- I purchased an SD card in late

14  October.

15       Q.    All right.  So what did you do about your social

16  media profile?

17       A.    The Facebook account that I had at the time, I took

18  it down.  I contacted all of the different data mining sites

19  that post your personal info and I requested that they take my

20  information down, and I took my LinkedIn page down.

21       Q.    All right.  And what about your Telegram account in

22  the name of Cheddar Mane?

23       A.    I deleted that account.

24       Q.    And why did you delete it?

25       A.    Just for more security.

**J.A. 486**

```
 1        Q.    Okay.  Mr. Lambert, at 8 o'clock p.m. on June 15th
 2   if Mr. Cantwell had texted you and said, just leave me alone,
 3   what would you have done?
 4        A.    Said okay and continue to leave him alone.  I had
 5   been leaving him alone up until that point when I made the
 6   mistake of entering a chat room that I didn't know that he was
 7   in.
 8        Q.    All right.
 9              MR. DAVIS:  If I may have just a moment, your
10   Honor?
11              THE COURT:  Yes.
12              (Attorney Davis confers with Attorney Krasinski)
13              MR. DAVIS:  No further questions.  Thank you.
14              THE COURT:  Thank you.
15              Cross-examination.
16              MR. WOLPIN:  Could I use the --
17              THE COURT:  You want to use the front?
18              MR. WOLPIN:  Yes.
19              THE COURT:  All right.  If we could disinfect that,
20   please.
21              (Podium is disinfected)
22              THE COURT:  Okay, Mr. Wolpin.
23                         CROSS-EXAMINATION
24   BY MR. WOLPIN:
25        Q.    So between 2018 and 2019 you were in -- or a part
```

**J.A. 487**

```
 1   of this group called the Bowl Patrol?
 2        A.   Yes.
 3        Q.   And the Bowl Patrol was sort of a loose group of
 4   people.  There were no clubhouses, correct?
 5        A.   Correct.
 6        Q.   There were no official central offices?
 7        A.   Correct.
 8        Q.   And there was no official hierarchy?
 9        A.   Official?  I'm sorry.
10        Q.   Hierarchy.  There was no one who was the treasurer
11   and the vice president?
12        A.   Correct.
13        Q.   However, you would describe yourself as being one
14   of the more prominent members of the group?
15        A.   Correct.
16        Q.   So among that group -- the sort of core of that
17   group is, I don't know, eight, ten people, correct?
18        A.   Approximately, yes.
19        Q.   Okay.  And you were in that core of the group the
20   Bowl Patrol in 2018 and in 2019?
21        A.   Yes.
22        Q.   And just to understand, the group had a number of
23   outlets.  One of those outlets we've heard about is a Telegram
24   account, correct, or channel?
25        A.   Yes.
```

**J.A. 488**

```
 1        Q.    And for the juror's sake, that channel looks a
 2   little bit like a Facebook feed or another social media feed
 3   where there's posts and people can view them?
 4        A.    That's correct.
 5        Q.    And as far as the Bowl Patrol's primary Telegram
 6   channel, it was called the Bowlcast?
 7        A.    Yes.
 8        Q.    And that's also the name of the group's podcast?
 9        A.    That's correct.
10        Q.    And that podcast, that Telegram channel, those
11   things are public, correct?
12        A.    Yes.
13        Q.    So the world can see what is done and said on that
14   group?
15        A.    That's correct.
16        Q.    Okay.  Now, in that context -- in that platform you
17   used a number of pseudonyms, but your primary pseudonym was
18   Cheddar Mane, your primary alias?
19        A.    That's correct.
20        Q.    Okay.  And some variation of that, Cheddarman,
21   Cheddar Mane, Cheddy Blac?
22        A.    That's correct.
23        Q.    Now we're going to talk in a minute about other
24   profiles you had, but let's stick with the Cheddar Mane one.
25              As far as the Cheddar Mane identity, you had an
```

**J.A. 489**

```
 1   avatar created to represent yourself?
 2        A.   Yes.
 3        Q.   Okay.  And the purpose of that avatar was to
 4   present Cheddar Mane publicly as more than just a voice or a
 5   piece of text, correct?
 6        A.   Yeah.  I guess you could say that, yes.
 7        Q.   Okay.
 8             MR. WOLPIN:  If I could see C17 just for the
 9   witness at this point, please.
10        Q.   All right.  So at this point we're looking at a
11   picture.
12             THE COURT:  I'm sorry.  I can't see it.
13             Okay.  Go ahead, counsel.
14             MR. WOLPIN:  Okay.
15        Q.   So first of all, this is something you're familiar
16   with?
17        A.   Yes.
18        Q.   Okay.  And this is something that you had created
19   as your avatar to represent you?
20        A.   Yes.  I didn't create it but, yes, I had it
21   created, correct.
22        Q.   You had someone create it on your behalf.  And then
23   this is something that online you would use as your online
24   Cheddar Mane presence?
25        A.   That's correct.
```

```
 1              MR. WOLPIN:  I would ask that it be admitted as an
 2      exhibit.
 3              THE COURT:  Is there objection?
 4              MR. DAVIS:  No objection.
 5              THE COURT:  Without objection it will be admitted
 6      and it can be shown to the jury.
 7              (Defendant's Exhibit No. C-7 admitted)
 8          Q.   All right.  So we see this is how you wanted the
 9      world to see Cheddar Mane.  We see in here the Mane part on
10      his chest, M-A-N-E, it's a little hard to see from a distance,
11      but that's correct, those four letters?
12              MR. DAVIS:  Objection to counsel's comment about we
13      see how you wanted the world to see Cheddar Mane.
14              THE COURT:  I'll overrule the objection, but be
15      careful with your phraseology, counsel.
16              MR. WOLPIN:  Thank you.
17          Q.   This is the public presentation of Cheddar Mane,
18      correct?
19          A.   Correct.
20          Q.   Okay.  And in that we can see again a patch on his
21      shirt saying M-A-N-E?
22          A.   Yes.
23          Q.   And we can see a shield in the upper right-hand
24      corner?
25          A.   Yes.
```

**J.A. 491**

```
 1          Q.    And that shield is the representation of Dylann

 2   Roof's haircut that we've talked about is the bowl cut,

 3   correct?

 4          A.    That's correct.

 5          Q.    That's sort of in honor of the murderer Dylann

 6   Roof, correct?

 7          A.    Correct.

 8          Q.    And that's the Bowl Patrol's overall symbol as a

 9   group is that shield with the Dylann Roof haircut, correct?

10          A.    Yes, or some variation of it, but yes.

11          Q.    And then in the middle we see a large firearm being

12   carried by the avatar?

13          A.    Correct.

14          Q.    Now, you said you were a prominent member of the

15   group the Bowl Patrol.  We're going to only briefly talk about

16   where that name came from as you already talked about it a

17   bit, but it's in reference, as you said, to an individual

18   named Dylann Roof?

19          A.    That's correct.

20          Q.    Okay.  And Dylann Roof is known as an individual

21   who walked into a church and shot and killed nine

22   church-goers, correct?

23          A.    That's correct.

24          Q.    Do you know the date that happened?

25          A.    Not off the top of my head, no.
```

```
 1        Q.    2015, June, sound correct?

 2        A.    That sounds right, yes.

 3        Q.    Okay.  And all of the individuals he killed were

 4   black church-goers?

 5        A.    Yes.

 6        Q.    And so your group adopted that image, that haircut

 7   as we can see on this avatar, as its primary emblem?

 8        A.    Yes.

 9        Q.    Now as to the public presence of the Bowl Patrol, I

10   would like to talk about the two ways, the Telegram site and

11   the podcast, the Bowlcast.

12              MR. WOLPIN:  We can take this down now for now.

13   Thank you.

14        Q.    As to the Bowlcast, that is a podcast, correct?

15        A.    That's right.

16        Q.    Meaning it's essentially a recorded program that

17   you can put up online for people to listen to?

18        A.    That's correct.

19        Q.    So it's not a live radio show, it's recorded, and

20   it may be edited and then posted online?

21        A.    Correct.

22        Q.    And I think you said there are ten total?

23        A.    Yes.

24        Q.    And those are posted publicly?

25        A.    I don't know if they're still available publicly,
```

**J.A. 493**

 1  but they were posted publicly, yes.

 2      Q.    At or around the time they were made, they were

 3  posted publicly?

 4      A.    Yes.

 5      Q.    Okay.  And they run from the spring of 2018 until I

 6  think you mentioned they ended in June of 2019?

 7      A.    That was the last one that I appeared on.

 8      Q.    That was the last one that you appeared on.

 9          MR. WOLPIN:  I would like just for the witness at

10  this point and the parties Exhibit A-6.

11      Q.    Now, as far as ones you appeared on, your first

12  appearance was on episode 3?

13      A.    That's correct.

14      Q.    Okay.  And in front of you is something you

15  recognize?

16      A.    Yes.

17      Q.    Okay.  And that is sort of your introduction or the

18  cover shot on the Telegram site that goes with the podcast

19  itself?

20      A.    That's correct.

21      Q.    Okay.  And in that is your avatar -- or a version

22  of your avatar we just saw?

23      A.    Yes.

24          MR. WOLPIN:  I would ask that that be published --

25  or admitted as a full exhibit and then published to the jury.

```
 1              THE COURT:  Is there objection?
 2              MR. DAVIS:  Objection.  Relevance and 403.
 3              THE COURT:  Overruled.
 4              It may be admitted and displayed to the jury.
 5              (Defendant's Exhibit A-6 admitted)
 6         Q.   So this is, as noted, released on July 4th of 2018.
 7              Does that sound correct in your head as to the
 8    release date?
 9         A.   Yes.
10         Q.   Okay.  And visible in that is your avatar with a
11    headband saying kill Jews?
12         A.   That's correct.
13         Q.   And behind you is a representation or photograph of
14    Dylann Roof with kind of a yellow halo around his head,
15    correct?
16         A.   That's correct.
17         Q.   And to the right is the avatar of Vic Mackey?
18         A.   Yes.
19         Q.   Okay.  And his avatar has that bowl haircut along
20    with a sort of skeleton face?
21         A.   Correct.
22         Q.   And then on his shirt it says the word rape?
23         A.   That's right.
24         Q.   So this is what was presented along with your first
25    sort of entry into the Bowlcast podcast process?
```

**J.A. 495**

```
 1        A.   Yes.

 2        Q.   And after that you appeared regularly as

 3   essentially consistently on 3, 4, 5, 6, 7, 8, those numbered

 4   podcasts as well?

 5        A.   Yes.

 6        Q.   And each time you appeared you appeared under this

 7   name, this identity of Cheddar Mane?

 8        A.   Yes.

 9        Q.   Okay.  All right.

10             MR. WOLPIN:  We can take it down if you would like.

11   Thank you.

12        Q.   Now, one way members of the Bowl Patrol communicate

13   either thoughts or ideas, I guess humor, is through something

14   called a meme?

15        A.   That's correct.

16        Q.   And you discussed a bit of that with Attorney

17   Davis, but the jury might not be familiar with memes.

18             So a meme is a manner of showing something visually

19   to get an idea across basically?

20        A.   Yes.

21        Q.   Okay.  And there are thousands of, I don't know,

22   maybe not thousands, but certainly dozens upon dozens of Bowl

23   Patrol memes in relation to that group, correct?

24        A.   Yes.

25        Q.   I mean, would you agree with me there may be
```

**J.A. 496**

```
 1  hundreds if not thousands?

 2      A.   Yes.

 3      Q.   Okay.  And these memes, these pictures, are then

 4  either shared with each other, correct?

 5      A.   Correct.

 6      Q.   Or sometimes presented publicly?

 7      A.   That's correct.

 8      Q.   And you had an involvement where you made some of

 9  these memes, some of these memes were your project, something

10  you put out in the world?

11      A.   That's correct.

12      Q.   And some of these memes are, you know, Vic Mackey's

13  project or Mosin-Nagant's project or someone else who created

14  them and put them out in the world to say something?

15      A.   Yes.

16      Q.   Okay.  I'm not going to go through 10,000 memes

17  with you, but I would like to present to you sort of

18  emblematic memes of what those are intended to present to the

19  public.

20           MR. WOLPIN:  If I could pull up just for the

21  witness at this point A7.

22      Q.   Now, you've described memes as a joke?

23      A.   Yes.

24      Q.   Now, you see in front of you a meme -- you're

25  familiar with this meme?
```

```
 1          A.    I am.

 2          Q.    Okay.  This is one made by Vic Mackey?

 3          A.    I guess.  If you say so.  I can agree that that's

 4     the type of meme he made, yes.

 5          Q.    This is a prominent meme, let's say.

 6          A.    Yeah.

 7          Q.    Okay.  And in this meme are four photographs of

 8     Dylann Roof.  That's familiar to you?

 9          A.    Yes.

10          Q.    Okay.  And so this is representative of the memes

11     that the Bowl Patrol put out into the world?

12          A.    Yes.

13                MR. WOLPIN:  I would ask to mark this as a full

14     exhibit.

15                MR. DAVIS:  Objection.  Relevance.

16                THE COURT:  Put the headset on.

17                (SIDEBAR)

18                MR. DAVIS:  The government objects, your Honor.

19     This is not --

20                THE COURT:  See my hand?  Stop.  He needs to put

21     the headset on.  I need to be sure he's hearing you, okay?

22                MR. DAVIS:  Sorry.

23                THE COURT:  All right.

24                Now, I have allowed the defense to examine

25     extensively about Dylann Roof.  We've elicited the fact that
```

**J.A. 498**

1    he's a mass murderer, a racist, a reprehensible individual

2    who's been sentenced to death for his crimes.  I've allowed

3    evidence that the Bowl Patrol people put him up as a saint.

4           I do not -- I'm going to sustain the objection to

5    this meme, but I am going to allow the defense to pursue any

6    evidence that it has about memes for sexually assaulting

7    people that the defense can show that Mr. Lambert was aware of

8    as a result of his participation in the Bowlcast or whatever

9    it's called, because one of the defense arguments here is, as

10   I understand it, that these people use such offensive language

11   with such frequency about sexually assaulting people that a

12   reasonable person in his position, that is, Mr. Lambert's

13   position, would not take it as a threat.

14          Now, that argument strikes me as an extremely

15   strained argument, but I'm not going to deny the defense the

16   opportunity to pursue it especially in view of the questioning

17   from the government of Mr. Lambert about him not having ever

18   seen people threatening to rape other people.  I think you

19   elicited information -- questioned responses from Mr. Lambert

20   in which he said essentially that I haven't ever seen anybody

21   threaten to rape somebody's spouse before.

22          And to the extent that the defense wants to pursue

23   this defense of these people speak to each other in such

24   extreme language that when ordinary people would see this as a

25   threat, a reasonable person in the victim's position would not

**J.A. 499**

1   see it as a threat, I need to allow them to do it.

2           But we're getting too far afield when we are going

3   over and over again about what a bad person Dylann Roof is.

4   We're getting too far afield when we're talking about memes

5   about killing Jews and things that don't have anything to do

6   with this particular case.

7           No one's on trial here for their views.  No witness

8   is on trial here for his views.  That's not what the case is

9   about.

10          So I've made clear that the defense has two ways of

11  proceeding here with respect to this type of evidence.  One is

12  evidence that the parties used such extreme language with each

13  other that a reasonable person in Mr. Lambert's position would

14  not perceive it as a threat and that Mr. Cantwell did not

15  intend it as a threat.

16          The second ground is to allow vigorous

17  cross-examination on grounds of bias.  So to the extent that

18  the defense wants to question this witness about evidence that

19  this witness may have engaged in criminal conduct and

20  therefore may have a motive to curry favor with the government

21  and to provide false testimony in this case, I am going to

22  give the defendant substantial latitude in pursuing through

23  questioning evidence of that kind of bias.

24          So based on what I've heard so far, Mr. Wolpin,

25  you've got two things that you can do on this subject.  One is

1  vigorously pursue issues of bias based on potential criminal

2  liability, and the other is evidence of communications about

3  sexual assault that tend to support your theory that either

4  Mr. Cantwell didn't intend this as a threat -- or a reasonable

5  person wouldn't have seen it as a threat in the position of

6  the person at whom the threat was directed.

7          Am I clear about this?  I have been trying to give

8  general guidance to the parties up to now.  I've now heard

9  substantial evidence and I'm beginning to have a better

10  understanding of the case, so I'm trying to give you some

11  guidance as to line drawing and I hope I've done that so we

12  don't have to be popping up and the government objecting to

13  things I'm not going to sustain, but the government can have

14  sufficient guidance from me so that you can reasonably

15  anticipate what I will sustain.  All right?

16          Do either of you have any questions about it before

17  we proceed?

18          MR. DAVIS:  No.

19          THE COURT:  Mr. Wolpin?

20          MR. WOLPIN:  For the purposes of the record and

21  supplementing the argument, the reason we're asserting these

22  are relevant is that what he has said is they view these as

23  jokes.  I know the Court is limiting it in its ruling to sort

24  of rape related things, but our argument is that violence

25  generally is treated as a joke, as a comedy by these

1  individuals, including the defendant and Mr. Lambert.

2          So to understand or put yourself in the other

3  person's shoes -- I mean, like I said, I think I have five in

4  total.  The point was to just show that they treat violence as

5  a joke.

6          THE COURT:  You can pursue them and the government

7  can object, and I'll deal with them one at a time.

8          I'm sustaining the objection as to this one.

9          You have established already beyond question that

10 they use memes expressing violence in a humorous way.  I don't

11 know how that helps your case, but I've let you do that

12 already substantially.  I might let you do a little bit more,

13 I don't know, I'll have to see what you're doing, but you've

14 already made that point and it's undisputed that that's what

15 these people do.  No one is going to argue anything against

16 that.  You've already established that point.  So at some

17 point it starts to spill over and is just raw efforts to

18 prejudice the jury against the witness which is not consistent

19 with the requirements of Rule 403.

20          Of course I must admit relevant evidence unless the

21 prejudicial effect or the waste of time substantially

22 outweighs any probative value.  Since you're seeking to

23 produce this evidence on a point that's undisputed that no one

24 is contesting, there's a limit to how much I'm going to let

25 you go on given its potential prejudicial effect.

**J.A. 502**

```
 1              So I've advised you.  Let's move on and let's see
 2    how we go.
 3              (CONCLUSION OF SIDEBAR)
 4              MR. WOLPIN:  May I just have a moment?
 5              THE COURT:  Yes.
 6              My clerk is reminding me that I speak too loudly.
 7    I've spent a lifetime in courtrooms.  I've learned to speak
 8    without needing amplification, but it's hard for me to whisper
 9    I have to admit.
10         Q.   So let's conclude that.  To be clear, your group
11    makes memes that are intended to be jokes that show and talk
12    about violence?
13         A.   Yeah, I think that's fair.
14         Q.   Now, on the Bowlcast of which you've appeared there
15    is discussion not just of violence but also of rape?
16         A.   Yes.
17         Q.   Okay.  And in those episodes you have made jokes
18    about rape?
19         A.   I don't recall specifically.
20         Q.   Okay.
21         A.   But it's definitely within the spectrum of
22    possibility, I suppose.
23         Q.   Okay.  You appeared on the third episode of the
24    Bowlcast?
25         A.   Yes.
```

**J.A. 503**

```
 1        Q.    And I assume if I were to play for you a recording
 2   that has Vic Mackey's voice and your voice, that's something
 3   you would recognize?
 4        A.    Yes.
 5        Q.    Okay.  So what I would like to do is play for you a
 6   clip from the third episode of the Bowlcast where you and Vic
 7   Mackey are having a joking discussion about rape.
 8              I know the Court has asked for --
 9              THE COURT:  Is it an exhibit?
10              MR. WOLPIN:  It is.
11              THE COURT:  Can you tell me the exhibit number?
12              MR. WOLPIN:  B-41.
13              THE COURT:  Has it been admitted?
14              MR. WOLPIN:  No.
15              THE COURT:  Are you moving its admission?
16              MR. WOLPIN:  I am.
17              THE COURT:  Is there objection?
18              MR. DAVIS:  I don't think so, Judge.
19              May I just have a word with counsel?
20              THE COURT:  Yes.
21              (Attorney Davis confers with Attorney Wolpin)
22              MR. DAVIS:  No objection.
23              THE COURT:  Without objection it will be admitted
24   and can be played.
25              (Defendant's Exhibit No. B-41 admitted)
```

```
 1        Q.    All right.  I'm going to play for you episode 41.
 2   We might pause early on to make sure we understand who's
 3   speaking, but otherwise it's a relatively short clip.
 4              (Defendant's Exhibit B-41 begins to be played)
 5              Pause.
 6              Does that voice ring a bell?
 7        A.    That's Vic Mackey.
 8        Q.    That's Vic --
 9              THE COURT:  I'm sorry.  You're talking over each
10   other.
11              Your answer is you recognize the voice?
12              THE WITNESS:  I do.
13              THE COURT:  Who is it?
14              THE WITNESS:  Vic Mackey.
15              THE COURT:  All right.
16              MR. WOLPIN:  Continue.
17              (Defendant's Exhibit B-41 continues to be played)
18        Q.    So Vic first and the second voice is yours?
19        A.    That's correct.
20        Q.    Okay.  And it's a joke about Jason Kessler?
21        A.    Yes.
22        Q.    Okay.  And that's another persona in the white
23   nationalist movement?
24        A.    He was the organizer of Unite the Right.
25        Q.    Okay.  And this is a joke about raping someone who
```

```
 1  you guys weren't then getting along with I presume?
 2       A.   Yes.
 3       Q.   Okay.
 4            One of the things that occurs on the Bowlcast as
 5  you said or in this world is playing characters, correct?
 6       A.   Yes.
 7            THE COURT:  He said yes.
 8       Q.   Excuse me.  My hearing.
 9       A.   Sorry.  I'll speak up.
10       Q.   I apologize.
11            And those stories or characters are supposed to be
12  funny or comedy, correct?
13       A.   Yes.
14       Q.   Okay.  And one of those sort of characters that
15  comes up is someone by the name of Edward Kempbowl.  Does that
16  ring a bell?
17       A.   Yes.
18       Q.   And the joke -- the primary identity of Edward
19  Kempbowl is that he likes to rape women?  Yes?
20       A.   I really -- I don't know.  I don't know how to
21  answer that.  I mean, if you say so, yes.  I mean, I'm aware
22  of the skit that you are talking about.  That's not a Bowlcast
23  that I appeared on.
24       Q.   Okay.  But you appeared on the next one and the
25  third one where you speak with Vic Mackey about Edward
```

1   Kempbowl and sort of go back and joke again about that?

2          A.   Yes.

3          Q.   Okay.  So what I would like to do is -- this is the

4   same episode we just played from where we identify, this is

5   E-43, Vic's voice and your voice and go through this clip

6   together as well.

7               THE COURT:  Is there objection?

8               MR. DAVIS:  No.

9               THE COURT:  Without objection it may be played.

10              (Defendant's Exhibit E-43 begins to be played)

11              MR. WOLPIN:  Stop for a second.

12         Q.   Starting, that's your voice, correct?

13         A.   Correct.

14         Q.   Okay.

15              (Defendant's Exhibit E-43 continues to be played)

16         Q.   And that's you at the end saying you gotta rape

17   her?

18         A.   Yes.

19         Q.   Now, there are a number of examples of times when

20   you or Vic Mackey joke about violence?

21         A.   Yes.

22         Q.   Now, people getting shot, people getting killed,

23   people getting murdered, that is sort of territory for jokes

24   in the Bowlcast, correct?

25         A.   Yes.

**J.A. 507**

1    Q.    Now, Christopher Cantwell knew you as Cheddar Mane,
2  correct?  That's how he knew you?
3    A.    Yes.
4    Q.    Okay.  He knew you as Cheddar Mane, a member of the
5  Bowl Patrol?
6    A.    I don't necessarily agree with that.
7    Q.    Okay.  Well, let's go through how this works.
8          You've been involved in chat groups you said on the
9  Radical Agenda platform, correct?
10    A.    Yes.
11    Q.    And in those chat groups did you appear as Cheddar
12  Mane?
13    A.    Yes.
14    Q.    Okay.  And that's a chat group run by Chris
15  Cantwell?
16    A.    Correct.
17    Q.    When you called in to his show, did you ever call
18  in and say, hey, I'm Ben Lambert?  Is that how it ever
19  started?
20    A.    No.
21    Q.    So there was no time when you're calling in to the
22  show and you were chatting in this chat group where you were
23  being Ben Lambert?
24    A.    Correct -- or I should say not that I recall, no.
25    Q.    Now, before I forget, you know, there are a number

**J.A. 508**

1   of different names or pseudonyms or characters you've used

2   involving the Bowl Patrol and potentially Mr. Cantwell, so I

3   just want to review those quickly and see if those are you or

4   not.

5           You had -- in addition to Cheddar Mane you had

6   Cheddy Blac?

7       A.   Yes.

8       Q.   You had Fuck Niggers?

9       A.   No.

10      Q.   That wasn't you?

11      A.   I don't think so, no.

12      Q.   Okay.  You had Fevs?  The character Fevs was yours?

13      A.   I did a Fevs voice on his show, but that was never

14  my -- I don't remember having that as a profile.

15      Q.   Okay.  But that was a voice or a character that you

16  did?

17      A.   Yes.

18      Q.   Okay.  And George Knox?

19      A.   Yes.

20      Q.   Cheddarman?

21      A.   Yes.

22      Q.   Hombre Cheddar?

23      A.   Yes.

24      Q.   This Nigga?

25      A.   Yes.

```
 1          Q.    Niggas Kissin'?
 2          A.    There was a channel that I ran called Niggas
 3    Kissin', but that was somebody else's account name.
 4          Q.    But you ran the channel?
 5          A.    I did run the channel.
 6          Q.    Do you still run the channel?
 7          A.    No.
 8          Q.    Okay.  When did you stop running the channel?
 9          A.    A couple months ago.
10          Q.    So for a number of months -- do you remember
11    exactly when you stopped or you're not sure?
12          A.    I'm not sure.
13          Q.    Do you know when you started?
14          A.    No, no.
15          Q.    Okay.  Would it have been last year?
16          A.    Probably, yes.
17          Q.    You pretended to be Mosin-Nagant before, another
18    member of the Bowl Patrol?
19          A.    I have, yes.
20          Q.    You've been Demarcus Chambers?
21          A.    Yes.
22          Q.    Are you Lauren Southern, that site?
23          A.    No.
24          Q.    Do you know who is?
25          A.    No.
```

1      Q.    But fair to say there are many pseudonyms you've

2  used over the last two to three years online?

3      A.    That's fair to say.

4      Q.    We're going to return to Bowl Patrol later, but I

5  want to shift gears and talk to you about Chris Cantwell and

6  your experience with him through the Radical Agenda.

7           In 2018 Chris Cantwell had his own online podcast?

8      A.    Yes.

9      Q.    It was called the Radical Agenda?

10     A.    Yes.

11     Q.    And it was sort of right-leaning white nationalist

12  in nature?

13     A.    Yes.

14     Q.    You described him as kind of a shock jock with a

15  white nationalist slant.  Is that a fair summary?

16     A.    Yes.

17     Q.    And his show wasn't like the Bowlcast in the sense

18  that it wasn't prerecorded, it was live?

19     A.    That's correct.

20     Q.    Meaning people could call in and be a part of the

21  show?

22     A.    That's correct.

23     Q.    Okay.  And it was also public.  This wasn't an

24  invitation only situation?

25     A.    That's correct.

**J.A. 511**

1      Q.    And you testified that you would listen to Chris's

2  show seriously for some period of time; is that correct?

3      A.    I would say that's fair, yeah.

4      Q.    Okay.  So your testimony just before was that, you

5  know, at the beginning you were listening to it seriously and

6  only at some point later did you begin prank calling him?

7      A.    Yes.

8      Q.    Okay.  Now, you gave an interview with the FBI in

9  October, correct?

10     A.    That's correct.

11     Q.    And part of what came up in that interview was this

12  situation with Chris and the Bowl Patrol?

13     A.    Correct.

14     Q.    And your participation in that.  And you -- I mean,

15  these were FBI agents.  You knew to be honest, correct?

16     A.    Yes.

17     Q.    And were you honest?

18     A.    There were times that I didn't give them all of the

19  information that I think that they wanted, but I would say in

20  general, yes, and -- yeah, yeah.

21     Q.    And in that interview --

22          MR. WOLPIN:  Just for the witness if we could bring

23  up page 43 of Exhibit D, I believe.

24     Q.    If you go scanning down to the bottom, this is a

25  transcript of your interview with the FBI.  The third sort of

1    entry from the bottom says from you:  I only ever listened to

2    his podcast when I was pranking him.

3         A.   Yes, I see that.

4         Q.   All right.  Now, we'll get back to pranking in a

5    minute but --

6              MR. WOLPIN:  You can take that down.  Thank you.

7         Q.   Now we're going to get to those calls.  You've

8    testified that you are from Missouri?

9         A.   Yes.

10         Q.   And you have a 636 phone number?

11         A.   That's correct.

12         Q.   And your phone number ended in 1958?

13         A.   That's correct.

14         Q.   You testified that you would call Chris's show from

15    that number?

16         A.   I did.

17         Q.   And that you would call him from other numbers too,

18    some beginning in 636 and some beginning in a Florida area

19    code?

20         A.   I don't think I testified that I did.  I mean, for

21    clarification, I didn't testify today that I used a Florida

22    area code but, yes, I did have a number that was a Florida

23    area code.

24         Q.   Okay.  So you had the 636 ending in 1958, you had

25    another 636 which was your work cell, and I couldn't tell

```
 1   whether you were saying there was another 636.

 2         A.   The work cell is a 314 area code number.

 3         Q.   Okay.  So three to four separate numbers you used

 4   to call in to the show?

 5         A.   Yes.

 6              MR. WOLPIN:  If just for the witness at this time

 7   we could bring up I2E, I believe.

 8              This was agreed upon as a full exhibit beforehand.

 9              THE COURT:  Has it been admitted?

10              MR. DAVIS:  We stipulated it's authentic, your

11   Honor, I think.  Yes.

12              THE COURT:  I'm sorry.  Have the parties agreed

13   that it should be admitted or not?

14              MR. DAVIS:  No.  We have stipulated it's authentic

15   I believe, unless I'm wrong.

16              MR. WOLPIN:  If we can get on the headsets real

17   quick, if I could make a --

18              (SIDEBAR)

19              MR. WOLPIN:  This is an excerpt of

20   self-authenticating phone records from Chris Cantwell's show

21   that was provided to the government along with sort of

22   necessary certifications.

23              THE COURT:  So he isn't going to require foundation

24   to be laid.  He wants it to be relevant.  He may have other

25   objections.  I don't know.
```

```
 1                 What are you introducing it for?

 2                 MR. WOLPIN:  This shows the number of calls he made

 3    to the Cantwell show.

 4                 THE COURT:  All right.

 5                 Mr. Davis, what's your issue?

 6                 MR. DAVIS:  Is it from just one number or multiple

 7    numbers?

 8                 MR. WOLPIN:  There are -- it's from the 636 number,

 9    and then there's one extra 636 number.  I didn't know whether

10    it was his or not, and I can validate that one if that's --

11                 MR. DAVIS:  I don't object.

12                 THE COURT:  All right.  It will be admitted.

13                 MR. WOLPIN:  Thank you.

14                 (CONCLUSION OF SIDEBAR)

15                 THE COURT:  It will be admitted and may be shown to

16    the jury.

17                 (Defendant's Exhibit I2E admitted)

18        Q.    This is a document showing phone calls from

19    ▮▮▮▮-1958.  That is in fact your number?

20        A.    It is.

21                 MR. WOLPIN:  Okay.  And if we can scroll down, can

22    you just pick one of the entries so we can see the call-in

23    number and make sure that's accurate.

24                 So these are call-ins to Chris Cantwell's show, and

25    we can see that those are all calls from ▮▮▮-1958.
```

```
 1              If we can continue to scroll down, we can see that
 2   there are a number of calls, and we're not going to go through
 3   every one.
 4        Q.    But that's from the 636 number.  I think
 5   erroneously they're -- no, it was removed -- from another 636
 6   number, but that just covers the one ending in 1958.
 7              And we can see you were calling -- if we go up to
 8   the top and keep going, there we are -- October or November
 9   quite a few times.  Is that fair to say?
10        A.    That's my number, yes.  I mean, maybe say the
11   question again.
12        Q.    That you called quite a few times in to Chris
13   Cantwell's show?
14        A.    Yes.
15              MR. WOLPIN:  We can take this down for the moment.
16        Q.    Now as began to be discussed, there was a time
17   where Bowl Patrol and Chris Cantwell kind of co-existed and
18   got along?
19        A.    Yes.
20        Q.    Okay.  As noted, Chris appeared on the first
21   podcast even before you started appearing on the show?
22        A.    That's correct.
23        Q.    As you said, this relationship deteriorated and
24   fell apart?
25        A.    Yes.
```

**J.A. 516**

```
 1        Q.    Okay.  And that's happening sort of in 2018, the
 2    last half of 2018?
 3        A.    Yes.
 4        Q.    Okay.  And as you said, there was some sense that
 5    Chris Cantwell was not sort of a true enough believer but was
 6    a sell-out?
 7        A.    Yes.
 8        Q.    All right.  That his beliefs weren't in line with
 9    yours and he was just doing this all for the money?
10        A.    I don't think I would say that his beliefs were not
11    in line with mine.  I would say that he changed his beliefs
12    and so therefore it was -- it appeared that he was doing it
13    for the money.
14        Q.    Okay.
15        A.    And perhaps notoriety.
16        Q.    Okay.  So he changed his beliefs and that was sort
17    of the basis of the dispute?
18        A.    Correct.
19        Q.    And by prank call you mean calling in and say
20    something that would be disruptive?  That was the point of the
21    prank call?
22        A.    I wouldn't agree that that's the point of the prank
23    call, no.
24        Q.    Okay.  So let's talk about that.
25              The pranks included things like characters and
```

 1  yelling and all kinds of other things, right?

 2      A.   They were different each one.  Are you talking

 3  about mine or are you talking about in general?

 4      Q.   Well, let's get both.

 5      A.   Okay.

 6      Q.   Now, you were familiar or aware that others in the

 7  group were doing the same thing, correct?

 8      A.   Yes.

 9      Q.   Okay.  So it wasn't an isolated thing that it was

10  just you.  It was coming in from multiple sides, multiple

11  people?

12      A.   Right.  Yes.

13      Q.   Okay.  Now, after the prank calls you guys would

14  then cut them up and put them into your Bowlcast episodes?

15      A.   Yes.

16      Q.   Okay.  And then you would play them again, correct,

17  in your Bowlcast episodes?

18      A.   I don't recall specifically.  I'm not going to say,

19  no, that's not correct because I don't specifically recall,

20  but if you say it, then I'm inclined to believe you, I guess.

21      Q.   Okay.  Well, I'm going to show you an example

22  hopefully in a moment.

23      A.   Okay.

24      Q.   But you appeared on the sixth episode of the

25  Bowlcast, correct?

**J.A. 518**

```
 1        A.    That's correct.

 2        Q.    And by the sixth episode we're now into February of

 3   2019.  Does that sound right?

 4        A.    That sounds right, yes.

 5             MR. WOLPIN:  Okay.  And I would ask to play Exhibit

 6   28 which involves a prank call and then Cheddar Mane's

 7   involvement.

 8             THE COURT:  Is it admitted as an exhibit?

 9             MR. WOLPIN:  It is not.  To be clear, if I could, I

10   can explain in greater detail if the Court wishes, it is not

11   Cheddar Mane himself.  It's him playing it as part of his role

12   on the Bowlcast.

13             THE COURT:  All right.  Well, first let me just

14   make clear what I would like to do in terms of -- if you want

15   to introduce something that has been marked for

16   identification, please tell me -- refer to the exhibit by

17   identification and then when you have laid the foundation to

18   justify its admission, then say I move for its admission and

19   request that it be played.  That way I'll know whether it's

20   been admitted or not.

21             So this is an exhibit that has not yet been

22   admitted and you are moving for its admission?

23             MR. WOLPIN:  Correct.

24             THE COURT:  Is there objection?

25             MR. DAVIS:  Yes.
```

**J.A. 519**

```
 1                THE COURT:  All right.  I don't think I can
 2    evaluate the objection without hearing from counsel on the
 3    headsets.  So can you go back to the headset and explain to me
 4    what this is, and then I'll hear Mr. Davis's objection.
 5                (SIDEBAR)
 6                THE COURT:  All right.  What is it that the jury
 7    will hear if I allow the exhibit?  Speak into the microphone.
 8                MR. WOLPIN:  I'm still not used to this technology.
 9                There are ultimately two prank calls that I intend
10    to elicit from this witness.  They're both played by him on
11    the sixth episode.  It shows how angry they were making Chris
12    intentionally in reviewing that.  So this is a call from
13    Mosin-Nagant and it's a Bowl Patrol member.
14                THE COURT:  I'm sorry.  I'm confused.  Is this Mr.
15    Lambert calling in and pranking Mr. Cantwell or is this
16    someone else calling in and pranking Mr. Cantwell?
17                MR. WOLPIN:  This is I presume someone else.  This
18    is him introducing it in the Bowlcast in a way that shows that
19    he's sort of reveling in it or continuing it.
20                THE COURT:  Him introducing it?
21                MR. WOLPIN:  Uh-huh.
22                THE COURT:  All right.  Let me unravel this again.
23                So what you're saying is that this is an excerpt
24    from Mr. Cantwell's Internet radio show that Mr. Lambert in
25    your view has taken and put up in the Bowlcast episode and
```

**J.A. 520**

```
 1   that he is then -- he is playing that excerpt and referring to
 2   it in a way that suggests he approves of what has happened?
 3            MR. WOLPIN:  Yes.
 4            THE COURT:  All right.  And the purpose for doing
 5   this is what?
 6            MR. WOLPIN:  The purpose for doing this is we are
 7   going to eventually be in an argument as to whether a
 8   reasonable person in his position would see what Chris said as
 9   harassment.  When you see sort of how the nature of this
10   relationship exists, they go back and forth between each other
11   as far as saying things that make them angry and do that on
12   purpose and elicit that on purpose and find the humor in that.
13            So that's the purpose for this exhibit.
14            THE COURT:  I'm really struggling to understand
15   your theory.  It isn't making any sense to me.  You're saying
16   that you want to prove that this evidence in your view tends
17   to prove that Mr. Lambert understands that prank calls make
18   Mr. Cantwell angry?
19            MR. WOLPIN:  I'm using it to show that the nature
20   of the relationship is to say things that bother the other
21   person, make them angry, cause a reaction.  That is the whole
22   nature of Bowl Patrol and Chris Cantwell's relationship.
23            So when Chris sends what he sends, the question is
24   going to be was that to provoke, you know, that same kind of
25   reaction that's not intended to make him actually fear for his
```

```
 1   safety or injury but just to be over-the-top in the same way
 2   they do.
 3           THE COURT:  How does this in any way undermine the
 4   government's claim that Mr. Cantwell acted with criminal
 5   intent when he made the communications that are at issue here?
 6           MR. WOLPIN:  Because our argument is he did not
 7   have the intent to put him in fear of injury.  Our argument is
 8   that his intent was to say things as they had said to each
 9   other in the past that were inflammatory and would be known to
10   the other party not to be taken seriously.
11           THE COURT:  What's the prank that's described here?
12           MR. WOLPIN:  This is where they just call in and
13   they just drive Chris up the wall.  There's barely anything to
14   the prank.  It's his reaction that's relevant in this one.
15           THE COURT:  I sustain the government's objection,
16   and I will allow you to, I mean, reiterate the point you've
17   already made a thousand times, that they were making prank
18   calls to the show.  Those were upsetting Mr. Cantwell.  That
19   Mr. Lambert knew that.  That he continued to make the prank
20   calls.  That he continued to be aware of them.  You can go
21   over all of that again and again as you've already done many
22   times, but I don't see -- it's a complete waste of time to
23   play this particular prank call and that the waste of time
24   substantially outweighs any probative value.
25           I can barely understand your theory of defense as
```

**J.A. 522**

1   it is.  This certainly is repetitive of the theme that I've

2   already allowed you to pursue in many different ways.

3         So I sustain the objection, but you can continue to

4   do it again if you want, establish that Mr. Cantwell gets very

5   angry when he's pranked and that Mr. Lambert knows it.  Okay?

6         So the objection is sustained.

7         MR. WOLPIN:  It may make sense to address the

8   following so we don't have to come up here again.

9         THE COURT:  All right.  Go ahead.

10        MR. WOLPIN:  I can skip that one then on the same

11  rationale.

12        I'm going to ask him what his intent was as far as

13  the calls.  He talks about trying to essentially ruin the

14  format and make it so that all of his calls would cause him to

15  no longer be able to operate the radio show.  That's not

16  consistent with what he's been saying all along.

17        THE COURT:  Again, I'm confused.  Can you explain

18  yourself?

19        MR. WOLPIN:  Again, the purpose of what they do to

20  each other -- it is somewhat hard to understand because most

21  people don't usually do this to each other.

22        THE COURT:  I'm sorry.  I think I'm wasting the

23  jury's time here.  I'm going to excuse the jury.  We'll take a

24  break now, and then you can argue this at whatever length you

25  want when the jury is not here, okay?

**J.A. 523**

```
 1              (CONCLUSION OF SIDEBAR)
 2              THE COURT:  I need to take a break so I can go over
 3    this in greater detail.  I don't like to have you just sitting
 4    here while I'm whispering and probably not all that
 5    effectively whispering.  We'll take a break.
 6              (IN COURT - NO JURY PRESENT)
 7              THE COURT:  All right.
 8              MR. DAVIS:  The witness was signaling, Judge.
 9              THE COURT:  Do you need to use the restroom or
10    something?  Do you need a break?
11              THE WITNESS:  No.  I just have some information
12    about the topic at hand.
13              THE COURT:  Yeah, well, we really can't do much for
14    you on that score, all right?
15              If you have made an answer to a question that you
16    don't think is complete and truthful, I'll give you a chance
17    to expand on your answer.
18              THE WITNESS:  Okay.
19              THE COURT:  But once the examination is ongoing,
20    essentially you can't really talk to counsel for either side.
21    They have to do their examinations of you.
22              If you think you need to expand on an answer or you
23    think you can volunteer something, you can ask and we'll see
24    what the lawyers say, but Mr. Davis can't really give you any
25    guidance about whatever it is you think you might want to
```

**J.A. 524**

```
 1   contribute, okay?
 2            All right.  Why don't you step down.  Take a break.
 3            I'll talk to the lawyers about this issue.
 4            THE WITNESS:  Sure.
 5            THE COURT:  Okay.  Mr. Wolpin, your theory is, as I
 6   understand it, that by showing that they have interactions in
 7   which Mr. Lambert recognizes that the Bowl Patrol is
 8   succeeding in making Mr. Cantwell angry, that that will tend
 9   to show that when Mr. Cantwell makes the statements at issue
10   here, either that he's not acting with criminal intent or that
11   the statements wouldn't be understood in the way they have to
12   be understood by a reasonable person in the context of victim
13   1.
14            MR. WOLPIN:  Yes.
15            THE COURT:  And because you show that they do a lot
16   of angry things to each other, that would suggest that the
17   thing that Mr. Cantwell did was not done with an intent to
18   extort as is required under the -- I mean, I'm just having
19   trouble -- I've heard you say it many, many times, and I can't
20   really understand it.
21            MR. WOLPIN:  I mean, the first count is -- although
22   it has intent to extort in it, it requires that it still be a
23   true threat.  That's a part of that count.
24            And so the question does continue to be, what's the
25   context of the language, what's the context in which they know
```

```
 1   each other, how do they treat each other in the past.
 2         THE COURT:  I get all of that and I agree with you.
 3   In fact, I will be proposing an amendment to the draft charge
 4   I gave you to make clear in my definition of intent to extort
 5   that an intent to extort by means of threat requires intent to
 6   extort by a threat that you intend to be a threat.  So that
 7   much I -- that's not in the charge I'm proposing to give right
 8   now, but I'm telling you I agree with you on that point.
 9         My problem is not in understanding the elements of
10   the charge.  My problem is understanding how this evidence in
11   any way supports your theory of defense because -- and let me
12   just state it this way.
13         Showing that Mr. Cantwell gets angry at Mr. Lambert
14   doesn't tend to show that what Mr. Cantwell did to Mr. Lambert
15   was not done with an intent to extort.  One can intend to make
16   somebody angry by an intent to extort and an intent to
17   threaten.  It's not inconsistent with the government's theory
18   at all.  I just don't understand how it has any relevant
19   tendency to prove or disprove anything at issue in this case.
20         MR. WOLPIN:  In the same way -- I'm trying to think
21   of an analogy as the best way to explain it, because we do
22   have a unique relationship and that's not normal or typical.
23         You know, people joke with each other in a certain
24   way, push around each other in a certain way physically, and
25   we have an assault charge.  When people behave in a certain
```

1   way over time to each other with the expectation that that's

2   what you do, that's how you do it, it doesn't mean you intend

3   them to think you're actually going to injure their wife.

4           THE COURT:  Well, that's why I -- I'm allowing all

5   of the comments between them about rape, okay?  So you're

6   getting all of that in.  That isn't in dispute.

7           This is, as far as I know, and if it isn't, you'll

8   tell me, a prank that doesn't in any way suggest that anyone

9   is threatening violence against anyone else.  It's generally a

10  conduct that's, as it's been described so far, I would say

11  inanely stupid that makes somebody angry.

12          Is this prank of that nature?

13          MR. WOLPIN:  It isn't, but the next one I was going

14  to address was, which -- one of the purposes of the pranking

15  beyond making him angry is what they call fed posting, which

16  means trying to get the other person in legal trouble by

17  saying things that are so inflammatory that the feds will be

18  paying attention.

19          THE COURT:  Read me the actual language of the

20  excerpt you want to play.

21          MR. WOLPIN:  All right.  So the one -- all right.

22  This is -- I don't think I have -- do I have this one

23  transcribed?

24          This is the one that was in the motion in limine:

25          As far as Special Agent Dino Capuzzo, I hope he

**J.A. 527**

```
 1   dies of brain cancer.
 2           THE COURT:  Slow down.  You've got to read -- when
 3   you read things, you can't read at a hundred miles an hour.  I
 4   have a reporter taking things down.
 5           MR. WOLPIN:  I'm sorry.  I apologize.
 6      At the end of the day do what is right for the right
 7   race.  As far as Special Agent Dino Capuzzo, I hope he dies of
 8   brain cancer.  I'm going to shoot his grave with Mosin-Nagant,
 9   is what gets said in that one.
10           THE COURT:  Can I stop you?  Is this something that
11   Mr. Lambert is saying?
12           MR. WOLPIN:  Yes.
13           THE COURT:  And he's talking about shooting
14   someone?
15           MR. WOLPIN:  Shooting the grave of an FBI agent
16   known to investigate far-right groups.
17           THE COURT:  Shooting the what?
18           MR. WOLPIN:  The grave of FBI --
19           THE COURT:  The grave?
20           MR. WOLPIN:  Grave, G-R-A-V-E.
21           THE COURT:  So this FBI agent is dead?
22           MR. WOLPIN:  He is not dead now.  He's wishing for
23   his death and talking about how he's going to shoot up his
24   grave when he's dead.
25           THE COURT:  Okay.  That isn't a threat to kill,
```

**J.A. 528**

1  right?  If you were charged with that, you would say that's

2  not a true threat, Judge, right?  That's not a threat.  That's

3  a statement that someone has a constitutional right to make in

4  your view, right?  It isn't a criminal threat.

5         MR. WOLPIN:  It's something that's designed to draw

6  federal attention to my client.

7         THE COURT:  Could that be a basis for a successful

8  prosecution for someone for criminal threatening in your view?

9         MR. WOLPIN:  No.

10        THE COURT:  That's because it's constitutionally

11 protected because it's carefully crafted not to be what in

12 First Amendment parlance is a true threat, right?  It's

13 basically saying I'm not going to kill this person but I would

14 love to shoot at his grave after he's already killed.  That's

15 suggesting you want him to die, you'll be happy when he dies,

16 but that's exactly the kind of thing that Mr. Cantwell would

17 stand up and tell me, I'm sure, Judge, that's not a criminal

18 threat, right?  So that's very different from what we're

19 dealing with here, isn't it?

20        MR. WOLPIN:  And my assertion is not that it's a

21 criminal act.  My assertion is one of the things they're

22 trying to do is cause him to be a subject of an FBI

23 investigation.  That's why they say things like that.  It's

24 not just for fun and happiness and just the mocking of him.

25 There's more to it than that.

**J.A. 529**

```
 1              THE COURT:  I don't think that could be the basis
 2   for an FBI investigation, could it?
 3              MR. WOLPIN:  The FBI watches people who make
 4   statements like that.
 5              THE COURT:  I know but an investigation has to be
 6   predicated, and that isn't a sufficient predicate for an FBI
 7   investigation.  I may be wrong, if the government wants to
 8   tell me I'm wrong about that.  My understanding is that the
 9   FBI can't simply go out and look at people's protected speech
10   and start investigating them because of their protected
11   speech.  They need more than that to open an investigation.
12   That's my understanding of the law.  I may have it wrong.
13              MR. DAVIS:  The government agrees, your Honor, and
14   the government made that point in the pleading.  The whole --
15   much of the impeachment by bias case is predicated on the sort
16   of general belief that the Bowl Patrol at any point could have
17   been indicted and sent to prison for these Bowlcasts, but
18   that's not --
19              THE COURT:  I want to be clear.  That's not why I'm
20   allowing it.  To the extent I'm allowing it -- as I said, what
21   I see is there are these two theories that the defense has
22   presented that allows bad stuff about Mr. Lambert or the
23   Bowlcast.
24              One theory is impeachment by bias.  The other
25   theory is context to understand that the communications are
```

```
 1   not intended to be a threat and would not be reasonably
 2   understood in context to be a threat.  Like, if people have
 3   a -- I think their argument, and I guess I see it somewhat
 4   differently from the defense, but I think the argument is when
 5   people are part of an insular group that has a very unusual
 6   way of communicating with each other, you have to allow
 7   evidence of how they communicate with each other to allow a
 8   jury to determine whether a reasonable person in that position
 9   would understand the communication as being one which is
10   sufficient to serve as a basis for the prosecution.
11          And that's why I'm allowing as much of this as it
12   is.  It's not because anyone has shown me anything yet on a
13   Bowlcast statement that would be criminal conduct or that
14   could be the basis to open an investigation, but I think the
15   defense is presenting some argument -- now, they call it
16   joking, but I can't imagine any jury would think that what was
17   being said was joking.  It makes a little more sense for me to
18   see it as Mr. Cantwell wasn't joking when he made these
19   statements, he was deadly serious, but he was trying to
20   express anger in a way that a person on the other end of it
21   would understand is merely an expression of anger, not an
22   intention to act.
23          That's why I'm allowing this, you know, we say all
24   kinds of extreme stuff to each other all the time, because the
25   defense has a theory that people in this subculture
```

```
 1    communicate with each other in ways that normal human beings
 2    don't.  I think that they should be entitled to pursue that
 3    theory, and I'm trying to allow them to do that.
 4            That's not to say that anything in the Bowl Patrol
 5    is prosecutable or investigable without other predication.  So
 6    I'm not admitting it on that basis.
 7            Examination about Mr. Lambert being a drug user or
 8    an illegal possessor of guns or someone who lies to the police
 9    and therefore could be prosecuted if he doesn't cooperate,
10    that kind of stuff goes to the different theory.
11            Have I got it right?  Do you have those two
12    theories?
13            MR. WOLPIN:  We haven't gotten to that second part
14    yet, and I haven't even made a proffer as to what I think does
15    give them legal liability.
16            THE COURT:  Right.  So the Bowl Patrol stuff comes
17    in to say, here's the subculture.  They communicate in a
18    particular way.  It's very different from what you're used to
19    hearing.  And what may be seen by you as a threat wouldn't be
20    seen by a reasonable person in this community as a threat
21    because of the way they communicate with each other.  Not
22    because they're joking, which is what you were saying to me,
23    like, at the beginning before the case started, because I
24    don't see anybody seeing this as a joke, but because it's --
25    we have ways of sending signals to each other that we're angry
```

1    that are not intended -- will not be understood as we're

2    actually going to do these things.

3         Now, I mean there are obvious evidentiary problems

4    with that because in fact he said something and he did it, and

5    because he's demanding something -- because your theory is a

6    theory of extortion it's hard to say, well, I'm going to say

7    something to make Mr. Lambert angry and that will induce him

8    to give me what I want that he otherwise doesn't want to give

9    me.

10        That's why it's not making any sense to me.  All

11   this stuff about I'm really, really angry at Mr. Lambert is

12   evidence of motive.  That's why I'm just having a lot of

13   trouble understanding your theory of defense, and I'm trying

14   very hard to do it.

15        To the extent I understand your theories of

16   defenses, they are:  Don't believe a word Mr. Lambert says

17   because he is biased and is protecting himself by currying

18   favor with the government, and, hey, these things happened.

19   They're outrageous.  You might be shocked by them, but what

20   we've shown you here is that these people have a pattern of

21   communicating with each other in this way, and that he did it

22   doesn't establish that it was done with an intent to extort.

23        The response to that is the obvious response.  That

24   if it was just to make him angry, how does that induce him to

25   give over what he otherwise is not inclined to give over?

**J.A. 533**

1    People who don't want to give you something you're asking for

2    don't give it to you just because you make them angry.

3              So that's where I am right now.  So say what you

4    want to say about these two excerpts, and then I'll rule and

5    we'll move on.

6              MR. WOLPIN:  I mean, I mostly said it.  I mean, the

7    purpose is to show it does show bias.  It shows interest in

8    sort of making people angry for sport.  That's what it shows.

9    It shows that he had that kind of relationship with Cantwell,

10   and making someone angry for sport is a unique relationship

11   that is not typical, and without understanding that background

12   the jury can't process what's going on in this discussion.

13             THE COURT:  If you have any evidence in these

14   communications about someone threatening Mr. Cantwell in a way

15   to make him angry that's not a threat, that kind of evidence

16   can definitely come in, but just they were pranking him and

17   making him angry, that doesn't tend to establish either of the

18   defense theories that we've been discussing.

19             So if that's all you've got, the objection is

20   sustained.

21             Did you want to add anything else?

22             MR. WOLPIN:  I guess to add that to the extent the

23   Court is considering whether these are threats, they are

24   threats to his livelihood.  We have Mr. Cheddar Mane admitting

25   on another podcast that it's expected that that show would

**J.A. 534**

```
 1    essentially be shut down.  So the threat is not to his person
 2    but to his sort of economic well-being.
 3          THE COURT:  That he has a motive to want to injure
 4    Mr. Cantwell, you can pursue that vigorously.  You were
 5    pranking him.  You've already established all of this.  That
 6    you thought he was betraying the movement just doing it for
 7    money.  You want to ask him about, you were trying to get his
 8    podcast shut down.  You were trying to render it ineffective.
 9    You were trying to make him angry.  You can pursue all of that
10    and he'll -- I expect, he already has, he'll acknowledge it a
11    hundred times over, but feel free to do that.  I'm not
12    restricting you from doing that.
13          I just -- I think it is a complete waste of time to
14    play prank calls or actions that other people take that you
15    could show Mr. Cantwell takes pleasure in seeing your client
16    suffer.  He'll acknowledge that and you can pursue that, but
17    we've gone over that many, many times already.
18          I mean, is there going to be any doubt in this case
19    that Mr. Lambert and the Bowl Patrol soured on their
20    relationship with Mr. Cantwell, they repeatedly called his
21    show to prank it and make it ineffective, trying to render him
22    unable to make a living doing what they thought was a betrayal
23    of the cause?  Is there going to be any doubt about that?  The
24    evidence is undisputed on that point.
25          MR. WOLPIN:  You know, what I was thinking in my
```

**J.A. 535**

1    head as far as an analogy -- you know, the point of this is to

2    show the emotions that are attached to it.  So it's almost --

3    you know, you play a 911 call.  You don't have to play the 911

4    call.  You don't have to present here the actual document of

5    the communication.  They could have just had Cheddar Mane talk

6    about it.

7            The reason you present source material is it most

8    effectively conveys sort of whether they -- and to the extent

9    that watching someone get angry and joking about it or

10   laughing about it, hearing those is different than me telling

11   him he did it.

12           THE COURT:  All right.  Play the exhibit you want

13   to play to the jury so I can hear it.

14           MR. WOLPIN:  Okay.  So let's go back.  E-27 is one

15   of them.  There's only two in this regard.  E-27.

16           (Defendant's Exhibit E-27 played for the Court)

17           THE COURT:  So that's just an excerpt from Mr.

18   Cantwell yelling during his show and expressing anger, right?

19           MR. WOLPIN:  Yes.

20           THE COURT:  And then Mr. Lambert taking pleasure in

21   it?

22           MR. WOLPIN:  Yes, and it starts with High Hard

23   Mouse, which is one of their compatriots.

24           THE COURT:  The objection is sustained as to that

25   exhibit.  What's the next one?

**J.A. 536**

```
 1                MR. WOLPIN:  E-28.

 2                (Defendant's Exhibit E-28 played for the Court)

 3                MR. WOLPIN:  That's Cheddar Mane introducing, and I

 4       cut it as short as I could.

 5                THE COURT:  All right.  I sustain the objection as

 6       to that one.

 7                Now let me explain my -- so that the appellate

 8       record is clear, I'm doing a Rule 403 analysis.

 9                I don't want anyone to suggest on appeal that I

10       don't understand Rule 403.  I have not applied the correct

11       balance so let me read the rule out loud to you, explain my

12       reasoning, and I hope that I can just make a shorthand

13       reference to it when I exclude things based on Rule 403 in the

14       future.

15                Rule 403, one of the most important rules of

16       evidence, is the Court may exclude relevant evidence if its

17       probative value is substantially outweighed by the danger of

18       one or more of the following:  Unfair prejudice, confusing the

19       issues, misleading the jury, undue delay, wasting time, or

20       needlessly presenting cumulative evidence.

21                This evidence in my view has minimal if any

22       probative value, and the minimal if any probative value is

23       substantially outweighed by the danger of wasting time and

24       needlessly presenting cumulative evidence.

25                So on that basis I sustain the objections to both
```

**J.A. 537**

```
 1   exhibits.
 2            Can we take a break now or are there more kinds of
 3   things you want to talk to me about?
 4            All right.  Let's take a break.
 5            (RECESS)
 6            (IN COURT - JURY PRESENT)
 7            THE COURT:  Go ahead, Mr. Wolpin.
 8            MR. WOLPIN:  Thank you.
 9       Q.   So let's finish up on this idea of the calls that
10   were coming in to Chris's show from the Bowl Patrol.
11            So fair to say you've describe this as trolling?
12       A.   I think that's fair, yes.
13       Q.   Okay.  And so the purpose or the meaning of
14   trolling is to provoke a response from the other person that
15   you're trolling, correct?
16       A.   Correct.
17       Q.   To bother them or anger them or cause a reaction?
18       A.   That's correct.
19       Q.   All right.  And I think you've said that the number
20   one rule of trolling is don't feed the trolls?
21       A.   That's also correct.
22       Q.   Meaning if the trolls see you get angry, they're
23   just going to do it more?
24       A.   Yes.
25       Q.   Okay.  And so what was going on here was that you,
```

**J.A. 538**

```
 1    along with the members of the Bowl Patrol, were trying to make
 2    Chris angry?
 3         A.    Yeah, I would say that's fair.
 4         Q.    Even if he just wanted to be left alone?
 5         A.    Yeah.
 6         Q.    You knew he didn't -- excuse me.  I'm sorry.
 7         A.    I mean there were numerous times when, I'll
 8    paraphrase, it was said, do you want to prank the show?  Fine,
 9    go ahead and do it.  You know, there were times when, you
10    know, he knew that it was a prank but he engaged and it went
11    somewhere so --
12         Q.    You often would call in or other Bowl Patrol
13    members and Chris would get visibly angry -- or audibly angry?
14         A.    Yes.
15         Q.    And you knew that?
16         A.    Yes.
17         Q.    And just to wrap that up, there are times when
18    those calls are coming in and it's unclear who the caller is.
19    And what I mean by that, I'll explain that question better, is
20    when someone calls to make that prank, like you, you don't say
21    this is Ben Lambert calling, correct?
22         A.    That's correct.
23         Q.    Okay.  So the underlying identity of the caller is
24    often -- or was often unidentified or unknown?
25         A.    Yes.
```

**J.A. 539**

```
 1        Q.    Now, you became aware that Chris had made a
 2   complaint to the FBI citing the Bowl Patrol's harassment?
 3        A.    Yes.
 4        Q.    And that was made and you became aware of it in
 5   February; is that correct?
 6        A.    To be honest, I don't recall specifically when it
 7   happened.
 8        Q.    Okay.  But you remember there was a time in this
 9   process when Chris went online and said I reported you guys to
10   law enforcement?
11        A.    Yes.
12        Q.    Okay.  After that happened -- that month did law
13   enforcement come and speak with you about it?
14        A.    No.
15        Q.    A month after did law enforcement come and speak
16   with you about it?
17        A.    No.
18        Q.    A month after that did they come and speak with you
19   about it?
20        A.    No.
21        Q.    Okay.  So the whole winter goes by.  The whole
22   summer goes by.  They only come speak to you in October?
23        A.    That's correct.
24        Q.    Now, you've talked a little bit about memes -- or
25   we talked a little bit about memes and what they are.
```

**J.A. 540**

```
 1              You made memes including Chris Cantwell in the
 2   meme, correct?
 3        A.   Yes.
 4        Q.   Okay.  And I want to talk with you about one meme
 5   in particular.
 6              MR. WOLPIN:  Just for the witness, Jay, you can
 7   bring up H5.
 8        Q.   Now, what you're looking at is a meme.  Is it a
 9   meme that includes -- you can see Chris Cantwell?
10        A.   Yes.
11        Q.   Okay.  And it is a meme that you created?
12        A.   Yes.
13        Q.   Okay.  And it was a meme that Bowl Patrol publicly
14   posted?
15        A.   Yes.  I believe so.
16        Q.   Okay.
17              MR. WOLPIN:  Well, if you can shrink it back down
18   for him for a moment.
19        A.   I saw that it was Mosin-Nagant.
20        Q.   Okay.  So you know -- you're familiar with
21   Mosin-Nagant?
22        A.   I am.
23        Q.   Okay.  And he's someone who also trafficked in Bowl
24   Patrol and memes and things like that?
25        A.   Yes.
```

**J.A. 541**

```
1        Q.    Okay.  And you were aware that Mosin-Nagant had
2   doxed Chris Cantwell?
3        A.    No.
4              MR. DAVIS:  Objection.
5              THE COURT:  I'm sorry.  I think I need the headset
6   again.
7              (SIDEBAR)
8              THE COURT:  What is the defense offering this for?
9              MR. WOLPIN:  The government has had the defendant
10  testify generally about doxing and why it's such a big deal
11  and it's this huge, massive thing, and they even had him
12  testify that Chris Cantwell doxed Mosin-Nagant.  And the fact
13  is the meme that individual Mr. Lambert made was the one used
14  to dox Chris Cantwell at Chris Cantwell's address in Keene,
15  New Hampshire.
16             So he's presented this as if this is this horrible
17  thing that he would never be a part of, and yet he was a part
18  of making the meme that doxed Chris as a federal informant
19  which is doubly bad.
20             THE COURT:  Okay.  I'm confused.
21             First, I thought that you folks were arguing that
22  unlike this witness your client was not making any secret of
23  who he was, where he lived, what his -- you can't dox somebody
24  who already makes public everything about themselves.
25             MR. WOLPIN:  His address he kept unknown.  He had
```

**J.A. 542**

```
 1   his show sent to a P.O. box.
 2          THE COURT:  So you're saying your client did
 3   conceal his address from people?
 4          MR. WOLPIN:  Correct.
 5          THE COURT:  And you're saying that Mr. Nagant
 6   disclosed his address and he did it using a meme that Mr.
 7   Cantwell created?
 8          MR. WOLPIN:  Mr. Lambert created.
 9          THE COURT:  Okay.  Now, you want to offer this to
10   do what?
11          MR. WOLPIN:  To show that his statement, and I have
12   it written down up there from his direct testimony, that
13   doxing is the worst thing you could do to somebody.  This idea
14   that they've put out there that he somehow would never be
15   involved in that, is not a part of that, that this is some
16   surprise to him, and he's out there participating in this.
17          THE COURT:  Okay.  Can you lay a foundation to show
18   that he was a participant in the doxing of Mr. Cantwell?
19   Because showing that he had prepared the meme doesn't show
20   that he was a participant in the disclosing of Mr. Cantwell's
21   address.
22          MR. WOLPIN:  I can continue the effort to do so.
23          THE COURT:  Why don't you do that.  If you can't do
24   that, I'm not sure how you can make your point.  So see if you
25   can lay a foundation for that.  If you can, I'll let you ask
```

**J.A. 543**

1    the question about doxing.

2           Is there anything else either of you want to say on

3    this point?

4           MR. DAVIS:  No.

5           MR. WOLPIN:  I would note there's a second version

6    of this in our exhibits that does not include the above noted

7    tweet.  It just includes the meme that he created in order to

8    make Chris look like an informant.

9           THE COURT:  Well, do you have a reasonable basis to

10   believe that the witness will acknowledge that, A, not only I

11   created the meme, but I understood that it would be

12   distributed in a way that would publicly implicate Mr.

13   Cantwell as a government informant?

14          MR. WOLPIN:  Yeah, that's the point.

15          THE COURT:  Okay.  If you can do that, then I will

16   allow you to put in the exhibit showing the meme, not the

17   exhibit and the discussion of doxing unless you can show that

18   this witness was somehow participant in the doxing.

19          MR. WOLPIN:  It will just take a moment for me to

20   locate the other exhibit.  Thank you.

21          THE COURT:  Okay.

22          (CONCLUSION OF SIDEBAR)

23       Q.   So let's go through -- there's a number of parts to

24   what you see in front of you.  We're going to go through those

25   parts.

**J.A. 544**

```
 1              There is a visual representation, what we've called
 2    a meme, in what's in front of you, correct?
 3         A.   Yes.
 4         Q.   Okay.  And that meme is something you are familiar
 5    with?
 6         A.   Yes.
 7         Q.   Okay.  And that meme, as you discussed, is in fact
 8    something that you created, you manufactured?
 9         A.   That's correct.
10         Q.   Okay.  And as we talked about, the purpose of memes
11    is to then share that with other people, correct?
12         A.   Yes.
13         Q.   Okay.  And so this meme that you made was a meme
14    that you then shared with others?
15         A.   Correct.
16         Q.   And you shared this with others by posting it in
17    Telegram sites?  How did you share it with others?
18         A.   I posted it in Telegram.
19         Q.   Okay.  So you posted it in Telegram and then others
20    who visited that Telegram site would be able to see the meme
21    that you created?
22         A.   That's correct.
23         Q.   Okay.  So let's first see if we can -- if you can
24    give me a moment.
25              So this meme gets shared on Telegram?
```

**J.A. 545**

```
 1        A.   Yes.
 2        Q.   And do you specifically share it with someone named
 3   Mosin-Nagant?  Would he have had access to it?
 4        A.   I didn't specifically share it with him, but he
 5   would have had access to it, yes.
 6        Q.   Okay.  And the reason -- as we've said, the reason
 7   you're sharing this is so that it will be publicly available
 8   to other people?
 9        A.   Yes.
10        Q.   Okay.  Now what you're looking at in front of you
11   in addition to the meme is a tweet from someone named
12   Mosin-Nagant who we've heard about in this case?
13        A.   Yes, I see it.
14        Q.   Okay.  And you can see both the identifier of
15   Mosin-Nagant and you can see the @ symbol and his handle, and
16   we can see the dates as February 17th and February 16th?
17        A.   Yes.
18        Q.   Have you seen Mosin-Nagant's posts before?
19        A.   Yes.
20        Q.   Okay.  And you're familiar with his postings?
21        A.   Yes.
22        Q.   Okay.  And what you see before you is a tweet from
23   what appears to be his post.  Do you agree?
24        A.   Yes.
25        Q.   Okay.  So you would say that this is something that
```

**J.A. 546**

1    appears to you to be posted by Mosin-Nagant involving a meme

2    that you created?

3         A.    Yes.

4              MR. WOLPIN:  I would ask that this be admitted at

5    this point as a full exhibit.

6              MR. DAVIS:  Same objection, Judge.  There's no

7    foundation for --

8              THE COURT:  The objection is sustained.  If you

9    have an exhibit with the meme alone, you can display the meme.

10   You haven't laid a sufficient foundation to tie this defendant

11   to the content of the text that goes with the meme.  If you

12   can do that, you might be able to introduce the full exhibit.

13   Without that you can introduce the image of the meme but not

14   the text that goes with it.

15             MR. WOLPIN:  Okay.

16        Q.    So as to what you see before you, that in fact is a

17   tweet you're saying you've never seen or you have seen?

18        A.    I've never seen Mosin-Nagant on Twitter at all.

19   It's not really a platform that I've ever used, so I mean --

20        Q.    Did it go around Bowl Patrol circles that he had

21   made a post like this?

22        A.    Not that I can recall, no.

23        Q.    So you've testified you're familiar with the fact

24   that Mosin-Nagant was doxed by Chris Cantwell, but you're

25   saying you have no familiarity with this information?

**J.A. 547**

```
 1        A.    I recognize the meme, but I've never seen this post
 2   by Mosin-Nagant on Twitter ever.
 3        Q.    At this point I'm not asking whether you've seen
 4   the post itself.  I'm asking whether you're familiar with its
 5   content from other sources, that you knew about this back in
 6   February?
 7        A.    No, I didn't.
 8             MR. WOLPIN:  Okay.  If I can have a moment, I
 9   believe it's B4.
10             THE COURT:  If you need more time later, you can
11   come back to it even if the witness has completed his
12   testimony.  I'll allow it.
13             MR. WOLPIN:  All right.  We're going to have to
14   split that up into two exhibits.
15             THE COURT:  Mr. Wolpin, maybe this will be a
16   benefit for you.  Let me just describe for the jury what's in
17   the meme.  You can still introduce the meme, but would it be
18   helpful to you at this point since you can't --
19             MR. WOLPIN:  I mean, I can go through it with the
20   witness if you would give me leave to do so.
21             THE COURT:  Pardon me?
22             MR. WOLPIN:  I can go through it with the witness
23   if you would give me leave to do so.
24             THE COURT:  All right.  Yeah, why don't you do
25   that.
```

```
 1              MR. WOLPIN:  I apologize.  I do have this as a
 2  caller separate meme.
 3              THE COURT:  So the jury will see this meme at a
 4  later point in the proceeding, but I'll allow the witness to
 5  be examined about its contents to just describe it to you
 6  since it's come up at this point in the examination.
 7      Q.   Okay.  So in this meme we see two individuals, two
 8  men, correct?
 9      A.   That's correct.
10      Q.   Okay.  And there is a man second from the left that
11  is Mr. Cantwell?
12      A.   That's correct.
13      Q.   Okay.  And we see at least from the date on this,
14  this is February 16th, so it was made sometime I presume
15  before February 16th of 2019?
16      A.   Yes.
17      Q.   Okay.  Do you know exactly when?
18      A.   No.
19      Q.   But fair to say in that time frame this would have
20  been consistent with when it was made?
21      A.   Yes.
22      Q.   And Mr. Cantwell is pictured with a hat that says
23  the letters FBI, correct?
24      A.   That's correct.
25      Q.   And he's shown with janitorial supplies, you know,
```

**J.A. 549**

1  mops and stuff?

2        A.    Yes.

3        Q.    And behind him is the seal of the FBI?

4        A.    That's correct.

5        Q.    And in the front left there's another man who's

6  clearly identifiable, and the man in the front left is an FBI

7  agent?

8        A.    Yes, he is.

9        Q.    He's someone whose name you knew at that time, that

10  being FBI Agent Dino Capuzzo?

11        A.    Yes.

12        Q.    And Dino Capuzzo was somewhat renowned in these

13  circles because he has investigations into white nationalists?

14        A.    Yes.

15        Q.    Okay.  And so you created this meme in an effort to

16  show that Chris was a snitch or a rat or a federal informant,

17  that was the point of the meme?

18        A.    Yes.

19        Q.    And then to put it out publicly to others that he's

20  a fed or a snitch or a rat or a federal informant?

21        A.    That's correct.

22        Q.    And this was, as we said, in and around February of

23  2019, correct?

24        A.    Yes.  Correct.

25        Q.    Thank you.

1              Now, we see the March 2019 chat that you had with

2    Chris over Telegram.  You went through that on direct,

3    correct?

4         A.   Correct.

5         Q.   Okay.  And in that interaction Chris at that point

6    is still visibly frustrated with you, correct?

7         A.   Yes.

8         Q.   He's saying to you at that point, with some swear

9    words and other things involved, if you don't leave me alone

10   I'm going to dox you?

11        A.   Yes.

12        Q.   Okay.  And you say at that point everything between

13   you and him had already stopped before March, all the prank

14   calls and all the other business?

15        A.   I believe so, yes.

16        Q.   Okay.  But you're still in a chat room with him on

17   Telegram with your account that says deleted but you're still

18   appearing as Cheddar Mane, correct?

19        A.   I'm not sure I understand.

20        Q.   When we see that chat from March 2019, you were

21   again appearing as Cheddar Mane or you're appearing under some

22   other alias?

23        A.   I don't recall.

24        Q.   All right.  And on the Bowlcast as we get through

25   all the episodes, even as far as No. 7, you're still mocking

**J.A. 551**

1    and taunting Chris in that episode?

2        A.    I don't remember specifically, but it's definitely

3    possible.

4        Q.    Okay.  Do you remember when -- I mean, episode 7 is

5    kind of a particular episode.  Do you remember when that

6    episode actually went up online?

7        A.    No.

8        Q.    Okay.  You know the episode before we established

9    was February and the last one was in June.  So it had to be

10   sometime between February and June?

11       A.    Sure.  Yes.

12       Q.    Okay.  And as you said, you wouldn't be surprised

13   if there was still discussion and mocking of Chris Cantwell on

14   that seventh episode?

15       A.    Yeah, that's fair.

16       Q.    Now you say you told others in the Bowl Patrol to

17   leave Chris alone after this, somewhere in this range?

18       A.    Correct.

19       Q.    Okay.  I mean, you've provided the government with

20   a number of e-mails and we saw your screenshots and things.

21   Have you provided the government anything supporting that you

22   did that, any texts you sent, any Telegram chats you sent to

23   Vic Mackey saying leave him alone?

24       A.    It wasn't directed -- the answer is no.  What I

25   told them to stop doing was messing with him, like pranking

1    the show, things like that.

2        Q.    Okay.  But you weren't doing it on anything that

3    was preserved like a Telegram chat?

4        A.    Unfortunately, that account -- once they are

5    deleted you can't go back, and there's no way to get that.

6        Q.    Okay.  So that's gone.

7            And from the other people involved you've never

8    asked them to give you those?  You know, you're in touch with

9    Paul.  You're in touch with some of the other folks of the

10   Bowl Patrol.  They haven't provided you those contacts from

11   their account?

12       A.    No.

13       Q.    Now, let's transition a little bit into June 2019

14   when you end up in a chat room with Christopher Cantwell.

15           You enter that online chat room as Cheddy Blac?

16       A.    Yes.

17       Q.    So this is a riff on your original Cheddar Mane

18   identity.  It's a new identity?

19       A.    Yes.

20       Q.    Okay.  When did you get rid of Cheddar Mane and

21   when did you start with Cheddy Blac?

22       A.    I don't recall exactly, but there was no -- there

23   was no intention to obfuscate who I was.  I mean, it was --

24   anybody who knew who Cheddar Mane was would know that Cheddy

25   Blac was also Cheddar Mane.

**J.A. 553**

```
 1          Q.    Okay.  So you appeared as Cheddy Blac.

 2                MR. WOLPIN:  Can we pull up Exhibit C-2 just for

 3     the witness at this point?

 4          Q.    Okay.  This was your account as Cheddy Blac.  This

 5     is how you sort of, I don't know what to call it, the

 6     faceplate for your account of Cheddy Blac with Telegram?

 7          A.    That's correct.

 8          Q.    Okay.  And this again is sort of the identity you

 9     came into Chris's chat room with on that day in June?

10          A.    That's correct.

11                MR. WOLPIN:  I would ask that this be made a full

12     exhibit.

13                MR. DAVIS:  Objection.  Relevance.  403.

14                THE COURT:  All right.  Overruled.  It can be

15     admitted and shown to the jury.

16                (Defendant's Exhibit No. C-2 admitted)

17          A.    I think I know where you're going with this and I

18     have --

19          Q.    I'll ask you questions.

20                THE COURT:  He'll ask questions.

21                THE WITNESS:  Okay.

22          Q.    So this is still how you're presenting yourself

23     publicly as of June 2019?

24          A.    Yes.

25          Q.    Okay.  And this is the identity you used when you
```

**J.A. 554**

```
 1   came into Chris Cantwell's Peaceful White Folk group?
 2         A.    Yes.
 3         Q.    Okay.  And you didn't come in alone.  There was
 4   multiple of you that came in?
 5         A.    I don't know, honestly.
 6         Q.    Was it a link provided to you by other Bowl Patrol
 7   members?
 8         A.    Yes.
 9         Q.    Okay.  Did other Bowl Patrol members enter at the
10   same time or you don't remember?
11         A.    I don't think so, but I can't say that I remember
12   for sure.  So I don't know.
13         Q.    And you said as you came in, it was sort of
14   instantly a sticker pack about someone in the group?
15         A.    Correct.
16         Q.    Okay.  And when we say sticker pack or stickers,
17   Telegram has a function that lets you create sort of little
18   pictures or meme type things within Telegram, right?
19         A.    That's correct.
20         Q.    And then you can submit those and show those to the
21   other people in the group?
22         A.    Correct.
23         Q.    And at least in these contexts there was a sticker
24   pack for Chris Cantwell and you had another sticker pack for
25   some other guy, Heimbach, and those were sort of passed around
```

1    among Bowl Patrol members?

2        A.    Not just among Bowl Patrol members.  There are --

3    sticker packs, anybody on Telegram can get them.

4        Q.    But as far as the two we're talking about, the

5    Chris Cantwell sticker pack and the Heimbach sticker pack,

6    those were ones that were sort of used by Bowl Patrol members?

7        A.    Yeah.  I mean the Heimbach sticker pack, it wasn't

8    just Heimbach in there.  It was Heimbach and, you know, a

9    bunch of other stuff, but yes.

10        Q.    Okay.  And so when you come in, you sort of come in

11    hot with the stickers.  That's what's going on at the

12    beginning, right?

13        A.    Yeah.  I said something to the effect of, oh,

14    Heimbach's in here, awesome, what's up, Heimbach, and then

15    posted a couple stickers, yeah.

16        Q.    Okay.  And your testimony is that you had no idea

17    this Peaceful White Folk group was related to Chris Cantwell?

18        A.    That's correct.

19        Q.    Okay.  If -- all right.  So we begin with what

20    happens next.

21            So you come in.  You're posting stickers about this

22    guy, and you say you instantly get sort of kicked out of the

23    group at that point?

24        A.    Correct.

25        Q.    Okay.  You then get a private Telegram chat from an

**J.A. 556**

1    account that is from Chris Cantwell?

2         A.   Yes.

3         Q.   Okay.  So that comes in.  And the first part of

4    that is:  I guess you forgot the lesson which kept you away

5    for a short while.  Do you need to be reminded?

6              That's sort of the starting point of that?

7         A.   That's the starting point, yes.

8         Q.   Okay.  Now, one of the features of Telegram, as we

9    were kind of just talking about, is that you have the ability

10   to block people, right?

11        A.   That's correct.

12        Q.   You have the ability to instantly shut it down, get

13   over it, right, just by blocking the person?

14        A.   Yes.

15        Q.   All right.  But by that point you don't block him?

16        A.   That's correct.  I didn't.

17        Q.   All right.  And you respond with this:  What are

18   you talking about?  That's your first sort of opening line:

19   What are you talking about?

20        A.   Correct.

21        Q.   But you knew what he was talking about.  He had

22   told you in March, and now suddenly the two of you are

23   together again.

24        A.   I didn't know he was in the room so, no, I didn't

25   know what he was talking about.

```
 1        Q.   You knew in March he had told you to leave him
 2   alone and about the doxing, and then he comes back to you and
 3   says, you know what I'm talking about, and you respond -- or
 4   he responds, you forgot the lesson, and you ask him, what are
 5   you talking about.
 6             You knew what he was interested in.
 7        A.   No, I didn't know what he was talking about.
 8        Q.   Okay.  He came in to that chat with his own name,
 9   it was Chris Cantwell?
10        A.   Yes.
11        Q.   He wasn't hiding his identity?
12        A.   Correct.
13        Q.   Okay.  And in that sort of -- first statement at
14   9:29, his next one is around -- before 4:00 a.m., so hours and
15   hours.  You didn't block the chat at any time during that
16   point?
17        A.   No.
18        Q.   Now --
19             MR. WOLPIN:  Is there any way I can see the
20   conversation again, please?  Pull up -- this is Government's
21   Exhibit 100 on page 3.
22        Q.   All right.  So we're a little ways into the chat at
23   this point, and we've hit June 16th.
24             Chris has referenced at this point --
25             MR. WOLPIN:  If we can go back a page.
```

 1       Q.   -- the picture, and your response is:  What picture

 2  are you even talking about?

 3       A.   Yes.

 4            MR. WOLPIN:  Now, Jay, if you can move back to the

 5  next page.

 6       Q.   I mean, Chris says:  Fuck around and I'll remind

 7  you the hard way.  And your response to that is:  So I'm

 8  guessing or assuming Peach took the picture.  I guess that

 9  means you don't care what happens to her either.

10            Peach is someone real.  Peach is a real person?

11       A.   Yes.

12       Q.   Okay.  Peach's name is Katelen Fry, correct?

13       A.   That's correct.

14       Q.   Peach is someone you knew had a romantic

15  relationship at one point with Mr. Cantwell?

16       A.   Yes.

17       Q.   Peach is a person you believed had provided him the

18  picture?

19       A.   Right.

20       Q.   Okay.  So you tell Chris that he must not care

21  what's going to happen to her, and within two minutes he says

22  the fuck your wife line, correct?

23       A.   Correct.

24       Q.   So things were going to happen to Peach.  What was

25  going to happen to Peach?

**J.A. 559**

```
 1        A.    It would be known that she was the one who had
 2   helped him dox me.
 3        Q.    You just have testified previously that being known
 4   as someone who cooperates or doxes people is a pretty serious
 5   business, right?
 6        A.    Yes.
 7        Q.    Okay.  So you're telling him you're going to make
 8   it known that she was involved in doxing you?
 9        A.    No.
10        Q.    No?
11        A.    No.
12        Q.    Okay.  You don't care what happens to her either
13   suggests again something is going to happen to her.
14        A.    People would know that she had proliferated the
15   pictures.
16        Q.    Okay.  And the reason you wanted people to know
17   that is to imply that there may be some consequences to her
18   for that?
19        A.    Sure.
20        Q.    Okay.  And those consequences could be up and to
21   including violence?
22        A.    There was no way for me to know that, so no.
23        Q.    Consequences to her could be up and to including
24   threats?
25        A.    There's no way for me to know what the consequences
```

```
 1   would be.
 2       Q.   Now, one thing the government didn't go through
 3   with you about this chat is at some point, I believe, you send
 4   him a song; is that correct?
 5       A.   No.
 6       Q.   Okay.
 7       A.   That's not correct.
 8       Q.   That's not correct?  I will come back to that in a
 9   minute.
10           Now, you say things to Chris like the following:
11           You're such a fucking nobody, Chris.  Do your worse
12   you crazy junky loser.
13           Correct?
14       A.   Yes.
15       Q.   You use words like faggot ass kike in this
16   communication, correct?
17       A.   I do.
18       Q.   You tell him you're scared of the 200 and so
19   listeners you have now.  Laugh out loud.  You have zero
20   credibility anymore.  You're so desperate and it's hilariously
21   pathetic.
22       A.   I said that, yes.
23       Q.   Okay.  So at this point when you're saying these
24   things you have no idea whether Chris has released the
25   photograph of your wife; is that correct?
```

```
 1         A.    No.

 2         Q.    You don't know whether he's called CPS or even

 3   going to call CPS?

 4         A.    Can we go back to the last question?  I think maybe

 5   I need to answer it more clearly.

 6         Q.    Okay.

 7         A.    The question about I don't know that the pictures

 8   are up.

 9         Q.    Yes.

10         A.    At that point I had confirmed that the pictures

11   were up, I believe.

12         Q.    The ones that are blurred out, not the actual

13   photographs?  The photographs aren't posted, as far as I

14   understand, until the Radical invitation played that you took

15   the screenshot of.

16         A.    I can't recall the exact order without being able

17   to look at it in front of me.

18         Q.    Okay.

19               MR. WOLPIN:  Your Honor, if I could just have a

20   moment.  I have to look through and find which government's

21   exhibit that is.

22               THE COURT:  Okay.

23               MR. WOLPIN:  I will come back to this as well.  I

24   don't have the government's exhibit in front of me.

25         Q.    Now, this Telegram conversation ends with you
```

```
 1   sending what we've called stickers from the Chris Cantwell
 2   pack, correct?
 3        A.   Correct.
 4        Q.   It ends with you sending a drawing of Chris
 5   Cantwell naked to Chris Cantwell?
 6        A.   Correct.
 7        Q.   Okay.  Now, you say you had a conversation with
 8   your wife afterwards that CPS could show up to your house?
 9        A.   Yes.
10        Q.   Okay.  You did not have a conversation with your
11   wife afterwards that she was at risk of personal injury or
12   rape?
13        A.   That's correct.
14        Q.   All right.  So the only thing you told her -- the
15   only thing you were concerned about potentially happening to
16   her at that time enough to tell her was the thing about CPS?
17             MR. DAVIS:  Objection.  Compound question.
18             THE COURT:  Yeah, rephrase your question.
19        Q.   The thing you told your wife after this was that
20   CPS might visit, correct?
21        A.   That's correct.
22        Q.   You did not tell your wife afterwards that she was
23   at some risk of physical violence or rape?
24        A.   No.
25        Q.   Now, the conversation, if we pull back up 100 of
```

**J.A. 563**

```
 1    the government's exhibit, ends at 9:42 p.m.?
 2         A.   Yes.
 3         Q.   Can we agree?
 4         A.   Yes.
 5         Q.   And that is on June 16, 2019?
 6         A.   Correct.
 7         Q.   Now, you've talked about the fact that then you did
 8    things with your screenshots of this conversation?
 9         A.   Correct.
10         Q.   You took the screenshots that you had and began
11    posting things on top of the pictures of you and/or your
12    family?
13         A.   Correct.
14         Q.   Okay.  And the things you posted on top of them
15    included a photograph -- a naked photograph of Chris Cantwell?
16         A.   Yeah, the sticker.  Yes.
17              MR. WOLPIN:  Okay.  And so if we look at Exhibit A
18    for just identification at this point of our exhibits.  You
19    can scroll down a bit.
20         Q.   So what you have in front of you I believe is
21    something you're familiar with.  This is the Bowlcast Telegram
22    site.
23         A.   Yes.
24         Q.   And on that site is where your screenshots end up,
25    correct?
```

**J.A. 564**

```
 1          A.    Yes, I believe so.

 2          Q.    Okay.  And so --

 3                MR. WOLPIN:  There should be a page 15-16.  All

 4    right.  Go up.

 5          Q.    Now, this is the actual site where the conversation

 6    ends up, correct?

 7          A.    That was a forwarded message from the Uncle Paul

 8    channel.  So, yes, it did end up there.

 9          Q.    All right.  So it gets posted online from Uncle

10    Paul to the Bowlcast?

11          A.    Correct.

12                MR. WOLPIN:  Scroll up.  I want to see what time

13    this ended up.  You can go to that top part.  Start on the

14    date up there.

15          Q.    The date that it's online is June 16, 2019?

16          A.    Correct.

17          Q.    So we established that this all ended at 9:42 on

18    June 16, 2019, and it's up on the Internet before the end of

19    that day?

20          A.    Yes.

21          Q.    If we look down below, do you see the time when

22    these things begin to get posted?

23                MR. WOLPIN:  Oh, back up.  Just hold it still for a

24    second.  Does that show us?  All right.

25          Q.    Well, let's just be clear.  There's only two and a
```

1    half hours left in the day.  It's up on the Internet before

2    the end of that day?

3         A.   Yes.

4         Q.   Now, in that time that you were putting naked

5    pictures of Chris over yourself, that was a time where if you

6    had wanted to you could have called the police?

7         A.   Yes.

8         Q.   Okay.  It, however, was not something you did that

9    day, correct?

10         A.   That's correct.

11         Q.   It's not something you did the next week, correct?

12         A.   That's correct.

13         Q.   It's not something you did the next month?

14         A.   Also correct.

15         Q.   Okay.  So obviously, as you might have expected,

16    once you posted this online there are all kinds of things then

17    posted about Chris Cantwell following what you post online,

18    correct?

19         A.   Yes.

20         Q.   Okay.  Many of them severe, derogatory, mean

21    towards Chris?

22         A.   Sure.

23         Q.   Okay.  So the follow-up sort of as you would have

24    expected to your posting of all of this on the Bowlcast was

25    that others would then chip in -- or through Uncle Paul others

**J.A. 566**

```
1    would then chip in against Mr. Cantwell?
2          A.   Sure.  Yes.
3          Q.   Now, you said you put it up online so there would
4    be a record of it?
5          A.   That's one reason, yep.
6          Q.   Okay.  Another way to have created a permanent
7    record of it would have been to forward it to police, correct?
8          A.   Yes.
9          Q.   But you didn't do that?
10         A.   No, I didn't.
11              MR. WOLPIN:  Now, if we go to C-19, just for the
12   witness at this point.
13         Q.   Is this something you're familiar with?
14         A.   Yes.
15         Q.   Okay.  And this is something you wrote?
16         A.   Yes.
17         Q.   And this is something through again Uncle Paul you
18   had posted online?
19         A.   Correct.
20         Q.   And posted from Uncle Paul to the Bowlcast?
21         A.   That's correct.
22              MR. WOLPIN:  I would move to have this admitted as
23   an exhibit at this time.
24              MR. DAVIS:  No objection.
25              THE COURT:  Without objection it will be admitted
```

**J.A. 567**

```
 1   as a full exhibit.
 2              (Defendant's Exhibit C-19 admitted)
 3        Q.   Now, this now is your public response to what's
 4   happened?
 5        A.   Yes.
 6              MR. WOLPIN:  If we can scroll down to the next
 7   page.  Actually, hold up a second.  Sorry.  It is on the
 8   second page.
 9        Q.   So the first line.  So you described what happened
10   to you as "a pathetic dox," right?
11        A.   Yes.
12        Q.   And this is now four days later.  This is on June
13   20th, so a couple days later?
14        A.   Yes.
15        Q.   Okay.  And the reason you call it a pathetic dox is
16   because he put it up on a site of his that only had 300 and
17   something subscribers, correct?
18        A.   No.
19        Q.   Okay.  After this interaction you put the whole
20   conversation online and then called it a pathetic dox.  You
21   then --
22              MR. WOLPIN:  If we can scroll down to the "don't
23   trust."
24        Q.   You called him a fed, a snitch, a nigger, and a
25   kike?
```

**J.A. 568**

1        A.    Correct.

2        Q.    Okay.  And you even mention the fact that the phone

3   call you did place was to his show?

4        A.    Yes.

5        Q.    Okay.  And so sometime between, as we've seen,

6   between this happening, you posting it online, and you writing

7   this, you made a call in to Chris's show?

8        A.    That's correct.

9        Q.    Okay.  Yet you didn't call the police?

10       A.    That's correct.

11       Q.    Okay.  Now, the government went through with you

12  examples of things you may have done after this interaction,

13  and one of the ones you talked about was this trail camera?

14       A.    That's correct.

15       Q.    Okay.  Now, when you met with the FBI, you told

16  them that you had gotten your SD card that day?

17       A.    Yes.

18       Q.    Okay.  So we're now -- when?  When are you meeting

19  with the FBI, middle of October?

20       A.    October.

21       Q.    Okay.  So June passes, July, August, September,

22  those months go by, and that entire time the trail camera has

23  no actual recording SD card in it?

24       A.    That's correct.

25       Q.    Okay.  You --

**J.A. 569**

 1          MR. WOLPIN:  If I could just have a moment.

 2     Q.    Now, the government went through with you some

 3 photographs or screenshots of potential things you could have

 4 said to Chris during this interaction, screenshots that you

 5 had made of responses where you typed out things?

 6     A.    Yes, yes.

 7     Q.    Okay, and then didn't actually necessarily send

 8 them?

 9     A.    That's correct.

10     Q.    And when you spoke with the FBI in October 2019,

11 did you give them those messages at that time?

12     A.    No, because I didn't realize that I had them.

13     Q.    Okay.  When you spoke to the FBI in December of

14 2019, did you give them at that time?

15     A.    No.

16     Q.    When they came to Missouri to meet with you in

17 March of 2019, did you give them to them at that time?

18     A.    No.

19     Q.    They gave you their e-mails of the agents involved?

20     A.    Yes.

21     Q.    Okay.  And this is something that you sent to them

22 when, last week?

23     A.    Approximately, yeah.

24     Q.    Okay.  Now, you say these are contemporaneous.

25 These are things you're doing at the time after you've gotten

1    --

2          MR. WOLPIN:  We're now on Government 116, which is

3    a full exhibit.

4          THE COURT:  Are you waiting for the exhibit to be

5    brought up?

6          MR. WOLPIN:  Yes.

7    Q.   So this is a screenshot you say happened at sort of

8    the outset of the conversation.  We can see the one, two,

9    three contacts at the top?

10   A.   That's correct.

11   Q.   Okay.  Now, at this point Chris has sent you two

12   things:  I guess you've forgotten the lesson which kept you

13   away for a short while, did you need to be reminded, and Twin

14   Creek Road?

15   A.   Correct.

16   Q.   Your response is:  You specifically mentioned my

17   kids.  And yet he hadn't mentioned your kids?

18   A.   Not in that conversation, no.

19   Q.   Not in any conversation, at least any conversation

20   we've seen?

21   A.   Not in one that we've seen, but I'm sure that I

22   didn't pull that out of the air.  I'm sure there was some sort

23   of relevance or validity to it or else I wouldn't have said

24   it.

25   Q.   Well, it would make a lot more sense if it was

**J.A. 571**

1    somehow later in the conversation when there was talk about

2    your family, but at that point at least in this conversation

3    he hadn't specifically mentioned your kids?

4         A.    That's correct.

5         Q.    Now, prior to your interaction in June with Mr.

6    Cantwell you knew he lived in New Hampshire?

7         A.    Yes.

8         Q.    Obviously you lived in Missouri, correct?

9         A.    Correct.

10        Q.    And the two of you had never physically crossed

11   paths, you had never had an interaction, been in the same room

12   in the same place in your entire life?

13        A.    That's correct.

14        Q.    Okay.  After June 16th, 2019, that didn't change.

15   You guys never had a physical interaction or were in the same

16   room until today?

17        A.    That's also correct, yes.

18        Q.    Now, after June 16th Chris didn't e-mail you?

19        A.    No.

20        Q.    He didn't call you?

21        A.    No.

22        Q.    He didn't send you additional Telegram messages?

23        A.    No.  There was no need to do it.  He had already

24   doxed me.

25        Q.    He didn't come to your door?

**J.A. 572**

```
 1          A.    No.

 2          Q.    The only contact between you and him after June

 3   16th is you calling in to his show to talk to him?

 4          A.    That's correct.

 5          Q.    Now, you've talked about doxing in general and

 6   you've described it as a very serious thing.

 7          A.    Yes.

 8          Q.    Okay.  Your testimony today is a very serious

 9   thing, correct?

10          A.    Yes.

11                MR. WOLPIN:  If I could have a moment, your Honor,

12   just to check with my assistant.

13                (Attorney Wolpin confers)

14          Q.    Now, you've talked about being friends with Paul

15   Nehlen.

16          A.    Yes.

17          Q.    Okay.  And someone who you respect and looked up

18   to?

19          A.    Yes.

20          Q.    Okay.  And someone you're familiar with as the

21   things he has done publicly as well.  You know him as a public

22   figure.  You said he ran for Congress.

23          A.    Yes.

24          Q.    So he is publicly known to have himself doxed

25   someone, being Douglas Mackey?
```

```
 1              MR. DAVIS:  Objection.  Relevance.

 2              THE COURT:  Sustained.

 3              MR. WOLPIN:  Your Honor, if I could, there's a --

 4              THE COURT:  Let's get the headsets on because I

 5    can't understand the relevance.

 6              (SIDEBAR)

 7              MR. WOLPIN:  Your Honor, the government put in an

 8    exhibit, which was the defendant's, on doxing.  The whole

 9    content about doxing is -- the subject matter is Mr. Nehlen's

10    doxing of another individual.  This person has said that

11    doxing is this horrible, terrible thing, and yet the person

12    he's communicating with about doxing is sort of renowned for

13    having doxed.  That's already in an exhibit that has been

14    submitted to the jury.

15              THE COURT:  It's already been -- it's in an exhibit

16    admitted to the jury that Mr. Nehlen has doxed someone?

17              MR. WOLPIN:  Yes.

18              THE COURT:  What exhibit is that?

19              MR. DAVIS:  101, Judge.

20              THE COURT:  All right.  And what else does this add

21    to talk about Mr. Nehlen doxing somebody if it's already in

22    evidence?  You've got to speak into the mic.

23              MR. WOLPIN:  So again, the individual is saying

24    that doxing is something extraordinary.  It's not

25    extraordinary.  It's common.  It happens all the time in this
```

**J.A. 574**

1  community.  It's been painted as in and of itself nearly a

2  crime or something that's akin to a crime, but it is not.

3  It's common.  Newspapers do it.  That's how Vic Mackey was

4  doxed.

5        I think the way the government has presented its

6  case is to make a question of what does doxing mean relevant

7  by putting in Chris's musings on doxing.

8        THE COURT:  I'll let you question the witness about

9  the government exhibit that shows that Mr. Nehlen doxed

10  somebody.  That's just going over something the government

11  introduced during its questioning so you can do that, but

12  don't take much more time on it because it's of such minimal

13  relevance that I don't want to waste the jury's time, okay?

14        MR. WOLPIN:  Thank you.

15        (CONCLUSION OF SIDEBAR)

16        MR. WOLPIN:  So at this point if we could just

17  bring up 101 for just the witness.

18        MR. DAVIS:  101 is in evidence, your Honor.

19        THE COURT:  All right.  It's in evidence so you can

20  show it to the jury.

21     Q.   All right.  In that, what you're seeing -- or will

22  be seeing -- is something that the government has put into

23  evidence as far as Chris Cantwell.  It's a writing he had back

24  in 2018 about doxing.

25        MR. WOLPIN:  Can we highlight this section right

**J.A. 575**

```
1   here?
2       Q.   The article he wrote is entirely in response to a
3   situation where Paul Nehlen, the person you went to to talk
4   about doxing, had himself doxed somebody else.  Is that
5   something you're familiar with?
6       A.   Yes.
7       Q.   Okay.  So it is known among the alt-right that Paul
8   Nehlen himself has been a doxer of others?
9       A.   Yes.
10      Q.   Now, you've testified that --
11           MR. WOLPIN:  We can put this down for a moment.
12      Q.   -- that doxing is a big deal?
13      A.   Yes.
14      Q.   Okay.  Now, you have a friend, a Mr. Moeller, Mr.
15  Tactical Bowlcut?
16      A.   Yes.
17      Q.   Okay.  And Mr. Moeller is a confidante of yours,
18  someone you talk to about things?
19      A.   Yes.
20      Q.   Okay.  And he is someone who has also been a part
21  of the Bowl Patrol?
22      A.   That's correct.
23      Q.   Okay.  And sort of the unique aspect with Mr.
24  Moeller is the conversations you had with him were while he
25  was in jail?
```

**J.A. 576**

```
 1        A.   Yes.

 2        Q.   All right.  So your conversations with him were

 3   recorded?

 4        A.   Correct.

 5        Q.   All right.  And those conversations between you and

 6   your other Bowl Patrol member, Mr. Moeller, you told him that

 7   doxing people is not really a big deal like it used to be?

 8        A.   I mean, if you say so.  I don't remember

 9   specifically saying that but --

10        Q.   I can play it for you.

11        A.   Okay.

12        Q.   Okay.

13             MR. WOLPIN:  So we have -- I would ask at this

14   point to move in as an exhibit -- it got renamed late so I

15   don't have the number in front of me -- F-24, which is an

16   audio of the witness.

17             THE COURT:  You're asking to play this so that the

18   witness can hear it only?

19             MR. WOLPIN:  At this point I think it's

20   impeachment.  He said he didn't say it.  To the extent he says

21   he doesn't remember, I can play it to refresh his

22   recollection.

23             THE COURT:  In general impeachment by contradiction

24   you can ask the witness if he doesn't remember it, you can

25   show it to him or have him listen to it to refresh his
```

1   recollection, but you ordinarily can't introduce extrinsic

2   evidence solely for the purpose of contradiction.

3           MR. WOLPIN:  In this case because I don't have a

4   witness to do it, I have an audio, rather than calling in --

5           THE COURT:  No, the problem is it's extrinsic

6   evidence.  It's not that it's the audio versus the witness.

7           You can ask him, didn't you say in another

8   conversation doxing is not a big deal.  And if he says I don't

9   remember, then you can say, well, let me play this for you.

10  Listen to it.  Does that refresh your memory?  Didn't you say

11  that?  And if he says, no, I didn't say it, then ordinarily

12  you have to accept the witness's position and move on, and the

13  jury will judge his credibility.

14          I mean, I've gone over this with counsel prior to

15  trial.

16          MR. WOLPIN:  If it's necessary to refresh his

17  recollection rather than to impeach, I would ask that we have

18  a moment to play it for him outside their presence.

19          THE COURT:  All right.

20          Can we play this over headsets or do I have to

21  excuse the jurors?

22          THE CLERK:  You have to excuse the jurors.

23          THE COURT:  All right.

24          Let me find out, how much more cross-examination do

25  you have?

**J.A. 578**

1              MR. WOLPIN:  I would say probably an hour.

2              THE COURT:  All right.  So we're not going to

3    finish with the witness today.  So go on to another subject.

4    We'll come back to this.  We'll stop at 4:30 for the day.

5    We'll play it for the witness after the jury is gone, and

6    we'll go from there.  We're just not going to be able to

7    finish with this witness unfortunately so we'll have to go

8    into tomorrow.

9              All right.  So go on to a different subject.

10        Q.   Let's move on from the concept of doxing and move

11   on to October of 2019.

12        A.   Okay.

13        Q.   So there was a day in October 2019 when the FBI

14   showed up at your house?

15        A.   Correct.

16        Q.   Now, that's, as I said, about four months after

17   this exchange?

18        A.   Yes.

19        Q.   And those officers came in a group.  How many came

20   total?  Do you remember?

21        A.   Well, I was at work at the time but it was four.

22        Q.   Okay.  So four officers showed up at your house?

23        A.   Yes.

24        Q.   And then they came to find you at work?

25        A.   Correct.

```
 1          Q.    It was immediately apparent to you that these guys
 2    were sort of ex-military type, serious guys?
 3          A.    Uh-huh.
 4          Q.    And when they --
 5          A.    I mean yes.  Sorry.  Yes.
 6          Q.    Thank you.
 7                They then come to your work after they go to your
 8    home?
 9          A.    Correct.
10          Q.    And talk to your boss?
11          A.    That's correct.
12          Q.    And they tell your boss at that time that there's a
13    threat against your family?
14          A.    I didn't hear the conversation so I would assume --
15    I mean, they did later but --
16          Q.    If you didn't hear the conversation, you don't need
17    to answer, but they came showing up at your work unannounced
18    looking for you?
19          A.    Correct.
20          Q.    Okay.  Now, when they first see you, you're there
21    wearing a sweatshirt with the Dylann Roof bowl symbol on it?
22          A.    Correct.
23                MR. DAVIS:  Objection.  Relevance.
24                THE COURT:  Overruled.  That's already come into
25    evidence anyways, I believe.
```

**J.A. 580**

1    Q.    So right away if the FBI knows anything about Bowl

2  Patrol at all, they can tell that you're part of Bowl Patrol

3  just by your clothing?

4    A.    Correct.

5    Q.    Now, they tell you they are there because of a

6  threat against your family?

7    A.    Yes.

8    Q.    They tell you that your safety is in danger?

9    A.    That's correct.

10    Q.    And they repeat that throughout the interview?

11    A.    Yes.

12    Q.    Okay.  They tell you things like, we came from

13  Boston because we're concerned about you, your wife's safety,

14  your children's safety, and your safety?

15    A.    That's correct.

16    Q.    Now, you spoke with the FBI first at your work and

17  then went back to a local police station?

18    A.    That's correct.  We briefly spoke.

19    Q.    And that brief speaking, whatever was said, wasn't

20  in fact recorded to your knowledge?

21    A.    To my knowledge, no.

22    Q.    Okay.  Then you go to the police station, and at

23  the police station that part of the interview is recorded?

24    A.    Correct.

25    Q.    I want to go through with you some of the things

**J.A. 581**

```
 1   that the FBI said to you at the beginning of that recorded

 2   interview as far as their purpose.

 3            MR. WOLPIN:  If we could bring up Exhibit D just

 4   for the witness.

 5        Q.   So this is -- at the outset we're in the first,

 6   what is ultimately the first few --

 7            MR. WOLPIN:  No.  Excuse me.  The FBI interview,

 8   excuse me, not the grand jury transcript.

 9        Q.   I can read for you --

10            MR. DAVIS:  Objection to reading, your Honor.

11            THE COURT:  Well, all right.  Yeah, first you need

12   to -- you can ask the witness, didn't the officers do X,

13   didn't they say this.  If he says he can't remember, you can

14   show it to him and ask him to refresh.

15            MR. WOLPIN:  That's how I intended to do it.

16            THE COURT:  All right.

17            MR. WOLPIN:  However, it's a transcript so I

18   thought it would be more efficient to have it ready.

19        Q.   So they said to you:  We want to assure the safety

20   of you and your family?

21        A.   Yes.

22        Q.   Where you're in danger the primary issue we're

23   concerned about is the feud with Mr. Cantwell, correct?

24        A.   Yes.

25        Q.   Where he threatened your wife and children, we take
```

```
 1   those things very seriously?
 2        A.   Yes.
 3        Q.   Do they tell you, we'll focus first on the threat
 4   against your family?
 5        A.   Yes.
 6        Q.   That they saw the exchange online?
 7        A.   Yes.
 8        Q.   And that because we are taking this seriously,
 9   we're not letting it go?
10        A.   I don't remember that that was specifically said.
11             MR. WOLPIN:  If we could go to page 8.
12        Q.   Let's see if this refreshes your recollection.
13             MR. WOLPIN:  And the third line down.
14        A.   Okay.
15        Q.   So it was made clear to you that -- so they did
16   say, we're not letting it go.  Does that refresh your
17   recollection?
18        A.   I mean, yes.
19        Q.   So before the recorded part began, they had told
20   you they were there for the threat, correct?
21        A.   Correct.
22        Q.   During the recorded part they began by telling you
23   that they were there to talk to you about the threat?
24        A.   Correct.
25        Q.   They're using the word threat?
```

**J.A. 583**

```
 1        A.    Yes.

 2        Q.    They're using the word seriously?

 3        A.    Yes.

 4        Q.    They're telling you they're not going to let it go?

 5        A.    I can see that they said that, yes.

 6        Q.    And then at that point they turn it over to you as

 7   to what you want to tell them?

 8        A.    Yes.

 9        Q.    Now, after they explain to you what they're there

10   for, the next thing you blurt out after, we're not letting it

11   go, is:  Just to put it out there with you guys, the picture

12   with the supposed LSD on my tongue, that was fucking

13   construction paper from my kids.

14        A.    Yes.

15        Q.    Okay.  So your first response to them coming is not

16   to say, it's a threat, it's not a threat.  Your first response

17   is you're worried about the LSD?

18        A.    Well, I knew what pictures were out there and I was

19   concerned with, you know, the potential for the perception to

20   be that I was a drug user and I knew that that was illegal.

21        Q.    And the next line, the next thing you tell them is:

22   Anything that is said in the Bowl Patrol or anything like that

23   is strictly performance art.  Strictly.

24        A.    Yes.

25        Q.    So that's what you want them to know at that point
```

**J.A. 584**

1    before you talk anything about threats is that Bowl Patrol is

2    just performance art?

3         A.   Correct.

4         Q.   Now, continuously they work to redirect you back to

5    this exchange between you and Cantwell?

6         A.   Yes.

7         Q.   All right.  So you go off on these other tangents

8    and they keep bringing you back?

9         A.   Correct.

10        Q.   We're not going to interrupt you or anything you

11   need to say, so let's focus.  You're aware of the threat from

12   Cantwell to your family.

13             Does that seem correct?

14        A.   Yes.

15        Q.   Okay.  And they say again to you:  So obviously you

16   took that threat very seriously, right?

17        A.   I mean, I remember that being said, yes.

18        Q.   Okay.  So they're telling you they take it

19   seriously and they're asking you, right, you do too?

20        A.   I mean, it would be better if I could see it in

21   front of me so I can confirm it.

22             MR. WOLPIN:  Can we show the witness 26, page 26?

23             MR. DAVIS:  Again, objection to reading from a

24   transcript.  This is proper to refresh recollection.

25             THE COURT:  Right.  But it is entirely proper to

**J.A. 585**

```
 1   question a witness, didn't the officer do X, didn't the
 2   officer say, and you can use the exact words.
 3           What you can't do is read the transcript to the
 4   jury.  It's a difference.  Look, we're at 4:27.  I don't want
 5   to waste the jury's time here.  Let's stop for the day.
 6           Members of the jury, I was hoping we could finish
 7   with this witness because I want to get him back as soon as we
 8   can to Missouri, but we'll have to go with him tomorrow.
 9   There's just no option here because the defense has
10   substantial additional cross and the government will have
11   redirect.
12           So I will excuse you for the day and ask you to
13   keep an open mind.  It's very important that you just make
14   real efforts for the next few days, just tune out the media,
15   okay?  Don't read any newspapers, listen to news on the radio.
16   Don't go on the Internet.  Don't go out and do any
17   investigations.  Keep an open mind.  Come back.
18           I believe we are -- is it safe to say that we are
19   well within the schedule that we have been anticipating?
20           MR. DAVIS:  I think we're within it.  Maybe not so
21   well within it.
22           THE COURT:  We're going to move even more quickly
23   tomorrow and we will stay on schedule.  So in case you have
24   any apprehension about that, I do not anticipate any delays in
25   the schedule.  If they happen, I'll give you notice, and it's
```

```
1    possible, but I'll do my best to keep us moving, okay?
2             Have a good evening everybody.  We'll see you
3    tomorrow at 9:30.
4             (IN COURT - NO JURY PRESENT)
5             THE COURT:  Sir, you're done for the day.  You can
6    step down.  Come back tomorrow and be ready to finish up
7    tomorrow.
8             Okay.  Be seated everyone.
9             So you're all highly experienced lawyers.  I have
10   respect for your knowledge and ability to do trial work.
11            My understanding about the right way to take a
12   statement that's in a police report, and this transcript is
13   effectively equivalent to a police report the way I see it, is
14   that it is perfectly acceptable for an examiner on
15   cross-examination to take a statement from a police report
16   that's in quotations and say you said to the officers and then
17   that exact word.  If he says, really it would be better if I
18   see the document, then you can show the document to him and
19   say, read it to yourself.  Having done so, is your
20   recollection refreshed that in fact you said blank?  And if he
21   says, no, I didn't say that, then you just have to move on.
22   You can't, like, introduce the police report or anything like
23   that.  That's the way I understand matters like that are dealt
24   with, and I think this transcript should be dealt with in the
25   same way.
```

**J.A. 587**

```
 1              Now, I may be wrong.  I may be missing something.
 2   If either of you see it differently, let me know.  I don't
 3   think it's -- a lot of lawyers come in and they want to just
 4   pull out police reports and start reading from them to the
 5   jury.  I don't think they can do that.  I think they can
 6   cross-examine and use the exact words that are attributed to
 7   the defendant to see if he'll adopt them.  And if he won't,
 8   there's not much he can do about it, as opposed to sworn
 9   testimony which can be dealt with in a different way.
10              So that's how I expect you to go, and if I'm wrong,
11   you'll tell me and I'll let you modify your practices.
12              Now, anything more on that subject?  Then we have
13   to jump back and go into this issue about doxing and what the
14   defense wants to do on doxing where I told us to move on.
15   Maybe we're just by it now and it doesn't matter.
16              Is there something more you want to do about the
17   doxing stuff?
18              MR. WOLPIN:  I would.  There's an impeachment to do
19   or a refreshing.  I actually don't -- at this point I would
20   have to go back through it with him to see whether he doesn't
21   remember saying it or he claims he didn't say it.
22              THE COURT:  Okay.  So what you have there is you
23   have a transcription of a call to the prison between the
24   witness and this friend of his who's in prison where he
25   says -- and what's the quote on that?  Do you know?
```

**J.A. 588**

```
1              MR. WOLPIN:  Doxing people is not really a big deal
2    like it used to be.
3              I don't have a transcript because it's so short.
4    That's the exhibit, the most recent exhibit --
5              THE COURT:  So there's some recent disclosure from
6    the defense to the government where this is a --
7              MR. DAVIS:  F-24.  Thank you.
8              THE COURT:  F-24.  So it would seem to me that that
9    works the same way as reading from this transcript.  That you
10   can say, he's your friend.  You talked to him in jail.  You
11   had a conversation on or about this date.  Do you remember
12   that, you talked to him?  And in that conversation didn't you
13   tell him doxing is not a big deal anymore?  And if he says,
14   yeah, I did, okay, you got it.  If he says I can't remember,
15   you can show him the thing to see if it refreshes his
16   recollection.  If he says, no, I didn't, then we have to deal
17   with the question of should you be allowed to introduce it, is
18   it collateral or not collateral, is it extrinsic evidence?
19   We'll deal with that as sort of the next step in the process,
20   but that's how I propose to deal with that, okay?
21             Anything else that either of you want to take up
22   with me today?
23             MS. KRASINSKI:  Just to put a pin in it that both
24   parties had submitted to Courtroom Deputy Negron last night
25   transcripts of two jail calls where the defense has made 106
```

**J.A. 589**

```
 1    objections.  So your Honor should have the government's
 2    transcript.
 3           THE COURT:  The excerpts that you propose and the
 4    full transcript so I can do the same thing I did yesterday?
 5           MS. KRASINSKI:  Yes, your Honor.
 6           THE COURT:  All right.  So I'll ask the clerk to
 7    give me that, and I'll rule on that at 9 o'clock tomorrow.
 8           In terms of scheduling -- so let's assume that this
 9    witness is off the stand by 10:00.
10           What are you going to do tomorrow?  What's the
11    government going to do?
12           MR. DAVIS:  I think we can probably rest at the
13    very end of the day.  Do you think?  No?
14           (Attorney Davis confers with Attorney Krasinski)
15           MR. DAVIS:  It depends on the length of cross.
16    Paul Nehlen is one witness.
17           THE COURT:  Okay.
18           MR. DAVIS:  And there are four other witnesses, but
19    none of them should be too long.  So I think if we move --
20    it's possible we'll rest tomorrow.
21           THE COURT:  One day blends into the rest for me.
22    What day of the week is this?
23           MR. DAVIS:  It's Wednesday.
24           THE COURT:  It's Wednesday.  Okay.
25           So you'll be resting either Thursday or Friday,
```

1  right?

2          MR. DAVIS:  If not Thursday, Friday before noon.

3          THE COURT:  Okay.  And then of course the defense

4  will always say to me, I can't say anything, I don't know

5  anything, I have to wait.

6          I'm just trying to get a handle on it.  If the

7  defendant testifies, it will be another day.  If the defendant

8  doesn't testify, probably not a long time.  Is that fair?  I'm

9  not holding you to anything, the world might change, but I'm

10  just trying to plan it out, all right?

11          So there's a reasonable prospect we could argue and

12  charge on Friday, more likely Monday?

13          MR. LEVIN:  More likely Monday.

14          THE COURT:  That's sort of where I'm seeing us.  Is

15  that consistent?  And that would still be within the schedule

16  we told them about, isn't it?  We told them we could extend

17  into next week is what I remember.

18          MS. KRASINSKI:  Yes, Judge.

19          THE COURT:  So we're still on schedule.  They

20  shouldn't -- they aren't going to need to panic on that.

21          Okay.  That's good.  I think we'll plan on that.

22          I gave you a very rough first draft charge.  I've

23  explained to you that I'm going to -- I am likely -- I want to

24  hear obviously arguments from parties, but the case law I've

25  reviewed on the extortion charges suggest that intent to

**J.A. 591**

```
 1   extort by threat includes an intent to threaten, because the
 2   concept of extortion by threat just doesn't make sense unless
 3   you're also intending to threaten.  I can give you case law on
 4   that or you can research it.
 5           So I'm inclined to say something along those lines
 6   in addition to what I've said under intent to extort, that the
 7   intent to extort also when you extort by means of a threat,
 8   requires that the defendant have an intent to threaten.  So
 9   I'm inclined to do that as an additional charge.
10           I'm inclined in the cyberstalking charge -- and we
11   can pars this out if you want, but I'm inclined to write these
12   charges to make it clear to the jury that the intent to extort
13   and the cyberstalking are directed at Mr. Lambert.  That
14   that's who he's trying to stalk and who he's trying to extort.
15   The standpoint from which a reasonable person views this is
16   from Mr. Lambert's standpoint, not Mr. Lambert's spouse's
17   standpoint.  So the intent to extort has to be proved as to
18   Mr. Cantwell.  The intent to engage in the acts which qualify
19   as cyberstalking have to be proved as to Mr. Cantwell.
20   Whether a reasonable person would view the statement as
21   harassing or a reasonable person would understand this or
22   that, that's viewed from the standpoint of -- it seems to me
23   from the standpoint of Mr. Lambert, and that's how I intend to
24   instruct the jury.
25           You don't have to say anything now, but think about
```

1   that and see if that's consistent or inconsistent with what

2   you're proposing to do.

3            All right.  Is there anything else anyone wants to

4   take up with me today?

5            I will provide a revised charge to you hopefully by

6   the end of the day tomorrow and certainly before you're

7   required to give closing arguments.  All right?

8            Anything else from anyone?  Okay.  Thanks.

9            Be here -- Mr. Levin, for your side if you could be

10  here by 9:00, and if the government could be here by 9:00, so

11  I can rule on any preliminary issues.

12            (Jury trial adjourned at 4:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 593**

1                    C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings, to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted: 5-4-21        /s/   Susan M. Bateman _____
                              SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 594**