UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 21-1186
_____

UNITED STATES,
Appellee,

v.

CHRISTOPHER CANTWELL,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
_____

JOINT APPENDIX
VOLUME II
_____


Christine DeMaso                           Seth R. Aframe
Assistant Federal Public Defender          Assistant U.S. Attorney
Federal Public Defender Office             U.S. Attorney's Office
51 Sleeper Street, 5th Floor               53 Pleasant St., 4th Floor
Boston, MA 02210                           Concord, NH 03301
617-223-8061                               603-225-1552


For Christopher Cantwell                   For the United States

# TABLE OF CONTENTS

## <u>VOLUME I</u>

District Court Docket Sheet ............................................................... J.A. 1

Indictment ........................................................................................... J.A. 18

Superseding Indictment .................................................................... J.A. 20

Telephone Conference Transcript (9/8/20) .................................. J.A. 24

Motion Hearing (9/18/20) ................................................................ J.A. 68

Trial Transcript Day 1—Morning (9/22/20) .............................. J.A. 118

Trial Transcript Day 1—Afternoon (9/22/20) ........................... J.A. 199

Trial Transcript Day 2—Morning (9/23/20) .............................. J.A. 332

Trial Transcript Day 2—Afternoon (9/23/20) ........................... J.A. 467

## <u>VOLUME II</u>

Trial Transcript Day 3—Morning (9/24/20) .............................. J.A. 595

Trial Transcript Day 3—Afternoon (9/24/20) ........................... J.A. 725

Trial Transcript Day 3—Afternoon,
    Cantwell Testimony (9/24/20) .................................................. J.A. 755

Trial Transcript Day 4—Morning,
    Cantwell Testimony (9/25/20) .................................................. J.A. 849

Trial Transcript Day 4—Morning (9/25/20) .............................. J.A. 955

Trial Transcript Day 4—Afternoon (9/25/20)........................................J.A. 983

Trial Transcript Day 5 (9/28/20) ...........................................................J.A. 1056

Trial Exhibit 100.....................................................................................J.A. 1063

Trial Exhibit 102.....................................................................................J.A. 1071

Trial Exhibit 103A ..................................................................................J.A. 1074

Trial Exhibit 105* ...................................................................................J.A. 1082

Trial Exhibit 105A ..................................................................................J.A. 1083

Trial Exhibit 106* ...................................................................................J.A. 1084

Trial Exhibit 106A ..................................................................................J.A. 1085

Trial Exhibit 108* ...................................................................................J.A. 1086

Trial Exhibit 108A ..................................................................................J.A. 1087

Trial Exhibit 109* ...................................................................................J.A. 1088

Trial Exhibit 109A ..................................................................................J.A. 1089

Trial Exhibit 110* ...................................................................................J.A. 1090

Trial Exhibit 110A ..................................................................................J.A. 1091

Trial Exhibit 111* ...................................................................................J.A. 1092

Trial Exhibit 111A ..................................................................................J.A. 1093

Trial Exhibit B-5a* .................................................................................J.A. 1094

Trial Exhibit C-2 .....................................................................................J.A. 1095

Trial Exhibit C-17 ................................................................... J.A. 1096

Trial Exhibit C-19 ................................................................... J.A. 1097

Trial Exhibit E-41* ................................................................. J.A. 1099

Trial Exhibit E-43* ................................................................. J.A. 1100

Trial Exhibit G....................................................................... J.A. 1101

Assented to Motion to Complete the Record (D.E. 115) .................... J.A. 1104

Sentencing Transcript (2/24/21) ........................................... J.A. 1110

Notice of Appeal (D.E. 133) .................................................. J.A. 1199

* Listings marked with an asterisk are audio recordings that can be found on the disc accompanying this Joint Appendix.

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * * *
                                        *
4     UNITED STATES OF AMERICA          *
                                        *
5                                       *  No. 1:20-cr-00006-PB
                  v.                    *  September 24, 2020
6                                       *  9:07 a.m.
                                        *
7     CHRISTOPHER CANTWELL,             *
                                        *
8                        Defendant.     *

9     * * * * * * * * * * * * * * * * * *

10

        TRANSCRIPT OF DAY THREE OF JURY TRIAL - MORNING SESSION
11
            BEFORE THE HONORABLE PAUL J. BARBADORO
12

13
      APPEARANCES:
14

15    For the Government:      AUSA John S. Davis
                               AUSA Anna Z. Krasinski, Esq.
16                             U.S. Attorney's Office

17    For the Defendant:       Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
18                             Federal Defender Office

19

20    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
21                             United States District Court
                               55 Pleasant Street
22                             Concord, NH 03301
                               (603) 225-1454
23

24

25

**J.A. 595**

2

1                           I  N  D  E  X

2    WITNESSES:          DIRECT    CROSS    REDIRECT    RECROSS

3    **BENJAMIN LAMBERT**
     By Mr. Wolpin              32 (Cont'd)              84
4    By Mr. Davis                            56

5    **PAUL NEHLEN**
     By Mr. Davis        87              105
6    By Mr. Wolpin            96

7    **KEVIN LEBLANC**
     By Mr. Davis        108
8    By Mr. Levin             120

9

10

11

12                         E  X  H  I  B  I  T  S

13              Govt's                      In Evd.
                110B........................19
14

15

                Deft's
16              B-4-A........................33
                C-21........................85
17

18

19

20

21

22

23

24

25

J.A. 596

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  All rise for the Honorable Court.  Please |
| 3 | be seated. |
| 4 | Court is in session and has for consideration jury |
| 5 | trial in United States of America versus Christopher Cantwell, |
| 6 | criminal case number 20-cr-06-01-PB. |
| 7 | THE COURT:  I have to address the defendant's Rule 106 |
| 8 | objection, rule of completeness argument, but before I do that |
| 9 | I wanted to pick up with where we left off yesterday afternoon, |
| 10 | because I think there may be some -- maybe it's only on my |
| 11 | part -- misunderstanding about what uses the defendant can make |
| 12 | in cross-examination of prior statements by the witness.  Okay? |
| 13 | So, Mr. Wolpin, you were examining the witness at one |
| 14 | point about, as I understand it, although I haven't seen the |
| 15 | document, what purports to be a transcript of a recorded |
| 16 | interview with the FBI; is that right? |
| 17 | MR. WOLPIN:  Yes, your Honor. |
| 18 | THE COURT:  Okay.  So, that document is, it's not a |
| 19 | police report, it's not a 302, it's an actual transcript? |
| 20 | MR. WOLPIN:  Correct. |
| 21 | THE COURT:  Okay.  Now, that document is not itself in |
| 22 | evidence at this point, right? |
| 23 | MR. WOLPIN:  No. |
| 24 | THE COURT:  Okay.  So, here's my basic approach, and |
| 25 | if I'm wrong on this, please tell me, okay?  Ordinarily, people |

1   can't read from things that are not in evidence, right?  So,

2   that's not yet in evidence.  It might come into evidence for

3   certain purposes, but it's not in evidence yet.  But I

4   understand it's a standard approach to cross-examination to use

5   statements as a control device, essentially, when examining a

6   witness, and I have zero problem with you asking questions in

7   leading form that simply quote from the document without

8   attributing it as a quote by saying, You were at an interview,

9   right, and at that interview the agent did this to you, didn't

10  he, and you said that to him, didn't you?  That's all fine, but

11  then what happens if he says, No, I didn't say that, or he

12  says, I don't remember that?  That's, as I see it, a Rule 613

13  problem, and I do think that in appropriate circumstances you

14  can admit the statement as opposed to a police report.

15  Ordinarily you couldn't admit the 302; you'd have to call the

16  investigating officer that heard the inconsistent statement.

17          But with the actual recording I think you can, under

18  appropriate circumstance, introduce the portion of it that is,

19  in fact, inconsistent with what the witness is now saying.  If

20  he disclaims memory or uncertainty about what he remembers, you

21  can show it to him, ask him, I am showing you a document, read

22  these words.  Does that now refresh your recollection?  And I

23  have no problem with that.  If he makes a statement that's

24  inconsistent with a statement that he made in the past, I have

25  no problem with you saying you, Didn't you tell the

1    investigating officer blah, and if he won't sign up for that,

2    then, if the matter is not collateral because there is a

3    collateral ruling, it's not collateral, you can then introduce

4    the statement, but you have to then authenticate the statement.

5    There are a variety of ways to do that.  You could do that

6    through a separate witness later on in your case, perhaps, as

7    long as you give the witness an opportunity to explain the

8    inconsistency, or potentially you could do it through the

9    witness himself by, say, for example, establishing that, in

10   fact, he did give the inconsistent statement by, before the

11   jury hears it, say, playing it for him, showing him the -- You

12   agree that you, in fact, made this statement, in which case the

13   statement can be admitted, but it's admitted under Rule 16 only

14   for impeachment purposes.  It's not admitted as substantive

15   evidence.  All right?

16           So, there's a second statement that you examined the

17   witness on, as I'm remembering, which was a statement in a

18   telephone call about whether doxing was or was not a big deal,

19   and apparently he said in that statement, you believe anyways,

20   he said doxing was not a big deal.  Again that statement is not

21   in evidence.  You can't read from that statement, but you can

22   ask him, Isn't it true you talked to a buddy of yours at the

23   prison, and those calls were recorded, and isn't it true you

24   told him doxing is not a big deal?  And if he says, I don't

25   remember, you can show it to him, refresh his memory.  If he

**J.A. 599**

1   says, I didn't do it, you can find some way to get that in.

2   But you can't just put it in; you have to authenticate it to

3   establish that it was a statement that was made.  So, again, if

4   it's on a non-collateral matter and it's inconsistent and you

5   can authenticate the inconsistent statement, you can admit it

6   for impeachment purposes only.  That's how I view it.

7        Do the parties have a different understanding about

8   how I want documents to be used from?  So, my basic starting

9   point is, if someone whips out a document that's not in

10  evidence and starts reading from it, probably a red alert

11  should be going off, because you can't do that, because that

12  effectively puts in evidence the document that's not admitted.

13  But it can come in potentially; it just depends on how it's

14  done.

15       Does anybody else have anything else to say on that

16  particular issue?

17       MR. WOLPIN:  Just to note, if I could --

18       THE COURT:  Yeah.

19       MR. WOLPIN:  -- that the government has agreed to the

20  authenticity of the recordings prior to trial that come from

21  the jail.  We wouldn't need a jail person to do that.

22       THE COURT:  If you need to do it at the appropriate

23  time, if the government was not agreeing to that, yeah, but you

24  can also authenticate it through him, right?  If you say, Put a

25  headset on, listen to this, Is that not, in fact, you talking

**J.A. 600**

1    on a phone call you had with this guy at the prison, and

2    doesn't it fairly and accurately represent what you, in fact,

3    said to him?  And if he doesn't sign up for that, then I'd let

4    you call a jail person, if the government, in fact, objected on

5    authenticity grounds.

6          But my point is for me, when people start reading from

7    documents not in evidence, that's when my alert goes up, I

8    start to get very nervous, because I don't understand what's

9    happening.  So, if you want to avoid me in an alert mode,

10   you'll find other kinds of ways of doing it that don't cause me

11   to be panicking about what's happening.

12         MR. WOLPIN:  Technologically are we able to have him

13   listen to recordings?

14         THE COURT:  I don't know the answer to that.  At this

15   point we can't play a -- can we play -- like, ordinarily in

16   drug trials when we have recorded conversations we can play

17   them over the headset and not over the PA system.  I don't know

18   if we could do that with these headsets.  We would have to

19   think about it.  It would take effort on our part.  I can't

20   guarantee you we can do that.  The better course of action

21   would be, and if you thought there was an issue and you wanted

22   to avoid the jail guard, I'd let you play it for him outside

23   the presence of the jury.  It will waste a little time.

24   Hopefully, you won't need to do that, because the government

25   could just step up and say, Hey, Judge, we agree he said this,

1   and we'll stipulate that he said it, because you may know, if

2   you know what the calls are, and if it's all accurate.  But

3   worst case I'd have to send the jury out, have you listen to

4   it, say, Now, have you listened to this recording, and that's

5   you, isn't it, and that's your buddy, and that's what you, in

6   fact, said to him, right?  Okay.  Judge, I ask that this be

7   admitted as an inconsistent statement to be considered for

8   impeachment purposes.  You've authenticated it, it's okay, I

9   say it comes in, it could be considered for impeachment

10  purposes.  So, that's how I would do it, I think.  Okay.

11          All right.  So, let's turn to the 106 objection and,

12  as I understand it, the government has two excerpts, 110A and

13  111A, and the defendant wants to -- those are excerpts from --

14  and it wasn't quite clear to me from these documents.  Are they

15  two different calls; each excerpt is for a different call?

16          MS. KRASINSKI:  That's correct, your Honor.

17          THE COURT:  Okay.  So, the excerpt that corresponds to

18  110A, this hasn't been marked.  I received it from the

19  defendant, Hannah Pleasants call transcript, is what it's

20  headed, as opposed to Ingrid Dean call excerpt.  So, I'm

21  talking about 110A, and the government wants to put in an

22  excerpt of the Hanna Pleasant call, and the defendant wants

23  some or all of the call transcript to come in.  I'm not

24  inclined to grant the request as to all of it.

25          If the defendant can explain to me what portions under

1    Rule 106 you think are your strongest arguments as to what

2    should be included.

3            MR. LEVIN:  Well, first of all, your Honor, we do have

4    a 401 and a 403 objection to this.  This is framed as an

5    admission of the defendant.

6            THE COURT:  Can I just stop you to make sure, because

7    this is new.  You're telling me, You don't even need to get

8    into 106, Judge.  Before you get into 106, you should exclude

9    the excerpt in its entirety.

10           MR. LEVIN:  Right.

11           THE COURT:  Okay.  So, let's examine that first.  Go

12    ahead.

13           MR. LEVIN:  The statement that the government wants to

14    get in, it says, You know what I threatened to do is dox this

15    fucking asshole, and then I ended up fucking adding CPS to the

16    fucking mix, and I called CPS, and they've got the phone call

17    of that.  So, like, you know, that's a different category of,

18    you know, it's not legal to do that.

19           What he's doing in this call, she's asking him, What

20    did your lawyers tell you?  He's talking basically in

21    hypotheticals this is the way the law works.  He's not even

22    charged with this at the time that he's making the statement.

23    This is not -- this hasn't been -- the extortion charge hasn't

24    been added to or the damage to reputation charge hasn't been

25    added to the indictment at this point.  But if you read the

1   fuller excerpt, he's talking, he says, You know, if you believe

2   the narrative, so he's really talking sort of hypothetically,

3   trying to explain to her what his lawyers have told them.

4   That's different than an admission to the offense.  So, I don't

5   think it's relevant.  I also think it's confusing and

6   potentially prejudicial, because it does -- if you isolate the

7   phrase that the government wants to put in, it does seem like

8   he's confessing to one of the charges, which he wasn't even

9   charged with at the time.  So, that would be our relevance and

10  prejudice objection.

11           If the Court is inclined to let it in --

12           THE COURT:  Can we focus on that one first?

13           MR. LEVIN:  I'm sorry.

14           THE COURT:  All right.  I don't see in here anything

15  that supports the conclusion that he's telling -- he's speaking

16  in hypotheticals and referring to legal advice.  I don't see

17  that.  Where is it?

18           MR. LEVIN:  Well, the first question she asks is,

19  "What does your lawyer have to say about this?"  He says,

20  "There's a limit to how much I can say on here, because they

21  would be sharing it with the prosecution."  And then he answers

22  her question:  "I mean, at the end of the day it's like this:

23  What they have, if you believe the narrative, if you just take

24  this thing as an isolated situation, it looks bad."

25           He's explaining, This is what my lawyers have told me.

**J.A. 604**

1    I'm like give me Vic, you know?  I'm alleged to have said I

2    should have -- I should say give me Vic.  I'm alleged to have

3    said, I should have said, give me Vic, he's more valuable and

4    I'm -- there is, there is, you know, there and my thing is

5    this:  I think that I can convincingly make the case that if

6    you don't want me to fuck your wife or whatever it's not a

7    threat, okay?  And like, and it literally just isn't, you know?

8    What I threatened to do is dox this fuckin' asshole and then I

9    ended up adding, fucking' adding CPS to the fuckin' mix, and I

10   called CPS, and they've got the phone call of that.  So, you

11   know, that's a different category of, you know, it's not legal

12   to do that.  But, like, that's not the crime that I'm accused

13   of right?  So, you know it would be pretty easy to go in there

14   and, like, make the case that, like, okay, you know, find him

15   guilty of a lesser count or something like this, you know?  And

16   then he says, Think that they're going to be able -- I don't

17   think they're going to be able to convince 12 people that fuck

18   your wife in front of your kids is a rape threat, is the moral

19   of the story.  So, I really don't believe that's the case.

20         THE COURT:  It strikes me, to the extent you're making

21   a 401 objection, that clearly is without merit.  So, your

22   argument would be based on 403, on confusion grounds,

23   essentially, that this would, in fact, be misleading or

24   confusing, because certainly under one reading of it it's a

25   statement from the defendant that he did, in fact, do

1    something, and that what he did he understood was not legal,

2    but he's not been charged with it at this time.  That's

3    relevant.  There's no question it's relevant.  Your argument is

4    it's misleading because in context it's clear that he's merely

5    saying, My lawyers are telling me that that would be illegal.

6              MR. LEVIN:  Right.  But that's not what I'm charged

7    with.  My lawyers are saying this would be illegal.

8              THE COURT:  Refresh my memory as to what the charge

9    was at that point.

10             MR. LEVIN:  At that point I believe the first, the

11   original first two charges in this case, the extortion threat

12   and the true threat, threaten to injure, were the only charges

13   in the indictment, what used to be Counts One and Two and now

14   are Counts One and dismissed.

15             THE COURT:  Okay.  So, you're saying the original

16   charges were what are Count One and Count Two of the

17   superseding; is that correct?

18             MR. LEVIN:  Yes.

19             THE COURT:  Okay.  So, the CPS charge, the (d) charge,

20   which I think of as the --

21             MR. LEVIN:  Right.

22             THE COURT:  I think of Count One as the

23   sexual-assault-type charge --

24             MR. LEVIN:  Right.

25             THE COURT:  -- and Count Three as the CPS charge.

**J.A. 606**

1          MR. LEVIN:  Right.

2          THE COURT:  -- and the CPS charge was not brought, had

3    not been brought at that point.

4          MR. LEVIN:  That's correct.  What he's describing

5    hadn't been brought.

6          THE COURT:  All right.  What's the government's

7    response under Rule 403, argument?

8          MS. KRASINSKI:  Well, I just disagree that at that

9    point he's talking about his lawyer's advice.  I mean, if you

10   look earlier he says, I think I can make the case.  He's now

11   talking about his opinion of what he thinks, and so when he

12   says later, What I threatened to do is dox this guy and ended

13   up adding CPS to the mix, that's an admission.  It is a clear

14   admission that he made threats and that --

15         THE COURT:  Well, it definitely is an admission that

16   he did those things, that's true.  The only question would be

17   "and that's illegal," that part of it.

18         MS. KRASINSKI:  And I think it's a fair -- I think

19   it's fair to include his understanding that his conduct is

20   illegal.  He's not saying, My lawyer told me it's illegal.

21   He's not saying that at all.

22         THE COURT:  Shouldn't, then, if I reject the Rule 403

23   argument, why shouldn't I err on the side of caution here and

24   admit the entire statement so that the parties can argue about

25   how it should be understood?  Certainly one option is

**J.A. 607**

1    Mr. Cantwell could testify and explain it.  He doesn't have any

2    obligation to do that, but in fairness, then, shouldn't I just

3    let the whole statement come in?

4         MS. KRASINSKI:  Actually, I think it is more confusing

5    with the entire statement than actually narrowing it to the

6    focused part that relates to the charges.

7         THE COURT:  It's less compelling for you, but that

8    doesn't mean it shouldn't come in.  I get it.  You want just

9    the most compelling part of it for you, but that's exactly what

10   Rule 106 is designed to prevent, that we don't pull things --

11   my reading of it, frankly, in the entirety is not the reading

12   of it that Mr. Levin gives to it, but Mr. Cantwell does not

13   clearly express in the first part of his statement what -- I

14   mean, he doesn't speak in carefully crafted paragraphs in the

15   first couple of paragraphs of his communication.  He's kind of

16   musing about what the situation is.

17        So, I agree that the grammar isn't great, the sentence

18   structure is not great, it's a little more confusing in the

19   beginning, but that's, I think, the defendant's point, is they

20   want to use that to say the best way to construe this

21   communication is simply Mr. Cantwell reflecting that he did do

22   -- and I don't think the defense will challenge this, because

23   the evidence on it seems to be so overwhelming -- he did make

24   the CPS, whether you call it a threat or not -- he's not going

25   to dispute that.  What he really wants to keep out is the one

1   sentence on, And that's illegal, right?  You're not going to

2   tell the jury there's reasonable doubt about whether Mr.

3   Cantwell actually ever indicated that he would call CPS or that

4   he ever called CPS, there's just substantial doubt about that.

5   I mean, that doesn't appear to be the theory that you're

6   advocating at trial here.  Have I got that right?

7          MR. LEVIN:  No, your Honor.  And I guess with regard

8   to the completeness argument I would say that either the whole

9   thing should come in, because it is more clear what he's

10  talking about and how the issue comes up and how he's trying to

11  sort of parse through what his lawyers have told them; or, if

12  the Court's not inclined to do that, then strike the last

13  sentence of Government's Exhibit 110A, which says, So, like,

14  you know, that's a different category of, you know, it's not

15  legal to do that.

16         THE COURT:  Yeah, that's the key statement you want to

17  try to keep out, and that's the key statement the government

18  wants to try to get in.  So, I don't think that inclusion of

19  everything in the -- the entire statement makes it more clear,

20  but that isn't the test.  Rule 106 doesn't say you can do it if

21  it's needed to make the statement's meaning more clear, right?

22  I don't have it in front of me.  Let me pull it out.

23                      (Pause)

24         THE COURT:  106 says, "If a party introduces all or

25  part of a writing or recorded statement, an adverse party may

**J.A. 609**

1    require the introduction at that time of any other part or any

2    other writing or recorded statement that in fairness ought to

3    be considered at that time."  Even if that doesn't increase the

4    clarity -- because I read it the way you do.  I read it as an

5    admission by the defendant that, Hey, these guys screwed up.  I

6    committed a crime, but they didn't charge me with the right

7    crime.  That's how I read it.

8         But I recognize Mr. Levin's point that the call is

9    prefaced with a statement about asking about what lawyers told

10   him, and it's not an admission if you simply say, Hey, I don't

11   know whether I've done anything wrong, but my lawyers told me

12   it's a crime, but that's not how I read the statement.  But I

13   think out of fairness Mr. Levin ought to be able to try to

14   argue for his interpretation.  Ultimately, it will be left to

15   the jury how to interpret the exhibit.

16        My view is it is not so clear either in the excerpt

17   you've presented or in its entirety that the probative value is

18   substantially outweighed by the danger of confusion, so either

19   in excerpt form or in its entirety I'm not inclined to exclude

20   the exhibit under Rule 403.  I also think the excerpt is

21   relevant.  But I do think that the defense ought to be given an

22   opportunity to have the full statement played to the jury and

23   ought to be given an opportunity to argue about the meaning

24   that should be given to it.

25        And so, my ruling on this one is you've persuaded me,

1   Mr. Levin, on your rule of completeness argument that the

2   entire call on 110A should be played.

3          MR. LEVIN:  It's not the entire call; it's just the

4   excerpt that we provided.  I think the entire call goes on

5   for --

6          THE COURT:  Okay.  So, I didn't understand that.

7          MR. LEVIN:  Yeah.  This is just the expanded excerpt.

8          THE COURT:  Okay.  So, you don't want the rest of it

9   in.  You want it all out, the excerpt out, the whole call out.

10          MR. LEVIN:  Right.

11          THE COURT:  I'm telling you I can't -- I'm denying

12   your request on 403, 401 grounds on that basis.  Your fallback

13   position is, if you aren't going to take the entire call out,

14   give the expanded excerpt we provided you, and I'm ruling on

15   that one that, under the rule of completeness, I'm ruling in

16   your favor, and the entire excerpt can be played.

17          MR. LEVIN:  Thank you, your Honor.

18          MS. KRASINSKI:  Your Honor, are you including in that

19   the second page of this, that, I don't think they're going to

20   be able to convince 12 people that fuck your wife in front of

21   your kids, is a rape threat?

22          THE COURT:  Why do you want to keep that -- I just,

23   like --

24          MS. KRASINSKI:  Your Honor, I'm just trying to make

25   sure we make the right clip.  That's all.

**J.A. 611**

1              THE COURT:  I just can't understand a lot of things

2      that lawyers are doing.  That evidence, that statement seems to

3      me to be damning for the defendant, and I just don't get it.

4      All right.  But, in any event, I have highly skilled lawyers

5      for the defense and the government, and you are better skilled

6      and better able to make technical judgments than I am.  As the

7      person trying to rule on things, it's easier for me to rule if

8      I understand what the parties are doing, and I just -- again,

9      this is another example of the parties fighting about things;

10     Please let me put in evidence that seems to me to be harmful to

11     the defendant, and the government saying, Please keep out the

12     evidence that is harmful to the defendant.  I'm just going to

13     let the entire call in, the whole thing.

14             MS. KRASINSKI:  I just want to do it right, your

15     Honor.  Thank you.

16             THE COURT:  All right.  And these are tactical

17     judgments that skilled lawyers have to make.  I want to be

18     clear about this.  That I see a different interpretation of

19     that evidence doesn't mean that the lawyers aren't justified in

20     pursuing what is in their judgment the best tactical approach

21     they can have to help their client or to help the government.

22     You're the experts on that matter, not me.  I'm explaining and

23     commenting on these things outside the presence of the jury,

24     because I have to rule on evidence, and when I don't understand

25     why people are trying to keep things out or why they're trying

1   to put them in, it's harder to rule.  That's why I'm explaining

2   these things.

3        Okay.  So, the defense wins on that.  You should

4   modify 110A, so you can mark it as 110B, which would be the

5   excerpt as expanded by the government, and that can be

6   admitted.

7        (Government's Exhibit 110B received into evidence)

8        THE COURT:  All right.  And so, that leaves us with

9   111A.  I didn't fully understand what the defense was giving

10  me, so what you're saying, Mr. Levin, with respect to 111A is

11  the government has proposed an excerpt, we've given you a

12  bigger excerpt, and we would like you to play the whole thing

13  if you're going to allow any of 111A.

14       MR. LEVIN:  That's correct.

15       THE COURT:  All right.  So, I'm sorry, I didn't

16  understand that.  Do you have a Rule 403 argument with respect

17  to 111A that the entire clip should be excluded?

18       MR. LEVIN:  Mr. Wolpin will address this.

19       THE COURT:  All right.

20       MR. WOLPIN:  It's just the same argument in regards to

21  what the charge was at the time.  He wasn't charged with

22  875(d).  He's having conversations of a technical statutory

23  nature with his attorneys and trying to explain that to the

24  outside world.  I think that should be excluded for the same

25  reasons that Attorney Levin just requested in the prior

**J.A. 613**

1    excerpt.

2              THE COURT:  All right.  Let me look at it.

3                         (Pause)

4              THE COURT:  All right.  Again, I think the defendant's

5    argument, to the extent it's based on Rule 401 and 403, the

6    statement does seem to be relevant because it -- it provides

7    the discussion in which the defendant is explaining that merely

8    doxing somebody is not a crime.  Threatening to dox by

9    extortion is a crime, which is one of the crimes he's charged

10   with here.

11             MR. WOLPIN:  Briefly follow up?

12             THE COURT:  Yeah, go ahead.

13             MR. WOLPIN:  One of my concerns is that, should

14   Mr. Cantwell testify, this is going to create a situation that

15   is going to be relatively confusing to the jury, which is

16   trying to explain that he wasn't charged with something at one

17   point, that the charges were changed, that he used to be

18   charged with this other thing.  I was looking at the ones I was

19   charged with.

20             It's going to create a degree of confusion, I think,

21   that has to be allowed, because he has to explain, if he

22   testifies, why he said the things he said, but it's going to

23   end up going down that process and that --

24             THE COURT:  Well, that's a little confusing to me that

25   you're making that argument in light of the position that you

1    took with respect to 110A, because with respect to 110A you

2    wanted to exclude the whole thing, but then your fallback

3    position is you need to include the rest of the statements,

4    which raises all these issues about what he was charged with

5    and wasn't charged with, and so I don't really credit that

6    argument very -- I don't give much credence to that particular

7    argument on your part, because it's inconsistent with the very

8    position you took with respect to the last exhibit.

9         But I understand your position that the entire thing

10   should be kept out.  Again, I don't think that the excerpt the

11   government proposes to introduce is confusing, that it's -- I

12   do think it is relevant.  I don't think there's any 403

13   consideration that requires its exclusion.  So, I overrule your

14   objection to the extent it's based on Rule 401 or Rule 403.

15        Now, I'm guessing -- this comes back to the very issue

16   where I just see the issue in such different terms from the

17   parties.  So, again, this is another example where the defense

18   seems to want to put in -- if they have to have anything from

19   111, it wants to put in statements like, Get away from me, and

20   you know I was trying to -- what I was trying to accomplish was

21   for a proper purpose.  I'm telling you to stop harassing me.

22   Leave me alone or I'm going to f-ing expose you.  All right.

23   That's a reasonable thing.  The liability enters when I say,

24   Give me Vic.  It's your only out.  So, okay, I didn't realize

25   that until Ryan emailed me about that later on, and so that's

**J.A. 615**

1    why I told Katelen that, you know, there's some liability, and

2    this is one of the things that they're using against me, okay?

3            Again, that seems to be, and I get it maybe as a sort

4    of general matter Mr. Cantwell wants to assert that, I was just

5    trying to protect myself, and I understand that, but it's not a

6    defense, or Mr. Cantwell might want to say, No, I didn't really

7    understand this was a crime when I did these things.  But

8    that's not a defense.

9            And so, if I introduce the excerpts that the defense

10   wants me to introduce, it will create confusion in the jury's

11   mind, but I can remedy that confusion by giving the

12   instructions on provocation is not a defense and ignorance of

13   the law is not a defense.  Maybe I just have higher confidence

14   than you folks do that the jury will follow my instructions,

15   but I think that's -- therefore, it doesn't seem to me that

16   what the defendant wants to produce is really useful to the

17   defense, but I'm inclined to err on the side of putting in the

18   entire call excerpt that the defense wants here.  Now, just

19   explain to me why I shouldn't do that.

20           MS. KRASINSKI:  Your Honor, I'm fine with including

21   the entire excerpt that's the first page of what they've sent.

22   I just want to make clear the second page is a totally

23   different part of the call.

24           MR. WOLPIN:  We would withdraw that.  We would agree.

25           THE COURT:  All right.  I appreciate that.  Thank you.

# J.A. 616

1          MS. KRASINSKI:  So, we'll change 111 to be the entire.

2          THE COURT:  Page 1.

3          MS. KRASINSKI:  Excuse me.  Yes, page 1 of --

4          THE COURT:  The excerpt.

5          MS. KRASINSKI:  -- the excerpt to be government's

6    exhibit --

7          THE COURT:  All right.  So, the defendant's 401, 403

8    and 106 arguments are preserved with respect to the two

9    exhibits, but I have granted the defendant's request with

10   respect to the 106 argument on both the excerpts that they've

11   presented to me, so that argument has been resolved in the

12   defendant's favor.  The defendant's 401 and 403 arguments are

13   preserved.

14          Okay.  Is there anything else that we need to address

15   before I bring the jury in?  Okay.

16          MR. WOLPIN:  May we just have two or three minutes

17   with Mr. Cantwell just to go over quickly some questions?

18          THE COURT:  Yes.  You don't need us out of here, do

19   you?  Are you telling me you need everybody to vacate the

20   courtroom?

21          MR. WOLPIN:  It has been a little bit of a challenge

22   just getting that time in.  Five or ten minutes?

23          THE COURT:  I have no trouble arranging for -- what

24   time does the defendant usually get here in the morning?

25          THE CLERK:  There's a courtroom set up for them to

1   meet.

2           MR. LEVIN:  He's been getting here at about 9:00.  So,

3   we did talk to them, and they've agreed to bring him into the

4   courtroom then so we can chat with him.

5           THE COURT:  So, there's another courtroom they can

6   bring him into?

7           MR. LEVIN:  I might also add yesterday we had lunch

8   with him across the hall.  They said they would do that.

9           THE COURT:  We'll stay here.  Mr. Cantwell will be

10  brought by the Marshal's people to the other courtroom.  You'll

11  go to the other courtroom and talk to him, but please, please,

12  please hurry, okay?

13          MR. WOLPIN:  We will.  I appreciate it.

14          MR. DAVIS:  Very briefly, Judge, we talked about the

15  redacted indictment.  We have not submitted a new indictment,

16  and I don't know if the jury actually gets an indictment, but,

17  if so, does the Court need the government to do a redacted

18  version that takes out Count Two now that it's dismissed?

19          THE COURT:  Yes.  I think the safer practice would be

20  to -- because I'm going to actually read -- I am amending my

21  charge to read the actual language of each of the three counts,

22  but I am referring to them as Count One, Two and Three.  So,

23  just giving them a redacted indictment would not work.  So, you

24  need to type up a new indictment.  You don't have to phony up a

25  signature or anything like that.  Just caption it "Indictment,

**J.A. 618**

1   Count One, Count Two, Count Three," all right, and that will be

2   a redacted version that will go to the jury so they'll get my

3   instruction, a redacted indictment and a verdict form and all

4   of the exhibits.  All right?  And I'll wait here.  Let's see if

5   we can get this done.  I appreciate the Marshals Service folks

6   accommodating us on that.  We'll move as quickly as possible

7   and try to get going as soon as we can.

8   (Defense counsel conferred with the defendant off the record)

9           THE COURT:  Are we ready to go?

10          MR. WOLPIN:  We have a question that may make sense to

11  bring this up now before we bring in the jury.

12          THE COURT:  Let's do it now.

13          MR. WOLPIN:  So, as the Court is aware, we have had

14  conversations and motions about items that would be played to

15  the jury to show why this witness would have concern about

16  liability in regards to his statements online.  I mean, I have

17  it not immediately teed up but not too far in, and obviously I

18  expect the government to object and then us to have a

19  conversation about whether it's admissible or not, so it seems

20  to make more sense to address --

21          THE COURT:  All right.  Roll.

22          MR. WOLPIN:  All right.  So, what I am seeking to

23  introduce on that regard are two clips from the BowlCast

24  involving this witness.  The first one involves him saying the

25  following.  This is E15.  Would the Court like us to play it or

**J.A. 619**

1    read for you --

2              THE COURT:  Reading it is fine.

3              MR. WOLPIN:  Okay.  And this is the type of system

4    they have built up in so many industries and they are -- they

5    have such hutzpah.  They have such, you know, they don't even

6    care.  They're not even trying to camouflage themselves

7    anymore.  They're almost to the point of coming out and saying,

8    Fuck you, whitey, because they have us, they have us, so the

9    only logical solution is to speak to them in a force they

10   understand.  I think that CEOs, I think that journalists, I

11   think that politicians need to feel the fear of the bullet.

12   They need to feel the fear of if I don't do the right thing, if

13   I do somebody wrong I'm going to fucking pay for it in a big

14   way.  That's how I feel.

15             THE COURT:  You think that exposes somebody to

16   criminal prosecution for saying that?

17             MR. WOLPIN:  I don't think the question is necessarily

18   whether it would result in criminal prosecution.

19             THE COURT:  Could it be a predicate for an

20   investigation?

21             MR. WOLPIN:  We have evidence that the FBI already in

22   this case was monitoring the BowlCast and their platform.  So,

23   the FBI is interested in them.  We know that.  We have

24   follow-up reports indicating that Vic Mackey was the subject of

25   an investigation for terrorism from the FBI.

**J.A. 620**

1          THE COURT:  But we don't know what the predicate was

2     for those things.  If I'm wrong I need you to tell me, but you

3     have been insistent on recognizing your client's First

4     Amendment rights not to be prosecuted unless the conduct

5     qualifies as a true threat under the First Amendment, and

6     insisting in trying to protect your client's rights I assume

7     you've become familiar with the true threat doctrine, and I

8     assume you've become familiar with case law that draws

9     distinctions between people who express reprehensible views and

10    even express views that others should die and where the line is

11    between a reprehensible, appalling statement and a criminal

12    statement.  And I have not studied the issue as you have,

13    because I haven't had to do it in the context of this case, but

14    my only moderately informed understanding is that statement

15    would not be a basis for criminal prosecution, it would not be

16    a predicate for a criminal investigation, because people have

17    First Amendment rights to think whatever they want and say

18    things that are reprehensible, outrageous but that don't cross

19    the line into true threat because they're not advocating

20    imminent violence against individuals.

21         Look, do I like this kind of stuff?  I do not.  I'm

22    not even saying I necessarily agree with what the First

23    Amendment doctrine is.  I'm telling you my understanding of

24    that doctrine.  And, as I understand that doctrine, saying

25    things like someone should come and shoot bullets into

**J.A. 621**

1   someone's grave clearly is a carefully crafted statement to try

2   to walk as close to the line of saying, I want this person to

3   die and I want you to go out and kill him, as you can without

4   crossing into the criminal behavior.  And people who engage in

5   this kind of rhetoric work very hard to find that line and try

6   to go as close to it as they can without crossing it.  Those

7   statements, I don't understand them to be a basis for criminal

8   prosecution or even investigation.  Do you?

9       MR. WOLPIN:  My client had a subjective expectation,

10   for example, that the FBI would be monitoring what he said.

11   These guys I know, because they talk about what they call "Fed

12   posting," which is an expectation that they are of interest to

13   the FBI for the violence that they talk about or I would argue

14   in that instance suggest is necessary at this time.  I think

15   it's the subjective question that this person certainly had

16   concerns that the FBI looked at him as a violent, dangerous

17   individual, and he was --

18       THE COURT:  All right.  We're after 10:00 now.  We're

19   over half an hour late for starting the day.  I simply can't go

20   on and on and on.  I get your basic point.  Let me briefly hear

21   from the government.

22       MR. DAVIS:  Briefly, Judge, the government does object

23   to this extrinsic evidence.  This whole area is only being

24   discussed because of the impeachment for bias doctrine.  The

25   government does not object to general questions of the witness

**J.A. 622**

1  on cross-examination about his fear as a prosecution, if any

2  that he had, by the FBI.  What the government's objecting to is

3  the extrinsic evidence, which is a step further in which the

4  impeachment --

5           THE COURT:  Let me stop and make sure I understand

6  your position.  Are you saying to me, Judge, if he wants to ask

7  the witness didn't you say in a BowlCast blah, blah, blah, and

8  weren't you afraid you were going to get prosecuted for that,

9  you would have no problem with that?

10          MR. DAVIS:  No.

11          THE COURT:  Because that's not extrinsic evidence.

12  So, it's not simply the extrinsic evidence; it is, in fact,

13  your position that under Rule 403 the probative value of that

14  statement is virtually nonexistent.

15          MR. DAVIS:  Correct.

16          THE COURT:  It isn't relevant because it doesn't tend

17  to show bias.  I've let the bias issue go extremely far here to

18  make sure that the defendant has a full and fair opportunity to

19  develop bias points.  I don't find this proffer to give rise to

20  admissible evidence on bias, and I'm not going to allow the

21  excerpt to be played.

22          Your objection is noted.  Do you have another one?

23          MR. WOLPIN:  At this point, no.  I had a second one.

24  I guess, yes, I'll address the second one very briefly.  In

25  that one he talks about, and this was a longer clip,

**J.A. 623**

1    essentially people needing to accept their role.  That role is

2    suggested to be involved with mass murder.  However, he says

3    he's not advocating violence, Vic Mackey chips in that he is,

4    and then they go back and forth about how we canonize these

5    guys and people need to take up this call.

6         THE COURT:  Look, I get it that you want the jury to

7    hate the witness and think everything he does and says and his

8    views are deeply offensive.  I get that, but that isn't a

9    legitimate basis on which the jury cannot credit his testimony

10   as truthful.  It has to be tied to -- and, again, I let you

11   take this argument about bias as far as I think you possibly

12   can, and now you've strayed into I just want to have things

13   that will dirty up the witness so the jury will hate him, and

14   that's not a sufficient basis, in my view.

15        Your objection is -- the government's objection to the

16   use of the statement is sustained, and you will not be allowed

17   to use it.  Your disagreement with me on that point is, of

18   course, preserved for purposes of the record.

19        MR. WOLPIN:  I'd note for the record that was Exhibit

20   E14 of the defense's.

21        THE COURT:  All right.

22        MR. DAVIS:  And just to respond to the Court's last

23   question, the government will object to a question about a

24   specific instance of a specific statement, we're likely to

25   object, such as these, even on cross.  What we don't object to

1    is general questions, because it's already in, the general

2    nature of what the BowlCast did.

3            THE COURT:  Every member of the jury fully understands

4    that the views that this witness has are reprehensible, and

5    we've allowed -- I've allowed abundant evidence on that point.

6            MR. DAVIS:  All right.

7            THE COURT:  All right.  Thanks.  Let's bring the jury

8    in.

9            THE CLERK:  All rise for the jury.

10               (The jury entered the courtroom)

11           THE COURT:  Good morning.  I apologize for the delay.

12   It's all on me.  I'm trying to make things run smoothly.  But I

13   want to tell you something.  We're doing fine in terms of the

14   schedule.  I expect that we'll have closing arguments and

15   charge on Monday.  So, it's a little bit ahead of the schedule

16   that I told you about, and there's a remote possibility we

17   could get to it on Friday, but I'm not optimistic on that

18   point.  So, for your planning purposes know we're okay, we're

19   moving ahead, and we'll have a good day of testimony today.

20   Everything we've been doing is to short circuit all of these

21   times when you're just sitting there and we're talking on the

22   headsets and I'm ruling on different arguments that the parties

23   present.

24           So, we're ready to begin, and the witness should

25   resume the witness stand.

**J.A. 625**

1    **BENJAMIN LAMBERT**, having previously been duly sworn,

2    was further examined and testified as follows:

3          THE COURT:  Sir, you understand you're still under

4    oath?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  All right.  Go ahead, Counsel.

7          MR. WOLPIN:  Thank you.

8          <u>CONTINUING CROSS-EXAMINATION</u>

9    <u>BY MR. WOLPIN:</u>

10   Q.   So, I wanted to pick up with some loose ends we left

11   yesterday before moving on.  Yesterday we had talked about a

12   particular meme that you created and you described but wasn't

13   available in a format to be viewed.

14         MR. WOLPIN:  Can we bring up for identification at

15   this point B-4-A?

16   Q.   All right.  So, now in front of you, I won't go through it

17   in the same detail again, but is this the same photograph or,

18   excuse me, same meme you identified yesterday?

19   A.   It is.  And it's colorized, but, yes, it is.

20   Q.   And this is the one created by you?

21   A.   Yes.

22         MR. WOLPIN:  I would ask this, move for this to be

23   stricken for ID and made a full exhibit.

24         MR. DAVIS:  No objection.

25         THE COURT:  No objection, it will be admitted and can

**J.A. 626**

```
 1   be shown to the jury.
 2            (Defendant's Exhibit B-4-A received into evidence)
 3   Q.   Just to do very briefly a reminder about what this was,
 4   this is Chris Cantwell in the white overalls?
 5   A.   Yes.
 6   Q.   And it's an FBI hat on his head?
 7   A.   Correct.
 8   Q.   And then the individual to the left is FBI Agent Dino
 9   Capuzzo?
10   A.   Yes.
11   Q.   Who is, again, known to investigate white nationalist
12   issues?
13   A.   Yes.
14   Q.   Okay.  Thank you.
15            MR. WOLPIN:  If we could bring up 216, which is
16   already a full exhibit, Government's 216.  Excuse me.
17   Q.   Now, this is a screenshot of the communication between you
18   and Mr. Cantwell; is that correct?
19   A.   That's correct.
20   Q.   I asked you yesterday about a song, and I guess I have a
21   little confusion as to the top portion of this has a play arrow
22   and the word "Wig Nasty" after it at 20:14.  Do you have an
23   explanation for that?  Do you understand that what that is?
24   A.   Yes.
25   Q.   So, that is, I presume, a song about Mr. Cantwell?
```

**J.A. 627**

```
 1    A.    No.

 2    Q.    Okay.  That is not a song about Mr. Cantwell?

 3    A.    No.

 4    Q.    Do you know why it appears in your chat with Mr. Cantwell?

 5    A.    Yes.  It's not actually in the chat itself.  That is a

 6    separate window.  He wouldn't have seen that.  It wasn't

 7    something that I sent to him.  It was a voice note sent by Wig

 8    Nasty, and it really has no bearing on the conversation with

 9    Cantwell.

10    Q.    Okay.  Thank you.  If we can move on to Government Exhibit

11    213, now, we had also some confusion about the timing of

12    things, and I wanted to make sure the timing was clear that

13    these are the last series of texts in this case?

14    A.    Yes.

15    Q.    And the final one arrives or it looks like it's sent at

16    9:42 p.m.?

17    A.    Yes.

18          MR. WOLPIN:  Just for the witness at this point,

19    because it's just for ID, can you bring up Exhibit A.

20    Q.    All right.  So, that's 9:42 on June 16th, correct, is the

21    final of those exchanges?

22    A.    Yes.

23    Q.    Is what you see before you is the BowlCast page, which we

24    reviewed yesterday?

25    A.    Yes.
```

**J.A. 628**

```
 1    Q.    Does that look familiar?
 2          MR. WOLPIN:  You can scroll down or highlight, excuse
 3    me, for the witness the date.
 4    Q.    This also is June 16th, 2019, correct?
 5    A.    Yes.
 6    Q.    Okay.  And on the next page we can see the public version
 7    that was posted on the BowlCast website, and if you can
 8    highlight the time on that below the first one.  So, that is
 9    shown as being posted online on June 16th at 22:57?
10    A.    That's correct.
11    Q.    Okay.  Which is 10:57 p.m., essentially?
12    A.    Correct, Central Time.
13    Q.    Okay.  So, at 9:42 p.m. it's over, and by 10:57 p.m. it's
14    up online that same day?
15    A.    Yes.
16    Q.    Now, if we can bring up Government's 102, which is a full
17    exhibit, this is the screenshot you later took of Radical
18    Agenda, correct?
19    A.    Correct.
20    Q.    And that's showing up as June 17th, 2019, if you look on
21    the left-hand side?
22    A.    Yes.  I'm familiar with it, yes.
23    Q.    Okay.  Yeah, it doesn't blow up too well.  And if we look
24    at the time frames, these pictures are being posted at 1:50
25    something a.m. on June 17th?
```

1    A.    Yes.

2    Q.    Okay.  So, at the time that your exchange was posted

3    online on the BowlCast these photographs hadn't been posted to

4    this Radical Agenda site?

5    A.    No, not those specific photographs.

6    Q.    All right.  And, as you understand now, no call to CPS had

7    been placed before the BowlCast posted your exchange?

8    A.    As I understand it, yes.

9    Q.    All right.  We can move on from that at this point.  Thank

10   you.

11          At the time that you received these messages you did

12   not seriously think that an incel listener was going to come to

13   your house and rape your wife?

14   A.    I knew that it was a very small chance that it would

15   happen, but that doesn't mean that there is no chance.

16   Q.    I guess the question I have again is did you take it

17   seriously that an incel listener was going to come to your

18   house and rape your wife after this exchange?

19   A.    Yes.

20   Q.    Now, you ended up speaking with the FBI in October,

21   correct?

22   A.    Correct.

23   Q.    And your intent in that conversation was to be direct and

24   honest with them, correct?

25   A.    I mean, correct.  It was obviously nerve-wracking, and I

**J.A. 630**

```
 1    felt as though I was under scrutiny.

 2    Q.   All right.  We'll talk about that in a minute.

 3              MR. WOLPIN:  If I could just have a moment to speak

 4    with the government?

 5              THE COURT:  Sure.

 6    Q.   So, when you spoke with the FBI in October you addressed

 7    this comment about incel listeners with the FBI?

 8    A.   If you could refresh my memory with the exhibit, that

 9    would be good.

10    Q.   Yes.

11              MR. WOLPIN:  So, if we could, I don't know if it's

12    easier here to either bring up D through the system or for me

13    to place it just for the witness only at this point to refresh

14    his recollection.

15              THE COURT:  So, you want to enable the web camera and

16    do it.

17              MR. WOLPIN:  That may be faster than trying to bring

18    it up and finding the page.

19              THE COURT:  All right.  We could do that.

20              MR. WOLPIN:  And I'll tell the Court there is an error

21    in the transcript, that's why I was discussing that with the

22    government, as far as a single word was miswritten by

23    agreement.  And this is now being presented just to the

24    witness.

25              THE COURT:  All right.
```

**J.A. 631**

1   Q.   Looking at what is highlighted, what you told them at the

2   time was that you did not think -- I'll phrase it in the exact

3   way you did.  Do I think that one of the incel listeners, incel

4   members of his audience was going to come rape my wife at the

5   time?  No.  Now?  Maybe.

6          Is that familiar?

7   A.   Yes.  That's familiar, yes.

8   Q.   So, what you told them is at the time it happened you

9   didn't seriously think an incel listener was going to come and

10   have sex with your wife?

11   A.   At the time I said that, because I had confidence in my

12   ability to defend myself from that happening and for my wife to

13   defend herself from that happening.

14   Q.   Now, the FBI came to your work, as we discussed yesterday?

15   A.   Yes.

16   Q.   And they made clear to you that they knew what the Bowl

17   Patrol was?

18   A.   Yes.

19   Q.   And that they knew who Cheddar Mane was?

20   A.   Yes.

21   Q.   And that they knew that you, Ben Lambert, were Cheddar

22   Mane?

23   A.   Yes.

24   Q.   And before the recording started, the FBI told you that

25   they had a CD of all the episodes where you were on the

**J.A. 632**

```
 1    BowlCast?
 2    A.   Yes.
 3    Q.   They told you that they were going to play the episodes of
 4    the BowlCast while they were interviewing you if you didn't
 5    cooperate with them?
 6    A.   No.
 7    Q.   Now, as we talked about briefly yesterday, you do have a
 8    friend within the Bowl Patrol by the name of Tactical Bowlcut?
 9    A.   Yes.
10    Q.   And he is named Robert Moeller by real name?
11    A.   Correct.
12    Q.   And for a period after the FBI came to you Mr. Moeller was
13    incarcerated?
14    A.   That's correct.
15    Q.   And you guys would have fairly regular conversations about
16    all kinds of topics, correct, over the phone?
17    A.   That's correct.
18    Q.   Including what was going on or what had gone on between
19    you and the FBI?
20    A.   Yes.
21    Q.   Okay.  And what you told him after the FBI came was that,
22    We were going to play the episodes of the BowlCast while we
23    were interviewing you if you weren't going to cooperate with
24    us.  That's how you described it to him?
25    A.   It is.
```

```
 1   Q.   Now, the Bowl Patrol or, excuse me, the FBI came after you
 2   like they were going to hold all of the Bowl Patrol stuff over
 3   your head?
 4   A.   That's what I told him, yeah.
 5   Q.   The FBI, when they came to you, it felt like to you that
 6   they were holding the Bowl Patrol stuff over your head?
 7   A.   That's what I told him.
 8   Q.   That's not quite the question I'm asking.  I'm asking you
 9   whether or not when the FBI came to you they held the Bowl
10   Patrol stuff over your head.
11   A.   No.
12   Q.   So, let's go back through that.  You had a conversation
13   with your friend soon after your interaction with the FBI,
14   correct, over the phone?
15   A.   That's correct.
16   Q.   That friend, again, is a member of the Bowl Patrol?
17   A.   Correct.
18   Q.   That friend is someone who you consider a very close
19   friend?
20   A.   I wouldn't say that, no.
21   Q.   That's someone you would send money to while he was
22   incarcerated?
23   A.   I did.  I did buy him, you know, one of those care
24   packages with the coffee and stuff in it, yeah.
25   Q.   And he's someone you would talk to on a regular basis
```

**J.A. 634**

1  about lots of things, about sports, about family, about what's

2  going on in the saga with Chris Cantwell?

3  A.   Yes.

4  Q.   And you told him over the phone that, They came after me

5  like they were going to hold all the BP stuff over my head.

6  A.   That's what I told him, yes.

7  Q.   Okay.  So, before the recorder was ever turned on the FBI

8  had told you they had listened to all of the episodes of the

9  BowlCast that you were on?

10  A.   I don't recall that specifically, so I can't really say

11  yes or no to that.

12  Q.   I thought you just testified to that a few minutes ago.

13  A.   Did I?

14  Q.   I believe so.

15  A.   Okay.  I mean, I'm sorry.  This is, you know, a little bit

16  stressful for me.

17       THE COURT:  Why don't you put your question again to

18  the witness.

19       And listen to what he asks and try to answer it.

20       THE WITNESS:  Okay.

21  Q.   All right.  So, when the FBI came to speak with you they

22  told you that they had listened to the episodes of the BowlCast

23  or had a CD of all the episodes of you on the BowlCast?

24       MR. DAVIS:  Objection.  Compound question.  It's

25  different to say they'd listened, to say that they had a CD.

**J.A. 635**

1          THE COURT:  All right.  Start again, Counsel.

2     Q.    Okay.  I can break it down.  Okay.  When the FBI came to

3     speak with you they told you, We have a CD of all the episodes

4     you've been on on the BowlCast?

5     A.    Yes.

6     Q.    And when the FBI came and told you that, they told you

7     that they were going to play them while we were recording you

8     talking to make you look bad, but they decided not to?

9     A.    I don't think that that actually happened.  I don't recall

10    at this point, no.

11    Q.    But, again, you had a conversation with Mr. Moeller far

12    closer in time to that interaction than it is today?

13    A.    Yes.

14    Q.    Okay.  And when talking with Mr. Moeller, you told him

15    that they said they were going to play the recordings while we

16    were talking to you to make you look bad, and we decided not to

17    do that?

18    A.    That's what I told him, yes.

19    Q.    Before the recorder went on the FBI threatened you with

20    saying that there was going to be CNN on your doorstep, because

21    if you did not help them they were going to tell CNN, *New York*

22    *Times*?

23    A.    That's what I told Ian, Robby.

24          MR. DAVIS:  Objection.  Hearsay.  This is improper

25    impeachment.  Counsel can ask --

**J.A. 636**

```
 1              THE COURT:  Hang on.  Hang on a minute.
 2              Right.  You can ask the witness, you can cross-examine
 3      the witness, And they told you this, didn't they?  And if he
 4      says, No, then you can deal with the alleged consistency:
 5      Well, you told Mr. So and So -- the FBI told you X, didn't
 6      they?  No, they didn't.  Well, you told Mr. So and So they told
 7      you X, didn't you?  Yes, I did.  That is an inconsistent
 8      statement that you can ask him about.
 9              MR. WOLPIN:  I thought that's how I prefaced the
10      question.
11              THE COURT:  I maybe didn't understand it, so I
12      apologize, but I have now explained to you what you can do, so
13      please go ahead.
14              MR. WOLPIN:  Yes.  Thank you.
15      Q.   When the FBI came to you they threatened you with saying
16      that they were going to have CNN on your doorstep, because if
17      you didn't help them they were going to tell CNN, *New York*
18      *Times*?
19      A.   No.
20      Q.   So, your testimony today is that they did not say that to
21      you?
22      A.   Correct.
23      Q.   Now, as we just went through, far closer in time to this
24      you had a conversation with Mr. Moeller?
25      A.   Yes.
```

**J.A. 637**

1    Q.   And that was on a recorded line?

2    A.   Yes.

3    Q.   And in that conversation you were talking to someone you

4    were friends with?

5    A.   Yes.

6    Q.   And you talked with him many times about what was going on

7    in the situation between you and Chris Cantwell?

8    A.   I did.

9    Q.   You were comfortable enough to talk to him about the fact

10   that you were speaking with the FBI, which you said is not

11   necessarily a positive in your movement?

12   A.   Yes.

13   Q.   So, this is someone you had some comfort or closeness

14   with?

15   A.   Yeah, you could say that.

16   Q.   And you told him that the FBI had threatened you, saying

17   there was going to be CNN on my doorstep, because if I did not

18   help them they were going to tell CNN, *New York Times*?

19   A.   That's what I told him, yes.

20   Q.   Now, that's what you told him, but you're saying at this

21   point that they did not say that to you when they were there?

22   A.   Yes.

23   Q.   Now, as we reviewed, the interview you had with the FBI

24   was recorded?

25   A.   Yes.

**J.A. 638**

45

```
1     Q.    Okay.  And you spoke with them.  There was a recording
2     device in the room at the police station?
3     A.    I didn't see a recording device in the room, but it was
4     recorded on a camera.
5     Q.    Okay.  And in that interview you told them, Right, and,
6     like you said, CNN.  I'm like fucking sitting on the porch?
7     A.    I don't recall saying that.
8     Q.    Okay.  Would it refresh your recollection to see the
9     transcript of what you said?
10    A.    Sure.
11          MR. WOLPIN:  Okay.  This is just for the witness.
12    A.    Yes.
13    Q.    Okay.  So, unprompted, you can see what happened before
14    and after, you told them, Like you said, I'm like fucking
15    sitting on the porch?
16    A.    Yes.
17    Q.    Do you remember whether there's any other mentions of CNN
18    in that interview that would explain why you were talking about
19    that?
20    A.    No.
21    Q.    And it's still your testimony that they did not tell you
22    or threaten you with CNN being on your doorstep if you did not
23    help them?
24    A.    They didn't threaten me with CNN being on my doorstep, no.
25    Q.    Now, the FBI had made it clear to you that they had
```

**J.A. 639**

1    listened to what you said on the BowlCast before the interview.

2    We established that, correct?

3    A.    Correct.

4    Q.    Okay.  So, they knew what kinds of things you said, if

5    they had listened to it?

6    A.    Yes.

7    Q.    And they made you aware of that before they sat down for

8    the recorded portion of the interview?

9    A.    I don't recall.

10    Q.    Now, if they had listened to the episodes of the BowlCast

11    they would have heard you talk about very violent things?

12    A.    Yes.

13    Q.    We've heard some of the jokes about rape but other violent

14    things about mass murder, about people needing to fear the

15    bullet, about dangerous things?

16    A.    About dangerous things and mass murder, sure.  Yes, yes.

17    Q.    Okay.  And the FBI would have been aware that there was an

18    Episode Number 7 of the Bowl Patrol, if they had listened to

19    all the ones that you were on?

20    A.    Yes.

21    Q.    And you're familiar with Number 7, correct?

22    A.    I'm familiar that I know that I was on it.  I don't

23    remember everything that was said by everybody on it.

24    Q.    Do you remember the title -- excuse me.  The title of

25    BowlCast Number 7 was *Taste of Terror*?

```
 1   A.   That sounds right, yeah.

 2   Q.   And that episode is the only episode that ultimately got

 3   taken down from the BowlCast, correct?

 4   A.   I don't know.

 5   Q.   Okay.  In that episode, the theme of the episode was how

 6   to cause terror in your community?

 7           MR. DAVIS:  Objection.  Rule 403, hearsay, relevance.

 8           THE COURT:  Put on the headsets.

 9   (SIDEBAR CONFERENCE AS FOLLOWS):

10           THE COURT:  Is this something different from what you

11   proposed to play and that I said you couldn't play?

12           MR. WOLPIN:  That was Episode 8.  This is Episode 7.

13   I'm done.  This was going to be the last question in the

14   series.

15           THE COURT:  All right.  You can move on, then.

16           MR. WOLPIN:  I would just renew simply the motion that

17   we had, the motion in the hearing we just had, I'd incorporate

18   the motion *in limine* hearing, and I'd note that we've now

19   established to some degree that he knew that they had listened

20   to the episodes, which provides --

21           THE COURT:  Hang on a second.  Counsel for the

22   government can't hear.

23           MR. WOLPIN:  Okay.  I'm just trying to finish the rest

24   of it.

25           THE COURT:  All right.  Now make your record.
```

**J.A. 641**

1          MR. WOLPIN:  In an effort to finish the record, I

2     would just incorporate the arguments made in the initial

3     motions *in limine* on this topic as well as the hearing we had

4     prior to the commencement of today's proceedings and note that

5     the foundation has been established that the FBI had told him

6     about his involvement in the Bowl Patrol and that they knew

7     about it, which is the rationale why we believe it's relevant

8     to show the seriousness of the items he said and why that would

9     be on his mind at the time he was meeting with the FBI.

10         THE COURT:  All right.  And I just want to make clear

11    for the record that I've given you extensive opportunities to

12    present to me any arguments you have about specific pieces of

13    evidence that you wish to introduce.  In fact, we took about a

14    half an hour at the beginning of court today to go over two

15    excerpts that you said you wanted to play.  None of those

16    concern BowlCast 7.  I don't know what's on BowlCast 7.  I only

17    know what you've done so far.  So, you haven't given me a

18    specific piece of evidence that you're trying to introduce.

19         There is abundant evidence in the record already

20    that's uncontroverted that this person and members of the Bowl

21    Patrol hold reprehensible views, they advocate violent conduct,

22    they are accelerations, and that they want to bring down the

23    government.  All of that is in front of the jury.

24         I don't have anything specific from you, so I have

25    nothing more that I can rule on.  So, since you have given me

**J.A. 642**

1   nothing more to rule on, I sustain the government's objection.

2           MR. WOLPIN:  I was just completing the record.

3           THE COURT:  And I'm just completing the record as

4   well.  Let's move on.

5   (END OF SIDEBAR CONFERENCE)

6   Q.   When you appear on the BowlCast there are discussions of

7   something called "fed posting," correct?

8   A.   Yes.

9   Q.   Okay.  And that's basically a compound word, "fed" and

10  "posting"?

11  A.   Yes.

12  Q.   And the idea is that you are saying something, meaning

13  posting, correct?

14  A.   Correct.

15  Q.   And that the fed portion of it is that it's something that

16  federal law enforcement would be interested in following or

17  hearing because of the nature of the content?

18  A.   Essentially, yeah, that's fair.

19  Q.   So, it's something where you're pushing the line of what

20  might be legal to gather the attention of federal law

21  enforcement?

22  A.   I don't know that you would want to gather attention of

23  federal law enforcement, but would it be something that could?

24  Yes.

25  Q.   And so, there are times when you say something and you

**J.A. 643**

1    say, This is fed posting or this is fed posting, acknowledging

2    it would be something that law enforcement would be interested

3    in hearing?

4    A.   Yes.

5         MR. WOLPIN:  Now, on a slightly different area but a

6    related area, I don't want to go down that road without asking

7    the Court, your Honor.  I apologize.

8         THE COURT:  All right.  So, there's another subject

9    you want to talk about but you need to make me aware of it.

10   All right.  Go put the headset on.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12        THE COURT:  Speak into the microphone.

13        MR. WOLPIN:  This is the issue raised in the motion *in*

14   *limine* prior to trial about threatening the FBI Agent Capuzzo

15   and talking about how that's fed posting and knowing that

16   essentially the FBI would know that he participated in a

17   conversation that threatened to kill and rape specific --

18        THE COURT:  All right.  I don't know what this is, so

19   I can't -- I need more information.  How much more

20   cross-examination do you have?

21        MR. WOLPIN:  Not a lot, your Honor.

22        THE COURT:  All right.  Go and finish everything else

23   you're doing, and when you're done I'll take a break and you

24   can explain what you want to do.  All right?

25   (END OF SIDEBAR CONFERENCE)

**J.A. 644**

1    Q.   So, in your conversations with the FBI it was important

2    for you that they see this all as performance art, correct?

3    A.   Correct.

4    Q.   And so, what you told them on numerous occasions was that

5    everything you had ever said on the Bowl Patrol was just

6    performance art?

7    A.   Yes.

8    Q.   Now, it was also important to you that the FBI see that

9    Ben Lambert is one person and Cheddar Mane was a different

10   person?

11   A.   That's correct.

12   Q.   It was important because of the kinds of things that

13   Cheddar Mane says online?

14   A.   Correct.

15   Q.   Now, do you personally think mass shootings are funny, or

16   is that just something that your character finds funny?

17   A.   I don't personally think mass shootings are funny at all,

18   no.

19   Q.   Okay.  So, as Cheddar Mane online you pretend they are,

20   but as Ben Lambert offline they are not funny to you?

21   A.   Yes.

22   Q.   Now, you had, as we said, quite a few conversations with

23   Mr. Moeller over the phone, correct?

24   A.   Yes.

25   Q.   And in those conversations, again, you're not appearing as

**J.A. 645**

```
 1    a character, correct?

 2    A.   No.

 3    Q.   You were appearing as -- well, not appearing -- you were

 4    speaking as Ben Lambert, correct?

 5    A.   It's not really that clear.  I mean, yes and no.

 6    Q.   When you're talking to your friend it's not for a public

 7    audience, correct?  This is a private call between the two of

 8    you?

 9    A.   It is a private call, yeah.

10    Q.   Okay.  And this is a call with someone, as we have talked

11    about, who you've considered a friend?

12    A.   Yes.

13    Q.   And in that call, in those calls, excuse me, you joked

14    about shootings?

15    A.   Yes.

16    Q.   You laughed about a shooting that happened in Jersey that

17    was a mass shooting?

18         MR. DAVIS:  Objection.

19         THE COURT:  Overruled.

20    A.   You'd have to refresh my memory.

21         MR. WOLPIN:  Okay.  So, it would ultimately be Exhibit

22    F23 I could put up just for the witness.  It would be a

23    transcript.

24    Q.   So, do you see Exhibit F23?

25    A.   Yes.
```

**J.A. 646**

```
 1              MR. DAVIS:  Can I just have a word with counsel?

 2              THE COURT:  Yes.

 3                   (Counsel conferred off the record)

 4   Q.   And in that call between the two of you, you were laughing

 5   about a shooting?

 6   A.   Yes.

 7   Q.   Now, your testimony yesterday was that you take doxing

 8   very seriously?

 9   A.   Yes.

10   Q.   And we've gone through who your friend is, and you've had

11   a number of conversations with him, and in speaking with him

12   you told him -- and in speaking to him you told him, you said,

13   Doxing people is not a big deal like it used to be?

14   A.   If you could show me.

15   Q.   Because it's so brief, I didn't make a transcript of it.

16   This is F24.  I could also play the recording, if that would

17   help you.

18   A.   Yeah, I think that was -- I can't remember exactly what

19   was said.

20   Q.   That doesn't refresh your memory?

21   A.   Not really.

22              THE COURT:  All right.  We can -- when we take our

23   break, we'll figure out a way to pursue that matter.  You can

24   play the recording for the witness outside the presence of the

25   jury and see if that refreshes his memory.
```

**J.A. 647**

54

 1    Q.    Now, in addition to the FBI having listened to the

 2    episodes of the BowlCast, the FBI would have seen that

 3    photograph of you with the pieces of paper on your tongue?

 4    A.    Yes.

 5    Q.    And in addition to having seen that, if they had listened

 6    to the BowlCast, they would have heard times where you talk

 7    about tripping?

 8    A.    Yes.

 9    Q.    Would have heard you talking about times where you took

10    strips of acid?

11    A.    Yes.

12    Q.    Hear you talking about dropping acid?

13    A.    Yeah.

14    Q.    Talking about it on a number of occasions?

15    A.    Yeah.

16    Q.    Now, you've talked about how you have firearms?

17    A.    That's correct.

18    Q.    And you had firearms before this interaction with Chris

19    and you had firearms after, it seems.

20    A.    Yes.

21    Q.    Okay.  So, you've been someone who's had guns for some

22    time?

23    A.    Yes.

24    Q.    So, you didn't go out and buy a gun in relation to this

25    June conversation?

**J.A. 648**

```
 1   A.    No.

 2   Q.    Okay.  Now, guns are very important to you, correct?

 3   A.    Yes.

 4   Q.    And something that you would not want to see taken away

 5   from you?

 6   A.    Of course not.

 7   Q.    And you knew when the FBI got there that they knew about

 8   this stuff about acid, and when they got there you told them

 9   you had a gun.

10   A.    Yes.

11   Q.    You were aware at the time that the FBI had prosecuted a

12   number of white supremacists for having a gun while a drug

13   user?

14   A.    I wouldn't say that, no, but I was aware that, you know,

15   it would be against the law to have a firearm and be a drug

16   user.

17   Q.    Okay.  And so, you told the FBI, as you did here today,

18   that you didn't use acid?

19   A.    That's correct.

20   Q.    Now -- I apologize.  Excuse me.

21                            (Pause)

22   Q.    When the FBI met with you after telling you about the Bowl

23   Patrol, they told you cooperating would be your opportunity to

24   get ahead of this?

25   A.    It was brought up during the interview, yes.
```

**J.A. 649**

1  Q.   And they told you that you had a lot to lose?

2  A.   Yes.

3  Q.   And they offered that Cheddar Mane could go off into

4  internet oblivion?

5  A.   Yes.

6  Q.   And you responded that you absolutely understood?

7  A.   Yes.

8        MR. WOLPIN:  If I could just have a moment, your

9  Honor.

10                      (Pause)

11        MR. WOLPIN:  Your Honor, other than that one area, I

12  would be done.

13        THE COURT:  All right.  Thank you.  And we'll reserve

14  your rights on that.  I will deal with it at the next break.

15        Let's have redirect, and we'll go for another 10 or 15

16  minutes, unless you finish with the witness before then,

17  Mr. Davis.

18        MR. DAVIS:  Thank you.

19        THE COURT:  And we need to take a moment to disinfect

20  here.

21                      (Pause)

22        THE COURT:  All right.  Go ahead, Mr. Davis.

23                  REDIRECT EXAMINATION

24  BY MR. DAVIS:

25  Q.   Let's talk about the avatar of you.  You recall being

**J.A. 650**

1   shown the picture of Cheddar Mane with the gun and the other

2   stuff?

3   A.   Yes.

4   Q.   So, how did you get that avatar?

5   A.   I had one of the other members of Bowl Patrol draw it for

6   me.

7   Q.   And why did you want it?

8   A.   Well, everybody else had a fancy avatar, and I didn't, so

9   I had him draw one for me.

10   Q.   All right.  And which member of Bowl Patrol drew it for

11   you?

12   A.   The one that goes by Illegal Aryan.

13   Q.   Illegal Aryan?

14   A.   Yes.

15   Q.   And did you actually pay Illegal Aryan to do your avatar?

16   A.   I did.

17   Q.   And how much did you pay for it?

18   A.   $75.

19   Q.   Okay.  Let's talk about prank calls.  Was there discussion

20   that you were aware of between members of Bowl Patrol and Mr.

21   Cantwell regarding his knowledge that prank calls were coming

22   in?

23   A.   Can you repeat it?

24   Q.   So, did Bowl Patrol and Mr. Cantwell ever discuss the fact

25   that prank calls were coming in and that at times they were

**J.A. 651**

 1   actually entertaining?

 2   A.   We didn't discuss it with him, no.

 3   Q.   All right.  Did Mr. Cantwell make suggestions about the

 4   timing of calls to the Bowl Patrol?

 5   A.   He did.

 6   Q.   All right.  Can you explain that?

 7   A.   There was a time when we were -- when there was --

 8           MR. WOLPIN:  Objection.  Relevance, your Honor.

 9           THE COURT:  Overruled.

10   A.   There was a time where there was a series of three prank

11   calls, and on the air Cantwell said, and I'll paraphrase, If

12   you want to prank the show, that's fine, but don't do it at the

13   beginning or the end of the show.  And that was pretty much it.

14   Q.   Okay.  So, you were asked -- let's talk about the meme.

15   You were shown the meme of Mr. Cantwell with the FBI hat and

16   the janitorial supplies?

17   A.   Yes.

18   Q.   And you drew up that meme, right?

19   A.   Correct.

20   Q.   Now, were you doing that meme to reveal a secret that no

21   one knew about?

22   A.   No.

23   Q.   That is, did anyone make a secret of Mr. Cantwell's having

24   made a complaint to the FBI about Vic Mackey and Mosin-Nagant?

25   A.   No.  In fact, on his website he had said specifically that

**J.A. 652**

1    he was going to, you know, forward information and forward all

2    the prank calls to the FBI.

3    Q.   All right.  Showing you Government Exhibit 112 in

4    evidence, I believe -- so that's Mr. Cantwell's account, right?

5    A.   Yes.

6    Q.   And it says, Today I submitted a criminal complaint to the

7    FBI, right?

8    A.   Yes.

9    Q.   And does it state exactly whom he named?

10   A.   It says that he named Vic Mackey and Mosin Nagant.

11   Q.   Okay.  So, is this generally known in the alt-right

12   community that Mr. Cantwell had called?

13   A.   Yes.

14   Q.   So, when you did this meme, are you outing him in some way

15   that he isn't already outed?

16   A.   No.

17   Q.   All right.  Let's talk about the chats.  You were shown

18   the chats and the time they ended.  Let's look at the chat on

19   Government Exhibit 219.  Do you have that?  That's in evidence.

20   A.   I see it.

21   Q.   Okay.  Now, that's actually your screenshot of that chat,

22   right?

23   A.   That's correct.

24   Q.   And that's from your perspective in Missouri, which is on

25   Central Time, right?

**J.A. 653**

```
 1    A.    That's correct.

 2    Q.    And do you remember defense counsel asking you if the

 3    chats ended at 9:45 p.m.?

 4    A.    Yes.

 5    Q.    And you agreed with that, right?

 6    A.    Yes.

 7    Q.    But that was Eastern Time, right?

 8    A.    That's correct, yes.

 9    Q.    And so, what time Central Time did the exchange with

10    Mr. Cantwell end?

11    A.    I can't see from this photo, but it would have been -- if

12    it was 9:45 Eastern it would have been 8:45 Central.

13    Q.    Can you see at the bottom of 219 it says 20:35?

14    A.    Yes.

15    Q.    So, that would be 8:35 p.m., right?

16    A.    Correct.

17    Q.    Okay.  So, you remember the thing that you wrote about

18    what happened that you posted on June 20th?

19    A.    I do.

20    Q.    And do you remember defense counsel asking whether you

21    described it as a pathetic dox?  Do you recall that?

22    A.    Yes.

23    Q.    So, you did say it was a pathetic dox, right?

24    A.    Yes.

25    Q.    So, can you explain what you meant?
```

**J.A. 654**

1  A.   That it was pathetic that he had done it, basically, you

2  know; just that it was a pathetic route to take, to do.

3  Q.   But explain that.  What do you mean it was a pathetic

4  route to take?  What do you mean by that?

5  A.   Because it was unnecessary.  You know, I made a mistake of

6  joining a chat, and so for him to turn around and do that

7  instead of letting me talk some sense into him, that was

8  pathetic.

9  Q.   All right.  Now, you were also asked on cross about the

10  screenshots of your draft message.  Do you recall that?

11  A.   Yes.

12  Q.   And you said you believed you sent that draft to Paul

13  Nehlen?

14  A.   Yes.

15  Q.   All right.  And the defense asked you, well, you didn't

16  turn them over in October when the FBI interviewed you.  Do you

17  recall that?

18  A.   Yes.

19  Q.   And you said, I didn't know I had them, right?

20  A.   Right.

21       MR. DAVIS:  All right.  And can we call up, just so we

22  know what we're talking about, they're both in evidence, the

23  draft screenshots.  I believe they're around 114.

24       MS. KRASINSKI:  117.

25       MR. DAVIS:  I'm sorry.  It's what?

```
 1              MS. KRASINSKI:  117.

 2    Q.    This is the screenshot we're talking about, Exhibit 117?

 3    A.    Yes.

 4    Q.    And the one after that.  So, tell the jury about how this

 5    came to be something that's an exhibit in the trial.  What

 6    happened?

 7    A.    I'm not sure I understand.

 8    Q.    When did you realize that you had this item, and what did

 9    you do about it?

10    A.    A couple of weeks ago I offered it to law enforcement.

11    Q.    And you sent it to them, right?

12    A.    Yes.

13    Q.    But why had you not sent it earlier?  That's the question.

14    A.    I didn't realize that I still had it in my phone.

15    Q.    And what did you have to do to actually find it?

16    A.    I had to go through a bunch of pictures on my phone.

17    Q.    And this was one of them?

18    A.    Yes.

19    Q.    And then you realized, Hey, I wrote this back when it was

20    happening?

21    A.    Yes.

22    Q.    And you sent it in, correct?

23    A.    Correct.

24    Q.    Okay.  And is that also true of the note that you wrote to

25    your lawyer?
```

1    A.   It didn't happen exactly the same way.  I had to search

2    back through my history of conversations with him on my phone,

3    and I realized, you know, wow, I have this on my phone, so I

4    screenshotted it and sent it in.

5    Q.   All right.  Okay.  So, you were also asked on cross about

6    after June 16th whether Mr. Cantwell contacted you.  Do you

7    recall that?

8    A.   Yes.

9    Q.   And it's true he didn't contact you after June 16th,

10   right?

11   A.   That's correct.

12   Q.   That is, he didn't call you, right?

13   A.   That's right.

14   Q.   And other than doxing you he didn't send other messages to

15   you, right?

16   A.   No.

17   Q.   And he didn't come to your door, actually show up in

18   Missouri, right?

19   A.   Correct.

20   Q.   Did you know what he was doing with law enforcement about

21   you at that time?

22   A.   No.

23   Q.   Did you know that in August, for instance, he was sending

24   pictures of your family to the FBI?

25   A.   No.

**J.A. 657**

```
 1   Q.   Did you know he was telling the FBI about you in
 2   interviews?
 3   A.   No.
 4   Q.   So, Mr. Cantwell hadn't forgotten you as of -- after June
 5   16th, right?
 6           MR. WOLPIN:  Objection, your Honor.
 7           THE COURT:  Sustained.
 8           MR. DAVIS:  I'll move on.
 9   Q.   You were asked about phone calls with Tactical Bowlcut.
10   Do you recall that?
11   A.   Yes.
12   Q.   And he was also in Bowl Patrol?
13   A.   Yes.
14   Q.   And he was a guy in jail, right?
15   A.   Correct.
16   Q.   And you sent him a care package?
17   A.   Two, yes.
18   Q.   And did you also talk to him on the phone regularly?
19   A.   Yes.
20   Q.   And is it fair to say the main thing you talked about was
21   sports?
22   A.   I don't really recall.
23   Q.   All right.  In any event, you said at one point, you were
24   asked on cross whether when you talked to Tactical you were Ben
25   Lambert or Cheddar Mane, right?
```

1    A.    Yes.

2    Q.    You were asked about laughing about a shooting, right?

3    A.    Yes.

4    Q.    And do you recall answering defense counsel, It's not

5    really that clear; it's not a yes-or-no answer?  Do you

6    remember that answer?

7    A.    Yes.

8    Q.    Can you explain that?  What were you saying there?

9    A.    Well, because I was still in the Telegram in the far

10   right, you know, one of the things that's really -- I mean, it

11   was kind of to pump up notoriety and to, you know, make it seem

12   like something that it wasn't, to kind of, I don't know, be

13   dramatic, tell him a story, you know, that was -- that would

14   keep me from looking like a snitch and make it seem like

15   something that it wasn't.

16   Q.    All right.  So, is looking like a snitch a good thing in

17   far-right circles?

18   A.    No.

19   Q.    All right.  And is most of what Mr. Tactical Bowlcut knew

20   about you from the Bowl Patrol?

21   A.    Yes.

22   Q.    Did he know much about you back then as Ben Lambert of

23   Missouri?

24   A.    I mean, he knew a little bit, yeah.  I mean, it was a mix.

25   Q.    All right.  Did you at one point tell Tactical on one of

1   those phone calls that you would have helped the FBI anyway,

2   regardless of whether they held Bowl Patrol over your head?

3   A.   Yes.

4   Q.   And can you explain that?  Why did you say that?

5   A.   Well, it goes back to not wanting to look like a snitch or

6   look like I was cooperating with the investigation.  I didn't

7   want to seem like I was cooperating.

8   Q.   But you said you would have helped them anyway, right?

9   A.   I would have?

10  Q.   Yes.

11  A.   I don't recall exactly.

12  Q.   All right.  So, let's talk about acid.  The defense

13  counsel asked you about a picture with the cardboard strips on

14  your tongue?

15  A.   Yes.

16  Q.   And you said that you talked about acid on BowlCasts?

17  A.   Yes.

18  Q.   And did you do that fairly frequently?

19  A.   I wouldn't say frequently, no, but the topic did come up,

20  yeah.

21  Q.   All right.  And why did you talk about acid on BowlCast?

22  A.   Well, one of the memes that is very common is -- well, it

23  kind of started off when there was after -- I'm not allowed to

24  say what it is.  After a rally there was kind of a split in the

25  movement where one faction was referred to as wignats, and this

**J.A. 660**

1  would be like -- and they were described as, you know, drug

2  users, you know, kind of white trash, basically, and so just to

3  act like that wasn't something that bothered anybody we would

4  meme about, you know, all the drugs we did and like sacrificing

5  cats and stuff like that, even though it wasn't true.  There

6  was a specific meme that said, Smoke meth, hail Satan, and it

7  was obviously done, you know, tongue in cheek.  And so, that's

8  kind of what that was all about, like, look at these wignats,

9  you know, they do all these drugs, they worship the devil and,

10  you know, perform satanic rituals and things like that.  So, it

11  was a joke.

12  Q.   All right.  Were you actually worried that, if anyone

13  looked into it, someone would decide you really were an LSD

14  user?

15          MR. WOLPIN:  I would object and ask to --

16          THE COURT:  Overruled.

17          MR. WOLPIN:  There's another issue this relates to.

18          THE COURT:  No.  We've got to move on.  You can make a

19  proffer at the next break.

20          MR. WOLPIN:  Thank you.

21  A.   Can you repeat the question, please?

22  Q.   The question is were you worried that if someone looked

23  into whether you, in fact, were an LSD user they would find

24  that you were an LSD user?

25  A.   No.

 1  Q.   All right.  Now, let's talk about the interview with the

 2  FBI briefly.  So, that happened on October 17, 2019, right?

 3  A.   Yes.

 4  Q.   That was a surprise to you?

 5  A.   It was.

 6  Q.   Do you recall the first thing you said to the FBI when

 7  they showed up?

 8  A.   Yes.

 9  Q.   What did you say?

10  A.   I told them that, you know, just to put it out there that

11  I was not a -- you know, I knew that the photo existed of me,

12  you know, doing acid, (indicating), which I wasn't really doing

13  it, and so I was concerned.  So, the first thing I said was

14  that I'm not a drug user at all, you know, and that wasn't real

15  acid.

16  Q.   All right.  But even before that do you recall when the

17  FBI very first came up to you a question you had about what

18  this was all about?

19  A.   Yes.

20       MR. WOLPIN:  Objection, your Honor.  This has been

21  asked and answered.

22       THE COURT:  Overruled.

23  Q.   What was your question?

24  A.   I said, Is this about Cantwell?  Does this have to do with

25  Chris Cantwell?

```
 1   Q.   That was the first thing you asked the FBI?
 2   A.   Yeah.
 3   Q.   And why were you asking about Chris Cantwell?
 4   A.   Because that was the only thing that I really thought it
 5   could be about at the time.
 6   Q.   All right.  And when you say the "thing," what thing are
 7   you talking about?
 8   A.   His threats to me.
 9   Q.   Okay.  Now, you were asked when you were interviewed by
10   the FBI when they asked you about incel listeners.  Do you
11   recall that?
12   A.   Yes.
13   Q.   And you were asked about whether you took it seriously.
14   Do you recall that?
15   A.   Yes.
16   Q.   So, do you recall saying to the FBI, when they asked you
17   about the incel listeners, Good luck with that?
18   A.   Yes.
19   Q.   All right.  So, why did you say, Good luck with that, and
20   what did you mean?
21   A.   What I meant was that I have confidence in my ability to
22   defend myself, and so if they wanted to try and commit some
23   sort of act against me and my wife, good luck, because I was
24   prepared to defend myself.
25   Q.   All right.  So, is it fair to say that you weren't too
```

**J.A. 663**

```
 1    worried about your ability to defend yourself, if necessary,
 2    with a gun, if someone showed up?
 3            MR. WOLPIN:  Leading, your Honor.
 4            THE COURT:  It is leading, but I'll allow that
 5    question.  Just don't lead, okay?
 6            You can answer that question.
 7    A.   Yes.
 8    Q.   Okay.  Were you also saying or were you saying you thought
 9    the thing about incel listeners was a joke?
10    A.   No.
11    Q.   All right.  So, let's talk about doxing.  You were asked
12    whether you said at one point that doxing is not a big deal.
13    Do you recall those questions?
14    A.   Yes.
15    Q.   Do you think doxing is a serious thing?
16    A.   Yes.
17    Q.   Has your life changed as a result of being identified as
18    Cheddarman?
19            MR. WOLPIN:  Objection, your Honor.
20            THE COURT:  Overruled.
21    A.   Yes.
22    Q.   And, Mr. Lambert, what's your favorite sport?
23    A.   Hockey.
24    Q.   Hockey?
25    A.   Yes.
```

**J.A. 664**

```
 1   Q.   And are you a hockey fan?

 2   A.   I am.

 3   Q.   And you also are a hockey player?

 4   A.   Yes.

 5   Q.   And are you also a hockey dad?

 6   A.   I am.

 7   Q.   And did you have plans about being a hockey coach for one

 8   of your children?

 9        MR. WOLPIN:  Objection, your Honor.  This is beyond

10   the scope.

11        THE COURT:  I'm not sure where you're going with this.

12        MR. DAVIS:  It's relevant to the issue of substantial

13   emotional distress, your Honor.

14        THE COURT:  All right.  Overruled.  Wrap it up.  Move

15   on to a different subject.

16        Your objection is overruled.

17   Q.   What were your plans?

18   A.   Well, I'm sorry, this is hard.  Can I just get a minute?

19   This is --

20                        (Pause)

21   Q.   Sure.

22   A.   I was supposed to coach my son's hockey team.

23   Q.   All right.  I just have one more question.

24   A.   Now I can't do it.

25   Q.   Okay.  And can you not do it because you've been
```

**J.A. 665**

```
 1    identified as a Bowl Patrol member?

 2    A.   Yes.

 3    Q.   All right.  Now, just one other thing I wanted to show

 4    you, and that is your phone calls to Chris Cantwell.  Do you

 5    recall that?

 6    A.   Yes.

 7    Q.   All right.  Let's look at Exhibit I-2-B in evidence.  You

 8    testified you made prank calls over a period of time.  Do you

 9    remember that?

10    A.   Yes.

11    Q.   And those calls ended sometime in early 2019; is that

12    right?

13    A.   Correct.

14    Q.   All right.  I'm asking you to look at I-2-B.  I thought it

15    was I-2-B.

16            MR. DAVIS:  I thought it was I-2-B.

17            MR. WOLPIN:  It is.  There was a typo.

18    Q.   All right.  Do you recognize the phone number at the top

19    of I-2-B, Mr. Lambert?

20    A.   Yes.

21    Q.   And is that your cell phone number, 636 ending in 1958?

22    A.   Yes.

23    Q.   All right.  And there's a bunch of calls starting in

24    February of 2018, right?

25    A.   That's correct.
```

**J.A. 666**

1    Q.   All right.  Let's go to the next page briefly.  Now, just

2    for the record, these aren't all prank calls, right?

3    A.   Correct.

4    Q.   All right.  Let's go to the next page.  And by now we're

5    in December of 2018, right?

6    A.   Yes.

7    Q.   At the end, 71?

8    A.   Yes.

9    Q.   And let's go to the last page.  Okay.  Do you see call

10   number 79?

11   A.   Yes.

12   Q.   And what's the date of that call?

13   A.   January 30th, 2019.

14   Q.   Okay.  And do you see call number 80?

15   A.   Yes.

16   Q.   And what's the date of that call?

17   A.   June 21st, 2019.

18   Q.   So, is it fair to say that for over five months there's no

19   phone calls from your cell phone to Mr. Cantwell?

20   A.   That's correct.

21   Q.   Had you left him alone as of June 15th, 2019?

22   A.   Yes.

23        MR. DAVIS:  No further questions.

24        THE COURT:  All right.  Thank you.  We'll take our

25   late mid-morning break, and we'll bring you back in about 15

```
 1    minutes.  I have to do one other thing with the lawyers.  I'm
 2    not sure how long it will take.
 3              THE CLERK:  All rise.
 4                  (The jury exited the courtroom)
 5              THE COURT:  All right.  Mr. Wolpin, what is it that
 6    you want to do that you haven't yet done?
 7              MR. WOLPIN:  I think the only two outstanding issues
 8    from the initial cross were the Tactical Bowlcut statement
 9    regarding --
10              THE COURT:  Can we play that?
11              MR. WOLPIN:  Maybe we could give the witness a minute.
12              THE COURT:  All right.  Let me know when you're ready,
13    Mr. Lambert.
14              But key it up so that we can go.
15              THE WITNESS:  I'm good.  Go ahead.
16              MR. WOLPIN:  Okay.  The Tactical Bowlcut, F24.
17                  (Audio recording played)
18              THE COURT:  Okay.  Does that refresh your memory as to
19    what you said to Tactical --
20              THE WITNESS:  Yes.
21              THE COURT:  Is it Tactical Bowlcut?
22              THE WITNESS:  Yes.
23              THE COURT:  Okay.  What you said to Tactical Bowlcut?
24              THE WITNESS:  Yes.
25              THE COURT:  So, if the lawyer asked you in front of
```

**J.A. 668**

1 | the jury, Did you, in fact, have a conversation with Tactical
2 | Bowlcut in which you said those words, you'll say, Yes, your
3 | memory is refreshed and you did, in fact, say those words?
4 |         THE WITNESS:  Yes.
5 |         THE COURT:  Okay.  So, do you want to do that in front
6 | of the jury, Mr. Wolpin?
7 |         MR. WOLPIN:  Yes, please.
8 |         THE COURT:  All right.  So, you'll be allowed to do
9 | that.
10 |        MR. WOLPIN:  I'm sorry.  I had split attention.  I
11 | will be able to play it, or I should just ask the witness?
12 |        THE COURT:  You'll be able to ask him his memory is
13 | now refreshed, and he will acknowledge that, in fact, he did
14 | say that in front of the jury to Tactical Bowlcut.  What's the
15 | other issue?
16 |        MR. WOLPIN:  The other issue is we had raised the
17 | question of a fed posting in a specific example of a group
18 | conversation that discussed --
19 |        THE COURT:  I'm still not, based on your questioning
20 | and his answers, really understanding what -- do you and he
21 | agree on what fed posting is and what it is?  So, why don't you
22 | tell me with your understanding is, and then I need to
23 | understand what the witness is saying, and then I can evaluate
24 | your argument.
25 |        MR. WOLPIN:  So, the idea of fed posting is that you

**J.A. 669**

1    say things online to draw the -- pique the interest of federal

2    law enforcement.  So, it's this idea of going right to the

3    line.

4             THE COURT:  So, you're thinking that, when you say

5    "pique the interest," it's actually to cause the Feds to pay

6    attention to you?

7             MR. WOLPIN:  It's used as a weapon by some people for

8    that purpose.

9             THE COURT:  That's what I'm trying to -- let me just

10   be sure I understand.  You're saying people come in and say

11   outrageous things not so that the Feds will investigate them

12   but so the Feds will investigate other people?  Is that what

13   you're trying to imply?

14            MR. WOLPIN:  There are multiple purposes.  One purpose

15   is, if you do it to somebody else, to get that effect.  If you

16   do it yourself it's sort of a proof of your extremity, that

17   you're saying things that are that far over the limit that --

18            THE COURT:  So, some people might say, I'm fed

19   posting, as a boast to show other like-minded individuals I'm

20   willing to make a statement that goes right up to the line of

21   legality?

22            MR. WOLPIN:  And in this specific instance -- -

23            THE COURT:  Can you just say yes or no to me?

24            MR. WOLPIN:  Yes, yes, yes.

25            THE COURT:  Okay.  And then there are other purposes.

## J.A. 670

1    Is one of the purposes you think to make a statement that will

2    cause the Feds to pay attention to someone else?

3            MR. WOLPIN:  Correct.

4            THE COURT:  All right.  And is that the type of fed

5    posting you're talking about here?

6            MR. WOLPIN:  No.  The reason we're saying it's

7    relevant is because it relates to this group of people saying

8    things that they recognize bring the attention of the FBI.

9            THE COURT:  But that they know are not criminal?

10           MR. WOLPIN:  Well, they then say, We might have gone

11   over the line.  So, that's the issue.

12           THE COURT:  Do you have a specific example in which

13   Mr. Lambert said, I just may have gone over the line in

14   something that I've said?

15           MR. WOLPIN:  This one is a group conversation while

16   everyone's chipping in left and right, so I can't say --

17           THE COURT:  Read it to me.

18           MR. WOLPIN:  I have -- if I can have a moment.

19           THE COURT:  Can you read it or give me the written

20   version?  Because when you play these excerpts I basically

21   can't understand who's saying what most of the time.

22           MR. WOLPIN:  I just need a moment, because it got

23   mixed in with my other stuff.

24           THE COURT:  All right.  While you're doing that, Mr.

25   Lambert, "fed posting," what do you understand "fed posting" to

**J.A. 671**

1   mean?  Has the lawyer described it correctly to me?

2        THE WITNESS:  It's a complex thing.  Like, fed

3   posting, you know, so there chats where you say, No fed

4   posting, which means, you know, nothing that goes to that line.

5   I mean, it can be used in so many different ways, and there's

6   not really like an official definition of it.

7        THE COURT:  Is fed posting said in reference to

8   something that approaches the line of illegality?

9        THE WITNESS:  Yes.

10        THE COURT:  So, if a statement is a fed posting

11   statement, it's something that purportedly goes up to the line

12   but not over the line of illegality?

13        THE WITNESS:  Correct.

14        THE COURT:  Okay.  So, it could be used in a variety

15   of contexts, but what it refers to is a statement that goes up

16   to but not over the line of illegality?

17        THE WITNESS:  I mean, you could actually use it to say

18   that, you know, somebody is going over the line of illegality,

19   but, I mean, usually that's not the case.

20        THE COURT:  All right.  So, it's a slang term that has

21   a meaning in this subculture that refers to a statement that

22   someone might make that is at or over the line of legality?

23        THE WITNESS:  Correct.

24        THE COURT:  And why it's called "fed posting" is

25   because you're making the statement in a forum where it's

**J.A. 672**

1    posted, and it's the kind of statement that, because it's close

2    to the line, that could attract the interest or attention of

3    government investigators?

4              THE WITNESS:  Correct.

5              THE COURT:  Okay.  Now, when you're ready, Mr. Wolpin.

6              MR. WOLPIN:  Okay.  So, this is a conversation from

7    the BowlCast episode.  I have a shorter version and a longer

8    version.  The longer version begins, This is easily the most

9    fed posting episode.  I love it.  It's close to over the line,

10   it really is.  And then they go on to talk about Dino Capuzzo.

11   Then what happens is we are busy fed posting.  That was really

12   fed posting.  That was really good.  Dino Capuzzo, you should

13   have raped, yeah, raped, you know, Capuzzo is the fucking front

14   post, dude, so money that could literally just be the episode

15   write-up, rape Dino Capuzzo.  Yeah, no, no, who was that?  Who

16   was the fucking, redacted, who just did that?  No, I'm not a,

17   redacted, anymore.  Who just did that?  Special Agent Dino

18   Capuzzo.  I know you did that.  Who raped Dino right now?

19   1690, rape Dino Capuzzo to death.  I do a lot of voices.  Will

20   you rape Special Agent Peach voice.  That was mine.  Can we

21   rape Dino Capuzzo with Special Agent Peach?  That would be

22   hilarious.  This is getting awfully ambitious.  You guys just

23   did it.  You just did it, dude, you just did it.  All right.

24   You guys just did it.  It was damn near perfect, and now you're

25   saying we can't do it again.  I'm just trying to think of a way

**J.A. 673**

1    we can wrap this up.

2        THE COURT:  Were any of those speakers are you

3    alleging was Mr. Lambert?

4        MR. WOLPIN:  One that I can identify is at the

5    initial, It's close to over the line it really is.  The rest

6    are people doing voices, and so, no, I cannot.

7        THE COURT:  Are you alleging that any of the

8    statements that are being referred to as over-the-line

9    statements were statements by Cheddar Mane?

10        MR. WOLPIN:  I can't identify that, your Honor.

11        THE COURT:  This is cumulative of abundant other

12    evidence that I've allowed you to get into on this point, and

13    I'm going to sustain the government's objection on Rule 403

14    grounds.  There is minimal, if any, relevance to the statement.

15    Its relevance is clearly substantially outweighed by the

16    cumulativeness of it.  And the danger that I have to say I

17    think is being courted by the defense, that to invite the jury

18    to not credit a witness because they hold reprehensible views

19    rather than for any legitimate purpose.

20        And I just, I really have gone to extraordinary

21    lengths to give your client every opportunity to put in every

22    piece of relevant evidence that I can possibly allow without

23    completely wasting the jury's time.  You have had abundant

24    evidence put in the record about what Mr. Lambert's

25    reprehensible views are, about his statements about violence,

**J.A. 674**

1    and I have allowed you to put in the specific statements that

2    Mr. Lambert has made, even ones that he made in a private

3    communication where he says he was joking.  You've had a fair

4    and full opportunity to develop this aspect of your case.

5           So, I overrule -- to the extent the government is

6    objecting to the admission of this statement, I sustain the

7    government's objection.

8           All right.  What else?

9           MR. WOLPIN:  For record purposes, that was defense

10   Exhibit E25.  I believe that finishes what we had.

11          THE COURT:  All right.  So, we'll bring the jury back.

12   You can play -- excuse me -- you can inquire of him, I want to

13   take you back to the phone call you had with Tactical Bowlcut,

14   and I want to ask you again did you, in fact, say to Tactical

15   Bowlcut whatever it is he said, and he'll say, Yes, I did, and

16   then we can end this.

17          Is there anything else you need to do on

18   recross-examination, if I allow it?

19          MR. WOLPIN:  I have maybe one or two areas.

20          THE COURT:  What are they?  I don't normally allow

21   recross.

22          MR. WOLPIN:  The government went and elicited more

23   information saying that he said to leave him alone.  There is a

24   post online that he says, Do your worst, to him that

25   contradicts that at this point.

**J.A. 675**

```
1          THE COURT:  We've already covered that.  That's
2    already been covered at length, has it not?
3          MR. WOLPIN:  No.  He's denied that.  He has asserted
4    that he was not telling others to do their worst to Cantwell.
5          THE COURT:  I'm sorry.  I'm confused.  I thought you
6    were referring to his kind of bravado statements to Cantwell.
7    Are you talking about something else?
8          MR. WOLPIN:  In March there is a post that, contrary
9    to the statement, I told everyone to leave him alone, there was
10   a statement made on social media to -- it's C21 so I can be --
11   March of this year:  I wash my hands of the entire situation.
12   Last year, excuse me, 2019.  Do your worst on Cantwell.  He is
13   clearly unhinged, clearly --
14         THE COURT:  Slow, slow, slow.
15         MR. WOLPIN:  I'll give it another try.  I apologize.
16   I wash my hands of the entire situation.  Do your worst on
17   Cantwell.  He is clearly unhinged, clearly bottom texting his
18   butthole with meth again, and he needs to probably seek medical
19   detox.  Nobody likes him anymore, and he should probably walk
20   off a cliff.
21         THE COURT:  All right.  So, that has not come in.  I
22   thought you were referring to statements he was making to
23   Cantwell, but this is some kind of -- did he make it on the
24   Bowl Patrol channel?  Where was this made?
25         MR. WOLPIN:  He will have to, obviously, authenticate
```

J.A. 676

1    it.  It's under Cheddar Mane 1690 at Cheddar Mane, public post.

2              THE COURT:  Mr. Davis, where does this date fit within

3    the timeline of the examination that you were conducting with

4    him about the phone calls and having left him alone?

5              MR. WOLPIN:  This is February.

6              THE COURT:  I'm asking Mr. Davis.

7              MR. DAVIS:  It's March 5th of 2019, which is within

8    the period of time.  That is, it's after the phone calls

9    stopped but three months before the June --

10             THE COURT:  All right.  But there was a suggestion, an

11   implication in your redirect that he was leaving Cantwell

12   alone --

13             MR. DAVIS:  Yes.

14             THE COURT:  -- between January and June.  This was

15   during that period.

16             MR. DAVIS:  Yes.

17             THE COURT:  So, I will allow that line of inquiry.

18   What else have you got?

19             MR. WOLPIN:  That's all.

20             THE COURT:  All right.  So, we'll take a break.  If he

21   doesn't go into other areas, Mr. Davis, I'm not going to allow

22   any re-redirect; you're just going to have to live with it.  If

23   something shocking should happen, you can ask, but don't expect

24   your request to be granted, unless it is truly something

25   unusual and shocking.  We need to get Mr. Lambert over with and

```
 1   out of the courthouse.  So, we'll take a short break, come
 2   back, finish this.  The government can be ready to call its
 3   next witness.
 4            THE CLERK:  All rise.
 5               (Recess taken from 11:39 a.m. to 11:45 a.m.)
 6            THE CLERK:  All rise.
 7               (The jury entered the courtroom)
 8            THE COURT:  All right.
 9            MR. WOLPIN:  All right.  If we could bring up
10   Exhibit C-21 for ID just for the witness.
11                     RECROSS-EXAMINATION
12   BY MR. WOLPIN:
13   Q.   Before you is a social media post; is that correct?
14   A.   Yes.
15   Q.   Okay.  And the nameplate is Cheddar Mane 1690 RWH?
16   A.   Yes.
17   Q.   This was an account of yours?
18   A.   Yes.
19   Q.   And this is a post from March 5th, 2019?
20   A.   Yes.
21   Q.   And in this post from March 25th, was this made public?
22   A.   Yes.
23   Q.   And in it you wrote, among other things, Do your worst on
24   Cantwell?
25   A.   Yes.
```

**J.A. 678**

```
1    Q.   And I would ask that -- again, just to be clear, this is

2    your account?

3    A.   Yes.

4    Q.   And your post?

5    A.   And my what?

6    Q.   And your post?

7    A.   Yes.

8         MR. WOLPIN:  All right.  I would move that the ID be

9    stricken from C-21 and it be moved in as a full exhibit.

10        MR. DAVIS:  No objection.

11        THE COURT:  No objection, it will be admitted.

12    (Defendant's Exhibit C-21 received into evidence)

13        MR. WOLPIN:  We can move on.

14   Q.   Now, I had previously asked you about a conversation you

15   had had with your friend in Florida.

16   A.   Yes.

17   Q.   Specifically, the one about doxing.

18   A.   Yes.

19   Q.   And at the time you couldn't remember whether you had said

20   that, correct?

21   A.   Yes.

22   Q.   And in the break we had did you have a chance to listen to

23   that recording?

24   A.   I did.

25   Q.   Okay.  And that recording was, in fact, of you?
```

**J.A. 679**

```
1   A.   Yes.
2   Q.   And in that recording you said, Doxing doesn't have the
3   same effect it used to?
4   A.   At the time that's what I believed, and that's what I
5   said.
6   Q.   And doxing people is not really a big deal like it used to
7   be?
8   A.   I was telling that to myself as much as I was telling it
9   to anybody.
10          MR. WOLPIN:  Thank you.
11          THE COURT:  Thank you, sir.  You can step down.  You
12  are released from your subpoena.  You can call your next
13  witness.
14                (Witness stepped down)
15          MR. DAVIS:  Paul Nehlen.  I can probably, Judge, if it
16  helps move things, question from here.
17          THE COURT:  All right.  That's fine.
18                      (Pause)
19          THE CLERK:  Please raise your right hand.
20          PAUL NEHLEN, duly sworn by the Clerk.
21          THE CLERK:  Thank you.  Would you please state your
22  full name and spell your last name for the record.
23          THE WITNESS:  Paul Nehlen, N-e-h-l-e-n.
24          THE CLERK:  Thank you.  You may be seated.
25          THE COURT:  You can proceed when ready, Mr. Davis.
```

**J.A. 680**

87

1                        DIRECT EXAMINATION

2   BY MR. DAVIS:

3   Q.   Mr. Nehlen, what town do you live in?

4   A.   Sullivan, Wisconsin.

5   Q.   In Wisconsin?  And what's your occupation, please?

6   A.   Business owner, inventor.

7   Q.   Okay.  And in what particular area?

8   A.   Filtration.

9   Q.   All right.  Do you know the defendant in this case,

10  Christopher Cantwell?

11  A.   I do.

12  Q.   And have you ever met with him personally?

13  A.   I have not.  Just online.

14  Q.   All right.  So, how long have you known him online?

15  A.   I think I was on a podcast of his maybe a few times

16  starting in 2017.

17  Q.   Okay.

18  A.   Or 2018, maybe.

19  Q.   And were you actually interviewed by Mr. Cantwell at one

20  point?

21  A.   I was.

22  Q.   And how many times?

23  A.   Once or twice.

24  Q.   And do you recall what years you were interviewed by

25  Mr. Cantwell?

**J.A. 681**

```
1    A.    I think it was 2017, when I was running for Congress.

2    Q.    Are you also acquainted or were you acquainted with a chat

3    group called Bowl Patrol?

4    A.    Yes.

5    Q.    And were you known by a particular nickname by members of

6    the Bowl Patrol?

7    A.    A nickname?

8    Q.    Were you sometimes called Uncle Paul?

9    A.    Oh, Uncle Paul, okay.  Sure.

10   Q.    Yes?

11   A.    Yes.

12   Q.    Okay.  In particular, did you know a person named Benjamin

13   Lambert?

14   A.    Yes.

15   Q.    And of all the Bowl Patrol members, which one did you feel

16   like you knew the best?

17   A.    Well, I guess I don't know what you mean by "members,"

18   necessarily.  I know Ben.  I would say I probably know Ben the

19   best.

20   Q.    All right.  That's all I'm asking.

21   A.    Okay.

22   Q.    So, when did you first meet Ben Lambert?

23   A.    It was while I was running for Congress in 2017.

24   Q.    Okay.  And did you meet him online also?

25   A.    Yeah.
```

**J.A. 682**

```
1    Q.   And how would you characterize your relationship with Ben
2    Lambert?
3    A.   Friendly.
4    Q.   Friendly?  Okay.  How frequently do you communicate or did
5    you communicate?
6    A.   Online or via text message.  Maybe we text-messaged each
7    other every few months or something.
8    Q.   Okay.  And do you recall whether Mr. Lambert has actually
9    visited you at your home in Wisconsin?
10   A.   Yes.  He was traveling somewhere north of Wisconsin or he
11   was coming back from somewhere north of Wisconsin and stopped
12   by the house.
13   Q.   All right.  And was someone with him on that visit?
14   A.   There was, a guy who went by the pseudonym of Hardmous.
15   Q.   Hardmous?  Okay.  And have you also been to Mr. Lambert's
16   home?
17   A.   I have.
18   Q.   How many times?
19   A.   Once or twice.  I think maybe twice on business trips.  I
20   don't know if I was to his house twice.  I've seen him at his
21   house once and maybe somewhere else near his house, maybe a
22   restaurant --
23   Q.   Okay.
24   A.   -- on another occasion.
25   Q.   And have you met Mr. Lambert's wife?
```

**J.A. 683**

```
 1    A.   I have.

 2    Q.   And have you met his children?

 3    A.   I have.

 4    Q.   All right.  Now, I want to direct your attention to

 5    Father's Day weekend of 2019.  So, that's June 16th, was

 6    Father's Day 2019.  Okay?

 7    A.   Yeah.

 8    Q.   Do you recall whether you got a communication from Ben

 9    Lambert that weekend?

10    A.   I did.

11    Q.   All right.  And what kind of communication do you recall?

12    A.   A phone call.

13    Q.   A phone call?

14    A.   Yeah.

15    Q.   All right.  And do you remember which day it was?

16    A.   Father's Day.

17    Q.   So, that would have been June 16th?

18    A.   It was Sunday.

19    Q.   Okay.  And in that call did -- and just listen carefully

20    to my question, if you would -- did Mr. Lambert communicate to

21    you about Christopher Cantwell?

22    A.   He did.

23    Q.   All right.  And did he have a statement about what he

24    thought about Mr. Cantwell's mental state, for lack of a better

25    word?  And don't answer.  I just want to make sure we're clear
```

**J.A. 684**

```
 1    on what this is.

 2             MR. WOLPIN:  I'm going to object.

 3             THE COURT:  You do object or you don't?

 4             MR. WOLPIN:  It has no relevance --

 5             THE COURT:  I just heard "Object," but then I saw you

 6    shaking your head.  So, you do object on relevance grounds?

 7             MR. WOLPIN:  The follow-up will not --

 8             THE COURT:  All right.  I don't know what the answer

 9    is going to be, so I can't judge the relevance, so please put

10    the headsets on.

11    (SIDEBAR CONFERENCE AS FOLLOWS):

12             THE COURT:  Okay.  What's the witness going to say?

13             MR. DAVIS:  So, I am just trying to avoid or let the

14    Court rule on any hearsay issue.  The witness is going to say,

15    I believe, that Ben Lambert said that Cantwell was insane, and

16    further he asked him for his advice about what to do about it.

17    Neither of those is hearsay; they're both relevant to the

18    victim's mental state while this is going on, and that's why I

19    intend to ask it.

20             THE COURT:  So, is the defense posing any relevance --

21    excuse me -- any hearsay objection?  It doesn't appear that

22    they would be hearsay.

23             MR. WOLPIN:  I don't understand why his statement

24    about --

25             THE COURT:  Just speak into the microphone.
```

J.A. 685

1          MR. WOLPIN:  -- about him being insane would be for a

2     purpose other than hearsay.  I think that's --

3          THE COURT:  It's a mental state statement for Mr.

4     Cantwell, and so it's not admitted for the truth to prove that

5     he's insane.  It's admitted to prove that Mr. Lambert was

6     concerned about his sanity.  So, if you want a limiting

7     instruction that it's not being admitted to try to prove that

8     Mr. Cantwell was insane, I'll give you that, but I don't think

9     that's what you want.

10         MR. WOLPIN:  No.

11         THE COURT:  All right.  So, the real argument is one

12    of relevance, and the government says it's relevant with

13    respect to Mr. Lambert's response to the conduct, which is the

14    alleged threats, and you argue relevance.  I agree that it

15    meets the requirements of Rule 401, so I'll overrule your

16    objection.

17         MR. WOLPIN:  I'll just note 403 as well.

18         THE COURT:  And I'll make the same response on 403,

19    that the probative value is not substantially outweighed by any

20    of the grounds identified in Rule 403.  All right.  Do you have

21    anything else?  Okay?  Okay.

22    (END OF SIDEBAR CONFERENCE)

23         THE COURT:  The objection's overruled.  You can ask

24    the question.

25    Q.   So, Mr. Nehlen, in the Father's Day phone call what did

**J.A. 686**

```
 1    Mr. Lambert say to you about what he thought about Mr.
 2    Cantwell?
 3    A.    He said, He is insane.
 4    Q.    He said he was insane?
 5    A.    Yes.
 6    Q.    All right.  Now, when he called you was he laughing?
 7    A.    No, he was not.
 8    Q.    Did the two of you laugh about this exchange between him
 9    and Cantwell?
10    A.    No, we did not.
11    Q.    Did he say he thought it was a joke?
12    A.    No, he did not.
13    Q.    All right.  And did he ask for your advice?
14    A.    Yes, sir.
15    Q.    Okay.  And did you give Mr. Lambert advice?
16    A.    Yes, sir, I did.
17    Q.    And what advice did you give him?
18    A.    I said that I thought he would need to push back, because
19    I felt like Cantwell was being a bully, and that, unless he
20    verbally pushed back, he was going to continue to be bullied.
21    Q.    Okay.  Now, after the phone call do you recall whether the
22    text communications, the Telegram communications between Mr.
23    Lambert and Mr. Cantwell were actually posted on the BowlCast
24    channel?
25    A.    I recall at some point they were, yes.
```

**J.A. 687**

```
 1   Q.   All right.  And do you recall playing any role in that
 2   happening?
 3   A.   I did not.
 4   Q.   All right.  Do you recall writing any introduction from
 5   Uncle Paul that introduced this exchange between Mr. Lambert
 6   and Mr. Cantwell?
 7   A.   I don't specifically remember writing it, but I can't rule
 8   out that I did write it.
 9   Q.   Okay.  So, you might have written --
10   A.   Yeah.
11   Q.   And are you familiar with a posting I'm talking about,
12   that begins --
13   A.   I am.
14   Q.   -- So out of the blue yesterday?
15   A.   I am.
16   Q.   So, your testimony is you might have written that, but
17   you're not sure?
18   A.   Correct.
19   Q.   Okay.  Mr. Nehlen, have you been active on social media in
20   the far-right community, or were you at that time?  Is that
21   fair to say?
22   A.   That's fair to say.
23   Q.   All right.  Before or after this particular exchange
24   between Mr. Lambert and Mr. Cantwell have you ever seen in that
25   social media one person threaten the wife and children of
```

```
 1   another member of that community?

 2   A.   No.  To the best of my recollection, no, I do not.

 3   Q.   Do you regard that as kind of the usual banter among the

 4   people?

 5            MR. WOLPIN:  Objection, your Honor.

 6            THE COURT:  I'm sorry.  You object?

 7            MR. WOLPIN:  Yes.

 8            THE COURT:  The form of the question is leading, so

 9   you can ask another question.

10   Q.   How would you characterize in this community, the social

11   media community in the far right, how would you characterize a

12   threat against someone's wife and children?

13   A.   I would say that's over the line.

14   Q.   And what do you mean by that?

15   A.   Well, it's one thing, in my mind, for --

16            MR. WOLPIN:  I object, your Honor.  I don't see his

17   position as relevant.

18            THE COURT:  I'll sustain the objection.  Go ahead.

19            MR. DAVIS:  All right.  Nothing further.  Thank you.

20            THE COURT:  Thank you.  Cross-examination.  Do you

21   want to be in the front?

22            MR. WOLPIN:  Yes, please.

23            THE COURT:  All right.  If we could sanitize.

24                      (Pause)

25            THE COURT:  Go ahead, Mr. Wolpin.
```

```
 1              MR. WOLPIN:  Thank you.

 2                        CROSS-EXAMINATION

 3   BY MR. WOLPIN:

 4   Q.    Good morning, Mr. Nehlen.

 5   A.    Good morning.

 6   Q.    So, you are friends with Ben Lambert?

 7   A.    Yes, sir.

 8   Q.    And, as you noted, that friendship is more than just

 9   something that's online, correct?

10   A.    Yes, sir.

11   Q.    You've had him over to your home?

12   A.    Yeah.  Yes, sir.

13   Q.    And you've been to his home?

14   A.    Yes, sir.

15   Q.    And you don't live close by, so it's not someone you could

16   easily get back and forth between, correct?

17   A.    No, but I think, if I could clarify that --

18   Q.    Yeah.

19   A.    -- he was traveling by on a trip that he was on, and I

20   happened to be traveling by his place.  It wasn't -- this was

21   not a planned trip to go see each other.

22   Q.    Okay.  But you made efforts when you were on a trip for

23   another reason to make sure you saw this person?

24   A.    Mm-hmm.

25   Q.    Correct?
```

**J.A. 690**

```
 1   A.   That's correct.

 2   Q.   You just have to speak.

 3   A.   Yes, sir.  Sorry.

 4   Q.   Thank you.  And you've met his family as well, as you

 5   noted, correct?

 6   A.   Yes, sir.

 7   Q.   Now, you testified about a phone call just a moment ago in

 8   some detail about what was said on that call.

 9   A.   Yes, sir.

10   Q.   Okay.  About what Mr. Lambert said and what you said on

11   that call?

12   A.   That's correct.

13   Q.   Now, you spoke to the FBI on September 2nd of this year,

14   correct?

15   A.   I believe so.

16   Q.   So, that was just a few weeks ago, correct?

17   A.   Yes.

18   Q.   Okay.  And when you spoke with them, they asked you

19   questions about your relationship with Mr. Lambert?

20   A.   Yes.

21   Q.   And they asked you questions specifically about your

22   contacts with Mr. Lambert as well?

23   A.   Okay.

24   Q.   Correct?

25   A.   Yes, sir.
```

**J.A. 691**

 1    Q.    I'm sorry.

 2    A.    I'm sorry, too.

 3    Q.    You just need to fully answer.  And at that time, when you

 4    spoke to the FBI a few weeks ago, you explained that you had

 5    spoken to Ben Lambert approximately a dozen times or so, but

 6    you did not recall any specific call with him and can't say

 7    that it happened or did not happen?

 8    A.    At that time that was correct.

 9    Q.    Okay.  So, at that time when you spoke with the FBI you

10    weren't even sure whether you had this call with Ben Lambert or

11    not?

12    A.    Yes.

13    Q.    Okay.  Now, you, as you noted, have this online presence

14    as Uncle Paul, correct?

15    A.    Yes.  That's correct.

16    Q.    And that includes a presence on the Telegram platform?

17    A.    Correct.

18    Q.    You're familiar with that platform?

19    A.    That is correct.  Yes, sir.

20    Q.    Okay.  And you, in fact, have a Telegram channel under

21    Uncle Paul, correct?

22    A.    Correct.

23    Q.    I think it's @uncle_paul_gtkrwn.

24    A.    That is correct.

25    Q.    Okay.  Before you met with the FBI there were quite a few

**J.A. 692**

1   posts on that channel, correct?

2   A.    That's correct.

3   Q.    Going back a significant period of time and a significant

4   number of posts?

5   A.    That is correct.

6   Q.    Since you've met with the FBI those posts are gone?

7   A.    That is correct.

8   Q.    Those posts have been deleted by you or just hidden?

9   A.    They're deleted.

10  Q.    Okay.  And among the posts that appeared under your name

11  were posts that were derogatory towards Mr. Cantwell?

12  A.    All of the posts.

13  Q.    Okay.  So, all of the posts that you deleted over this

14  period of time said pretty nasty things about Mr. Cantwell?

15  A.    No.  I meant to say that all of the posts, not just posts

16  that had to deal with Mr. Cantwell, were deleted, all of the

17  posts.

18  Q.    Okay.  But there were numerous posts that did have to do

19  with Mr. Cantwell?

20  A.    I can't say how many, but there probably were a few, yes.

21  Q.    Okay.  And those posts may be memes with his picture, for

22  example?

23  A.    Possibly.

24  Q.    And would have included some of the language we've heard

25  in this case, maybe calling him names?

**J.A. 693**

```
1    A.   Quite possibly.

2    Q.   Okay.  You would call him boofwell (ph)?

3    A.   Yes, that's correct.

4    Q.   And other names that you knew were derogatory or negative?

5    A.   Yes, sir.

6              MR. WOLPIN:  Now, could we bring up, is it C26, just

7    for the witness?

8    Q.   Is this your Uncle Paul channel?

9    A.   Yes.

10   Q.   Okay.  And, as we can see, there are only what appear to

11   be two posts left?

12   A.   That's correct.

13   Q.   Okay.  The top one happens to be about Mr. Cantwell?

14   A.   That's correct.

15   Q.   And that is from January 25th of this year?

16   A.   I'm not sure if it's from this year or if it's from last

17   year.  It might be from this year.

18   Q.   Okay.  And it addresses this situation with Mr. Cantwell?

19             MR. DAVIS:  Objection.  Vague.  "This situation"?

20             THE COURT:  Rephrase your question.

21             MR. WOLPIN:  All right.  That's fine.

22   Q.   So, let's just, so we get back to basics, this is the

23   channel you have as Uncle Paul?  Can you see on your screen?

24   A.   Yes.

25   Q.   Okay.  And these are the only two posts that were left up?
```

**J.A. 694**

1    A.    That is correct.

2            MR. WOLPIN:  Okay.  I would move at this point to have

3    this as a full exhibit.

4            MR. DAVIS:  Objection.  Relevance.

5            THE COURT:  I don't understand the relevance at the

6    present time.

7            MR. WOLPIN:  Motive and bias towards the defendant.

8            THE COURT:  I can't discern what that is by looking at

9    it.

10           MR. WOLPIN:  It's not clear?  I don't want to address

11   it openly.

12           THE COURT:  All right.  Go put the headsets on.

13   (SIDEBAR CONFERENCE AS FOLLOWS):

14           THE COURT:  If it's easier for you, you can sit down

15   while you do this.

16           MR. WOLPIN:  Thank you.  I feel odd not making eye

17   contact.

18           THE COURT:  That's all right.

19           MR. WOLPIN:  Our issue here is the one that you chose

20   to leave out, was a post that came immediately after Chris's

21   arrest.  It's meant to needle him, in our opinion, and

22   continue --

23           THE COURT:  What does the post say that is derogatory

24   of Mr. Cantwell?

25           MR. WOLPIN:  It says, In the end it wasn't the prank

**J.A. 695**

1    calls that sent Chris Cantwell over the edge.  It was me
2    personally on two separate occasions offering him advice on how
3    to get a job.
4         THE COURT:  What does that mean?
5         MR. WOLPIN:  It's just their usual taunt about him,
6    that, It's us that's causing him to be arrested ultimately.
7         THE COURT:  I guess I don't understand the humor of
8    this group.  What is Mr. Nehlen's statement about him getting a
9    job, giving him advice on getting a job?
10        MR. WOLPIN:  I guess I should be more clear.  The post
11   is Uncle Paul, and it's a repost of someone else named Mosin,
12   and that repost says, In the end it wasn't the prank calls that
13   sent Chris over the edge.  It was me personally on two separate
14   occasions offering him advice on how to get a job.  This is
15   right after Chris was arrested.  This is them gloating in the
16   fact that they got him to be arrested.  Mosin is Mosin-Nagant.
17        THE COURT:  We're so off the track of anything
18   remotely relevant here.  I'm sorry.  You can cross-examine him
19   about the two posts, you can say that that post is taunting
20   Chris.  You can do all of that, if you want.  I'm just not
21   going to let the post in.  It doesn't add anything.  I don't
22   know what the second post is at all.  I can't understand that.
23        MR. WOLPIN:  Okay.  Understood.
24        THE COURT:  All right.  Let's go on.
25   (END OF SIDEBAR CONFERENCE)

**J.A. 696**

1         MR. WOLPIN:  All right.  We can move on, so we can
2    take that down, please.  So, if we could bring up Exhibit AA,
3    this is just for the witness.  For the Court's understanding, I
4    had shortened an exhibit for the government.  They wish further
5    things to be redacted, so this currently is not an exhibit that
6    is before the jury.
7    Q.   In front of you is another Telegram channel.  Is that
8    familiar to you?  Are you able to see it?
9    A.   I don't know if you can blow that up.  Okay.
10   Q.   Okay.  And this is the channel for the BowlCast?
11   A.   I can see that.
12   Q.   And this is a channel that you are also familiar with?
13   A.   I'm familiar with it, yes.
14        MR. WOLPIN:  Okay.  If we scroll down to the next
15   page, please.
16   Q.   And these are the posts that ultimately went up on the
17   BowlCast that came from Mr. Lambert?
18   A.   Can you zoom in a little bit?  I can't see the --
19   Q.   Sure.
20   A.   Okay.  I can see it now.
21   Q.   Okay.  And so, I think you testified that at least as to
22   the introduction which came from Uncle Paul that may or may not
23   have been you?
24   A.   Yes, that's correct.
25   Q.   If we go down a little further to after the conversation

1    is posted there are comments under Uncle Paul again.  I will

2    show those to you, hopefully, in a moment.

3              MR. WOLPIN:  There we go.  Thank you.  So, if we

4    highlight the three down here.  Thank you.

5    Q.   Following the posts there's a number of derogatory

6    comments about Chris Cantwell made on the BowlCast site,

7    correct?

8    A.   I'm sorry.  Would you repeat that question?

9    Q.   Yeah.  So, following the posts from Ben Lambert's chat

10   there are comments about that below?

11   A.   Okay.

12   Q.   Okay.  And some of those comments also originate from

13   Uncle Paul?

14   A.   Okay.

15   Q.   Were those derogatory comments about Chris Cantwell from

16   you or from someone else?

17   A.   Probably from me.

18   Q.   Okay.  So, it's fair to say that, even before this

19   situation between Ben Lambert and Chris Cantwell you and

20   Mr. Cantwell were not on good terms?

21   A.   I'd say that was probably true, but possibly related to

22   this incident here I can't recall.  I can't recall.

23   Q.   Were you aware of the Bowl Patrol's pranks and harassment

24   of Chris that went on before this?

25   A.   I was aware of prank phone calls.

**J.A. 698**

```
 1    Q.   Okay.  And was that something you participated in or
 2    cheered on in any way?
 3    A.   No.  I never made any prank phone calls.
 4    Q.   Okay.  But you knew that there was sort of bad blood
 5    between the Bowl Patrol and Mr. Cantwell at that time?
 6    A.   I did.
 7         MR. WOLPIN:  If I could just have a moment.
 8                    (Pause)
 9         MR. WOLPIN:  That's all, Mr. Nehlen.  Thank you.
10         THE COURT:  Thank you.
11         Any redirect?
12         MR. DAVIS:  Briefly.
13         THE COURT:  Why don't you just do it from there,
14    Mr. Davis.
15                   REDIRECT EXAMINATION
16    BY MR. DAVIS:
17    Q.   Mr. Nehlen, you were asked on cross about meeting with the
18    FBI on September 2nd.  Do you remember that?
19    A.   Yes, sir.
20    Q.   And you were asked whether you recalled a specific phone
21    call with Ben Lambert at that time?
22    A.   Yes.
23    Q.   All right.  And were you then uncertain whether you had
24    had a phone call as opposed to text communications with Ben
25    Lambert?
```

**J.A. 699**

1    A.    I was.  At that time I wasn't sure if it was a phone call

2    or a text.

3    Q.    But did you remember on that day that you had communicated

4    with Ben Lambert about this thing from Cantwell?

5    A.    Yes, I absolutely remembered.

6    Q.    And did you tell the FBI that day that Mr. Lambert said

7    that Mr. Cantwell was insane?

8    A.    Yes, I did.

9    Q.    And did you also tell the FBI on that day that Mr. Lambert

10   asked you for advice about this?

11   A.    Yes, sir, I did.

12   Q.    And did you tell them about the advice you gave?

13   A.    I did.

14   Q.    What made you remember that it was a phone call and not

15   text exchanges that you had with Mr. Lambert?

16   A.    I looked at a calendar that had holidays listed on it, and

17   I realized that it was Father's Day.

18   Q.    And why is that significant?

19   A.    Well, because Ben euphemistically refers to me as "Dad,"

20   so I felt like it was a phone call for sure at that point,

21   because he would call me on Father's Day.

22   Q.    All right.  Last thing:  If we see a channel called Uncle

23   Paul, again, you said that was a nickname for you?

24   A.    Yes, sir.

25   Q.    Did that channel have at some point more than one

**J.A. 700**

1    administrator?

2    A.   Yes, sir.

3    Q.   And when a channel has more than one administrator, what

4    does that mean in terms of knowing the origin of a post on that

5    channel?

6    A.   You can't really.  I mean, it comes from the channel, but

7    you don't know what person it came from, you know.

8    Q.   So, any administrator could have posted that?

9    A.   That is correct.

10   Q.   But there's no question that after this happened, at

11   least, you have not been on good terms with Chris Cantwell?

12   A.   That's fair to say, yes.

13            MR. DAVIS:  Nothing further.

14            THE COURT:  Thank you.

15            MR. WOLPIN:  Brief.

16            THE COURT:  Is there something on that last subject?

17   Otherwise, we've covered it.  Do you have something on the

18   administrator and who posted kind of thing?

19            MR. WOLPIN:  No.

20            THE COURT:  No?  Okay, then we've covered it.

21            Thank you, sir.  You can step down.  You're excused.

22                  (Witness stepped down)

23            THE COURT:  Call your next witness.  I know we're

24   close to lunchtime.  I want to be sure we're being efficient.

25            MR. DAVIS:  We can do it, Judge.

**J.A. 701**

```
 1              THE COURT:  How long will this witness be?

 2              MR. DAVIS:  This witness will be probably ten minutes

 3    on direct.

 4              THE COURT:  Can the jury wait for a little bit for

 5    lunch?  We'll try to get one more witness in and we'll take a

 6    lunch break.  Okay?  Thank you.

 7              MR. DAVIS:  Kevin LeBlanc.

 8              THE CLERK:  Please raise your right hand.

 9              KEVIN LEBLANC, duly sworn by the Clerk.

10              THE CLERK:  Thank you.  Please state your name and

11    spell your last name for the record.

12              THE WITNESS:  Kevin LeBlanc, L-e-B-l-a-n-c.

13                         DIRECT EXAMINATION

14    BY MR. DAVIS:

15    Q.   And how are you employed?

16    A.   I'm employed as a New Hampshire State Trooper.

17    Q.   Okay.  Could I ask you to lean a little closer to the

18    microphone, Trooper LeBlanc?  And are you currently a task

19    force officer?

20    A.   Yes.  I'm a sergeant task force officer for the FBI.

21    Q.   All right.  Would you summarize, briefly, your law

22    enforcement experience, Officer LeBlanc?

23    A.   Sure.  My career began in 1998 with the Baltimore City

24    Police Department in Maryland.  I was employed there from 1998

25    till 2003.  In 2003 I received a job at the Concord, New
```

**J.A. 702**

1    Hampshire Police Department, became certified in New Hampshire,

2    and then in 2007 is when I started with the New Hampshire State

3    Police.

4    Q.   All right.  And when were you assigned to the FBI task

5    force?

6    A.   Summer of 2017.

7    Q.   All right.  And have you worked as a case agent on the

8    Christopher Cantwell case?

9    A.   Yes, I have.

10   Q.   All right.  Directing your attention to October 24th of

11   2019, do you recall that day?

12   A.   Yes.

13   Q.   And what happened on that day?

14   A.   On that day I met Mr. Cantwell at the Keene Police

15   Department for an interview.

16   Q.   When you say "Mr. Cantwell," is that the defendant in this

17   case?

18   A.   Yes, Christopher Cantwell.

19   Q.   Do you see him in the courtroom?

20   A.   I do.

21   Q.   All right.

22   A.   Behind you with the maroon shirt (indicating).

23   Q.   All right.  Thank you.  What time was the meeting?

24   A.   9:00 a.m.

25   Q.   And where was it?

**J.A. 703**

1    A.   At the Keene Police Department in New Hampshire.

2    Q.   All right.  And how had the interview of Mr. Cantwell been

3    arranged?

4    A.   It was arranged via email.

5    Q.   Okay.  And what information -- well, who requested the

6    interview?  Was it FBI, or was it Mr. Cantwell?

7    A.   FBI.

8    Q.   All right.  And what information did you give to

9    Mr. Cantwell about the purpose of the interview?

10   A.   The purpose was to follow up with him, since it had been

11   several weeks since the first interview with him, and he was

12   told that we had identified different members of Bowl Patrol,

13   to include Cheddarman and Vic Mackey, and that we had conducted

14   multiple interviews in different parts of the country, and that

15   I wanted to follow up with him on that.

16   Q.   Okay.  And who participated with you from law enforcement

17   in the interview?

18   A.   Sergeant Joel Chidester from the Keene Police Department

19   was present at the interview, but he didn't ask any questions.

20   Q.   All right.  And were you the lead on the interview?

21   A.   Yes.

22   Q.   Okay.  Was this interview voluntary on Mr. Cantwell's

23   part?

24   A.   Yes.

25   Q.   That is, he was not told he had to come in or he was under

```
 1   subpoena?

 2   A.   Correct.

 3   Q.   And did he agree to do that?

 4   A.   Yes.

 5   Q.   All right.  Do you recall where the interview occurred?

 6   A.   It was in a back area at the Police Department in a

 7   conference room.

 8   Q.   All right.  And at that time was Mr. Cantwell under

 9   arrest?

10   A.   No.

11   Q.   All right.  And had you actually met with Mr. Cantwell in

12   that same room at another time?

13   A.   Yes.

14   Q.   And when was that, approximately?

15   A.   I believe it was September 17th.

16   Q.   Okay.

17   A.   Around that time, the first interview.

18   Q.   And was that first interview one that Special Agent Shayne

19   Tongbua was part of?

20   A.   Yes.

21   Q.   Okay.  Was there any recording made of the interview on

22   October 24th?

23   A.   No, there was not.

24   Q.   And why was that?

25   A.   By agreement between myself and Mr. Cantwell, based on the
```

**J.A. 705**

1    previous discussions we had with him for the first interview.

2    Q.    Okay.  And you were aware that Mr. Cantwell had complained

3    about harassment that he had received from other persons?

4    A.    Yes.

5    Q.    Okay.  And was it your purpose to show him anything in

6    regard to the exchange with Mr. Lambert?

7    A.    Yes.

8    Q.    All right.  So, what had happened between the September

9    interview of Mr. Cantwell and the October interview?

10    A.    During that time frame is when we had traveled to

11    St. Louis and conducted interviews with Ben Lambert and Cheddar

12    Mane.

13    Q.    All right.  So, you had been able to identify the alleged

14    victim?

15    A.    Yes.

16    Q.    And you had actually interviewed him and gotten his side

17    of the story?

18    A.    I did not, but FBI did, yes.

19    Q.    Okay.  But you did go to Missouri, right?

20    A.    Yes.

21    Q.    Okay.  And so, what documents did you bring with you for

22    your meeting with Mr. Cantwell in October of 2019?

23    A.    I brought with me an email that he had sent to the FBI and

24    copies of that message exchange between him and Cheddar Mane.

25    Q.    Okay.  And so, when you say the "message exchange," is

1    that the Telegram message exchange that we've been looking at

2    throughout the trial showing communications on June 15th and

3    16th between Mr. Cantwell and Mr. Ben Lambert?

4    A.   Yes.

5    Q.   Okay.  And back in September had you shown those documents

6    to Mr. Cantwell?

7    A.   No.

8    Q.   All right.  So, this is the first time you were going to

9    be able to do that?

10   A.   Yes.

11   Q.   Okay.  So, how did Mr. Cantwell present on that morning?

12   A.   He seemed okay, normal, regular.

13   Q.   Okay.  And how did you begin the meeting?

14   A.   I had arrived first, and then when he arrived Joel had to

15   go get him and bring him there.  I'm pretty sure we probably

16   would have shaken hands, brief introduction again.  I

17   reiterated with him the purpose of the interview that I wanted

18   to discuss with him in regards to the interviews conducted and

19   the identification of Bowl Patrol members.  And from there I

20   moved into, I discussed with him how in the first interview he

21   had indicated to us that he was willing to cooperate and

22   testify, if needed, and I had asked him if he was still willing

23   to testify.

24   Q.   All right.  And I'll ask you to slow down a little bit,

25   Task Force Officer LeBlanc, just so the court reporter can get

**J.A. 707**

1   it.

2          And when you asked him if he was still willing to

3   testify, what did Mr. Cantwell say?

4   A.   He told me that he was willing to testify against them,

5   meaning Bowl Patrol, and that he would want the testimony to be

6   in regards to their harassment of him, and he did not want any

7   testimony to be about their beliefs.

8   Q.   No testimony about their beliefs?

9   A.   About their beliefs.

10  Q.   Okay.  So, what happened next?

11  A.   And then discussed with him how during the first interview

12  with him back in September, when we discussed Cheddar Mane, he

13  had mentioned in that interview that he had threatened to dox

14  Cheddar Mane, and that he had been told by other people that

15  that was extortion, so he didn't really want to talk about it

16  too much.  So, I brought that topic up, and while doing that I

17  showed him the email that he had sent to the FBI.

18  Q.   All right.  And was that email dated August 28th of 2019?

19  A.   I believe so, yes.

20  Q.   And did that email describe in Mr. Cantwell's words the

21  interaction he had with Cheddar Mane back in June?

22  A.   Yes.  There was a paragraph within that email where he

23  says, The CPS thing was, and he describes an interaction with

24  Cheddar Mane, how he had threatened to expose him if he did not

25  stop harassing him, he threatened to call CPS, and that he had

**J.A. 708**

1    given him an out by identifying Vic Mackey, and that he did

2    expose him and did call CPS.

3    Q.    So, did you, then, show -- what did you do then?

4    A.    I showed Mr. Cantwell that email and asked him if he was

5    familiar with it.  He acknowledged that he did send that to the

6    FBI and that he was familiar with the content of the email.

7    Q.    All right.  So, you had a hard copy of the email there?

8    A.    Yes.  I had printed it off.

9    Q.    All right.  And you passed it over to him?

10    A.    Yes.

11    Q.    Did he take long to read it?  What happened?

12    A.    No.  He essentially glanced at it.  It was apparent to me

13    he recognized it, and that's when he said he had sent it and he

14    was familiar with the content and slid it back towards me.

15    Q.    Okay.  So, what happened next in the interview?

16    A.    I then had the copies of the message exchange between him

17    and Cheddar Mane, did the same thing, slid it towards him, and

18    what I was trying to do is understand with him that he had

19    mentioned an exchange between him and Cheddar Mane in the

20    interview, he had mentioned it in the email.  So, I handed him

21    the messages saying, Is this what you're talking about?  Are

22    these the messages that you are referencing?

23    Q.    Okay.  And at that time did the FBI have unobscured

24    versions of the exchange between Cheddar Mane and Cantwell?

25    A.    No, we did not.

**J.A. 709**

```
1   Q.   What version did you have?

2   A.   It was a version where there are stickers, I guess you'd

3   call them, over the faces to blur out people's faces and

4   things.

5   Q.   Okay.  And that's the version you since learned that Mr.

6   Lambert made and posted after the exchange happened?

7   A.   Correct.

8   Q.   Okay.  And had you printed out a copy of that entire

9   exchange?

10  A.   Yes.

11  Q.   And you handed that over to Mr. Cantwell?

12  A.   Yes.

13  Q.   And what did he do?

14  A.   He looked at it briefly.  It seemed apparent that he

15  recognized it, and he said, Yes, I sent these messages.

16  Q.   Okay.

17  A.   And then he went on to state that he was becoming nervous

18  because I was asking about these messages, because they, and

19  I'm not sure who "they" was, but they had told him it was

20  extortion.

21  Q.   And did he say anything else at that point?

22  A.   No.  I just confirmed with him the date of them as far as

23  the year that it had occurred, in June of 2019.

24  Q.   All right.  And what about his appearance at that point in

25  the interview did you note?
```

**J.A. 710**

1    A.    He became uneasy.  It was clear to me it was uncomfortable

2    for him to talk about it.  He kind of leaned back, was shifting

3    in his seat, because it was just an uncomfortable topic for him

4    to talk about.

5    Q.    All right.  So, but he certainly acknowledged he had sent

6    those texts, right?

7    A.    Correct.  He recognized it and said, I sent these

8    messages.

9    Q.    All right.  What happened next?

10   A.    I had a discussion with him where I had already told him

11   that we had conducted different interviews in different parts

12   of the country, so I had asked him if he had heard about any of

13   these interviews, just if any word or rumors made it back to

14   him.

15   Q.    Do you recall whether you referenced the dates in the

16   exchange between him and Ben Lambert?

17   A.    Yes.  I believe it was June 15 or 16.  I confirmed that it

18   was, in fact, of 2019.

19   Q.    And did he agree that that had happened in June of 2019?

20   A.    Yes.

21   Q.    Okay.  So, when you asked him about whether he had heard

22   about any interviews of Bowl Patrol people, how did he respond?

23   A.    He said he had not, but then he added that within the last

24   week or so a person who goes by the name Chief fed Poster

25   Sophie had contacted his Telegram administrator, whose name was

**J.A. 711**

1   Shelly, asking them to delete their Telegram history, because

2   they had been contacted by the Feds.  He went on to state that

3   he doubts we talked to this person and that it was even

4   doubtful that really happened to Chief fed, because that person

5   had the ability to delete their own Telegram, if they wanted

6   to.

7   Q.   All right.  So, at that point in the interview did you ask

8   if Mr. Cantwell had any questions?

9   A.   Yes, I did.

10  Q.   And did he have a question?

11  A.   Yes.  He had asked me if any of the phone numbers that he

12  provided to the FBI helped us identify Vic Mackey.

13  Q.   So, he specifically asked about Vic Mackey?

14  A.   Yes.

15  Q.   And at that point did he ask about anyone else?

16  A.   No.

17  Q.   All right.  What did you tell him?

18  A.   I told him I couldn't discuss the specifics of the case,

19  and that all I could tell him is that we learned the identities

20  of people through various sources, and that the case was

21  progressing.

22  Q.   Okay.  And did he make any other statement?

23  A.   He told me that, as he had previously mentioned to us,

24  that he suspected that people pose to be members of the

25  movement, the white nationalist movement, and he suspects

1   people do that in order to sabotage the movement, and that he

2   had also had speculated whether or not Vic Mackey or Cheddarman

3   were, in fact, feds.

4   Q.   Were, in fact, feds?

5   A.   He said that and then added that that is why he gave Vic

6   Mackey credentials to his website.  In case Vic Mackey was a

7   fed, he'd be able to see there was nothing to hide on his

8   computer, that he had nothing to hide on his computer.

9   Q.   That Mr. Cantwell had nothing to hide?

10  A.   Correct.

11  Q.   Okay.  And how long did the -- was that the conclusion of

12  the interview?

13  A.   Yes, basically.

14  Q.   And how long did it go, the entire time?

15  A.   Between 20 and 25 minutes.

16  Q.   All right.  And how did you leave it?  How did the FBI

17  leave it with Mr. Cantwell as of the end of that interview on

18  October 24?

19  A.   Just left it that I would be in touch with him as the case

20  progressed.

21       MR. DAVIS:  All right.  No further questions.  Thank

22  you.

23       THE COURT:  Cross-examination.

24              CROSS-EXAMINATION

25  BY MR. LEVIN:

1    Q.   Mr. LeBlanc, you testified that this meeting in October

2    24th, 2019 with Mr. Cantwell, that was to follow up after your

3    previous meeting about a month previous to that?

4    A.   Yes, sir.

5    Q.   And you are aware that over the summer Mr. Cantwell had

6    sent emails to the FBI where he had talked about this

7    interaction he had had with Benjamin Lambert or Cheddar Mane,

8    as he was known to him at that point?

9    A.   Yes.

10   Q.   And he had talked about wanting Vic Mackey's dox?

11   A.   Yes.

12   Q.   And had sent some materials to the FBI, including

13   photographs to the FBI in August of 2019?

14   A.   Yes.

15   Q.   And then on September 24th, 2019 you met with Mr.

16   Cantwell, and Joel Chidester was present as well?

17   A.   On which date?  I'm sorry.

18   Q.   On September -- at the end of September of 2019.

19   A.   The first interview with him?

20   Q.   That's right.

21   A.   Yes.

22   Q.   September 24th; is that right?

23   A.   I believe it was September 17th.

24   Q.   Okay.  I'm looking at your report, and it says, Interview

25   of Cantwell on September 24th, 2019, but I'll take your word

**J.A. 714**

1    for it that it was September 17th.

2          On September 17th, 2019 you had interviewed Cantwell

3    at the Keene Police Department; is that right?

4    A.    Yes.

5    Q.    So, at that time Mr. Cantwell had talked about various

6    members of the Bowl Patrol, had talked to you about being

7    pranked and harassed by them and made, basically, a more

8    expanded complaint?

9    A.    Yes.

10   Q.    And then a month later you contacted him and said, We'd

11   like to update you on the investigation --

12   A.    Yes.

13   Q.    -- essentially?

14   A.    Essentially.

15   Q.    And between those two dates, the September 17th, 2019 and

16   October 24th, 2019, you had actually gone to Missouri and

17   talked to Ben Lambert; is that right?

18   A.    I went to Missouri, but I did not talk to Ben Lambert.

19   Q.    Yeah.  But your group -- you're a task force officer; is

20   that right?

21   A.    Yes.

22   Q.    You're a New Hampshire State Trooper that's embedded in

23   the FBI, right?

24   A.    Yes, sir.

25   Q.    And you're working on these terrorism-type investigations

1   with Shayne Tongbua?

2   A.   Yes.

3   Q.   And other members of the FBI and other task force

4   officers?

5   A.   Correct.

6   Q.   So, a group of you traveled to Missouri together for the

7   purpose of gathering information about this case?

8   A.   Yes.

9   Q.   And then, when you came back to Missouri -- I mean, when

10  you came back from Missouri to New Hampshire you reached out to

11  Mr. Cantwell and asked to speak with him; is that right?

12  A.   Yes.

13  Q.   And he met you at the Keene Police Department.  That was a

14  voluntary interview that you had with him, a sit-down with him?

15  A.   Yes.

16  Q.   And Joel Chidester was also present at that?

17  A.   Yes.

18  Q.   And when you met with Mr. Cantwell, initially he started

19  off talking about how he would be happy to testify, if needed;

20  is that right?

21  A.   Yes.

22  Q.   It was a polite, cordial conversation you had with him?

23  A.   Yes.

24  Q.   He wasn't rude or disrespectful to you?

25  A.   No.

**J.A. 716**

```
 1    Q.   He indicated that he was still willing to testify in
 2    regards to the Bowl Patrol destroying his business; is that
 3    right?
 4    A.   Yes.
 5    Q.   And the harassment that was directed towards him by the
 6    Bowl Patrol; is that right?
 7    A.   He was alleging it was Bowl Patrol.
 8    Q.   Right.  But he indicated that he would still be willing to
 9    testify about that, right?
10    A.   Yes.
11    Q.   But he did not want the testimony to be about their
12    beliefs; is that right?
13    A.   Correct.
14    Q.   I'm just trying to characterize your testimony.  Is that
15    correct?
16    A.   Yes.
17    Q.   And then during the interview you asked him about some of
18    the things that he had spoken about during the September 17th
19    interview; is that right?
20    A.   Yes.
21    Q.   And during the September 17th interview he had talked
22    about threatening to call CPS on Cheddar Mane if Cheddar Mane
23    didn't provide him with the identity of Vic Mackey; is that
24    right?
25    A.   That's correct.
```

## J.A. 717

1  Q.   Now, you indicated that you showed him a text exchange; is

2  that right?

3  A.   Yes.

4  Q.   And he admitted that that was a text exchange that he was

5  involved in; isn't that correct?

6  A.   Yes.

7  Q.   And it was after he admitted to that that he confessed to

8  you, I'm a little bit nervous that you guys are asking me about

9  this?

10  A.   Correct.

11  Q.   Because somebody had told him that that might be

12  extortion; is that right?

13  A.   Yes.

14  Q.   He was candid with you, in other words?

15  A.   Sorry?

16  Q.   He was candid with you about that?

17        MR. DAVIS:  Objection.  Calls for speculation.

18        THE COURT:  If the officer knows, he can answer.  If

19  he doesn't, he doesn't have to answer.

20  A.   I would say he was candid with that specific item.

21  Q.   He indicated that -- he provided some more information to

22  you, is that right, about a person on his Telegram site

23  indicating that they wanted their Telegram history deleted

24  because they had been visited by the feds; is that right?

25  A.   He provided that information but then added that he

```
 1    doubted that it was even true.
 2    Q.   And had the feds visited this person, or was that just
 3    complete out of the blue to you?
 4    A.   That was news to me.  I don't know anything about that
 5    name.
 6    Q.   Now, at the end of the interview you said that Cantwell
 7    wondered if any of the telephone numbers he had provided had
 8    led to the identification of Vic Mackey; is that right?
 9    A.   Yes.
10    Q.   And you said that you didn't want to share any information
11    with him?
12    A.   Correct.
13    Q.   You wrote a report, did you not, about this interview?
14    A.   Yes.
15    Q.   And the interview took place on October 24th, 2019, and
16    the report was written the same day; is that right?
17    A.   I'd have to see the bottom of the report.
18         THE COURT:  Show him on the document camera, if you
19    want.
20         MR. LEVIN:  Yes, please.
21    Q.   Is this the report -- I'm sorry.  I'm going to show you
22    the top of it.  Is this the report you wrote about your
23    interview with Mr. Cantwell on October 24th, 2019?
24    A.   Yes.  I just need to --
25    Q.   Was that drafted the very same day?
```

**J.A. 719**

```
 1              THE COURT:  Can you enlarge it a little bit?

 2              Can you see it okay?

 3              THE WITNESS:  It was distorted but, yes, I got a

 4    glimpse.  10/24.  Yes, I saw it.

 5    Q.   So, the interview took place on October 24th; is that

 6    right?

 7    A.   Yes.

 8    Q.   And the date it was drafted was also October 24th?

 9    A.   Yes.

10    Q.   And if you see just above that, it indicates, it talks

11    about a September 24th, 2019 interview.  You're saying that's

12    the September 17th, 2019 interview; is that right?

13    A.   Yes.  Because if you look at the top of this page, if you

14    go back up, that date of 10/28, that's the date that the report

15    became serialized and approved.

16    Q.   Right.

17    A.   And the September 24th date was me misreading the other --

18    the September 17th report actually says September 17th for the

19    interview, and when I referenced it I incorrectly looked at the

20    date of entry on that original report --

21    Q.   Oh, okay.

22    A.   -- and mixed up the dates.

23    Q.   So, the report on that date had been a week later.

24    A.   But the actual report, September 17th, I incorrectly

25    referenced it as September 24th.
```

**J.A. 720**

1    Q.   All right.  Now, you testified just now, I just have one

2    more question, which is you testified that Mr. Cantwell wanted

3    to know whether there had been any -- whether the telephone

4    numbers he had provided had led to the identification of Vic

5    Mackey, and you said that you didn't want to talk about that;

6    is that right?

7    A.   I explained to him that for the purpose of case integrity

8    I was not going to discuss specifics of the case with him, as I

9    would not with any other person.

10   Q.   Okay.  But in this report, when you talk about the

11   conclusion of the interview, you do indicate that you told him

12   that information had -- various information had led to the

13   identification of Cheddar Mane and Vic Mackey; is that right?

14   A.   Yes.

15   Q.   So, you did share with him that they had been identified?

16   A.   Well, I began the introduction to the interview by

17   explaining to him the purpose was to follow up with him because

18   they had been identified.

19   Q.   They had been identified?

20   A.   Yes.

21   Q.   So, you did share with him that you knew who they were at

22   that point?

23   A.   Yes.  I told him that was one of the reasons for the

24   interview, was that Cheddar Mane and Vic Mackey had been

25   identified, and I wanted to follow up with him on the case,

**J.A. 721**

1    with the case.

2              MR. LEVIN:  Just one moment, your Honor.

3                        (Pause)

4              MR. LEVIN:  No further questions, your Honor.

5              THE COURT:  Anything else?

6              MR. DAVIS:  No redirect.

7              THE COURT:  All right.  Thank you, sir.  You're

8    excused.

9                   (Witness stepped down)

10             THE COURT:  Thank you for your patience, Members of

11   the Jury.  I'm sure some of you are pretty hungry right now,

12   but we'll break until 1:40 and come back and resume with

13   testimony at that time.

14             THE CLERK:  All rise.

15                  (The jury exited the courtroom)

16             THE COURT:  Anybody have anything they need with me?

17             MS. KRASINSKI:  Yes, your Honor.

18             THE COURT:  All right.  People can be seated.

19             MS. KRASINSKI:  I just want to put on the record that

20   the parties have agreed to stipulate to the authenticity of

21   Government's Exhibits 110 and 111 as they will be remade in

22   accordance with the Court's ruling this morning, and I want to

23   get that on the record so that we can advise the custodian of

24   jail call records that she doesn't need to testify.

25             THE COURT:  All right.  So, the parties have agreed to

**J.A. 722**

```
1    authenticity, and, given my prior rulings, all objections of
2    the defendant, which are preserved, the recordings can just be
3    played, the excerpted recordings.  All right?
4              MS. KRASINSKI:  Thank you.
5              THE COURT:  And what else have you got this afternoon?
6              MR. DAVIS:  Just one more witness.  We will, I'm sure,
7    rest this afternoon.
8              THE COURT:  All right.  Over the lunch break consult
9    with your client about whether he's likely to testify and give
10   me any kind of advice you have with respect to that so I can
11   plan after lunch.  Do you have other witnesses that you want to
12   call this afternoon?
13             MR. LEVIN:  No, your Honor.
14             THE COURT:  All right.  So, in fact, we may be
15   potentially closing tomorrow, is what it's coming down to.
16   It's a good thing I've been working on the jury instructions.
17             Okay.  Let me know right after lunch what your
18   client's position is on that issue, because I do want to try to
19   plan things in an orderly way.  All right?
20             THE CLERK:  All rise.
21             (Lunch recess taken at 12:53 p.m.)
22
23
24
25
```

1              C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13    Date: ___5/17/21_____          /s/ *Brenda K. Hancock*
                                       Brenda K. Hancock, RMR, CRR
14                                     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:20-cr-6-01-PB
             v.                     *   September 24, 2020
                                    *   1:50 p.m.
CHRISTOPHER CANTWELL                *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 3
AFTERNOON SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:          John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             United States Attorney's Office




For the Defendant:           Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defender's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter

```
 1                        I N D E X

 2

 3

 4   WITNESS:                    Direct  Cross    Redirect  Recross

 5

 6   BRETT FERNALD
     By Ms. Krasinski            7

 7

 8   CHRISTOPHER CANTWELL    Transcribed under separate cover

 9

10   EXHIBITS                          FOR ID        IN EVD

11   Government's Exhibit 105                          21

12   Government's Exhibit 106                          21

13   Government's Exhibit 108                          21

14   Government's Exhibit 109                          23

15   Government's Exhibit 110                          17

16   Government's Exhibit 111                          19

17   Government's Exhibit 114                          12

18   Government's Exhibit 114B                         11

19   Government's Exhibit 115                          14

20   Government's Exhibit 115B                         13

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2             THE COURT:  I just want to get some timing issues

 3    together here.

 4             So the government is going to have one more witness,

 5    play a couple of excerpts, and rest.  I assume the defendant

 6    will have a motion.  Is there -- can you give me a sense of how

 7    long the government's witness will be on direct?

 8             MS. KRASINSKI:  Maybe 25 minutes to half an hour,

 9    your Honor.

10             THE COURT:  Okay.  And you've told the defense who

11    the witness is?

12             MS. KRASINSKI:  Yes, your Honor.

13             THE COURT:  How -- about how long do you anticipate

14    with cross?  I know it depends on what happens in direct,

15    but --

16             MR. LEVIN:  I don't think long, your Honor.  I don't

17    know what the witness is going to testify, but -- I know part

18    of what the witness is going to testify about and then there's

19    some other stuff, apparently, that I don't know.

20             THE COURT:  You know, lawyers don't get -- really

21    have the fun of surprise anymore.  When I was trying cases, I

22    tried a case against Bob Stein and the defendant was a state

23    senator who was a business partner with Bill Shaheen, who was

24    the U.S. Attorney at the time.

25             And I don't know if you ever tried a case with Bob,
```

**J.A. 727**

1  but Bob would -- instead -- in the defense case, he not only

2  wouldn't tell us anything in advance, he wouldn't announce the

3  witness's name.  He would just walk into the back of the

4  courtroom and bring a person in.

5           And I would try the case -- I would try the case

6  with a colleague and we'd look at the person, do you know who

7  that is?  I don't know.  Do you want to do him?  You do him.

8  That's how we -- and that's how much notice we got of what was

9  happening in our cases back then as a prosecutor.  The defense,

10 of course, got all the notice.

11          So a short witness, it sounds like.  I guess what

12 I'm going to have to do is hear that evidence, have you rest,

13 and excuse the jury for a motion.  Is that --

14          MR. LEVIN:  (Nods head.)

15          THE COURT:  All right.  And do you anticipate we

16 will be bringing the jury back in for additional evidence?

17          MR. WOLPIN:  I guess it's a question of timing and

18 how the Court wishes to operate over the next, you know,

19 36 hours.  I mean, my -- I think it's fair to say the odds are

20 that Mr. Cantwell will testify.

21          THE COURT:  Okay.

22          MR. WOLPIN:  So whether the Court wishes us to begin

23 that today or whether it wishes that to start tomorrow --

24          THE COURT:  I'm inclined to have it begin today with

25 the idea that if that's your only witness, we'll finish with

5

1   him -- if we finish before noon, I have a strong preference for

2   having both arguments -- all arguments and charge on the same

3   day.  I don't like to -- so I -- if it gets much beyond the

4   lunch break, I have trouble hearing any of the closing

5   arguments.  So I'd like to push, and that's what I'll do.

6           But it sounds like then we will have evidence and so

7   I don't see any efficient way to avoid it.  I'll just have to

8   tell the jury to come out, we'll take a 15-minute break, and

9   then you can start your -- start your case.  All right?  So

10  that'll be the plan.

11          MR. WOLPIN:  Thank you.

12          THE COURT:  All right.  Are we ready to bring the

13  jury in?

14          Okay.  We'll bring the jury in.

15                 WITH THE JURY PRESENT

16          THE CLERK:  Please be seated.  This hearing is back

17  in session.

18          THE COURT:  So let me update you on scheduling.

19          The government has one more witness that should be

20  relatively short.  We're going to then take a break and the

21  defense will have an opportunity to put on evidence.

22          I have told you several times, but I'll just remind

23  you, of course.  The defendant has no obligation to put on any

24  evidence.  A defendant has -- is entitled to a presumption of

25  innocence and he remains innocent unless the government proves

**J.A. 729**

```
 1   his guilt beyond a reasonable doubt.  He has no obligation to
 2   call any witnesses, ask any questions, and, of course, he has
 3   no obligation to testify.  He has a right not to testify.  And
 4   if he chooses not to testify, you can't hold his silence
 5   against him in any way or even discuss the fact that he hasn't
 6   testified.
 7            But if there is a defense case here, I think there's
 8   a very good prospect that we will conclude the case and have
 9   closing arguments and charge on Friday.  I can't guarantee it,
10   but that's where I'm currently thinking we're likely to be.
11            So there's a possibility you could have the case to
12   begin deliberating on Friday and, if not, you should have it on
13   Monday with plenty of time.  So we're -- we're well within our
14   time schedule.
15            All right.  So could you call your next witness,
16   please.
17            MS. KRASINSKI:  United States calls Officer Fernald.
18            THE CLERK:  Raise your right hand.
19            BRETT FERNALD, having been first duly sworn,
20   testified as follows:
21            THE CLERK:  Thank you.  Would you please state your
22   name and spell your last name for the record.
23            THE WITNESS:  My name is Brett Fernald,
24   F-e-r-n-a-l-d.
25            THE COURT:  All right.  You can be seated.
```

**J.A. 730**

```
 1              THE WITNESS:  Thank you, sir.
 2              THE COURT:  Go ahead, Counsel.
 3                     DIRECT EXAMINATION
 4  BY MS. KRASINSKI:
 5       Q.   By whom are you employed?
 6       A.   I'm employed by the Manchester, New Hampshire,
 7  Police Department.
 8       Q.   And how long have you served the Manchester Police
 9  Department?
10       A.   Seven and a half years.
11       Q.   And before that, what did you do?
12       A.   I was a police officer in Hooksett, New Hampshire,
13  for two and a half years.
14       Q.   And before you joining the Hooksett Police
15  Department, did you undergo any training?
16       A.   Yes.  I went to the New Hampshire Police Academy.  I
17  graduated class 154 and I graduated in April of 2011.
18       Q.   And what'd you do before that?
19       A.   Before I got into law enforcement, I served in the
20  U.S. Army as an Airborne Ranger and I was honorably discharged
21  in May of 2010.
22       Q.   And what's your current assignment?
23       A.   My current assignment is a task force officer with
24  the FBI.
25       Q.   How long have you been a task force officer with the
```

**J.A. 731**

8

```
 1    FBI?

 2          A.   Since May of 2019.

 3          Q.   Were you involved in the investigation into

 4    Christopher Cantwell?

 5          A.   Yes, I was.

 6          Q.   And as -- when did you become involved?

 7          A.   I became involved when I -- my assignment was to be

 8    a task force officer in May of 2019.

 9          Q.   And as part of that, have you listened to some

10    Radical Agenda episodes?

11          A.   Yes, I have.

12          Q.   Have you listened to Mr. Cantwell on the first

13    episode of the BowlCast?

14          A.   Yes, I did.

15          Q.   Have you watched interviews of Mr. Cantwell?

16          A.   Yes.

17          Q.   Have you listened to Mr. Cantwell's recorded jail

18    calls?

19          A.   Yes, I have.

20          Q.   And as a result of this, have you become familiar

21    with Mr. Cantwell's voice?

22          A.   Yes, I have.

23          Q.   Now, I want to first turn to Radical Agenda

24    episodes.  Where'd you find the episodes that you listened to?

25          A.   They are available on the Internet to the public.
```

1    There's a few different ways you can --

2    christophercantwell.com, joshwhotv.com, bitchute.com,

3    radicalagenda.com.

4        Q.    And as part of this investigation, were some of

5    those episodes downloaded?

6        A.    Yes.

7        Q.    Other than making the audio recording or the

8    recording of the podcast itself, is there anything else that

9    Mr. Cantwell did in relation to each Radical Agenda episode?

10       A.    He stated in his show that the live show, sometimes

11   he would edit out things and then present the edited version on

12   the podcast on his website.

13       Q.    Did he put anything else on his website?

14       A.    Yes.

15       Q.    What would he put on his website in relation to

16   each --

17       A.    The website would have -- it would have an episode

18   description, each episode would have a title, it would have a

19   stage number, an episode number, a brief synopsis of the

20   episode, and it would have the date that it was published.

21           MS. KRASINKSI:  I want to show the witness only

22   what's been marked for identification as Government's Exhibit

23   114B.

24           Do you recognize that?

25       A.    Yes, I do.

```
 1        Q.    What is it?

 2        A.    That is from christophercantwell.com.  It is the way

 3   each episode was presented on the website.  It has a picture,

 4   displays Radical Agenda, it gives the stage number, it gives

 5   the episode, and it gives a title of the episode.  It also has

 6   the date and at the bottom you can also see that it's

 7   christophercantwell.com.

 8        Q.    And so you -- you know that this was something that

 9   came from the defendant's website?

10        A.    Yes.

11             MS. KRASINSKI:  Your Honor, I move to admit

12   Government's Exhibit 114B.

13             MR. LEVIN:  Objection, 403.  We don't have an

14   objection to the exhibit, but to the image on the exhibit, we

15   think should be redacted.

16             THE COURT:  The one that's on the screen now?

17             MR. LEVIN:  Yes.

18             THE COURT:  Are you introducing it for that purpose

19   of that --

20             MS. KRASINSKI:  No, your Honor.

21             THE COURT:  -- that image?

22             MS. KRASINSKI:  It's for the date and to associate

23   it with the website, your Honor.

24             THE COURT:  How easily could you produce an exhibit

25   that redacts the image or blocks the image?
```

**J.A. 734**

1            MS. KRASINSKI:  Just one moment, your Honor.

2            THE COURT:  All right.

3            MR. LEVIN:  We would have the same objection to

4    the -- 115B.  I don't know if that's where they're going,

5    but ...

6            Thank you.

7            THE COURT:  All right.  It'll be admitted with the

8    redactions.

9            So there's an image on there that has no bearing on

10   the case, so we're taking that out.

11           You can go ahead and show it to the jury.

12           (Government's Exhibit 114B admitted.)

13      Q.    And, Officer Fernald, can you tell us the date and

14   title of this episode?

15      A.    Yes.  It's Radical Agenda S05E044, titled False Flag

16   Day, and the date is June 14th, 2019.

17      Q.    Now, in preparation for your testimony today, did

18   you review Government's Exhibit 114?

19      A.    Yes.

20      Q.    And what's that?

21      A.    It's the audio.

22      Q.    And is Exhibit 114 a short portion of that Radical

23   Agenda episode?

24      A.    Yes, it is.

25      Q.    What portion is it?

1      A.    It's the beginning portion where Mr. Cantwell says

2  the date and he says where he's broadcasting from.

3      Q.    And how do you know it's Mr. Cantwell that says

4  that?

5      A.    Through my investigation, I've become familiar with

6  his voice.

7            MS. KRASINSKI:  Your Honor, I move to admit

8  Government's Exhibit 114.

9            MR. LEVIN:  No objection.

10           THE COURT:  Without objection.

11               (Government's Exhibit 114 admitted.)

12                  (Audio recording played.)

13     Q.    And where did Mr. Cantwell say he was coming from?

14     A.    He said he was from Keene, New Hampshire.

15     Q.    And that's where the Radical Agenda studio is?

16     A.    Yes.

17     Q.    And did you confirm that during the investigation?

18     A.    Yes, I did.

19     Q.    And where is the Radical Agenda studio in Keene,

20  New Hampshire?

21     A.    It's located at 103 South Lincoln Street, Keene,

22  New Hampshire.

23     Q.    Let's briefly turn to Government's Exhibit 115B for

24  the witness only.  It's been marked for identification.

25            Now, we will redact the image from this in a moment,

**J.A. 736**

1    but do you recognize this?

2         A.   Yes, I do.

3         Q.   What is it?

4         A.   It's a posting on christophercantwell.com

5    referencing the Radical Agenda episode.  It gives the episode,

6    it gives the stage number, it gives the episode number, the

7    title of the episode, and it also gives the date of the

8    episode.

9         Q.   And how do you associate that with Mr. Cantwell?

10        A.   At the bottom, christophercantwell.com, and on the

11   show he refers listeners to that website and he appears to take

12   ownership of that website.

13             MS. KRASINSKI:  Your Honor, subject to a redaction

14   of the image, I move to admit Government's Exhibit 115B.  We

15   won't publish it until --

16             THE COURT:  All right.  Any objection, subject to

17   the -- if it's redacted in the way you're proposing?

18             MR. LEVIN:  No, your Honor.

19             THE COURT:  It'll be admitted, subject to the

20   redaction.

21             MS. KRASINSKI:  So we won't publish it at this time.

22             (Government's Exhibit 115B admitted.)

23        Q.   Officer Fernald, in preparation for your testimony

24   today, did you review Government's Exhibit 115?

25        A.   Yes, I did.

14

```
 1        Q.    And what's that?
 2        A.    It's an audio recording that -- Mr. Cantwell's voice
 3   saying it's the Radical Agenda and he gives the date and
 4   location that he's broadcasting from.
 5        Q.    So, again, a similar introduction to the Radical
 6   Agenda show?
 7        A.    Yes.
 8              MS. KRASINSKI:  Your Honor, I move to admit
 9   Government's Exhibit 115.
10              MR. LEVIN:  No objection.
11              THE COURT:  Without objection.  It can be played.
12                  (Government's Exhibit 115 admitted.)
13                      (Audio recording played.)
14        Q.    So, again, Mr. Cantwell said he was in Keene,
15   New Hampshire?
16        A.    That's correct.
17        Q.    And how did these dates, June 14th, 2017 -- excuse
18   me -- June 14th, 2019, and June 17th, 2019, relate to the
19   messages between Mr. Cantwell and Mr. Lambert?
20        A.    June 14th is the day prior to the exchange on
21   June 15th and June 17th is the day that Mr. Cantwell calls
22   Missouri CPS.
23        Q.    Now, let's switch gears for a bit and talk about
24   Mr. Cantwell's jail calls.
25              As part of the investigation, did you obtain and
```

1    listen to his jail calls?

2        A.    Yes, I did.

3        Q.    And what was the process for doing that?

4        A.    The process was after Mr. Cantwell's arrest on

5    January 23rd, I contacted Strafford County House of

6    Corrections.  From there I was referred to Sandy Bower, she's

7    a records supervisor, and I would make a request for the dates

8    in which I would like the phone calls and she would put the

9    dates -- she would put those phone calls on a CD for me and I

10   would go to Dover, New Hampshire, and pick up the CD.

11       Q.    And the CD, it contains the recordings of the calls

12   themselves?

13       A.    Yes.

14       Q.    Did it also contain associated data?

15       A.    Yes.  It obtained -- each CD obtained the software

16   to enable the jail calls to play.

17       Q.    So what other information were you able to identify

18   about each call?

19       A.    So each call would -- it would tell both parties

20   that the calls are being recorded and they can be used in

21   criminal proceedings.  It tells -- there's a recording of

22   Mr. Cantwell's voice saying it's -- that's who the call's from

23   and each call, it will give the -- the dial number, so the

24   number that Mr. Cantwell called, would be displayed and --

25       Q.    Was there a date?

**J.A. 739**

1      A.    And also there would be a date associated with when

2  the call was placed.

3      Q.    Now, that sort of admonishment that you talked

4  about, that the call was being recorded and could be used in

5  criminal proceedings, was that admonishment given at the

6  beginning of every single jail call?

7      A.    Yes.

8      Q.    In preparation for your testimony today, did you

9  review Government's -- what's been marked for identification as

10  Government's Exhibit 110?

11     A.    Yes, I did.

12     Q.    And what is that?

13     A.    Exhibit 110 is a jail call from February 28th

14  between Mr. Cantwell and Hannah Pleasants.

15     Q.    February 28th of what year?

16     A.    Sorry.  February 28th of 2020.

17     Q.    And you said it's between Mr. Cantwell and someone

18  named Hannah Pleasants?

19     A.    Yes.

20     Q.    Who is that?

21     A.    She appears to be a friend of Mr. Cantwell.

22          MR. LEVIN:  Objection, speculation.

23          THE COURT:  Overruled.

24     Q.    Now, have you listened to the entire February 28th,

25  2020, call between Mr. Cantwell and Ms. Pleasants?

**J.A. 740**

1       A.    Yes, I have.

2       Q.    And Exhibit 110 is a portion of that call?

3       A.    Yes, it is.

4       Q.    And is it a true and accurate portion of that call?

5       A.    Yes, it is.

6       Q.    Other than limiting the exhibit to that portion, was

7   the call edited, altered, modified, in any way?

8       A.    No, it's not.

9             MS. KRASINSKI:  Your Honor, I move to admit and

10  publish Government's Exhibit 110.

11            THE COURT:  All right.  All prior objections are

12  preserved.  Any other objections?

13            MR. LEVIN:  No other objections.

14            THE COURT:  All right.  It can be admitted.

15                (Government's Exhibit 110 admitted.)

16                    (Audio recording played.)

17      Q.    And, now, you said that that call occurred on

18  February 28th, 2018?

19      A.    Yes.

20      Q.    And when was the superseding indictment filed in

21  this case?

22      A.    July 8th, 2020.

23      Q.    And is that when Mr. Cantwell was charged with

24  threat to injure property or reputation?

25      A.    Yes.

**J.A. 741**

```
 1        Q.    So after this call?

 2        A.    After the call.

 3        Q.    Now, in preparation for your testimony --

 4              THE COURT:  I may have misheard the original date.

 5    Did you say February 28th, 2018?

 6              MS. KRASINSKI:  If I did, that would be incorrect.

 7              THE COURT:  That's what I believe you said.  Is it

 8    correct?

 9              MS. KRASINSKI:  No.

10              THE COURT:  It's 2019, isn't it?

11              THE WITNESS:  2020.

12        Q.    This call -- what's the date of this call?

13        A.    The day of the jail call with Hannah Pleasants,

14    February 28th, 2020.

15              THE COURT:  Okay.  All right.  So there's no dispute

16    about that.  She just misspoke.

17              All right.

18              MS. KRASINSKI:  Thank you, your Honor.

19        Q.    In preparation for your testimony today, did you

20    review Government's Exhibit 111?

21        A.    Yes, I did.

22        Q.    What is that?

23        A.    It's a jail call between Mr. Cantwell and Ingrid

24    Dean.

25        Q.    Who is Ingrid Dean?
```

**J.A. 742**

```
 1        A.    Ingrid Dean is a friend -- appears to be a friend of
 2   Mr. Cantwell.
 3        Q.    And what's the date of that call?
 4        A.    March 7th, 2020.
 5        Q.    And, again, have you listened to the entire
 6   March 7th, 2020, call between Mr. Cantwell and Ms. Dean?
 7        A.    Yes, I have.
 8        Q.    And is it -- Exhibit 111 a portion of that call?
 9        A.    Yes, it is.
10        Q.    Is it a true and accurate copy of the portion of
11   that call?
12        A.    Yes, it is.
13        Q.    Other than limiting the exhibit to the relevant
14   portion, has the exhibit or has the call been altered or
15   modified in any way?
16        A.    No, it has not.
17              MS. KRASINSKI:  Your Honor, I move to admit
18   Government's Exhibit 111.
19              THE COURT:  Subject to the prior objections, are
20   there any additional objections?
21              MR. LEVIN:  Just the prior objections, your Honor.
22              THE COURT:  All right.  Those objections are
23   preserved and overruled.
24              You can play the excerpt.
25                  (Government's Exhibit 111 admitted.)
```

20

```
 1                    (Audio recording played.)
 2        Q.   Now, Officer Fernald, did you hear Mr. Cantwell
 3   mention a phone call between himself and Katelen in that jail
 4   call?
 5        A.   Yes.
 6        Q.   And during the course of the investigation, did you
 7   become aware that Mr. Cantwell had emailed a recording to the
 8   FBI of a conversation he had with a woman?
 9        A.   Yes.
10        Q.   And who was the woman that he had that conversation
11   with?
12        A.   Katelen Fry.
13        Q.   And what was the date that Mr. Cantwell emailed his
14   recorded conversation to the FBI?
15        A.   December 12th, 2019.
16        Q.   And what was the date of Mr. Cantwell's arrest?
17        A.   January 23rd, 2020.
18        Q.   So Mr. Cantwell's December 12th, 2019, recorded
19   conversation, that was before Mr. Cantwell was arrested?
20        A.   Yes.
21        Q.   Was it before he was charged?
22        A.   Yes.
23             MS. KRASINSKI:  Your Honor, I believe based
24   on Agent Tongbua's testimony and discussion with the parties,
25   at this point I'd move to introduce Government's Exhibits 105,
```

**J.A. 744**

```
 1   106, and 108, which are portions of that call.
 2            THE COURT:  Are there objections other than those --
 3   any of those previously raised?
 4            MR. LEVIN:  No, just the ones we previously made,
 5   your Honor.
 6            THE COURT:  All right.  Those will be admitted
 7   subject to those objections being overruled.
 8          (Government's Exhibits 105, 106, 108 admitted.)
 9            MS. KRASINSKI:  And permission to publish, your
10   Honor?
11            THE COURT:  Yes.
12            MS. KRASINSKI:  Let's do them, actually, in reverse
13   order.  Let's start with Government's Exhibit 108.
14                     (Audio recording played.)
15            MS. KRASINSKI:  All right.  Let's listen to
16   Government's Exhibit 106.
17                     (Audio recording played.)
18            MS. KRASINSKI:  And, finally, Government's
19   Exhibit 105.
20                     (Audio recording played.)
21            MS. KRASINSKI:  Nothing further, your Honor.
22            THE COURT:  Thank you.  Cross-examination?
23            MR. LEVIN:  No questions, your Honor.
24            THE COURT:  Thank you, sir.  You can step down.
25                     (Witness excused.)
```

```
 1               THE COURT:  Does the government have any additional
 2    witnesses?
 3               MR. DAVIS:  Could we have just a moment, your Honor?
 4               THE COURT:  Yes.
 5               And I'll note if there are any exhibits that were
 6    inadvertently omitted that were not moved into evidence, we can
 7    do that as a cleanup matter later.
 8               MS. KRASINSKI:  Your Honor, I think there's one last
 9    item -- one last portion of the call between Katelen Fry and
10    Christopher Cantwell.  That's Government's Exhibit 109.
11               THE COURT:  All right.  So you need to -- do you
12    need to recall the witness?
13               MS. KRASINSKI:  We've already --
14               MR. LEVIN:  That's not necessary from our
15    perspective, your Honor.
16               THE COURT:  All right.  So you're not disputing that
17    this call was a call in which the person who appears to be
18    Mr. Cantwell is, in fact, Mr. Cantwell; is that what we're
19    talking about?
20               MR. LEVIN:  That's correct.
21               THE COURT:  All right.  So the -- the parties
22    stipulate as to this call that the person whose voice you will
23    recognize as being Mr. Cantwell's is, in fact, Mr. Cantwell's
24    voice and the government -- and the defense, subject to
25    objections previously raised with me, has no additional
```

23

```
 1   objections to playing that tape.

 2              MR. LEVIN:  That's correct.

 3              THE COURT:  All right.  So you can go ahead and play

 4   that --

 5              MS. KRASINSKI:  Thank you, your Honor.

 6              THE COURT:  -- additional --

 7              (Government's Exhibit 109 admitted.)

 8                   (Audio recording played.)

 9              MS. KRASINSKI:  Your Honor, the United States rests.

10              THE COURT:  All right.  Members of the jury, we'll

11   take a short break and I'll be bringing you back into the

12   courtroom to hear any defense case that they may have starting

13   in a few minutes.

14              So take your break now and we'll bring you back in

15   as soon as we're ready.

16              THE CLERK:  All rise for the jury.

17                   (Jury excused.)

18              THE COURT:  All right.  The defense has a motion.

19   I'll hear you on it.

20              MR. LEVIN:  Yes, your Honor.  At this time, the

21   defense would move to dismiss under Rule 29 of the Federal

22   Rules of Criminal Procedure.

23              Viewed in the light most favorable to the

24   government, no reasonable jury could find the defendant guilty

25   on any of the three counts on the facts presented.
```

24

1          We're making a general motion for acquittal under

2    Rule 29.  We're not singling out any particular count or any

3    particular element of any count.  We're making a general

4    insufficiency motion to dismiss at this time, your Honor.

5          THE COURT:  All right.  And you don't want

6    to specifically draw my attention to any particular deficiency,

7    just generally you don't think they've put in a case that any

8    juror could find guilt on as to any of the three charges?

9          MR. LEVIN:  That's correct, your Honor.

10          THE COURT:  All right.  Construing the evidence in

11    the light most favorable to the government, based on the

12    arguments that have been presented to me, I believe there's

13    sufficient evidence to permit a reasonable jury to find the

14    defendant guilty on all three charges.

15          Accordingly, I deny the motion and the -- of course,

16    the defense can renew the motion at the appropriate time at the

17    end of its case if it chooses to do so.

18          I understand that there may be a defense case.  Am I

19    right?

20          MR. WOLPIN:  Correct.

21          THE COURT:  And does that case consist of the

22    defendant as the -- the defense principal witness?

23          MR. WOLPIN:  Yes, your Honor.

24          THE COURT:  Mr. Cantwell, before you testify, I just

25    want to make sure you understand something.  I go over it with

**J.A. 748**

```
 1   defendants at every -- every time we get to this point in the
 2   proceeding.
 3           That is, there are certain things that your lawyers
 4   are principally responsible for in a case; they have to take
 5   your advice, they have to consult with you, they have to listen
 6   to you.  But there are certain aspects of a trial where they
 7   make the decision after consulting with you, like which
 8   witnesses to call, what questions to ask those witnesses.
 9   That's really the job of the lawyers in consultation with you.
10           There are other things that are exclusively your
11   judgment, you have complete control over.  One of those things
12   is whether to testify or not to testify.  As you heard me say,
13   you have a constitutional right to remain silent.  I have told
14   and would continue to tell the jury they couldn't hold your
15   silence in any way against you.  It's totally up to you to
16   decide whether to testify or not.  Of course, I want you to
17   listen to your advice of counsel, but you have to make that
18   decision on your own.
19           Do you understand all of that?
20           THE DEFENDANT:  I do, sir.
21           THE COURT:  And understanding all of that, are you
22   electing to testify in your own behalf?
23           THE DEFENDANT:  I am, Judge.
24           THE COURT:  All right.  So as far as I'm concerned,
25   we're ready to bring the jury back in and let's get started
```

**J.A. 749**

1    with the case.  Any reason why we can't go right ahead?

2           Oh, I did want to ask one thing.  Let me ask my

3    marshals; how do you want to handle him getting to the witness

4    stand?

5           THE MARSHAL:  I was just thinking that myself, your

6    Honor, and that would be your discretion.  I'm not sure what --

7           THE COURT:  All right.  I am not worried that

8    Mr. Cantwell is a security threat.  I'm sure -- he's been

9    completely compliant and I -- I'm sure he would obey my

10   instructions.  I have no objection to him walking up to the

11   stand and taking it.  I always listen to my marshals.

12          The other question I would have is sometimes the

13   marshal service people want to sit in closer proximity to the

14   defendant than across the room, but yet we may have -- I'd ask

15   my case manager who did this the last trial, have you thought

16   through that issue?  Is there space for them to --

17          THE CLERK:  At the last trial, your Honor, the

18   defendant wasn't in custody, so we didn't have an issue.

19          THE COURT:  Yeah.  I'm not sure as we sit here that

20   there's really much room for the marshals to sit consistent

21   with our social distancing policy.

22          Tracy, have you thought about this issue yet?

23          DEPUTY CLERK UHRIN:  No.  Do we have an empty chair

24   that we're not using for a juror?  The only thing I could think

25   of --

**J.A. 750**

```
 1                THE CLERK:  I could slide the jurors down.

 2                DEPUTY CLERK UHRIN:  -- have them slide down and

 3     have him in the corner.

 4                THE COURT:  It isn't -- I mean, I want to be clear.

 5           Mr. Cantwell, I don't think you're a danger to me or

 6     anybody in the courtroom.  I'm perfectly comfortable with it.

 7     I just always have to listen to advice I get from my security

 8     folks on it.

 9                So one of the marshals, senior Marshal Service

10     persons, is on his way up and I'll take his advice.  But I want

11     to reiterate I'm not worried about you, Mr. Cantwell; I don't

12     think the prosecutor's worried about you; but I -- I do listen

13     to my security people, at least hear what they have to say.

14                All right.  So our security chief has entered the

15     courtroom.

16                Sir, I wanted to consult with you about --

17     Mr. Cantwell's elected to testify.  We have in -- usually when

18     someone's in custody testifying in my courtroom, we move them

19     before the jury's brought in to the witness box and we have

20     marshals people sitting within closer proximity than they're

21     currently sitting.

22                Mr. Cantwell is in custody.  It's my judgment that I

23     am comfortable -- I personally am comfortable with him walking

24     to the witness stand and taking his seat there.  I note that

25     it's hard for me to see how I could configure the courtroom
```

**J.A. 751**

```
1   consistent with social distancing rules and have your personnel
2   sitting close by.
3           So I'm -- I'm -- personally, I have no problem with
4   Mr. Cantwell testifying there with your personnel where they
5   are, but if there's a particular security concern you have and
6   a recommendation for me, I at least want to hear it.
7           THE MARSHAL:  If I could just take a quick look,
8   your Honor.
9           THE COURT:  Yeah, go ahead.
10          THE MARSHAL:  Thank you.  I appreciate it.
11          These are two jurors?
12          THE COURT:  Right.
13          THE MARSHAL:  Your Honor, if we could just maybe
14  keep this door propped --
15          THE COURT:  Yup.
16          THE MARSHAL:  -- and I can have one of my security
17  staff right over here.  I think that will cover it.
18          THE COURT:  I think that's a fine solution.
19          So we'll allow Mr. Cantwell, when called, to walk to
20  the witness stand.  He can testify as he normally does.  The
21  one difference from ordinary is that the rear courtroom door
22  will remain open and a marshal service person will be in the
23  vicinity of the open door.
24          And I -- I'm completely satisfied with that, sir.  I
25  think that's a good recommendation.  Thank you.
```

J.A. 752

 1                All right.  So let's -- let's deal with it that way

 2     and we're ready to bring the jury in.

 3                        WITH THE JURY PRESENT

 4                THE CLERK:  Please be seated.  This hearing is back

 5     in session.

 6                THE COURT:  All right.  The defense may call its

 7     first witness.

 8                MR. WOLPIN:  The defense would call Mr. Cantwell.

 9                THE COURT:  Mr. Cantwell, come on up.  Stand by the

10     witness stand and raise your right hand, please.

11     (Testimony of Christopher Cantwell filed under separate cover.)

12                (Proceedings adjourned at 4:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 753**

C E R T I F I C A T E


      I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 5/12/21           */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:20-cr-6-01-PB
            v.                    *   September 24, 2020
                                  *   1:50 p.m.
CHRISTOPHER CANTWELL              *   Afternoon Session
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT EXCERPT OF JURY TRIAL DAY 4
TESTIMONY OF CHRISTOPHER CANTWELL
BEFORE THE HONORABLE PAUL J. BARBADORO


Appearances:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           United States Attorney's Office




For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defender's Office




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter

2

```
1                          I N D E X

2

3

4    WITNESS:              Direct   Cross   Redirect   Recross

5
     CHRISTOPHER CANTWELL      3
6

7

8    EXHIBITS                        FOR ID          IN EVD

9
     Defendant's Exhibit G                             41
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**J.A. 756**

```
 1                  P R O C E E D I N G S
 2        (Following is an excerpt of Jury Trial Day 4.)
 3             THE CLERK:  Please be seated.  This hearing is
 4   back in session.
 5             THE COURT:  All right.  The defense may call
 6   its first witness.
 7             MR. WOLPIN:  The defense would call
 8   Mr. Cantwell.
 9             THE COURT:  Mr. Cantwell, come on up.  Stand
10   by the witness stand and raise your right hand, please.
11             CHRISTOPHER CANTWELL, having been first duly
12   sworn, testified as follows:
13             THE CLERK:  Thank you.  Would you please state
14   your name and spell your last name for the record.
15             THE WITNESS:  Christopher Cantwell,
16   C-a-n-t-w-e-l-l.
17             THE COURT:  Great.  You can be seated, sir.
18             And go ahead when ready, Mr. Wolpin.
19             MR. WOLPIN:  Thank you.
20                    DIRECT EXAMINATION
21   BY MR. WOLPIN:
22        Q.  So, Chris, let's just start with a little bit
23   about you as a person.
24             Before you came to New Hampshire, where were
25   you from?
```

J.A. 757

4

```
 1        A.    Long Island.

 2        Q.    Okay.  New York?

 3        A.    Yes.

 4        Q.    Okay.  And is that where you grew up as a kid?

 5        A.    Yes.

 6        Q.    And at some point did you move to

 7   New Hampshire?

 8        A.    I did.

 9        Q.    All right.  Before you came to New

10   Hampshire -- well, did you come to New Hampshire as an

11   adult or as a child?

12        A.    As an adult.

13        Q.    All right.  And when you were an adult, how

14   old were you when you came here?

15        A.    I moved here in 2012, so I would have been 32

16   or 33.

17        Q.    Okay.  Before you came to New Hampshire, what

18   kind of work did you do?

19        A.    I was an IT guy.  Information technology,

20   computers, networks.

21        Q.    Okay.  Did you work for big companies, did you

22   work for yourself?

23        A.    I worked for medium to -- small- to

24   medium-sized companies and I worked as an independent

25   contractor for a period of time.
```

```
 1        Q.    Okay.  And did you have some education in that

 2   realm of computer technology?

 3        A.    I learned IT the way I learn all things, the

 4   hard way.

 5        Q.    Okay.

 6        A.    I took a BOCES computer technician's class in

 7   Long Island and everything else I figured out on my own.

 8        Q.    Okay.  And what brought you to New Hampshire?

 9   Why'd you come here?

10        A.    I became concerned about New York State's gun

11   control regime especially, but I -- I liked the -- the

12   freedom-oriented culture here.

13        Q.    Okay.

14        A.    I was specifically interested initially in the

15   Free State Project.

16        Q.    All right.  So what part of the state did you

17   come to?

18        A.    Just outside of Keene --

19        Q.    And what --

20        A.    -- in Marlborough.

21        Q.    And what is significant about Keene, if

22   anything?

23        A.    When I was investigating where in

24   New Hampshire to move, I saw the guys in Keene.  They

25   were producing a lot of media.  It's a -- Keene is home
```

**J.A. 759**

1   to a broadcast talk radio show, nationally syndicated

2   broadcast talk radio show, called Free Talk Live.  And

3   there were associated media properties associated with

4   Free Talk Live, YouTube channels and blogs and that sort

5   of thing.  And they seemed to be drawing a lot of

6   attention to themselves and I was one of the people that

7   got their attention drawn.

8        Q.   Okay.  So before you came to New Hampshire,

9   you said you were working in IT, but did you have some

10  media background yourself before you came --

11       A.   I did.  I had built up a bit of a social media

12  following in New York.  I ran for the United States

13  House of Representatives in New York's First

14  Congressional District.  During that time, I had built

15  up a bit of a social media following and I did a little

16  bit of standup comedy as well and I sort of developed a

17  YouTube channel.

18       Q.   Okay.  So you said standup comedy.  You mean

19  as in going out at night for open mic nights in

20  New York?

21       A.   Yeah.  I was -- fortunately, for the

22  audiences, never had a big, full-featured thing or

23  whatever, but I was doing open mic nights and I'd -- and

24  I'd get some laughs.

25       Q.   Okay.  And you said you -- you started with a

**J.A. 760**

1    YouTube channel.  Did you have a particular media, a

2    name, of something that you were doing at that time?

3        A.    This was all built up.  This all happened -- I

4    created my YouTube and my Facebook when I was running

5    for Congress, so at that time it didn't make much sense

6    to work under an alias and I've worked under my real

7    name ever since.

8        Q.    Okay.  And what was -- did you have a podcast

9    originally before you got here?

10       A.    No, not originally.  I was making short

11   YouTube videos.

12            A podcast, for those who don't understand it,

13   it's a specific format that it -- RSS stands for real

14   simple syndication.  So like a podcast will go out over

15   iTunes and Stitcher and these sorts of things.

16            My YouTube videos were only on my YouTube

17   channel, so they were not syndicated.  And that's the

18   difference between the YouTube channel and a podcast.

19       Q.    Okay.  And what was the first podcast that you

20   created?

21       A.    The -- the first podcast that I created was

22   called Some Garbage Podcast.  It was a self-deprecating

23   title that me and a business partner of mine started,

24   basically talking about politics after work and we

25   decided we'd let other people listen because it seemed

**J.A. 761**

8

1    like a lot of people we knew were starting podcasts.

2    And since I did not think our production value was very

3    high, we sort of used a self-deprecating title to get

4    away with the poor production quality initially.

5         Q.   Okay.  Was that something that was able to

6    lead to you making a living from the Some Garbage

7    Podcast?

8         A.   Not initially, no.  -- I started doing Some

9    Garbage Podcast back in Long Island -- I went back to

10   Long Island for a period of time, had a job with my

11   partner Eddie, and I was working for this media

12   marketing company with him and that was paying the bills

13   and we were doing Some Garbage Podcast as a hobby.  But

14   I was surprised to find after some period of time that

15   people were willing to pay for the production and more

16   and more I started to focus my efforts on building a

17   media career.

18        Q.   Okay.  So how does someone make money from or

19   how did you make money from a podcast?

20        A.   There are lots of ways to do that and I tried

21   to do all of them.  You can solicit donations from the

22   audience, and especially in the early stages that tends

23   to be the most lucrative way of doing it.

24             Later on, when you have a larger audience, you

25   get advertising dollars and there's some very --

**J.A. 762**

```
1   advertising programs with very low bars of entry, such
2   as Google AdSense, Amazon affiliates, and that sort of
3   thing.  And if you have the wherewithal to do it, then
4   you can build premium features into your website,
5   members-only paywall functions, as I did.
6            Later on I began to sell T-shirts, mouse pads,
7   other merchandise with the -- with the show logo on it.
8       Q.   Okay.  So let's get back to what -- when you
9   came to New Hampshire.  You came to New Hampshire about
10  what year?
11      A.   So I had come to New Hampshire -- to be
12  precise, I had come here originally in 2012.  I took a
13  job back in New York for a little while and that's when
14  I started doing Some Garbage Podcast and then I came
15  back to New Hampshire in 2014.
16      Q.   Okay.  And since 2014 to now, have you been
17  consistently a New Hampshire resident?
18      A.   I have.
19      Q.   Okay.  Now, while here, did you develop a new
20  sort of media venture while you were here in
21  New Hampshire?
22      A.   I don't know if I'd call it an entirely new
23  venture, but I rebranded the Radical Agenda -- I
24  rebranded Some Garbage Podcast to Radical Agenda.  And
25  that became -- I -- I -- as the production started to
```

**J.A. 763**

1    make more money and gain more attention, I felt it was

2    worth adding the effort to increase the production value

3    and at that point it didn't make much sense to call it

4    garbage anymore.

5        Q.    All right.  So at the outset, at the beginning

6    of Radical Agenda, what were sort of the political

7    leanings of the show?  What were you expressing?

8        A.    At the beginning stages of the entire venture,

9    it was -- it was Libertarian and it would be safe to say

10   an extreme form of Libertarianism known as

11   Anarcho-capitalism, the idea being privatize everything;

12   you don't have to have the government involved in any

13   aspect of the human condition, a concept known as the

14   nonaggression principle, stating that the only proper

15   use of coercion or initiatory -- the only proper use of

16   coercion or violence is in defense of person and

17   property.

18       Q.    So over time, how does your content change of

19   this Radical Agenda podcast?

20       A.    Well, it's an open phone show and so the

21   Radical Agenda's theme, above all else, was that you're

22   not going to get hung up on if you call in and you

23   disagree with me or you got an idea that is kind of out

24   there.  Right?

25             And so as I interact with people who have

1    different ideas, one cannot help but be influenced by

2    the people one speaks to.  And as -- especially as

3    Donald Trump began to gain speed for his presidential

4    campaign, that drew a lot of attention to the issue of

5    immigration.  And so you could say that this caused my

6    political views to shift rightward substantially.

7        Q.    Okay.  And on your show, do you say things

8    that are shocking or is it pretty toned down?

9        A.    Shocking is pretty much the whole entire point

10   of it.  I shouldn't say that.  I'm sorry.  It is -- it

11   is part of the branding to be a shocking production.  It

12   is an uncensored -- it's styled in part after -- I

13   always give credit to the Opie and Anthony show, which

14   is a morning radio show, used to be on Terrestrial Radio

15   and then was on strictly satellite radio, and now -- now

16   one of the hosts is no longer even with Sirius XM.  They

17   launched satellites into outer space to get away from

18   the censors and even that didn't work.

19       Q.    All right.  So swearing, is there swearing in

20   your show, yes or no?

21       A.    Oh, yeah.

22       Q.    Okay.  Is there racist language in your show?

23       A.    Yes.

24       Q.    All right.  Is there homophobic language in

25   your show?

**J.A. 765**

```
 1        A.    Yes.
 2        Q.    Okay.  And is that by callers or you or both?
 3        A.    Both.
 4        Q.    Okay.  Now, as the host of Radical Agenda, did
 5   you go under the name Chris Cantwell or did you use some
 6   other name?
 7        A.    I am Chris or Christopher Cantwell.  I never
 8   used an alias.
 9        Q.    All right.  And as far as the show, did you
10   have a phone number?
11        A.    I -- I should say -- not that I've never used
12   an alias.  There are times when I've played characters
13   on the show, but everybody knows that Christopher
14   Cantwell is the host and that's my real name, yeah.
15        Q.    Okay.  And you have a show number that's
16   published online?
17        A.    Yes.
18        Q.    But you have a private phone number as well?
19        A.    I do.
20        Q.    Okay.  Do you have a -- do you have a P.O. box
21   or an address associated with your show?
22        A.    Yes.  I have a publicly listed -- on my
23   contact form on the website, I have an address where
24   people can send me postal mail and that goes to a -- a
25   service called the Shipping Shack in Keene, New
```

J.A. 766

13

```
 1   Hampshire, so that -- so I'm not giving my home address
 2   out to lunatics.
 3       Q.   Okay.  So you made a conscious decision not to
 4   put your home address in with your work address as far
 5   as the show?
 6       A.   Yeah.  If I had my way, my driver's license
 7   would say the Shipping Shack's address.  The only things
 8   I put my home address on are things that I'm like
 9   legally obligated to do so.
10       Q.   Okay.  And so, typically, your home address
11   wasn't known, at least at the beginning?
12       A.   No, it wasn't.
13       Q.   All right.  I'm going to move on and ask you
14   some questions about your original relationship with the
15   Bowl Patrol.
16       A.   Yeah.
17       Q.   So what's the first thing you hear about them
18   and how do you start interacting with them?
19       A.   So the Bowl Patrol shows up in my social media
20   orbit sometime late 2017 to early 2018.  And at the
21   period of time that this happens, there's a lot of like
22   social media censorship going on of right-of-center
23   political views, especially in the financial system as
24   well.  So like I lost my PayPal account and I got banned
25   from Facebook and this type of stuff.
```

**J.A. 767**

14

```
1              And when I first come into contact with them,
2    they're on these uncensored platforms that people were
3    migrating to, Telegram, Gab, Minds, to name the three
4    probably most prominent ones in this category of
5    service.
6              And so they started to show up in my Gab
7    mentions, which is like -- if any of you have used
8    Twitter, somebody mentions you, you see; if somebody
9    retweets you, you see.  It's a similar thing on Gab.
10             I had -- on Telegram I had a chat room
11   where -- it was for listeners to interact with me and
12   with each other and they joined that chat room at some
13   point.  I don't remember which one first, but they
14   basically showed up in my social media orbit in that
15   period of time.
16        Q.   Okay.  So individuals started showing up.  Who
17   were the prominent members at first who started showing
18   up?
19        A.   The ones that first come to my mind would be
20   Vic Mackey, Cheddar Mane, Mosin-Nagant, and Hardmous.
21        Q.   And do you know them personally when they show
22   up in your -- your chat groups?
23        A.   Initially, no, not at all.  I have no idea.  I
24   couldn't pick these guys out of a lineup.  Most of them
25   I still can't.
```

**J.A. 768**

1    Q.    Okay.  So when they are showing up in your

2    social media world, they're not showing up under their

3    own names?

4    A.    No, no.

5    Q.    They've all picked some kind of pseudonym?

6    A.    Yeah.

7    Q.    Okay.  Do those pseudonyms tend to repeat?  I

8    mean, do they show up under the same pseudonym multiple

9    times?

10    A.    Yeah.  Typically they would stick with an

11    identifiable theme of an identity.  So, for example,

12    Mosin-Nagant might be Masin-Nagant.  Like there would be

13    variations on it at times.  But, generally speaking, you

14    could follow one user from one platform to another.  And

15    even if he got banned from one platform and came back,

16    he would have something that would indicate to you that

17    it was the person that you were talking to.

18    Q.    Okay.  And --

19    A.    But not always.

20    Q.    And so this, you said, is initially happening

21    late 2017, 2018?

22    A.    Yeah, yeah.

23    Q.    Okay.  And where's your head at that time?

24    What are you thinking?  Why are you engaging with them?

25    A.    I'm thinking that -- I'm thinking that he --

1   the social media censorship is a political tactic that I

2   don't want rewarded.  And so I think that the idea

3   behind it is if you're -- if -- that if they censor

4   people from social media and that changes the direction

5   of the content, that that's going to encourage the

6   censorship and that that's going to be negative not only

7   for me, but for society more broadly, and so I want to

8   do the exact opposite of what the censorship means to

9   do.  And --

10       Q.   So you make a conscious decision to sort of

11  engage with them?

12       A.   Yeah.  They are -- I didn't come into contact

13  with a whole lot of people who did edgier content than I

14  did, but the Bowl Patrol met that bill.

15       Q.   Okay.  So you saw them essentially as more

16  extreme than you were?

17       A.   Yes, definitely.

18       Q.   Okay.  And for a time, did that

19  relationship -- I mean, did you guys encourage each

20  other?  Was there some working relationship?

21       A.   Yeah.  I mean, they were -- the Bowl Patrol

22  was talented.  They had -- they -- they were good with

23  photoshopping and image -- image editing application.

24            You might hear me use the word photoshop as a

25  verb sometimes.  They would photoshop things and -- and

```
 1   they -- they were talented guys and they had some --
 2   their content was out there, but they had pretty good
 3   audio quality and they were useful to me for a period of
 4   time.
 5        Q.   Okay.  And at some point did that relationship
 6   between you and these members of the Bowl Patrol begin
 7   to fray?
 8        A.   Yeah, that would be one way of putting it.
 9   The -- the relationship started to go south towards
10   the -- towards the end of 2018.
11        Q.   Okay.  And would members of the Bowl Patrol
12   call in to your show?
13        A.   Yeah.  They would call in to the show.  And
14   initially it was either productive and/or funny, but
15   towards the end of 2018, it started to get downright
16   scary.  And then after that it started to get just plain
17   disruptive.
18        Q.   Okay.  So is there a particular call from
19   Cheddar Mane in October that you remember?
20        A.   There's a few.  Notably, just before Robert
21   Bowers walked into the Tree of Life Synagogue in
22   Pittsburgh and gunned down 11 people, Cheddar had called
23   in to the show and was asking me something to the effect
24   of -- I should set the stage for this.
25             On the show, I take a view of law enforcement
```

```
1    that is at odds with some people on -- in extremist

2    movements.  I think that it's in our best interest to

3    treat law enforcement with respect and to work with them

4    if we can because what we are trying to do is not

5    inherently criminal.  People try to treat us that way

6    and for that reason, it's -- it's in our best interest

7    to maintain positive relationships with law enforcement.

8            The Bowl Patrol took a different angle on that

9    and on I believe it was October 15th, Cheddar called in

10   to the show and started basically saying something to

11   the effect of --

12           MS. KRASINSKI:  Objection, your Honor.

13   Consistent with the other rulings, I'd ask that we not

14   get into those statements.

15           THE COURT:  I'm sorry, members of the jury.

16   I've got to excuse you for a few minutes because I --

17   I've got to hash this thing out.  I thought I had

18   resolved it, but I'll have to take a break.

19           THE CLERK:  All rise for the jury.

20                (Jury excused.)

21           THE COURT:  All right.  Mr. Wolpin, go through

22   step by step every bad thing you want to bring out about

23   the --

24           MR. WOLPIN:  This isn't a bad thing.  That's

25   not the point of this right now.
```

J.A. 772

```
1              THE COURT:  Well, I've got to understand
2   better what you're doing because I can't keep stopping
3   every two minutes while you guys fight over this stuff.
4              MR. WOLPIN:  So --
5              THE COURT:  What are you trying to do?
6              MR. WOLPIN:  To explain why there's a breach.
7   Essentially, Cheddar Mane calls and they have this
8   discussion that's a real discussion about police, and
9   then Chris sort of shuts them down and doesn't agree
10  with them and that's what starts the rift.
11             So this is an explanation of why they split.
12  This isn't anything --
13             THE COURT:  Does the government know what he's
14  talking about?  I mean, I -- I don't know what the
15  evidence is, so if all he's going to say is we had a
16  discussion and Cheddar Mane expressed different views
17  than I did about the police and we -- we disagreed and
18  that was the beginning of our -- the fallout in our
19  relationship, that's all he's going to say, I don't know
20  why that's objectionable.  Is that all he wants to say?
21             MR. WOLPIN:  Yes.
22             THE COURT:  All right.  Are you going to be
23  trying to go in and say all these bad things about the
24  Bowl Patrol, some more stuff like that?  Are you trying
25  to do that?
```

J.A. 773

```
 1              MR. WOLPIN:  What I -- the audio I have and --
 2              THE COURT:  Yeah, because, see, what's hard
 3    for me -- and you've got to be careful about what you're
 4    doing here because you -- I can't -- I can't let you use
 5    rulings like, oh, let's not mention Charlottesville, to
 6    try to create an impression about your client while
 7    damning the victim.  Do you understand that?
 8              MR. WOLPIN:  Yes.
 9              THE COURT:  So you run -- you run risks that
10    you will do things that will cause me to reassess prior
11    rulings I've made in this case at your request to limit
12    what the jury can hear about Mr. Cantwell.  So please be
13    aware of that fact.
14              Now, tell me what you want to do that's like
15    why Cheddar Mane's bad, reprehensible, has terrible
16    views; why the Bowl Patrol's bad, reprehensible, has
17    terrible views.  Anything you've got in your direct
18    about those things?
19              MR. WOLPIN:  Not significantly, no.
20              THE COURT:  Okay.  Well, if it doesn't come
21    up, then it's not going to be a problem.
22              All right.  So is that what you were concerned
23    about?
24              MS. KRASINSKI:  Yes, your Honor.
25              THE COURT:  All right.  So he's saying -- he's
```

**J.A. 774**

21

1    disavowing any intention to do that and so we won't --

2    we don't have a problem.

3         MR. WOLPIN:  The one side note on that is I

4    do -- would like Mr. Cantwell to be able to play a brief

5    clip of prank calls to explain how that was occurring on

6    his show.  That is an audio I think is --

7         THE COURT:  Is it a -- is it Cheddar Mane --

8         MR. WOLPIN:  Some of them are.  Some are Fevs.

9    It's all mixed in.  It's a sort of a -- in an effort to

10   try to keep it short, we cut them into one cut instead

11   of having, you know --

12        THE COURT:  So you've cut together a bunch of

13   prank calls to say this is an example of what I was

14   getting.

15        MR. WOLPIN:  Yes.

16        THE COURT:  Okay.  Has the government heard

17   those prank calls?

18        MR. WOLPIN:  They were provided in the

19   exhibits.

20        MS. KRASINSKI:  Do we have --

21        THE COURT:  Do you --

22        MR. WOLPIN:  B-5.

23        MS. KRASINSKI:  B-5 is a compilation?

24        MR. WOLPIN:  Yes.

25        THE COURT:  Have you seen a tran -- are you

```
 1   going to object to that compilation?

 2           MS. KRASINSKI:  We haven't seen a transcript,

 3   your Honor.

 4           THE COURT:  If you need to listen to them, you

 5   can do that.

 6           What I'm trying to do is run a trial where

 7   somebody's guilt or innocence doesn't depend upon the

 8   beliefs that they have -- not the beliefs Mr. Cantwell

 9   has, not the beliefs that Mr. Lambert has -- but it's

10   really hard to do, given the way you want to present the

11   case.  And I'm trying to give you as much latitude as

12   possible, but at some point I'm going to lose the

13   ability to draw lines if you are going to continue to

14   want to engage in this let's try to show what awful

15   beliefs Mr. Lambert and the Bowl Patrol have.

16           MR. WOLPIN:  I wasn't -- that's not the reason

17   I was using this.

18           THE COURT:  All right.

19           MR. WOLPIN:  I was trying to -- I think there

20   needs to be some explanation of what happened between

21   the two of them.  I wasn't planning on playing any calls

22   of -- in that sense.  The pranks was what I was headed

23   to.  So I wasn't --

24           THE COURT:  All right.

25           MR. WOLPIN:  -- attempting to go in that
```

J.A. 776

```
 1   direction.
 2             MS. KRASINSKI:  Can you play --
 3             MR. WOLPIN:  Sure.
 4             THE COURT:  Let's just play it in the
 5   courtroom right now.  Play the compilation so we can
 6   hear the whole thing.
 7                  (Audio recording played.)
 8             THE COURT:  Stop for a minute.  Stop for a
 9   minute.
10             All right.  I'm not going to let you play that
11   whole thing.  That is like -- that's just a complete
12   waste of time.  If you want to play the first
13   30 seconds --
14             MR. WOLPIN:  Okay.
15             THE COURT:  -- you can play the first
16   30 seconds to -- just to say, yeah, it's really
17   frustrating when I can't have an intelligent
18   conversation because a bunch of idiots are calling and
19   making gobbledygook sounds.  You can do that.  But stop
20   it at approximately 30 seconds.  I don't want to go
21   beyond that.
22             It's an illustration.  He can then say, and
23   this went on and on and multiple shows and it was
24   extremely frustrating.
25             All right?  So 30 seconds, approximately, stop
```

1    it.  Okay?

2              MR. WOLPIN:  All right.

3              THE COURT:  Are you doing anything else that's

4    more along the lines of Bowl Patrol bad, Lambert bad?

5              MR. WOLPIN:  The only other thing was I had a

6    discussion with Mr. Cantwell, a discussion about Fed

7    postings, but --

8              THE COURT:  Yeah.  See, the problem is that I

9    don't even see what the -- frankly, the relevance is of

10   I'm really angry at Mr. Lambert as a Bowl Patrol, other

11   than to prove the government's case.

12             So because I don't see the relevance of it,

13   it's really hard for me to give you any more latitude

14   than what I already feel are the miles of latitude that

15   I've given you.  It will be undisputed -- the government

16   will, in fact, be arguing in its case -- that

17   Mr. Cantwell was angry at the Bowl Patrol because they

18   were disrupting his show.  That -- no one is going to

19   dispute that.  So at this point the evidence on those

20   points are really cumulative, so I can't -- I can't let

21   you go on and on about it.

22             You can play 30 seconds, you can have him

23   explain why he's frustrated, why he's angry, and he can

24   explain how he tried to go to the FBI and they didn't do

25   anything and he -- he wanted to be left alone.  You can

```
 1    explain all that.  But I -- we can't be going into --
 2    I'm not letting you go beyond 30 seconds on that
 3    compilation.
 4              Yes, Counsel?
 5              MS. KRASINSKI:  I just want to confirm that's
 6    going to be for ID only, like a chalk, and not a full
 7    exhibit.
 8              THE COURT:  That's -- no, he can -- that can
 9    be admitted as an exhibit.  You just have to put --
10              MS. KRASINSKI:  Okay.
11              THE COURT:  -- a composite exhibit together
12    with just the 30 seconds that are actually played to the
13    jury.  That'll be the exhibit.
14              MS. KRASINSKI:  Thank you, your Honor.
15              THE COURT:  But we don't have time to go back
16    and edit it out and et cetera, et cetera.
17              And I can't make out the words, we don't have
18    a transcript, but I think the point is you can't make
19    out the words a lot of time.  So I think we don't need a
20    transcript because it would be unintelligible.
21              All right.  Anything else of that ilk that
22    we're going to be dealing with?
23              MR. WOLPIN:  No.  I think everything else will
24    be --
25              THE COURT:  Okay.
```

```
 1              MR. WOLPIN:  -- addressed.

 2              THE COURT:  All right.  Good.  Are we ready to

 3    bring the jury back in?

 4              Is my reporter okay?  Do you want a break or

 5    do you --

 6              THE COURT REPORTER:  We can go a little more.

 7              THE COURT:  We'll go 20 minutes or so and then

 8    take a break?  Okay.

 9                 (Jury returned to the courtroom.)

10              THE CLERK:  Please be seated.  This hearing is

11    back in session.

12              MR. WOLPIN:  All right.

13              THE COURT:  Go ahead, Counsel.

14              MR. WOLPIN:  Thank you.

15         Q.   So there was ultimately a split on ideological

16    grounds between the two of you?

17         A.   Yeah.  They -- the --

18         Q.   Well, slow it down there.

19         A.   Okay.

20         Q.   You started a new podcast under a different

21    name, is that correct, soon after?

22         A.   I did, yes.  I started another show called

23    Outlaw Conservative.

24         Q.   All right.  And what was the difference

25    between Outlaw Conservative and Radical Agenda?
```

**J.A. 780**

27

1    A.    Outlaw Conservative aimed to do away with some

2    of the is less palatable elements of the Radical Agenda.

3    I wanted to do a very similar format in that there would

4    be an opening monologue, we'd take calls on the air, I'd

5    go over the news and interact with the audience, but we

6    would eliminate the profanity, the racial content, and

7    the fantasy violence themes.

8    Q.    So as that rift happens, you begin to get a

9    number of phone calls from the Bowl Patrol?

10    A.    Yes.  Yes.

11    Q.    Okay.

12    A.    Phone calls, comments, chats, spam.  It was a

13    never-ending torrent of nonsense.

14    Q.    Okay.  And how -- why did you believe that was

15    coming through the Bowl Patrol?

16    A.    Because of the things that they would say.

17          So they had jargon vernacular, if you will,

18    that was a bit of a signature.  The -- the -- the style

19    of image editing, the types of names that they would

20    use, and the things that they would say all indicated to

21    me that they were associated with this group.

22    Q.    Okay.  And the primary people, again, who you

23    were affiliated with Bowl Patrol that were making these

24    kinds of calls or interactions were who?

25    A.    Vic Mackey, Cheddar Mane, Hardmous,

**J.A. 781**

```
1    Mosin-Nagant.
2         Q.   Okay.
3         A.   Later, Wig Nasty, some other ones, added to
4    the mix over time.
5         Q.   Okay.  So we're just going to play a very
6    brief snippet of what that was like for your show.
7         A.   That'd be a refreshing change of pace.
8              THE COURT:  Let me just stop.
9              Can you clarify, by asking appropriate
10   questions, are these calls coming in to Radical Agenda
11   or to the new show that he's running?
12        Q.   So prior to trial, you took a look through
13   your Radical Agenda archives, correct?
14        A.   Right.  These are not from Outlaw Conservative
15   because on Outlaw Conservative, I edited them out.
16        Q.   Okay.
17             THE COURT:  And, Counsel -- just again, I'm --
18   just so that we avoid confusion, can you ask quick
19   questions to clarify this: Did Radical Agenda continue
20   while Outlaw Conservative was also going on so that
21   there are two programs or did Radical Agenda cease and
22   Outlaw Conservative begin?
23             If you could ask questions on that.
24             MR. WOLPIN:  Yes, please.
25        Q.   So are they concurrent, running at the same
```

1    time, or you quit Radical Agenda?

2        A.    I was not yet prepared to put the Radical

3    Agenda down yet.  The -- Radical Agenda used to air

4    every Monday, Wednesday, and Friday from 5:00 to 7:00

5    p.m. U.S. Eastern time.

6            What I ended up doing with Outlaw Conservative

7    was replacing the Wednesday airtime with the Outlaw

8    Conservative format.  And so on Mondays and Fridays, I

9    would do the uncensored production and on Wednesdays I

10    would do Outlaw Conservative.

11        Q.    Okay.  And so it sounds like you would get

12    calls of this nature to both shows?

13        A.    Yes.  They were -- they hated Outlaw

14    Conservative.  They -- they thought that it was proof

15    that I was a sellout, you know, just whatever

16    terminology you want to apply.  That was evidence that I

17    was just in this for fame --

18            MS. KRASINSKI:  Objection, basis of knowledge,

19    speculation.

20            THE COURT:  You could lay a -- I will allow it

21    if you can lay a foundation as to that he has a basis

22    for formulating those views.

23        Q.    Are there comments being made to you directly

24    that say those things?

25        A.    The -- the calls -- the comments, I'm sure

**J.A. 783**

1   we'll discuss the website defacement, these things.  The

2   word sellout was a common refrain, yes.

3        Q.   Okay.

4             THE COURT:  And, finally, again, I apologize

5   for interrupting, but just to get -- can you -- you're

6   going to play an excerpt.  Can you give me a bit of a

7   time frame as to the period during which these calls are

8   coming?

9             MR. WOLPIN:  Yes.

10       Q.   So when we're talking about this rift and when

11  these calls are coming in, we're talking about what

12  months, what year?

13       A.   The -- well, we're talking about 20 -- late

14  2018 through all of 2019.  I think what you're about to

15  play is most likely early 2019.

16       Q.   Okay.  So this is at the early stages of 2019,

17  sort of examples of what you've pulled from your show?

18       A.   Yes.

19             MR. WOLPIN:  Okay.  I would move at this

20  point -- obviously it may be redacted in some format --

21  but move a version of B-5 into evidence.

22             THE COURT:  All right.  So, members of the

23  jury, B-5 is a -- as I understand it, and if I'm wrong,

24  counsel will correct me, is a compilation of

25  a -- a number of what have been referred to in this

**J.A. 784**

```
 1   trial as prank calls.  Okay?
 2           The actual -- the exhibit that's been offered
 3   goes on longer than I believe I want you to hear and so
 4   I'm going to allow Counsel -- because he hasn't had time
 5   to prepare a redacted exhibit, it will be -- I will tell
 6   him to instruct his assistant to stop the call -- the
 7   exhibit after about 30 seconds, give or take a little
 8   bit on either side.
 9           MR. WOLPIN:  Right.
10           THE COURT:  The assistant will note the point
11   at which you stop and then you will prepare a redacted
12   exhibit overnight that will only include the portion
13   that was played to the jury.  And that will -- we'll
14   call that -- what's the exhibit number of the exhibit
15   you have?
16           MR. WOLPIN:  B-5.
17           THE COURT:  A-5, did you say?
18           MR. WOLPIN:  B --
19           THE COURT:  B-5.
20           MR. WOLPIN:  -- as in boy.
21           THE COURT:  So we'll call this B-5a and B-5a
22   will be the redacted copy that will be in evidence.  So
23   if you want to listen to it during deliberations again,
24   you can, but you won't have the full compilation tape
25   because it simply goes on longer than I think is
```

**J.A. 785**

32

```
 1  necessary.
 2           All right.  So with that in mind, Counsel,
 3  when you're ready, you can get your watch out and give
 4  about 30 seconds and then we'll -- you'll tell him to
 5  stop and we'll go on.
 6           MR. WOLPIN:  All right.  Jay, if you can --
 7               (Audio recording played.)
 8           MR. WOLPIN:  Stop.
 9           THE COURT:  We can go another 30 seconds.  We
10  want to get several of these in.
11           MR. WOLPIN:  Yes.  Thank you.
12           Please begin.
13               (Audio recording resumed.)
14           THE COURT:  Okay.
15      Q.   So those are only representative, correct?
16  There's certainly many of others.
17      A.   They are representative and only of a specific
18  category of calls.  This was -- this was when they would
19  flood the call-in lines with pure nonsense.  It wasn't
20  the scary stuff, it wasn't the sexual stuff that you're
21  listening to.  This is just the pure nonsense.  And
22  there was a lot of it.
23      Q.   Okay.  Now, if we can bring up I-2b, which is,
24  I believe, already in evidence.  This is the Call in
25  Studio's records.
```

**J.A. 786**

```
 1              So you had a company called Call in Studios
 2   that sort of ran your phone line system, correct?
 3        A.   Yes.
 4        Q.   All right.  And they kept track of every
 5   number that was identifiable that came in to the show?
 6        A.   They did.
 7        Q.   Okay.  And what we see here is sort of an
 8   excerpt from those records?
 9        A.   That's what it appears to be, yes.
10        Q.   Okay.  And so if we look at any particular
11   call, like circle one, it tells us the incoming number
12   and then it has sort of a receiving number.
13              Is the -- and then there's a note with it as
14   to something about the caller.
15        A.   Yes.
16        Q.   How is that generated by --
17        A.   It's a text-to-speech -- I'm sorry,
18   speech-to-text engine.  So you say something and the
19   computer tries to determine what your words are and then
20   it puts it into text.
21              I'm a one-man show.  I do it live on the air
22   by myself.  And so I don't have the capacity to pick up
23   the phone, talk to somebody, and then decide if they get
24   on the air, typically.  I, for a brief period, hired a
25   call screener, but this is the auto-screener system that
```

```
1   you say, hey, my name is Chris and I'd like to be on the
2   show and the speech-to-text engine does the best it can
3   to turn that into letters that I can read while I'm on
4   the air.
5       Q.   Okay.  And then we see -- this happens to be
6   just the call log specific to the ███████ 1958, which
7   has already been described as the number of Mr. Lambert.
8       A.   Yes.
9       Q.   Now, as far as this process, did you attribute
10  all of these pranks to Cheddar Mane?
11      A.   Not at the time, no.  I --
12           MS. KRASINSKI:  Objection, your Honor.
13  Misstates evidence.  Ben Lambert testified that not all
14  of these were pranks.
15           THE COURT:  All right.  I -- I think that --
16  you can -- you're not contending that all of them are
17  prank calls, right?
18      Q.   I was referencing as far as the prank calls --
19           THE COURT:  All right.
20      Q.   -- that came in, you're not referencing or
21  believing that every single one is Cheddar Mane?
22      A.   I definitely don't believe that every single
23  prank was Cheddar Mane and I don't believe that every
24  single Cheddar Mane call was a prank.
25      Q.   Okay.
```

35

1      A.    In the early stages, I think he was actually a
2  productive participant.
3      Q.    Okay.  And then as you started to get a -- you
4  know, this volume of calls, what did you attempt to do
5  with it?
6      A.    Well, you said when I started to get the
7  volume of -- when the --
8      Q.    Of prank calls.
9      A.    -- the amount of disruptive calls increased?
10 Is that what you're trying to say?
11     Q.    Yes.
12     A.    So I took a number of means to try to deal
13 with this.  Most notably, I had to stop accepting calls
14 from like *67.  You can block your caller ID when you
15 call somebody.  I had to stop accepting those calls on
16 the air, which when you talk about the things that we
17 talk about, will cut your call volume down quite a bit
18 because people, generally speaking, don't want to be
19 identified.  And so I had to do that because I couldn't
20 screen callers based on their caller ID and I had too
21 many coming in.
22         The next thing I did would be to ban the phone
23 numbers of people who were calling in and -- and making
24 calls that were unhelpful in some way.
25     Q.    And, actually, if we bring up I-2b again and

**J.A. 789**

36

 1 | go to the last page --

 2 |     A.   If I could just revisit that answer.

 3 |         As I was saying, the interim stage, which was

 4 | mentioned by Mr. Lambert, was I tried to coach the

 5 | callers.  That, you know, when they -- when they called

 6 | in and they -- I tend to give them the benefit of the

 7 | doubt that they're trying to be funny.

 8 |         And so I would give guys what I thought was

 9 | helpful feedback.  If I thought that their prank calls

10 | were not very good, I'd say things like, you know, maybe

11 | you try to do that towards the end of the show --

12 | towards the beginning of the show and don't ruin it for

13 | me at the end or, you know, your impression is good but

14 | you need better lines, or something to that effect.  I

15 | tried to give them helpful --

16 |         I'm sorry.  Give me one second to fix this.

17 | My --

18 |         THE COURT:  Do we have another mask?

19 |         THE WITNESS:  Let's see how that holds up.

20 |    Q.   Okay.  And at some point you began reporting

21 | these callers back to the hosts, whoever was the phone

22 | company that had them, correct?

23 |    A.   Yeah.  Initially what I started to do was I

24 | started to ban the phone numbers.  And then I realized

25 | that like I had a problem, that like the same guy would

**J.A. 790**

1  get on five times, no many matter how many times I

2  blocked his number.  And I started -- and I was like how

3  the heck are they doing this?  Nobody's going to buy

4  that many Tracfones.

5          And I figured out that online there's these

6  free services that you can use to do what's called a

7  carrier lookup.  So if you put a phone number into this

8  specialized search engine, it'll tell you it comes back

9  to Verizon or Sprint or AT&T or, in the case of these

10 voiceover IP services that they were using, they could

11 come back usually either to a company called Neutral

12 Tandem or Bandwidth.com.

13    Q.   And did you make efforts to contact those

14 companies directly to get them to block numbers?

15    A.   Yeah.  I found out that they were using an app

16 called Burner initially and I called -- well, I emailed

17 the proprietors of that application and I said, you

18 know, you've got basically a white supremacist terrorist

19 group who's using --

20          MS. KRASINSKI:  Objection, your Honor.

21          THE COURT:  Overruled.

22    A.   That's what I said to them, you know; that

23 they are using this to basically harass people.

24          I believe that they banned them from the

25 Burner app, but then they were on another one called

```
 1   TextNow and --

 2           THE COURT:  All right.  So I think you've

 3   covered his question and please listen to his questions

 4   and try to answer them.

 5           THE WITNESS:  Okay.

 6      Q.   So those are the efforts you're making to fix

 7   it.  You say this started in late 2018.  Was there

 8   something in particular that happened in February of the

 9   next year?

10      A.   Yeah.  In February 2018 -- of 2019, I wake up

11   very early in the morning to messages from listeners who

12   say that there's, quote, nasty stuff on my website.  And

13   I go to inspect the damage there --

14           If there's another one of these clear masks,

15   I'll take it.  I'm sorry.

16           THE COURT:  Do you have an extra mask?  The

17   one he's got is not working right.

18           THE WITNESS:  It's the adhesive on the foam

19   thing.  I think I can get through the answer here,

20   though.

21           The website was defaced with what might be

22   described as grotesque sexual imagery and things that

23   were unflattering of a correspondent.

24      Q.   Okay.  So --

25           THE COURT:  So hang on just a second.  Let him
```

J.A. 792

1    get the other mask back on.

2            MR. WOLPIN:  Okay.

3        Q.   So you wake up and you see that it's been

4    defaced.  Is it just your website?  What happens when

5    someone posts something defacing on your website?

6        A.   So at that point in time, I had a service

7    signed up for the website which I paid for that every

8    time a new blog post went up, an email would go out to

9    all of about 3,000 email subscribers.

10           And so every single one of these posts, of

11   which there was a dozen or so, every single one of them

12   got emailed out 3,000 times.

13       Q.   Okay.  And you said included were pornography?

14       A.   Pornography, terrorist propaganda, and

15   unflattering photos of me, to name a few things.

16       Q.   All right.  So that incident, someone posted

17   through your site.  Who else had access to your site?

18       A.   At that time, I had -- a couple of people,

19   but, notably, Vic Mackey.

20       Q.   Okay.  And so did you make a report to anybody

21   about this issue?

22       A.   Yes.  And I should clarify that Vic Mackey's

23   posting privileges had been rescinded some time ago, but

24   when that happened, I -- I never expected that he'd have

25   done anything like this and so I neglected to disable

```
 1  his credential.

 2       Q.   Okay.

 3       A.   After he used that credential, I made a report

 4  to the Federal Bureau of Investigation.  I tried to call

 5  them on the phone, ended up sitting on hold for like a

 6  half-hour or something like that and it kept on

 7  repeating this message, you can submit it through the

 8  website for the same thing.  And eventually I submitted

 9  a complaint through their website.

10            MR. WOLPIN:  Okay.  For the witness you could

11  bring up G, Exhibit G.

12       Q.   Is this something to which you were familiar?

13       A.   It is.

14       Q.   Okay.  And what do you see in front of you?

15       A.   Complaint Referral Form, Internet Crime

16  Complaint Center, and then there's identifying

17  information about me and a description that I gave to

18  them about the problem I had with the website.

19       Q.   So this is the description that you wrote

20  online in February 2019 to the Internet Crime Complaint

21  Center?

22       A.   Yes.  This is, to my understanding, a sworn

23  complaint that I made.

24       Q.   And that's what you wrote on February 11th,

25  2019?
```

**J.A. 794**

```
 1         A.    Yeah.
 2              MR. WOLPIN:  Okay.  I would move at this point
 3    to strike the ID and have this in as a full exhibit.
 4              THE COURT:  Is there objection?
 5              MS. KRASINSKI:  No, your Honor, although I
 6    think an unredacted version might be preferable, which I
 7    do have a hard copy of.
 8              THE COURT:  All right.  Well, we can deal with
 9    that later, but we'll admit the redacted version for now
10    and you can deal with the unredacted version later.
11    During cross-examination, if you want to, you can refer
12    to the unredacted version.
13              (Defendant's Exhibit G admitted.)
14         Q.    So this is the complaint?
15         A.    Yes.
16         Q.    Let's go through it a little bit.
17              You give your real address on the top?
18         A.    I do.  And not my Shipping Shack address, my
19    home address.
20         Q.    Okay.  And below, you note here that your
21    website was defaced with terrorist propaganda and
22    pornography last night --
23         A.    Yes.
24         Q.    -- including bestiality.
25         A.    Yes.
```

**J.A. 795**

```
 1        Q.   Okay.  You provided IP addresses you thought
 2   were involved?
 3        A.   Yes.
 4        Q.   You noted that these were carried out by a
 5   group calling themselves the Bowl Patrol and you pointed
 6   out Vic Mackey and Mosin-Nagant as people that they are
 7   already familiar with at the FBI?
 8        A.   I should say that Mosin-Nagant is an alias I
 9   knew was familiar to the FBI.  I did not know if Vic
10   Mackey was at that time.
11        Q.   Okay.  Now, down at the bottom, do you note
12   that it's broader than just these two guys?
13        A.   Oh, yes, I definitely do.
14        Q.   Okay.  And what do you say at the bottom?
15        A.   Quoting from the form, I said:  This group has
16   been responsible for constant spam and harassment of me
17   and my communications channels for months, ever since I
18   distanced myself from the group in the way of the
19   Pittsburgh synagogue shooting.
20        Q.   So you do name more than -- you name the whole
21   group as being involved in this harassment?
22        A.   I do.
23        Q.   Okay.  Now, if we could go to B-9.  That's for
24   the witness only.
25             All right.  Is this something you're familiar
```

43

```
 1   with?

 2        A.   Yes.

 3        Q.   Okay.  And what is this -- what account is

 4   this posted from?

 5        A.   This is posted to my Gab social media account.

 6        Q.   Okay.  And do you know what date it would have

 7   been posted?

 8        A.   It -- judging from what it says here, it -- so

 9   I say:  Today I submitted a criminal complaint.

10             I know that date to be February 11th, I

11   believe --

12        Q.   Okay.

13        A.   -- of 2019.

14        Q.   And so this is a public statement that you'd

15   made a report to the FBI?

16        A.   Yes.

17        Q.   Okay.  Why do you put out something to the

18   public saying you reported -- made a report to the FBI?

19        A.   There's -- that's -- that's a jam-packed

20   question, but I'll try to pick it apart a little bit.

21             First thing was I wanted the deterrent effect.

22   I wanted people to know if you're going to screw around

23   with me, you're going to have a problem with law

24   enforcement, so as to prevent these things from

25   happening in the future.
```

**J.A. 797**

```
 1              Secondly, in the circles I travel and online,
 2    you know, there's a perception that we are unjustly
 3    targeted by law enforcement, and there's some
 4    justification for that view.  And so I don't want people
 5    to think that I'm surreptitiously working with law
 6    enforcement and trying to do something disreputable.  So
 7    when I work with law enforcement, which I've done on
 8    numerous occasions, I've said so publicly.
 9        Q.   Okay.  So if we could pull up Exhibit B-4 at
10    this point just for the witness.
11              Is this something you're familiar with?
12        A.   It certainly is.
13        Q.   Okay.  And is there a date on this?
14        A.   This is February 16th and 17th.
15        Q.   Okay.  And is there a name attached to it?
16        A.   Mosin-Nagant.
17        Q.   And who is Mosin-Nagant?
18        A.   Mosin-Nagant is the first Bowl Patroller that
19    I banned from my chat rooms.
20              MS. KRASINSKI:  Your Honor, I'm going to
21    object to this.  We've already discussed this exhibit
22    and the contents of it on relevance.
23              THE COURT:  Get the headsets on, please.
24              Well, in fact, I've got to give -- I've got to
25    give my court reporter a break, so I'll excuse the jury.
```

**J.A. 798**

```
 1              We'll take a short break, come back and finish
 2    the day, but I'll spend a few minutes with the lawyers
 3    first.
 4                        (Jury excused.)
 5              THE COURT:  Is this the exhibit that the
 6    defense objected to?
 7              MR. WOLPIN:  No, this is the exhibit that the
 8    government objected to the top piece and we edited it.
 9    This was provided by the defendant to the law
10    enforcement.
11              THE COURT:  I need to have it back up.
12              All right.  Why do you want it in?
13              MR. WOLPIN:  Because the government has put
14    into issue my client's feelings about doxing; they put
15    in a writing of his undoxing.  They accused him of
16    doxing this Mosin-Nagant character.  And so the
17    situation is that Mosin-Nagant doxed our client.
18              I think it's fair, based on what the
19    government's presented, to let the defendant explain
20    what doxing means, because they did that through their
21    -- their --
22              THE COURT:  Why do you need this exhibit?
23              MR. WOLPIN:  For the same reason, to show what
24    doxing means.  He's experienced it.  He knows what it
25    means.  It's relevant because the government --
```

```
 1              THE COURT:  The meme's in.  You want to talk
 2   about the meme, that's fine.  You can't put in this
 3   exhibit.  The government's objection to it is sustained.
 4              Feel free to go into the whole meme thing and
 5   he doxed Mosin-Nagant and Mosin-Nagant doxed him and all
 6   of the stuff you want to do on that.  Feel free to do
 7   it.  You just can't do it with this exhibit.  Okay?
 8              What else have you got?
 9              MR. WOLPIN:  That's all we've got.  That was
10   most of the end of that chapter, I believe.  I'm trying
11   to move through --
12              THE COURT:  Can you -- help me understand so
13   that when I rule on evidentiary objections, how does the
14   evidence you're eliciting help lead to a verdict of not
15   guilty against your client?  Give me the -- if you can
16   give me one sense of the theory, it might help me when
17   ruling on objections.
18              MR. WOLPIN:  Okay.  So for the offense of
19   cyberstalking, the government needs to prove that this
20   is extreme -- or I forget -- actually, I feel like I'm
21   misquoting the language, whether it's extreme emotional
22   distress or exceptional emotional distress.  The word is
23   escaping me.
24              But that is --
25              MS. KRASINSKI:  Substantial, your Honor.
```

**J.A. 800**

1          MR. WOLPIN:  That is a relative term by the
2  Court's proposed jury instruction as to what the other
3  party would know or feel.
4          This is a unique situation.  I mean, this is a
5  charge with a significant prison sentence.  I mean, I
6  think my client needs to --
7          THE COURT:  No, but it -- that the crime is
8  serious doesn't make an argument.  I understand the
9  argument about context.  This is a different thing.
10  This is let me tell you why these people were really
11  mean to me and why I was really mad at them.  And I -- I
12  don't understand how that helps you.
13          So tell me how, if the jury follows my
14  instructions, that it can possibly help you.
15          MR. WOLPIN:  Because it tells us for this
16  group this isn't extreme emotional distress.  This is
17  daily happenings in this group.  The things that might
18  cause, quote, unquote --
19          THE COURT:  You can elicit -- I've said you
20  can say, he doxed me, I doxed him, they doxed each
21  other.  I -- you're -- you're fine to do that --
22          MR. WOLPIN:  Okay.
23          THE COURT:   -- but you can't do it with this
24  exhibit.
25          MR. WOLPIN:  Okay.

**J.A. 801**

```
 1              THE COURT:  All right?  That -- it's the --
 2    it's not the meme, which is already in evidence that you
 3    have, it's the statement about meth using blah, blah,
 4    blah stuff --
 5              MR. WOLPIN:  No, the address.  That was
 6    relevant.  It posted his address online, Chris's
 7    personal home address online.  I don't care -- I would
 8    redact out the meth part.  That's irrelevant.
 9              THE COURT:  All right.  I -- I already thought
10    I -- again, things blur together for me, but has that --
11    has the fact that Mosin-Nagant disclosed his exhibit --
12    his street address, isn't that already in evidence?
13              MS. KRASINSKI:  Testimony about that is, I
14    believe, your Honor.
15              THE COURT:  All right.  So you can elicit
16    testimony that they -- Mosin-Nagant doxed you after you
17    doxed -- doxed Mosin-Nagant.  Isn't that what happened?
18              MR. WOLPIN:  I think it's the other way
19    around.
20              THE COURT:  All right.  Tell me -- I'm sorry.
21              Does the government know the sequence of who
22    doxed who?
23              MS. KRASINSKI:  I -- I don't know which
24    individual doxed the other first, your Honor.
25              MR. DAVIS:  I believe Mosin-Nagant was doxed
```

1  by Mr. Cantwell at the very end of February, last part

2  of February.

3            MR. WOLPIN:  Which would have been after this.

4            MR. DAVIS:  So it would have been after this.

5            THE COURT:  Okay.  All right.

6            So Mosin-Nagant doxed him, he doxed

7  Mosin-Nagant.  If you want to introduce that, go ahead.

8  All right.  I -- I understand your point is you want to

9  diminish the importance of doxing.  That's fine.  I'm

10  going to -- I've let you do that already and I'll

11  continue to.

12            MR. WOLPIN:  My only concern is obviously he

13  can say it, but there's an evidentiary proof and I worry

14  if there's some concern about his credibility that I

15  have a document showing it's true.  That's all -- that's

16  the only reason.

17            THE COURT:  All right.  Prepare a redacted

18  exhibit that has everything else from Mosin-Nagant

19  except the street address.

20            MR. WOLPIN:  Okay.  That works for me.

21            MS. KRASINSKI:  We're not going to object or

22  argue that Mosin-Nagant --

23            THE COURT:  He can testify to it and you'll --

24  I'll announce that the government doesn't disagree.  Is

25  that --

**J.A. 803**

```
 1              MS. KRASINSKI:  Yeah.  We don't --
 2              THE COURT:  Okay?  I mean -- oh, my goodness.
 3         All right.  So you can do that.  All right?
 4              MR. WOLPIN:  I appreciate it.  Thank you.
 5              THE COURT:  All right.  What else have you
 6    got?  Is there -- is there anything else I can talk to
 7    you about before we take our break and then bring the
 8    jury back in till 4:30?  Or is it already 4:30?  No,
 9    3:30.
10              MR. WOLPIN:  I've got March, May -- we're
11    going to get through it.
12              THE COURT:  I -- okay.  So I am fine with you
13    demonstrating to the jury that -- your view that people
14    in this community don't treat doxing as a serious
15    problem.  You can go to town on that.  You can do as
16    much as you want on that.  That -- that I can
17    understand.
18              What I can't understand is -- and I can
19    understand Mr. Cantwell's anger and -- and, really, even
20    rage about how he's been treated by these people, but it
21    just doesn't bear on the case.  It bears on the
22    government's side of the case against Mr. Cantwell, but
23    not your side of the case.
24              MR. WOLPIN:  Again, I would -- I would say the
25    concept of extreme emotional distress varies by group.
```

**J.A. 804**

1   If this is the type of way they treat each other, then

2   why should what -- I mean, I don't want to be that coy

3   about it, but --

4           THE COURT:  But there's a real difference

5   between calling somebody's show and doing blah, blah,

6   blah, blah, blah and saying I'm going to have sex with

7   your wife in front of her children.  Those don't --

8   they're not equivalent --

9           MR. WOLPIN:  I --

10           THE COURT:  -- Mr. Wolpin.  They are not

11   equivalent.  And so it doesn't tend to prove what --

12   what you're suggesting.

13           So I've let you bring in any other statements

14   about rape; I've let you bring in many, many statements

15   about the -- the Bowl Patrol's beliefs about violence

16   and accelerationism and their vicious racist views and

17   their anti-Semitic views.

18           But based on what your client has said and

19   things that have been testified to, I think your client

20   is of -- and if I'm wrong, you can tell me -- is of the

21   belief that somebody's guilt or innocence shouldn't turn

22   on their -- their views about things, and that's not

23   what this case should be about.  It's about whether he

24   did the things he's charged with doing with the

25   intentions that are required to support a crime.  And

1  what his views are on other subjects and what

2  Mr. Lambert's views are on other subjects is not --

3  should not be the basis of a criminal charge.

4          And I'm trying to draw that line to protect

5  First Amendment rights while also recognizing the

6  government's legitimate interest in prosecuting

7  criminal -- violations of the criminal law.  That's what

8  I'm trying to do here.  Okay?

9          MR. WOLPIN:  Okay.

10         THE COURT:  So we'll take a short break and

11  come back and finish up.  All right?

12         THE CLERK:  All rise.

13     (Recess taken from 3:38 p.m. until 3:50 p.m.)

14         THE COURT:  I have another draft of jury

15  instructions that have -- we don't need this on the

16  record.

17             (Off-the-record discussion.)

18           (Jury returned to the courtroom.)

19         THE CLERK:  Please be seated.  This hearing is

20  back in session.

21         THE COURT:  Go ahead, Counsel.

22         MR. WOLPIN:  Thank you.

23     Q.   So just, again, for the witness only, if we

24  could bring up B-4.  I believe that's where we were.

25             So this is from February 17th, a post from

53

1    Mosin-Nagant?

2        A.    Yes.

3        Q.    Okay.  And in that post there are two tweets;

4    correct?

5        A.    Yes.

6        Q.    Okay.  And one of those tweets is the FBI meme

7    we saw when Mr. Lambert testified?

8        A.    Yeah, the one with the janitor with Capuzzo

9    there.

10       Q.    Okay.  And in that meme is you with the FBI

11   hat.  And who else is in there?

12       A.    Dino Capuzzo.

13       Q.    Okay.  And was he someone that was known in

14   the White Nationalist movement?

15       A.    Yeah.  He's a special agent that I cooperated

16   with an investigation of his.

17       Q.    All right.  And in this particular tweet from

18   2017 -- excuse me -- from February 17th by Mosin-Nagant,

19   it notes that you live at ▮▮▮▮▮▮▮▮▮▮▮▮ Street in

20   Keene, New Hampshire.

21       A.    Yes.

22       Q.    Okay.  So --

23       A.    That's where I actually live.

24       Q.    And that's your real address, right?

25       A.    Yes.

**J.A. 807**

54

```
1        Q.   So they're calling you a snitch and giving out
2   your address as sort of a one-two combination?
3        A.   Yes.
4             MS. KRASINSKI:  Objection to the
5   characterization --
6             THE COURT:  Yeah, sustained.  It is what it
7   is.
8             MR. WOLPIN:  Okay.
9             THE COURT:  The jury has the meme.
10            MR. WOLPIN:  All right.
11       Q.   And we've already heard testimony that being
12  outed as a snitch is not exactly a positive in the White
13  Nationalist movement?
14       A.   Yeah, they definitely don't like that.
15       Q.   Okay.  Now --
16       A.   If I could say, you know --
17            THE COURT:  No, wait till there's a question.
18            THE WITNESS:  Okay.
19       Q.   As to that view, what else about that view do
20  you have?
21       A.   The -- the label of being a snitch is
22  something that I tried to avoid by telling people when I
23  spoke to law enforcement.  That was the -- that was half
24  the point of it.  And, you know, these guys tried to
25  conflate the two.
```

```
 1        Q.   Okay.  So, now, as far as the -- what you've
 2   described as these repetitive calls from Bowl Patrol,
 3   did you ever encourage or ask your listeners to commit
 4   violence against them?
 5        A.   No.
 6        Q.   Now, you have callers in every day or every
 7   day you were on the air at least --
 8        A.   Yes.
 9        Q.   -- correct?
10             Did you ever announce people's personal
11   information from the Bowl Patrol online?
12        A.   Not on the show, no.
13        Q.   Okay.  We'll get to the other issue in a
14   minute.
15        A.   Yeah.
16        Q.   Now, one of the individuals in the Bowl Patrol
17   you've mentioned is Hardmous, correct?
18        A.   Yes.
19        Q.   Okay.  And how did you know him?
20        A.   Hardmous is one of the people who came into my
21   social media orbit in early 2018 or late 2017.  And he
22   displayed a degree of technical talent and so I -- I had
23   him do some work for me.
24        Q.   Okay.  So he was a Bowl Patrol member?
25        A.   Yeah.
```

56

```
 1        Q.   Okay.  And when would you say you learned who
 2   he was, where he lived, what his name was?
 3        A.   Yeah, to -- to do technical work for me, I
 4   require somebody to sign a nondisclosure agreement and I
 5   need to get a scan of their driver's license.  So I have
 6   all of his information.
 7        Q.   And how long had you had it?
 8        A.   I don't remember precisely the date, but it
 9   would have been early to mid 2018.
10        Q.   Okay.  And we're going to hear or talk a
11   little bit more about Katelen Fry and some of the
12   photographs, but did she send you a photograph involving
13   Hardmous or Ben Lambert in the --
14        A.   Yeah, in late -- I guess it was late 2018 she
15   had sent me a photograph of herself on a couch with
16   Cheddar Mane and Hardmous.
17        Q.   All right.  Was that sent to you for -- what
18   was the reason?
19        A.   She had informed me that she was going to see
20   them when she went to go visit family.  Her and I were
21   an item at the time and I said, you know -- we were not
22   public about our relationship, but I said, if you're
23   going to go see these guys, you've got to tell them that
24   I'm your girlfriend (sic), whatever, and I think she
25   sent me a photo to put me at ease.
```

**J.A. 810**

57

1      Q.    So was there an ill purpose in that?

2      A.    No.  No.

3      Q.    And you had that, you said, beginning in what

4   month and what year?

5      A.    That would have been -- I've heard it

6   described as around Thanksgiving of 2018.  For some

7   reason, I had it in my head that this was early October.

8   But in the fall of 2018.

9      Q.    Okay.  Now, you've written some things about

10  doxing and we've talked a little bit about doxing, so

11  I'm going to ask you some questions about doxing.

12         To begin with, why are certain people

13  anonymous in this movement, generally?

14     A.    That's a -- that's a loaded question, you

15  know.  There's -- to -- to summarize, if you say things

16  that -- some people want to be anonymous because they

17  want to commit crimes.  Okay?  And that is a different

18  category of problem than somebody who wants to say

19  things which are politically unpopular.  And those are

20  two categories of people who would want to protect their

21  anonymity on the Internet.

22     Q.    Okay.  And are people in the White Nationalist

23  movement doxed fairly regularly?

24     A.    It happens with sufficient regularity that

25  it's -- I find it almost humorous that people get so

**J.A. 811**

1    bent out of shape about it because, you know, you -- it

2    happens a few times a year, somebody that -- whose name

3    you recognize gets doxed, yeah.

4        Q.    Has Vic Mackey been doxed?

5        A.    Recently, yeah.

6        Q.    Okay.  By the Huffington Post?

7        A.    It was the Huffington Post or the Southern

8    Poverty Law Center.  One of these outfits, yeah.

9        Q.    So it's not just other White Nationalists

10   releasing information; it's media?

11       A.    Not even close, yes.  CNN doxes you now.

12       Q.    Okay.  And in reference to what the government

13   put in as your writings on doxing, that was actually

14   about Paul Nehlen?

15       A.    So there was a post in evidence, I believe it

16   was titled dox -- On Doxing and Anonymity.

17       Q.    Yes.

18       A.    Yes.  So that was right after Paul Nehlen had

19   doxed a guy by the name of Ricky Vaughn or Douglass

20   Mackey, real name.  His online persona was Ricky Vaughn.

21            And the Huffington Post hated Ricky Vaughn

22   because he was a big, like, very popular pro-Trump

23   account on Twitter.

24            And -- but Ricky earned himself the enmity of

25   Mr. Nehlen and Mr. Nehlen published his identifying

**J.A. 812**

59

```
 1   information on the Internet.

 2        Q.   Okay.  So --

 3        A.   And so this had started this discussion that

 4   prompted me to write the article titled On Doxing and

 5   Anonymity.

 6        Q.   Now, after you make this report to the FBI in

 7   February through the Internet crime report --

 8        A.   Yeah.

 9        Q.   -- does law enforcement respond to you?

10        A.   No.

11        Q.   Do you get a call?

12        A.   No.

13        Q.   Do you get an email?

14        A.   I think I got a receipt, like an automated

15   thing.  But nobody ever said, Mr. Cantwell, we take your

16   complaint very -- nothing like that happened.

17        Q.   Okay.  And how about March, April?  Anything

18   like that?

19        A.   No.

20        Q.   Now, where -- where are things headed?  I

21   know -- where are things headed from February into

22   March?  Is it still the same level of stuff, has it gone

23   down after the report?

24        A.   It got worse.  Once I made the complaint

25   online and I said that I made the complaint, then they
```

**J.A. 813**

1    started in with this -- this snitch stuff.  And there

2    have been people in the White Nationalist movement who

3    said that about me before because of -- because I've

4    been open that I cooperated with other investigations.

5           These guys started conflating -- the Bowl

6    Patrol characters started conflating the fact that I

7    reported them to the FBI for the website defacement with

8    the arrest of -- with the imprisonment of some other

9    guys who ended up doing years in federal prison for

10   allegedly violent crime.

11        Q.   Okay.  So let's take a step back a little bit.

12             After February, did you continue to get these

13   kinds of calls that we've been talking about?

14        A.   Yes.

15        Q.   Okay.  Now, did they still come from real

16   numbers or did you start to get more from other numbers?

17        A.   I started to get them from what I determined

18   to be these voiceover IP services, which I refer to as

19   caller ID spoofing.

20             So there's apps, like I mentioned, Burner,

21   there's another one called TextNow, where for like a

22   couple of bucks, they'll give you a phone number, you

23   use it a few times, and you basically throw it away and

24   get another one.

25        Q.   So if, for example, someone like Cheddar Mane

**J.A. 814**

1    had continued to call you, would you necessarily know if

2    he were using one of those numbers?

3         A.   No, I wouldn't know.  I wouldn't know who it

4    was.  I mean, I'd know the call came in and I'd be able

5    to determine -- after a period of time I managed to

6    figure out that it was call -- coming from these

7    services, which helped me screen them, but I wouldn't

8    know who was doing it until -- unless I was able to

9    identify the voice or whatever.

10        Q.   And there was an interaction between you and

11   Cheddar Mane online in March, correct?

12        A.   Yes, there was.

13        Q.   Okay.  And what platform was that on?

14        A.   I believe you're referencing a Telegram

15   conversation.

16        Q.   Okay.  So that's a Telegram conversation

17   between the two of you.  So at least on that day, the

18   two of you were in the same Internet location at the

19   same time?

20        A.   Yeah.  I mean, to this day, I still have a

21   Telegram account and I -- and it's the same one.  And

22   so, you know, lots of people are on Telegram.  It's

23   almost like saying that, you know, you're on telephones

24   or something.

25        Q.   But you ended up having an actual --

**J.A. 815**

```
 1        A.    Yeah.

 2        Q.    -- face --

 3        A.    Not face-to-face -- there was an interaction

 4   between us on the Telegram platform, yeah.

 5        Q.    Okay.  And at that point you told him in sort

 6   of very blunt words that you would dox him if he and his

 7   friends continued?

 8        A.    Yeah.  I don't have the exact language in my

 9   head, but I told him in no uncertain terms that if you

10   keep on bothering me and coming near my audience that,

11   yeah, you're going to get doxed.

12        Q.    I think you talked about Vic Mackey, too.

13        A.    I probably did.

14        Q.    Okay.  Now, at that point in March, did you

15   release information publicly about Mr. Lambert?

16        A.    I did not.

17        Q.    Okay.  Why in March, if he's been bothering

18   you and you guys have an interaction, don't you release

19   his information at that point?

20        A.    There was a couple reasons, most notably that

21   he said he was going to stop.  And so I didn't see the

22   Cheddar Mane account causing the trouble and so since I

23   couldn't personally assign the trouble making to Cheddar

24   Mane, I didn't see fit to cause Cheddar Mane trouble.

25        Q.    Okay.  So as the spring continues into May,
```

**J.A. 816**

```
 1   you go to your local police department?
 2        A.   Yes.
 3        Q.   Okay.  And that's to report or have a
 4   conversation with an officer at the local Keene Police
 5   Department?
 6        A.   Yes.  So I have a pretty regular relationship
 7   with Joel Chidester at the Keene Police Department --
 8        Q.   Okay.
 9        A.   -- because from what I do, it's not uncommon
10   for me to get threats or whatever.  And so I send -- I
11   send him emails on a pretty regular basis if somebody's
12   leaving me voicemails that hint at violence or whatever.
13        Q.   So do you end up going to see him in May?
14        A.   Yeah.  I got one of my more explicit threats
15   and he invited me to come have a sit-down.
16        Q.   All right.  Do you pass most of these along to
17   prosecute or are you -- why do you do it?
18        A.   So for the most part they're not what I would
19   call true threats.  They are guys saying things like you
20   should come here and fight me.  Right?  If somebody says
21   you should come to here and fight me, well, I'm not in
22   any particular danger of that happening and so I don't
23   see any reason to go prosecute a guy who's, you know,
24   just expressing his frustration with what I do, which I
25   know is upsetting to a lot of people.
```

**J.A. 817**

64

1          And so --

2     Q.   So you just refer them along?

3     A.   I refer them when they talk about violence.

4  So like, you know, if people just say, Nazi, go home or

5  whatever, like, I don't bother to inform the police

6  department.  But if somebody says I want to fight you or

7  hints at violence, I'll send it over.  But if somebody

8  makes like an explicit threat, then I will -- then I

9  will say -- you know, I have said occasionally that I

10 would like to see it prosecuted, yes.

11    Q.   Okay.  And you mean by something like I will

12 kill you?

13    A.   Yeah.

14    Q.   Okay.  Now, did you meet with Chidester

15 actually in person in May?

16    A.   Yes.

17    Q.   Okay.  And what was -- did you mention or talk

18 to him at all about issues you had with the Bowl Patrol?

19    A.   Yeah.  I talked to him about a broader

20 category of problems that I was having and the Bowl

21 Patrol was prominently featured in that category of

22 issues.  And, so, you know --

23    Q.   Was he able to help you with the problem with

24 a group like the Bowl Patrol?

25    A.   No.  The Bowl Patrol was not -- well, they

**J.A. 818**

65

```
 1   were not Keene residents and so -- and I did not have a
 2   thing where I could say this person made this true,
 3   actionable threat in terms of Bowl Patrol at that point.
 4        Q.   Okay.  So does he -- how does this end up
 5   leading to an interaction with the FBI?
 6        A.   Well, I -- I'd later come to find out that
 7   they had taken pictures of my car in the parking lot
 8   while I'm in there talking to Joel.
 9        Q.   But that's in the -- so what is it that
10   actually happens from there that gets you to meet
11   with -- or in contact with the FBI?
12        A.   So that particular meeting did not immediately
13   lead to anything with the FBI.  So I went -- I went to
14   meet with Joel, I talked to him about this -- you know,
15   this category of problems that I was having, and then I
16   went home.
17             What happened later was after the -- the
18   interaction at issue in this case, I went back to Joel
19   because I was -- I was having more problems with the
20   Bowl Patrol.  And he ultimately said that we should get
21   the FBI involved or said that he couldn't help me, only
22   the FBI could.
23        Q.   Okay.  So then let's move forward to June.
24        A.   Yeah.
25        Q.   In June, you got a contact from this person
```

66

1  we've talked about named Peach.

2      A.    Yeah.  So in the early morning of June 15th, I

3  get a call from --

4          MR. WOLPIN:  For a moment, if you could bring

5  up just for the witness B-15.  B-15.  B as in boy, 1-5.

6  Sorry.  The mask.

7      Q.    So is this something you've seen before?

8      A.    Yes.

9      Q.    Okay.  Did this come into your possession?

10     A.    Yes.

11     Q.    Okay.  When did this come into your

12  possession?

13     A.    In the early morning of June 15th of 2019.

14     Q.    Okay.  And who did it come from?

15     A.    Peach.

16     Q.    Okay.  And Peach is?

17     A.    Peach is my ex-girlfriend, Katelen Fry.

18     Q.    Okay.  So Katelen Fry, on June 15th, forwarded

19  this to you?

20     A.    Yes.

21     Q.    Where were you when you received it?

22     A.    I was home.

23     Q.    Okay.  And did this spur a conversation

24  between the two of you?

25     A.    Yeah.  She asked me if that was Cheddar.

**J.A. 820**

 1              MR. WOLPIN:  Okay.  So at this point I would

 2   move to admit this as a full exhibit and strike the ID.

 3              MS. KRASINSKI:  Objection, 401 --

 4              THE COURT:  Sustained.

 5        Q.   Let's talk further about it.

 6              So this is a message you got from her.  Did

 7   this spark any response in you?

 8        A.   To -- to clarify, this is an image that she

 9   sent me in a message on Telegram.  So this is a

10   screenshot of a Telegram message that somebody sent her,

11   which she then sent to me in the early morning of

12   June 15th.

13        Q.   And what did that cause in you as far as a

14   response?

15        A.   It made me aware that somebody was harassing a

16   love interest of mine and she asked me if it was Cheddar

17   Mane.  I initially said I don't think so, and I asked

18   her why she would think that.  She then explained to

19   me --

20              MS. KRASINSKI:  Objection, hearsay.

21              THE COURT:  Sustained.

22        Q.   Okay.  So from this you had a sense that

23   someone was threatening her; is that what conclusion you

24   reached?

25        A.   I'm careful about how I use the word threat,

1  as you can probably understand, but, yeah, I mean,

2  they're trying to make her very uncomfortable.

3      Q.   Okay.  And was there a reason that you

4  attributed this to Cheddar Mane?

5          THE COURT:  I -- stop.  Put the headsets on.

6          MR. WOLPIN:  Okay.

7                       AT SIDEBAR

8          THE COURT:  All right.  Speak into the

9  microphone.

10          I -- are you going to introduce evidence that

11  would allow a jury to conclude that this screenshot is

12  of a communication that came from Cheddar Mane?

13          MR. WOLPIN:  So the situation is that

14  Mr. Cantwell received this on the morning of.  It's in

15  reference to taking pictures of children.

16          THE COURT:  Yeah, but can you answer my

17  question?  Are you going to try to contend that you have

18  introduced sufficient proof for the jurors, if they

19  receive this exhibit, to conclude that this screenshot

20  was a communication from Cheddar Mane?

21          MR. WOLPIN:  No.

22          THE COURT:  All right.  Why does it come in?

23          MR. WOLPIN:  Because it reflects on my

24  client's state of mind --

25          THE COURT:  No.  No.  Sustained.

**J.A. 822**

```
 1                    CONCLUSION OF SIDEBAR
 2           The COURT:  And let me just state for the
 3    record under Rule -- it's a Rule 403 ruling that
 4    prejudicial effect substantially outweighs any probative
 5    value.
 6      Q.   So you get a text in the morning.  And is
 7    there another interaction you have online that evening?
 8      A.   Yes.
 9      Q.   Okay.  And can you explain how that
10    interaction begins?
11      A.   Yeah.  The -- I believe the one that you're
12    referencing is when Cheddar Mane and a bunch of Bowl
13    Patrol characters joined the Peaceful White Folk
14    Telegram chat group.
15      Q.   Okay.  And that group named Peaceful White
16    Folk is affiliated with who?
17      A.   Affiliated with what?
18      Q.   With who?
19      A.   With me.
20      Q.   Okay.  So that's a group that you were running
21    at that time?
22      A.   Yeah.  The -- the group came into existence
23    because the -- the public Radical Agenda chat room
24    was -- you couldn't use it on Apple devices anymore.
25    And so we created a separate one that was technically
```

**J.A. 823**

1    private that you had to have an invite to get into so

2    that -- which would -- it -- the Apple devices did not

3    ban these technically private chat courtrooms and so we

4    created another one that we called the Peaceful White

5    Folk.  That was mine, yeah.

6        Q.    And you said a number of people showed up at

7    the same time; is that correct?

8        A.    Yeah.  It was a like they -- you saw the names

9    join in a list.  It was like so-and-so joined, so-and-so

10   joined, like this.

11       Q.    Okay.  And did you recognize those names?

12   Were they familiar in some way to you?

13       A.    Some of them.  One -- one was Cheddy Blac,

14   which I recognized to be a variation of Cheddar Mane.

15   And another one was a variation of Mosin-Nagant.  And I

16   can't off the top of my head recall what the other names

17   were.

18       Q.    All right.  And what started happening when

19   this group entered the room?

20       A.    They immediately started antagonizing

21   listeners.  I believe Cheddar probably accurately

22   testified that he started beaming at a guy named

23   Heimbach.  He had these -- this sticker pack of

24   unflattering photos of Matt Heimbach.

25             Another person said, let's join the Taliban,

**J.A. 824**

```
 1   which --

 2            MS. KRASINSKI:  Objection, hearsay.

 3            MR. WOLPIN:  The impact on the listener.

 4            THE COURT:  It's not hearsay, because it's not

 5   admitted for the truth, but it doesn't strike me as

 6   relevant.  So I -- you have to demonstrate that there's

 7   some relevance to this.

 8            MR. WOLPIN:  It relates to my client's

 9   reaction and why he was --

10            THE COURT:  Yeah, your client's reaction --

11   put the headsets on.

12                         AT SIDEBAR

13            THE COURT:  Your client's being provoked is

14   admissible by the government to prove that your client

15   had a motive to commit the crime, but it's not relevant

16   to any of the defenses that you are seeking to pursue

17   here that I can see.  And I've asked you about a

18   thousand times to tell me how it is and you haven't been

19   able to articulate a legally sufficient reason why it is

20   relevant to any defense that you are putting on.

21            Do you want to take one more shot at it?

22            MR. WOLPIN:  I don't want to solely just

23   repeat what I've said, but I think the government has

24   charged this in ways that include offenses that have

25   context in a way that matters as far as the specific
```

**J.A. 825**

```
 1   group.

 2            THE COURT:  I've given you abundant

 3   opportunities to demonstrate context.  I have told you

 4   over and over and over again that evidence that is

 5   relevant, if at all, only because it tends to show that

 6   your client has reason to be angry at Cheddar Mane is

 7   evidence that the prosecution can introduce because it

 8   shows your client has a motive, but it's not relevant

 9   that I can see for any other purpose.  So when you try

10   to introduce it over the government's objection, I can't

11   see that there's a relevant purpose to introduce it.

12            Now, you've had abundant evidence on that

13   point, but I'm telling you it's time to move on because

14   if -- to the extent it is relevant, it's minimally so,

15   and the waste of time associated with this evidence and

16   its potential prejudicial effect -- that is, that it

17   encourages the jury to base its decision on anger

18   towards the victim rather than on any admissible

19   basis -- substantially outweighs any minimal probative

20   value that this evidence has.

21            So I'm telling you for the last time, move on.

22                  CONCLUSION OF SIDEBAR

23       Q.   So after this group enters and begins

24   communicating, what do you -- what action do you take?

25       A.   So there's a -- sort of a few things happened
```

1    at once.  And so the first thing I did was -- I'm trying

2    to remember if I banned them from the chat room before I

3    posted this image in the chat.  But I started banning

4    guys from the chat room, first things first.

5            I also -- in another window, I was having a

6    conversation with Katelen --

7        Q.   Okay.

8        A.   -- and so --

9        Q.   Now, let's just talk about what you did,

10    rather than talking about what's going on with third

11    parties.

12        A.   Yeah, it's difficult if I don't --

13        Q.   Let's just say you banned the people from the

14    chat room.

15        A.   Yeah, I banned the people from the chat room.

16        Q.   Okay.  Did you then have an online

17    communication separately with Cheddy Blac?

18        A.   Yeah, I sent a message directly to Cheddy

19    Blac.

20        Q.   Okay.  What was your purpose for sending that

21    message?

22        A.   Well, I sort of probably had a few things

23    going through my head at once, but I was pissed off and

24    I had warned him that if he came back around that I was

25    going to dox him.  And I figured that I probably

74

1    shouldn't do that without some process.

2        Q.    Okay.  So you knew you had previously told him

3    to leave you alone or you'd dox him, correct?

4        A.    Yeah.

5        Q.    And we've seen that there was some vulgarity

6    in that, wasn't there?

7        A.    To say the least of it.

8        Q.    Okay.  At the start, at this point, what

9    information do you know about Ben Lambert?

10       A.    To clarify, when I first sent the message, all

11   I've got is this photograph that I mentioned that Peach

12   had sent me the prior fall and at the moment, I couldn't

13   even actually find that image.

14           But I send him the message, do you need a

15   lesson -- a reminder of the lesson that kept you away is

16   the first thing I do.  And at the moment, I'm bluffing,

17   because I don't have it.

18       Q.    All right.  And then do you get -- ultimately

19   you get his street address?

20       A.    Yes.

21       Q.    Okay.

22       A.    And so I have to reference a conversation with

23   Katelen to talk about that, I think, but I asked her for

24   the information.

25       Q.    Okay.  Had you decided what you were going to

**J.A. 828**

1   do with it at that time or what was the plan?  Did you

2   have a plan?

3       A.   No, I -- plan would be a strong word.  I came

4   back and I think I just said the name of the street and

5   I waited to see what he said.

6            And then -- you know, I don't have the thing

7   in front of me, but some time went by before he even

8   replied.  So I left it there.

9            MR. WOLPIN:  Could you put up Government's

10  Exhibit 100 right now, which I believe is a full

11  exhibit?

12      Q.   His eventual response over time, after some

13  time, is "what are you talking about"?

14           And then you see the balance.  What was the

15  message you took from that?

16      A.   He was pissing on my back and telling me it's

17  raining.  He's lying.

18      Q.   All right.  So you had the sense he was there

19  intentionally?

20      A.   Yeah.  He says:  What are you talking about?

21  Some fag pretends to be you -- which means he's well

22  aware of the Telegram account that's been impersonating

23  me, which, to my recollection, wasn't even part of this

24  incident.

25           He says:  I told them to stop.  They did.

76

1          Well, I'd been dealing with this stuff for the
2    last eight months and it never stopped.  That's not
3    true.
4          Q.   So in this initial part, do you say anything
5    about Child Protective Services?
6          A.   No.
7          Q.   In this initial part, do you say anything
8    about his wife?
9          A.   No.
10         Q.   Okay.  If we can scroll down, as this is going
11    on, do you have a plan?  Do you know what you're going
12    to do at the end of this?
13         A.   No.
14         Q.   All right.  You tell him about a picture and
15    he asks you what picture you're talking about.  What
16    picture are you talking about?
17         A.   So in the -- in a conversation with Peach, she
18    had explained to me that she took a picture -- I don't
19    know how to answer this question.
20         THE COURT:  You were talking about a picture,
21    apparently, and he's -- your lawyer's asking -- just say
22    what the picture is you're talking about.
23         A.   So I have two conversations going on at once
24    and this is the source of the pictures.  Okay?  So I
25    stated --

77

```
1              THE COURT:  Let's start with just -- I think
2    what he's asking is just what is the picture you're that
3    you're talking about?
4              THE WITNESS:  I've got several pictures.  They
5    are of Cheddar Mane, Cheddar Mane's family, and a
6    screenshot of Peach's GPS from when she went to visit.
7         Q.   Okay.  And at that point have you decided, I'm
8    going to put him out in the world, or not?
9         A.   No.
10        Q.   Okay.  If we can scroll down.
11             And --
12        A.   To clarify, like I think that at this point
13   I've got the right to do it, frankly, because I told
14   this guy, you stay away from me or I'm going to dox you.
15   And he's back around, I know he's lying to me, and, you
16   know, but I haven't decided to do it or not.
17        Q.   Okay.  Is doxing itself, was it your
18   understanding that doxing was legal or illegal?
19        A.   Doxing is legal.
20        Q.   Okay.  Now, you say some pretty harsh things.
21   You use harsh language.  I think if we go up, I'm sorry,
22   just like halfway up to the one above:  You know, have
23   trouble sleeping at night until she leaves you and takes
24   your kids away.
25             I mean, this is pretty strong stuff.
```

**J.A. 831**

1    A.    Yeah.

2    Q.    Okay.  Looking at the response that comes in

3    at 6:39, which is -- if we can scroll up a little bit,

4    maybe we can highlight this one.  What did this mean to

5    you?

6    A.    It meant a lot of things, most of which are

7    hard for me to reference without going back to the other

8    chat, but it's -- it's -- primarily I think the guy's

9    trying to get a rise out of me and it's working.

10    Q.    Okay.  And when he says, I'm assuming Peach

11    took the picture, Peach is a reference to who?

12    A.    Peach is a reference to Katelen Fry, my

13    ex-girlfriend.

14    Q.    Okay.  What were -- what had been your

15    relationship with her?

16    A.    I asked Katelen to marry me.

17    Q.    Okay.  So I imagine it's someone you cared

18    about?

19    A.    Yeah.

20    Q.    What did you take this statement by him to

21    mean?

22    A.    I took it to mean, first and foremost, that

23    he's been lying to me throughout this fucking

24    conversation because he's -- what he's referencing, I

25    know isn't true.  And so what he's referencing makes me

```
1    know that he's been lying to me the whole fucking time
2    in his thing and that he's going to make her life
3    difficult.
4           And to clarify, again, like I said before
5    about the threat thing, I'm careful what I call a
6    threat.  Okay?  And I don't -- and I don't believe that
7    he's going to go do physical violence to her or anything
8    like that, but, you know, he's saying something nasty
9    about her and I -- and I could -- and these guys made my
10   life a living hell for eight fucking months and I don't
11   want that to happen to her.  So I got fucking mad.
12        Q.   Okay.  So if we look at the next one, that
13   contact about Peach was at 6:39?
14        A.   Yeah.
15        Q.   Your response is -- is at what time?  Can you
16   see?
17        A.   It's at 6:41.
18        Q.   Okay.  And what is your response?
19        A.   "As a matter of fact, I don't.  So if you
20   don't want me to fuck your wife in front of your kids,
21   then you should make yourself scarce."
22        Q.   Was that post about I don't care about her
23   true?
24        A.   No.
25        Q.   Were you trying to make him think that you
```

```
 1   would rape his wife?
 2        A.   No.
 3        Q.   Did you expect that he would think that you
 4   were going to rape his wife?
 5        A.   No.
 6        Q.   Why not?
 7        A.   Because the guy's been calling me a fucking
 8   sellout and a fucking rat for the last eight months.  Do
 9   you think I'm going to go fucking drive down there and
10   rape his wife because I could make a buck off of that?
11   It's ridiculous.
12             It's -- you know, and I'm not saying that this
13   is a joke.  It's not the theme of the show or whatever.
14   But like we talk about like fantasy violence, things
15   like throwing people out of helicopters, on the show
16   because they're sufficiently ridiculous that people
17   aren't supposed to fucking take them as real things.
18   Okay?
19             What I got bent out of shape with these guys
20   about is they're talking about bodies that ain't even
21   fucking cold yet and they're --
22             MS. KRASINSKI:  Objection, your Honor.
23        A.   -- and they're bringing it too close to the --
24             THE COURT:  All right.
25             THE WITNESS:  I'm trying to --
```

```
 1              THE COURT:  I'm sorry.  I'm sorry.

 2              What is the basis for the objection?

 3              MS. KRASINSKI:  Relevance, hearsay, 403.  He's

 4     talking --

 5              THE COURT:  Okay.  Put another question to the

 6     witness.

 7              And please listen to what your lawyer says and

 8     try to answer his question.

 9              THE WITNESS:  All right.

10        Q.   Thank you, Chris.

11             Now, is this something that you gave a lot of

12     thought to, that section?

13        A.   No.  I got -- you know, this guy said

14     something about her and I wanted to say something

15     profoundly unpleasant, so I replied accordingly.

16        Q.   In the White Nationalist movement, does the

17     word cuck have a meaning?

18        A.   Yes.

19        Q.   What does the word cuck refer to?

20        A.   Cuck in White Nationalist circles is as

21     versatile as fuck in every other one, but the idea

22     basically being -- it's almost like calling someone a

23     faggot.  It's like depriving somebody of their

24     masculinity.  I'm going to take your woman from you,

25     et cetera.
```

**J.A. 835**

82

1      Q.    So there's a theme throughout White

2   Nationalism of this idea that sleeping with someone

3   else's wife is an insult?

4      A.    Yeah.  I'd say that that's pretty universally

5   understood.  It's not a particularly pleasant thing to

6   do to somebody.  And in -- and not just White

7   Nationalism, but, you know, on a -- on the right wing

8   typically, it -- the right wing more broadly, cuck has a

9   particular connotation to it.

10     Q.    But, specifically, it impugns someone else's

11  manhood if -- if someone else is sleeping with their

12  wife?

13     A.    Yeah.  You can't satisfy your wife, so

14  somebody else is going to do it for you.

15     Q.    Okay.  So it's an insult?

16     A.    Yes.

17     Q.    Now, if we can scroll down.

18           Okay.  So then you send him the picture that

19  you have of his wife?

20     A.    Yes.

21     Q.    At that time, have you posted it online?

22     A.    I posted it with the faces blurred out in the

23  Peaceful White Folk chat room, which had a limited

24  number of users in it, but I blurred the faces out at

25  that point.

**J.A. 836**

1      Q.    Okay.  So in that one, you couldn't see who it

2   was?

3      A.    Right.

4      Q.    Okay.  Now, this line, you say:  I bet one of

5   my incel listeners would love to give her another baby.

6      A.    Yeah.

7      Q.    What -- where -- where does that come from?

8   What does that mean?

9      A.    Well, if you think it's -- if you think it's

10  disrespectful to get cucked by your favorite podcaster,

11  try getting cucked by somebody who can't get laid to

12  save his life.  Right?

13          And so, you know, I -- and -- look, I get the

14  double entendre here and what people try to connect this

15  to.  I get it.  But anybody who listened to Radical

16  Agenda could identify two particular listeners who

17  identified themselves as incels on the show.

18          One is Dave in New York and another one is

19  Crypto Joe.  They're both autistic and they both call in

20  and they say idiotic-sounding things about like trying

21  to get girls.  Like Dave would call me and ask me for

22  dating advice and he'd never take any of it.  And he'd

23  call me with ridiculous questions like how do I get a

24  girl who paints her nails; how do I get a girl -- I

25  have -- it's notorious, the clip -- how do I find a girl

1  with hair down there --

2         THE COURT:  Counsel, can you tie this in to

3  what you're -- --

4         MR. WOLPIN:  Yes.

5     Q.   So in your listenership, in your mind, are

6  your incel listeners people who are sort of violent?

7     A.   No.

8     Q.   They're more --

9     A.   They're pathetic.

10    Q.   Okay.

11    A.   With all due respect to the listeners if they

12  fucking hear this, like, that's what they sound like on

13  the show.  They're a joke.

14    Q.   And so --

15    A.   And a funny one.

16    Q.   All right.  If we keep scrolling down, you

17  send him the picture of Ben Lambert?

18    A.   Yup.

19    Q.   You talk about Vic and he responds:  I don't

20  own guns or do drugs.

21         Did you take that as a statement that was

22  being truthful with you?

23    A.   No.  I was quite certain that he was being

24  dishonest, like he had been throughout the entire

25  conversation.

**J.A. 838**

```
 1        Q.    Okay.  So it keeps going to some degree.
 2             We can keep going.
 3             All right.  We get to some mention of CPS.
 4   Did you have a plan to reference CPS?
 5        A.    I did not, no.
 6        Q.    Okay.  Where did CPS come from, if there was
 7   no plan --
 8        A.    So part of what we've skipped around here is
 9   he's basically, like, he's saying to me -- and he's got
10   a point; you dox me, then what are you going to do after
11   that, right?
12             And, generally speaking, like, I -- I -- I
13   don't want to try to, like, not downplay the doxing too
14   much here, because I understand it's in my best interest
15   to do that, but, like, doxing is serious business.
16             As the prosecution noted I've said before, I
17   don't take it lightly to go and put a guy's personal
18   information out there.  And so I'm thinking of an
19   interim step that might actually solve my problem, which
20   is to stop this damn harassment.
21             And so I say to myself, I've already went to
22   the cops about this, I've been to two law enforcement
23   agencies about this, they're not responding to my
24   concerns, what can I do other than publish this guy's
25   information?
```

```
 1              And I'm looking at a picture of his fucking
 2    kids.  And so I think to myself, if the CPS shows up at
 3    his fucking house, maybe he's going to realize that,
 4    like, this has real-world implications and he'll leave
 5    me alone.
 6         Q.   Okay.
 7         A.   And so I warn him of that.
 8              THE COURT:  Okay.  Good.  Pick up your
 9    headphones.  I need to ask you both a question.
10              We're going to stop for the day here.
11                        AT SIDEBAR
12              THE COURT:  Mr. Wolpin, I know you have day
13    care concerns, but I really, really think it's important
14    to --
15              MR. WOLPIN:  My headset is -- is on the fritz.
16              THE COURT:  Can you get him another headset?
17              No, we've got ones that work wonderfully.
18    We've got a hundred of them.
19              THE CLERK:  If you tend to face that --
20              THE COURT:  If you want to go to where you're
21    questioning and speak into that microphone where you're
22    standing, is it easier for you?
23              MR. WOLPIN:  All right.  I can't hear, but --
24              THE COURT:  Can you hear me, Mr. Wolpin?
25              THE CLERK:  Is it on channel 1?
```

**J.A. 840**

87

```
 1              MR. WOLPIN:  Nope.
 2              THE CLERK:  I'll --
 3              MR. WOLPIN:  All right.  Thank you.
 4              THE CLERK:  Hold the button to 1.
 5              THE COURT:  All right.
 6              MR. WOLPIN:  It is working now.
 7              THE COURT:  I'm giving up.
 8              Members of the jury, I will -- I would like
 9    you to come back -- I'd like to start at nine o'clock
10    tomorrow.  So I'm going to ask you to show up a little
11    bit before 9:00, because I want to finish with the
12    evidence in the case at or about lunchtime so as soon as
13    we come back after lunch, we can do closing arguments
14    and jury instructions.  I don't want to make you come
15    back an extra day for just a small amount of evidence.
16              So I normally start for 9:30, but we're going
17    to have to make an adjustment and start at nine o'clock
18    tomorrow.  All right?  So please come a little bit
19    early.
20              Keep my general instructions in mind.  Don't
21    discuss the case with anybody, don't disclose -- don't
22    expose yourself to any discussions of this case at all
23    in the media.
24              Have a good night and we'll see you at nine
25    o'clock tomorrow.
```

**J.A. 841**

```
 1                        (Jury excused.)

 2              THE COURT:  Be seated, please.

 3              So, Mr. Wolpin, I tried to discuss this with

 4   you with the headsets.  I just could not wait any longer

 5   while we were fooling around with the headsets.

 6              I really have tried to accommodate your child

 7   care needs in starting a half an hour later, but I'm

 8   trying now to balance the interests of the jury and the

 9   health risks associated with bringing everybody back

10   here potentially for another day against a half-an-hour

11   problem with health care -- I mean child care.

12              So I -- I -- I just could not figure out a way

13   to do it, so I need you to come back at 9:00 --

14              MR. WOLPIN:  I've been getting here at 8:55 is

15   sort of my --

16              THE COURT:  All right.  If you miss it by two

17   minutes, I'm not going to hold it --

18              MR. WOLPIN:  I'll run in the door.

19              THE COURT:  Okay.  And we'll try to start --

20   but everybody else be here by 8:30 or, in fact, we're

21   going to talk about jury instructions tonight and so I'm

22   going to say everybody else but Mr. Wolpin, be back

23   here -- the defendant doesn't have to be here, but you

24   be back here at eight o'clock tomorrow so that if there

25   are any last-minute issues with jury instructions, we --
```

**J.A. 842**

1    we can talk about them.

2            And whoever's giving the closing doesn't

3    have to come.  So if you're -- so as long as one

4    representative of the government is here and one

5    representative of the defendant is here empowered to

6    raise with me any last-minute concerns with my

7    instructions.  Okay?

8            MR. LEVIN:  By 8:00 a.m.?

9            THE COURT:  8:00 a.m., yeah.

10           MR. LEVIN:  And they'll be told to let us in?

11   Because they haven't been opening the doors until --

12           THE COURT:  The case manager will inform the

13   CSOs that they need to be on duty, ready to go, at eight

14   o'clock, and let anybody in -- let the lawyers in at

15   eight o'clock.  Because I want to get this in and, if

16   necessary, even have the jurors deliberate in the

17   evening until it is clear to me that they are not going

18   to be able to return a verdict.  Because if we -- if we

19   can avoid having to bring people in for another day,

20   that minimizes -- lessens risk.  That's what I'm trying

21   to do.

22           MR. LEVIN:  Will the draft jury instructions

23   be emailed to us?

24           THE COURT:  I have the draft jury instructions

25   here now and I'm going to give you a half an hour to

1    read them and then I'm going to meet with you about them

2    at five o'clock and I'm going to hear your objections to

3    it.

4            MR. LEVIN:  Okay.

5            THE COURT:  And then I'm going to go back and

6    make another round of changes, if you have any, and I'll

7    try to have another set for you available at eight

8    o'clock.  And then I'll meet with you again to see if

9    there are any last-minute changes because I want to be

10   sure everybody has a clear idea as to how I'm going to

11   charge.

12           And I will say this round of changes are

13   not -- they're -- there's one substantial change and

14   that's what I've told you about and that is when proving

15   intent to extort by threat also requires proof of intent

16   to threaten.

17           And that's consistent with the way the

18   government charged it anyway, but I believe that's the

19   law.  I put it in.  If someone can persuade me it's not

20   the law, I'll take it back out.

21           The other changes I have are stylistic, so

22   I've decided to read each count in my instruction when I

23   talk about that count, and I made some other what I

24   think are mostly minor changes to the charge.  But it's

25   very similar to the charge I gave you before the trial

**J.A. 844**

```
1   even started, which I don't normally do.  I don't
2   normally even give the people a charge until a day
3   before closing.  So I think we should be able to move
4   relatively quickly here if you've looked at the charge
5   before today.
6           But we'll -- we'll take a break till 5:00.
7   We're going to -- I do not need the defendant to be
8   present.
9           I would like -- it has been my practice at the
10  request of defense counsel to record every interaction I
11  have with counsel.  The problem is I have a court
12  reporter who's been working hard all day long.  I would
13  like to be able to hold this meeting at 5:00 without a
14  court reporter and I -- I will allow anybody who wants
15  to put on the record the next morning whatever they
16  think happened that they want to record, but I would
17  like the parties' permission to be able to hold a
18  discussion, as I normally do in every single case, with
19  jury instructions in an informal way without a record,
20  with just counsel present, so that we don't keep the
21  reporter till six o'clock at night when she's been
22  working all day.  That's my request.
23          Is there an objection there?
24          MR. LEVIN:  That's fine, your Honor.  We're --
25  we're agreeable with that.
```

```
 1              THE COURT:  All right.

 2              MS. KRASINSKI:  No objection, your Honor.

 3              THE COURT:  All right.  So we won't have the

 4     reporter.  I suggest we meet in the jury assembly room,

 5     which is already set up.

 6              THE CLERK:  I would say no, only because I

 7     have to disinfect then down there.

 8              THE COURT:  All right.  We'll do it here then.

 9              THE CLERK:  Yeah.

10              THE COURT:  You stay here.  I'm going to go

11     upstairs.  I'm going to come back down at five o'clock

12     and we'll do it here.

13              That's -- I appreciate it.  That's fine.

14              MR. WOLPIN:  Your Honor --

15              THE COURT:  Yes.

16              MR. WOLPIN:  -- typically I wouldn't have any

17     contact with my client in between testifying.  I don't

18     think that's appropriate.  But I do have to have some

19     conversation with him about closing.  I would just ask

20     for leave to --

21              THE COURT:  Yes.  Of course, if counsel

22     represents to me that you will not engage in preparation

23     about the testimony but instead need to review the

24     potential closing argument, I have no objection and I'm

25     sure the government would take your representation that
```

**J.A. 846**

```
 1   you will refrain from --
 2            MR. WOLPIN:  Thank you.
 3            THE COURT:  -- discussing testimonial matters
 4   with your client.
 5            All right.  So that being said, whoever -- if
 6   you're doing the closing, Mr. Wolpin, and you want to
 7   head out, Mr. Levin can probably cover the instructions
 8   and brief you.  And, otherwise, I'll see Mr. Levin back
 9   here at 8:00, one member of the government team at
10   8:00 --
11            MR. LEVIN:  At 8:00?
12            THE COURT:  At 8:00 tomorrow.
13            MR. LEVIN:  Oh, okay.  But we're going to stay
14   here now --
15            THE COURT:  5:00 tonight --
16            MR. LEVIN:  Okay.
17            THE COURT:  -- you, and 8:00 tomorrow, and
18   Mr. Wolpin at 9:00.  Okay?
19            MR. LEVIN:  Thank you.
20            THE COURT:  All right.
21            This isn't on the record.
22                (Off-the-record discussion.)
23             (Proceedings adjourned at 4:40 p.m.)
24
25
```

94

C E R T I F I C A T E

        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 12/9/2020      /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR

**J.A. 848**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   20-cr-06-01-PB
            v.                  *   September 25, 2020
                                *
   CHRISTOPHER CANTWELL         *
                                *
* * * * * * * * * * * * * * * * *
```

<u>TRANSCRIPT EXCERPT OF JURY TRIAL TESTIMONY</u>
<u>OF CHRISTOPHER CANTWELL</u>
<u>BEFORE THE HONORABLE PAUL J. BARBADORO</u>

<u>APPEARANCES</u>:

<u>For the Government</u>:        John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             U.S. Attorney's Office

<u>For the Defendant</u>:         Eric Wolpin, Esq.
                             Jeffrey S. Levin, Esq.
                             Federal Defender Office

<u>Court Reporter</u>:            Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             (603) 225-1453

**J.A. 849**

```
                         I N D E X


WITNESS:                 Direct    Cross    Redirect    Recross


CHRISTOPHER CANTWELL


By Mr. Wolpin             3                    93


By Ms. Krasinski                   45



EXHIBITS:                               FOR ID      IN EVD


Government's Exhibit No. 4BB.                          4
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Good morning, members of the jury.
 3              THE CLERK:  Court is in session and has for
 4    consideration a jury trial in United States of America versus
 5    Christopher Cantwell, criminal case number 20-cr-6-1-PB.
 6              THE COURT:  Mr. Cantwell, you understand you're
 7    still under oath?
 8              THE DEFENDANT:  I do, Judge.
 9              THE COURT:  All right.  Thank you.
10              Go ahead, counsel.
11              MR. WOLPIN:  I would like to just clear up two
12    loose ends from yesterday.
13              One, if for the witness we could bring up 4BB.
14        CONTINUED DIRECT EXAMINATION OF CHRISTOPHER CANTWELL
15    BY MR. WOLPIN:
16        Q.   All right.  This is a redacted version of what we
17    looked at yesterday.  Is this familiar to you?
18        A.   It is.
19        Q.   Okay.  And to summarize, if we could, what do you
20    see on the bottom half?
21        A.   I see a Photoshopped image of me as a janitor for
22    the Federal Bureau of Investigation standing behind Special
23    Agent Dino Capuzzo who was going to investigate people in my
24    social orbit.
25        Q.   Okay.  So the date on this is when, what month?
```

**J.A. 851**

```
1        A.    February 16th.  I know it to be from 2019.

2        Q.    Okay.  So this is something you saw previous to

3   now?

4        A.    Yeah, this was five days after I had published on

5   my website that I went to the FBI about the defacement of my

6   website.

7        Q.    And on the above portion and the below portion

8   there's a name that posted these two tweets, correct?

9        A.    Yeah.

10        Q.    And that's a name you're familiar with?

11        A.    The name of the person who posted the tweets?  Yes.

12   This is a pseudonym of a guy named Dallas Medina.

13   Mosin-Nagant.

14             MR. WOLPIN:  I would move at this time for the ID

15   to be stricken and for this to be admitted as a full exhibit.

16             THE COURT:  Any objection?

17             MS. KRASINSKI:  No objection, your Honor.

18             THE COURT:  It will be admitted.

19             (Government's Exhibit 4BB admitted)

20             MR. WOLPIN:  Since the jury has already seen the

21   bottom part, we're not going to talk too much about that.

22             What we haven't seen yet is the top part.  If we

23   could highlight that.  Maybe the whole line so it comes out a

24   little clearer.

25        Q.    All right.  In the top part there's a tweet related
```

J.A. 852

```
1   to this that appears and that cites an address.  Whose address

2   is that?

3         A.    That's my address.

4         Q.    Okay.

5         A.    My home address.

6         Q.    The 103 Lincoln Street in Keene, New Hampshire, is

7   where you live?

8         A.    103 South Lincoln Street in Keene, New Hampshire.

9   That's my home address, not my publicly listed mailbox.

10        Q.    Okay.  And so this is not something you put up as

11  part of your show?

12        A.    No.

13        Q.    Okay.  And there was some testimony this week that

14  you had doxed someone named Mosin-Nagant?

15        A.    Yes.

16        Q.    Is this the same person?

17        A.    It is the same person.

18        Q.    And which came first, him releasing your home

19  address or your releasing his identifying information?

20        A.    Him releasing my home address along with countless

21  other provocations.

22        Q.    Okay.  But just as far as this?

23        A.    Yes.  He published my home address, and then I

24  published his identifying information probably more than a

25  month later.
```

```
 1          Q.    All right.  Let's move on from that.  Thank you.
 2                I would like to touch on one other thing we talked
 3     about yesterday, which is how things started with the Bowl
 4     Patrol.  We're going to do just a few quick questions.
 5          A.    Okay.
 6          Q.    You initially were on their first podcast?
 7          A.    To be clear, it was not represented to me as their
 8     first podcast when I went on there.  I found that out later,
 9     yes.
10          Q.    But you appeared with them and did you participate
11     with them in the kind of talk and humor that they use?
12          A.    I want to be clear.  Sort of, okay?  Like these
13     guys -- I literally didn't know what I was going onto.  And
14     when they started in with the Dylann Roof stuff, I was like --
15     I was uncomfortable with it.
16                But we were in the same category of stuff.  Like I
17     like the racist humor, yes, but the mass shooter stuff I was
18     never into.
19          Q.    All right.  But you participated with them?
20          A.    Yes, I did.
21          Q.    Okay.  And on your show are there jokes about rape?
22          A.    Jokes about rape?
23          Q.    Yes.
24          A.    Yes.
25          Q.    Okay.  Are there skits that are humorous that
```

1    involve that as well?

2         A.    Yeah, I mean violence is a theme of the show.  It

3    is.

4         Q.    Okay.  So that similar -- that gets talked about or

5    joked about.  You said people getting pushed out of

6    helicopters, that's the kind of thing that gets talked about

7    and mentioned?

8         A.    Yes.

9         Q.    Okay.  All right.

10             Now, moving back to the exchange you had with

11    Cheddar Mane in June.

12             MR. WOLPIN:  If we could bring up Government's

13    Exhibit 208, I would just like to finish with this last point.

14        Q.    The line that follows the Peach line -- the Peach

15    comment he makes is at what time in this conversation?

16        A.    He makes the comment about Peach at 6:39.

17        Q.    How long does it take you before you respond to

18    that comment?

19        A.    Less than two minutes.

20        Q.    Okay.  And as we reviewed a little bit yesterday,

21    did you think through what you were saying at that point or

22    was it more reactionary?

23        A.    I didn't think.  It was within two minutes of what

24    he said, but it was within -- I mean, the amount of time it

25    took me to type that out was how long it took me to think

```
 1    about it.  I just got mad and I reacted.
 2         Q.    All right.  In that particular text was there any
 3    mention of Vic Mackey?
 4         A.    No.
 5         Q.    Was there any mention of getting an identity of
 6    somebody?
 7         A.    No.
 8         Q.    Now, there's a gap in time before there is a
 9    mention of Vic Mackey, correct?
10         A.    That's right, yeah.
11         Q.    Now, the one before was at 6:41 p.m.  If we can
12    look at -- the next one was when?
13         A.    7:10 p.m.  About a half an hour later.
14         Q.    So half an hour later.
15               In your mind were those two texts connected?
16         A.    No, they weren't, and thank you for helping me
17    clarify, okay?
18               When he said the Peach thing, I replied to that,
19    and then I'm back to the original thought, okay?  This thing
20    became -- this was a prior conversation that's being carried
21    on from another date.  It's, come around here, I'm going to
22    dox you.  He tells me, I'm innocent.  I'm not the one
23    bothering you.  And I say, you can prove that to me if you
24    want to give up Vic, okay?  And then he says the thing about
25    Peach, and I'm replying to his comment about Peach with the
```

 1   thing about his wife, which I regret making that statement,

 2   but it's completely disconnected -- in my mind it's completely

 3   disconnected from the thing.  A half an hour later I'm back to

 4   the original thought.  If you don't want this to happen, if

 5   you -- if you want to -- give me Vic is part of the prior

 6   conversation.  It has nothing to do with the wife thing.

 7        Q.   Okay.  Now, let's talk about what happens as this

 8   exchange is winding down.

 9             What does the back and forth become at the end?

10        A.   At the end?

11        Q.   Yeah, near the end.  The last half.  The last

12   third.

13        A.   If I -- I mean, at the end of this screenshot?

14        Q.   No.  At the end of the whole conversation.

15        A.   If I recall correctly, now we're talking about CPS

16   towards the end of it.

17        Q.   Okay.

18             MR. WOLPIN:  And if we can bring up 100, I think

19   Government's 100 has the whole chain, and if we go about

20   two-thirds in.

21        Q.   And yesterday we went through the CPS so I'm not

22   going to do that again with you.

23             MR. WOLPIN:  Keep going.

24        Q.   All right.  So at some point he begins in with the

25   you're fucking nobody, Chris, do your worst, junky loser?

1       A.   Yes.

2       Q.   Is that also the kind of language that has been

3  used in the past?

4       A.   Yeah, it was part of a class of, you know, I mean

5  there's the -- yeah, calling me a junky loser was a class of

6  defamatory comments that these guys were making.

7       Q.   Okay.  And you respond, okay, you got it.  He comes

8  back again and says you have very few listeners and zero

9  credibility and says you're hilariously pathetic, correct?

10      A.   Yeah.

11      Q.   At this point have you released to the public a

12  picture of his family that's visible with their faces and the

13  children?

14      A.   No.  I had -- to make him aware of the severity of

15  this I posted the thing with the faces blurred, but I had not

16  posted any unredacted images.

17      Q.   And when you say the faces were blurred, could you

18  tell who the people were?

19      A.   No.

20      Q.   Did you put the address with that?

21      A.   No.

22      Q.   Okay.  Now, this continues on, and then ultimately

23  ends at the end --

24           MR. WOLPIN:  If we can go all of the way to the

25  bottom.

```
 1        Q.    -- with this cartoon?

 2        A.    Yeah.

 3        Q.    That cartoon, is that something that you had seen

 4   before then?

 5        A.    I had seen that cartoon entirely too many fucking

 6   times.  I'm sorry.

 7        Q.    Okay.  Well, let's work on the language.

 8        A.    Yeah.  Okay.

 9        Q.    And is this the end or is there actually more than

10   this?

11        A.    There's more than that.

12        Q.    Okay.  What was the more than that?

13        A.    This was a thing that they did so many times I lost

14   track of it.  They had this, like, it's called a sticker pack.

15   It's like a thing where, like, you have these images and it's

16   one click to get them, okay, and, like, it was just this

17   collection of them that they had made which was really fucked

18   up.

19        Q.    Chris, you've got to work on the language.

20        A.    I'm sorry.

21              So they would come in and, like, flood my chat

22   rooms with these things all the time.

23        Q.    So were there more than this then?

24        A.    Yes, there were.

25        Q.    Okay.  And how did the whole conversation actually
```

```
1    end?
2         A.    It ended with that.  That's when I blocked him.
3         Q.    So you blocked him?
4         A.    Yeah.
5         Q.    Okay.  Now, Telegram has the capacity for sort of a
6    more secretive chat.
7              MR. WOLPIN:  We can take that off, please.
8         Q.    Is that true?
9         A.    Yes.  It's called a secret chat, yes.
10        Q.    And what's the difference between a secret chat and
11   a regular chat?
12        A.    There are several important differences to the
13   secret chat, okay?  Telegram is -- Telegram is -- the entire
14   thing is an encrypted messenger.  So, like, if somebody is,
15   for lack of a better term, tapping your Internet connection,
16   they're not going to be able to see the messages that you send
17   to Telegram, okay, but Telegram can see the messages, like,
18   the Telegram service, the administrator for that service could
19   have read, for example, this conversation between me and
20   Cheddar Mane.  All right?
21             There's a technology known as end-to-end encryption
22   which means that even the service provider can't read that
23   conversation because only the parties involved have what's
24   known as the encryption keys.  So that's an important
25   distinction of it.
```

**J.A. 860**

1          It also has a couple other important features, one

2    of which is self-destructing messages that you can set a

3    timer -- and this does not exist in the regular direct

4    message, like, between me and Cheddar Mane.  You can set a

5    timer that the message will delete itself in anywhere from one

6    second to, you know, a month.  You can set it whatever you

7    want it to be.

8          Q.    Well, I guess -- can someone or could you have used

9    some kind of technique to make this difficult to preserve?

10         A.    Which leads us to the third and most important

11   feature of secret chats, which is it prevents people from

12   taking screenshots, okay?  A lot of the evidence that you've

13   seen in here is these screenshots.  I don't know if you've

14   ever done this on your phone.  Whatever you're looking at on

15   your phone, you can save that image.  It's like a JPEG file

16   that can be shared and transferred later on.

17         One of the most important features of secret chats

18   is that it can't 100 percent of the time prevent you from

19   taking a screenshot depending on the security settings of the

20   phone, but it will either prevent it depending on the security

21   settings or it will notify the other side that a screenshot

22   has been taken.  So --

23         Q.    Did you make any effort to use these technologies

24   at the outset of your conversation to make it difficult to

25   record?

**J.A. 861**

```
 1        A.   At no point have I ever used secret chats with
 2   Cheddar Mane, and I've used that technology in other
 3   circumstances.
 4        Q.   So you were aware of it at the time in the
 5   beginning, and that wasn't something you sought to do at the
 6   time?
 7        A.   I was 100 percent aware of it, and I made no effort
 8   to, you know.
 9             And by the way -- I had no expectation of privacy
10   with Cheddar Mane, by the way.  These guys were --
11        Q.   Let's keep to the question.
12        A.   Got you.
13        Q.   All right.
14             MR. WOLPIN:  So if we could bring up for the
15   witness Government 102 which I think -- yes, it has been
16   admitted so that can be brought before the jury.
17        Q.   All right.  So this conversation over the Telegram
18   ends with the pictures, it's over, or what's happening next?
19        A.   Well, you want me to go to what happens next or
20   what's in this image in front of me?
21        Q.   Let's wait on that.  Maybe I brought that up too
22   soon.  I apologize.
23             What happens next?
24        A.   I mean, immediately after the chat it's tough to
25   say.  I kind of just tried to regain my composure and go about
```

1    the rest of my evening or whatever, right, and then later on I

2    started seeing -- the chat transcripts were showing it.  It

3    became part of the category of spam that they were putting

4    into my comment sections and chat rooms and stuff.

5         Q.   Okay.  So the next thing that's happening in

6    relation to this is you are getting these chats sent back to

7    you in your sort of platforms?

8         A.   Correct.

9         Q.   Okay.  With comments or just the chats themselves?

10        A.   With comments.  I mean, the chats were part --

11   became one of many image macros that they were flooding my

12   chat rooms and comment section with, and sometimes there would

13   be, you know, commentary from the spammer.

14        Q.   Okay.  So as that's happening, had you yet put to

15   the public Mr. Lambert's address or the pictures of his

16   family?

17        A.   No.

18        Q.   I mean in an unredacted form?

19        A.   No.

20        Q.   Okay.  So the ones that are coming in to you are

21   the ones this jury has seen which also don't have the family's

22   picture in it, correct?

23        A.   Right.  As he testified that he put stickers over

24   the unflattering images of me, he put over the faces of his

25   family, et cetera.  The identifying information he took out of

**J.A. 863**

1   it by putting the pictures of me.  He started flooding my

2   chats -- or his associates or whoever started flooding my

3   chats with those images.

4       Q.   Okay.

5            MR. WOLPIN:  So now if we can bring up 102.  That's

6   better timing.

7       Q.   All right.  So the first line -- well, we can see

8   someone is saying something to you before.  Is it more than

9   just that one?  Is this that night or are there --

10      A.   Well, I mean, to be clear, the reason that he was

11  able to do this in March of 2020 is because the chat record is

12  kept --

13           MS. KRASINSKI:  Objection.  Foundation.

14           THE COURT:  Stop for a second.

15           I'm sorry.

16           MS. KRASINSKI:  I objected to foundation.

17           MR. WOLPIN:  His --

18           THE COURT:  Wait a second.

19           (Pause)

20           All right.  So he's not really responding to your

21  question, he's interjecting something, and I don't know what

22  he's saying and what he's about to say.

23           So I'll instruct you to put a question to the

24  witness, and I'll instruct you please listen to the questions

25  and try to answer them so we can have an orderly way of

1    proceeding.

2              All right.  Go ahead.

3              THE WITNESS:  Repeat the question.  Sorry.

4        Q.   So we've gone through -- the chat has happened,

5    you're getting feedback of them from people online, and you

6    haven't posted the family's picture yet.

7              Now what you're looking at, to be clear, is a

8    website?

9        A.   That's the Radical Agenda chat group, yes.

10       Q.   Okay.  From June 17th of 2019?  It has it next to

11   your name.

12       A.   Yes.  Okay.  Yes.

13       Q.   And this is public?  The things that are coming in

14   to you on this are public?

15       A.   Yes.

16       Q.   All right.  And what we first see of your reaction

17   at 1:54 a.m. is, here's the redacted parts.

18       A.   Yes.

19       Q.   Why is that what you're saying?

20       A.   Because I'm replying to what is above or what was

21   above what I'm saying.  They were posting these chat logs and

22   I'm saying, here's what was redacted from the chat logs.

23       Q.   Okay.  So it was only after you got that harassment

24   back that you put up the pictures?

25       A.   When they started flooding my chat rooms with the

**J.A. 865**

```
 1   chat logs, I'm, like, you know, like, you think it's -- like,
 2   yeah, my attitude is, do you think it's, like, my burden to
 3   keep your secrets while you harass me?
 4        Q.   Let's get back to the question, okay?
 5        A.   All right.
 6        Q.   Now, have you called CPS at this point?
 7        A.   No.
 8        Q.   Okay.  Had you said in the chat that's now public
 9   that you were going to call CPS?
10        A.   I had said that in the chat, and they were now
11   making that threat public, yes.
12        Q.   Okay.  Did you eventually call CPS?
13        A.   I did.
14        Q.   Okay.  And what happened with that?  We heard that
15   call.  Were you honest with them?
16        A.   Yes.  To the best of my knowledge, yes.
17        Q.   Did you give your real name?
18        A.   I did.
19        Q.   Did you give your address?
20        A.   I did.
21        Q.   Did you identify kind of your leanings as well?
22        A.   Yes.
23        Q.   All right.  And then at that point is there any
24   further exchange that you remember between you and Mr.
25   Lambert?
```

```
 1        A.    Not that I could identify as Mr. Lambert, no.

 2        Q.    Okay.  So there was -- he did at some point --

 3        A.    He called the show, yeah, and that I did realize

 4   was him from what he was saying, to be clear.

 5              So to the best of my recollection I didn't identify

 6   anything other than that call in to the show as a

 7   communication between me and Mr. Lambert after that date until

 8   this case.

 9        Q.    So the call in to the show, why did you not engage

10   with him?

11        A.    Because I was -- it became my habit to try not to

12   engage with him and his group for the prior preceding months,

13   okay?

14              One of the things that he testified to while he was

15   here was accurate.  That when they were making prank calls to

16   the show, I was trying to, like, tell them how to make a

17   better prank call, okay, and after -- it got to a certain

18   point where I just had to treat this as if somebody was

19   putting, like, male enhancement spam in my chat room.  I just

20   wouldn't go away.  So I didn't think it was a good idea to

21   even curse them out.  They even said, like, they got a kick

22   out of it when I yelled at them or whatever.

23              So my habit had become by June, after this had gone

24   on for eight months, to just hang up and move on, and most of

25   the time I even deleted it from the thing.  I suspect, I'm not
```

```
 1   certain of this, but when the government played their

 2   exhibit --

 3             MS. KRASINSKI:  Objection.  Foundation.

 4             THE COURT:  Put another question to the witness.

 5        Q.   So the call came in.  You chose not to engage?

 6        A.   Right.

 7        Q.   The caller -- did you hang up or did the caller

 8   hang up?

 9        A.   I hung up.

10        Q.   Okay.  After that did you try calling him back

11   privately, Telegram chatting him privately in any way?

12        A.   No.  I didn't even, like, record the phone number

13   that he called from.

14        Q.   Now, we've talked about how in May you had a

15   conversation with the Keene Police Department discussing

16   things among -- some of these issues with the Bowl Patrol?

17        A.   You're talking about the May meeting now?

18        Q.   Yes.

19        A.   Yes.

20        Q.   Okay.  So this is context.  This is now June.

21             After June you have -- or in June you had an e-mail

22   conversation with Joel Chidester of the Keene Police

23   Department.  Do you remember that?

24        A.   Yes.  I had several, but I think you're referring

25   to the one after the Cheddar chat?
```

```
 1        Q.    Yes.

 2        A.    Okay.

 3              MR. WOLPIN:  So if we can pull up just for the

 4    witness G-7.  G, as in Gary.  Thank you.

 5        Q.    All right.  So this is an e-mail that appears from

 6    Christopher Cantwell?

 7        A.    Yes.  This is my Gmail account.

 8        Q.    All right.  And it's to a Joel Chidester?

 9        A.    Yes.

10        Q.    At keene.nh.us e-mail address?

11        A.    Yeah.

12        Q.    And it was sent on Friday, June 21, 2019?

13        A.    Yes.

14        Q.    So that's just a few days after the chat we've been

15    talking about?

16        A.    Yes.

17        Q.    All right.  At that point did you tell him anything

18    about what had happened between you and Mr. Lambert?

19        A.    Yeah, mentioning the CPS thing in this.

20        Q.    Okay.  So you provided him information about that?

21        A.    Yes.

22        Q.    You told him about the call to CPS?

23        A.    Yes.

24        Q.    You sent him a file called Cheddar.zip, which is

25    attached to this e-mail?
```

**J.A. 869**

```
 1        A.   Yes.

 2        Q.   What was in the file Cheddar.zip?

 3        A.   It was the photos of Cheddar and his family that I

 4   had sent to -- that I had put in the chat room.

 5        Q.   So essentially the only thing that wasn't public

 6   from the chat was those redacted photos?

 7        A.   I'm sorry.  I had put those into my public chat

 8   room before I sent them to Joel Chidester.

 9        Q.   I understand.  I'll reask the question.

10             The chat itself was all already online?

11        A.   Cheddar's chat logs, the screenshots of Cheddar's

12   chats, were online and he had redacted those images which I

13   then provided to Joel Chidester, yes.

14        Q.   Okay.  And you talked about this in the nature of

15   your dispute with the Bowl Patrol as well?

16        A.   I did.

17        Q.   All right.

18             MR. WOLPIN:  We can take that down.  Thank you.

19        Q.   Now, did you send Chidester the Telegram exchange

20   itself?

21        A.   No.

22        Q.   Why didn't you?

23        A.   I didn't think it made me look particularly good

24   for one, and two, I had linked him to -- I know that there was

25   the link to the Uncle Paul channel in there.  I think at some
```

```
 1    point I provided him with the link to the Bowlcast channel.  I
 2    gave them, you know, links to the other side of this thing,
 3    but, you know, it might help to -- what I was sending him was
 4    what I -- if I had done something wrong, I thought I might
 5    have done wrong, and it might --
 6         Q.    And it related to the CPS?
 7         A.    Yes.
 8         Q.    Now, did these communications with Chidester lead
 9    to any interaction with you and the FBI?  Yes or no to start.
10         A.    Yes.
11         Q.    Okay.  Did that result from you having an in-person
12    meeting with Joel Chidester or did that result from just some
13    of these e-mails?
14         A.    From the point of this message that we just
15    discussed until the time that I met with the FBI I don't think
16    I had another in-person meeting with Joel Chidester before
17    that.
18         Q.    Okay.  So he works with you to some degree to help
19    connect you to the FBI is how you understand it?
20         A.    That's correct, yes.
21         Q.    All right.
22              MR. WOLPIN:  If we can bring up at this point H-8,
23    and we're going to go down to -- just for the witness.  This
24    is not a full exhibit.  If we can go down to page 10, if we
25    can, it's easily numbered.
```

```
 1          Q.   So on -- is this something you're familiar with?
 2    Take a look at it.
 3          A.   There's a lot here, but I recognize this is an
 4    e-mail thread between me and the Bedford FBI office.
 5          Q.   Okay.  What's the date when you get an e-mail from
 6    the Bedford FBI office?
 7          A.   July 17th of 2019 is what you're pointing at.
 8          Q.   Okay.  And do you see that that's from FBI Bedford?
 9          A.   Yes.
10          Q.   Okay.  Now, was there a named person in that that
11    you were to contact or call?
12          A.   No.
13          Q.   Okay.  So that was just sort of a nameless FBI
14    e-mail?
15          A.   Yeah, I think I replied to them as such, nameless
16    FBI agent.
17          Q.   Okay.  So if we go up to the first page, you
18    respond on what day?
19          A.   The e-mail reply that you're pointing to is July
20    17th at 12:44 p.m.
21          Q.   Okay.  So same day within a few hours you've
22    already respond to the FBI?
23          A.   Yes.
24          Q.   Okay.  And I'm not going to go through all of it,
25    but this is an e-mail which includes a lot of information?
```

**J.A. 872**

```
 1        A.   Yeah.

 2        Q.   Okay.  And explains some of the things you've just

 3   been testifying about?

 4        A.   Yes.

 5        Q.   All right.  And you provided that directly to the

 6   FBI by e-mail?

 7        A.   Yes.

 8        Q.   All right.  Now --

 9             MR. WOLPIN:  If we could take that down, please.

10        Q.   Now we've seen July 17th they've responded to you.

11   You respond back the same day.

12             MR. WOLPIN:  And then if we can pull up H-7 for the

13   witness.

14        Q.   This is now an e-mail from who?

15        A.   This is from me to the Bedford FBI.

16        Q.   Okay.  And what date are we at now?

17        A.   This is August 4th.

18        Q.   Okay.  And at this point have you gotten a response

19   back from the FBI from the e-mail from the two weeks prior?

20        A.   It's tough for me to say when you're skipping

21   around in the e-mail thread.

22        Q.   The e-mail thread is a little difficult to follow.

23        A.   Yeah.

24        Q.   What do you tell them in the first line?

25        A.   "Is it routine that you ask zero questions of a
```

1    complainant?  I am still receiving a relentless bombardment of

2    harassing phone calls to my personal cell phone and radio

3    show."

4        Q.    Okay.  You then provide them -- I keep forgetting I

5    can't scroll.

6            You then provide them a whole bunch of numbers that

7    have been calling you in relation to this harassment?

8        A.    Yes.

9            MS. KRASINSKI:  Your Honor, at some point I'm going

10    to object to this.  We're not refreshing recollection.  We're

11    not --

12            THE COURT:  I agree.

13            You can ask the questions.  Just don't basically

14    disclose the content of a document that's not yet in evidence.

15    You can lay a foundation and try to admit the document.  You

16    can ask questions about what he did.  And if he needs to look

17    at the e-mail chain to refresh his memory, he can do that.

18            MR. WOLPIN:  Okay.

19            THE COURT:  The one thing you can't do is take

20    documents not in evidence and basically have the witness

21    describe what they contain.

22        Q.    Now, those e-mails continue.  You send the FBI a

23    number of e-mails?

24        A.    Yes.

25        Q.    And we're not going to go certainly through all of

```
 1   them, but you provide them information about this ongoing
 2   problem that you have?
 3        A.   Yes.
 4        Q.   And is there a time when you are able to meet with
 5   them?
 6        A.   Yeah, I met with them for the first time in
 7   September of 2019.
 8        Q.   Why did you agree to do that?
 9        A.   Because I needed their help.
10        Q.   And where was that?
11        A.   At the KPD.
12        Q.   Keene Police Department?
13        A.   Yeah.
14        Q.   And you went and met with FBI agents, Keene PD.
15   Who did you eventually meet with?
16        A.   I met with Joel Chidester, Kevin LeBlanc, and
17   Shayne Tongbua.
18        Q.   Okay.  And why did you ask that Joel Chidester --
19   did you ask that Joel Chidester be there?
20        A.   Yeah, I asked -- the FBI wanted me to come to their
21   Bedford office, and I didn't trust them and so I said meet
22   with me at the KPD with Joel Chidester because I trust Joel
23   Chidester.
24        Q.   And when you met with them in September, did you
25   talk about Cheddar Mane?
```

```
 1        A.   Yes.

 2        Q.   Okay.  Did you tell them about the CPS call?

 3        A.   Yes.

 4        Q.   Did you tell them whether you had any concerns

 5   about liability at that point?

 6        A.   Yeah, I told them that somebody told me that this

 7   CPS thing was -- it could be interpreted as extortion.

 8        Q.   When you were there meeting with them, did you have

 9   a concern that you had made a rape threat?

10        A.   No.

11        Q.   Was that what you were talking about when you said

12   liability?

13        A.   No.

14        Q.   Now, you said you got an e-mail from somebody that

15   gave you some concern.  Who was the person you got the e-mail

16   from?

17        A.   It was my system administrator, a fellow by the

18   name of Ryan.

19        Q.   Okay.  Do you remember what he said to you?

20        A.   Yeah, the subject line was --

21             MS. KRASINSKI:  Objection.  Hearsay.

22             THE COURT:  I'm not sure that it's being admitted

23   for the truth, but I need to understand what's being done so

24   go back and use the headsets, please.

25             (SIDEBAR)
```

**J.A. 876**

```
 1                  THE COURT:  What is the witness going to say?
 2                  MR. WOLPIN:  He's going to say that the person told
 3      him he could have some liability for blackmail which --
 4                  THE COURT:  Excuse me.  Mr. Wolpin, why don't you
 5      go back to where you were questioning from because if you're
 6      going to stand, it's hard for you to get close to the mic, and
 7      there's a mic there, right?
 8                  MR. WOLPIN:  Right.
 9                  THE COURT:  So if you would just whisper into the
10      mic.
11                  MR. WOLPIN:  So what I expect him to say is that
12      this person sent him an e-mail.  That e-mail included a
13      reference to blackmail.  That was the thing that made him
14      concerned about his liability.  That was his motive to talk to
15      the FBI about that.
16                  THE COURT:  And this is in part an explanation for
17      the excerpts that the government introduced?
18                  MR. WOLPIN:  Yes.
19                  THE COURT:  All right.  So it's not being
20      introduced for the truth of any matter that the person
21      asserted?
22                  MR. WOLPIN:  No.  This is not a lawyer or some --
23                  THE COURT:  The hearsay objection is overruled.
24                  MR. WOLPIN:  Thank you.
25                  (CONCLUSION OF SIDEBAR)
```

1     Q.   So you got an e-mail from your systems

2  administrator?

3     A.   Yes.

4     Q.   And do you remember -- or what did he say that gave

5  you some concern?

6     A.   He said, don't blackmail these guys, and the

7  implication that he made was essentially, like, if you're

8  going to get the government after somebody, just do it.  Don't

9  threaten them because you will get yourself in hot water with

10  the law yourself.

11     Q.   Okay.  So did you have then blackmail on your mind

12  when you went to meet with the FBI?

13     A.   Yeah.  I had Googled the term after that, and it

14  was kind of a downward spiral from there.

15     Q.   Okay.  And you told the FBI at that meeting that

16  you were concerned about that?

17     A.   Yeah.

18     Q.   Okay.  And you went to meet with them knowing that

19  you had that concern?

20     A.   Yes.

21     Q.   All right.  Now, when you meet with them, is it

22  clear to you whether they, that first time in September, is it

23  clear to you whether they have this exchange between you and

24  Cheddar Mane?

25     A.   Yeah.

**J.A. 878**

```
 1        Q.    Okay.  And what would they not have if they had the

 2   online version of that?

 3        A.    If they had -- which they did, they had the -- the

 4   parts that -- they had the screenshots of Cheddar I published.

 5   And if they were missing anything from that, it would have

 6   been the photographs that I had provided to them.

 7        Q.    Okay.  So you ultimately provided them the missing

 8   pieces, the actual photographs?

 9        A.    Yeah.

10        Q.    Now, did you provide them your own version of that

11   chat?

12        A.    I did not.

13        Q.    Okay.  Did you tell them whether the chat was real?

14        A.    In that moment I didn't go through every line of

15   the thing, but I said I think that you guys are aware of this

16   exchange and I said the gist of what happened.

17        Q.    Okay.  Now at that time -- we're now in September,

18   that was back in June -- what did you think about your own

19   records?

20        A.    Well, I had deleted the chat, okay, and so -- I had

21   taken screenshots of the thing before I blocked and deleted

22   Cheddar Mane, okay, but I had deleted the actual original chat

23   itself and so those were the records that I had.

24        Q.    Okay.  Now, let's talk for a second.  You have --

25   you keep a lot of data?
```

**J.A. 879**

```
 1        A.    I keep -- yeah.

 2        Q.    All right.  How many computers do you have at your

 3   house and hard drives and those things?

 4        A.    It would -- the easier way to do this might be to

 5   say that I had roughly 40 terabytes of data when this case

 6   came about.

 7        Q.    Okay.

 8        A.    Which is a huge -- I mean, it's just ridiculous.  I

 9   mean nobody has that.

10        Q.    And what's on that?

11        A.    It is videos, images, thousands and thousands,

12   millions perhaps, hundreds of thousands of images, audio

13   files, recorded phone calls.  I mean, just -- you know, I

14   don't delete things habitually.

15        Q.    Okay.  And at the time you met with the FBI what

16   were you thinking about when they asked you about the chats?

17        A.    I was nervous, okay?  You know, I initially said to

18   them, you know, they told me when we sat down, you don't have

19   to talk about anything you don't want to talk about, okay?

20        Q.    Let's take a pause there.

21        A.    I was nervous about --

22        Q.    Take a pause for a second.

23        A.    Okay.

24        Q.    Specifically as to the exchange between you and

25   Cheddar Mane, what did you think they needed more of?
```

```
 1          A.   I didn't think that we needed to discuss that at
 2   all, and I certainly didn't think that they needed more than
 3   they had.
 4          Q.   Okay.  And you provided them the pictures?
 5          A.   I provided them the pictures.
 6          Q.   Okay.  Now, did you meet with the FBI a second
 7   time?
 8          A.   Yes, in October.
 9          Q.   Was that a meeting by choice?
10          A.   Yes.
11          Q.   Okay.  And when you met with them that time, what
12   was the purpose of that meeting as you saw it?
13          A.   It was -- they invited me back in an e-mail thread
14   entitled harassment complaint.  They were talking about, they
15   were telling me that they were following up on the complaint
16   that I had made and that they were there to help me.
17          Q.   And then when you appeared to meet with the FBI,
18   who was there from the FBI?  Do you remember?
19          A.   Agent LeBlanc.
20          Q.   Okay.  And did you have a meeting with him at that
21   point?
22          A.   Yeah, him and Joel Chidester were both in the room.
23          Q.   Okay.  And who sort of led that meeting?  Was it
24   you talking or them?
25          A.   That meeting was led by LeBlanc.
```

```
 1        Q.   Okay.  And what was the primary focus of that

 2   meeting?

 3        A.   The chat with Cheddar Mane.

 4        Q.   Okay.  And when you spoke with him, were you

 5   honest?

 6        A.   Yes.

 7        Q.   When you spoke with them the first time, were you

 8   honest?

 9        A.   Yes.

10        Q.   Now, you ultimately provide them a copy of a phone

11   call between you and Katelen Fry?

12        A.   In December, yeah.

13        Q.   In December.  Again, the government has played that

14   so that's something that's now in their possession, correct?

15        A.   Yeah.

16        Q.   Okay.  Was that something that you were forced to

17   turn over?

18        A.   No.

19        Q.   Okay.  How did it come to be that you recorded a

20   phone call of yourself with Ms. Fry?

21        A.   So I habitually -- I have an app on my phone that I

22   habitually record my phone calls because part of the reason is

23   I'm terrified of finding myself in positions like this one,

24   okay, and so I record my phone calls.

25             I have an app -- New Hampshire law, you have to --
```

 1   both parties have to consent.  So I have a thing that asks me

 2   each call, do you want to keep the recording, okay?

 3            Katelen understands that if she calls me on the

 4   regular phone, that it records the phone call.  If she wants

 5   to call me without the recording, she calls me Signal or

 6   Telegram or whatever.  So we had trouble connecting with

 7   Telegram.  We ended up on a regular thing.

 8            So that's how the call gets recorded.

 9        Q.   Okay.  And at that point were you trying to

10   preserve evidence for the FBI?

11        A.   No.

12        Q.   Okay.  So that call was recorded.  What was the

13   reason or the context in which you gave that to the FBI?

14        A.   Well, I was -- they came to see Katelen, and

15   Katelen was upset that they -- Katelen was upset that the FBI

16   came to her, she was afraid of them, and so I wanted them to

17   leave her alone.

18        Q.   Did you turn it over because you didn't want them

19   to go out and speak with her again?

20        A.   Yeah, I didn't want them to bother Katelen.

21        Q.   Okay.  And you thought that would contain the

22   information they would be looking for anyway?

23        A.   So I had e-mailed them and I said, don't bother

24   her, because she told me she didn't want to talk to them.  So

25   I said, don't bother Katelen, and they said to me that they

**J.A. 883**

1  had to, like, conduct their interviews and it was standoffish,

2  okay, and so I thought that -- the impression that I got from

3  what the agent said to me was that he thought I was trying to

4  prevent him from speaking to a witness or something, and I'm,

5  like, dude, I'm not trying to prevent you from getting

6  information.  This girl is upset.  This girl I care about, she

7  called me fucking crying and I don't want you to bother her,

8  and so I said here's the recording of the conversation.

9           MR. WOLPIN:  So if we can, if we can bring up 106A,

10  which is a partial transcript of that recording.

11           Now, this is a part of the recording and without

12  going into what else is in the recording, these are just

13  snippets, right?

14      A.    Yeah.

15      Q.    So you provided a recording that was longer and had

16  more information than at this point we've gone through?

17      A.    Substantially.

18      Q.    Okay.  Now, in this you say, "I didn't threaten to

19  rape his wife.  What I said was you don't want me to put this

20  out there.  One of my incel listeners would love to give her a

21  kid."

22           So what did you think -- at that time when people

23  were saying there might be a rape there, what did you think

24  people were referring to?

25           MS. KRASINSKI:  Objection.  Who is saying this?

**J.A. 884**

```
 1                   THE COURT:  All right.  Yeah --
 2                   MR. WOLPIN:  I can rephrase.
 3                   THE COURT:  Start again.  It's the first part of it
 4    that's problematic.
 5                   MR. WOLPIN:  Okay.
 6          Q.    So you say, "I didn't threaten to rape his wife"?
 7          A.    Yeah, I'm referencing an earlier part of the
 8    conversation.
 9          Q.    Okay.  And that's then followed up by the thing
10    about incel listeners?
11          A.    Right.
12          Q.    Okay.  So when you had heard that -- had you heard
13    from people -- let's go back.
14                   MR. WOLPIN:  Let's bring up the other one, 105A.
15    Maybe that will make this a little smoother.
16          Q.    So it's not you that first said something about
17    rape his wife, right?
18          A.    Say that one more time.
19          Q.    It's not you that first says something in this
20    conversation about rape?
21          A.    No, no.  She said to me -- she said to me that she
22    -- she said that I threatened to rape his wife.
23          Q.    She had heard that?
24          A.    I heard these words come out of her mouth, and I
25    was shocked to hear them.
```

**J.A. 885**

1    Q.   Okay.  At that point is that something you had

2  thought was an issue?

3    A.   No.  This was -- to my recollection everybody had

4  talked about this as a problem that I contacted CPS.

5  Everybody talked about it that way.  That I was ratting was

6  the problem.  Even her.  I had talked to her about this

7  multiple times since it happened.

8         And so this was the first time that I recalled

9  anybody describing this as a rape threat, and I was, like,

10  what the hell are you talking about.

11    Q.   Okay.  So that's that first reference.  That's your

12  response?

13    A.   Yeah.

14         MR. WOLPIN:  Now, if we go back to 106A.

15    Q.   Later in the conversation you say, "I didn't

16  threaten to rape his wife," correct?

17    A.   Right.

18    Q.   And the reference you made to the actual exchange

19  was something about incel listeners?

20    A.   Yes.

21    Q.   Okay.  Is that the part of the exchange in which

22  you're charged with making quote-unquote a rape threat?

23    A.   If I recall the indictment correctly, that and the

24  sex with your wife comment are both deemed -- are both alleged

25  to be that is what I understand it to be at this time.

**J.A. 886**

```
 1        Q.    Now, in your mind the one that gave you some
 2   concern -- or came to your mind was this incel listener part,
 3   not the part about fucking your wife?
 4        A.    Yeah.  So when she says this to me, I immediately
 5   said I was shocked and I said, I didn't fucking threaten to
 6   rape his wife.  But it occurred to me that, like, this woman
 7   cares about me.  She's not trying to hurt me.  She's not
 8   attacking me.  I shouldn't get defensive, right?  I told you I
 9   asked her to marry me and the thing didn't work out.  So I'm
10   trying to say what is her concern, and I stopped to think
11   about it and I'm, like, what did I say that Katelen -- why
12   does Katelen think I threatened to rape a guy's wife, and so I
13   scanned my head.  I haven't seen this conversation in months
14   at this point.  This is December.
15              And I'm, like, all right, the incel thing, they're
16   involuntarily celibate.  If they're giving somebody a baby,
17   she's probably not consenting.  Okay.  I guess that's what you
18   mean by rape.  That must be what you're talking about, but I'm
19   not threatening.
20        Q.    Is that how you saw it at the time when you made
21   the statements, as a rape threat?
22        A.    No.
23        Q.    Now, the government also provided a call with
24   Hannah Pleasants in February?
25        A.    Yes.
```

**J.A. 887**

```
 1            Q.   Now, the jury has already heard that's a jail call.
 2    So where were you at that point?
 3            A.   I was in jail.
 4            Q.   And in jail do you get a lot of chances to talk
 5    about your case or talk about what's going on with other
 6    people?
 7            A.   Yeah, you could talk about your case with other
 8    inmates all day if you feel like it, you know.
 9            Q.   Okay.  Is that what you do?
10            A.   No.
11            Q.   Okay.  So you had a call with Ms. Pleasants.
12                 MR. WOLPIN:  If we can bring up 110A.
13            Q.   Now, we are in March 7th, 2020.  Do you remember at
14    that time what you were charged with of those -- do you see
15    some statutes?
16            A.   Yeah, I was charged with 875(B) and (C), threats
17    and extortion.
18            Q.   Okay.  Had you been charged with 875(D) at that
19    time?
20            A.   No.
21            Q.   Okay.  Now, when you see what you're charged with,
22    what do you start doing?  I mean, what's your reaction?
23            A.   When I first got arrested, I knew that I might have
24    a problem, right?  This is what I said to the FBI is somebody
25    told me that this might be extortion, and so I wasn't shocked
```

```
 1   when I got arrested.
 2          When I saw the indictment, I panicked because I'm,
 3   like, this is not what I thought the problem was that I had,
 4   you know, this is a completely different class of issue, and
 5   I'm sorry, it's not funny, but it was a completely different
 6   class of problem than I was expecting.
 7        Q.   Because you didn't perceive it as a threat to
 8   injure or a threat to rape?
 9        A.   No.
10        Q.   But you do have some conversations about 875(D),
11   but at that point that's not even a charge you're facing?
12        A.   No, no.
13        Q.   And have you looked -- is there, like, law books
14   and --
15        A.   Yeah.  So when I went down my Google rabbit hole, I
16   looked at the federal statute for blackmail, okay, which is a
17   different -- I used the words extortion and blackmail
18   interchangeably until a couple of months ago.
19          And so I looked up the statute for blackmail when
20   Ryan e-mailed me, and that's a misdemeanor if you accuse
21   somebody of a crime for payment, whatever.  And so when I end
22   up in here they tell me I'm charged with Sections 875(B) and
23   (C), and there's a tablet in the jail and there's a -- you can
24   use the law library on the tablet, and I'm, like, what the
25   hell happened here, let me go look this up, you know.
```

**J.A. 889**

```
1          Q.    Were you looking at other parts of the code that
2    you haven't been charged with?
3          A.    Well, yeah, you know, I'm sitting in a cell by
4    myself all day.  They had me in administrative segregation.  I
5    started reading everything in that stupid fucking thing.
6    Sorry.
7               And so I'm looking at this thing and I'm, like,
8    okay, I didn't threaten to rape nobody.  This is fucking
9    crazy, but --
10         Q.    Language, Chris.  Language.
11         A.    And then I see right below it, it's (D), and I'm,
12   like, okay, reputation, that rhymes more with this thing that
13   I was looking at before.
14         Q.    Were you charged with causing extreme emotional
15   distress or cyberstalking at that point?
16         A.    No.
17         Q.    Was that something you had a concern about before?
18         A.    No.
19         Q.    So --
20              MR. WOLPIN:  All right.  Let's look at -- there's
21   another call that the government presented.  That's 111A, and
22   that's a full exhibit.
23              I meant to reference the transcript.  Is that the
24   transcript?  Oh, there isn't a separate transcript for that
25   one?
```

**J.A. 890**

```
 1                THE COURT:  You can use the document camera and put
 2   up the transcript.
 3                MR. WOLPIN:  Unfortunately, because it was e-mailed
 4   to me last night, I only have it --
 5                (Government's paralegal retrieves exhibit)
 6        Q.    All right.  So this is April 7th of this year.
 7              Excuse me.  This one, unfortunately, is undated.
 8              You have a conversation as well with someone named
 9   Ingrid Dean I believe on March 7th?
10        A.    Yes.
11        Q.    And this is another person who you would consider a
12   friend?
13        A.    Yeah, Ingrid Dean is my on-again, off-again
14   girlfriend throughout the years.
15        Q.    So someone else you have a relationship with?
16        A.    Yeah.
17        Q.    Okay.  And you're having and getting to have a call
18   with that person?
19        A.    Yep.
20        Q.    Now, in this you make reference to 875 again (A),
21   (B), (C) and (D)?
22        A.    Yeah.
23        Q.    You note at the top -- again, your sense of what's
24   going on is that this wasn't a rape threat?
25        A.    Right.
```

1      Q.   But the thing you continued to have concerns about,

2  as you told her, was which part of the statute?

3      A.   875(D), the threats against a reputation.

4      Q.   And in this conversation -- is this someone you

5  care about?

6      A.   Yeah.

7      Q.   Is this someone you're talking to in a normal way?

8      A.   In a normal way?

9      Q.   About what's going on with you, about your case.  I

10 mean, this is what's going on in your life at this point.

11     A.   Yeah, this is somebody who cares about me and I'm

12 in jail, you know.

13     Q.   So did you at any point believe that you had made a

14 rape threat or a threat to injure?

15     A.   No.

16     Q.   Did you believe that you had committed the crime of

17 cyberstalking?

18     A.   At this point I didn't even know about that, and I

19 certainly don't think that I have today, no.

20          MR. WOLPIN:  I have nothing further.

21          THE COURT:  All right.  Thank you.

22          It's probably a good time to break, and then we'll

23 come back with cross-examination.

24          So we'll take a fifteen minute break.

25          (RECESS)

**J.A. 892**

```
 1              THE COURT:  All right.  You can begin
 2   cross-examination.
 3                    CROSS-EXAMINATION
 4   BY MS. KRASINSKI:
 5        Q.   Good morning, Mr. Cantwell.
 6        A.   Good morning.
 7        Q.   We didn't talk too much about Vic Mackey and your
 8   testimony so far, but he's peppered throughout these
 9   communications so let's talk about him first.
10        A.   Okay.
11        Q.   I want to look at Defense Exhibit B-20.
12             Let's go to the second page of that.
13             THE COURT:  This is in evidence?
14             MS. KRASINSKI:  It is, your Honor.
15             THE COURT:  All right.
16        Q.   And so on March 17th of 2019 you had a conversation
17   with Mr. Lambert, right?
18        A.   Yeah.
19        Q.   And in that conversation you said, "When you get
20   doxed, it's all because of Vic.  Remember that."  Right?
21        A.   Yes.
22        Q.   Now, let's move to Government's Exhibit 304, which
23   is also in evidence, and this is a post on your Gab account,
24   right?
25        A.   Yes.
```

```
1          Q.   And you said, "I have dox on several of these Bowl
2     Patrol idiots, and I'm gonna start dropping them until they
3     rat out Vic."
4          A.   Yes.
5          Q.   You believed Vic Mackey defaced your website?
6          A.   Yes.
7          Q.   You told the FBI that he was leading a harassment
8     campaign against you?
9          A.   Yes.
10         Q.   And you were mad at Vic Mackey?
11         A.   I was.
12         Q.   Really mad at Vic Mackey?
13         A.   I was really mad at Vic Mackey.
14         Q.   How mad at Vic Mackey were you?
15         A.   I don't know how to measure that.  I'm sorry.
16         Q.   Now, let's go to the conversation with Mr. Lambert.
17    Government's Exhibit 100.
18              And when you were talking to Mr. Lambert in June of
19    2019, you mentioned Vic.  So the first time is on page 2 of
20    this, so let's take a look at that.
21              And you say, "If you want to dox Vic, use a better
22    target, but if you give me fake info, then your wife is gonna
23    have trouble sleeping at night until she leaves you and takes
24    your kids away."
25         A.   Yeah, I said that.
```

**J.A. 894**

```
 1          Q.    And so you brought up Vic?

 2          A.    I did.

 3          Q.    And then if we go to the next page you say, "Give

 4    me Vic.  It's your only out."

 5          A.    I do.

 6          Q.    And so you offered Mr. Lambert an out?

 7          A.    I did.

 8          Q.    The out of identifying Vic?

 9          A.    One of them, yeah.

10          Q.    An out is a way to get out of a situation?

11          A.    Cheddar Mane had presented himself to me as some

12    innocent guy who made a mistake, and he could prove that by

13    giving me Vic's identity.

14          Q.    So an out --

15          A.    Yeah.

16          Q.    -- is a way to get out of a situation?

17          A.    Yes.

18          Q.    A way to prevent you from doing things?

19          A.    Yes.

20          Q.    And on page 5 of this conversation you say, "Give

21    me Vic."

22          A.    I do.

23          Q.    And again what you mean by that is give me Vic's

24    dox.  Fair?

25          A.    Yeah.  I mean, you know, dox is a pretty broad
```

**J.A. 895**

1   category of stuff, but give me something, yes.  Give me --

2   what you know, tell me.

3       Q.    Something so that you can identify Vic Mackey?

4       A.    Yes.

5       Q.    You can dox Vic Mackey?

6       A.    So I could report him to law enforcement amongst

7   other things, yes.

8       Q.    You can expose Vic Mackey?

9       A.    Yes.

10      Q.    And on page 6 of this you say, "Tell Vic that if he

11  gives himself up, he can save your family."

12      A.    Yep.

13      Q.    You mentioned Vic Mackey four times during this

14  conversation?

15      A.    Thanks for keeping track, yes.

16      Q.    Now, let's go back to the first page of

17  Government's Exhibit 100.  Some way, somehow Mr. Lambert ended

18  up in your Peaceful White Folk Telegram chat.  Fair?

19      A.    Yes.

20      Q.    And you sent him a message?

21      A.    I did.

22      Q.    A private message?

23      A.    Yes.

24      Q.    You said, "I guess you forgot the lesson which kept

25  you away for a short while.  Do you need to be reminded?"

```
 1        A.    That's what I said.

 2        Q.    And you sent that message at 9:00 p.m.?

 3        A.    Yes.

 4        Q.    And then you got his address?

 5        A.    Yes.

 6        Q.    And you got that from Katelen Fry?

 7        A.    I did.

 8        Q.    And almost a half an hour later you send another

 9   message?

10        A.    About a half hour after the first one, yes.

11   There's a half hour between those two messages, yes.

12        Q.    And you had time to think about what you wanted to

13   say?

14        A.    Well, there's a half hour between these things.  To

15   be clear, I wasn't sitting in front of my screen waiting for

16   the next opportunity, right?  I was doing other things.  This

17   was happening on my phone.

18        Q.    But you did have time to think about what you were

19   going to say?

20        A.    Yeah.

21        Q.    And you sent him a message that said, "Twin Creek

22   Road"?

23        A.    Yes.

24        Q.    And that was deliberate?

25        A.    Yeah.
```

**J.A. 897**

```
 1        Q.   You wanted him to know you knew where he lived?

 2        A.   Yeah.

 3        Q.   You wanted him to know that this was real?

 4        A.   Yes.

 5             MS. KRASINSKI:  And let's go to page 2 of this,

 6   Government's Exhibit 100.

 7        Q.   And you send a message at 4:15 p.m.  Can you read

 8   that for us?

 9        A.   "You're a fucking liar.  You came here with your

10   loser fucking pals because you have the attention span of a

11   nigger and the morals of a kike, and because of that fact

12   you're going to lose everything you have."

13        Q.   And when you say lose everything, you're talking

14   about his job?

15        A.   Well, to be clear, I don't know what his job is,

16   okay, but I know that your life gets upended when you get

17   outed, yes.

18        Q.   So potential for losing your job?

19        A.   Yes.

20        Q.   Possibly losing your wife?

21        A.   Yes.

22        Q.   Possibly losing your family?

23        A.   To be clear, I thought at the time that his wife

24   knew about him, but, you know, it will disrupt your

25   relationship if you get outed for a Nazi.  That's for sure.
```

**J.A. 898**

```
 1          Q.    So you're talking about all these things?
 2          A.    Yeah.
 3          Q.    And then 30 minutes later you send another message:
 4    "Next time I post that photo the faces won't be blurred, and
 5    then you're gonna start getting unexpected visitors."
 6          A.    Yep.
 7          Q.    You were talking about doxing?
 8          A.    Yeah.
 9          Q.    And you have some thoughts about doxing.  Fair?
10          A.    I do.
11          Q.    You testified yesterday that doxing is serious
12    business?
13          A.    I did.
14          Q.    You've said before in an article on your website
15    that it helps to think of doxing as a form of violence?
16          A.    It helps to think of it in similar terms, yes.
17          Q.    Similar terms as a form of violence?
18          A.    Yes.
19          Q.    And after you talked about doxing him you talked
20    about him getting unexpected visitors?
21          A.    Yes.
22          Q.    People would start coming?
23          A.    I'm sorry?
24          Q.    People would start coming?
25          A.    Well, potentially, yeah.
```

**J.A. 899**

```
 1          Q.    Coming unexpectedly?

 2          A.    Yeah.

 3          Q.    Whenever they chose?

 4          A.    Well, look, I can't -- the point is that if your

 5   address is out there, yes, then that can happen.  I'm not

 6   saying that I'm sending anybody to your house.

 7          Q.    But that's ominous?

 8          A.    It's ominous, indeed, and intentionally.

 9          Q.    You meant it to be ominous?

10          A.    I did.

11          Q.    Because as you say, doxing carries the potential

12   for violence?

13          A.    It does.

14          Q.    And we've talked a little bit about this.  You sent

15   e-mails to law enforcement?

16          A.    I did.

17          Q.    One of those e-mails was to Keene Police Officer

18   Joel Chidester?

19          A.    Yes.

20          Q.    You sent him an e-mail on June 21, 2019?

21          A.    Yes.

22          Q.    You typed the e-mail?

23          A.    I did.

24          Q.    You chose your words?

25          A.    I did.
```

**J.A. 900**

```
 1        Q.    And in that e-mail you said, "I threatened to
 2   release one of their identities and he called my bluff.  So I
 3   published what I had and invited CPS in Missouri to check on
 4   his children."
 5        A.    That sounds about right, yes.
 6        Q.    You called it a threat?
 7        A.    I did.
 8        Q.    And in your testimony yesterday you said, "I'm
 9   careful what I call a threat."
10        A.    Yes.
11        Q.    And you also e-mailed with the FBI?
12        A.    I did.
13        Q.    And one of those e-mails was on August 28, 2019?
14        A.    I'm willing to agree to that.  I don't have the
15   thing in front of me, but yeah.
16        Q.    If you don't remember, let's pull up --
17        A.    There were a number of e-mails exchanged.  I don't
18   remember the dates, but that sounds reasonable.
19             MS. KRASINSKI:  For the witness only, let's display
20   what's been marked for identification as Government's Exhibit
21   502.
22        Q.    Take a look at that for a minute.  If you need to
23   scroll through, let us know, and let me know when you've had a
24   chance to finish looking at that.
25        A.    Okay.  I mean, I don't know what the goal is here,
```

**J.A. 901**

```
 1   but I'm familiar with this message.
 2              MS. KRASINSKI:  We can take it down, Ms. Sheff.
 3   Thank you.
 4        Q.   And that's an e-mail that you sent?
 5        A.   It is.
 6        Q.   On August 28, 2019?
 7        A.   Yes.
 8        Q.   You typed the e-mail?
 9        A.   I did.
10        Q.   You chose your words?
11        A.   I did.
12        Q.   And you were talking about your interactions with
13   Ben Lambert?
14        A.   I did.
15        Q.   And you said, "I threatened to expose his
16   identity."
17        A.   I threatened to expose his identity sounds like
18   something I would have said in that e-mail, yeah.
19        Q.   You characterized it as a threat?
20        A.   Yes.
21        Q.   And you carried out this threat?
22        A.   I did.
23        Q.   You posted pictures of Ben Lambert -- well, a
24   picture of Ben Lambert?
25        A.   Yes.
```

**J.A. 902**

```
1        Q.    You posted a picture of Mrs. Lambert?

2        A.    I did.

3        Q.    You posted a picture -- that picture -- one of

4    those pictures had her holding her children?

5        A.    I'm sorry.  Say again.

6        Q.    One of those pictures --

7        A.    One of the pictures was of the children, yes, yes.

8        Q.    Where she was holding one of them?

9        A.    Yes.

10       Q.    And you posted another picture of her and her

11   children?

12       A.    That sounds about right, yes.

13       Q.    And we can look at that.  That's Government's

14   Exhibit 102 which is in evidence.

15             And if we look at the second page of that, you also

16   disclosed his identity -- excuse me, his address?

17       A.    Yes.

18       Q.    You said, "Like I said, if I could just drive down

19   to Twin Creek Road in Winfield, Missouri, and shoot this

20   idiot, I would."

21       A.    That's what I said.

22       Q.    You put this in the Radical Agenda Telegram group?

23       A.    Yes.

24       Q.    A public group?

25       A.    Yes.
```

**J.A. 903**

```
 1        Q.    With hundreds of listeners or viewers?

 2        A.    Yes.

 3        Q.    With some of your listeners?

 4        A.    Yeah.

 5        Q.    With some of your incel listeners?

 6        A.    Well, to be precise, I know of exactly two incel

 7   listeners, and I'm actually not sure that they're in that

 8   chat, but potentially, sure.

 9        Q.    And I want to go back to Government's Exhibit 100

10   here, back to this statement, page 2 of this exhibit, and you

11   say, "Next time I post that photo," because you had posted it

12   before?

13        A.    I had posted it with the faces blurred out, yes.

14        Q.    And to be clear, you're talking about the picture

15   of Mrs. Lambert and her three children?

16        A.    Yeah, I think it's the one that he described as

17   being from Christmas, yes.

18        Q.    You took the time to edit the photograph?

19        A.    Yes.

20        Q.    You blurred out the faces?

21        A.    I did.

22        Q.    And I believe you testified yesterday that you

23   posted it in the Peaceful White Folk group?

24        A.    That's my recollection, yes.

25        Q.    And I think you testified that that was an
```

**J.A. 904**

1   invitation-only group?

2        A.   To be precise, that's a functional thing, and so,

3   like, the -- you need an invitation link.  So anybody who has

4   that can get it.  It's not like -- I didn't invite Cheddy Blac

5   into it, but it's what they call the function of it.  You need

6   an invitation link.

7        Q.   And so you hadn't invited Cheddar, Cheddarman, into

8   that group?

9        A.   No.  The invitation link to Peaceful White Folk had

10  been posted to the Radical Agenda public group, which is how

11  people were joining the invitation-only group.  The private

12  invitation link was made public was the function.

13       Q.   And you posted this blurred photo sometime before

14  this exchange, "next time"?

15       A.   I don't know at what point in or before the

16  exchange, but it was around about the time of this discussion,

17  yes.

18       Q.   I think you mentioned in your testimony yesterday

19  that you became aware that Katelen Fry received messages about

20  a photograph with children on June 15th, 2019?

21       A.   Could you repeat that question?  I'm sorry.

22       Q.   I think you testified yesterday about Katelen Fry

23  sending you a message.

24       A.   Katelen Fry sent me a message on the morning of

25  June 15th, yes.

**J.A. 905**

```
1          Q.    And it was about a photograph of children?

2          A.    No, that was not what Katelen messaged me about in

3    the morning.

4          Q.    But regardless, you posted this some time before

5    this conversation "next time"?

6          A.    Now you're talking about the photo of the blurred

7    faces again?  Yeah, before I said next time I had posted the

8    photo with the blurred faces, yes.

9          Q.    And you blurred the faces because doxing is serious

10   business, right?

11         A.    It certainly is, yeah.

12         Q.    So you threatened to dox Mr. Lambert?

13         A.    Yes.

14         Q.    And you did dox Mr. Lambert?

15         A.    Yes.

16         Q.    And let's talk about Child Protective Services.

17         A.    Okay.

18         Q.    If we go to page 6 of this, you say, "On Tuesday

19   I'm going to send every episode of Bowlcast along with your

20   identifying information to whatever the local equivalent of

21   CPS is in your jurisdiction."

22         A.    That's what I said.

23         Q.    And then you said later in that, "But I'm pretty

24   sure once that visit comes you'll understand that this is

25   serious."
```

**J.A. 906**

```
1         A.    Yeah, I had already been to the cops repeatedly

2    about it.  I would say it was serious.

3         Q.    Yesterday you testified that the idea of calling

4    Child Protective Services was somehow supposed to be less

5    serious than doxing.  Is that fair?

6         A.    Yes.

7         Q.    Kind of like an interim step?

8         A.    Yes.  It was a way to prevent the information from

9    becoming public.  Hoping that if he got a visit from the

10   government, he would wake up and stop the problem.

11        Q.    Now, you host the Radical Agenda?

12        A.    Yes.

13        Q.    It's your podcast?

14        A.    It is.

15        Q.    You care about it?

16        A.    A lot.

17        Q.    I mean, you actually changed the name from Some

18   Garbage podcast because you don't think it's garbage?

19        A.    Not anymore.

20        Q.    You create the content?

21        A.    I do.

22        Q.    You put it on your website?

23        A.    I do.

24        Q.    And the Radical Agenda, you were hosting that in

25   May of 2015?
```

**J.A. 907**

```
 1          A.    I was.  Wait.  I'm sorry.  What year did you say?

 2          Q.    May of 2015.

 3          A.    2015?  Yeah, yes.

 4          Q.    And in May of 2015 you broadcast episode 6 titled I

 5    Hate Cops?

 6                MR. WOLPIN:  Objection, your Honor.

 7          A.    That was a long time ago.

 8                THE COURT:  Put the headsets on.

 9                If examining counsel can put the headset on and

10    come back up to where you're examining from, I think that's

11    the easier way to do it.

12                (SIDEBAR)

13                THE COURT:  Okay.  Are you following up on his

14    testimony yesterday where he said something about being

15    respectful of police officers?

16                MS. KRASINSKI:  No, your Honor.  This is a podcast

17    about him getting very upset about a fake call to CPS and how

18    it ruined a family.

19                THE COURT:  Okay.  What's the objection?

20                MR. WOLPIN:  I don't see the relevance at this

21    point.  It's years before.  It has no connection to this

22    offense.

23                THE COURT:  All right.  I think it is relevant to

24    his mental state when he engaged in the acts that comprise the

25    charge, so I overrule your objection.
```

**J.A. 908**

```
 1              MS. KRASINSKI:  Your Honor, if there comes a point
 2   we need to refresh his recollection, we have a video of that
 3   and we can do it at a break.
 4              THE COURT:  Okay.  Thank you.
 5              (CONCLUSION OF SIDEBAR)
 6       Q.   In that episode you start with a discussion about a
 7   Kentucky family?
 8       A.   I do not -- I'm not at -- I have no idea what
 9   you're talking about.  I'm sorry.  And generally I don't.  I
10   have hundreds of episodes of the Radical Agenda, and I do not
11   know the content of the 2015 episode you're referencing.
12              THE COURT:  Mr. Cantwell, why don't we let her ask
13   the question.  And if you don't have a memory, then she can
14   stop for now and then she can show you the episode to see if
15   that refreshes your memory.
16              THE WITNESS:  Understood, Judge.  Thank you.
17       Q.   Do you remember having an episode where you talked
18   about the police showing up at a family's home to take their
19   kids away after a phone call to CPS?
20       A.   That sounds vaguely familiar.
21       Q.   Do you remember it?
22       A.   I do not remember the details.
23       Q.   Well, we'll put a pin in this, and at a break we'll
24   let you watch your words to help refresh your recollection.
25   So we'll come back to this.
```

**J.A. 909**

```
 1              Now, again you say that this was supposed to be
 2   some type of interim step, something less serious than doxing?
 3        A.    Yes.
 4        Q.    But you doxed Ben Lambert first?
 5        A.    Yes.   That's what happened, yes.
 6        Q.    And if we go back to Government's Exhibit 102,
 7   which is in evidence, and we go to the second page of that,
 8   after posting the picture of Mr. Lambert you say, "That's
 9   Cheddar Mane, a/k/a Cheddy Blac, and tomorrow morning I'm
10   calling CPS to give them every episode of Bowlcast and inform
11   them that this acid-dropping fake Nazi is endangering those
12   children with his behavior."
13        A.    Yes, that's what I said.
14        Q.    And let's go to the second page -- or the third
15   page, excuse me, of this, and let's look at your final
16   statement about calling CPS in here.
17              Can you read that for us, please?
18        A.    "I hope every CPS worker in Missouri is a Jew or a
19   nigger, and I hope they break every rule and destroy this
20   scumbag's life."
21        Q.    And you did call the Missouri Division of Social
22   Services?
23        A.    I did.
24        Q.    You called around 12:30 p.m. this day.
25        A.    Okay.
```

**J.A. 910**

```
1        Q.    And so you threatened to call CPS?

2        A.    I did.

3        Q.    And you followed through?

4        A.    I did.

5        Q.    So two of the things you've threatened, you

6   threatened to dox, you threatened to call CPS, you followed

7   through on?

8        A.    I did.

9        Q.    So now let's go back to Government's Exhibit 100,

10  and let's go to page 3, and in this same conversation you say,

11  "As a matter of fact, I don't.  So if you don't want me to

12  come and fuck your wife in front of your kids, then you should

13  make yourself scarce."

14       A.    That's how I replied to his comment about Peach,

15  yes.

16       Q.    And you testified on direct yesterday that I wanted

17  to say something profoundly unpleasant?

18       A.    Yes, profoundly unpleasant.

19       Q.    You wanted it to have an impact?

20       A.    I did.

21       Q.    And at this point you had already told Mr. Lambert

22  you knew where he lived?

23       A.    Yes.

24       Q.    So it's possible you could show up at his house?

25       A.    Yes, it's possible.
```

**J.A. 911**

```
1          Q.   You could show up at night?

2          A.   I mean, this is within the realm of physical

3     possibility, yes.

4          Q.   You could show up during the day?

5          A.   Yes.

6          Q.   You could watch his house?

7          A.   To be clear, no, I couldn't do any of these things

8     in my own mind, but I mean within the realm of physical

9     possibility these things could happen, yes.

10         Q.   Now, I want to talk about the claim you just made,

11    right, that this was in response to a threat to Peach, a

12    threat to Katelen Fry.

13         A.   An ominous statement about Peach, yeah.

14         Q.   Let's look at that.  Let's look at that statement.

15    Mr. Lambert said, "So I'm assuming Peach took the picture.

16    Guess that means you don't care what happens to her either."

17         A.   That's right.

18         Q.   Then Lambert didn't say he was going to hurt her?

19         A.   He didn't.

20         Q.   He didn't say he was going to rape her?

21         A.   No.

22         Q.   He didn't say that a Bowl Patrol listener would

23    give her a baby?

24         A.   No.

25         Q.   It could have meant that she would have been
```

**J.A. 912**

```
 1    associated with a doxing?
 2              MR. WOLPIN:  Speculation, your Honor.
 3              THE COURT:  Overruled.
 4         A.   The whole point of this statement is that you don't
 5    know what's going to happen.
 6         Q.   I don't think you answered my question, though.
 7              It could have meant that she would have been
 8    associated with the doxing?
 9         A.   It could have.
10         Q.   It could have meant that this community, this white
11    nationalist community would have known her as someone not to
12    trust?
13         A.   And it could have meant that his wife would consent
14    to having sex with me in front of the children.
15         Q.   Well, let's talk about that.  Especially in
16    relation to your discussion yesterday of kucking, and you said
17    it's about depriving someone of their masculinity?
18         A.   Yes.
19         Q.   I think the words you said yesterday were:  You
20    can't satisfy your wife so someone else is going to do it for
21    you.
22         A.   Those are the words I believe I used, yes.
23         Q.   So you're going to satisfy Mrs. Lambert?
24         A.   Not in reality, but that's the implication of this
25    statement, yes.
```

**J.A. 913**

```
 1              MS. KRASINSKI:  Let's look at Government's Exhibit
 2    201, which is in evidence, your Honor.
 3         Q.    You've never met this woman?
 4         A.    The first time I heard her name was in here.
 5         Q.    So you've never met her?
 6         A.    No.
 7         Q.    She's never met you?
 8         A.    That's right.
 9         Q.    You don't know these children?
10         A.    No.
11         Q.    How old do these children look to you?
12         A.    Too young to watch something like that.
13         Q.    And so it's your claim today that fucking her in
14    front of these kids would be satisfying to her?
15         A.    The point is to say something sick, and it's sick.
16    I get it.
17         Q.    It's your claim that fucking her in front of these
18    children would be consensual?
19         A.    It's not the claim.
20              MR. WOLPIN:  Objection, your Honor.  He answered
21    the question as to his interpretation.
22              THE COURT:  Overruled.
23         A.    I'm pointing out the ridiculousness of what you
24    were saying previously.
25         Q.    Now, let's go back to Government's Exhibit 100.
```

**J.A. 914**

```
 1              We were comparing your statement with Mr. Lambert's
 2  statement about Peach.
 3              So Mr. Lambert didn't say he was going to take any
 4  action against Katelen Fry?
 5       A.   No, he didn't.
 6       Q.   And let's look at your statement.  Your response
 7  was specific?
 8       A.   Yes.
 9       Q.   It involved you?
10       A.   Yes.
11       Q.   It involved you taking a specific action?
12       A.   Yes.
13       Q.   It involved you taking that specific action against
14  one particular person?
15       A.   Yes.
16       Q.   And doing it in a particular way?
17       A.   It did.
18       Q.   Fucking her in front of her children?
19       A.   Yes.
20       Q.   And yours was followed by another statement, "Give
21  me Vic.  It's your only out."
22       A.   A half an hour later, yeah.
23       Q.   Now, both today and yesterday you talked about this
24  idea of fantasy violence?
25       A.   Yes.
```

```
1          Q.    You explained that there are certain statements of
2    violence that are so ridiculous that no one could take them
3    seriously?
4          A.    Yeah.
5          Q.    The example that you gave yesterday and was brought
6    up again today was throwing someone out of a helicopter?
7          A.    Yes.
8          Q.    And you've said things like this before?
9          A.    Frequently.
10         Q.    Things that are fanciful?
11         A.    What was the word?
12         Q.    Things that are fanciful.
13         A.    Fanciful, yes.  Yeah.
14         Q.    Things that are ridiculous?
15         A.    Yeah.
16         Q.    Things that could never be taken as a real threat?
17         A.    Yeah.
18         Q.    So we've also talked a bit about Gab?
19         A.    Yeah.
20         Q.    A social media platform that you use?
21         A.    Yes.
22         Q.    And you've posted things that --
23               MR. WOLPIN:  I object, your Honor.
24               I think this may require additional discussion.
25               THE COURT:  All right.  Put the headsets on.
```

**J.A. 916**

```
 1                     (SIDEBAR)

 2           MR. WOLPIN:  Your Honor, at this point our client

 3   has acknowledged and agreed that he's made statements of rapes

 4   and whatever kind.  At this point I don't -- we've had these

 5   discussions.  I don't think putting in extrinsic evidence at

 6   this point is necessary.  He can address generalities, but I

 7   don't see why specifics from unknown times to unknown people

 8   have relevance at this time.

 9           THE COURT:  What are you going to put on?

10           MS. KRASINSKI:  So he has a November of 2018 post,

11   "All white men should hunt down and mercilessly kill as many

12   trannies, faggots, niggers, kikes, and cocks as they possibly

13   can in the new game Angry Goy II."

14           That's not a threat, and I want to contrast it.

15   That is fantasy violence.  It is something no one could ever

16   take as a threat and contrasting it with this which is very

17   specific and very directed.

18           THE COURT:  All right.  I'm going to sustain the

19   objection on Rule 403 grounds.

20           In my view there are many other ways you can make

21   your point without calling attention to a specific deeply

22   offensive statement he made that isn't tied directly to the

23   case.  So I'm sustaining the objection on Rule 403 grounds.

24           MS. KRASINSKI:  Yes, your Honor.

25                (CONCLUSION OF SIDEBAR)
```

**J.A. 917**

```
 1          Q.    And fantasy violence is something that
 2    reasonably -- that no one could reasonably think was ever
 3    going to happen?
 4          A.    Pretty much, yes.  I mean, that's a pretty accurate
 5    description of it.  It is far enough either in temporal
 6    distance or actual representation that it ought not to be
 7    taken seriously.
 8          Q.    Your statement, "If you don't want me to come and
 9    fuck your wife in front of your kids," it's not ridiculous.
10    It's not like throwing someone out of a helicopter.
11          A.    For me to come and fuck his wife in front of his
12    kids to me is ridiculous, and it should be ridiculous to him.
13          Q.    To do that you would have to know where he lived,
14    right?
15          A.    Yes.
16          Q.    And you made sure he knew you knew where he lived?
17          A.    Some numbers of hours prior, yeah.
18          Q.    Now, I want to talk about why you chose Mr.
19    Lambert, why you chose Cheddar to threaten.
20                If we go back to page 2 of this, you told him, "And
21    I don't care if it's you causing the trouble.  You're the one
22    who's gonna suffer because you're the one who I can get."
23          A.    Yes.
24          Q.    "I don't care if it's you causing the trouble."
25          A.    That's what I said.
```

**J.A. 918**

```
 1        Q.    Because you knew Ben Lambert at that point wasn't
 2   causing the trouble.
 3        A.    That's not true.  That's very inaccurate.
 4        Q.    Let's go back to page 1 of Government's Exhibit
 5   100.  Your first message is, "I guess you forgot the lesson
 6   which kept you away for a short while."  You knew he had been
 7   leaving you alone for a short while?
 8        A.    That is not accurate.
 9        Q.    You wrote that --
10        A.    There's a lot of inaccurate stuff in this chat.
11   Would you like me to explain?
12        Q.    I would like you to answer my question.  You
13   wrote --
14        A.    I wrote that --
15              THE COURT:  Wait, wait.  I'm sorry.
16              She gets to ask the question.  You answer.  Your
17   lawyer will have a chance to do redirect.
18              Ask a question.
19        Q.    You wrote, "I guess you forgot the lesson which
20   kept you away for a short while."
21        A.    I wrote that.
22        Q.    And you -- and actually, let's turn to defense
23   exhibit, which is already in evidence, I-2-B.  Let's go to the
24   last page of this.
25              The last time Mr. Lambert's cell phone was used to
```

```
 1   call in to the Radical Agenda was January 30, 2019, before
 2   these chats?
 3        A.    That's the last time that that number identified
 4   itself on my call-in system.
 5        Q.    So he didn't use this number to prank call you in
 6   February of 2019?
 7        A.    He did not use that number to prank call me in
 8   February of 2019.
 9        Q.    Or in March of 2019?
10        A.    Not with that number.
11        Q.    Or in April of 2019?
12        A.    Not with that number.
13        Q.    Or in May of 2019?
14        A.    Not with that number.
15        Q.    And you testified yesterday -- let me make sure I
16   get it accurate -- that you didn't have anything you could
17   specifically attribute to him.
18        A.    That is accurate.
19        Q.    You said, "I don't care if it's you causing the
20   trouble because you're the one who's gonna suffer because
21   you're the one I can get."
22        A.    Yes.
23        Q.    And when your website was vandalized in February of
24   2018 -- or '19, excuse me.
25        A.    Yes.
```

**J.A. 920**

```
 1          Q.    It's Vic Mackey who you believe did that?

 2          A.    I believed it was Vic Mackey and Mosin-Nagant who

 3    vandalized the website, and in the FBI complaint I mentioned

 4    the Bowl Patrol and months of a harassment by the group.

 5          Q.    Well, let's talk about that.  You have.  You've

 6    attributed a lot to the Bowl Patrol, but as you say, you were

 7    e-mailing with the Keene Police Department before this?

 8          A.    To be clear, not before my contacts with the Bowl

 9    Patrol, no, but, you know, I -- from 2018 onwards I had a

10    regular communication with Joel Chidester at the Keene Police

11    Department about a variety of problems that I had.

12          Q.    You e-mailed Officer Chidester --

13                MR. WOLPIN:  I object, your Honor.  Relevance as to

14    the existence of other reports.

15                THE COURT:  Overruled.

16          Q.    -- in December of 2018 talking about texts from

17    individuals who claimed to be Skinheads Against Racial

18    Prejudice?

19          A.    Yes.

20          Q.    That they had been threatening you since the year

21    before?

22          A.    Yes.

23          Q.    And that didn't include any mention of Bowl Patrol?

24          A.    No.

25                MR. WOLPIN:  Again, your Honor, I object to
```

**J.A. 921**

1    relevance.  That there are other complaints --

2              THE COURT:  Yeah, I think you made that objection

3    and I overruled it.  Thank you.

4              MR. WOLPIN:  Thank you.

5       Q.    In January of 2019 you e-mailed Joel Chidester

6    about a woman named Jackie Mason?

7       A.    Yes.

8       Q.    She's not a member of Bowl Patrol?

9       A.    No.

10      Q.    You followed up with two more complaints about Ms.

11   Mason?

12      A.    That sounds about right.

13             THE COURT:  Okay.  I think you've made your point

14   on that.  You can move on.

15      A.    That's how I handle problems.  I report them to law

16   enforcement.

17      Q.    I want to go back to Ms. Fry.

18             Is it fair to say that she's a member of this white

19   nationalist community?

20      A.    Member is a strong word, but she is familiar with

21   the subject matter of Radical Agenda if that would suffice.

22      Q.    She was part of the Radical Agenda Telegram group?

23      A.    Yes.

24      Q.    She was part of a separate Radical Agenda

25   invitation Telegram group?

**J.A. 922**

```
 1         A.    Yes.

 2         Q.    And what was the difference between the two?

 3         A.    To be precise, I think there were actually two

 4    different invitation groups.  One called Radical Invitation

 5    and one was Peaceful White Folk, which was functionally public

 6    but technically classified as invitation only.  Radical

 7    Invitation was a yet still smaller group.

 8               The Radical Agenda Telegram group is public, and

 9    literally anybody can join that.  The description of that has

10    been at times:  If you don't want to tell it to the New York

11    Times or the FBI, don't say it here.  That's what I say in the

12    Radical Agenda public group.

13               Radical Invitation was literally you don't get in

14    here unless somebody with administrative privileges

15    specifically lets you in.

16               Peaceful White Folk was technically considered

17    invitation only, but the invitation link was passed around

18    such that it was functionally public.

19         Q.    So she was a member of the public Radical Agenda

20    group?

21         A.    Yes.

22         Q.    Was she a member of Peaceful White Folk?

23         A.    Yes.

24         Q.    And she was also a member of this Radical Agenda

25    Invitation group that required an administrator?
```

```
 1          A.   Yes.  It would be fair to describe her as inner
 2    circle.
 3          Q.   And she viewed this as a rape threat?
 4               MR. WOLPIN:  I object, your Honor.
 5          A.   Not at first, no.
 6               MR. WOLPIN:  Objection.
 7          A.   Only after the FBI came around.
 8               THE COURT:  Hang on a second, Mr. Cantwell.
 9               I'm going to sustain the objection.
10               So you don't even have to answer the question,
11    okay?
12          Q.   She talked to you about this?
13          A.   Yes.
14          Q.   And today -- and she -- let me get the wording
15    right.  What I want to focus on is your response to what she
16    says.  She says, "Okay, but you threatened to rape Cheddar
17    Mane's wife."  And you said today that your response to that
18    was, I was, like, what the hell are you talking about?
19          A.   Yes.
20          Q.   But that's not actually what you said to her.
21               MR. WOLPIN:  Your Honor, I object.  I don't know
22    that that's -- I think that he was talking about his internal
23    monologue.  I read him or talked about what he actually said.
24               THE COURT:  What he actually said, didn't we play
25    that?  Isn't it in evidence?
```

J.A. 924

```
 1              MR. WOLPIN:  Yes.
 2              THE COURT:  So it's in evidence.  We know what he
 3   actually said.
 4        A.    I think that, what the hell are you talking about,
 5   is a fair characterization of how I responded, but maybe
 6   that's not an exact quote.
 7        Q.    Well, let's listen to how you responded.
 8        A.    Yeah, let's do it.
 9              MS. KRASINSKI:  I think it's -- this small portion
10   of Government's Exhibit 5 is named in Trial Director as 105, I
11   believe, Ms. Sheff.
12              THE COURT:  So this is an excerpt of what was
13   played to the jury?
14              MS. KRASINSKI:  Correct, your Honor.
15              THE COURT:  Go ahead.
16              (Government's Exhibit 5 is played)
17        A.    Right.
18        Q.    What you said was, "I fucking left that out there,"
19   okay?
20        A.    As I had described to my attorney previously --
21              THE COURT:  Wait a second.  I'm sorry.  We've got
22   to go one at a time.
23        A.    That's the text --
24              THE COURT:  Hang on a second, Mr. Cantwell.  I just
25   want to get the sequencing right.
```

**J.A. 925**

```
 1              Okay.  So put your question.
 2              Wait till she finishes.  Then you answer.
 3              You wait till he finishes.
 4       Q.   What you said was, "I fucking left that out there."
 5       A.   I said that.
 6       Q.   And I just want to be clear because you were very
 7  upset in your testimony today talking about the FBI visiting
 8  Ms. Fry.
 9       A.   I was.
10       Q.   You're the one who gave the FBI Ms. Fry's
11  information, correct?
12       A.   I was.
13       Q.   You're the one who asked them to go speak to her,
14  correct?
15       A.   Yes.
16       Q.   So they went out there at your request?
17       A.   Yes.  You're missing a piece.  She had told me
18  before that she didn't want to talk to them, and that's not
19  included in the little snippet that you included here.
20       Q.   But the FBI went to speak to Ms. Fry because you
21  told them to?
22       A.   Yes, because we were crime victims and wanted their
23  help.
24       Q.   Now, you also talked yesterday about your incel
25  listeners.  Fair?
```

**J.A. 926**

```
 1         A.   Yes.

 2         Q.   You said, and you said it today, I know of two?

 3         A.   Yes.

 4         Q.   You gave a long description of them yesterday?

 5         A.   Yeah, Dave and Joe.

 6         Q.   You said they're not violent?

 7         A.   No, they're not.

 8         Q.   You said they're pathetic?

 9         A.   In a lovable, adorable way, yes.

10         Q.   You've written about incel before?

11         A.   I probably have.

12         Q.   And on September 30th of 2019, you posted --

13              MR. WOLPIN:  Objection, your Honor.

14              THE COURT:  Basis?

15              MR. WOLPIN:  The date is after this interaction.  I

16    don't know what his knowledge at a future point would have to

17    do with this.

18              THE COURT:  So the date is what?

19              MS. KRASINSKI:  September 30, 2019.

20              THE COURT:  All right.

21              And your point is anything he says about incel

22    after the date of this incident is not relevant?

23              MR. WOLPIN:  Yes.  I mean, I don't know exactly

24    what content they're going to point out, but since it's

25    referring to incidents --
```

**J.A. 927**

```
 1            THE COURT:  I think we've covered that subject
 2    adequately.  I'm going to sustain the objection.
 3            THE WITNESS:  I would like to answer that one.
 4            THE COURT:  I think your lawyer would like you not
 5    to have to answer that one, but if you want to answer it --
 6    wait a second.
 7            Go ahead and put the question to the witness and
 8    the witness can answer.  I'm not going to deprive him of a
 9    chance to answer the question.
10        Q.    You said, "I used to think the incel thing was just
11    a pejorative thrown at right-wingers by lowlife leftists who
12    think with their genitals.  It isn't.  These people are real
13    and they are dangerous."
14        A.    Yeah, in September of 2019 that's exactly what I
15    said about incel listeners, because previously at the time
16    that I said that to Cheddar Mane I thought they were a joke.
17    And then in September I found out about this guy who went and
18    killed some people or did something crazy violent, I don't
19    remember the details, and then when I talked to Katelen about
20    it in December I was like, that must be what she's thinking
21    of.
22        Q.    Well, why don't we talk about a post that you put
23    on Radical Agenda in April of 2018.
24        A.    2018 now?
25        Q.    Yes.
```

```
 1          A.    Okay.

 2          Q.    Again, your website.

 3          A.    Okay.

 4          Q.    Your content.

 5                Give me one moment.

 6                MS. KRASINSKI:  Your Honor, can we put the headsets

 7    on?

 8                THE COURT:  Yes.

 9                (SIDEBAR)

10                MS. KRASINSKI:  I anticipate a 403 objection on

11    this so I wanted to raise it before I say it.

12                On April 25, 2018, Mr. Cantwell made a post that

13    says, "Chris Harper Mercer, Elliot Rodger, Nikolas Cruz, mass

14    murderers all, none of whom were white I should point out, all

15    identified as incels."

16                THE COURT:  All right.

17                What's the 403 objection?

18                MR. WOLPIN:  At this point we're over the line.  I

19    don't see the point anymore.  The government has made its

20    purpose and its point, and I think at this point when there's

21    talk about race of those individuals --

22                THE COURT:  But your client just testified that he

23    didn't think incels were violent until a later date so I think

24    it is -- on this basis I think it is -- it's relevant because

25    the charges are based in part about a statement about incels
```

**J.A. 929**

1    coming to the house and the defendant's recent statement about

2    when he learned that incels were dangerous.

3              So objection is overruled.

4              MR. WOLPIN:  I would ask if we could just --

5              THE COURT:  Do you need to talk more?

6              MR. WOLPIN:  Just one more.

7              If they're going to read it, obviously I would ask

8    that they redact any portion about race that has nothing to do

9    with that.  There's no reason to mention that.

10              THE COURT:  Do you have a problem with that?

11              MS. KRASINSKI:  I don't, your Honor.

12              THE COURT:  So go ahead and do that.  The objection

13   is otherwise overruled.

14              But I am going to ask you to move on from this

15   subject.  We've covered it extensively.  Once you finish this,

16   go on to a different subject.

17              MS. KRASINSKI:  Yes, your Honor.

18              (CONCLUSION OF SIDEBAR)

19        Q.    Now, we're talking about your statements on incels

20   before you made these June 2019 comments to Ben Lambert.

21              And you posted an article on your website on April

22   25, 2018, called Saints and Sinners?

23        A.    Okay.

24        Q.    And in that you wrote, "Chris Harper Mercer, Elliot

25   Rodger, Nikolas Cruz, mass murderers all, all identified as

**J.A. 930**

```
 1   incels."
 2         A.    Yes.
 3         Q.    Now, let's go back to Government's Exhibit 100 and
 4   your claim that all you meant was leave me alone.  Stop
 5   harassing me.  Leave me alone.
 6         A.    Just the driving thrust of what I'm trying to
 7   accomplish, yes.
 8         Q.    You sent the first message at 9:00 p.m.?
 9         A.    Yep.
10         Q.    And Mr. Lambert doesn't respond to that message?
11         A.    No, he doesn't.
12         Q.    He was leaving you alone.
13               THE COURT:  Well, I'll sustain objection to that.
14   You can move on.  It's argumentative.
15         Q.    Let's go to the next page of that.  You send a
16   message at 4:15 p.m.?
17         A.    Yes.
18         Q.    And Mr. Lambert didn't respond directly to that
19   message?
20         A.    No, he didn't.
21         Q.    And you send another message at 4:45 p.m.?
22         A.    Yep.
23         Q.    And he doesn't respond directly to that message?
24         A.    That's right.
25         Q.    And he doesn't respond directly to the next one?
```

**J.A. 931**

```
 1        A.    That's right.

 2        Q.    And he doesn't respond until after you say, "If you

 3   want to dox Vic, he's a better target, but if you give me fake

 4   info, then your wife is going to have trouble sleeping at

 5   night until she leaves you and takes your kids away."

 6        A.    That is what I said.

 7        Q.    Let's go to the next page.

 8              And at 6:41 you say, "As a matter of fact, I don't.

 9   If you don't want me to come and fuck your wife in front of

10   your kids, then you should make yourself scarce."

11        A.    That sounds familiar at this point, yes.

12        Q.    And Ben Lambert doesn't respond directly to that

13   message?

14        A.    No, he doesn't.

15        Q.    You reengage?

16        A.    I'm sorry.  Say that again.

17        Q.    You send the next message?

18        A.    I send the next message a half an hour later, yeah.

19        Q.    You say, "Give me Vic.  It's your only out."

20        A.    Yes.

21        Q.    And Mr. Lambert doesn't respond directly to that

22   message?

23        A.    No, he doesn't.

24        Q.    And then over an hour later you respond?

25        A.    Yes.
```

**J.A. 932**

```
 1        Q.   You say, "I guess I'm gonna have to prove my
 2   seriousness."
 3        A.   Yes.
 4        Q.   And then, if we go to page 6, after Mr. Lambert
 5   tells you he doesn't have Vic's dox, you send a message,
 6   "Guess you're fucked then."
 7        A.   Yes.
 8        Q.   Mr. Lambert doesn't respond directly to that
 9   message?
10        A.   Nope.
11        Q.   And you wait a little while and send another
12   message at 9:17 p.m.?
13        A.   Yes.
14        Q.   And Mr. Lambert doesn't respond directly to that
15   message?
16        A.   No, he doesn't.
17        Q.   You send him another message a minute later.  In
18   fact, two messages a minute later?
19        A.   Yes.
20        Q.   Mr. Lambert doesn't respond to either one of those?
21        A.   No, he doesn't.
22        Q.   You send two more messages a minute later?
23        A.   Yes.
24        Q.   Ben Lambert doesn't respond to either one of those?
25        A.   That's right.
```

**J.A. 933**

```
 1          Q.   And then you send another message, "If that doesn't
 2    work, I'll escalate until I get what I want."
 3          A.   That's what I said.
 4          Q.   And Ben Lambert didn't respond directly to that
 5    message?
 6          A.   That's right.
 7          Q.   And then you wait six minutes and you send another
 8    message?
 9          A.   I don't know if it would be accurate to say that I
10    waited.  Again, this is happening on my phone while the rest
11    of my life is going on, but I didn't send another message for
12    however number of minutes, yes.
13          Q.   And that's when you said, "Tell Vic that if he
14    gives himself up, he can save your family."
15          A.   Yes.
16          Q.   And Ben Lambert didn't respond directly to that
17    message?
18          A.   That's right.
19          Q.   And then you send the last message on this page,
20    "You won't do it, but at least then you'll know you're certain
21    that you chose the wrong side."
22          A.   That's what I said.
23          Q.   And that's when he responds?
24          A.   Yes.  That's right.  That's when he says, "LOL.
25    You're such a fucking nobody, Chris.  Do your worst."
```

**J.A. 934**

```
 1          Q.   He says, "Do your worst."

 2          A.   Yeah.

 3          Q.   He doesn't say I'm going to go fuck any of your

 4     girlfriends?

 5          A.   No.

 6          Q.   He doesn't say I'm going to go hurt anyone you

 7     love?

 8          A.   No.

 9          Q.   He doesn't say I'm going to come and do anything to

10     you, Chris Cantwell?

11          A.   No.  He just says go boost some meth up your

12     asshole, you faggot-ass kike."  That's all he said.

13               (Attorney Krasinski confers with Attorney Davis)

14          Q.   I want to go back to something you were talking

15     about yesterday.

16          A.   Okay.

17          Q.   Early on in your testimony you were talking about

18     your early relationship with Bowl Patrol.

19          A.   Yes.

20          Q.   And you said that they were talented?

21          A.   They are.

22          Q.   You talked about Photoshop?

23          A.   Yes.

24          Q.   And you turned to this jury and you said to them,

25     you might hear me use Photoshop as a verb sometimes?
```

**J.A. 935**

```
 1          A.    That sounds right.

 2          Q.    You chose your words carefully there?

 3          A.    I thought it was worth clarifying.

 4          Q.    Because you care about language?

 5          A.    I am careless with my words from time to time, so

 6    this, I'm looking forward to this one, but, no, I'm not

 7    careful about my language in a lot of cases, no.

 8          Q.    I didn't say --

 9          A.    I care about language.  I do, yes.  That's

10    accurate.  Whether I'm careful, that's another question.

11          Q.    You care about language?

12          A.    I care about language.  I do.  It's a very useful

13    tool and a very beautiful art form.

14          Q.    And with this useful tool and this beautiful art

15    form you said, "So if you don't want me to come and fuck your

16    wife in front of your kids, you should --"

17                MR. WOLPIN:  Objection.  Asked and answered at this

18    point.

19                THE COURT:  You should let the question be asked

20    before you start interposing.

21                The objection is overruled and you can ask your

22    question.

23          A.    Are you asking me again if I said that?

24                THE COURT:  Wait.

25                Ask the question again.  The objection is
```

**J.A. 936**

```
 1   overruled.  Let's have the answer.
 2       Q.    With this useful tool and this beautiful art form
 3   you wrote, "So if you don't want me to come and fuck your wife
 4   in front of your kids, then you should make yourself scarce."
 5       A.    That's what I wrote.
 6            MS. KRASINSKI:  Subject to refreshing recollection
 7   on that one issue --
 8            THE COURT:  Right.
 9            Members of the jury, there's one matter left where
10   I need to play something for the witness about refreshing his
11   recollection.  That isn't in evidence so you can't hear it.  I
12   don't know of any way to do it without asking you to leave and
13   come back.  So we'll just take a very short break and come
14   back, we'll just do this last thing, and then we'll do
15   redirect, and then we'll be ready for lunch.
16            (IN COURT - NO JURY PRESENT)
17            THE COURT:  If you have a transcript excerpt, you
18   can try that first if it's more expeditious.  You can refresh
19   recollection with anything.
20            MS. KRASINSKI:  No, this shouldn't be difficult.  I
21   believe it's annotated in your system as CPS 3.
22            (Recording played)
23            THE COURT:  Okay.  So that's what you were going to
24   use to refresh his recollection.  He's now heard that.
25            I suggest that we bring the jury back in, that you
```

**J.A. 937**

```
 1  ask a couple of leading questions to bring us back to the
 2  point where you were.  Ask him, now that you have heard what I
 3  have played for you, does that refresh your recollection that
 4  you had a -- whatever it is you want to say about it.  All
 5  right?  And then he can answer, and then that will end your
 6  part of this and then we can have direct.
 7           MS. KRASINSKI:  Yes, your Honor.
 8           MR. WOLPIN:  I would ask for a moment just to
 9  object on grounds of relevance and prejudice.
10           I don't know whether he's talking about people
11  making false statements.  That's what it sounds like.  His
12  statements, as we know, to CPS were not false.  When pushed
13  whether there was a crime committed, he said --
14           THE COURT:  If you want to try to bring that out
15  with him in redirect if you think that will help your case, go
16  ahead.
17           The objection is overruled.
18           MR. WOLPIN:  And I would just like 403, 401.
19           THE COURT:  I think I've made the balancing -- I
20  mean, I hope that a court of appeals reviewing this transcript
21  would understand that I know what Rule 403 is because I've
22  read it.  I've done the balancing test a million times in this
23  trial already.  So please refer to other portions of the
24  transcript to know that I have tried to fulfill my obligations
25  under Rule 403 as best I can with an understanding of the rule
```

**J.A. 938**

```
 1    that has been developed over 40 years of doing this.
 2              All right.  So the objection is overruled.
 3              We can bring the jury back in.
 4              We'll take a break after we're finished with the
 5    cross, and if you could disinfect, and then we'll finish up.
 6              MR. WOLPIN:  Thank you, your Honor.
 7              THE COURT:  Keep the focus on this.  Keep it brief.
 8              MS. KRASINSKI:  Yes, your Honor.
 9              (IN COURT - JURY PRESENT)
10              THE COURT:  All right.  Go ahead, counsel.
11              MS. KRASINSKI:  Thank you, your Honor.
12         Q.   Now, we had talked a little bit about this idea
13    that calling Child Protective Services was supposed to be an
14    interim step?
15         A.   Yes.
16         Q.   Somehow less serious than doxing?
17         A.   Yes.
18         Q.   And I had asked you about your May 2015, episode 6,
19    Radical Agenda?
20         A.   Yes.
21         Q.   And now -- and I had asked you about whether you
22    remembered your discussion of a call to Child Protective
23    Services from that episode?
24         A.   You did.
25         Q.   And during the break moments ago you watched a
```

**J.A. 939**

```
 1    portion of that episode?

 2         A.   I watched a brief snippet of it, yes.

 3         Q.   And did that refresh your memory regarding your

 4    discussion of a call to CPS?

 5         A.   It refreshed my memory as to the contents of the

 6    snippet that you showed me.  The broader context of it, no.

 7         Q.   And so you do remember what you said during that

 8    portion?

 9         A.   Yes.

10         Q.   That someone was intimidating a woman, threatening

11    to take her babies away?

12         A.   The snippet that I heard was they were going to

13    take the babies away for what they knew was a bullshit call.

14         Q.   And that's a call to CPS?

15         A.   Yes.

16         Q.   And so you knew the possible consequences of

17    calling CPS?

18         A.   If the children are in danger, that's basically why

19    we have CPS.

20         Q.   And you knew that?

21         A.   Yes.

22         Q.   And you called CPS because you wanted someone to go

23    to Ben Lambert's house?

24         A.   Yes.

25         Q.   And you described it in your public doxing,
```

**J.A. 940**

```
 1   Government's Exhibit 102, because you wanted to destroy his
 2   life?
 3        A.   I described it in decidedly different terms
 4   elsewhere, but that's what I said in the public Radical Agenda
 5   chat room, yes.
 6             MS. KRASINSKI:  No further questions, your Honor.
 7             THE COURT:  Thank you.  Redirect?  Oh, we need to
 8   disinfect the front podium.
 9             (Podium disinfected)
10             THE COURT:  All right.  Go ahead, Mr. Wolpin.
11                     REDIRECT EXAMINATION
12   BY MR. WOLPIN:
13        Q.   If we could bring up I-2-B again.
14             So one of the things the government talked about
15   with you was the fact that Cheddar Mane made calls from a
16   particular number?
17        A.   Yes.
18        Q.   All right.  And we had your chat log up, and they
19   asked you questions about when you had received calls from
20   him?
21        A.   Yes.
22        Q.   All right.
23             THE COURT:  I would ask my case manager, could you
24   enable the defense assistant's screen.
25        Q.   And what we're looking at are the call logs for
```

```
 1    Benjamin Lambert's number that he has given.

 2            Do you see that in front of you?

 3        A.    I'm sorry.  The call logs from Ben Lambert's phone,

 4    yeah.  Right.

 5        Q.    To your show?

 6        A.    Yeah.

 7        Q.    Okay.

 8            MR. WOLPIN:  And if we scroll down to the last

 9    page, if we could.

10        Q.    Now, if we look on the January 18th, 2019, one,

11    what does it say next to that call?

12        A.    Blocked.  Caller on blocked list.

13        Q.    Why does it say that?

14        A.    Because I blocked his number repeatedly.

15        Q.    Why did you block his number repeatedly?

16        A.    Well, I blocked it because his calls were no longer

17    welcome.  The repetition of it, to clarify, is because when

18    the call-in lines get flooded, there were times when I would

19    end up accidentally banning innocent people, and I would get

20    e-mails from listeners sometimes like I've been getting busy

21    signals for weeks or whatever.

22            And so on a semi-regular basis I would just clear

23    the banned list because when I was banning these guys,

24    especially for their carrier being Voice over IP, it ended up

25    catching innocent people in it.  And the numbers were
```

**J.A. 942**

1   disposable so there was no sense in keeping them in the list

2   anyway.

3           So I blocked Cheddar Mane repeatedly and he was --

4   and then he would get back on whenever he was off the banned

5   list or for all I know by using another number.

6       Q.   So you would ban his number because of the content

7   of the call?

8       A.   Yes.

9       Q.   And that ban might last a while and he wouldn't be

10  able to get through?

11      A.   Not with that number.

12      Q.   Okay.

13          MR. WOLPIN:  And if we sort of get rid of the

14  highlight for a moment.  All right.

15      Q.   We see the next call blocked.  The next call is

16  blocked.  So for that period of time was one of the periods of

17  being blocked?

18      A.   Yeah.

19      Q.   Okay.  But that doesn't appear to have deterred him

20  from calling back from his number again on that number 79.

21  When was that?

22      A.   79 is January 30th is when he -- I guess I had

23  cleared the banned list sometime between the 21st and the

24  30th.

25      Q.   And you have no idea whether he's calling back

```
1    under other phone numbers?
2         A.    No.  It was impossible for me to keep track of
3    which number was which call because, like I said, they had so
4    many phone numbers, right?  It was almost an episodic thing to
5    use the banned list just so that they didn't get back on the
6    line.
7         Q.    Okay.  And after February when you made public the
8    report to the FBI, did you get more calls that came or less
9    calls that came from sort of these burner type accounts?
10        A.    After I made the report in February, wisely I would
11   say, they were all -- it was almost exclusively coming from
12   these disposable Voice over IP services.
13        Q.    Did the actual content -- did the actual calls
14   cease at that point?
15        A.    No.  It got worse.
16        Q.    Now, Mr. Lambert testified about making a call to
17   your show after June 16th and 17th.
18              Do you remember that?
19        A.    Yeah, I remember him mentioning it and I remember
20   the prosecution playing a clip of it.
21        Q.    Okay.  So we see, at least on 81, that that wasn't
22   the only time he called your show after that?
23        A.    81 is, yeah, July 1st, yeah.
24        Q.    Okay.  So he made an effort to call at that point.
25   What does the screen note tell you?
```

```
 1          A.    The auto screener?

 2          Q.    Uh-huh.

 3          A.    It says -- I suspect that there might be something.

 4   It says Dan Antica terrorist.

 5          Q.    So not identifying himself as Cheddar Mane or

 6   Cheddy Blac at that point?

 7          A.    No.

 8          Q.    And there's another one at 80 that is or is not

 9   after the June 16th and 17th interaction?

10          A.    Yeah, that's June 21st of 2019.

11          Q.    And what's the name and the call screen noted on

12   that one?

13          A.    So I'm not sure that it meant to be a name.  The

14   call screen note is Bob reparations, and it seems to be that

15   he said, I'm Bob, I'm calling about reparations, or something

16   like that.  That would be a typical refrain of how somebody

17   would introduce themselves to the auto screener.

18          Q.    All right.  So that's another call from Cheddar

19   Mane that was nine minutes long and was not under the name

20   Cheddar Mane, correct?

21          A.    To clarify, he probably sat on hold for eight

22   minutes and 30 seconds is probably what happened.

23          Q.    Oh.  So that doesn't tell you how long he actually

24   got on the air with you?

25          A.    Right.  Yeah.
```

**J.A. 945**

```
 1        Q.    But these are two different dates than the dates of
 2   his admitted call?
 3        A.    Right.
 4              MR. WOLPIN:  Now, if we can bring up B-12, third
 5   page, which is just for the witness at this point, and
 6   actually we should probably start up at the top.
 7        Q.    Now, you sent e-mails --
 8              MS. KRASINSKI:  Your Honor?
 9              THE COURT:  Yes.
10              MS. KRASINSKI:  At this point I'm going to object.
11   We're not refreshing recollection.  He shouldn't be testifying
12   from a document.
13              THE COURT:  Right.
14              Are you trying to lay a foundation for the
15   admission of this document?
16              MR. WOLPIN:  I am.
17              MS. KRASINSKI:  Okay.  I withdraw the objection,
18   your Honor.
19              THE COURT:  All right.
20        Q.    So what you're seeing in front of you, is this
21   something that's familiar to you?
22        A.    That is the -- it's a little bit confusing because
23   I think I forwarded it from my ProtonMail to my Gmail, and I
24   think this is to Ad Hoc Labs, the creators of an app called
25   Burner.
```

**J.A. 946**

```
 1          Q.    Okay.
 2                MR. WOLPIN:  And if we go down to the third page,
 3     or actually, excuse me, the second page so that we can see the
 4     title of the e-mail.
 5          Q.    This shows the date, which is what date?
 6          A.    Wednesday, February 13, 2019.
 7          Q.    Okay.  And what you are trying to accomplish here
 8     is to send to a company names of -- numbers that are causing
 9     you significant trouble?
10          A.    Right.  When the numbers started flooding the chat
11     and I figured out what they were doing, I contacted the
12     provider of the app and I said, these are the offending
13     numbers, try to do something about the accounts that are
14     causing me this problem.
15          Q.    Okay.
16                MR. WOLPIN:  And if we move down to the third
17     page -- and before I address this, I can move to admit this as
18     a full exhibit, if I can, to strike the ID and move for
19     admission.
20                THE COURT:  You showed me -- I'm familiar with it,
21     but I'm not understanding why it's admissible in evidence.
22                Get your headset.  Put it on.
23                (SIDEBAR)
24                THE COURT:  And come back over to where you were
25     standing.
```

**J.A. 947**

```
 1                Now tell me what you're trying to do.
 2                MR. WOLPIN:  The next page has Cheddar Mane's
 3    number on it showing that he sent to the lab an e-mail to
 4    block that number.
 5                THE COURT:  Why don't you just ask him, didn't you
 6    send Cheddar Mane's e-mail -- telephone number to this service
 7    and try to block him.
 8                MR. WOLPIN:  Okay.
 9                (CONCLUSION OF SIDEBAR)
10        Q.    And included in the list of phone numbers that you
11    sent to be blocked was Cheddar Mane's, ████████1958?
12        A.    1958 is in that list, yeah.
13        Q.    And so, as you said, these calls kept coming?
14        A.    Yeah.
15        Q.    Now, the government talked with you a little bit
16    about language and your use of language?
17        A.    Yes.
18        Q.    And I think you said you're not always careful with
19    your language.
20        A.    Yeah, I could work on that.
21        Q.    All right.  And even in the courtroom today you've
22    used a swear word or two?
23        A.    Yeah.
24        Q.    Okay.  Now, when these calls came in, how would you
25    respond?
```

**J.A. 948**

```
 1          A.    That depends on a call.

 2          Q.    Were there calls where you used strong language?

 3          A.    Yeah.

 4          Q.    Were there calls when you would be yelling and

 5    screaming angry?

 6          A.    Yes.

 7          Q.    Okay.  And so would the callers know that that's a

 8    reaction they could get from you?

 9          A.    They would certainly know that, yes.

10          Q.    Now --

11          A.    And in fairness, I should say that when they see me

12    screaming angry about it -- there was a point made earlier

13    when I just hung up on a guy and moved on, right?  That's how

14    I tried to discourage the behavior, okay?

15              When I'm yelling, screaming angry about it, I

16    should be honest, like, it's part of the show, okay, and I

17    tried to -- you know, I'm a professional.  This is what I do

18    for a living, okay?  And so people are trying to disrupt the

19    show, and I tried to make it entertaining, right?  So I tried

20    to do what I could with this content.

21              And so -- so, yeah, I mean, I shouldn't say that,

22    like, I told them -- I acted angry and then they should have

23    said that that's the reason not to do it anymore.  When your

24    number is blocked and it's busy and you can't get through and

25    I'm hanging up on you and telling you don't call anymore,
```

**J.A. 949**

1    that's the point at which, you know, I feel that they're doing

2    something wrong.  When I'm yelling at them FU, in fairness

3    it's not what -- they rightly took that for a period of time

4    as encouragement.

5        Q.    Now, the government pointed out that on the Radical

6    Agenda page you made some strong statements about what would

7    happen with CPS.  Do you remember that?

8        A.    You're talking about on the Radical Agenda show?

9        Q.    No.  On the page that came after where you said

10   things about, I hope they do this, I hope they do that, you

11   know, all that stuff?

12       A.    Yeah.

13       Q.    Why did you use such strong language in public?

14       A.    Well, first and foremost, because I was mad, okay?

15   And secondly, because the honest goal there is to be a

16   deterrent against the behavior, right?

17            And so I'm making a public statement of this

18   behavior that I've been dealing with, this campaign of nonstop

19   torment that's been going on for eight months that I've been

20   to law enforcement about repeatedly really needs to stop, and

21   I will do everything within the limits of the law to

22   accomplish that goal.

23       Q.    So were you purposely using more shocking language

24   in public?

25       A.    That was sort of, like, characteristic of the

**J.A. 950**

```
 1   character I play on the Radical Agenda, which is the host and

 2   moderator of a chat room.

 3        Q.    Okay.  Did you want to totally destroy his life?

 4        A.    I hope that Benjamin Lambert outlives Cheddar Mane

 5   by a hundred years and he goes on to lead his kids' hockey

 6   team to championships and shit, okay?  I don't want to destroy

 7   Benjamin Lambert.  I wanted to destroy Cheddar Mane.

 8        Q.    Now, I want to talk to you about Exhibit 206, if I

 9   could, the government's exhibit.

10             This is the first part of the exchange.  The

11   comment "kept you away for a short while," what does that

12   mean?

13        A.    It means that an account identifiable as Cheddar

14   Mane had not shown up in my -- had not shown up on my problem

15   radar in the last few weeks.

16        Q.    Okay.  And so that was what you meant by that?

17        A.    To be more precise, I probably hadn't seen a

18   Cheddar Mane account in roughly three months.  Since I told

19   him in March I would dox you, okay, I had not been able to

20   identify him as one.  I would love to say how I know that he's

21   lying about being there.

22        Q.    Okay.  But as far as this time goes, part of the

23   issue is you don't know who's calling you or what numbers

24   they're calling you from?

25        A.    They operated as a black block.  The whole point
```

1    was anonymity.  You never could tie anything to any

2    individual.

3         Q.    Now, the government made a point of explaining that

4    you had half an hour to think about what to do between the

5    first one and the second one.

6         A.    That's right.

7         Q.    All right.

8               MR. WOLPIN:  Now, if we can move to 208.

9         Q.    And then you had a half an hour to plan what you

10   would say and to think through what you would want to say,

11   correct?

12        A.    That's what they -- that' the implication.

13        Q.    Now, between the text or Telegram chat about Peach

14   and the Telegram chat about the wife, how much time do you

15   have between those?

16        A.    Less than two minutes.

17        Q.    Okay.  How many times do you mention Vic Mackey in

18   that text?

19        A.    In that --

20        Q.    In that specific --

21        A.    In that message?

22        Q.    Yes.

23        A.    Zero.

24        Q.    What do you actually ask him to do in that message?

25        A.    Get scarce, or make yourself scarce, as in don't be

**J.A. 952**

```
1    around me.
2            MR. WOLPIN:  If I could just have a moment?
3            THE COURT:  Yes.
4            (Attorney Wolpin confers with Attorney Levin)
5            MR. WOLPIN:  That's all.  Thank you.
6            THE COURT:  I think we've covered it.
7            Is there anything else?
8            MS. KRASINSKI:  No, your Honor.  Thank you.
9            THE COURT:  All right.  Thank you.
10           Does the defense have any additional witnesses?
11           You can step down, Mr. Cantwell.
12           MR. WOLPIN:  No, your Honor.
13           THE COURT:  Defense rests?
14           MR. WOLPIN:  Yes.
15           (Conclusion of requested excerpt)
16
17
18
19
20
21
22
23
24
25
```

**J.A. 953**

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8

 9

10   Submitted: 12-8-20    /s/   Susan M. Bateman _____
                           SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**J.A. 954**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *  20-cr-06-01-PB
           v.                       *  September 25, 2020
                                    *  8:45 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Anna Z. Krasinski, AUSA
                           U.S. Attorney's Office




For the Defendant:         Eric Wolpin, Esq.
                           Jeffrey S. Levin, Esq.
                           Federal Defenders Office




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

**J.A. 955**

I N D E X

WITNESS:                 Direct        Cross        Redirect        Recross

CHRISTOPHER CANTWELL

(Previously transcribed under separate cover)

```
 1                  P R O C E E D I N G S

 2              (IN COURT - NO JURY PRESENT)

 3         THE COURT:  All right.  Do you want to discuss the

 4    jury instructions with me?

 5              Just to set the stage, I submitted a first draft of

 6    the instructions to the parties prior to trial.  I provided

 7    them with a revised draft yesterday and met after the close of

 8    court with a representative from each side with the revised

 9    instructions.  We discussed several modifications that the

10    parties were proposing, most of which I agreed to.  I put

11    together another revision and provided it to the parties at

12    about 8 o'clock today.

13              I tried to accurately do what I told you I would do

14    last night, but I might not have.  If I haven't or if there

15    are other issues, I would welcome a chance to hear you on

16    them.  Of course you'll preserve any arguments you have such

17    as I know the government, excuse me, the defense will register

18    an objection to my instruction about provocation not being a

19    defense.  You don't need to preserve that here.  You've made

20    that very clear to me.

21              But if there's any kind of constructive change that

22    you didn't raise with me yesterday or that you don't think I

23    executed faithfully, I'm happy to hear first from the defense

24    and then the government.

25         MR. LEVIN:  Your Honor, I don't have my finger on
```

**J.A. 957**

```
 1   it, but I do recall that there is some case law that talks
 2   about intent to extort.  It says here:  Means to act with the
 3   intent to obtain something of value from another person with
 4   that person's consent but induced by threat and force,
 5   violence or fear.
 6              I thought there was a part of it that should be
 7   wrongfully, you know, something that you're not entitled to.
 8              THE COURT:  Yeah.
 9              MR. LEVIN:  If somebody takes your -- steals your
10   purse and you threaten to get it back, that's not extortion.
11   So there has to be a wrongful element of the request.
12              THE COURT:  Okay.  I think that's an interesting
13   point.  I wish we had talked about it last night.
14              MR. LEVIN:  It just occurred to me, your Honor.
15   I'm sorry.
16              THE COURT:  Yeah, that's all right.  I will -- I
17   think that is an interesting point.
18              So the argument would be say, for example, you're
19   trying to use self-help to get back your own property.  Can
20   you commit this crime of extortion as threat by threatening to
21   kill the person that wrongfully stole your car if he doesn't
22   give it back to you.
23              MR. LEVIN:  Right.
24              THE COURT:  And you're saying I don't think you can
25   commit the crime if the evidence is that it's your property
```

```
 1   and you have a right to it even if you use threatening means

 2   to get it back.

 3                MR. LEVIN:  That's correct.

 4                THE COURT:  Okay.  Well, that's an interesting

 5   theory.  I'll try to explore it.

 6                Have you got something to say on that point?

 7                MR. DAVIS:  Only, Judge, there is a definition in

 8   the Hobbs Act that's useful I think.  So 18 U.S.C. Section

 9   1951.

10                THE COURT:  My definition of threat comes from the

11   Hobbs Act.  Is there an intent to extort definition in the

12   Hobbs Act?

13                MR. DAVIS:  I'm reading from 1951(b)(2):

14                The term extortion means the obtaining of property

15   from another with his consent induced by wrongful --

16                THE COURT:  Yeah, that's what I'm recalling.

17                MR. LEVIN:  Yeah, that's what I was thinking.

18                MR. DAVIS:  We would not object to that.

19                THE COURT:  So we add the word wrongful.

20                Unfortunately, I didn't bring my reading glasses

21   down.

22                Vinny, would you -- for your sake -- I've got them

23   up in the my office.  Would you run up there and get them for

24   me?  You can, you know, just touch them with a --

25                THE CLERK:  I have an extra pair of yours.
```

J.A. 959

```
 1              THE COURT:  No, that's all right.  Can you get mine
 2    for me?  These are mine?  Okay.  I've got like 20 pair around
 3    here.  Thank you.
 4              MR. DAVIS:  And we did propose the use of wrongful
 5    in our proposed instruction.
 6              THE COURT:  Yeah.  Let me just figure out the exact
 7    place to put it.
 8              By the way, I'm not absolutely convinced on the
 9    hypothetical that I presented that you could not be found
10    guilty of extortion under those circumstances because the
11    question of what's wrongful, can the threat be wrongful, force
12    that you're not legally entitled to use, can you threaten
13    force that you -- because you can't use deadly force on
14    somebody to recover your own property, and so threatening the
15    use of deadly force to recover your own property -- at least
16    there's an argument, I haven't studied it, that that would be
17    a wrongful threat.  I don't think you can simply say if you're
18    entitled to it that it wouldn't be wrongful because the means
19    can make it wrongful even if there's an entitlement to the
20    property.
21              Do you see what I'm saying?
22              MR. DAVIS:  Yes.
23              THE COURT:  So in this case if it were to be argued
24    that he has a right to be left alone and not have his site
25    harassed, and he can therefore threaten to do anything he
```

```
 1    wants to stop that and it's not an extortion or threat, no,
 2    that doesn't strike me as the way the law would work, but I'm
 3    happy to insert the word wrongful at the appropriate place.
 4             So to act with an intent to extort means the -- how
 5    about this:  To act with the intent to wrongfully obtain
 6    something of value from another person with that person's
 7    consent induced by threat, force, or fear, or should it be
 8    means to act with the intent to obtain something of value from
 9    another person with that person's consent but wrongfully
10    induced by threat?
11             Where do you want wrongfully?
12             MR. LEVIN:  In the statute it says, "Induced by
13    wrongful use of actual or threatened force, violence, or fear,
14    or under color of official right."
15             And I'm presuming "color of official right" means
16    pretending that you have some sort of legal right to it, I
17    guess.
18             THE COURT:  All right, but we're not dealing with
19    the Hobbs Act here.
20             MR. LEVIN:  Right.
21             THE COURT:  So I'm trying to figure out where you
22    want me to insert the term here.
23             MR. LEVIN:  Induced by wrongful use of threatened
24    force, violence, or fear.
25             THE COURT:  Should wrongful be used in describing
```

1    the threat or should wrongful be used in describing the

2    intention with which the threat is made?

3                MR. LEVIN:  I think it's --

4                THE COURT:  Give me the definition of the Hobbs

5    Act.  Give me the cite to the Hobbs Act again.

6                MR. DAVIS:  It's 1951(b)(2), and it uses it in the

7    second part of the definition.  "The term extortion means the

8    obtaining of property from another, with his consent, induced

9    by wrongful use of actual or threatened force, violence,

10   fear --"

11               THE COURT:  So it describes the use of force, all

12   right?  So wrongful use -- so force can be wrongful even if

13   you have a right to the property if the force is not lawful

14   force, right?

15               MR. DAVIS:  Right.

16               THE COURT:  So that would be wrongful.  So it

17   clearly does refer not to in the hypothetical I presented

18   merely whether the person has a right to recover the property

19   but whether they have the right to use the means that's being

20   threatened, right?

21               MR. DAVIS:  Right.

22               THE COURT:  So that could mean if they are

23   unlawfully -- if they're threatening to use force that they

24   cannot lawfully use to obtain property, even if it's their

25   own, it still would qualify under that definition, right?

**J.A. 962**

```
 1              MR. DAVIS:  That's correct.
 2              THE COURT:  But here we're talking about not the
 3     crime of extortion.  We're talking about the crime of
 4     threatening to extort, right?  So I'm trying to figure out --
 5     extortion by threat, rather.
 6              So if I look on page 13 -- let me hear, Mr. Levin,
 7     where on page 13 or page 14 should I insert the word wrongful
 8     or wrongfully?
 9              MR. LEVIN:  Well, first of all, on page 13 in that
10     first section -- no.  I'm looking at page 14, "To act with an
11     intent to extort means to act with the intent to obtain
12     something of value from another person with that person's
13     consent but induced by," and then you would insert, "the
14     wrongful use of threatened force, violence, or fear."
15              THE COURT:  Okay.  Would that satisfy you?  Is that
16     where you want wrongful?
17              MR. LEVIN:  Yes.
18              THE COURT:  All right.
19              MR. DAVIS:  I think my only addition would be
20     actual or threatened.  Actual or threatened use.
21              MR. LEVIN:  By wrongful use of actual or threatened
22     force?
23              MR. DAVIS:  The wrongful use of actual or
24     threatened force, violence, or fear.  I think that's correct.
25              MR. LEVIN:  Yeah.
```

**J.A. 963**

1          THE COURT:  Okay.  Well, Mr. Davis, so one of the

2   reasons I didn't put that in was because you can commit this

3   crime by using force, but this indictment doesn't charge that

4   Mr. Cantwell ever used force.

5          Am I making too much of that distinction?

6          MR. DAVIS:  No, but arguably he actually used fear.

7   He induced fear and he followed through.  There was an actual

8   use of fear.

9          THE COURT:  Okay.  That's fair.

10          So propose the language you want to use, Mr. Davis,

11   to modify what Mr. Levin suggested.

12          MR. DAVIS:  So on page 14 the first clause as is

13   all the way through with that person's consent as is, and

14   then, but induced by the wrongful use of actual or, and then,

15   threatened force, violence, or fear.  So just insert, the

16   wrongful use of actual or.

17          THE COURT:  Give it to me one more time.

18          MR. DAVIS:  So insert -- where it says, but induce

19   by threatened force now, insert between by and threatened, so

20   it reads, but induced by the wrongful use of actual or.

21          MR. LEVIN:  We agree with that.

22          THE COURT:  All right.  Where there's agreement,

23   I'm inclined to go along.

24          So that it's clear -- I mean, when I tried to

25   square grammatically what you have jointly proposed with the

**J.A. 964**

1  indictment, the one thing that doesn't work perfectly for me

2  is this instruction would allow the jury to convict on a

3  theory of actual use of -- I guess I'm having trouble with the

4  expression actual use of threatened force.  That seems to me

5  to be confusing.

6           MR. LEVIN:  I think it's the wrongful use of actual

7  or threatened, and that modifies force, violence, or fear.  I

8  don't think actual or threatened just modifies force.  That

9  would be the way I would read it.

10          THE COURT:  So this is a -- if I were construing a

11  statute this way, I would be saying this is a rule of the last

12  antecedent problem.

13          The way it's written without actual and the way I

14  understand it is, one way to do it is threatened force, the

15  other way of doing it is threatened violence, and the other

16  way of doing it is fear.

17          So the use of -- so another way to do this is the

18  wrongful use of threatened force, threatened violence, or

19  fear.

20          Do you see what I'm saying?

21          MR. LEVIN:  Yeah.

22          THE COURT:  I'm willing to do it that way, but if

23  you still prefer the way you've jointly proposed, I will defer

24  to the parties' joint view, but don't complain about it on

25  appeal when I've told you there's another way to do it and

**J.A. 965**

```
1    you've told me that's what you want.
2          So the two ways I would think is the way you've
3    suggested, which I'm willing to defer to, or that it would be
4    say:  By the wrongful use of threatened force, threatened
5    violence, or fear.
6          Do you have a position on which of those you
7    jointly prefer?
8          MR. DAVIS:  Either is fine with the government.
9          MR. LEVIN:  I agree, your Honor.  I'm not wedded to
10   it.
11         THE COURT:  All right.  So I'm going to do it my
12   way then:  But induced by the wrongful use of threatened
13   force, threatened violence, or fear.  And that's a play off of
14   the Hobbs Act definition.
15         That's the only place where I need to make that
16   change, right?  Okay.  So I'm going to do it my way but by
17   agreement of the parties that it's an acceptable way.
18         All right.  Anything else anybody has for me?
19         MR. LEVIN:  Just wondering when you would like us
20   to put on the record our objection to the provocation is not a
21   defense instruction.
22         THE COURT:  I advise all defendants to put their
23   objections on after the instruction is given because there's
24   some troubling case law for the defense that can suggest that
25   you might waive an instruction.
```

**J.A. 966**

```
 1              Like in the event that I misread something, that
 2   I've told you I'm going to do X but I actually say something
 3   different to the jury, you really have to -- to make
 4   bulletproof any appeal of the charge, you should wait till
 5   after the instruction.  So once the instruction has been given
 6   I would advise you to -- we'll put the headsets on and you can
 7   say, Judge, I just want to preserve my objection to the use of
 8   the provocation instruction because I don't believe it's
 9   warranted to give a provocation is not a defense under these
10   circumstances, and that would preserve it.  So wait till
11   afterwards just to be sure.
12              MR. LEVIN:  I was hoping I would have an
13   opportunity to do it before because I was hoping I might
14   persuade you not to give the instruction.  Once the
15   instruction is given, it's too late for that.
16              THE COURT:  I mean, I think you already did once
17   last night off the record, but on the record do you have
18   something new to add or something different?
19              MR. LEVIN:  Yes, I would.
20              THE COURT:  Okay.  Well, we'll probably be in
21   charging right after lunch or at least having closings right
22   after lunch.  So at the lunch break we'll stop and you can
23   give me your new argument about provocation, all right?
24              MR. LEVIN:  Okay.  Thank you.
25              THE COURT:  Anything else?
```

**J.A. 967**

```
 1              MR. LEVIN:  No, your Honor.

 2              THE COURT:  Okay.

 3              MR. DAVIS:  Only, Judge, one on page 15.

 4              THE COURT:  Yes.

 5              MR. DAVIS:  The word between should be used to make

 6   that Count 2 description clearer.  It should say between on or

 7   about June 15th.

 8              THE COURT:  Yes, I made that change in the draft,

 9   it didn't get picked up, because that's the actual quote.

10              Isn't it between in or about in your indictment?

11              MR. DAVIS:  It is --

12              THE COURT:  I think you use between in or about.

13              MR. DAVIS:  It says between -- this is Count 2.  So

14   it's between on or about June 15th.

15              THE COURT:  What about Count 3?

16              MS. KRASINSKI:  He's right.  It's in.

17              THE COURT:  I tried to quote.  I quoted Count 3 as

18   between in or about, and you're telling me you did on or

19   about.  What's the superseding say?

20              MR. DAVIS:  So the superseding for present Count 2,

21   which is where I was raising this, is between on or about.

22              THE COURT:  All right.  And then tell me what Count

23   3 says.

24              MR. DAVIS:  Count 3 says between in or about June

25   15th.
```

**J.A. 968**

```
 1              THE COURT:  Okay.  So I've got it right on 3, and I
 2   just should have between on or about on Count 2, okay?
 3              MR. DAVIS:  Correct.
 4              THE COURT:  Okay.  Good.
 5              Yeah, because I caught that on 3, but I didn't go
 6   back and catch it on 2.
 7              Okay.  No other changes.
 8              Let me see.  So I would ask you, one of you, to
 9   take -- there are just two pages here.  Scan those and send
10   them to Lorraine and say those are two more changes that the
11   judge would like and could she send me an amended set.
12              The other thing is, have you folks prepared a
13   composite indictment yet?
14              MR. DAVIS:  Yes, we have.
15              THE COURT:  All right.  Could you scan that and
16   send it to her and ask her if she could draft me a verdict
17   form just setting forth Count 1, the description of the charge
18   the way it's charged in the indictment, Count 2, guilty, not
19   guilty, foreperson.  She knows how to set up a verdict form,
20   and if she could e-mail me a revised version of that.
21              Vinny, you can wait till we bring the jury in.  We
22   can get going and then you can do that at a break or once I
23   get the case started, okay?
24              Are we ready for the jury?  Okay.  Good.  Thanks.
25              (IN COURT - JURY PRESENT)
```

**J.A. 969**

```
 1        (Continued direct examination of Christopher Cantwell
 2   previously prepared under separate cover)
 3             THE COURT:  All right.  Does the government have
 4   any rebuttal case?
 5             MS. KRASINSKI:  No, your Honor.
 6             THE COURT:  All right.
 7             Members of the jury, you've now heard all the
 8   evidence in the case that you're going to hear.  What's left
 9   are closing arguments and jury instructions.
10             We will break until 12:45, you can have some lunch,
11   and I will have the closings, first the government's closing
12   and then the defense closing, and then a brief rebuttal
13   closing by the government.  Then we'll take another break.
14   I'll give you -- I'll read you the jury instructions that I
15   will also give you in paper when you deliberate, and then
16   you'll be free to begin your deliberations.
17             So have a nice lunch break.  We'll see you back
18   here at 12:45.
19             (IN COURT - NO JURY PRESENT)
20             MR. LEVIN:  Your Honor, the defense renews its Rule
21   29 motion on the same grounds as argued previously.
22             THE COURT:  All right.  And understood and
23   preserved, and I deny your motion.
24             Is there anything -- I have a verdict form.  It's
25   very straightforward.  You can just take a look at it.  If you
```

**J.A. 970**

```
 1    have a problem with it, let me know.  The instructions will be
 2    as we agreed.
 3            I'm sorry.  You wanted to present an argument on
 4    the provocation defense instruction.
 5            MR. LEVIN:  Yes, your Honor.  Just briefly.
 6            THE COURT:  Everyone else can be seated.
 7            MR. LEVIN:  We do object to the section of the
 8    draft jury instructions on the bottom of page 20, top of page
 9    21, the title is Provocation Not a Defense.
10            The problem with this instruction from our
11    standpoint is it doesn't define provocation.  It doesn't
12    define defense.  It's confusing.  It's misleading as to the
13    correct standard of the law or at least does not adequately
14    inform the jury on the law.
15            THE COURT:  All right.  At the break -- wait.  I'll
16    let you finish, but at the break I really need your help.  So
17    you need to give me an adequate definition of provocation that
18    you want me to -- that if I'm going to give it, you give me
19    the form that legally is sufficient.  Give it to me after the
20    lunch break so that I can consider it in light of the case
21    law.
22            It's not enough just to tell me you don't define
23    provocation.  You should say, I object to you giving the
24    instruction altogether, but if you are going to give an
25    instruction on provocation, here's what I legally think you
```

```
 1   should give.

 2              MR. LEVIN:  Okay.  I'm prepared to go into that.

 3   That was just the beginning.

 4              We're basing our objection on In Re:  Winship, 397

 5   U.S. 358, a U.S. Supreme Court case which states that the

 6   defendant has a due process right to insist that the

 7   government prove beyond a reasonable doubt each and every

 8   element of the crime with which he's charged.

 9              From our standpoint, anything that lightens that

10   burden potentially violates due process.

11              We're citing also two cases from the Second

12   Circuit, U.S. versus Absolom, A-B-S-O-L-O-M, 305 Federal

13   Appendix 786.  That's a 2009 Second Circuit case.

14              And U.S. versus Abelis, A-B-E-L-I-S.

15              THE COURT:  Let me stop you.  I have a law clerk in

16   the room.

17              Please write down any case citations he gives

18   because I'm going to have to read them over the break.

19              MR. LEVIN:  U.S. versus Abelis, 146 F.3d 73.

20   Abelis is A-B-E-L-I-S.  It's a 1998 Second Circuit opinion.

21              I'm citing these for the proposition that a jury

22   instruction is erroneous if it misleads the jury as to the

23   correct legal standard or does not adequately inform the jury

24   on the law.

25              And the argument we're making is that while
```

J.A. 972

```
 1   provocation is not a complete defense to the charges in the
 2   sense that if the government meets its burden of proving
 3   beyond a reasonable doubt every element of the charges,
 4   evidence of provocation -- I'm sorry.  In the sense that if
 5   the government meets its burden of proving beyond a reasonable
 6   doubt every element of the charges, evidence of provocation
 7   does not negate criminal culpability.  However, it is
 8   certainly part of a defendant's defense, and evidence of
 9   provocation can be relied upon by the jury to determine
10   whether the government has met its burden to prove beyond a
11   reasonable document every element of the charges.
12           The defense has not --
13           THE COURT:  That completely -- I mean, I know
14   you're just reading something, your notes, but that completely
15   confuses me.  I don't understand what you're saying.
16           How does evidence of provocation help you
17   demonstrate to the jury that the government has not proved the
18   elements of its case?
19           I want to be clear.  I want help from the defense.
20   Explain to me the additional language you want.  But just
21   going on like this really isn't helping me at all.  So help me
22   understand.
23           You apparently have a theory that has yet to be
24   articulated, despite my raising it with you over and over and
25   over again during the course of the trial, as to how -- you
```

**J.A. 973**

```
 1   raised in your opening statement, which was obviously a
 2   provocation defense, how that provocation defense undermines
 3   the government's ability to prove its case.  That's what I --
 4   I've been asking for this for days, so please answer it now so
 5   that I can understand your argument.
 6             MR. LEVIN:  Okay.  I will.
 7             Your Honor, this was an antagonistic relationship
 8   between these two men.  This was a relationship based on
 9   insults back and forth.  It ramped up to a particular level.
10             In the jury instructions which the Court has
11   drafted it says:  In determining whether the defendant's
12   communication was sent with the intent to extort, you may
13   consider all circumstances surrounding the making of the
14   communication.  For example, you may consider language,
15   specificity, frequency, context, relationship between the
16   defendant and the threat recipient, the recipient's response,
17   any previous threat made by the defendant.  All these are
18   things in which --
19             THE COURT:  That's why -- as I've made clear to you
20   from days before the start of the trial through every single
21   day of the trial, I have erred on the side of caution in
22   allowing you to put in contextual evidence.
23             I am willing -- if you want to give me some
24   language about provocation evidence can be considered in
25   context in evaluating whether the government has proved the
```

**J.A. 974**

```
 1    elements of its case, I've been willing from the beginning to
 2    do that and I'm just waiting for you to give it to me.
 3              MR. LEVIN:  We're not asking for a provocation
 4    instruction, your Honor, but --
 5              THE COURT:  No, but I'm saying to you -- you know
 6    full well what you are doing.  It is in your opening
 7    statement.  It is not a -- you didn't tie it to context.
 8    You're inviting the jury to find the defendant not guilty
 9    because he was provoked by Mr. Lambert, and that is not a
10    legal basis on which a jury could find the defendant not
11    guilty.
12              I'm very willing to give any reasonable additional
13    language on provocation that you want me to give understanding
14    that you have preserved your objection to the entire concept
15    of provocation.  You say, don't say a darn word about it,
16    Judge, and I've heard you on that.  I understand your
17    objection on that.  Your objection on that is overruled.
18              MR. LEVIN:  Okay.
19              THE COURT:  I am now explaining to you that I am
20    asking for your help to say, all right, Judge -- the judge
21    doesn't agree with me on this, but the judge has asked me over
22    and over and over again to explain how I should instruct on
23    this particular issue.
24              And so I've been asking and asking and asking, and
25    I'm now asking again, will you please give it to me.
```

**J.A. 975**

```
 1              MR. LEVIN:  I have two suggestions, your Honor.

 2              If the Court is going to give the instruction over

 3    the defendant's objection, we would ask that it be amended to

 4    read as follows:  "Evidence of provocation may be relied upon

 5    to determine whether the government has met its burden to

 6    prove beyond a reasonable doubt every element of the charges

 7    in this case.  If you find that the government has met its

 8    burden of proving beyond a reasonable doubt every element of

 9    the charges, however, the evidence of provocation does not

10    negate the defendant's criminal culpability."

11              And then the other thing is --

12              THE COURT:  Wait.  How does that strike you?

13              MR. DAVIS:  Evidence of provocation is not relevant

14    to proof of intent to extort or proof of intent to threat.

15              THE COURT:  No, but see -- you're absolutely right

16    as a matter of law, but here's the challenge.  What I've

17    understood all along -- to the extent I can understand what

18    the defense is, it's a context defense.  There are certain

19    aspects of the charges against the defendant that require the

20    jury to make an assessment of how a reasonable person in the

21    victim's position would receive communications, and I think

22    the defendant's argument, to the extent I can discern one, is

23    there's an argument that these people exist in a subculture

24    that we ordinary people don't understand.  It's a subculture

25    where people say things to each other that ordinary people
```

J.A. 976

1  would find so shocking and reprehensible, and in order to

2  flesh that out and tell the truthful story, the jury needs to

3  hear about Mr. Cantwell's anger.

4          His anger is not a defense.  It doesn't undermine

5  the charge, but the context in which this entire communication

6  occurred, including Mr. Cantwell's anger, should be considered

7  by the jury in determining whether a person in the position of

8  the victim would reasonably understand the communications at

9  issue to be qualifying communications.

10          To the extent I can make any sense of your defense,

11  that's what it is.

12          MR. LEVIN:  That's right, your Honor.  That's

13  exactly right.

14          THE COURT:  Okay.  I wish you could have

15  articulated it for me at some point during my many, many

16  requests to help define it, to do that.  I've been spending

17  days trying to understand what you're doing, and that's how I

18  understand it.  So I've got it right, right?

19          So the language that you're proposing does not

20  strike me as problematic.

21          Do you have a problem with that, Mr. Davis?

22          MR. DAVIS:  Yes, your Honor.

23          THE COURT:  All right.  We need to see it in

24  writing.  Type it up.  Submit it.  I'll look at it after lunch

25  so I and Mr. Davis can evaluate the specific language you're

```
1    proposing.
2              That's what I had hoped we would have gotten into
3    last night when I was here until 7:00, 7:30 trying to address
4    suggestions that you had.
5              We're doing it late in the process, but you type it
6    up.  You submit it.  I'll look at it.  Mr. Davis will look at
7    it.  We'll come back after lunch and I'll evaluate it, but I'm
8    very willing to give additional language.
9              MR. LEVIN:  The other problem with the instruction
10   here is it says:  You may consider this evidence only for the
11   purpose of understanding the context of the relationship
12   between the defendant and victim one.
13             And when you go back to that jury instruction for
14   Count 1, it talks about than just the context.  It talks
15   about --
16             THE COURT:  Well, I narrowed that language at your
17   request from last night, by the way.
18             MR. LEVIN:  Right.
19             THE COURT:  It was broader and you said, could you
20   narrow it, which I did.
21             MR. LEVIN:  Yes, you did.  You narrowed it by
22   taking --
23             THE COURT:  So I granted your request and now
24   you're telling me it's too narrow.
25             MR. LEVIN:  I'm just -- in line with the requests
```

J.A. 978

```
 1   that we made, I'm saying that there are other things in which
 2   its relevant to.
 3            I mean, it's relevant evidence I think, and the
 4   government has argued its relevant and we've argued it's
 5   relevant and --
 6            THE COURT:  It's relevant for motive on the
 7   government's part because his anger and frustration is a
 8   motive for him to commit the crime.  So all of that evidence
 9   of anger and frustration is relevant on motive.
10            So if you're afraid the government is being denied
11   the opportunity to argue it for motive, I'll add they can
12   consider it for motive.
13            What else do you want it to be considered for?
14            MR. LEVIN:  We want it to be considered for all the
15   things that are listed in that jury instruction on page 14 in
16   determining --
17            THE COURT:  I'm happy to incorporate and repeat.
18            To be clear, what you want me to do essentially is
19   read it twice to the jury.  Read it once when I had it in the
20   original charge and read it again with respect to provocation.
21   You propose language to that effect and I'll do it.
22            MR. LEVIN:  Right.  To be clear, we're objecting to
23   the instruction altogether.
24            THE COURT:  You have preserved your argument that
25   there should be no word about provocation in the instructions.
```

**J.A. 979**

1  That objection is overruled.

2          I am now asking for your help in what additional

3  language to add given the fact that you and I disagree about

4  whether the word provocation should be in my instruction.

5          MR. LEVIN:  Yes.

6          THE COURT:  You have a right to try to convince the

7  Court of Appeals that there should never have been any

8  reference to the word provocation.

9          MR. LEVIN:  Thank you.

10         THE COURT:  But I have to make the decision.  I

11 have made it.

12         Now, given that I have made it, I need your help in

13 building back into the instruction I'm going to give

14 everything that you think needs to be in there recognizing

15 your argument that there's just no way to cure the egregious

16 error I have committed, okay?

17         MR. LEVIN:  Thank you.

18         THE COURT:  So you'll present it to me in writing.

19 I'm happy to reread into that instruction the portion of the

20 instruction that I crafted specifically to try to allow the

21 jury to evaluate as best I could understand was your defense,

22 but I'm happy to repeat it again in the provocation and make

23 clear to them that evidence about Mr. Cantwell's anger or the

24 actions that they took as to him is evidence they can consider

25 in context in evaluating whether the government has proved its

**J.A. 980**

```
 1   charges, but provocation is not a defense, okay?
 2            MR. LEVIN:  Thank you.
 3            THE COURT:  There's a way to do this.  I mean, we
 4   have to be careful with the language, and that's why I want
 5   your help.
 6            So bring it back to me and relatively quickly.  I'm
 7   going to go out and grab a sandwich, and then I'll be back
 8   looking for this and trying to edit it up while you guys are
 9   doing your closing arguments.
10            MR. LEVIN:  I'll e-mail it to everyone, including
11   Vinny.  Is that okay?
12            THE COURT:  All right.
13            Anything else you want to say on it?
14            MR. DAVIS:  Your Honor, could we have until
15   1 o'clock in light of the hour just because of lunch and we
16   have to have go back and get our stuff?
17            THE COURT:  Yeah, yeah, yeah.
18            MR. DAVIS:  Thank you.
19            (RECESS)
20
21
22
23
24
25
```

**J.A. 981**

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate transcription of

 6   the within proceedings, to the best of my knowledge, skill,

 7   ability and belief.

 8

 9

10   Submitted: 5-4-21        /s/   Susan M. Bateman _____
                              SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**J.A. 982**

<pre>
 1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
 2

 3    * * * * * * * * * * * * * * * * *
                                      *
 4    UNITED STATES OF AMERICA        *
                                      *
 5                                    *  No. 1:20-cr-00006-PB
                  v.                  *  September 25, 2020
 6                                    *  1:15 p.m.
                                      *
 7    CHRISTOPHER CANTWELL,           *
                                      *
 8                  Defendant.        *

 9    * * * * * * * * * * * * * * * * *

10
         TRANSCRIPT OF DAY FOUR OF JURY TRIAL - AFTERNOON SESSION
11
              BEFORE THE HONORABLE PAUL J. BARBADORO
12


13
      APPEARANCES:
14

15    For the Government:      AUSA John S. Davis
                               AUSA Anna Z. Krasinski, Esq.
16                             U.S. Attorney's Office

17    For the Defendant:       Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
18                             Federal Defender Office

19

20    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
21                             United States District Court
                               55 Pleasant Street
22                             Concord, NH 03301
                               (603) 225-1454
23

24

25
</pre>

2

1                               I  N  D  E  X

2                                                          Page
3       Closing Argument By Ms. Krasinski.........8
        Closing Argument by Mr. Wolpin...........23
4       Rebuttal Closing Argument by Mr. Davis....36
        Jury Charge..............................45
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  All rise for the Honorable Court. |
| 3 | THE COURT:  First, the defendant has a categorical |
| 4 | objection to any instruction on provocation.  I understand that |
| 5 | objection.  Let me briefly explain why I feel compelled to give |
| 6 | an instruction on the concept of provocation. |
| 7 | As I've noted, I've struggled during the course of |
| 8 | pretrial preparation to understand the defendant's defense. |
| 9 | I've repeatedly inquired of defense counsel to ask them to |
| 10 | explain the defense so that I could prepare properly.  I worked |
| 11 | hard to develop a proposed charge that I submitted to the |
| 12 | parties well in advance of the trial.  I made clear to them |
| 13 | when I thought a provocation defense would be needed I believe |
| 14 | on the first day of trial, once I heard their opening |
| 15 | statement.  I submitted a proposed provocation charge which |
| 16 | came from the government because the defendant didn't submit |
| 17 | any alternative charge. |
| 18 | I then met with counsel at about 5:00 last night and |
| 19 | heard proposed changes to the entire charge, including the |
| 20 | provocation charge.  I made certain changes to the provocation |
| 21 | charge at the defendant's request. |
| 22 | I showed up at 8:10 this morning, and I had delivered |
| 23 | the proposed charge to defense counsel as modified at 8:00.  I |
| 24 | came down and talked to the parties about the proposed charge |
| 25 | this morning. |

1        It is, frankly, a little bit frustrating for me to be

2   forced to delay the jury while we continue to evaluate an issue

3   that, frankly, should have been resolved long ago, given the

4   many opportunities I have given counsel to present this issue

5   to me.  But why I needed to do a provocation charge became

6   apparent to me in the opening statement, when the defendant

7   made an opening statement that was obviously crafted as a

8   direct appeal to a non-existent provocation defense, and at

9   that point the jury would have been impossibly confused if I

10  were to instruct without giving any kind of provocation

11  instruction.

12       The need for it became even more apparent when the

13  defendant insisted on the introduction of evidence, over the

14  government's objection, that was minimally relevant for any

15  other purpose than provocation but that directly addressed a

16  potential provocation defense.  I nevertheless erred on the

17  side of caution and admitted that evidence, because I've always

18  been sensitive to the need to allow the defendant a full and

19  fair opportunity to develop context evidence.  But because I

20  did that, and because that evidence that otherwise wouldn't

21  have been admissible but for the defendant's insistence in its

22  minimal relevance for a legitimate purpose, it also carried

23  with it a potential for an improper purpose, and so I have to

24  give this instruction over the defendant's objection.

25       Now, I have tried to craft a modified instruction that

**J.A. 986**

1    very closely tracks the defendant's proposal but is in my own

2    words and tries to address a couple of things.  One, I am

3    sensitive to the need to make sure that there is absolutely no

4    doubt that the burden of proof remains with the government as

5    to each element of the charge at all times, that it never

6    switches to the defendant.  I've tried to build that into the

7    proposed charge in even stronger terms than the defense has

8    proposed.

9         Second, I'm aware of the context defense, and although

10   I gave the context instruction earlier in the case, I'm

11   prepared to repeat it here.

12        So, let me read the proposed instruction, and I,

13   again, remain open to hearing suggestions from the parties as

14   to how to improve it.

15        "You have heard evidence that Victim 1 and others have

16   engaged in behavior that disrupted the defendant's live call-in

17   radio show.  You have also heard evidence that Vic Mackey or

18   others may have engaged in behavior that disrupted the

19   defendant's website.  You may consider such evidence for the

20   purpose of understanding all of the circumstances surrounding

21   the making of the communications at issue in this case,

22   including, for example, the language, specificity and frequency

23   of the communications, the context surrounding the

24   communications, the relationship between the defendant and

25   Victim 1, Victim 1's response, any previous communications

```
1    between the defendant and Victim 1, and whether you believe the
2    person making the communications was serious, as distinguished
3    from mere idle or careless talk, exaggeration or something said
4    in a joking manner.  You may not consider this evidence for any
5    other purpose.  Remember, the defendant cannot be found guilty
6    of any charge unless the government proves every element of the
7    charge beyond a reasonable doubt.  That burden never switches
8    to the defendant.  If, however, the government proves every
9    element of the charge beyond a reasonable doubt, evidence of
10   provocation, justification or self defense does not negate the
11   defendant's criminal culpability with respect to that charge."
12          So, I have taken a little bit of the government's
13   proposed charge, I've taken a large part of the defendant's
14   proposed charge, and I put it into language that I believe
15   accurately describes the burden of proof, how this evidence can
16   be considered and the purpose for which it will not provide a
17   defense if the government proves every element of the charge
18   beyond a reasonable doubt.
19          What does the defendant want to say about how I could
20   improve the charge, understanding your view is I've
21   categorically erred in giving it and it can't be improved, but
22   if I ask you for suggestions, telling you I'm going to do it,
23   what else would you say to me?
24          MR. LEVIN:  We have no other suggestions, your Honor.
25   That's fine.
```

**J.A. 988**

```
 1              THE COURT:  All right.  What does the government want
 2    to say?
 3              MR. DAVIS:  No objection.
 4              THE COURT:  All right.  So, we will incorporate that
 5    into the charge.  I'd ask my law clerk to -- is Lorraine back
 6    from her appointment?
 7              THE CLERK:  She might be.
 8              THE COURT:  I ask you to see if you can contact her
 9    and ask her to substitute this for the provocation and then
10    print up four copies of the jury charge, and if she can't
11    because she's not available, then I'll ask Caroline to do it
12    for me.  Okay?  All right.
13              All right.  Are we ready to bring the jury in?
14              MS. KRASINSKI:  Yes, your Honor.
15              THE COURT:  All right.  Let's bring the jury in.
16              THE CLERK:  Please remain standing for the jury.
17                  (The jury entered the courtroom)
18              THE CLERK:  Please be seated.  This hearing is back in
19    session.
20              THE COURT:  Sorry for the delay.  It's on me again.  I
21    apologize.  I apologize.  We are, though, ready for closing
22    arguments, so we'll hear the government's closing argument.
23              You can proceed when ready.
24              MS. KRASINSKI:  Thank you, your Honor.
25
```

**J.A. 989**

1                       <u>CLOSING ARGUMENT</u>

2    <u>BY MS. KRASINSKI</u>:  Ladies and gentlemen, Christopher Cantwell

3    is guilty of extortion and cyberstalking.  He's guilty because

4    he sent an interstate communication threatening to rape

5    Mrs. Lambert, and he sent that threat with the intent to get

6    something he wanted, Vic Mackey's personal information, his

7    dox.  He's guilty because he threatened to try to get Child

8    Protective Services to destroy Ben Lambert's life by claiming

9    that Ben Lambert uses LSD and by reporting his involvement in a

10   white nationalist group to Child Protective Services and to the

11   FBI.  He's guilty of cyberstalking because he engaged in a

12   campaign intended to harass and intimidate Ben Lambert.  He

13   threatened to dox Ben Lambert, and he did.  He publicized

14   photos of Mrs. Lambert and their three children.  He threatened

15   to call Child Protective Services, and he did.  And during this

16   campaign Chris Cantwell made it clear that he would stop if,

17   and only if, Ben Lambert gave up Vic's information.  Give me

18   Vic.  It's your only out.

19           Chris Cantwell wanted revenge.  He wanted revenge on

20   Vic.  He wanted to eliminate a rival, and this was his path to

21   that information.  Chris Cantwell was willing to say or do

22   anything to get Ben Lambert to give him what he wanted, the

23   information that he needed to do that.

24           Chris Cantwell's words and his actions were

25   purposeful, they were manipulative and designed to get that

**J.A. 990**

1   result.  And what was the purpose, the result that Chris

2   Cantwell was seeking?  You know this now.  Vic Mackey's

3   information.  He wanted to dox Vic Mackey.  He told you he

4   wanted to expose Vic Mackey.  Why?  He told you he was angry.

5   He was really angry.  He was frustrated.  He described to you

6   the prank calls he was getting into his show, people were

7   making memes he didn't like, and he believed Vic Mackey was the

8   ringleader who was organizing this harassment campaign.

9          Both Agent Tongbua testified and Mr. Cantwell

10  testified about this, that he placed the majority of the blame

11  on Vic Mackey.  And you know that Mr. Cantwell blamed Vic

12  Mackey and one other person, a guy who went by the pseudonym

13  Mosin-Nagant, for defacing his website.  Chris Cantwell places

14  the blame for all of that on Vic Mackey.  And Mr. Cantwell made

15  his objective clear.  He brought Vic up during the

16  conversation.

17         And let's have Government's Exhibit 100 up while we

18  talk about this, because the first time he mentions Vic Mackey

19  it's all about getting Vic Mackey's information.  If you want

20  to dox Vic, he's a better target, but if you give me fake info,

21  then your wife is going to have trouble sleeping at night until

22  she leaves you and takes your kids away, and he repeats his

23  demand for Vic's dox over and over again.  He says on Page 3,

24  Give me Vic.  It's your only out.  And then later, on Page 5 of

25  this he repeats it again, Give me Vic.  And close to the end of

**J.A. 991**

1    the conversation, Tell Vic if he gives himself up you can save

2    your family.

3         In opening the defense laid out a theory that all

4    Chris Cantwell meant was, Leave me alone, but I want you to

5    think about that, because to adopt that theory you'd have to

6    ignore this purpose, you would have to ignore the purpose that

7    is littered throughout these communications.  And,

8    conveniently, in their opening statement there was no reference

9    to Vic Mackey at all.  But you've seen the messages, and you

10   know the history.  It's always been about Vic Mackey, even back

11   in March of 2019, months before the exchange that brings us

12   here today, and you see that in Defense Exhibit B-20.  When you

13   get doxed it's all because of Vic.  Remember that.

14        And to adopt the defense theory, you'd also have to

15   ignore all of the evidence that shows what Chris Cantwell

16   really thought about Ben Lambert, that he wasn't after Ben

17   Lambert, but Ben Lambert was the one who could give him what he

18   did want.  He said this during his call to the Missouri Child

19   Abuse and Neglect Hotline.  And let's listen to a small portion

20   of that call.  The call is in evidence as Government's Exhibit

21   103, but let's listen to just a very small portion of that now.

22                  (Audio recording played)

23        MS. KRASINSKI:  I've had problems with these other

24   members of the group.  This isn't about Ben Lambert.  And Mr.

25   Cantwell again explains this in his call with Katelen Fry, his

1    confidante, his friend, and this is the call that he recorded

2    back in December of 2019, back before any charges, back before

3    his arrest, and let's listen to that now.  It's Government's

4    Exhibit 109.

5                        (Audio recording played)

6              MS. KRASINSKI:  Vic Mackey is the hostile actor.  He

7    doesn't know how conscious of it Cheddar was.  He doesn't know

8    how conscious of it Ben Lambert was.  And he explained it in

9    his messages to Ben Lambert back in Government's Exhibit 100,

10    and what he writes is, And I don't care if it's you causing the

11    trouble.  You're the one who's going to suffer, because you're

12    the one who I can get.  And you know that by this point Ben

13    Lambert wasn't causing the trouble.  He sat there, and he

14    admitted to you that he had made prank calls, that he had made

15    memes.  He admitted all of the things that he had done to get a

16    rise out of Mr. Cantwell.  But he also told you in March of

17    2019, after Mr. Cantwell threatened to dox him the first time,

18    that he had left him alone, and the evidence bears that out,

19    and Mr. Cantwell sat there, and he told you today that he had

20    not seen anything associated with Cheddar, with Ben Lambert's

21    pseudonym, for three months before this exchange, and if you

22    look at the phone records, Defense Exhibit I-2-B, and you look

23    at the last page, Mr. Lambert's cell phone didn't call in to

24    Radical Agenda for months before this exchange.

25              Now, let's talk about how serious Mr. Cantwell was,

**J.A. 993**

1    how much he wanted Ben Lambert to believe him.  This was a

2    multi-pronged attack.  Chris Cantwell made a number of threats,

3    a threat to dox, a threat to report to CPS, a threat to report

4    to the FBI, and a threat to rape.  And look at the language he

5    uses, and right now I'm specifically talking about this

6    language directed at Mrs. Lambert.  It's specific.  It is

7    directed at a particular person.  It is coupled with all of the

8    other threats, two of which he followed through on, and this is

9    after Mr. Cantwell sent that message of just his street

10   address.  Mr. Cantwell knows where they live; he could show up

11   any time.  And he follows it with a picture of Mrs. Lambert.

12   He knows who his target is; he knows what she looks like.

13          And Mr. Cantwell testified and he told you he cares

14   about language, and he's precise with his language, and with

15   each of these messages he had time to think, he had time to

16   craft his message, he had time to type it out, he had time to

17   consider whether to send it, and he was careful with his

18   language here.  He told you he wanted to send something that

19   was profoundly unpleasant.

20          Now, he told you that, while he cares about language,

21   he's not always careful with his language, and what happens

22   when you're having a conversation face-to-face with someone?

23   This wasn't a bar fight.  This wasn't two people screaming at

24   each other.  These are written communications.  He had time to

25   deliberate, he had time to come up with exactly what he wanted

1    to say, type it out and send it.

2          Mr. Cantwell wants you to believe that this rape

3    threat was some impassioned response to a threat to his former

4    girlfriend, Katelen Fry, to Peach.  But compare the two

5    statements.  Mr. Lambert wrote, Guess that means you don't care

6    what happens to her either.  There is no specific language in

7    there.  Mr. Lambert doesn't say he is going to do anything to

8    her.  He doesn't say he's going to send anyone else to do

9    anything to her.  He certainly doesn't use the type of

10   language, the type of sexual violence and sexual imagery in Mr.

11   Cantwell's response.  Mr. Cantwell's response is the opposite.

12   It's active, it involves Chris Cantwell, it involves a specific

13   person, Mrs. Lambert, and it involves their young children:  If

14   you don't want me to come and fuck your wife in front of your

15   kids...  It is specific and it is direct.

16         Now, he wants you to think that there is a reference

17   to cucking, somehow that he would be more satisfying to her,

18   that doing this in front of her children would somehow satisfy

19   her in a way that Mr. Lambert couldn't.  But use your common

20   sense and look at this language.  This isn't talking about some

21   satisfying sexual encounter.  This is rape, and it's talking

22   about sexual violence against a woman in a way that would also

23   traumatize her children.

24         He also talked about fantasy violence, but there's

25   nothing fanciful about this.  Fanciful is the refuge of the

1    defendant who's now been charged with a threat.  He has nowhere

2    else to go but to try to dismiss this as fanciful.  But here's

3    where it's not.  It's focused on a specific individual, it's

4    coupled with threats that Mr. Cantwell actually carried out,

5    and it's coupled with a demand for something:  Give me Vic,

6    it's your only out.

7            And as you're thinking about whether or not he

8    intended this statement to reflect violence, think about his

9    previous statements on doxing, that it's helpful to think of

10   doxing as a form of violence.  Do you really think that he

11   intended his threat to dox, to convey some sort of form of

12   violence, but he didn't intend for this statement to convey a

13   form of violence?  No.  That's not plausible.  He testified

14   that he has two incel listeners, and he testified that they're

15   pathetic.  He's trying to make his later statements, that, One

16   of my incel listeners would love to give her a baby, somehow is

17   less ominous than it really was.  And then he told you, Well, I

18   only thought incel listeners were dangerous sometime after I

19   sent this exchange.  But then you heard that well before this

20   exchange he had written an article about a number of people

21   that were identified as mass murderers and were incels.

22           The statements weren't a joke.  There's zero

23   entertainment value.  There's no audience.  It's not idle talk.

24   He carried out some of his threats.  It's not a political

25   statement, it's not exaggeration.  It was designed and planned

1    to get something, to get Vic's information.

2         And think back to Mr. Cantwell's testimony.  Think

3    back to what he said about Katelen Fry.  This is someone he

4    trusts, someone he asks to marry him, someone he confides in,

5    and he tells her about what he meant, and we're going to play a

6    portion of Government's 105.

7                   (Audio recording played)

8         MS. KRASINSKI:  I left that out there.  I didn't say

9    it; I implied it.  Mr. Cantwell also wants you to believe that

10   this is just the way these two talk to each other, this is

11   normal within their community.  But you've heard from people

12   within that community.  Both Ben Lambert and Paul Nehlen

13   testified about this.  They talk about violence generally,

14   there's no denying that, but going after someone's spouse

15   crosses a line, and you know, based on Mr. Cantwell's reaction

16   after making these statements, that this crossed a line even in

17   their community.  He told you he became worried after his tech,

18   Ryan, told him not to blackmail people.  And then you've heard

19   Ms. Fry's reaction to it.  People within his own community

20   thought that this crossed the line.

21        And you know that trash talk is normal in certain

22   contexts.  For example, trash talk is normal in sports, right?

23   Michael Jordan trash-talked Patrick Ewing in the Nicks, but he

24   didn't say, Throw the next game or I'll fuck your wife.

25   There's a difference.  And you have all of the communications.

1    You can see the foul words that they sling back and forth at

2    each other, but there is nothing between these two people when

3    they're talking that comes close to this threat of sexual

4    violence.

5           Now, I want to be clear, in America everybody has the

6    right to their beliefs, even despicable beliefs.  We have a

7    First Amendment, and for better or worse people have the right

8    to express reprehensible beliefs.  There's a difference to

9    making appalling, racist statements on a podcast no matter how

10   offensive and private threats issued with the purpose of

11   getting something.

12          Now, I'm not here to condone Ben Lambert's involvement

13   in the Bowl Patrol, I'm not here to condone his personal

14   beliefs, but even people who believe or say appalling things

15   can be victims of crime, and the fact that Ben Lambert

16   expressed these beliefs under a pseudonym is what made him the

17   target.  It's precisely why Mr. Cantwell chose him as a victim.

18   It's why Mr. Cantwell believed Ben Lambert could give him what

19   he wanted.  Mr. Cantwell wasn't going to be able to get Vic

20   Mackey's identity from a Boy Scout; he could only get Vic

21   Mackey's identity from someone else within the Bowl Patrol.

22   And the fact that Ben Lambert used a pseudonym, that's what

23   gave Mr. Cantwell leverage, especially because Chris Cantwell

24   knew that Ben Lambert had a family, had kids and had something

25   to lose.

**J.A. 998**

1          Now, we've also seen that Mr. Cantwell uses racial or

2     anti-Semitic slurs, but, again, I want to be very clear, this

3     is not a prosecution about racial or anti-Semitic beliefs.

4     It's not a referendum on whether or not it's good or bad to

5     expose the identity of someone who holds these beliefs.  This

6     is a prosecution of Christopher Cantwell because he tried to

7     use Ben Lambert's racial and anti-Semitic beliefs as a weapon

8     to get something he wanted, because he threatened to fuck Pam

9     Lambert in front of her children unless Ben Lambert gave Chris

10    Vic Mackey's identification, because Chris Cantwell began to

11    carry out some of his threats when Mr. Lambert didn't give in.

12    He did publicly post the Lamberts' identifying information,

13    their address, their photographs, their minor children's

14    photographs without their consent, without their permission,

15    all because Mr. Cantwell knew it could result in terrible

16    consequences for them.  And he knows this.  Mr. Cantwell

17    understands this.  He's candid about it when he talks to his

18    friends and his confidantes.  He explained it to Ms. Fry again

19    back in December of 2019, and we're going to play a very small

20    portion of Government's Exhibit 106.

21                    (Audio recording played)

22          MS. KRASINSKI:  And we won't play the jail calls now,

23    but you have both of them, Government's Exhibit 111 and 110.

24    He explained it to his on-and-off-again girlfriend, Ingrid Dean

25    that he's essentially guilty of Count Two, of sending an

**J.A. 999**

1    interstate threat to injure reputation, and he explained that

2    it's not legal to do what he did to his friend, Hannah

3    Pleasant.

4         And you can think about everything he saved on his

5    devices.  That's consciousness of guilt.  Immediately after

6    their conversation ended he took screenshots of it.  He wanted

7    to keep a record of the conversation.  And yet, despite this,

8    when Special Agent Tongbua met with Mr. Cantwell, Mr. Cantwell

9    said he didn't keep any record of these communications.  He was

10   open and transparent about so many things.  Why not just say,

11   Yes, I still have records of these communications?  Why lie?

12   He took the screenshots, but that's not what he told the FBI.

13        Now, I want to take a few minutes to outline the

14   criminal charges.  You'll hear the judge instruct you about the

15   essential elements of the crime charged here, and the essential

16   elements basically become your checklist as you're

17   deliberating.  They're questions of fact that each of you and

18   collectively you all have to decide that the government has

19   proved beyond a reasonable doubt.  So, I just want to go

20   through your checklist for you.

21        Count One charges that Christopher Cantwell sent

22   extortionate interstate communication, and there are three

23   essential elements to that:  that he knowingly transmitted a

24   communication in interstate commerce; that the communication

25   contained a threat to injure the person of another; and that

1    the defendant transmitted the communication with the intent to

2    extort something of value from any person.

3    Count Two charges that the defendant, Christopher

4    Cantwell, sent a threat to injure the property or reputation of

5    another, and there are three essential elements to that count

6    as well:  first, that he knowingly transmitted a communication

7    in interstate commerce; second, that the communication

8    contained a threat to accuse another person of a crime or to

9    injure the reputation of another person; and, third, that the

10    defendant transmitted the communication with the intent to

11    extort something of value from another person.

12    And, finally, Count Three charges that Mr. Cantwell

13    engaged in cyberstalking, and there are four essential elements

14    of that:  first, that Mr. Cantwell used the facilities of

15    interstate commerce, including an electronic communication

16    service or system; second, that he used that electronic

17    communication service or facility in interstate commerce to

18    engage in a course of conduct; and, third, that while engaging

19    in that course of conduct Mr. Cantwell acted with the intent to

20    injure, harass or intimidate the victim; and, fourth, that

21    Mr. Cantwell's course of conduct placed the victim in

22    reasonable fear of serious bodily injury to his wife, caused

23    substantial emotional distress to him, or would reasonably be

24    expected to cause substantial emotional distress either to him

25    or his wife.

**J.A. 1001**

```
 1              Now, you know that the messages were sent from
 2    Mr. Cantwell here in New Hampshire to Mr. Lambert in Missouri.
 3    You know that many of them were sent using the Telegram
 4    messenger app, and you also know that when Mr. Cantwell
 5    followed through on his threat to call Child Protective
 6    Services he picked up the phone from here in New Hampshire and
 7    he called Missouri.  So, we know that he transmitted these
 8    communications in interstate commerce and that he used an
 9    electronic communication service or other facility of
10    interstate commerce.
11              Now, both Counts One and Two require that Mr. Cantwell
12    had transmitted the communications with the intent to extort.
13    He wanted something.  You know he wanted something.  You know
14    he wanted it badly.  Vic Mackey's information was worth
15    something to him, it was valuable to him, and you'll hear the
16    defendant instruct you on what a thing of value is, that it
17    doesn't need to be a tangible thing.  The thing of value as
18    you're evaluating whether or not Mr. Cantwell had the intent to
19    extort something of value was information -- knowledge is
20    power -- Vic Mackey's information.
21              Now, as it relates to Count Two, that the
22    communication contained a threat to accuse another person of a
23    crime or to injure the reputation of another person,
24    Mr. Cantwell has admitted that to you.  He told you that when
25    he said he was going to dox Mr. Lambert, he told you that was a
```

1    threat.  He told you that he is careful what he describes as a

2    threat, and he called that a threat, and he told you when he

3    was talking about calling Child Protective Services that that

4    was a threat.  He's told you that he threatened to injure

5    Mr. Lambert's reputation, and he told you that he threatened to

6    accuse Mr. Lambert of a crime.

7         And his statement about Mrs. Lambert we've talked

8    about.  It was also a threat, and the important thing here is

9    that Mr. Cantwell intended it to be perceived as a threat.  It

10   doesn't matter whether or not Mr. Cantwell ever actually

11   intended to travel to Missouri to carry it out.  And you'll

12   hear His Honor instruct you that, while the government has to

13   prove that Mr. Cantwell intended to issue a threat, a serious

14   statement expressing an intent to injure, a statement that

15   under the circumstances would cause apprehension in a

16   reasonable person, His Honor will instruct you that it is not

17   necessary to prove that he actually intended to carry it out.

18         Apprehension in a reasonable person in Mr. Lambert's

19   position, when you're looking at that, I ask you to use your

20   common sense.  Would a reasonable person in his position

21   receiving these messages along with his address, along with

22   photos of his family, along with the other threats that

23   Mr. Cantwell ultimately did follow through on, perceive it as a

24   threat?  Yes, especially because Mr. Cantwell followed it up

25   with an ultimatum:  Give me Vic, it's your only out, and then

1   he looped back to this theme again later.  He wanted to think,

2   Well, it might not be me, maybe one of my incel listeners would

3   come and give her another baby, one of my incel listeners would

4   like to do it.

5          And you know that Mr. Lambert perceived it that way.

6   He told you that he started driving his wife to work for a bit

7   after this.  He told you he contacted his attorney to talk

8   about what to do.  He told you that he called Paul Nehlen.

9   Paul Nehlen told you that Mr. Lambert considers him a fatherly

10  figure.  And Mr. Lambert told you that, look, he thought the

11  chances were low that Mr. Cantwell would actually come out and

12  do it, but he didn't know for sure, because, as Paul Nehlen

13  told you, when Ben Lambert received all of these messages his

14  reaction was, Chris Cantwell's insane.  He might not do this,

15  but I don't know what he's going to do.

16         And Mr. Cantwell engaged in, in relation to the

17  cyberstalking count, a course of conduct, two or more acts.

18  Again, he threatened to dox.  He did dox.  He threatened to

19  call Child Protective Services.  He did that.  He made

20  Mr. Lambert fearful for his safety, for his wife's safety, for

21  his children's safety by his messages and his actions.

22         And Mr. Lambert suffered substantial emotional

23  distress.  You saw how this is impacting his life.  Now, again,

24  and I want to be candid, you might not feel sorry for him.  You

25  might think it's not a bad thing for his attitudes to be

1    exposed, but that's not the question.  The question is whether

2    or not the government has proved beyond a reasonable doubt that

3    he suffered substantial emotional distress, and after seeing

4    him testify and break down when he was talking to you about how

5    he cannot be a hockey dad, the hockey dad that he wanted to be,

6    you know he has.  You can think about how Mrs. Lambert would

7    have reacted to this, whether or not Mr. Cantwell's conduct

8    would reasonably be expected to cause substantial emotional

9    distress to her.  How would she have reacted to seeing those

10   messages?

11        Ladies and gentlemen, you have seen all of the

12   evidence, the defendant has had a fair trial, and the evidence

13   shows that the defendant is guilty beyond any reasonable doubt.

14   I ask that after you go into the jury room, have a chance to

15   review all of the evidence, that you find Mr. Cantwell guilty

16   on all counts.

17        THE COURT:  Thank you, Counsel.  We'll take just a

18   moment to disinfect, and then we'll hear the defense's closing.

19                    (Pause)

20        THE COURT:  Thank you.  Mr. Wolpin, you can proceed.

21        MR. WOLPIN:  May I take a moment, please?

22        THE COURT:  Yes.

23                    CLOSING ARGUMENT

24   BY MR. WOLPIN:  Chris responded angrily to someone he knew took

25   a lot to shock.  It was over the top, it was obscene, but Chris

**J.A. 1005**

1    did not make a serious statement expressing an intent to

2    injure, and it was not tied to a thing of value.  He is not

3    guilty of making an extortionate threat.  He did not attempt to

4    cause to this particular person under these particular

5    circumstances, which are unique, and we will discuss that more,

6    substantial emotional distress.  Chris Cantwell is not guilty

7    of cyberstalking, and he is not guilty of reputational

8    extortion.

9          The Bowl Patrol was an anonymous, nebulous group.  It

10   reveled in mocking Chris, interrupting him, posting pornography

11   on his website, calling him a snitch and posting his address

12   online.  Ben Lambert was a troll, self-acknowledged troll, a

13   troll who acts with the intent of causing emotional distress

14   and then repeats it over and over again to cause that distress

15   to compound.  The number one rule of trolling is don't feed the

16   trolls.

17         And what is obvious to see about Chris is it's easy to

18   get a reaction out of him.  Why is he the target?  Because when

19   they go after him he goes over the top.  That's fun to see.

20   That's the joy of trolling.  That's why you troll, is to get

21   the reaction.  They know how Chris reacts.  They know that when

22   he reacts he says things that are outrageous but not

23   necessarily dangerous, and Chris had just enough notoriety that

24   taking him down had a little bit of extra pleasure.

25         They felt safe doing this to Chris because they knew

1    who he was.  When you choose to bully someone, you don't choose

2    to bully the person who can hurt you back.  You choose to bully

3    the person who you believe is weak, who you believe is just

4    bluster.  That's the target of bullying.  That's why they go

5    after Chris.

6          Now, Ben Lambert may be a really wonderful person in

7    his family life, in his community, at home.  If the internet

8    had never been invented he might have lived a pretty normal,

9    wonderful life.  But for some people the internet is a drug, is

10   an addiction.  It takes you to dark places and emboldens you to

11   say things you would never say in person.  It allows you to

12   worship mass murderers and egg them on, because it's online.

13   It emboldens people to say things that are extreme and over the

14   top, using language they wouldn't use in their normal life.

15   You need to think about the words in this case in that context,

16   that understanding that these two men live much of their lives

17   online in a rather unhealthy and abnormal space.

18         Now, it's come up a number of times that the

19   interaction in this case happened in a private sphere rather

20   than in this public performance element, for example, their

21   podcasts.  However, it was telling then when Mr. Lambert was on

22   the stand and he was asked about a conversation he had with a

23   friend of his in Florida on a jail call that was private, that

24   wasn't to be publicly distributed, it was a phone call between

25   friends.  And we talked about why he was laughing about mass

1    murder with that person, if it wasn't a public performance, if

2    it wasn't a joke.  And his answer was, The lines get blurred.

3    I'm not even sure who I am when I'm in that call.  Am I Cheddar

4    Mane, Mr. Machine Gun, or am I Ben Lambert, the father?  The

5    lines among these people are blurred as to who they are, when

6    they can say what they say, and what that means.  That is not

7    normal.  That is not the culture most of us live in on a daily

8    basis, but when the judge instructs you on the law, you will be

9    told you can consider these surrounding circumstances when you

10   evaluate the words that were said in this case, and, in doing

11   so, you must consider this context.

12            Now, to start with the first count, the first count of

13   extortionate interstate communications, it requires that the

14   communication contain a threat to injure the person of another.

15   A threat is a serious (indicating) statement expressing an

16   intent to injure another person.  It also requires that that

17   threat, if you were to find that was a statement that's of

18   serious purpose, that that be tied to extort this thing of

19   value.  The government has not met its burden as to this charge

20   on either of those two elements.

21            As to that first question, was this a serious

22   statement of an intent to injure, you've heard from a number of

23   people.  You've heard from Chris, himself, over and over again.

24   As you've seen, Chris likes to talk about things.  He likes to

25   record himself talking about things.  He's talking about things

1    from the jail.  He's talking about things with Katelen Fry.

2    He's talking about things with the police.  In each instance he

3    understands that the CPS thing may be a problem, that he did

4    not see this as a serious statement.  And the statement that is

5    in the actual charge is, So, if you don't want me to come and

6    fuck your wife in front of your kids, then you should make

7    yourself scarce.  Give me Vic, it's your only out.  That is the

8    statement in this charge, not the incel listeners.  That's not

9    the statement he's charged with, and yet you saw, when Katelen

10   Fry addressed with him, What's going on, that's what he thinks

11   in his head might be the thing that's the problem, not the

12   thing that he's actually charged with.

13         When you consider whether this was serious, you can

14   consider the time it took for him to come to the decision to

15   make the statement.  The government made a point of pointing

16   out that the first two contacts of Chris were a full half an

17   hour apart, and he had all kinds of time to think about it.

18   The statement about the wife comes within two minutes of

19   Mr. Lambert's statement about Peach.  Now, it's probably

20   evident from Chris's testimony that that is someone he cared

21   about, that is someone he asked to marry him, that is someone

22   that the mere mention of her name brings tears.  The government

23   can play that statement down of Mr. Lambert and say it wasn't

24   specific or clear, but when you talk about something happening

25   to somebody, the ambiguity is what makes it scary, because you

1   don't know what that means; you don't know what that will

2   result in.  And so, Chris comes back and returns within two

3   minutes with the meanest thing he can think to say, which is

4   outrageous, that's, In front of your children.  It's over the

5   top.  It's exactly the kind of reaction that Cheddar Mane has

6   watched Chris give to their prank calls for months.  It was not

7   a serious statement.

8          You can look to Ben Lambert's response.  He doesn't

9   instantly respond to that with something about the threat.

10  He's back onto something else and then goes on to other things.

11  You can consider what he does over the next number of hours and

12  days.  Now, whether it's Eastern Standard Time, Central

13  Standard Time, 9:42, 8:42, that's not what matters.  What

14  matters is within that evening it's posted online for the world

15  to see, this thing that is supposedly making him afraid.  It's

16  posted with a naked picture of Chris on top, and it's available

17  for all the world to see, because when you're a troll the

18  purpose of getting the reaction is so you can show others what

19  you've done.  That's the badge, that's the honor.  That goes

20  up, and Chris starts getting in his harassment.  Cheddar Mane

21  knew that was going to happen.  The second that goes online the

22  rest of the world's going to be flooding Chris with this, that,

23  boof meth, or whatever.  Only then does Chris post the picture;

24  only after that does he call CPS.  You can go back and see that

25  after this Mr. Lambert had his own post online calling Chris a

1    fed, snitch, nigger, kike.  Why that language?  Because that's

2    just the standard language, because that is the universe these

3    two men live in.  What does he do?  He calls in the show.  Why

4    does he call Chris's show?  It's not going to make his life

5    better.  He calls Chris's show because that's the troll, that's

6    the entertainment, that's the process, because it was not a

7    serious statement.

8         We have or had Paul Nehlen here to testify briefly

9    about this.  He told the FBI three weeks ago he couldn't even

10   say whether he had a phone call with Ben Lambert, and then he

11   got up on the stand and told you all the details of the call.

12   He was visited by or spoke with the FBI in preparation several

13   weeks ago, and what's the reaction?  Take down everything on

14   his website.  Why?  Because what is his website full of?  The

15   same stuff against Chris Cantwell.  Who is his friend?  Ben

16   Lambert.  What is his response?  Bully back, because that's how

17   this works, not go to the police, not take this as a serious

18   statement.

19        We have a screenshot that Ben Lambert recently

20   produced of an inexplicable text message.  In that message he's

21   typing stuff in response to texts that haven't happened yet.

22   That's in reference -- You referenced my kids.  Chris hadn't

23   referenced his kids.  He can't explain what that means, why

24   that happened, but he felt a need to give something more to

25   show that this was serious.

1          You've seen the fancy technology the FBI has.  They

2     can take a phone, they can figure out the date it was created,

3     the date it was modified.  They did all of that to Chris's

4     stuff.  They don't do that to Cheddar Mane when he gives them

5     this message that makes no sense.  Who did he send it to?  Why

6     is that person not here explaining that they actually received

7     that?  Why is he taking a screenshot -- not a screenshot, which

8     he clearly knows how to do, but he's taking another camera to

9     take a picture of it rather than a screenshot, because before

10    he comes he recognizes that it wasn't a serious statement.

11         We have a screenshot of a text to his lawyer

12    (indicating).  You can take a look at that.  That's Steve

13    (indicating).  How do we know it's Steve?  Because the text

14    says Steve.  Who is Steve?  No idea.  Is there a lawyer named

15    Steve in Missouri?  Possibly.  Did he speak with a lawyer?  Who

16    knows?  Where is the lawyer who got the text?  What's his name?

17    Why isn't that image looked at by the FBI?  They just took it

18    and gave it to you.  That's not what they did with all of

19    Chris's stuff.

20         And Lambert's statements that he took this all

21    seriously are simply not credible.  He says he was fearful and

22    he got a game camera to put outside his house.  The FBI shows

23    up in October, four months later, and no SD card.  Did he even

24    put a game camera up at his house?  The FBI is at his house.

25    Do they check to see if that's true?  No.  Who needs to?  He

1    says he started driving his wife to work some.  Is that true?

2    We have no idea.  What did he tell her?  He said, I didn't tell

3    her there was any threat against her, so suddenly he's taking

4    her to work all the time?  What's the explanation?  Did that

5    happen?  We don't know.  What Ben Lambert said he did is simply

6    not credible.

7         Now, let's take a little step back and ask the

8    question how we even got here in court today.  These guys have

9    this thing over the internet.  It ended.  No one called the

10   police.  So, why are we here?  How did we get here?  We got

11   here because Ben Lambert posted it online, which I guess is his

12   right to do so, not a problem.  We get here because the FBI,

13   someone is monitoring the BowlCast website on Telegram.  Why

14   are they doing that?  Because they're terrorists.  So, they see

15   it.  No one's reported a crime to them.  And they make a

16   decision that, This is what we're going to pursue, that we take

17   this seriously, that this is a serious threat in our opinion.

18   And so, they go to Missouri.  They meet with Chris first,

19   because, as you've heard, Chris will meet with the law

20   enforcement at the drop of a hat.  But then they go to

21   Missouri, and what has Mr. Lambert said about that experience?

22   The start of the interview is, We take this threat seriously.

23   Your family is in danger.  We are, quote, not letting it go.

24   Does that tell you what you're supposed to say?  I took it

25   seriously.  He knows what they want to hear, because they've

1   told him what they want to hear.  You'd ask, well, why did he

2   give it to them, then?  What did he tell his friend?  They were

3   holding Bowl Patrol over my head to get my cooperation.  In the

4   same way that some have the power to reveal the identity of a

5   person, so does law enforcement have the power to reveal the

6   identity of a person.  And so, he said it was serious.  He knew

7   what they wanted to hear.  He knew they were holding Bowl

8   Patrol over his head.  This was not a quest to find out what he

9   actually believed.  This was an effort to prosecute Chris

10  Cantwell.

11        And we understand why the FBI might be monitoring

12  Chris Cantwell.  It's the same reason they're monitoring the

13  BowlCast.  That should be their job, but this isn't something

14  where they put up pole cameras outside his house and caught him

15  doing a crime.  This is something they found on the internet

16  and went to this guy and told him what they wanted to hear.  He

17  told his friend that, and agreed he told his friend, that they

18  basically said that, I was going to have CNN on my doorstep if

19  I didn't help them.  He'd be doxed.  So, he helps them, and he

20  says it's serious, and he takes them up on that offer.

21        Now, what's interesting about that is he has a

22  conversation with his friend in Florida after that about

23  doxing, and he says to his friend, Really, it's not all that

24  serious.  Because what did Chris do?  Chris posted a picture of

25  his wife on a tiny, fractional corner of the internet that

1   normal people are never going to go to, not even the name, and

2   the government asked him and he responded in tears as to what

3   happened, but the government didn't ask him when.  When could

4   you not coach your hockey team?  Is it because of Chris's post

5   on the internet, or is it because of the decision to bring this

6   charge?  And so, if Cheddar Mane didn't take it seriously --

7   excuse me -- if Ben Lambert didn't take it seriously before, he

8   does now.

9          Now, the second part of that extortionate threat is it

10  requires that there be an intent to extort something of value

11  from a person that is tied to the communication.  You will see

12  and have seen, more times than maybe you want to, the

13  communication between these two men.  In that communication he

14  says not, Give me Vic.  He says, Make yourself scarce.  That is

15  the, Leave me alone.  It's not for another half an hour, when

16  he's off doing other things, and he comes back to his thought

17  that you get, You give me Vic.  You need to consider that time

18  difference.  The statement about the wife is simply not tied to

19  an intent to extort, and if that is the case, then he is not

20  guilty.

21         We're going to talk next about the cyberstalking

22  charge.  The cyberstalking charge requires conduct that would

23  be reasonably expected to cause substantial emotional distress

24  to a person.  You must consider whether in light of the

25  evidence presented in this case a reasonable person in the same

**J.A. 1015**

1    or similar circumstances... So, again, what are you being told

2    by that? This is not abstract people. This is not a question

3    of whether a doctor or a judge or a construction worker or

4    someone who's outside of this community would feel that

5    distressed. The question is specific to this person in this

6    circumstance.

7            This was someone who spent their life obsessing about,

8    joking about mass murder, who knew the risk that he would be

9    doxed, because they essentially all get doxed. You've heard

10   all their names in here. It's almost inevitable.

11           Now, Chris certainly testified that he intended to

12   cause discomfort, but in these particular circumstances, with

13   this particular individual, his intent was not substantial

14   emotional distress. Consider what you have learned about the

15   culture of doxing in this case. You saw the FBI meme of Chris.

16   You saw that Chris's address was posted above. That is sort of

17   a double whammy. So, here in the world is where this guy

18   lives, and, B, he's a fed, snitch, rat, which, as you know, is

19   not something that is a favorably looked upon characteristic.

20   You know that the person that Mr. Lambert chose to go to to

21   talk about his issue with doxing was someone who doxed

22   somebody. You're going to read Chris's article that they have

23   cited for you. The article they cited for you is about Paul

24   Nehlen choosing to dox another person in the movement. That's

25   his father figure. That's his confidante for this. This is a

```
1   universe and a world that they were a part of.  Remember he

2   told his friend, Doxing was really no big deal.  In this

3   circumstance, in this case, there was not substantial emotional

4   distress.

5        Now, you've heard from Chris Cantwell.  You've seen in

6   a courtroom he struggles not to use a swear word.  They knew

7   this guy.  They knew how he spoke.  They knew they riled him

8   up.  They did it because they could.  They knew when he said

9   something as outrageous as, Sex with your wife in front of your

10  children, that it was not serious.  They knew it.  Chris knew

11  it.  It is the government's burden to prove to you Mr. Cantwell

12  is guilty beyond a reasonable doubt.  It is a heavy burden,

13  heavy burden on purpose, because this is criminal law.

14       And so, when you consider all of this evidence, it's

15  not a question of possibly or maybe; you need to be convinced

16  of each of the elements beyond a reasonable doubt.  When you

17  review that evidence, when you consider whether this was a

18  serious threat in this context, when you consider whether this

19  was extreme emotional distress in -- excuse me -- substantial

20  emotional distress in this context, Chris Cantwell is not

21  guilty.  Thank you.

22       THE COURT:  Thank you, Counsel.

23       Again, we need to disinfect and brief rebuttal from

24  the government.

25                    (Pause)
```

J.A. 1017

1          THE COURT:  Okay.  Mr. Davis.

2                    REBUTTAL CLOSING ARGUMENT

3   BY MR. DAVIS:  The defendant says that giving me Vic was an

4   afterthought from the threat to rape Mrs. Lambert.  Let's look

5   at Exhibit 100 maybe one more time.  What happened at the

6   beginning of all this?  What do we know now?  Well, we know we

7   got the initial salvo at 9:00 on this one, 9:00 Eastern, and

8   then the road is, the street address is left there, and Ben

9   Lambert is definitely upset now, and he's worried, and he's

10  wondering what to do, and so for the next four and a half hours

11  we see his responses.

12          But what's going on right there?  Well, we know now

13  from Mr. Cantwell's testimony what was going on.  What's going

14  on is that Mr. Cantwell has got photographs of the family, and

15  he's industriously taking time to blur out the faces of

16  Mr. Lambert's family in Missouri and then to post those

17  blurred-face photographs in the proud white folk channel, and

18  assuming that Mr. Lambert is going to find out about that or

19  see that, and he's setting all of that up, and that takes some

20  effort, and it takes some time, and it takes some patience, but

21  he's got all of that, and that's what he does.  That's what's

22  happening right then.

23          And so, the hours go by, and it's almost 4:00 in the

24  morning Mr. Cantwell's time, and he still hasn't heard

25  anything, and then he talks about getting a fucking life.

1 | Maybe he goes to bed then.  And at 2:13 p.m. the next afternoon
2 | Mr. Cheddy Blac says, I haven't given it any thought, and it
3 | was an honest mistake.  Seriously, man, I couldn't care less
4 | about what you're trying to do these days.  That's what he
5 | says.
6 |         Now, think about that.  What's happened now, he's
7 | posted some blurred photos, he's maybe had a night's sleep, and
8 | Mr. Ben Lambert is trying not to engage, trying to de-escalate,
9 | trying to be reasonable.  Maybe for once in the miserable life
10 | of this subculture he's actually being reasonable and
11 | restrained.  And so, a couple of hours go by that Sunday,
12 | Father's Day afternoon, and then the real crime begins, because
13 | Mr. Cantwell has made a very deliberate, very unprovoked, very
14 | certain decision about a plan that he is going to execute, and
15 | he's posted these blurred photos, and that hasn't gotten too
16 | far, and so now it's time to push "Send" and execute.  So, at
17 | 4:15 p.m. in rapid succession we get this.  We get the insults,
18 | the prediction that, You are going to lose everything you have,
19 | the fact that, The next time I post that photo, again, the
20 | photo he's already put up somewhere else trying to stir Mr.
21 | Lambert into coming to the table, he says, The faces won't be
22 | blurred, and then you're going to start getting unexpected
23 | visitors, another theme of this crime.  And he gives him in,
24 | again, rapid succession, 4:45 p.m., 4:45 p.m., 4:47 p.m., maybe
25 | there's a little bit of a candid apology, as only Mr. Cantwell

1   can do, he says, You know, I really know it's not you causing

2   the trouble, but you're the one who is going to suffer, because

3   you're the one I can get, a little bit of candor from Mr.

4   Cantwell.

5        And then two minutes after that what's going on here?

6   What's actually happening here, If you want to dox Vic, he's a

7   better target.  He sure is.  But if you give me fake info, then

8   he's talking about his wife, Your wife is going to have trouble

9   sleeping at night until she leaves you and takes your kids away

10  and we start thinking about a family broken up.  That was the

11  big salvo.  That was all the guns firing, and Mr. Cantwell must

12  have been pretty confident that results would come through, but

13  actually maybe Mr. Lambert had the children to feed or

14  something, and all he can say is, What picture are you even

15  talking about?  Because he doesn't even know then.  He doesn't

16  know many hours after this whole thing is started that Mr.

17  Cantwell's already taken him out with blurred photos on a chat

18  group with his friends.

19       And so, it takes two hours for Mr. Lambert to come

20  back, and he's still befuddled and asking questions, and then

21  he says, What picture are you even talking about?  He doesn't

22  know.  And that's 6:37 p.m., and guess who's been waiting,

23  waiting for two hours almost to fire back?  Mr. Lambert is, at

24  6:37 p.m., and at that very same minute, without a delay,

25  Mr. Cantwell says, Fuck around, and I'll remind you the hard

1    way.  And so, Mr. Lambert may be figuring out Peach took a

2    picture that you posted, and he responds 6:39, two minutes

3    later, As a matter of fact, I don't, and the threat and then

4    more silence, and then he says, Give me Vic, it's your only

5    out.  I'm going to have to prove my seriousness.

6         Mr. Cantwell at 6:37 p.m. was sitting by his computer

7    ready to fire back.  He was executing a plan that he'd laid out

8    at 4:45 p.m., and he was probably kind of frustrated he hadn't

9    heard anything.  And now he says that the threat against Mrs.

10   Lambert was just sort of, just sort of a throwaway, and that

11   talking about Vic had nothing to do with that.  Does that make

12   any sense?  This is a campaign that's been going on since the

13   previous night, and this is a campaign whose purpose he has

14   already clearly announced that he is doxing Vic, and now he's

15   saying the only thing he can say, which is, Well, actually,

16   when I talked about f-ing the wife, that didn't have anything

17   to do with this.  Do you believe that?

18        All right.  So, what are the defenses here?  One

19   defense is that Benjamin Lambert is a liar, and he is a lot of

20   things, but what is he lying about?  What is Benjamin Lambert

21   lying about?  Well, think about that.  What we know about

22   Benjamin Lambert is that he said from the beginning, You know

23   that I had stopped bothering the guy, and today even Mr.

24   Cantwell admits, For three months he hadn't been bothering me,

25   and his own messages acknowledge, You're not the one who's

1    causing the trouble.  And so, that's true.  And then he says,

2    You know, I tried to de-escalate and to reason with this guy,

3    and that's true, and that's true because, in part, you can see

4    the threat.

5          And one of the most important pieces of evidence in

6    this case is the quiet and the silence of Ben Lambert in the

7    middle of this, because what the defendant desperately wants

8    you to think is that we in the Bowl Patrol world and the

9    alt-right, what we love to do is engage in horrible invective

10   against each other, we're entertained endlessly by stupid stuff

11   where we throw insults and joke about violence, and that's what

12   we love in this world, and there's probably some truth to that.

13          But on this occasion, on this weekend between these

14   two guys, when Mr. Cantwell opens fire, Ben Lambert draws back.

15   He almost goes into a shell, and he does eventually write the

16   usual stuff about, I forget what horrible words, but look at

17   the time.  It takes him 24 hours to say anything to

18   Mr. Cantwell that would give a rise to anyone, that's

19   insulting, that's fighting back.  And, remember, Paul Nehlen

20   had told him, At some point you've got to stand up to a bully,

21   and that makes sense, too.  But Mr. Lambert tells you, I didn't

22   take this -- I wasn't trying to fight this guy.  I was trying

23   to de-escalate.  And the fact that he holds his fire for so

24   long shows just how seriously he did take this.  And then he

25   did write drafts of a possible response, and he did call Paul

1    Nehlen, a guy he admired, for his advice and tells him,

2    Cantwell's insane, and he asks him what he should do.

3           And then he did something else at the end of all this.

4    He posts the exchange on the BowlCast.  Well, that's kind of a

5    strange thing to do, but it's not that strange in that world.

6    You can't go to the feds.  It's not a good thing to talk to the

7    cops.  But for a little security one thing you want to do is

8    make sure your community knows about that.  You don't go to law

9    enforcement, but you make sure the community is aware, and

10   that's what he did.  And then he warned his wife about a visit

11   from CPS.  That took a risk.  And he did consider calling law

12   enforcement, because he was expecting a call to CPS, and he

13   wrote his lawyer for advice about that, and he called in to the

14   show on June 19th, not to prank, but to try to stand up to a

15   bully.  He wasn't making some voice there.  He was actually

16   talking to Chris Cantwell:  I really appreciated that you put

17   photos of my wife and kids, until he cuts him off and pretends

18   to everyone nothing just happened, there's nothing to see

19   there.  And then he wrote a full account of what had happened,

20   and he posted it, and then he walked away.  He never made

21   another BowlCast.  He's back in Missouri at the first day of a

22   new job, and the FBI comes to see him, and the first thing he

23   says is, Is this about Cantwell?

24          What's he lying about?  Where in this story is Ben

25   Lambert lying about something?  He's not.

1          And so, the other defense really, and the only other

2     defense, is the rape is not a serious threat.  The defense says

3     the lines are blurred, the lines are blurred.  What is a

4     threat?  The Court will tell you a threat is a serious

5     statement expressing an intent to injure another person, which

6     under the circumstances would cause apprehension in a

7     reasonable person.  It's not necessary that the defendant

8     actually intend to carry out the threat.  What he has to do is

9     intend to issue a threat.

10          Well, look at this threat.  It was private, it was

11     confidential, there's no humor, there's no one listening,

12     there's no entertainment value.  Its only purpose is for its

13     effects on Ben Lambert.  The threat is accompanied with some

14     effort by other stuff, namely photographs of the wife and the

15     children back home and the residential address.  Take me

16     seriously, because I'm looking at a picture of your wife.  And

17     the threat's repeated.  It isn't said once.  It's said twice.

18     We're talking about incel listeners.  And the threat is, we

19     always talk about context in this case, the threat is part of

20     all of this; it's in the context of a very serious and

21     sustained effort to get Vic Mackey's information.  Why would

22     all of that be an obvious, serious effort to get through

23     extortion the information he so desperately wants, but in the

24     middle of it there's something that it's kind of a throwaway,

25     it means nothing, we all laugh about it now.

1          And it's also a threat that's accompanied by two other

2     threats that are both serious and real and are actually acted

3     upon, a threat to dox and a threat to call CPS, and it's a

4     threat that Mr. Cantwell, himself, took seriously enough to

5     make screenshots of everything and save on his devices and have

6     right there on his computer, while telling the law enforcement

7     that, I don't have any copies of all of that.  And it's a

8     threat that, when Mr. Cantwell talked about it, he admitted

9     making the threats, but he never claimed then that he was just

10    joking or talking trash.

11         Is that threat anything other than serious?  Is it

12    something -- if you're the husband of that mother, and you're

13    looking at a picture of her and your little children, is that

14    something that would cause apprehension in a reasonable person?

15    Of course it would.  And when the defense says, Oh, the lines

16    are blurred here, what I say back is, if there's anything

17    that's emerged from all of this, is that, even in this awful

18    world there is a very clear line between all that trash and a

19    threat on someone's wife and kids, and that line was crossed,

20    and Mr. Cantwell knows it.

21         I want to emphasize one other thing, and that is that

22    provocation is not a defense.  You'll hear from the Court that

23    it is not a way to negate criminal liability, for you to say,

24    Oh, it was pretty bad, the Bowl Patrol did bad things, and so

25    there was provocation, and it's an excuse.  It's not an excuse.

1        Retaliation is not a defense.  Taking the law in your

2    own hands is not a defense.  And think about that.  How could

3    it be any other way?

4        This is not the first time that a victim has done bad

5    things like being a troll and still be a victim, and it's not

6    the first time that a defendant has committed a crime against

7    someone he didn't like.  There's always another side to a

8    story.  But what the law says is you've got to cut through that

9    and say what are the elements of the crime and decide whether

10   those elements are present beyond a reasonable doubt.

11       Ladies and gentlemen, there is no reasonable doubt

12   here.  This was a serious threat that would cause in a

13   reasonable person apprehension, and there's no question that

14   this exchange is all about extorting from Ben Lambert, who is

15   collateral damage in Missouri, a guy who doesn't even matter to

16   this guy (indicating), extorting from him because he's the one

17   I can get the information about Vic Mackey, the big prize, and

18   in an extortion that is very clearly accompanied by a threat to

19   report a crime and a threat to ruin reputation, because if

20   you're in the anonymous world of being an awful person on the

21   internet, the one thing that absolutely threatens you is being

22   doxed and unmasked.

23       And so, it's very clear that Count One, and Count Two,

24   and Count Three, when you look at their elements, when you look

25   at what happened here, they're proved beyond a reasonable

1  doubt; and, provocation or not, there's no question, no serious

2  question about the result.

3       Ladies and gentlemen, the defendant, Mr. Cantwell, has

4  had a fair trial.  On behalf of the United States and my

5  partner, Ms. Krasinski, I ask you to return verdicts of guilty

6  on all counts.  Thank you.

7       THE COURT:  Thank you, Counsel.  We'll take a short

8  break, and then I will give you the instructions, and then

9  you'll be good to go.  Okay?  So, we'll take a short break now.

10       THE CLERK:  All rise.

11       (Recess taken from 2:54 p.m. to 3:00 p.m.)

12       THE CLERK:  All rise for the Honorable Court.

13       Please remain standing for the jury.

14            (The jury entered the courtroom)

15       THE CLERK:  Please be seated.  This hearing is back in

16  session.

17                      JURY CHARGE

18       THE COURT:  All right.  I'm going to instruct you on

19  the law at this point.  I want to let you know I'm going to

20  read these instructions, because I need to convey the law

21  precisely to you.  You don't need to take notes during this

22  process, if you don't want to, because you'll have a set of the

23  instructions with you in the deliberation room, and the way I

24  write it up, each separate topic has a heading.  So, if you

25  say, Oh, let's find out what the government's burden of proof

1    is, well, there's a section called "Government's Burden of

2    Proof," or the first charge, there's a section on that and

3    subsections.  So, you can just quickly page through, get to the

4    instructions, and you'll have them there.  Okay?  So, feel free

5    to just sit and listen, if that's what you choose to do.

6            I also tell you that I'm going to just pull this down

7    a little, because I can't read without my glasses fogging up,

8    and I'm going to be reading for about 20 minutes to a half an

9    hour here.  So, I'll do that to make sure that I can actually

10   see what it is that I'm reading to you.

11           Okay.  At this stage of the trial it is my duty to

12   instruct you on the principles of law that you will apply in

13   deciding this case.  It is your duty to follow these

14   instructions during your deliberations.  You should not single

15   out any one instruction but, instead, apply these instructions

16   as a whole to the evidence in the case.

17           You are the sole and exclusive judges of the facts.

18   You must weigh the evidence that has been presented

19   impartially, without bias, without prejudice and without

20   sympathy.  You must decide what the facts are, what the truth

21   is, based upon the evidence presented in the case.  You will

22   decide the case by applying the law as I give it to you in

23   these instructions and the facts as you find them to be from

24   the evidence.

25           In determining what the facts are and what the truth

1    is, you must necessarily assess the credibility of each witness

2    and determine what weight you will give to each witness's

3    testimony.  By "credibility" I mean the believability or the

4    truthfulness of a witness.  You should scrutinize all of the

5    testimony given, the circumstances under which each witness has

6    testified and every matter in evidence which tends to show

7    whether a witness is or is not worthy of belief.  Consider each

8    witness's intelligence, motive, state of mind, demeanor and

9    manner while testifying.  Consider the witness's ability to

10   see, hear or know the matters about which that witness has

11   testified.  Consider whether the witness had a good memory of

12   what he or she has testified about.  Consider whether the

13   witness had any reason for telling the truth or not telling the

14   truth, whether the witness had an interest in the outcome of

15   the case, whether the witness had anything to gain or lose as a

16   result of his or her testimony, whether the witness had any

17   friendship, relationship or animosity towards other individuals

18   involved in the case, and whether the witness's testimony was

19   consistent or inconsistent with the witness's own testimony and

20   the testimony of other witnesses.  Consider the extent to

21   which, if any, the testimony of each witness is either

22   supported or contradicted by other evidence in the case.

23          After assessing the credibility of each witness, you

24   will assign to the testimony of each witness, both under direct

25   and cross-examination, such weight as you deem proper.

**J.A. 1029**

1          You are not required to believe the testimony of any

2     witness simply because that witness was under oath.  You may

3     believe or disbelieve all or part of the testimony of any

4     witness.  It is within your province to determine what

5     testimony is worthy of belief and what testimony may not be

6     worthy of belief.

7          During the trial you have heard several government

8     agents testify.  You should consider the testimony of a

9     government agent in the same manner as you consider the

10    testimony of any other witness in the case.  In no event should

11    you give the testimony of a government agent any more

12    credibility or any less credibility simply because that witness

13    is a government agent.

14         The testimony of a witness may be discredited or, as

15    we sometimes say, impeached by showing that the witness

16    previously made statements which are different than or

17    inconsistent with his or her testimony here in court.

18    Inconsistent or contradictory statements which are made by a

19    witness outside of court may be considered only to discredit or

20    impeach the credibility of the witness and not to establish the

21    truth of those earlier out-of-court statements.

22         You must decide what weight, if any, should be given

23    to the testimony of a witness who has made prior inconsistent

24    or contradictory statements.  In making this determination, you

25    may consider whether the witness purposely made a false

1    statement or whether it was an important mistake, whether the

2    inconsistency concerns an important fact or whether it had to

3    do with a small detail, whether the witness had an explanation

4    for the inconsistency, and whether the explanation appealed to

5    your common sense.

6         If a person is shown to have knowingly testified

7    falsely concerning any important or material matter, you have a

8    right to distrust the testimony of such an individual

9    concerning other matters.  You may reject all of the testimony

10   of that witness or give it such weight or credibility as you

11   may think it deserves.

12        It is exclusively your duty, based upon all of the

13   evidence and your own good judgment, to determine whether the

14   prior statement was inconsistent and, if so, how much, if any,

15   weight is to be given to the inconsistent statement in

16   determining whether to believe all or part of the witness's

17   testimony.

18        The fact that the prosecution is brought in the name

19   of the United States of America entitles the government to no

20   greater consideration than that accorded to any other party in

21   litigation.  By the same token, the government is entitled to

22   no less consideration.  All parties, whether the government or

23   individuals, stand as equals at the bar of justice.

24        The weight of the evidence is not necessarily

25   determined by the number of witnesses testifying on either

1    side.  You'll consider all of the facts and circumstances in

2    evidence to determine which of the witnesses may be worthy of

3    belief.  You may find the testimony of a small number of

4    witnesses on a particular issue is more credible than the

5    testimony of a greater number of witnesses on the other side of

6    that issue.

7            In reviewing the evidence, you will consider the

8    quality of the evidence and not the quantity.  It is not the

9    number of witnesses or the quantity of testimony that is

10   important but the quality of the evidence that has been

11   produced that is important.  You will consider all of the

12   evidence, no matter which side produced or elicited it, because

13   there are no property rights in witnesses or in the evidence

14   that has been presented.

15           During the trial you have heard certain statements,

16   arguments and remarks from counsel.  These are intended to help

17   you in understanding the evidence and in applying the law to

18   this case.  However, if counsel have made any statements

19   concerning the evidence that are contrary to your recollection

20   of the evidence, then you must take your own recollection as to

21   the evidence.  If counsel have made any statements concerning

22   the law that are contrary to my instructions, you must take the

23   law from me.  You are not to be concerned with the wisdom of

24   any rule of law.  Regardless of any opinion you may have as to

25   what the law ought to be, it would be a violation of your sworn

1    duty to base a verdict upon any other view of the law than the
2    law as I give it to you in my instructions.

3         From time to time during the trial counsel have made
4    objections.  This is a proper function to be performed by
5    counsel on behalf of their respective clients.  You should not
6    concern yourself with the fact that objections have been made
7    nor with my rulings on those objections.  I must rule on
8    objections, and I have not intended to indicate in any way by
9    my rulings or what I have said what the verdict should be in
10   this case.  In this case, as in all cases, I'm completely
11   neutral and impartial.  It's up to you to determine whether the
12   defendant is guilty or not guilty based on the facts as you
13   find them to be and the law as I give it to you.

14        So, what is evidence?  The direct evidence in this
15   case consists of, one, the sworn testimony of the witnesses,
16   both on direct and cross-examination, regardless of who may
17   have called the witness, two, the exhibits which have been
18   received into evidence, and, three, any facts to which all of
19   the lawyers have agreed or stipulated.

20        Certain things are not evidence and cannot be
21   considered by you as evidence.  Arguments and statements by
22   lawyers are not evidence.  What they have said in their opening
23   statements, closing arguments and at other times is intended to
24   help you interpret the evidence, but it is not evidence.  If
25   the facts as you remember them differ from the way the lawyers

1    have stated them, you must rely on your memory.

2             Questions and objections by lawyers are not evidence.

3    Attorneys have a duty to their clients to object when they

4    believe a question is improper under the *Rules of Evidence*.

5    You should not be influenced by objections or by my rulings on

6    objections.  Testimony that has been excluded or stricken or

7    that you have been instructed to disregard is not evidence and

8    must not be considered.  Anything you have seen or heard when

9    court was not in session is not evidence.  You are to decide

10   the case solely on the evidence received at trial.

11            There are two types of evidence which you may properly

12   consider in deciding whether a defendant is guilty or not

13   guilty.  Direct evidence is the testimony given by a witness

14   about what that witness has seen, has heard, or has observed or

15   what the witness knows based on personal knowledge.  Direct

16   evidence also includes any exhibits that have been marked and

17   any stipulations which have been agreed to by the lawyers for

18   both sides.

19            Evidence may also be used to prove a fact by

20   inference, and this is what is sometimes -- this is referred to

21   as "circumstantial evidence."  In other words, from examining

22   direct evidence you may be able to draw certain inferences

23   which are reasonable and justified based on your daily

24   experience and common sense.  Such reasonable inferences

25   constitute circumstantial evidence.

**J.A. 1034**

1          The law makes no distinction between the weight to be

2     given to either direct or circumstantial evidence.  It is up to

3     you to decide how to weigh the evidence in this case.  However,

4     the defendant cannot be found guilty on any crime based on a

5     hunch or a suspicion, even a strong one, on what is probably

6     the case.  He can only be found guilty if on the direct

7     evidence and the reasonable inferences you draw from the direct

8     evidence you are satisfied that he is guilty of the crime

9     beyond a reasonable doubt.

10          During the trial I may have instructed you that

11    certain evidence was being admitted for a limited purpose.  It

12    is your duty to follow these instructions during your

13    deliberations.

14          The fact that an indictment has been returned against

15    the defendant is not evidence of the defendant's guilt.  An

16    indictment is merely a formal means of accusing an individual

17    of a crime in order to bring that person to trial.  It is you

18    who will determine whether the defendant is guilty or not

19    guilty of the offenses charged based on a consideration of all

20    the evidence presented and the law applicable to the case.

21    Therefore, you must not consider the indictment in this case as

22    any evidence of the guilt of the defendant; nor should you draw

23    any inference from the fact that an indictment has been

24    returned against him.

25          A defendant, although accused, begins a trial with a

**J.A. 1035**

1    clean slate with no evidence against him.  The law permits

2    nothing but the admissible evidence presented before you to be

3    considered in support of any charge against the defendant.  The

4    presumption of innocence alone is sufficient to acquit the

5    defendant, unless you are satisfied beyond a reasonable doubt

6    that the defendant is guilty after a careful and impartial

7    consideration of all of the evidence in the case.  The burden

8    is always on the government to prove guilt beyond a reasonable

9    doubt.  This burden never shifts to the defendant.  The law

10    does not impose upon a defendant in a criminal case the burden

11    or duty of calling any witnesses or producing any evidence.

12           If, after careful and impartial consideration of all

13    of the evidence in this case, you have a reasonable doubt as to

14    whether the defendant is guilty of any charge, you must find

15    the defendant not guilty of that charge.  If you view the

16    evidence in the case as reasonably permitting either of two

17    conclusions, one consistent with innocence and the other

18    consistent with guilt, you must adopt the conclusion that is

19    consistent with innocence.  You must never find the defendant

20    guilty based on mere suspicion, conjecture or guess.  Rather,

21    you must decide the case on the evidence that is before you and

22    on the reasonable inferences that can be drawn from that

23    evidence.

24           A separate crime is charged in each count of the

25    indictment.  Each count and the evidence pertaining to it

1   should be considered separately.  The fact that you may find

2   the defendant guilty or not guilty of one or more of the

3   offenses charged should not control your verdict as to any

4   other offense charged against the defendant.  The defendant is

5   not on trial for any act or conduct not alleged in the

6   indictment.  Neither are you to be concerned with the guilt of

7   any person or persons not on trial as a defendant in this case.

8           The defendant has pleaded not guilty to each charge in

9   the indictment.  This plea puts at issue each of the essential

10  elements of the offenses as described in these instructions and

11  imposes on the government the burden of establishing each of

12  these elements by proof beyond a reasonable doubt.

13          The indictment in this case contains three counts.

14  Each count charges the defendant with a separate crime.  When

15  you begin your deliberations, each of you will be provided with

16  a copy of the indictment containing the counts which are before

17  you in the case.  Remember, with respect to each count in the

18  indictment the prosecution must prove beyond a reasonable doubt

19  that each essential element of the count existed in the manner

20  charged in that count before you may return a verdict of guilty

21  with respect to that count.

22          You will note that the indictment charges that the

23  offenses at issue were committed on or about certain dates.

24  The proof need not establish with certainty the exact date of

25  an alleged offense when the term "on or about" is used.  It's

1    sufficient if the evidence establishes beyond a reasonable

2    doubt that the offense charged was committed on a date

3    reasonably near the date alleged, that is, a date reasonably

4    close in time to the date upon which the offense is alleged to

5    have occurred.

6         In addition to the elements of each offense charged in

7    the indictment you must consider with respect to each offense

8    whether any act in furtherance of the offense was committed in

9    New Hampshire.  In this regard, the government need not prove

10   that the crime itself was committed in New Hampshire or that

11   the defendant was present here.  Instead, the government need

12   only prove by a preponderance of the evidence that at least one

13   act in furtherance of one or more of the charged offenses was

14   committed in New Hampshire.

15        I want to emphasize everywhere else where I talk about

16   the burden of proof the burden of proof is on the government to

17   establish guilt beyond a reasonable doubt.  This is the one

18   section where the burden of proof is by a preponderance rather

19   than beyond a reasonable doubt.

20        The indictment charges the defendant, Christopher

21   Cantwell, with one count of Extortionate Interstate

22   Communications, in violation of 18 United States Code, Section

23   875(b), one count of Threatening to Injure Property Or

24   Reputation, in violation of 18 U.S.C. Section 875(d), and one

25   count of cyberstalking, in violation of 18 U.S.C. Section

1     2261A(2).

2         The indictment refers to the alleged victim in each

3     count as "Victim 1."  The government asserts that Victim 1 is

4     Benjamin Lambert.  Lambert was also known by the online

5     pseudonym "Cheddar Mane."

6         Now I'll talk to you about each of the three charges,

7     one at a time, starting with Count One, Extortionate Interstate

8     Communications.  Count one of the indictment charges that,

9     quoting now, "On or about June 16th, 2019, within the District

10     of New Hampshire and elsewhere, the defendant, Christopher

11     Cantwell, Christopher C. Cantwell, with intent to extort from

12     Victim 1 a thing of value, namely, personal identifying

13     information for a man known by the on-line pseudonym 'VM,' and

14     for the purpose of issuing a threat and with knowledge that the

15     communications would be viewed as a threat, transmitted a

16     communication in interstate commerce containing a threat to

17     injure the person of another."

18         In order to sustain its burden of proof for the crime

19     of extortionate interstate communication as charged in the

20     indictment, the government must prove each of the following

21     elements beyond a reasonable doubt:  first, that the defendant

22     knowingly transmitted a communication in interstate commerce;

23     second, that the communication contained a threat to injure the

24     person of another; and, third, that the defendant transmitted

25     the communication with the intent to extort money or something

1    of value from any person.

2         I will now define several of the terms used in Count

3    One.

4         To transmit something in interstate commerce means to

5    send it from a place in one state to a place in another state.

6    A "threat" in this context is a serious statement expressing an

7    intent to injure another person, which under the circumstances

8    would cause apprehension in a reasonable person, as

9    distinguished from a political statement, idle talk,

10   exaggeration or something said in a joking manner.  It is not

11   necessary to prove that the defendant actually intended to

12   carry out the threat.

13        To act with intent to extort means to act with the

14   intent to obtain something of value from another person with

15   that person's consent but induced by wrongful use of threatened

16   force, threatened violence or fear.  An intent to extort by

17   threat also requires that the defendant act with an intent to

18   threaten.

19        In determining whether the defendant's communication

20   was sent with the intent to extort, you may consider all of the

21   circumstances surrounding the making of the communication.  For

22   example, you may consider the language, specificity and

23   frequency of the threat, the context in which the threat was

24   made, the relationship between the defendant and the threat

25   recipient, the recipient's response, and any previous threat

1   made by the defendant and whether you believe the person making

2   the statement was serious, as distinguished from mere idle or

3   careless talk, exaggeration or something said in a joking

4   manner.

5        The term "thing of value" is anything of value.  It is

6   not limited to money or tangible things with an identifiable

7   price tag.

8        I'll now turn to Count Two, threat to injure property

9   or reputation.  Count Two of the indictment charges that,

10  "Between on or about June 15, 2019, and on or about June 17,

11  2019, within the District of New Hampshire and elsewhere, the

12  defendant, Christopher C. Cantwell, with intent to extort from

13  Victim 1 a thing of value, namely, personal identifying

14  information for a man known by the on-line pseudonym 'VM,'

15  knowingly transmitted in interstate and foreign commerce

16  communications containing a threat to injure the reputation of

17  Victim 1 and a threat to accuse Victim 1 of a crime."

18       In order to sustain its burden of proof for the crime

19  of threat to injure property or reputation as charged in the

20  indictment, the government must prove each of the following

21  elements beyond a reasonable doubt:  first, that the defendant

22  knowingly transmitted a communication in interstate commerce;

23  second, that the communication contained a threat to accuse

24  another person of a crime or to injure the reputation of

25  another person; and, third, that the defendant transmitted the

1    communication with intent to extort money or something of value

2    from any person.

3         With respect to Count Two, the count I'm describing

4    now, a threat is a serious statement expressing an intent to

5    accuse another person of a crime or to injure the reputation of

6    another person.  The previous definitions I gave you for

7    interstate commerce, intent to extort and thing of value also

8    apply to Count Two.

9         All right.  Now I'll talk to you about Count Three,

10   the cyberstalking charge.  Count Three of the indictment

11   charges that, "Between in or about June 15 and June 17, 2019,

12   within the District of New Hampshire and elsewhere, the

13   defendant, Christopher C. Cantwell, with intent to harass and

14   intimidate Victim 1, did use facilities of interstate and

15   foreign commerce, including electronic communication services

16   and telephone facilities, to engage in a course of conduct that

17   placed Victim 1 in reasonable fear of serious bodily injury to

18   Victim 1's spouse, and that caused, attempted to cause and

19   would be reasonably expected to cause substantial emotional

20   distress to Victim 1 and Victim 1's spouse."

21        In order to sustain its burden of proof for the crime

22   of cyberstalking as charged in the indictment, the government

23   must prove each of the following elements beyond a reasonable

24   doubt:  first, the defendant used facilities of interstate

25   commerce, including an electronic communications service or

1   system; second, the defendant used the electronic communication

2   service or other facility of interstate commerce to engage in a

3   course of conduct; third, that the defendant, while engaged in

4   that course of conduct, acted with intent to harass or

5   intimidate Victim 1; and, fourth, that the defendant's course

6   of conduct placed Victim 1 in reasonable fear of serious bodily

7   injury to his spouse, caused substantial emotional distress to

8   Victim 1, or would be reasonably expected to cause substantial

9   emotional distress to either Victim 1 or his spouse.

10        I will now define several of the terms used in Count

11   Three.

12        "Using facilities of interstate commerce" means

13   employing or utilizing any method of communication or

14   transportation between one state and another and includes, for

15   example, electronic cellular telephone networks, the mail or

16   the internet.

17        A "course of conduct" in this context is a pattern of

18   conduct comprised of two or more acts evidencing a continuity

19   of purpose.  You may consider each communication between the

20   defendant and another person to be a separate act.  In order to

21   find the defendant guilty, you are required to agree

22   unanimously that the United States has proven beyond a

23   reasonable doubt that the defendant engaged in a course of

24   conduct.  While you are required to agree unanimously that the

25   defendant engaged in two or more acts evidencing the continuity

1   of purpose in order to find him guilty of this crime, you are

2   not required to agree unanimously on which two or more acts

3   constitute the course of conduct.

4       To find the defendant guilty of the crime charged you

5   must unanimously agree that the United States has proved beyond

6   a reasonable doubt, one, the defendant's course of conduct

7   placed Victim 1 in reasonable fear of serious bodily injury to

8   his spouse; two, that the defendant's course of conduct caused

9   substantial emotional distress to Victim 1; or, three, the

10  defendant's course of conduct would be reasonably expected to

11  cause substantial emotional distress to either Victim 1 or

12  Victim 1's spouse.  The government must prove only one of the

13  three means set forth in the statute.

14      "Substantial emotional distress" means mental

15  distress, mental suffering or mental anguish.  It includes

16  depression, dejection, shame, humiliation, mortification,

17  shock, indignity, embarrassment, grief, anxiety, worry, fright,

18  disappointment, nausea, nervousness, as well as physical pain.

19      When considering whether the intended course of

20  conduct would be reasonably expected to cause substantial

21  emotional distress to a person, you must consider whether in

22  light of the evidence presented in this case a reasonable

23  person in the same or similar circumstances as Victim 1 or

24  Victim 1's spouse would suffer substantial emotional distress

25  as a result of the intended course of conduct as defined in

**J.A. 1044**

1    these instructions.

2         To act with intent means to act voluntarily and

3    intelligently, not by ignorance, accident or mistake, and with

4    the specific intent or purpose of causing a desired result in a

5    particular individual.  It is not enough merely to foresee that

6    such a result is a likely consequence of repeated

7    communications.  Moreover, a bad motive of some other kind

8    standing alone is not enough.

9         "Intent to harass" means to act with the specific

10   intent or purpose of causing an adverse emotional reaction in a

11   specific person, not merely speech that happens to cause

12   annoyance or insult.

13        "Intent to intimidate" means to act with the specific

14   intent or purpose of putting a person in fear or apprehension

15   of injury inflicted by a particular person.

16        You have heard evidence that Victim 1 and others have

17   engaged in behavior that disrupted the defendant's live call-in

18   radio show.  You have also heard evidence that Vic Mackey or

19   others may have engaged in behavior that disrupted the

20   defendant's website.  You may consider such evidence for the

21   purpose of understanding all of the circumstances surrounding

22   the making of the communications at issue in this case,

23   including, for example, the language, specificity and frequency

24   of the communications, the context surrounding the

25   communications, the relationship between the defendant and

1    Victim 1, Victim 1's response, any previous communications

2    between the defendant and Victim 1 and whether you believe the

3    person making the communication was serious, as distinguished

4    from mere idle and careless talk, exaggeration or something

5    said in a joking manner.  You may not consider this evidence

6    for any other purpose.

7           Remember, the defendant cannot be found guilty of any

8    charge unless the government proves every element of the charge

9    beyond a reasonable doubt.  That burden never switches to the

10   defendant.  If, however, the government proves every element of

11   a charge beyond a reasonable doubt, evidence of provocation,

12   justification or self defense does not negate the defendant's

13   criminal culpability with respect to that charge.

14          The government is not required to prove that the

15   defendant knew that he was violating the law.  Ignorance of the

16   law is not a defense to the charges alleged in the indictment.

17          The principles of law set forth in these instructions

18   are intended to guide you in reaching a fair and just result in

19   this case, which is important to both of the parties.  You are

20   to exercise your judgment and common sense without prejudice,

21   without sympathy, but with honesty and understanding.  You must

22   be conscientious in your determination of a just result in this

23   case, because this is your highest duty as officers of this

24   court.

25          Remember also, the question before you can never be

1    will the government win or lose the case.  The government

2    always wins when justice is done, regardless of whether the

3    verdict be guilty or not guilty.

4         When you've considered and weighed all of the

5    evidence, you must make one of the following findings with

6    respect to each count:  If you have a reasonable doubt as to

7    whether the government has proved any one or more of the

8    essential elements of the crime charged, it is your duty to

9    find the defendant not guilty.  If you find the government has

10   proved all of the essential elements of the crime charged

11   beyond a reasonable doubt, then you may find the defendant

12   guilty.

13        The punishment provided by law for the offense charged

14   in the indictment is exclusively my responsibility and should

15   never be considered by you in any way in arriving at an

16   impartial verdict.

17        When you retire, you should elect one member of the

18   jury as your foreperson.  That individual will act very much

19   like the chairman of a committee, seeing to it that the

20   deliberations are conducted in an orderly fashion and that each

21   juror has a full and fair opportunity to express his or her

22   views, positions and arguments on the evidence and on the law.

23   The verdict must represent the considered judgment of each

24   juror.  In order to return a verdict, it is necessary that each

25   juror agree thereto.  Your verdict must be unanimous as to each

1    count.  It is your duty as jurors to consult with one another

2    and to deliberate with a view to reaching an agreement, if you

3    can do so without violence to individual judgment.  Each of you

4    must decide the case for yourselves but only after an impartial

5    consideration of the evidence in the case with your fellow

6    jurors.  During your deliberations, do not hesitate to

7    reexamine your own views and to change your opinion, if

8    convinced it is erroneous; but do not surrender your honest

9    conviction as to the weight or effect of the evidence solely

10   because of the opinion of your fellow jurors or merely for the

11   purpose of returning a verdict.

12       Always remember you are not partisans, you are judges,

13   judges of the facts.  Your sole interest is to seek the truth

14   from the evidence in the case.

15       If during your deliberations it becomes necessary to

16   communicate with me, you may do so only in writing, signed by

17   the foreperson or by one or more members of the jury.  Give

18   that note to the Marshal, and he will bring it to my attention.

19   No member of the jury should ever attempt to communicate with

20   me except by a signed writing, and I will communicate with you

21   on anything concerning the case either in writing or orally in

22   the courtroom.

23       Remember, you are not to tell anyone, including me,

24   how the jury stands numerically or otherwise on the matters you

25   are deciding until after you have reached a unanimous verdict

**J.A. 1048**

1    or have been discharged.

2         Nothing said in these instructions is intended to

3    suggest or to convey in any way or manner what your verdict

4    should be.  The verdict is your sole and exclusive

5    responsibility.

6         When you have arrived at a verdict, notify the

7    Marshal, and you will be returned to the courtroom where the

8    foreperson will render the verdicts orally.

9         I need to speak on the headsets with counsel just

10   briefly.

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12        THE COURT:  I want to note for the record that the

13   defendant has objected to my provocation instruction.  The

14   defendant has argued that, even with the suggested changes,

15   that I should not give any provocation instruction, and that

16   objection is preserved for purposes of appeal.

17        MR. LEVIN:  Thank you, your Honor.

18        THE COURT:  Are there any other objections that anyone

19   has to the proposed charge?

20        MR. LEVIN:  No, your Honor.

21        THE COURT:  Anything from the government?

22        MR. DAVIS:  No.

23        THE COURT:  No?

24        MS. KRASINSKI:  No.

25        THE COURT:  Okay.  Thank you.

**J.A. 1049**

1    (END OF SIDEBAR CONFERENCE)

2         THE COURT:  All right.  We're almost done.  I want to

3    tell you that you will have the instructions, you will have the

4    indictment, you will have a verdict form, and there is an

5    answer that I ask you to fill in with respect to each of the

6    three charges, and it asks you to state whether the defendant

7    is guilty or not guilty of each of the three charges.  So, fill

8    out the entire form, have the foreperson sign and date it, and

9    then you knock on the door when you've reached a verdict, and

10   the security officer will inform us, and we'll bring you into

11   the courtroom to render the verdict orally.

12        You also will have access to the exhibits.  My very

13   experienced case managers know this better than I.  But you'll

14   give them some instruction on how to operate the system?  So,

15   you'll be able to call up exhibits on the screen the same way

16   the lawyers have, so you'll be able to look at those, if you

17   choose.

18        With that said, the only thing left is to swear the

19   Court Security Officer.  Oh, alternates.  Okay.

20        This is always an unfortunate thing for me, that we

21   impanel more than the number of jurors that we need for a

22   trial.  We started with 14.  We lost two early in the trial.

23   We still have two more than we need, and those two jurors are

24   alternates, and, unfortunately, despite your sacrifice of

25   sitting through the trial, you're not going to be able to

```
1    participate in the deliberations, and those alternates are --

2    do you know?

3              THE CLERK:  13 and 14.

4              THE COURT:  Juror Numbers 13 and 14.

5              THE CLERK:  Oh, 15 and 14.  I'm sorry.

6              THE COURT:  15 and 14.  Okay.  So, Jurors 15 and 14,

7    I'm going to excuse you in a moment.  You can pick up your

8    things and head out, but I'm going to ask you not to be

9    released from your oath at this point.  You can't discuss the

10   case with anyone else, but also don't expose yourself to any

11   discussions of the case in the media.  Don't discuss the case

12   with anybody.  I will have the Clerk call you as soon as the

13   jury reaches a verdict.  Once the verdict is reached, then you

14   are released from your oath, and you can do anything you want

15   to do with respect to the case.  But I can't let you

16   participate.  You're free to get your stuff and head home, and

17   we'll contact you when a verdict is reached.  And I do want to

18   thank you for your service, particularly in this difficult

19   time, sitting around all day with a mask on waiting for me to

20   get to you.  It's a real sacrifice, and I appreciate it.  I

21   want to thank you for your service, but you are discharged but

22   still subject to your oath until released by the Clerk.

23              Now we can administer the oath to the Court Security

24   Officer.

25              THE CLERK:  Please raise your right hand.  Do you
```

**J.A. 1051**

```
1    solemnly swear that you will keep this jury together in their

2    room provided for them, that you will separate them from

3    others, that you will guard the secrecy of their deliberations,

4    that you will not communicate with them yourself, nor permit

5    any other person to do so unless directed by the Court, and

6    that you will not ask the results of their deliberation until

7    the verdict has been returned in open court, so help you God?

8              THE COURT SECURITY OFFICER:  I do.

9              THE CLERK:  Thank you.

10             THE COURT:  Can I see the headset for just a moment?

11   (SIDEBAR CONFERENCE AS FOLLOWS):

12             THE COURT:  Mr. Levin, you had previously indicated to

13   me that you were likely to render an objection to my statement

14   that the facts comprising the course of conduct need not be

15   unanimously agreed upon, and I want to be sure that, unless

16   you're prepared to abandon that objection --

17             MR. LEVIN:  We abandon that, your Honor.

18             THE COURT:  You do abandon it?

19             MR. LEVIN:  Yeah.

20             THE COURT:  Okay.  Thank you.  I just didn't want to

21   let it go by inadvertence.

22             MR. LEVIN:  Thank you.

23   (END OF SIDEBAR CONFERENCE)

24             THE COURT:  All right.  Is there anything else?

25             THE CLERK:  All rise for the jury.
```

```
 1              (The jury exited the courtroom)

 2         THE COURT:  So, I would just ask the parties to sit

 3    with the case managers and ensure that the JERS system has in

 4    everything admitted and nothing that hasn't been admitted so

 5    that you are both satisfied with what the exhibits are that

 6    will be going to the jury.  And with that, if somebody can

 7    remain in the courthouse.  If we get to the point where I

 8    excuse the jury for the evening, I'll notify you and -- the

 9    government can go back to their offices, but just be available

10    in the event that we should get a verdict.

11         THE CLERK:  Can you please write down your cell phone

12    numbers for me.  Thank you.

13              (Recess taken from 3:41 p.m. to 5:32 p.m.)

14         THE CLERK:  All rise for the Honorable Court.

15                   (The jury entered the courtroom)

16         THE CLERK:  Please be seated.

17         THE COURT:  Okay, folks.  So, I want you to take the

18    weekend off, okay?  That means don't go out and try to

19    investigate the case.  Don't even be thinking about the case.

20    You should do your deliberating with other jurors here in the

21    courtroom, so I don't want you to be wasting any time and

22    energy this weekend on this case.  The following instructions

23    that I've given you in the past I want to reemphasize how

24    important it is now.  I've discharged the alternates.  You're

25    in the middle of deliberation.  You must not expose yourself to
```

```
 1   any discussions of the case in the media.  You must not let

 2   anybody talk to you about this case.  So, don't watch any local

 3   news, don't listen to any local radio, don't read any local

 4   newspapers, don't go out and do any internet searches where

 5   something could pop up and you could potentially see something

 6   that would be a problem.  It's very, very important that you do

 7   that this weekend.  So, keep my general instructions in mind,

 8   have a nice, enjoyable, relaxing weekend where you're not

 9   thinking about this case, and then come in on Monday at 9:00

10   and resume your deliberations.  Okay, everybody go and have a

11   good weekend.

12               THE CLERK:  All rise.

13                      (The jury exited the courtroom)

14               THE COURT:  Each side have a representative here

15   Monday at 9:00.

16               MR. LEVIN:  Thank you, your Honor.

17               THE COURT:  Thank you.

18          (WHEREUPON, the proceedings adjourned at 5:34 p.m.)

19

20

21

22

23

24

25
```

J.A. 1054

73

1                         C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13   Date: ___5/17/21_____              /s/ *Brenda K. Hancock*
                                          Brenda K. Hancock, RMR, CRR
14                                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**J.A. 1055**

```
                   UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW HAMPSHIRE


   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
   UNITED STATES OF AMERICA               *
                                          *  1:20-cr-6-01-PB
                  v.                      *  September 28, 2020
                                          *  10:13 a.m.
   CHRISTOPHER CANTWELL                    *
                                          *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF JURY TRIAL DAY 5
BEFORE THE HONORABLE PAUL J. BARBADORO


Appearances:


For the Government:            John S. Davis, AUSA
                               Anna Z. Krasinski, AUSA
                               United States Attorney's Office


For the Defendant:             Eric Wolpin, Esq.
                               Jeffrey S. Levin, Esq.
                               Federal Defender's Office


Court Reporter:                Liza W. Dubois, RMR, CRR
                               Official Court Reporter

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The Court understands that the jury has
 3    reached a verdict in this case.  Would you please hand the
 4    verdict form to the court security officer.
 5            Will the defendant please stand.
 6            In the matter of the United States of America vs.
 7    Christopher Cantwell, criminal case number 20-cr-6-1-PB, as to
 8    Count One of the superseding indictment charging the defendant
 9    with extortionate interstate communications in violation of
10    18 U.S.C. 875(b), we, the jury, find the defendant, Christopher
11    Cantwell, guilty.
12            As to Count Two of the superseding indictment
13    charging the defendant with threatening to injure property or
14    reputation in violation of 18 U.S.C. 875(d), we, the jury, find
15    the defendant, Christopher Cantwell, guilty.
16            As to Count Three of the superseding indictment
17    charging the defendant with cyberstalking in violation of
18    18 U.S.C. 2261(a)(2), we, the jury, find the defendant,
19    Christopher Cantwell, not guilty.
20            Dated September 28th, 2020, signed by the
21    foreperson.
22            THE COURT:  All right.  Do you wish to have the jury
23    polled?
24            MR. WOLPIN:  Yes, your Honor.
25            THE COURT:  I would propose to poll them by asking
```

J.A. 1057

1   each juror was your verdict guilty on Counts One and Two and

2   not guilty on Count Three.  Is that an acceptable way to do the

3   poll?

4           MR. WOLPIN:  Yes, your Honor.

5           THE COURT:  Okay.

6           So, members of the jury, I'm going to ask you

7   individually to tell me whether, in fact, that was your

8   verdict.  And, I apologize, I'll just point and I'll go down

9   the front row, then I'll go the -- I'll go the second row and

10  then I'll go the third row all the way to the end.  Okay?

11          So, ma'am, was your verdict guilty on Counts One and

12  Two and not guilty on Count Three?

13          THE JUROR:  Yes.

14          THE COURT:  Was your verdict guilty on Counts One

15  and Two and not guilty on Count Three?

16          THE JUROR:  Yes.

17          THE COURT:  Was your verdict guilty on Counts One

18  and Two and not guilty on Count Three?

19          THE JUROR:  Yes.

20          THE COURT:  Was your verdict guilty on Counts One

21  and Two and not guilty on Count Three?

22          THE JUROR:  Yes.

23          THE COURT:  Was your verdict guilty on Count One and

24  Two and not guilty on Count Three?

25          THE JUROR:  Yes.

```
 1              THE COURT:  Was your verdict guilty on Count One and
 2   Two and not guilty on Count Three?
 3              THE JUROR:  Yes.
 4              THE COURT:  Was your verdict guilty on Counts One
 5   and Two and not guilty on Count Three?
 6              THE JUROR:  Yes.
 7              THE COURT:  Was your verdict guilty on Counts One
 8   and Two and not guilty on Count Three?
 9              THE JUROR:  Yes.
10              THE COURT:  Was your verdict guilty on Counts One
11   and Two and not guilty on Count Three?
12              THE JUROR:  Yes.
13              THE COURT:  Was your verdict guilty on Counts One
14   and Two and not guilty on Count Three?
15              THE JUROR:  Yes.
16              THE COURT:  Was your verdict guilty on Counts One
17   and Two and not guilty on Count Three?
18              THE JUROR:  Yes.
19              THE COURT:  Was your verdict guilty on Counts One
20   and Two and not guilty on Count Three?
21              THE JUROR:  Yes, your Honor.
22              THE COURT:  All right.  Thank you.
23              Does -- before I discharge the jury, does counsel
24   need to me to do anything else?  Do you need to see me or
25   anything else before I discharge the jury?
```

J.A. 1059

```
1              MR. WOLPIN:  No, your Honor.

2              THE COURT:  All right.  So on behalf of everyone

3    here, I want to thank you, members of the jury.  It's always a

4    sacrifice to serve.  It's particularly unpleasant when you have

5    to come into a building like this and wear a mask for eight or

6    ten hours a day and I really do appreciate the sacrifice that

7    you've made and want to thank you on behalf of everyone because

8    our constitutional right to trial by jury depends upon people

9    like you who are willing to come into court as ordinary

10   citizens, devote your time and attention to trying to -- to

11   give Mr. Cantwell, and every defendant in criminal cases, a

12   fair trial and I really do want to thank you for your service

13   here.

14             You're now discharged from your oath and obligation.

15   You're free to conduct any investigation that you want, say or

16   do anything that you want to do, with respect to the case.

17             I have a couple of things I have to do with counsel

18   here.  If I could ask you if you could just wait for me in the

19   jury deliberation room, I do want to thank you in person

20   individually.  And so if you could just wait for me for a

21   minute and I'll be in to talk to you.  And, again, thank you

22   for your service and you are excused.

23                          (Jury excused.)

24             THE COURT:  Do we have a sentencing date?

25             THE CLERK:  January 4th.
```

**J.A. 1060**

```
 1              THE COURT:  January 4th at --
 2              THE CLERK:  10:30.
 3              THE COURT:  -- 10:30 will be sentencing in this
 4    case.
 5              The defendant is currently in custody.  I see no
 6    reason to change his custody status.  Is there anything else
 7    that we need to cover today?
 8              MR. WOLPIN:  No, your Honor.
 9              THE COURT:  All right.  Thank you.
10              And I really do want to just take a moment and
11    commend counsel for both sides here.  We really -- in addition
12    to depending on jurors, we depend upon lawyers to bring their
13    skills to court.  And this was a very well tried case by both
14    the prosecutors and the defendant, defendants -- defendant,
15    excuse me, and I just want to thank you for a very well tried
16    case.  All right?
17              So we're done for the day.
18              (Proceedings concluded at 10:22 p.m.)
19
20
21
22
23
24
25
```

7

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 5/12/21          /s/  Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR



**Cheddy Blac**
online

June 15

I guess you forgot the lesson which kept you away for a short while, do you need to be reminded?
9:00 PM ✓✓

9:29 PM ✓✓

What are you talking about
11:24 PM

Some fag pretends to be you
11:24 PM

I told them stop, they did
11:24 PM

What do you even stand to gain here
11:42 PM

Let's think about this. Every time someone you think is in BP talks shit about you- a public figure - you threaten to dox me? Say you did. What then?
11:56 PM

June 16

I honestly don't know what I even did
12:21 AM

I followed a link into a group I didn't even know you were in
12:21 AM

Get a fucking life or I will ruin the one you have
3:56 AM ✓✓

Don't bother anyone, then you won't have to worry about crossing me
3:57 AM ✓✓

Message

 

9:42   4G   49%

← **Cheddy Blac**
online   ⋮

I haven't given you any thought and it was an honest mistake. Didn't even know you were in there or I'd have thought better of it. Other than that, all I can do is just leave you the fuck alone and tell other people to do the same - which I have done.

Seriously man I couldn't care less about what you are trying to do these days.   2:13 PM

You're a fucking liar. You came here with your loser fucking pals because you have the attention span of a nigger and the morals of a kike, and because of that fact, you are going to lose everything you have.   4:15 PM ✓✓

Next time I post that photo, the faces won't be blurred, and then you're going to start getting unexpected visitors   4:45 PM ✓✓

And I don't care if it's you causing the trouble, you're the one who's gonna suffer cause you're the one who I can get   4:45 PM ✓✓

If you wanna dox Vic, he's a better target, but if you give me fake info, then your wife is gonna have trouble sleeping at night until she leaves you and takes your kids away   4:47 PM ✓✓

What picture are you even talking snout   6:37 PM

About   6:37 PM

Fuck around and I'll remind you the hard way

GIF   Message   📎 🎤

  







**Cheddy Blac**
last seen recently

seriousness    8:17 PM ✓✓

Show me the picture you have    8:21 PM

No    8:23 PM ✓✓

8:27 PM ✓✓

More where that came from    8:27 PM ✓✓

I bet one of my incel listeners would love to give her another baby    8:28 PM ✓✓

You think the FBI would take issue with an LSD user owning guns around kids?    8:31 P...

GIF    Message



9:43 🕉 ⊖ ⓪ ⊠                    📶 4G 49% 🔋

**Cheddy Blac**
last seen recently

← ⋮

Fine. Good luck  8:42 PM ✓✓

I dont even have his dox  8:42 PM

Guess you're fucked then  8:43 PM ✓✓

Alright, since you're obviously not understanding the severity of this, I'll do you a favor.  9:17 PM ✓✓

On Tuesday I'm going to send every episode of BowlCast along with your identifying information to whatever the local equivalent of CPS is in your jurisdiction.  9:18 PM ✓✓

This way the information won't be public, yet.  9:18 PM ✓✓

By Tuesday you should be able to talk to your wife and kids and get them to all have their stories straight, get anything incriminating out of the house.  9:19 PM ✓✓

But I'm pretty sure once that visit comes, you'll understand that this is serious.  9:19 PM ✓✓

If that doesn't work, I'll escalate until I get what I want.  9:20 PM ✓✓

Tell Vic that if he gives himself up, he can save your family  9:26 PM ✓✓

He won't do it, but at least then you'll know certain that you chose the wrong side  9:27 PM ✓✓

⌄

GIF  Message                    📎  🎤

○○          ▢          ←







GOVERNMENT
EXHIBIT
102
(id)    1:20-cr-06-01-PB

Case 3:18-cr-00089-NKM Document 664-1 Filed 10/29/2021 Page 482 of 609 Pageid#: 6455986



Case 2:18-cr-00389-WBS Document 90-1 Filed 10/29/2021 Entry ID: 6455986



But I can't, so I'll let the law do it.                                                    1:58:21 AM

                                                                                           1:58:32 AM

                                                                                           1:58:53 AM

**Christopher Cantwell** admin                                                             1:59:14 AM
I think when CPS hears that fucking podcast he hosts,
they'll pay his fucking criminal ass a visit

He's had ample warning, so I'm sure he'll get rid of                                       1:59:29 AM
the drugs before then and come up with suitable lies

                                                                                           1:59:37 AM

                                                                                           1:59:43 AM

                                                                                           1:59:43 AM

**Christopher Cantwell** admin                                                             2:00:09 AM
I hope every CPS worker in Missouri is a Jew or a
Nigger and I hope they break every rule and destroy
this scumbag's life

                                                                                           2:00:22 AM

                                                                                           2:00:28 AM

+ JOIN

J.A. 1073

17R239_REP-000101_000007

**GOVERNMENT EXHIBIT**
**103A**
(id)    1:20-cr-06-01-PB

**Child Abuse Hotline Call**

CPS:    Child Elder Abuse Hotline.  Would you like to make a report?

CC:    Yeah, I, a, what do you call?  I have a concern which is not – I do not have direct evidence of a child being directly abused.  I believe that the parent is potentially putting the child in danger.  He's a member of a white supremacist organization.  They call themselves the Bowl Patrol.

CPS:    Okay, let me stop you there for a second so how do you know about this situation?  Is it through your job, or-

CC:    It is – you could say that.  I am a white supremacist myself and I happen to know this guy.

CPS:    Okay, do you want to leave your name?

CC:    Yeah, I will leave you my name.  My name is Christopher Cantwell and if you Google it you will find out exactly who I am.

CPS:    You say Cantwell is your last name?

CC:    Yes.  C-A-N as in November, T as in Tango, W-E-L-L.

CPS:    And a telephone number where you can be reached as well.

CC:    I can be reached at ███-1213.

CPS:    Do you want to leave your address?

CC:    You can call – if you want, it's ████████████████, Keene, New Hampshire.

CPS:    What city are you in?

CC:    Keene.  K-E-E-N-E.

J.A. 1074

CPS:    And you are in the State of Missouri?

CC:     No, New Hampshire.

CPS:    New Hampshire, okay.

CC:     He's in Missouri. I am calling you from New Hampshire.

CPS:    And let me get the child's name.  Do you have a child's name?

CC:     I do not know the child's name.  I don't even know his real name.  I know an alias for him but I happen to have pictures of him at his home address which happens to be in Missouri.

CPS:    Okay.  Alright, let me just get a little more info about the child. Is it a male or female?

CC:     There are three or four kids in the house according to the picture I am looking at.  There are boys and girls there.

CPS:    Okay and what's the father's alias?  What's his name or the name you have for him?

CC:     The father goes by the name Cheddar Mane.

CPS:    And what's his address?

CC:     The address is, one second.  The address is, oh where did it go?  Hold on a second.  There it is. ███████████████████████ Winfield, Missouri.

CPS:    Do you have a phone number for the father with area code first?

CC:     I don't.

CPS:    Do you know if there's a mother in the home?

CC:     Yeah, there's a mother in the home.  I am looking at a picture of her.

J.A. 1075

CPS:    You don't have a name for her?

CC:    No, I don't.

CPS:    How hold does dad look to you:

CC:    Dad is, I am going to say he is in his late thirties.

CC:    And what about mom? How old does she look?

CC:    Mom's a – mom looks a little younger than him.  I am going to go ahead and say early to mid thirties?

CPS:    Now, the problem that you're reporting today, do you know if it's been reported to the hotline before?

CC:    I don't believe it has.  He has gone through a great deal of effort to keep his identity a secret and I happen to find out this bit of information and because I have a problem with this guy and I think that he's a – I think that he – by my standards – I am literally – people call me a Nazi and I don't care.  By my standards, I think this guy is dangerous. So that's why I am calling you.

CPS:    Okay, so what's going on?  Tell me what's going on, please.

CC:    Alright, so I am looking at a picture of this guy with what looks like seven hits of LSD on his tongue.  Okay, that's one.  And the other is that he's – so, look I've got white identity politics but he's part of an organization, they call themselves – organization is a rough word for it, but he is part of a group that call themselves Bowl Patrol, okay?  And the reason they call themselves Bowl Patrol is because it's a reference to the hairstyle of Dylan Roof who went into the church and shot a bunch of black people, okay.  They run around trying to antagonize people.  They try to instigate people to go out and do these mass shootings.  They praise, they call Dylan Roof Saint Roof.  They talk about Robert

Bowers, the guy that shot up the synagogue in Pittsburgh as Saint Bowers.  They do shit like this, okay?  And so I had to kick them out of all my chat rooms and stuff like this.  I host a podcast. Because they were trying to instigate my audience members to go out and get themselves shot and imprisoned doing this craziness, you know?  So they go on and do this show they call it The Bowl Cast.  They go on another one called Goy Talk with this guy Paul Nehlen who is a failed congressional candidate.  They are part of a segment of the white nationalist movement that is referred to as accelerationists, which is to say they want to speed of the collapse of western civilization through violence and chaos because they don't believe the system can be redeemed.  And so, they encourage acts of violence and terrorism which, again, even by my standards is out of league, you know what I mean?

CPS:    Okay, and so what's the name of the group, again, it's the Dylan Roof, they're called what?

CC:    Bowl Patrol, like b-o-w-l, Bowl Patrol.

CPS:    Okay and so, um, go ahead, go ahead and tell me what else they encourage.

CC:    They encourage acts of lone wolf terrorism, suicidal mass shootings.  You know, whatever problem that can be created they think is just fantastic.  The idea is that they are accelerationists, which means that they view our political system as beyond redemption and so they want to cause as much chaos and destruction as humanly possible in order to see the system collapse so that something better might come out of it, make sense?

CPS:    Yes, now have they – is any of his behaviors – what else is dad doing?  Has he made any threats to harm the children or anything to your knowledge?

CC:    No, I have no idea that he's harmed the children or anything like that.  All I know is that he is a dangerous guy who I am looking at him with pictures of LSD on his tongue and a bunch of kids in his house. So, you know, it's not-

CPS:     How do you know that he has LSD on his tongue?

CC:     I am looking at a thing, well, because I have a history of drug use myself from my younger years. And so I am looking at a picture of this guy with thin strips of paper on his tongue, and well you know, that's what that looks like to me, in any case.  I don't know why he would be bragging about- I don't know why he would be sending people pictures of himself with paper on his tongue for any other reason.

CPS:     Okay. Do you have any information as to how dad behaves when he is under the influence of drugs?

CC:     I don't.  I have these, I can send you these podcasts that he's on and you can hear him.  He identifies himself as Cheddar Mane and like these guys they talk about encouraging people to go out and do acts of violence and stuff.  If you've got an email address I can send you some stuff.

CPS:     What do, what do you feel needs to happen for you to be confident that the children are safe?

CC:     The truth of the matter is, hon, I think that this guy is a problem and the thing is that what he does to the best of my understanding is not a criminal act, okay? So like, I just, basically, I am looking to make this guy uncomfortable, is the truth of the matter.  I think he is bad for my cause and so Is aid what can I do about this and so I called you.

CPS:     Okay.

CC:     You know, I don't know, you know I don't know what the rules are, right?  I just know that if this guy is taking drugs and talking about starting a damn race war for violence and terrorism with, you know, a bunch of kids in the house, might be of interest to somebody, you know, of authority.

CPS:     Okay so on a safety scale of 1-10 with 10 being the kids are safe, 0 meaning the children are not safe, what do you feel that their safety rating is?

## J.A. 1078

CC:     Um, since I don't know anything about what goes on in that house on a day-to-day basis, it's impossible for me to say, right?  I mean, what I know is that there is a guy who runs around on the internet under what he presumes is an anonymous name encouraging other people to go out and engage in acts of racially motivated terrorism and so, uh, unfortunately, uh, I haven't seen the federal government get too interested in doing anything about this and so I figured I would give you a call.  I mean, I have no idea what goes on in the house on a day to day basis.

CPS:    Okay, do you know if the police have ever been notified about dad's behavior?

C:      I, I, there's-to the best of my knowledge what he does is not a crime, you know what I am saying?  But like this, what he has been doing is not like, I have had problems with these other members of his group, like deface my website and I reported them to the FBI, okay?  So like, but the FBI doesn't seem particularly interested in doing anything about it because they haven't done anything about this crime that was literally committed against me.  I gave them the IP address of these guys and told them what they did and I made a formal criminal complaint and they did nothing about it.

CPS:    Do you know if dad has any weapons or anything in his home?

CC:     He actually, the conversation I had with him yesterday he says he doesn't, but I think that is a lie because he has expressed to me enthusiasm for firearms in the past and if I recall correctly, he offered to buy my weapons at one point and I didn't want to give it to him.

CPS:    Okay, will you hold for just a second, I just want to discuss this with my supervisor.

CC:     You've got it.

CPS:    Thank you.

J.A. 1079

END OF PART ONE

CPS:     Okay, thank you so much for holding.  Um, now we don't have any information that dad is
encouraging his children to participate in any violent acts?

CC:      No, I don't have any information that he is encouraging his children to do anything violent, but I
do believe he is indoctrinating them into the ideology, but I don't, I don't have like concrete proof of
that, because like I said, I don't know what goes on in the house on a daily basis.  I just know the guy is a
problem.

CPS:     Okay, we have documented the call. It doesn't rise to the level of a report, but we have
documented the call.

CC:      Okay.  Do you want me to send you, uh, an email with some material?

CPS:     Well, I don't have an email for you to send it.  You know what, um, hold on here.  Let me see if
there's another email, or you couldn't fax it?

CC:      No, I'm talking – I've got .mp3 files here.  The podcasts that he's on, is like I said, these guys are
going out there and talking about, you know, they're encouraging fucking people to terrorism and it's on
an audio file.

CPS:     I don't have an email to give you to receive that info, but I will check around, I have your phone
number here, 603-803-1213 and if I find out that we have an email or something where you can send it
to I will give you a call back if that's the case.

CC:      Yes, and I will give you – you want to jot down a website real quick?

CPS:     Yes, go ahead.

CC:     Okay, it's radiowehrwolf.world, but wehrwolf is spelled weired.  It's r-a-d-i-o-w-e-h-r-w-o-l-f.w-

o-r-l-d,  radiowehrwolf.world

CPS:    Okay, I've got it.

CC:     Okay and on there you can find, there's like a thing at the top that says "shows" and the second

one down is Bowl Cast and you can see they've deleted a couple of episodes, uh, because they got to,

probably because they went too far on those and they knew it.  Uh, but you can see they are up there,

the type of stuff they are talking about is pretty troubling.

CPS:    Alrighty, thank you so much for calling.

CC:     Okay.

CPS:  Alright.

CC:     Alright, take care, hon.

END OF TAPE @

Trial Exhibit 105 is an audio recording.

It can be found at Track 1 on the disc accompanying this Joint Appendix.

GOVERNMENT
EXHIBIT
105A
1:20-cr-06-01-PB

CC:     The only choices that I have are to go to law enforcement or to go to hunt this fucking assholes down and commit a crime myself.  Those are the two choices that I have.

KF:     How can you say that?

CC:     No, because, well because those are my two choices.  I can say that and I can say that to the fucking FBI.  That's why I go to the FBI, right?  That's why I go to the government so that I don't have to commit a crime.  You know, it's not a matter of I think they are on my side or not, it's these guys broke the law and the only remedy I have is law enforcement.

KF:     Okay, but you threatened Cheddar Mane and said you are going to come and rape his wife.

CC:     I didn't say I was going to go rape his wife, okay?  I fucking left that our there, okay?

J.A. 1083

Trial Exhibit 106 is an audio recording.

It can be found at Track 2 on the disc accompanying this Joint Appendix.

GOVERNMENT
EXHIBIT
106A
1:20-cr-06-01-PB

CC:  I didn't threaten to rape his wife, what I said was fucking you don't want me to put this out

there.  One of my incel listeners would love to give her a kid, okay?  That's not, you know, I

understand the definition of threat legally, okay, and that's not what that is.  The thing that

there's like liability on is like I said, give me Vic's information, you know, to prevent me from

doing something, okay?

Trial Exhibit 108 is an audio recording.

It can be found at Track 3 on the disc accompanying this Joint Appendix.

GOVERNMENT
EXHIBIT
108A
(id)    1:20-cr-06-01-PB

**Telephone call with Christopher Cantwell and Katelen Fry December 5, 2019**

**KF:**          **Katelen Fry**
**CC:**          **Christopher Cantwell**


CC:    -and I, I explained what my relationship was with you, you know, that we were briefly

dating and that that's not going on anymore and that you visited Cheddar Mane and Hard Mouse

and that's how I got the information for Cheddar Mane.

Trial Exhibit 109 is an audio recording.

It can be found at Track 4 on the disc accompanying this Joint Appendix.

CC:     I think that these – I honestly believe that Cheddar and all those guys, you know, well, you know, I don't know how conscious of it Cheddar or Hard Mouse was, okay?  But like I am 100% that, convinced that Vic Mackey is a hostile actor and has been from the beginning, okay?

Trial Exhibit 110 is an audio recording.

It can be found at Track 5 on the disc accompanying this Joint Appendix.



GOVERNMENT
EXHIBIT
110A
1:20-cr-06-01-PB

HANNAH PLEASANT:     What does your lawyer have to say about this shit? Like is...

CHRIS CANTWELL:     Well you, you know there's a limit to how much I can say on here because, you know...

HANNAH PLEASANT:     Right.

CHRIS CANTWELL:     ...they'd be sharing it with the prosecution, but I mean at the end of the day it's like this. You know? It, the, eh, eh, eh, they, what they have is, you know, if you, if you believe the narrative, you know, eh, be like, if you just take this thing as an isolated situation it looks bad. Right? I'm like give me Vic, you know... I, I, I, you know, eh, the, the, the, I am alleged to have said I should have I should say. Give me Vic he's more valuable, um, and...

HANNAH PLEASANT:     Wh....

CHRIS CANTWELL:     uh, you know, and there's, there's... You know they're... And, and my thing is this. I think that I can convincingly make the case that, you know, if you don't want me to fuck your wife or...

HANNAH PLEASANT:     [children talking in background] (UI)


CHRIS CANTWELL:     ...whatever it's not a threat. Okay? And like, and it literally just isn't. You know? What I threatened to do is dox this fucken asshole and then I ended up fucken adding CPS to the fucken mix. And I called CPS and they've got the phone call of that. So like, you know, that's a different category of, you know, it's not legal to do that. You know? But like that's not the crime that I'm, uh, accused of. Right? So, you know, it'd be pretty easy to go in there and like make the case that like, okay, you know, find him guilty of a lessor count or something like this. You know?

Trial Exhibit 111 is an audio recording.

It can be found at Track 6 on the disc accompanying this Joint Appendix.

GOVERNMENT
EXHIBIT
111A
1:20-cr-06-01-PB

CHRIS CANTWELL: My trial is currently scheduled for April 7, alright? And I think that I can win just by like, just arguing the evidence the prosecution gives us, ok? Those screenshots are not a rape threat and, and, at least one reasonable person exists in a room full of 12 registered voters who's going to be able to see that, ok? So I don't think they can convict me of what they are trying to fucking charge me with and I don't think they believe that they can, ok?

INGRID DEAN: Yea wasn' t … sorry

CHRIS CANTWELL: Go ahead.

INGRID DEAN: What you ... the only thing you were extorting was that you were going to call CPS and that's not a crime.

CHRIS CANTWELL: Well it can be. The thing is, if you look at 875(a), (b), (c), (d) there are four different sections of it, ok?

INGRID DEAN: Yea, I know.

CHRIS CANTWELL: What like, yea 875(d) is you're threatening to harm someone's reputation for a thing of value, ok?

INGRID DEAN: Umm, hum.

CHRIS CANTWELL: So you could make the argument that like doxing someone. This is why I said you know if you read. I don't know what you have seen of the phone call between me and Katelen but like when I said there is some liability there this is what I was literally thinking of, but like for harming someone's reputation and then like you can harm someone's reputation, you can dox them but if you say give me something in exchange for it, give me something to prevent me from doing that then that's a crime ok? I didn't realize that at the time and I wasn't making the connection because I'm like ok, I'm going to dox you right, I told you that before.

INGRID DEAN: Yea.

CHRIS CANTWELL: Get away from me you know and what I was trying to accomplish was for a proper purpose. I'm telling you to stop harassing me, leave me alone or I'm going to fucking expose you. Alright? That's a reasonable thing. The liability enters when I say "Give me Vic, it's you're only out." Ok, so I didn't realize that until Ryan emailed me about it later on and so that's why I told Katelen that you know, there is some liability and this is one of the things they are using against me. Ok?

INGRID DEAN: Who's Ryan?

CHRIS CANTWELL: But that's …. Ryan's my tech.

Trial Exhibit B-5a is an audio recording.

It can be found at Track 7 on the disc accompanying this Joint Appendix.



DEFENDANT'S
EXHIBIT
C2 (id)
20-cr-00006-PB

9:42

# Cheddy Blac
online

## Info

Killin ain't shit. Bitches ain't shit. Niggers ain't shit.

Bio

@CheddyBlac

Username

Notifications

On

## Shared content

Photos and videos                    2

## Start Secret Chat

00        J.A. 1095

17R239_REP-000179

DEFENDANT'S
EXHIBIT
C17 (id)
20-cr-00006-PB
tabbies



DEFENDANT'S
EXHIBIT
C19 (id)
20-cr-00006-PB



**The Bowlcast**
Forwarded from <u>Uncle Paul</u>

FROM CHEDDAR MANE:

Cantwell is a liar. Like a typical narcissistic meth head rat snitch, he has deflected blame for his ridiculous actions.

Cantwell threatened to post pictures of my wife and kids before, if BP didn't leave him alone and stop prank calling his show. We did. Everyone took notice because the pranks were the reason they listened and his audience is down to a couple hundred cops/antifa /spies/losers at this point, so the only logical conclusion is that his little podcast was only entertaining while he was chimping out over our hilarious pranks.

Fast forward a couple months.

Cantwell continues to fade into obscurity and blame others for this slide into nothingness.

"I'm talented!! I'd be making millions of dollars if not for these Jews and bowl patrol pranks!" He says, refusing to accept any responsibility for his situation and look within himself the same way a nigger blames others for their state of affairs. He is insanely jealous that a guy like me can have the life I have while he is selling possessions and moving into mommy's basement. (Poor little baby thinks he should be getting paid for selling people out to the feds and ACTING like he gives a fuck about anyone but himself.)

Lets take a look at what ACTUALLY caused this pathetic dox: I accidentally joined a telegram group not knowing it was his and memed at heimbach. Nothing more, nothing less.

**J.A. 1097**

Lets take a look at what ACTUALLY caused this pathetic dox: I accidentally joined a telegram group not knowing it was his and memed at heimbach. Nothing more, nothing less.

He again threatened me, but knowing it was only a matter of time for this toothless junkie to pull the same shit again endlessly until his incarceration/overdose (a foregone conclusion at this point), I told him to go ahead, knowing that his delusions of grandeur would be his undoing. He just can't wrap his head around the fact that nobody gives a fuck whether he lives or dies and if they do, they probably only want the latter.

"The only way you can get out of this is to give me vic mackey's dox" (a moot point because even if I DID have it, I am not a fed rat snitch turncoat piece of white trash like he is, so he never would have gotten it anyway.)

He decided to show publish the pictures. And now he is lying about why.

Don't trust this fed snitch nigger kike with any information and don't believe his lies. He's unhinged, on drugs, in the wrong. And he knows it based on how quickly he hung up on me yesterday.

Chris, you need professional help.

Still waiting for CPS to show up so we can have a good laugh and glass of lemonade together, I am...

Cheddar Mane                                    1.3K 👁 15:17

**J.A. 1098**

Trial Exhibit E-41 is an audio recording.

It can be found at Track 8 on the disc accompanying this Joint Appendix.

Trial Exhibit E-43 is an audio recording.

It can be found at Track 9 on the disc accompanying this Joint Appendix.

DEFENDANT'S
EXHIBIT
G (id)
20-cr-00006-PB

2/11/2019                                IC3 Complaint Referral Form



**Complaint Referral Form**
**Internet Crime Complaint Center**

---

**Victim Information**

Name: Christopher Cantwell
Business Name: Radical Agenda LLC
Age: 30 - 39
Address: 103 S. Lincoln Street
Address (continued): Apt 1
Suite/Apt./Mail Stop:
City: Keene
County: New Hampshire
Country: United States of America
State: New Hampshire
Zip Code/Route: 03431
Phone Number: 16038031213
Email Address: ChrisCantwell@protonmail.com
Business IT POC, if applicable:
Other Business POC, if applicable:

---

**Description of Incident**

Provide a description of the incident and how you were victimized. Provide information not captured elsewhere in this complaint form.

My website (ChristopherCantwell.com) was defaced with terrorist propaganda and pornography last night. Including pro███████████material and bestiality.

The offending IP addresses were 36.38.141.196 and 206.189.198.44

This was carried out by individuals calling themselves the "Bowl Patrol" a ██████████reference. In particular, one goes by the name of ████████████████████on Telegram) and the other calls himself "Mosin Nagant" an alias which I know is familiar to the FBI already.

████had an author's account on my website some time back when he was allowed to contribute content. His permission to do so had since been rescinded, but his account remained active. He seems to have shared the credentials with Nagant, to post the offending material last night.

This group has been responsible for constant spam and harassment of me and my communications channels for months, ever since I distanced myself from the group in the wake of the Pittsburgh synagogue shooting.

I am interested in pursuing criminal charges if at all possible.

Which of the following were used in this incident? (Check all that apply.)
☐ Spoofed Email
☐ Similar Domain
☐ Email Intrusion

**J.A. 1101**

17R239_REP-000008

2/11/2019                                                IC3 Complaint Referral Form

☑ Other      Please specify: WordPress login

*Law enforcement or regulatory agencies may desire copies of pertinent documents or other evidence regarding
your complaint.*

*Originals should be retained for use by law enforcement agencies.*

---

**Information About The Subject(s) Who Victimized You**

| | |
|---:|:---|
| Name: | ████████████ & Mosin Nagant |
| Business Name: | Bowl Patrol |
| Address: | |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | |
| Country: | [None] |
| State: | [None] |
| Zip Code/Route: | |
| Phone Number: | |
| Email Address: | |
| Website: | |
| IP Address: | |

---

**Other Information**

If an email was used in this incident, please provide a copy of the entire email including full email headers.

[No response provided]

Are there any other witnesses or victims to this incident?

[No response provided]

If you have reported this incident to other law enforcement or government agencies, please provide the name,
phone number, email, date reported, report number, etc.

[No response provided]

☐ Check here if this an update to a previously filed complaint:

---

**Who Filed the Complaint**

Were you the victim in the incident described above? Yes

---

**Digital Signature**

By digitally signing this document, I affirm that the information I provided is true and accurate to the best
of my knowledge. I understand that providing false information could make me subject to fine,
imprisonment, or both. (Title 18, U.S. Code, Section 1001)

Digital Signature: Christopher Cantwell

---

**J.A. 1102**

17R239_REP-000008.02

2/11/2019                                    IC3 Complaint Referral Form

Thank you for submitting your complaint to the IC3. Please save or print a copy for your records. ***This is the only time you will have to make a copy of your complaint.***

**J.A. 1103**

17R239_REP-000008.03

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.                                               No. 20-CR-00006-PB

CHRISTOPHER CANTWELL

**<u>ASSENTED-TO MOTION TO COMPLETE THE RECORD</u>**

The defendant, Christopher Cantwell, by and through his counsel, Jeffrey S. Levin and

Eric Wolpin, AFPDs, files this motion to complete the record regarding an objection the defense

made to a jury instruction titled 'Provocation – Not a Defense." The government assents. As

grounds it is stated:

On Thursday, September 24, 2020, after the defense rested its case, the Court gave the

parties a draft set of proposed jury instructions which included an instruction titled "Provocation

- Not a Defense." *See* Exhibit A (excerpt from Court's draft jury instructions). The Court's

proposed jury instruction stated as follows:

> *PROVOCATION - NOT A DEFENSE*
>
> *You have heard evidence that Victim 1 and others have engaged in behavior that
> disrupted the defendant's live call-in radio show. You have also heard evidence that Vic
> Mackey or others may have engaged in behavior that disrupted the defendant's website.
> This evidence of other acts was admitted only for a limited purpose. You may consider
> this evidence only for the purpose of understanding the context of the relationship
> between the defendant and Victim 1. You may not consider this evidence for any other
> purpose. Justification, self-defense, and provocation are not defenses to the crimes the
> defendant is charged with here.*

*Id.* Defense counsel indicated that it would object to the instruction.

On Friday, September 25, 2020, defense counsel orally objected to the proposed jury

instruction , citing *In Re Winship*, 397 U.S. 358 (1970) for the proposition that the defendant has

a due process right against conviction except upon proof beyond a reasonable doubt of every fact

**J.A. 1104**

necessary to constitute the crime charged; and citing as well two Second Circuit cases, *U.S. v. Abelis*, 146 F.3d 73 (2nd Cir. 1998) and *U.S. v. Absolam*, 305 Fed. App'x 786 (2nd Cir. 2009), for the proposition that a jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.

The Court noted the defendant's objection and invited defense counsel to propose alternate language. Defense counsel submitted alternate language for the instruction by email to the Court and parties. *See* Exhibit B. Defense counsel's proposed language for the instruction was as follows:

> *You have heard evidence that Victim 1 and others engaged in behavior that disrupted the defendant's live call-in radio show. You also heard evidence that Vic Mackey or others may have engaged in behavior that disrupted the defendant's website. Evidence of provocation may be relied upon by you to determine whether the government has met its burden to prove beyond a reasonable doubt every element of each of the charges in this case. If you find that the government has met its burden of proving beyond a reasonable doubt every element of the charges, however, then evidence of provocation does not negate the defendant's criminal culpability.*

> *You may consider evidence of provocation for the purpose of understanding all the circumstances surrounding the making of the communication, including, for example, the language, specificity, and frequency of the communication; the context in which the communication was made; the relationship between the defendant and Victim 1; Victim 1's response; any previous communications between the defendant and Victim 1; and whether you believe the person making the communication was serious, as distinguished from mere idle or careless talk, exaggeration, or something said in a joking manner. You may not consider evidence of provocation for any other purpose.*

Exhibit B.

The Court noted the submission of the defense's alternate instruction and the defendant's preference that no instruction be given on this point.

The government assents to the granting of this motion. No separate memorandum is filed as all points are contained herein.

J.A. 1105

Wherefore, the defendant through his counsel moves the Court to complete the record by allowing this motion along with the attached exhibits and for such other relief as may be deemed just.

Date: September 28, 2020

Respectfully Submitted,

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar No. 18372
*/s/ Jeff Levin*
Jeff Levin
N.H. Bar No. 12901
Assistant Federal Defenders
Federal Defender Office
22 Bridge Street
Concord, NH 03301
Tel. (603) 226-7360
E-mail: jeff_levin@fd.org

CERTIFICATE OF SERVICE

I hereby certify that the above document was served on September 28, 2020 to all counsel of record and in the manner specified herein: through CM/ECF.

*/s/ Jeff Levin*

J.A. 1106

To act with "intent" means to act voluntarily and intelligently, not by ignorance, accident, or mistake, and with the specific intent or purpose of causing a desired result in a particular individual.  It is not enough merely to foresee that such a result is a likely consequence of repeated communications.  Moreover, a bad motive of some other kind, standing alone, is not enough.

Intent to "harass" means to act with the specific intent or purpose of causing an adverse emotional reaction in a specific person, not merely speech that happens to cause annoyance or insult.

Intent to "intimidate" means to act with the specific intent or purpose of putting a person in fear or apprehension of injury inflicted by a particular person.

## PROVOCATION – NOT A DEFENSE

You have heard evidence that Victim 1 and others have engaged in behavior that disrupted the defendant's live call-in radio show.  You have also heard evidence that Vic Mackey or others may have engaged in behavior that disrupted the defendant's website.  This evidence of other acts was admitted only for a limited purpose.  You may consider this evidence only for the purpose of understanding the context of the relationship between the defendant and Victim 1.  You may not consider this

EXHIBIT A

evidence for any other purpose.  Justification, self-defense,
and provocation are not defenses to the crimes the defendant is
charged with here.

### IGNORANCE OF THE LAW - NOT A DEFENSE

The government is not required to prove that the defendant
knew that he was violating the law.  Ignorance of the law is not
a defense to the charges alleged in the Indictment.

### CONCLUSION

The principles of law set forth in these instructions are
intended to guide you in reaching a fair and just result in this
case which is important to both of the parties.  You are to
exercise your judgment and common sense without prejudice,
without sympathy, but with honesty and understanding.  You
should be conscientious in your determination of a just result
in this case because that is your highest duty as officers of
this court.  Remember also that the question before you can
never be:  will the government win or lose the case?  The
government always wins when justice is done, regardless of
whether the verdict be guilty or not guilty.

When you have considered and weighed all the evidence, you
must make one of the following findings with respect to each
count:

| | |
|---|---|
| **From:** | Jeff Levin |
| **To:** | "Vincent Negron" |
| **Cc:** | Eric Wolpin; Krasinski, Anna (USANH); John (USANH) Davis (John.Davis8@usdoj.gov); Sheff, Ruth (USANH); J Arsenault |
| **Bcc:** | Behzad Mirhashem |
| **Subject:** | Cantwell - Defense Revision of "Provocation Not a Defense" Instruction |
| **Date:** | Friday, September 25, 2020 12:31:00 PM |

You have heard evidence that Victim 1 and others engaged in behavior that disrupted the defendant's live call-in radio show. You also heard evidence that Vic Mackey or others may have engaged in behavior that disrupted the defendant's website. Evidence of provocation may be relied upon by you to determine whether the government has met its burden to prove beyond a reasonable doubt every element of each of the charges in this case. If you find that the government has met its burden of proving beyond a reasonable doubt every element of the charges, however, then evidence of provocation does not negate the defendant's criminal culpability.

You may consider evidence of provocation for the purpose of understanding all the circumstances surrounding the making of the communication, including, for example, the language, specificity, and frequency of the communication; the context in which the communication was made; the relationship between the defendant and Victim 1; Victim 1's response; any previous communications between the defendant and Victim 1; and whether you believe the person making the communication was serious, as distinguished from mere idle or careless talk, exaggeration, or something said in a joking manner. You may not consider evidence of provocation for any other purpose.

Sincerely,

*/s/ Jeff Levin*

Jeffrey S. Levin
Federal Defender Office
District of New Hampshire
Ralph Pill Marketplace
22 Bridge Street – Box 12
Concord, NH 03301
Tel. (603) 226-7360
Fax (603) 226-7358
Email: Jeff_Levin@fd.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   20-cr-06-01-PB
            v.                      *   February 24, 2021
                                    *   10:05 a.m.
    CHRISTOPHER CANTWELL            *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:

For the Government:          John S. Davis, AUSA
                             Anna Z. Krasinski, AUSA
                             U.S. Attorney's Office


For the Defendant:           Jeffrey Levin, Esq.
                             Eric Wolpin, Esq.
                             Federal Defenders Office


Probation:                   Sean Buckley


Court Reporter:              Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             603) 225-1453

J.A. 1110

```
 1                      P R O C E E D I N G S
 2              THE CLERK:  Court is in session and has for
 3    consideration a sentencing hearing in United States of America
 4    versus Christopher Cantwell, criminal case
 5    number 20-cr-6-1-PB.
 6              THE COURT:  All right.  Here's how I intend to
 7    proceed.  I would like to first review the report with the
 8    defendant to make sure he's read it and understands it.  I
 9    want to determine the defendant's guideline sentencing range
10    in the absence of a departure or variance.  I then will
11    address departures and variances together.  I have certain
12    specific questions that I want to review with the parties, and
13    then I'll give them an opportunity to say anything else they
14    want to say.  I'll give the defendant an opportunity to speak.
15    I'll then rule on departures and variances and impose the
16    sentence I intend to impose.  All right?
17              So let's start with the presentence report.
18              Mr. Cantwell, I have a report for you that was
19    prepared originally on November 20th of 2020, and it was
20    revised on December 17th.  Have you seen that report?
21              THE DEFENDANT:  I have.
22              THE COURT:  Have you read it and discussed it with
23    your attorney?
24              THE DEFENDANT:  I have.
25              THE COURT:  Do you feel you understand it?
```

**J.A. 1111**

```
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  All right.  Thank you.  You can be
 3    seated.
 4              Does the government dispute any of the facts or
 5    legal conclusions contained in the report?
 6              MR. DAVIS:  No, your Honor.
 7              THE COURT:  Is the defense pressing any objections
 8    to the facts and legal conclusions set forth in the report?
 9              MR. WOLPIN:  No, your Honor.
10              THE COURT:  I adopt the findings of fact and
11    conclusions of law set forth in the report which will be made
12    a part of the record under seal.
13              I determine that the defendant's total offense
14    level in the absence of a departure or variance is 20 and his
15    Criminal History Category is III.  The guideline sentencing
16    range is 41 to 51 months.
17              So the parties have filed detailed and helpful
18    memoranda that affect my sentencing judgment.  I've had a
19    chance to study those.  There are three specific issues that
20    have come up that I want to talk to the parties about.  So
21    there is an argument that the defense has that the defendant's
22    criminal history category overstates the seriousness of his
23    criminal history and that that warrants departure or variance.
24    I want to hear from the defense on that first and then hear
25    from the government.  So that will be the first issue I want
```

```
 1   to take up.
 2            The government has asserted in its papers that the
 3   fact that the threat was made against the victim's family
 4   member is a potential ground for an aggravating factor that I
 5   should consider in sentencing.  I want to hear your argument
 6   and the defense's response on that.
 7            And then the matter that I need the most help on is
 8   with respect to the defendant's provocation argument and how
 9   that should affect this particular sentencing judgment, and I
10   want to focus on what I see -- and maybe there's a way to
11   reconcile it, but it seems to me that you -- the parties have
12   vastly different views about the events that immediately
13   preceded the conduct for which the defendant was convicted,
14   and I want to understand both parties' positions on that and
15   what your reactions are to the other party's take on the
16   sequencing of events because that can affect how I evaluate
17   the provocation argument that the defense is presenting.
18            So I want to deal with those three things in that
19   order, and then I'll turn to the government and have it make
20   its argument for sentence and then the defense.  Then I'll
21   give Mr. Cantwell an opportunity to speak.
22            Okay?  Everybody understand how we want to go
23   ahead?  Okay.  So let's start with the overrepresentation of
24   criminal history category argument.  I've read your papers.  I
25   think I understand your arguments, but if you want to add
```

1   anything to them, feel free to do that.

2        MR. WOLPIN:  Yes, your Honor.  Our argument stems

3   from the fact that obviously we have a point based system that

4   does its best to approximate prior past behavior through

5   certain variables like length of sentence.  As discussed in

6   what we filed, that gets I think more complicated in a time

7   served scenario, because it becomes less evident that the

8   sentence length imposed is truly a proxy for the seriousness

9   of the offense.

10        In this case there was a situation where Chris

11   appeared in court, left that day and left the state as

12   required, and that was simply the end of it.

13        Whether a court in another sort of hypothetical

14   world where he was not held pretrial that appeared with no

15   days or ten days or five days or whatever it might have been

16   would have similarly reached a sentence as here, it is

17   unclear.

18        THE COURT:  Let's make this concrete, okay?  So

19   let's start with -- which of the convictions are you arguing

20   aren't really dealt with in a way that's consistent with the

21   underlying purposes of the sentencing statute, and let's take

22   them one at a time and identify what points are assessed and

23   why you think those points produce overrepresentation.

24        MR. WOLPIN:  Yes.  All right.

25        So the points that are scored in this case only

**J.A. 1114**

```
 1    come from two incidents or two sets of conviction.  The first
 2    is a 2009, and I'm on page 15 of the PSR.
 3               THE COURT:  Got it.  Paragraph 61?
 4               MR. WOLPIN:  Correct.
 5               And then paragraph 62, which is two points from a
 6    2017/2018.
 7               In this situation -- this argument focuses on the
 8    last --
 9               THE COURT:  So he gets one point based on 61 and
10    gets two points based on 62, but then he gets another two
11    points because of the supervision essentially that adds to
12    this offense while on supervision.
13               MR. WOLPIN:  Correct.
14               THE COURT:  All right.  And so what do you want to
15    say as to 61?
16               MR. WOLPIN:  So as to 61, this becomes a question
17    of date.  It falls really right at that relatively arbitrary
18    ten-year mark.  So I understand there needs to be arbitrary
19    rules and timing and that is not illogical.  However, it does
20    lead to circumstances where if one has committed something
21    just a couple months before, it would count as zero as opposed
22    to one.
23               THE COURT:  So what we're talking about is the
24    equivalent of a DUI charge?
25               MR. WOLPIN:  Correct.
```

```
 1              THE COURT:  And that was in 2009 and he was
 2   assessed one point for that.
 3              MR. WOLPIN:  Correct.
 4              THE COURT:  If the charge had occurred how much
 5   earlier would it be zero?
 6              MR. WOLPIN:  Well, our argument would be this
 7   offense begins in June, ends in June of 2019.  So this would
 8   have been March.  So if this -- the conduct, your Honor, in
 9   our position predates the ten-year mark.  The conviction for
10   whatever reason took 16 months or so to actually be entered.
11              So had this case simply resolved in a more
12   expeditious manner, our argument is this would have counted as
13   zero.
14              THE COURT:  All right.  So your view is if it's
15   close to the ten-year cutoff, it meets it technically but not
16   practically because the conduct that gave rise to conviction
17   well predates the ten-year period and it seems to be just a
18   delay in processing the case which results in the conviction
19   being within the ten-year period and the one point therefore
20   is excessive.
21              MR. WOLPIN:  Fair.  Yes.
22              THE COURT:  Okay.  Got it.
23              What do you want to say?  Do you agree that two
24   points is warranted based on 62?
25              MR. WOLPIN:  Correct.  So how that sentence was
```

**J.A. 1116**

1    imposed, it imposed greater than 60 days of jail time.  This

2    case began as a number of felonies, ultimately resolved as

3    misdemeanor offenses with time served resolutions.

4            THE COURT:  These are the Charlottesville -- one of

5    the Charlottesville convictions?

6            MR. WOLPIN:  There are two together that are

7    misdemeanors charged from the same incident.

8            THE COURT:  Okay.

9            MR. WOLPIN:  And --

10            THE COURT:  He gets points for one but not the

11    other because they occurred on the same day.

12            MR. WOLPIN:  Because it's all the same, yes.  It

13    ultimately is.

14            THE COURT:  The government points out he assaulted

15    two different people, each one resulted in a conviction, but

16    they don't count -- you don't double count the points.  You

17    just get two for that.

18            MR. WOLPIN:  Correct.  And my understanding of what

19    these allegations were, it's a single spray of OC spray.

20    There were two people that were named as being sort of

21    affected by that and that's why there are two charges.  So it

22    truly is the same act even though there ended up being two

23    convictions.

24            THE COURT:  Well, yeah, they are two distinct

25    victims -- you're saying that -- are you making the contention

```
 1   that it was a single spray that hit two people?
 2            MR. WOLPIN:  That's my understanding of the facts
 3   of that case, correct.
 4            THE COURT:  Okay.  All right.  Got you.
 5            MR. WOLPIN:  So from our position -- again, I
 6   understand why when this case started as a felony there may
 7   have been, you know, a detention --
 8            THE COURT:  Let me just go back to this single
 9   spray issue.  Whether it was a single spray or not still would
10   only be two points for the two convictions, wouldn't it?
11            MR. WOLPIN:  Yes.
12            THE COURT:  So that point is like not determinative
13   of whether the two points is appropriate or not.
14            MR. WOLPIN:  No.
15            THE COURT:  Two points and only two points should
16   be assessed based on those two convictions under the guideline
17   whether it is a single spray or two distinct sprays that
18   occurred in close proximity to each other with no intervening
19   arrests, et cetera.
20            MR. WOLPIN:  Yes.
21            THE COURT:  Okay.  That's your position, but you
22   agree two points is the right assessment for that.
23            MR. WOLPIN:  Correct.
24            THE COURT:  Okay.  So you have a problem with the
25   two points based on the commission of the offense -- I want to
```

J.A. 1118

1    say under supervision.  That's sort of a traditional way we

2    talk about it.  What do you want to say about that?

3            MR. WOLPIN:  I want to say that -- in relation to

4    this offense, yes.

5            So there was an unsupervised good behavior period

6    which was imposed as part of a 2017 case.  That ends up

7    causing what are misdemeanors to jump from what was originally

8    two points to four points total for that offense.

9            THE COURT:  Wait, wait, wait.  I'm not

10   understanding you.  What do you mean?

11           MR. WOLPIN:  So it starts as two points as noted in

12   the, sort of within that section on paragraph 62.  Then this

13   criminal justice sentence issue elevates that another two

14   points.  So we're at a total ultimately of four points that

15   originate, I understand originates from the criminal justice

16   sentence provision but ultimately stems back from that.

17           THE COURT:  Well, it comes from the fact that while

18   he was under this period he committed the offenses of

19   conviction here, right?

20           MR. WOLPIN:  Right.

21           THE COURT:  So it's not like it changes a

22   misdemeanor to a felony.  It doesn't do that at all.  It's

23   basically if you're -- if you're being -- in the typical case

24   we have where you're being supervised -- if you commit a crime

25   while you're being supervised, you get extra points added on

```
 1    because we need to be holding people who are supposed to be
 2    under special supervision terms to a greater responsibility to
 3    avoid criminal conduct.  And when they do it, it shows they're
 4    not being rehabilitated by the prior sentence and therefore
 5    justifies the imposition of more points.  That's the way I
 6    understand it works.  Is that -- my thinking of it
 7    incorrectly?
 8                    MR. WOLPIN:  No.
 9                    THE COURT:  Okay.  So that's what happened here,
10    and your point is that because he was not being formally
11    supervised by probation you think that it's improper to give
12    the two points.
13                    MR. WOLPIN:  I'm not arguing from a legal
14    standpoint that that is not what the guidelines call for.  I'm
15    arguing from a consideration of how the points are being --
16    reflecting the history, yes.  I think that unsupervised
17    conditions of supervision or nonsupervision, just good
18    behavior, are so routine and commonplace, don't have that
19    rehabilitative function with supervision, that I think it
20    stretches beyond -- even though technically within the rule it
21    stretches beyond two points and sort of ends up having a
22    significant impact beyond what I think that good behavior
23    period should reflect.
24                    THE COURT:  Okay.  I understand your argument.
25    Basically then you're saying treat -- don't treat -- don't
```

**J.A. 1120**

```
 1   give him one, effectively give him one for what happened with
 2   the DUI of ten years ago.  Don't give him two.  And if he's
 3   left with that, he only has two points so he would be a II
 4   rather than a III, right?  That's your position?
 5             MR. WOLPIN:  Yes.
 6             THE COURT:  And did you want to say anything else
 7   about that?
 8             MR. WOLPIN:  No, your Honor.
 9             THE COURT:  All right.  What does the government
10   want to say in response?
11             MR. DAVIS:  Your Honor, the standard is whether a
12   Criminal History Category of III substantially overrepresents
13   either the risk of recidivism or the seriousness of the
14   history.
15             As we argued, the defendant cannot meet that burden
16   of showing substantial overrepresentation.  He's got five
17   criminal history points on this calculation.  As we argue,
18   there are seven criminal convictions that result in precisely
19   zero criminal history points.  Those are nonetheless
20   convictions and they bear on the seriousness of his offense
21   and certainly the seriousness of his criminal history, and the
22   recent ones --
23             THE COURT:  The ones prior to 2009, the ones
24   reflected in paragraphs 56 through 60 are offenses that
25   occurred in 1997, 1998, and 2000, right?
```

J.A. 1121

```
 1              MR. DAVIS:  Yes.
 2              THE COURT:  So they're a long time ago when he
 3   was --
 4              MR. DAVIS:  They're old convictions, yes.
 5              THE COURT:  They're old convictions for which he
 6   served a total of 45 days -- or no, he also did 60 on the
 7   criminal possession of a weapon.
 8              MR. DAVIS:  Yes.
 9              THE COURT:  So he did 60 on that and 45 days on the
10   operating under influence charge.
11              MR. DAVIS:  Yes.
12              THE COURT:  Okay.
13              MR. DAVIS:  And two of them, your Honor, are much
14   more recent.  One of them is the -- one of the assaults and
15   batteries in Charlottesville.
16              THE COURT:  Well, the defense agrees that he
17   deserves the two points for that.
18              MR. DAVIS:  Right.  But the point is there is
19   another one that's a zero that does not result in more points.
20              THE COURT:  Yeah, but the guidelines specifically
21   think about why you should not give points for those -- the
22   fact that there are two convictions why the guidelines
23   shouldn't give points.
24              MR. DAVIS:  Right.
25              THE COURT:  I don't have to accept his single spray
```

**J.A. 1122**

1    argument to say, oh, it was -- he shouldn't get an extra two

2    points.

3                    MR. DAVIS:  Right.

4                    THE COURT:  Like if it were two sprays separated by

5    half an hour during the course of this demonstration, it would

6    still only be two points.

7                    MR. DAVIS:  Yes.

8                    THE COURT:  Okay.

9                    MR. DAVIS:  Although it's even closer because under

10   4A1.1(e), if the assault and battery in Virginia was a "crime

11   of violence," then another point would be added, and the issue

12   there is that --

13                   THE COURT:  Why doesn't it qualify as a crime of

14   violence?

15                   MR. DAVIS:  Because it's not categorically a crime

16   of violence I don't think, and we're not saying that it is,

17   but it's close.  The only point being --

18                   THE COURT:  That's part of the fundamental

19   misjudgment by the United States Supreme Court to use a

20   categorical approach which restricts the power of a judge to

21   actually look at what happened.  I can't look at what happened

22   and say, oh, you should get points or not get points based on

23   what actually happened in the case.  I have to look at the

24   offense of conviction, and you're saying this offense of

25   conviction is not categorically a crime of violence even

**J.A. 1123**

```
 1   though by its terms because it's an assault conviction you
 2   would think, oh, that's got to be a crime of violence, but it
 3   isn't and because we have to use this categorical approach I
 4   can't dig into the underlying circumstances.
 5            MR. DAVIS:  And I'm not arguing that you should,
 6   your Honor.  I'm only saying this is a discretionary call on
 7   your part.  The defendant is asking for a departure.  The
 8   Court can assess anything and everything, and all the
 9   government is saying here is the defendant missed by a hair
10   getting another point because that was almost a crime of
11   violence.
12            The question is whether this criminal history score
13   somehow substantially overrepresents his record or whether
14   he'll recidivate, and we're just saying there are a lot of
15   things here where he ekes out a no score.
16            We also argue the Charlottesville misdemeanors are
17   not your ordinary misdemeanor.  There's the Unite the Right
18   rally.  There are guys driving from New Hampshire with an
19   armory of weapons, including guns and knives, who is in that
20   march and is in a confrontation.
21            And, yes, he scrapes by with misdemeanor
22   convictions, only one of which counts, but that's another
23   consideration for the Court.  Are these misdemeanors that are
24   meaningless or are they misdemeanors that say something about
25   criminal intent or the likelihood of more crimes?
```

J.A. 1124

```
1              THE COURT:  All right.  So you recognize that I
2    can't do that in determining how many points to assess.
3              MR. DAVIS:  Correct, correct.
4              THE COURT:  But you're saying I can do it and
5    should do it with respect to evaluating a request for a
6    departure.
7              MR. DAVIS:  Yes.
8              THE COURT:  Okay.
9         Do you have some argument that I am not permitted
10   to do what the government says that he's asking me to do?
11             MR. WOLPIN:  No.  I do think it is a broader
12   consideration of his record is sort of the version the Court
13   is looking at.
14             THE COURT:  Okay.
15             MR. WOLPIN:  I mean, this is not a categorical
16   issue because these are misdemeanors and they're not crimes of
17   violence because the penalty doesn't exceed one year.  So that
18   is not the sort of question that -- it would never have been a
19   crime of violence under the definition because they're just
20   misdemeanor offenses.
21             I don't think the Court should be taking into
22   account the government's version of bringing guns.  There was
23   nothing that this charge related to.  There was no gun
24   involved.  There was no gun ever alleged to be involved.
25             And so to sort of take that as some kind of bad
```

1    fact that changes the nature of the actual conviction and the

2    actual conduct, I think that's unfair and that I would say is

3    beyond the Court's consideration in looking at his record.

4           THE COURT:  I think what he's saying is this

5    two-point assessment is technically a two-point assessment,

6    but it's actually -- when you look at what he actually did,

7    it's worse than two points.

8           So when you are looking at other convictions and

9    saying that's not as bad as the guidelines suggest, you should

10   be able to consider that this particular conviction in the

11   government's view is worse than what the point level suggests

12   and therefore I should exercise my discretion to not depart

13   downward.

14          To me what matters is he's close to the line

15   between a II and III, and I'm looking at whether -- in my mind

16   what weighs heavily when I decide on somebody's criminal

17   history and I exercise discretion about it, it's how has that

18   person been treated by the criminal justice system for the

19   offenses.

20          So if people have not served substantial prison

21   time for offenses, then that's a factor that weighs in my

22   discretionary judgment as to when someone is close to the line

23   whether he looks more like a II than a III.  People who have

24   been exposed to the criminal justice system and have received

25   substantial prior sentences, in other words, where we try to

1  hold them to account and they still aren't deterred from their

2  criminal conduct, that's a reason to be cautious about

3  granting a close-to-the-line horizontal departure.

4          Cases where someone may have accumulated a number

5  of convictions that technically move him from a II to a III

6  but who hasn't served substantial prison sentences, has had

7  less opportunity to have the ability of a sentence to deter

8  him, to be tested.  So that's a factor that weighs

9  significantly in my judgment on that.

10          Did you want to say -- I was interrupting you,

11 counsel.  Did you want to go back and say anything more about

12 the criminal history category issues?

13          MR. DAVIS:  I don't think so, Judge.

14          THE COURT:  I've read your memorandum and I think I

15 understand your position.

16          Okay.  Let's turn to your issue.  You point out

17 that the guidelines recognize that it can be an aggravating

18 factor in a threatening case if there's -- if a threat is

19 directed to a victim's family member as it was in this case.

20 I understand your point quite well.  I did want to give the

21 defendant an opportunity to respond to it.

22          Did you want to say anything more about that?

23          MR. DAVIS:  Only that we are not seeking an upward

24 departure.

25          THE COURT:  But it's an aggravating factor.

**J.A. 1127**

```
1              MR. DAVIS:  Sure.
2              THE COURT:  That when I consider where to sentence
3    him within whatever range I land at, or when I consider
4    whether to vary downward, you're saying take that aggravating
5    factor into account, right?  I think that's what you're
6    saying.
7              MR. DAVIS:  Yes.
8              THE COURT:  Okay.  It is what it is.  It was a
9    threat against the victim's family.  The guideline book
10   recognizes that is potentially an aggravating factor.  He's
11   not arguing for an upward variance, but it is a factor that I
12   feel that I would be inclined to take into account in
13   sentencing unless you can convince me that it's not something
14   that I should consider at all here.
15             MR. WOLPIN:  I would say it fits within the nature
16   and circumstances of the offense for sure.  I think there are
17   some points to address around that issue, though.
18             THE COURT:  You can do that -- if you want to do it
19   as a whole towards the end sort of like in this case
20   fortunately the victim's spouse was not informed of the
21   threat, so in that sense it wasn't quite as bad as it might
22   have been, you know, you can make those kind of totality of
23   circumstances arguments later.  But again, it is what it is.
24   It's a potential aggravating factor.  It's something I'm
25   inclined to take into account.  Legally you're not telling me
```

**J.A. 1128**

```
 1   I can't do that.  You're saying consider it in the context of
 2   the entire case, Judge, and it won't be as big a factor as the
 3   government says it should be.
 4              MR. WOLPIN:  Correct.
 5              THE COURT:  Got it.  Okay.  Now let's get to the
 6   issue that I'm most confused about and maybe you can easily --
 7   it seems that you disagree fundamentally about what
 8   precipitated the criminal conduct by the defendant in this
 9   case.
10              Your position is, as I understand it, this was a
11   long-standing plan to get dox on Vic Mackey and the defendant
12   had a long-standing plan to try to compel people to give him
13   dox on Vic Mackey, and that on the day that the particular
14   extortion and threats that occurred here occurred it was not
15   the victim who provoked the defendant.  It was the defendant
16   who before the victim did anything had posted a picture of the
17   defendant's family, where as I understand you seem to be
18   taking the position that's not the sequencing of the events;
19   that there was a decision by the victim to go on to
20   the Telegram site that the defendant was involved in, and that
21   it was that action that precipitated publication of the
22   blurred image and precipitated the discussion that you say led
23   to an implied threat against Peach, the defendant's
24   friend/wannabe girlfriend, and that that is what provoked the
25   extreme criminal behavior by the defendant.
```

**J.A. 1129**

```
 1            So you think of it more as an extortionate plan
 2   that developed over a long period of time and that wasn't
 3   precipitated by some bad conduct by the victim, but that the
 4   immediate precipitating event was the victim happened to go on
 5   to a site he didn't know the defendant was associated with.
 6   The defendant had already posted an image of the victim's
 7   family.  The victim tried to deescalate matters, and it was
 8   the defendant who was aggravating the situation and that
 9   prompted the Peach conversation.
10            Do you agree your version seems to be in conflict
11   with the defense version?
12            MR. DAVIS:  Yes, I think the spirit of it is.  I
13   think we agree on a lot of facts but --
14            THE COURT:  But it does seem to disagree about when
15   this first photo of the family was published.  You say it
16   occurred before the victim entered into the website that the
17   defendant was affiliated with.
18            MR. DAVIS:  Right.
19            THE COURT:  The defense doesn't expressly say
20   that's wrong but appears to describe an account that's
21   inconsistent with the one you describe.
22            So it is your contention, is it not, that the
23   sequence -- what happened that day was, first, the picture,
24   the blurred picture was published.  Then the victim entered
25   the site.  Then the exchanges occurred.  The victim tried to
```

J.A. 1130

1    deescalate.  The defendant refused to deescalate.  Then they

2    had the discussion where Peach was mentioned.  Then the

3    defendant made the threats that led to his conviction.

4            Have I got your view of the sequencing right?

5            MR. DAVIS:  Yes.  So the government doesn't know

6    all of the facts -- it knows a few things.  What it knows is

7    that the person known as Peach sent a message to Mr. Cantwell

8    that's dated very early on June 15th of 2019, and what Peach

9    is doing there is sending a query by someone else, it's not

10   clear who it is, but asking basically why did you take those

11   pictures of his family.

12           And so it's clear that those pictures had been

13   posted.  People have seen them.  People know that Peach was

14   the person who was the source of those photos and people are

15   asking Peach questions.  And again, the date of the screenshot

16   that Peach sends to Mr. Cantwell was very early on June 15th.

17           Now, is that screenshot accurate?  Do the dates

18   work out?  Is there --

19           THE COURT:  I thought your memo did a pretty good

20   job of stating what I thought your version was.

21           So what you've alleged on page 3 of your memorandum

22   is that the defendant began a campaign to unmask Vic Mackey in

23   late February.

24           MR. DAVIS:  Correct.

25           THE COURT:  And you post something that the

**J.A. 1131**

```
 1    defendant said, and then you say that in March he threatened

 2    to dox the victim.

 3              MR. DAVIS:  Directly, yes.

 4              THE COURT:  And said:  When I do, it will all be

 5    because of Vic.

 6              So you say this is a plan that is unfolding in

 7    February and March.

 8              MR. DAVIS:  Yes.

 9              THE COURT:  And you provide what you say are

10    supportive postings that document that.

11              MR. DAVIS:  Correct.

12              THE COURT:  You allege that -- you acknowledge that

13    there was this extreme I would call it a trolling campaign

14    against Mr. Cantwell's site by the Bowl Patrol.  They were

15    trying to disrupt his site during this period and that was

16    extraordinarily frustrating for him.  I don't think you

17    dispute the fact that the victim was involved in some way in

18    that campaign.  He was making calls.

19              MR. DAVIS:  Yes.

20              THE COURT:  But you allege that those calls had

21    largely ceased involving the victim and a substantial period

22    of time went by where there's no evidence that the trolling

23    behavior involved the victim and there's no evidence that it

24    was continuing at the same clip for a significant period of

25    time.
```

**J.A. 1132**

```
 1            MR. DAVIS:  Correct.
 2            THE COURT:  And so then we get to the dates in
 3  question, which is in June, and what I understand your memo to
 4  suggest is it was the defendant, not Mr. Lambert, who
 5  commenced hostility.  When first posted, the faces in the
 6  photos were apparently blurred.  Part of the defendant's plan
 7  to proceed incrementally with Mr. Lambert.  The defendant
 8  admitted to publicly posting the photograph in his exchange
 9  with Mr. Lambert the following day.
10            MR. DAVIS:  Yes.
11            THE COURT:  And that was all before Mr. Lambert
12  inadvertently went on to the site that Mr. Cantwell was
13  associated with.
14            MR. DAVIS:  Well, the admission the defendant is
15  making is that in the course of the Telegram app
16  communications that are the subject matter of the case.
17            THE COURT:  Yeah, but you're implying that the
18  posting predated --
19            MR. DAVIS:  Yes.  But the posting itself -- because
20  of the Peach screenshot, the posting itself predated this
21  event.
22            THE COURT:  Okay.  And I do remember seeing
23  exhibits to that effect at the trial.  I'm just asking you to
24  refresh my memory about exactly what your evidence is that
25  supports that contention.
```

**J.A. 1133**

```
1              MR. DAVIS:  If I may, your Honor?

2              THE COURT:  Yeah.  And I don't mind if both of you

3    talk.  I'm more in the free-for-all category with these

4    things.

5              MR. DAVIS:  Yes.  Judge, it's in document 123-4 and

6    it starts with -- it's a screenshot.  It says June 15th.

7              THE COURT:  Yeah.

8              MR. DAVIS:  But the first time on it is 12:47 a.m.

9    So it's very early on June 15th if that is correct, and

10   there's also a time difference because Peach may well be in

11   California at the time and there may be a three-hour

12   difference.

13             THE COURT:  Would you read the exchange?

14             MR. DAVIS:  Yes.  "Hello Katelyn.  So why did you

15   take pictures of those kids?"

16             THE COURT:  Okay.  That's a communication to Peach

17   from someone we don't know?

18             MR. DAVIS:  Correct.

19             THE COURT:  At a particular time?

20             MR. DAVIS:  Correct.

21             THE COURT:  And you're saying that's evidence of

22   the fact that that image had been posted by that point?

23             MR. DAVIS:  Correct.  And the defendant's statement

24   to Cheddarman in the Telegram app confirms that because the

25   defendant is the one who says:  The next time they won't be
```

**J.A. 1134**

```
 1   blurred.
 2              THE COURT:  Next time I post.  Okay.
 3              MR. DAVIS:  And it's all sort of -- the victim
 4   doesn't know what he's talking about at that moment, right?
 5              THE COURT:  Yeah.
 6              MR. DAVIS:  And then when Mr. Cantwell provides --
 7              THE COURT:  And then when does the victim log on to
 8   the site that Mr. Cantwell is associated with?
 9              MR. DAVIS:  On the evening of June 15th.
10              THE COURT:  So the exchange with Peach telling us
11   that the image had been posted by that point in your view
12   occurred early in the morning on the 15th?
13              MR. DAVIS:  Yes.
14              THE COURT:  And the entry into the Cantwell
15   affiliated Telegram site did not occur until the next day.
16              MR. DAVIS:  Well, that same day.  But, yes, the
17   following evening, correct.
18              THE COURT:  In the evening of that day.
19              MR. DAVIS:  Yes.
20              THE COURT:  Okay.  And then it was -- then when did
21   Mr. Cantwell post:  The next time I post that photo the faces
22   won't be blurred, and then you'll be going to start getting
23   unexpected visitors.
24              When did he post that?  That says 4:45 according to
25   your --
```

J.A. 1135

1    MR. DAVIS:  He sent an unblurred photo as part of

2    the Telegram exchange.  That's one of the photos that's part

3    of the Telegram exchange.  So he actually showed it to the

4    victim as part of the Telegram exchange.

5    He also posted it on his own podcast or whatever

6    his group is called on the night of the 16th.

7    THE COURT:  When did Mr. Cantwell first communicate

8    with the victim about the fact that he had gone on the

9    Telegram app?

10    MR. DAVIS:  At approximately 8:00 p.m.  It's the

11    first time on the Telegram app sequence.  It's June 15th.

12    THE COURT:  Yeah.

13    MR. DAVIS:  So the whole sequence begins on the

14    evening of June 15th.  I'm sorry, I'm not looking at the --

15    THE COURT:  I don't have all the exhibits in front

16    of me, but am I understanding your position is that what

17    happened is the blurred image was posted, someone communicated

18    with Peach about why the image was being posted, much later

19    that day the victim enters the Telegram site, and following

20    that the defendant initiates communication with the victim and

21    the victim tries to deescalate by saying, hey, I don't want

22    anything to do with you, essentially, and then what followed

23    were the communications where Mr. Cantwell refused to

24    acquiesce in that approach, and that led to the Peach comment

25    which led to Mr. Cantwell engaging in the criminal act?

```
1    That's the sequencing of what you think is what happened on
2    the 15th?
3              MR. DAVIS:  Yes, as supplemented by Mr. Cantwell's
4    testimony at trial which did not fully explain the posting of
5    the photo but did acknowledge that he was having two
6    communications at once at various times with Peach, that he
7    was talking to Peach and he may well have been getting
8    additional photographs or getting photographs ready to use as
9    part of his doxing campaign with the address of the victim.
10             So this whole chrono, your Honor, stems from the
11   date stamp on the screenshot that Peach sent to Mr. Cantwell
12   because that's what we have and it says June 15th, and then it
13   says 12:47 a.m. on June 15th.
14             But what seems clear beyond any doubt is that the
15   blurred photo had been posted by that time.  If that time is
16   accurate, the blurred photo had been posted because someone is
17   reaching out to Peach and asking her about it and she's
18   involved enough and engaged enough that she's sending that to
19   Mr. Cantwell immediately.
20             THE COURT:  Okay.  All right.  So that's your view
21   about the sequencing of the event.
22             Let me just hear from the defense about what's
23   wrong with the sequencing of the --
24             MR. WOLPIN:  I do think there's a fundamental sort
25   of factual disagreement about the sequencing the events.
```

**J.A. 1137**

```
1              It is correct that Peach sent this message to Chris
2    that's attached to our sentencing memorandum that is from June
3    15th.
4              There is no posting of a blurred photo --
5              THE COURT:  What time is reflected as the posting
6    time?
7              MR. WOLPIN:  Morning.  Early morning on June 15th.
8              THE COURT:  All right.  And you don't disagree that
9    the victim entered the Telegram site in the evening of the
10   15th?
11             MR. WOLPIN:  Correct.
12             THE COURT:  Okay.
13             MR. WOLPIN:  Later Cheddar Mane joins this chat
14   group.  It's Cheddar Mane's joining of the chat group that
15   then prompts Chris to ask Peach for the photographs.  The
16   photographs are then blurred.  They are then posted -- our
17   sequence does not involve blurred photographs being posted
18   prior to the participation in this online chat between Cheddar
19   Mane and Chris.  That's the fundamental difference.
20             THE COURT:  You're saying that Peach and the
21   defendant were communicating in the early morning of the 15th,
22   but they weren't communicating about a blurred image and no
23   blurred image had been posted as of that point?
24             MR. WOLPIN:  No.  It was after joining the chat.
25   As the government noted, there was back and forth that
```

**J.A. 1138**

1    continued with Peach and Chris.  At that point is when he got

2    the photos, blurred them, they went up, and then there's a

3    reference to them within the chat.

4            So it is certainly our position that the

5    photographs were not --

6            THE COURT:  When do you say the defendant posted

7    the blurred image of the victim and his family?

8            MR. WOLPIN:  Once that Telegram -- again, I don't

9    know the exact time, but once that Telegram interaction in

10   that chat group, or ultimately not a group but individual chat

11   occurred, it followed from that, not before.

12           THE COURT:  Okay.  So that seems to be a

13   fundamental difference between you.  I know you argued

14   otherwise at the time of the trial, that's my recollection at

15   least, about when that blurred photo was posted.  You argued

16   that it was posted before the Telegram chat.  That's my -- the

17   exchange about the Telegram entry.

18           If I'm misremembering that, you'll tell me, but you

19   had a sequence of exhibits that purported to support your view

20   of the timeline.  Those exhibits should be still available to

21   you.  You should still be able to get them and walk me through

22   them so that I can see the actual documents.

23           Well, let's be clear.  Why is this relevant?  This

24   is relevant because you agree -- you acknowledge that the

25   sentencing guidelines recognize that provocation in a case

**J.A. 1139**

1    like this under certain circumstances can be a basis for a

2    downward variance, right?

3              MR. DAVIS:  Yes.

4              THE COURT:  Okay.  So you understand they're

5    asserting my client was provoked and you should vary downward

6    because he was provoked.  And your response to that argument

7    is to say, this wasn't provocation, Judge.  This was a

8    long-standing plan that the defendant developed months before

9    he committed the criminal acts to use threats to extort the

10   victim to give him dox on Vic Mackey.  And even on the day in

11   question it wasn't the victim who provoked, it was Mr.

12   Cantwell who was provoking by putting out that blurred image.

13             That's your argument, isn't it?

14             MR. DAVIS:  Yes.

15             THE COURT:  Okay.  So I just want to be sure

16   factually, if you can support that, that I know exactly what

17   the sequence of evidence is.

18             You say, he's got the facts wrong, Judge.  That's

19   not what happened.  There wasn't a long-standing plan to

20   provoke.  There was frustration, and, yes, he wanted Vic

21   Mackey's information, and, yes, he was mad at the victim, and

22   he thought Vic Mackey was leading the Bowl Patrol and that's

23   all he was saying in those early communications, and this

24   wasn't a plan -- a long-standing plan to extort by threat

25   information.  The defendant lost it, Judge, when his wannabe

**J.A. 1140**

1   girlfriend, Peach, was impliedly threatened, and that made him

2   go over the line.

3           That's what you're saying happened, right?

4           MR. WOLPIN:  Yes.

5           THE COURT:  And those are two very different takes

6   on the case because you would agree, would you not, that

7   provocation is less compelling as a justification for a

8   variance if the provocative act occurred months in the past,

9   the defendant waits months and months and months and then

10  claims provocation when he acts improperly, and it's also not

11  appropriate to use provocation as a downward variance where

12  the defendant engages in a conduct that produces a response

13  that causes the defendant to be provoked.

14          So understanding what's really happening with these

15  facts is important insofar as it bears on your argument for a

16  downward variance based on provocation.  That's why I'm

17  asking -- it may sound like, why is the Judge getting bogged

18  down on these little details?  Because you're each telling a

19  different story factually, so I need to know which one to

20  believe.

21          MR. WOLPIN:  Your Honor, if I might, I hate to do

22  this, ask for a brief break.  I would like to take a look back

23  at some paperwork that we have in relation to this and make

24  sure that we're --

25          THE COURT:  I would like the government to come

**J.A. 1141**

```
 1   forward with its exhibits and walk me through and show me

 2   sequentially why it is the government thinks the defendant's

 3   characterization of the case is wrong, and if you have

 4   evidence to support your characterization of the case, I'd

 5   like to see it.  Because my recollection is that this was an

 6   issue between you even during the trial that neither of you

 7   focused on in great depth, but it was something that I was

 8   aware of during the trial that you seem to have different

 9   views about the sequencing of the relevant events here.  And

10   because you're raising a provocation variance, it's important

11   for me to do the best I can and try to make sense of that

12   evidence when I evaluate your provocation variance.

13          MR. DAVIS:  The only thing I would say about that,

14   Judge, is I don't think there's any disagreement, though, that

15   the posting of blurred photos occurred prior to -- if the

16   provocation is, I guess Peach took those photos, I guess you

17   don't care what happens to her, so that's an event.  That's

18   something said in the Telegram messages.  The Court has seen

19   that.  We can show you that.

20          But there's no doubt that before that was said,

21   this defendant placed in a place where the public could see it

22   blurred photos of the victim's wife and family and people did

23   see it and people did communicate with Peach and he's on the

24   phone with Peach while this is happening and --

25          THE COURT:  Let me try to tell you what I think the
```

1 defense is saying here, okay?

2          MR. DAVIS:  Okay.

3          THE COURT:  What I think the defense is saying is

4 what happened here was these guys embarked on a group effort

5 to destroy my means of making a living and that made me really

6 mad and I wanted it to stop, and I tried all means available

7 to me to get it to stop, and these people, including the

8 victim, persisted.

9          What happened on June 15th that set me off was I

10 found the victim lurking at one of my Telegram sites and that

11 pissed me off and I posted a blurred image.  So it was, the

12 immediate precipitating event was started by the victim and

13 not me.  He came on to my site.  I posted a blurred image.  We

14 then had the exchanges we had.  During that exchange I

15 threatened.  He tried to deescalate.  I wouldn't accept the

16 deescalation.  He made a comment about Peach.  I took that to

17 be a threat to Peach.  That made me really angry.  I flipped

18 out, lost control, and made threats that turned out to be

19 criminal.  And that's exactly the kind of provocation that the

20 guidelines say a judge should take into account.

21          You say it worked very differently.  You say he had

22 a long-term plan to extort members of the Bowl Patrol to give

23 up Vic Mackey.  He focused on the defendant as a way to do

24 that.  Months go by.  He has an opportunity to do it again.

25 He posts an image, a blurred image of the victim's family to

**J.A. 1143**

```
 1   try to again threaten the victim to get him to give up Vic
 2   Mackey.  He then contacts the victim and they have the
 3   exchanges that they have.  The contents of which are not in
 4   dispute.
 5           So your view is it was a preexisting plan.  Your
 6   view is immediate precipitating events on June 15th were
 7   started by the defendant, not the victim, and those are
 8   important facts that should affect your judgment about whether
 9   there was any provocation here, right?  Isn't that what you're
10   saying?
11           MR. DAVIS:  Except that we also don't agree that
12   wandering into the chat group and whatever the victim did was
13   provocation at all under 5K2.10.  It was an annoyance, it was
14   irritating, but the guideline talks about --
15           THE COURT:  I'm not saying that the defendant's
16   version of facts is true, that he's entitled to a variance.
17   I'm just saying a judge should try to determine what the
18   actual facts are to the extent the judge can before the judge
19   makes a judgment about how to exercise discretion to consider
20   a concept like provocation.
21           MR. DAVIS:  Right.
22           THE COURT:  I just want to get the factual record
23   straight.
24           MR. DAVIS:  So the record is this man had a real
25   beef with the Bowl Patrol.  He wanted to dox Vic Mackey.
```

**J.A. 1144**

```
1            THE COURT:  All right.  That much is undisputed.
2            MR. DAVIS:  He said that he would dox other Bowl
3   Patrol members when he could, and he posted that in February
4   or March of 2019.  He did then dox Mosin-Nagant at the end of
5   February of 2019 and got him out.  Then on March 17th of 2019
6   --
7            THE COURT:  I get all of that.  You make the --
8   wait.  You make the following statement:  It was the
9   defendant, not Mr. Lambert, who commenced hostilities on the
10  15th.
11           He says it wasn't the defendant who commenced
12  hostilities on the 15th.
13           MR. DAVIS:  Then why does the screenshot from Peach
14  say June 15th, 12:47 a.m.?
15           THE COURT:  I want you to make your record.  I
16  don't have to just take your word for it.  You've got all
17  these exhibits.  If you went back and refreshed your memory
18  about how you proceeded at trial, you should be able to say
19  here's our view, Judge, here are the following five exhibits.
20  Let me produce copies of them.  You can read them.  Draw your
21  own conclusions, Judge.  That's all I'm saying.  You should be
22  able to do that.  It's not an unreasonable request.
23           And apparently the defendant wants an opportunity
24  to take a short break and marshal its evidence just so I can
25  make the record.  I'm not saying even if everything the
```

J.A. 1145

1    defendant says is true that I would grant a variance, okay?

2    I'm just saying I've got to do my job here, which is make sure

3    I understand the factual record as best I can before I make an

4    important decision.  That's all I'm asking.

5         I mean, are you willing to do that if I give you a

6    fifteen-minute break to come back and -- with your exhibits

7    and you can look at the trial exhibits, they're all there, and

8    say here are the relevant ones, Judge, and here's how we

9    interpret them.  If you have other exhibits, you can say here

10   are the relevant ones, Judge, here's how we interpret them.  I

11   will then have the record and I'll make my best judgment.

12   That's all I'm asking.

13        MR. DAVIS:  That's fine, your Honor.

14        Just one other thing, Judge.  On the sentencing

15   memo, page 9, of the defendant, Mr. Cantwell, it says:  In

16   June of 2019, the day prior to the online encounter at the

17   heart of this case, Christopher's ex-girlfriend known as Peach

18   forwarded Christopher an electronic communication she had

19   received, Exhibit D.  Christopher understood this

20   communication, so why did you take picture of those kids, to

21   reference photographs that Peach took of Cheddar Mane's

22   children in the fall of 2018.

23        The defendant's own pleading acknowledges that the

24   day before June 15th Mr. Cantwell gets a text message or a

25   screenshot from Peach, and what he knows is going on is there

**J.A. 1146**

```
 1    are photos posted of the victim's family, his wife and

 2    children, and Peach is getting questions about it.  That's

 3    what he says.

 4              THE COURT:  All you've got to do is make some

 5    photocopies of a few documents, put them in the right

 6    sequence, and hand them to me and say, look at this, Judge.

 7    Start with this one and then go to that one, and you'll see

 8    the actual evidence that supports what I'm saying.

 9              Is that too much to ask of you?

10              MR. DAVIS:  It is not, Judge.

11              THE COURT:  All right.  Good.

12              And you'll do it from your perspective.

13              We'll take a short break.  When you're ready, we'll

14    come back and finish this thing.

15              I just want to understand each party's position and

16    the evidence supporting it so that I can make my own judgment

17    about it.  I mean, I'm making an important decision that

18    affects a person's life.  I want to be sure I do it on the

19    best possible record I can with as little misunderstanding as

20    possible.  That's all I'm trying to do.

21              (RECESS)

22              THE COURT:  So take me through the documents, what

23    story they tell you from your perspective.  I'll hear from the

24    defense after.

25              MR. DAVIS:  We request permission to use the ELMO.
```

```
 1                 THE COURT:  Go ahead.  Do we need to turn it on?
 2     Is it on?
 3                 THE CLERK:  Yes.
 4                 MS. KRASINSKI:  Your Honor, defense provided us a
 5     copy of the broader communications between Peach and the
 6     defendant and not just that screenshot, so what I'm going to
 7     attempt to do is present a very neutral time frame with that
 8     new document.  I only have the one copy.
 9                 THE COURT:  Was this an exhibit at trial?
10                 MS. KRASINSKI:  It was not, your Honor.
11                 THE COURT:  Okay.
12                 MS. KRASINSKI:  It's something we just received
13     today.
14                 THE COURT:  Okay.
15                 MS. KRASINSKI:  So I'd ask permission to mark that
16     as Government's Exhibit 1.
17                 THE COURT:  All right.  Are you going to refer to
18     any other documents?
19                 MS. KRASINSKI:  Yes, your Honor.  I e-mailed a copy
20     to the deputy clerk, but I also have printed copies.
21                 THE COURT:  Okay.  Great.  You can hand me the
22     printed copies.
23                 Are other documents being referred to by their
24     trial exhibit number or are we going to mark them separately?
25                 MS. KRASINSKI:  My plan was to refer to them by
```

**J.A. 1148**

```
 1    their trial exhibit number, your Honor.

 2              THE COURT:  All right.  That's fine.  Except for

 3    the one document that's new that we're marking.  Go ahead.

 4              MS. KRASINSKI:  So, your Honor, Defense Exhibit

 5    B-20 indicates that on March 17, 2019, the defendant first

 6    threatened to dox Mr. Lambert:  Stay the fuck away from me and

 7    my platforms or I'll dox your stupid ass.

 8              THE COURT:  This is Defendant's B-20?

 9              MS. KRASINSKI:  Correct, your Honor.

10              And later in that conversation is where the

11    defendant says:  When you get doxed, it's all because of Vic.

12    Remember that.

13              THE COURT:  Got it.

14              MS. KRASINSKI:  Now, in some time of March 2019 the

15    defendant posted:  I have dox on several of these Bowl Patrol

16    idiots and I'm gonna -- we assume that says start -- st

17    dropping them until they rat out Vic.

18              And this is Government's Exhibit 304.

19              THE COURT:  The date on that again?

20              MS. KRASINSKI:  So the date comes from Government's

21    Exhibit 300 from the computer -- the forensic extraction of

22    the defendant's computer.  And March 17, 2019, is the date

23    that the screenshot of Government's Exhibit 304, the I have

24    dox post, was saved on the defendant's computer.

25              THE COURT:  Okay.
```

**J.A. 1149**

1          MS. KRASINSKI:  So this is where the defendant's

2    new exhibit comes into play.

3          Defense Exhibit B-15 is what we've sort of all been

4    looking at before, this message that Peach sent to the

5    defendant on June 15th that the defendant says in his

6    sentencing memo that he understood to be referring to pictures

7    of Mr. Lambert's family.

8          THE COURT:  We don't know who is communicating with

9    Katelyn on this?

10          MS. KRASINSKI:  That's correct.  At trial the

11    defense asked Mr. Lambert if it was Mr. Lambert.  He said no.

12    Other than that, there's no evidence of who sent these

13    messages to Katelyn.

14          THE COURT:  And that appears to be 12:47 a.m., and

15    we don't know who sent them so we don't know -- that would be

16    the time or the place where the document is posted?

17          MS. KRASINSKI:  These were messages received on

18    Katelyn's phone, so it would be the time that she received the

19    message -- or, well, she took the screenshot, but the time of

20    hello Katelyn would be the time she received the message.  We

21    believe she resides in California, so that would be the time

22    in California.

23          THE COURT:  Okay.  Good.

24          MS. KRASINSKI:  Okay.  So we have always assumed

25    that because the defendant understood this very early June

**J.A. 1150**

1    15th message to be referring to pictures of Mrs. Lambert's

2    children that no one could send a message to Katelyn about

3    that photograph --

4              THE COURT:  Unless it had been posted.

5              MS. KRASINSKI:  Exactly.

6              THE COURT:  So that was an assumption you made

7    based on the fact that someone is communicating with Katelyn

8    about what you thought was an image, and it's a reasonable

9    assumption therefore that the image was available in some way

10   over the Internet.

11             MS. KRASINSKI:  Correct, your Honor.

12             THE COURT:  All right.  Go ahead.

13             MS. KRASINSKI:  So this is Government's Exhibit 1,

14   the communications that defense provided us, sort of the more

15   complete communications between Katelyn and the defendant, and

16   that frankly changes this a bit.

17             THE COURT:  All right.

18             MS. KRASINSKI:  So, again, it shows on June 15th

19   that Katelyn sent the defendant the screenshots we just looked

20   at from Defense Exhibit B-15.  But then it also shows the

21   defendant's reaction and so --

22             THE COURT:  Is this from the defendant's phone?

23             MS. KRASINSKI:  As I understand it as it was

24   represented to me, Katelyn provided these screenshots to

25   defense counsel.

```
 1              THE COURT:  So this is Katelyn's phone?

 2              MS. KRASINSKI:  That's my understanding.

 3              THE WITNESS:  Screenshots that Katelyn took from

 4  her phone?

 5              MR. WOLPIN:  Yes.

 6              THE COURT:  Okay.  And they were provided to

 7  defense counsel and not the government.

 8              MS. KRASINSKI:  Correct, your Honor.

 9              THE COURT:  The government didn't have these?

10              MS. KRASINSKI:  We just received these during this

11  hearing, your Honor.

12              THE COURT:  All right.

13              MS. KRASINSKI:  So the defendant responds that he

14  doesn't know, but he doubts that the person who sent those

15  messages was Mr. Lambert.

16              THE COURT:  Okay.

17              MS. KRASINSKI:  And Mr. Cantwell says, I have not

18  leaked that photo and the photo in question has not been

19  published, and then --

20              THE COURT:  So the defendant is denying that he

21  posted it.

22              MS. KRASINSKI:  And as you read this, it becomes

23  sort of clear that they're talking about different

24  photographs, that the defendant is talking about a photograph

25  of Katelyn with Ben Lambert and one other individual when they
```

1    were all hanging out together at the Lambert's house.

2         So that conversation began at 2:56 a.m. on June

3    15th.  Again, since this is from Katelyn's phone, that would

4    be in California.

5         Later in that conversation, so at 7:51 p.m., the

6    defendant says, give me the address and those pictures, and

7    she sends him images of the defendant's family and address

8    information.

9         And so that is at 7:51 p.m. there, which is

10   approximately 10:00 p.m. here.

11             THE COURT:  Okay.

12             MS. KRASINSKI:  On June 15th.

13             THE COURT:  All right.

14             MS. KRASINSKI:  So now we go to Government's

15   Exhibit 100, which is the communication between the defendant

16   and the victim, and at 9:00 p.m. is when the defendant first

17   sends a message to the victim, and at 9:29 p.m. before he asks

18   for the address information from Katelyn, he sends a message

19   to the victim with his street address.

20             THE COURT:  Yep.

21             MS. KRASINSKI:  Then -- and I should note that

22   these times, the times on Government's Exhibit 100 are Eastern

23   Time.

24             THE COURT:  Okay.  So we're looking at the

25   defendant's phone, the screenshots?

```
 1              MS. KRASINSKI:  Yes, your Honor.

 2              THE COURT:  All right.

 3              MS. KRASINSKI:  Then they communicate.  At 2:13

 4   p.m. the victim tries to deescalate, and the defendant

 5   responds at 4:45 p.m.:  Next time I post that photo, the faces

 6   won't be blurred, and then you're going to start getting

 7   unexpected visitors.

 8              THE COURT:  Is that -- do you contend now that

 9   that's when that photo was published?

10              MS. KRASINSKI:  At some point before 4:45 p.m. the

11   blurred photo would have been published.

12              THE COURT:  And the entry into the Telegram account

13   was when?

14              MS. KRASINSKI:  So the entry into the Telegram

15   account that we have is when he posts the unredacted versions.

16              And I want to be clear.  No one has been able to

17   recover a copy of the redacted version that he posted so

18   that's why we don't have that date and time information.

19              THE COURT:  But you know it was posted by 4:45 p.m.

20   Eastern Standard Time?

21              MS. KRASINSKI:  Yes, your Honor.

22              THE COURT:  On the 15th?

23              MS. KRASINSKI:  On the 16th, your Honor.

24              If we go back to the first page of Government's

25   Exhibit 100, you see that the date -- it rolls -- the
```

**J.A. 1154**

```
 1   conversation rolls from the 15th to the 16th.
 2              THE COURT:  When did the victim join, what is it,
 3   the I Like White People account or --
 4              MS. KRASINSKI:  Peaceful White Folk.
 5              THE COURT:  The Peaceful White Folk account, when
 6   did the victim enter that?
 7              MS. KRASINSKI:  The testimony from both the
 8   defendant and the victim was consistent on that, that it was
 9   essentially immediately before this 9:00 p.m. message.
10              So the victim entered Peaceful White Folk.  I think
11   his words were he posted a Heimbach meme, and then he was --
12   the defendant kicked him out of the chat.
13              THE COURT:  So my confusion about this stems from
14   your incomplete information about it and the inferences you
15   drew from it.  And now that we have seen the full chain, the
16   government understands better the sequencing of events, and I
17   understand now the government agrees that the sequencing is
18   such that the victim entered the Peaceful White Folk account
19   before any pictures were posted of the victim's family and the
20   sequencing of events is otherwise as they are represented in
21   the exhibits that were contributed to the trial.  Is that fair
22   to say?
23              MS. KRASINSKI:  Yes, your Honor.
24              THE COURT:  So we're now at a point where there's
25   no fundamental disagreement between the defense and the
```

1  government as to the historic facts that lay out the timeline

2  about what the defendant said about the Bowl Patrol people,

3  when the victim entered the Peaceful White Folk account, and

4  all of the exchanges between the defendant and the victim that

5  followed that were captured and produced at trial in the way

6  we understood them to be.

7           So we have resolved that point of confusion.  Is

8  that fair to say?

9           MS. KRASINSKI:  Yes, your Honor.

10          THE COURT:  And from your perspective, you don't

11  have any disagreement with the defense as to the historic

12  facts.  You disagree about what inferences should be drawn

13  from them and what significance to attach to them, but the

14  factual record is now undisputed?

15          MS. KRASINSKI:  Yes, your Honor.

16          There's one other historical fact that I would just

17  like to point out and that's from Defense Exhibit I think it's

18  I2A, the I series, and this is the defense exhibit showing the

19  victim's call-ins to the defendant's show.  And the final page

20  of that shows that there were no calls from the victim --

21  attributable to the victim after February 15, 2019, until

22  after this incident.

23          THE COURT:  Okay.  Good.  Thank you.  That was a

24  point of confusion in my mind at the trial and it wasn't

25  important to me because I wasn't a fact finder and provocation

```
1    isn't a defense to the charge, and clearly the defense did not

2    see any tactical advantage to them in disclosing the correct

3    sequencing, and so now we've resolved that and I can better

4    evaluate the parties' arguments with respect to the

5    provocation defense here.

6              Does the defense want to respond to anything you've

7    heard at this point?

8              MR. WOLPIN:  No.  I think the fundamental sort of

9    timing question that was at issue with the Court has been

10   resolved.  I just note it is consistent as well.  I mean, the

11   government did review Chris's phone in relation to this

12   investigation and did ultimately produce a timeline.  That

13   timeline shows these photos that we've been talking about

14   coming on to the phone on the 16th, which is consistent with

15   that these were not sort of had for a long period of time or

16   had days before or something like that.

17             THE COURT:  All of that makes more sense to me.

18             MR. WOLPIN:  Yes.

19             THE COURT:  From the very beginning that was a

20   point of dissidence in my mind because trying to put the

21   evidence in the case together logically, there doesn't even

22   appear to be a motivating force for the timing of the release

23   of the blurred image other than entry into the Peaceful White

24   Folk account and therefore would follow logically that it

25   would happen afterwards.  To the extent the government was
```

J.A. 1157

```
 1    suggesting in pleadings with me that that was not the case,
 2    there's a dissidence here and it wasn't making a lot of sense
 3    to me and I wanted to try to resolve it.
 4              MR. WOLPIN:  Thank you.
 5              MS. KRASINSKI:  Your Honor, one procedural thing.
 6    May I move that the public version of Government's Exhibit 1
 7    be redacted with the photographs of the minor children
 8    redacted?
 9              THE COURT:  Yes.  So in terms of what would be
10    available to the public, we aren't going to disclose the
11    images of the minor children.
12              MS. KRASINSKI:  Thank you, your Honor.
13              THE COURT:  Okay.  So this took longer than I
14    hoped, I apologize, but I need to be -- when I'm confused
15    about something, it makes me nervous because I make decisions
16    that affect people's lives and I don't want to be confused.
17              We've now resolved that point of confusion.  I'm
18    ready to hear the defense -- the government's recommendation
19    and anything you want to say about sentencing.  I'll then hear
20    from the defense.
21              Please keep in mind, as you know, I studied very
22    carefully your memoranda.  You provided me very detailed and
23    helpful memoranda, so you don't need to repeat what's in
24    there.  I think I understand it.
25              So what would the government like to say about your
```

1   recommendation and anything you would like to say in support?

2           MS. KRASINSKI:  Your Honor, the government opposes

3   the request for a variance and departure and recommends a high

4   end of the guideline sentence of 51 months of imprisonment

5   followed by three years of supervised release.

6           The defendant committed two very serious crimes

7   less than a year after he pled guilty to two assault and

8   battery crimes in Virginia and was still subject to the

9   sentences for those offenses.  He began his campaign against

10  Mr. Lambert with the goal of obtaining Mr. Vic Mackey's

11  identity and exposing Vic Mackey to the world and everything

12  that doxing entails.

13          It was in this pursuit of Vic Mackey's

14  identification that the defendant made repeated threats of

15  physical and psychological violence.  And I view a threat to

16  rape a mother in front of her children as a threat to commit

17  psychological violence against those children to witness that,

18  and so that is a part of the threat here.

19          The context of the threats matter, because at the

20  time the defendant made them it was public knowledge that he

21  had traveled from New Hampshire to Virginia armed with

22  firearms, knives, and it was public knowledge that he didn't

23  hesitate to use pepper spray on counter protesters and was

24  convicted of offenses related to that.

25          It was public knowledge by that point that the

**J.A. 1159**

```
1    defendant had made statements that he was trying to make

2    himself more capable of violence.  And the defendant

3    acknowledges that he had a platform.  He had listeners.  He

4    had followers.  And so that context matters because he invoked

5    his followers, his Incel listeners, in part of this campaign

6    to threaten and extort Mr. Lambert.

7              And to me it's magnified because as a recipient of

8    a threat like this, you don't know what to look out for.  You

9    don't know if you're waiting for Mr. Cantwell to show up at

10   your door.  You don't know if you're looking for some

11   unidentified listener to show up at your door.

12             THE COURT:  I'm inclined to agree with all of that.

13   Let me ask you a question that I have struggled with, and I'm

14   interested in your answer to this.

15             Would it have made any difference to you if Mr.

16   Cantwell had engaged in his -- the identical behavior with a

17   member of the public with whom he had had none of the prior

18   interactions that he had with the victim in this case?  I

19   understand your position that provocation shouldn't be a basis

20   for a variance, but is there anything about the nature of the

21   interaction between the two of them that differentiates the

22   outcome in this case from a case in which Mr. Cantwell learned

23   that a member of the instant messenger company that had the

24   messages knew Vic Mackey's address and he contacted that

25   person cold and threatened to rape his wife in front of their
```

```
 1   children?  Are these two cases, would they be -- all other
 2   things being equal, should they be sentenced identically, or
 3   is there something about the nature with the interactions that
 4   preceded these threats, although in your view not amounting to
 5   provocation, nevertheless should affect the outcome?
 6           Because at least there would be an argument, I
 7   think the defendants allude to this, that these people have
 8   exchanged such incredibly offensive and violent conduct on a
 9   routine basis that would shock the ordinary person and that in
10   effect they had become through their interactions with each
11   other desensitized to their extraordinarily horrendously
12   violent nature of the exchanges between the two of them.
13           So answer my question about are those two cases,
14   should they be sentenced identically, in other words, there
15   should be no consequence, no evaluation of the interaction
16   between the two people that preceded the defendant's criminal
17   conduct, is it just the came as if he had called up an
18   employee at a company who had nothing to do with any
19   interaction with the defendant and made these threats?
20           MS. KRASINSKI:  So to me, in answering your
21   question what I look at is the fact that the victim himself
22   had stopped harassing Mr. Cantwell for months before this
23   exchange.
24           Had Mr. Lambert --
25           THE COURT:  It's not just that.  I'm talking about
```

**J.A. 1161**

```
1   how two people who have a pattern of interacting with each
2   other in extraordinarily offensive and violent ways become
3   desensitized to the very nature of their communications and so
4   the effect on victim is different.  Is there an argument to be
5   made here, and what's your response to it?
6            MS. KRASINSKI:  I think even in this community that
7   spits vitriol and disgusting views, even in this community
8   there is a line, and I think that line is underscored by the
9   fact that the defendant viewed this language, so I'm assuming
10  Peach took that picture, guess that means you don't care what
11  happens to her either, that the defendant viewed a comment
12  that innocuous about a partner to be so offensive that he
13  claims that that's what spurned this whole thing, that that
14  shows that his following statement, so if you don't want me to
15  come and fuck your wife in front of your kids, then you should
16  make yourself scarce, is way over the line even in this
17  community that says disgusting things about Jews and about
18  black people.
19           THE COURT:  I don't agree with you at all about
20  that.  It's not a question of whether it's criminal and over
21  the line warranting punishment.  It's a question of would I
22  sentence those two cases in exactly the same way.  Because I
23  think if you are here in front of me with the hypothetical
24  case that I've given you, you would be saying to me this is
25  not a person who lives and interacts in this community where
```

**J.A. 1162**

```
 1   people spew violence on a daily basis, that spew hatred on a
 2   daily basis.  This is a person that, like all the rest of us
 3   that live in society where that kind of conduct is so shocking
 4   that it's almost inconceivable, and the harm to a victim who
 5   is subjected to that kind of threat in that kind of
 6   environment is so extraordinary that it warrants a gigantic
 7   upward departure.  I think that's the argument you would be
 8   making to me.  If I'm wrong about that, tell me.
 9            So I'm just trying to figure out do you really
10   sentence those two cases identically.  I think there's a good
11   argument that they shouldn't be sentenced identically.  That
12   doesn't mean that the defendant's sentence in this case should
13   be nothing.  It just means that context matters when you try
14   to evaluate and make a sentencing judgment.  That's all.
15            MS. KRASINSKI:  No, I agree that context matters,
16   and it has been a very difficult deep dive into a world that I
17   was never a part of.  But from my deep dive, even in this
18   world where people spew violence and hatred, making a comment
19   about someone's partner, about someone's children, is outside
20   of the norm of even that.
21            THE COURT:  I don't disagree with you on that.  I
22   understand what you're saying.
23            MS. KRASINSKI:  And I want to address something
24   else that the defendant raises, and that is sort of that
25   unmasking white supremacist who posts this vitriol under a
```

1   pseudonym is some sort of social good, because that's another
2   one of his arguments for a downward variance.
3           But he didn't dox Mr. Lambert out of some sense of
4   moral obligation and -- you know, this case isn't about
5   whether it's a good thing.
6           THE COURT:  I'm unlikely to credit the defendant
7   with some kind of altruistic act if that's what you're
8   suggesting.  That's not a high likelihood.
9           MS. KRASINSKI:  He also asks the Court to
10  disregard, and the term he uses is the unpleasantries that Mr.
11  Lambert has suffered as a result of being doxed.  And the
12  Court -- I mean, I don't think the Court should do that
13  because it was exactly those unpleasantries that the defendant
14  was invoking when he threatened to dox Mr. Lambert.  I mean,
15  that was what he was threatening to do.
16          And so I don't think the Court should disregard
17  that.  And, you know, he says, well, I only posted it to a few
18  hundred people, but once information is online that's it, it's
19  available for the world.  The damage is done.  I mean, any
20  further dissemination of that was absolutely reasonably
21  foreseeable to the defendant and whatever Mr. Lambert said
22  online as Cheddar Mane, Cheddarman, or any of his other
23  pseudonyms, you know, he sat on that stand and at the end of
24  his testimony he talked about not being able to be a hockey
25  dad.  And I may disagree with all of the views he said under

**J.A. 1164**

1  his pseudonym, but that's a real consequence and I don't think

2  the Court should disregard that.

3          And I also want to focus on the fact that, you

4  know, we know at the time this was happening Mrs. Lambert was

5  not aware of the threat, but I think in sentencing the

6  defendant and in considering his motions for a departure and a

7  variance that the Court should consider the very lasting

8  implications for her and those children as well.  Their

9  photographs are in the public domain.  Their address is in the

10  public domain.  They no longer have any control over the use

11  or misuse of photographs of their children.

12          You know, the Court is well aware that once

13  something is on the Internet it can be copied, it can be

14  further disseminated.  You don't know who has copied it.  You

15  don't know who they've shared it with.  You can't measure the

16  ripple effect.  You can't find and delete every single copy.

17          He essentially gave hundreds of people the ability

18  to further disseminate this very private information, and the

19  truth is she knows about it now.  I've met with her and

20  frankly, you know, even now it's too painful for her to really

21  want to participate.

22          And what the other sort of interesting part of this

23  to me is, you know, the defendant testified that he regretted

24  what he did, but even by the time of trial he never once took

25  steps to mitigate that.  Those photographs could have been

1    deleted long ago, at least his posting of them.  The address

2    information could have been deleted long ago.

3          Now, I get that that's, you know, closing the

4    stable door after the horses have already bolted, but it would

5    at least show some type of real regret for the actions he

6    took, you know, some sort of attempt to mitigate the damage.

7          But when Attorney Davis and I were preparing for

8    trial and meeting with Mr. Lambert, you know, that was sort of

9    the one thing that really -- that Mr. Lambert really continued

10   to struggle with, with this sort of online platform, is that

11   the photographs, all that information was still up, it was

12   still accessible.  Someone in my opinion with true remorse,

13   true regret for this exchange, for this conduct, would have at

14   least taken some effort to mitigate the damage but never did.

15         So in sum, based on the history and circumstances

16   of this offense, the defendant's history, the nature and

17   circumstances of this offense, a sentence of 51 months of

18   imprisonment would reflect the serious nature of Mr.

19   Cantwell's crimes, it would promote respect for the law, it

20   would provide just punishment, it would afford adequate

21   deterrence, and it would protect the public from future crimes

22   of the defendant.

23         THE COURT:  Thank you.

24         All right.  I'll hear from the defense.

25         MR. WOLPIN:  So this case is less about the what

1    and more about the why.  I mean, ultimately the discovery we

2    were provided has everything in writing.  Much of what was

3    presented at this trial was fixed in writing.  And so there

4    isn't a dispute at this point as to the what.  But I do think

5    the why, as the Court has alluded to, is an important

6    consideration particularly for sentencing, and I make that

7    argument because there's a spectrum of why.  There is on one

8    end completely unprovoked, the sort of model that the Court

9    noted, and probably as far on the other end is self-defense,

10   that the conduct leading up to it was egregious or sufficient

11   to the point to make someone not even guilty of the offense.

12   This in our opinion falls somewhere obviously in the middle of

13   that spectrum.

14          It is not an unprovoked situation, it is not a

15   self-defense situation, but it is a situation where context

16   and why matter, and we are asking that the Court consider the

17   13 months that Christopher has already served in relation to

18   pretrial time, which with sort of the nuances of federal good

19   time is about a 15-month sentence with the good time credit as

20   well as continued supervision upon his release.

21          Before talking a little more about the sort of

22   context of this case, I do think it's worth addressing the

23   context of other cases, and there is some of that in my motion

24   and some of that in the government's response as to other

25   cases charged similarly or with similar facts.

**J.A. 1167**

```
 1              And to some degree it is somewhat difficult --
 2         THE COURT:  Yeah, there are a couple of things in
 3    your memoranda on that point that troubled me.
 4         MR. WOLPIN:  Okay.
 5         THE COURT:  To the extent that you're implying that
 6    prosecutors don't often charge these kinds of offenses and
 7    therefore I should give the defendant a lighter sentence,
 8    again, I don't see that as part of the calculus that I should
 9    be engaging in when trying to avoid unwarranted sentencing
10    disparity.  And to the extent you identify specific cases
11    where you say the sentence was lower and the charges are
12    comparable, and the government identifies cases that it says
13    are comparable and the sentences are higher, that's an inquiry
14    that rarely turns out to be useful in evaluating claims of
15    unwarranted sentencing disparity.
16              What would be useful if you had it that you don't
17    provide is -- if you could demonstrate that a very high
18    percentage of certain kinds of cases are routinely the subject
19    of downward departures and variance that are similar to this
20    case, that would be useful.
21              And a good example of that is in the child
22    pornography area where you well know there are certain kinds
23    of enhancements that the guidelines call for that almost no
24    judge gives.  And when judges widely don't follow the
25    guidelines, that is important information because if you're
```

**J.A. 1168**

1    the one judge who sticks with the guidelines, you may be

2    promoting unwarranted sentencing disparity.

3            But the kind of information you provide me on that

4    point does not cause me to think that the sentence should be

5    other than a guideline sentence simply to avoid unwarranted

6    sentencing disparity.  It's the kind of analysis that just is

7    very rarely fruitful, but you can say what you want to say

8    about it.  I've read your memorandum.

9            MR. WOLPIN:  The effort -- obviously with the less

10   frequency or infrequency of this charge, it is harder to

11   collect that data.

12           I do think that was addressed in the best way I

13   could come up with, which was the tool through the guidelines

14   itself, this analyzer tool, which allowed me to collect all

15   2B3.2 cases within our region and say, hey, what is going on

16   in those cases broadly rather than saying this particular case

17   had this fact and this fact.  It's a broader data.

18           And when you look at 2B3.2 which is the guideline

19   we're dealing with here, there were 13 cases in the time frame

20   available through the data analyzer, which is 2015 to 2019,

21   looking through New Hampshire, Maine, Rhode Island, and

22   Massachusetts, our sort of First Circuit neighbors, there were

23   13 cases noted in those circuits or in those districts over

24   those five years.  All of them were given below guideline

25   sentences.

```
 1            So from the perspective -- and that's attached as
 2   Exhibit I, I believe, and J, sort of what was pulled out of
 3   that tool.
 4            So that I agree it can be tough to come in and say
 5   case X, case Y, here's the difference.
 6            THE COURT:  And especially when there's a very
 7   small subset of cases you analyze.  That's why -- I find the
 8   argument persuasive in the context of child pornography where
 9   you could say 75 percent of the judges depart downward given
10   these circumstances, and if you don't depart downward, there's
11   no good reason to distinguish your decision from others.
12   You're in fact promoting unwarranted sentencing disparity by
13   sticking with the guideline.
14            That argument where it can be demonstrated is
15   appealing.  This one is harder to establish because you're
16   using a very small subset of cases.  To really evaluate it I
17   would have to kind of undertake a detailed analysis of each of
18   the cases that you are proposing.  I would have to read the
19   sentencing transcript to understand whether there was any
20   cooperation and what the judge found about how accepting
21   responsibility -- in how many cases there was acceptance of
22   responsibility credit given because the defendant pleaded
23   guilty.  There are just so many factors that really would have
24   to be considered to prepare case A against case B, and I don't
25   think that's what the drafters of the sentencing statutes were
```

**J.A. 1170**

```
 1   after when they talked about avoiding unwarranted sentencing
 2   disparity.
 3            So I don't tend to give much weight to that
 4   argument.  I certainly considered it to the extent you
 5   outlined it in your brief.  I would suggest you find a more
 6   better use of your time on other aspects of your memorandum.
 7            MR. WOLPIN:  Okay.  So to finalize or move on from
 8   that, and it directly relates to the circumstances of this
 9   case which I'm about to address, is I do think that what a lot
10   of these charges are intended to address, including one cited
11   by the government, are when there's commentary to public
12   officials, there's an interference with government action.  So
13   we've had recent cases like that where there's a threat to a
14   legislator, a threat to someone counting votes, that there's a
15   broader need for deterrence and punishment where there is an
16   effort to inhibit the effective administration of our
17   government.
18            That is not the situation here.  This is ultimately
19   a dispute that is limited to a dispute between two individuals
20   involved in a far longer running dispute, not something that
21   has this broader impact of government operation.
22            The other cases I tend to see in reviewing this are
23   sort of the sexting scenario where there's an effort to
24   obtain, you know, naked photographs, many naked videos, and
25   those are again similar cases cited that have another broader
```

```
 1   deterrent-based interest.  I think --
 2            THE COURT:  Yeah, I sentenced that case, and I can
 3   tell you the sentence was a lot longer than the sentence that
 4   he's being exposed to here.  Those kind of cases -- I don't
 5   remember the sentence I gave, but if you went back and looked
 6   at it, you can see it's way, way higher than what we're
 7   talking about here.
 8            MR. WOLPIN:  I do think those are the kind of
 9   scenarios where general deterrence and punishment has to be at
10   its utmost.  I think when it's a private dispute, that is not
11   the same situation where there's a -- I mean, not that there's
12   not a need to punish and regulate that behavior but not to the
13   same punitive extent as where there are broader public
14   interests at work.
15            So getting back to our situation, you know, the
16   government presented a timeline just now that incorporated
17   some of our facts but obviously not all.  It did come through
18   the government's prism.  We do think it's important for the
19   Court to understand the context and why this came to be.  And
20   I know there is I think -- although we've resolved that
21   factual dispute, I think there is some factual dispute as to
22   what kind of role Cheddar Mane had in this process.
23            THE COURT:  Yeah.  So let's be clear.  I am quite
24   satisfied that during the period in February and March that
25   there was a very -- a coordinated campaign by the members of
```

**J.A. 1172**

```
 1   the Bowl Patrol, including the victim in this case, to harass

 2   Mr. Cantwell to attempt to disrupt his ability to earn a

 3   living off of his programs and it drove him crazy.  That to me

 4   is -- that was established at the trial.

 5           But there is an additional contention that the

 6   government is making that you may have evidence to refute that

 7   you want to bring to my attention, which is that that pattern

 8   of harassment had waned by June and in any event did not

 9   involve the victim in the case.  I think the government is

10   making that contention.

11           Have I got that wrong?  Am I mischaracterizing your

12   position?

13           MS. KRASINSKI:  I don't know about the broader

14   campaign.  I think the evidence established that --

15           THE COURT:  Your memorandum sort of suggested that

16   the campaign had already fallen off at that time.  If you're

17   not contending that, that's fine.  If they are contending

18   that, then to the extent you want to refute that, you can, but

19   I do think it is the government's contention clearly that the

20   government asserts that the victim in this case was not an

21   active participant in that campaign in the months immediately

22   preceding the defendant's criminal conduct.  And if you want

23   to refute that, you can.

24           MR. WOLPIN:  I'll refute that in the sense that the

25   issue Christopher was dealing with from his end wasn't
```

J.A. 1173

1    resolving.  It wasn't diminishing.  He was continuing to get

2    these kinds of actions.

3              What became more difficult for him to unpack was

4    who it was coming from because as was brought out to some

5    degree at trial, there became the use of spoofing software

6    and, you know, phone companies that allowed you to do this and

7    that, and he spent a significant amount of time trying to make

8    it stop from that end, but he was never certain who was the

9    person calling even when it was Cheddar Mane or not Cheddar

10   Mane.

11             THE COURT:  I agree with that.  That's consistent

12   with my understanding.

13             MR. WOLPIN:  I mean, it's sort of the amorphous

14   sort of conspiracy concept that you can't always tell where

15   it's coming from.  And so for Christopher when this contact

16   came to him from Peach which -- and I know the government

17   addressed the one as well in the chat that is sort of

18   downplaying that, that language has an implicit malice built

19   in whether it's --

20             THE COURT:  What are you talking about?

21             MR. WOLPIN:  The June 15th contact to Ms. Peach

22   that has been provided.

23             THE COURT:  The one we talked about just today you

24   mean?

25             MR. WOLPIN:  Just today, correct.

**J.A. 1174**

```
 1                  THE COURT:  Okay.

 2                  MR. WOLPIN:  Which was then forwarded along to

 3     Chris.

 4                  THE COURT:  Doesn't that exchange show that Mr.

 5     Cantwell didn't think that came from Mr. Lambert?

 6                  MR. WOLPIN:  Chris doesn't know who that comes from

 7     at the time.  I mean, he understands that --

 8                  THE COURT:  Well, you're not saying that -- I'm not

 9     understanding you.

10                  MR. WOLPIN:  Okay.  So Chris gets this from Peach

11     out of the blue.  He understands that it's in reference,

12     because she explains it to him, to her visiting of Cheddar

13     Mane.  He's aware that this has to have a sort of Cheddar Mane

14     nexus.  Again, the same thing.  He doesn't know who it's from,

15     he can't be certain, but it's on his mind.

16                  And then the next day that person who sort of gets

17     involved shows up in his chat room and to him that's not a

18     coincidence.  There is some, in his mind some pattern of

19     malice.  It can't be proven, it's uncertain, but in

20     understanding provocation I think the Court does need to

21     consider what his view of what was happening was, and it

22     wasn't an unreasonable view in light of sort of the very

23     narrow subject matter of that text.

24                  THE COURT:  Do you contend that anything -- that

25     the victim -- anything the victim did while in the -- what is
```

J.A. 1175

```
1    it called, Peaceful White Folk or something?
2              MR. WOLPIN:  Yes.
3              THE COURT:  Whatever it's called, that Telegram,
4    did the victim do anything provocative other than to enter
5    that room?
6              MR. WOLPIN:  It's his appearance that was viewed
7    with others who are also --
8              THE COURT:  You agree he didn't do anything
9    provocative other than to appear in the room?
10             MR. WOLPIN:  Not in language.  In appearance with
11   others who are Bowl Patrol folks in a chat room run by Chris,
12   that was the beginning.  That was sort of an unexpected -- to
13   be clear, this is not something where Chris sought out contact
14   with him that day or the initial contact comes from that.  So
15   this idea that there's a long-standing plan and it came to
16   fruition on that day, Chris was not expecting to have any
17   contact with Cheddar Mane that day.
18             THE COURT:  No, that's a different statement from
19   there was a long-standing plan to try to dox Vic Mackey and to
20   try to threaten people who might be able to give him
21   information to dox Vic Mackey.  That seems to be clear from
22   the evidence in the case.
23             MR. WOLPIN:  Yes.
24             THE COURT:  I agree with you that there's no
25   evidence to suggest that he planned that this will occur on
```

```
 1   June 16th, that instead there are these circumstances someone,
 2   the victim said it wasn't him, we don't have any evidence it
 3   was him, communicated with Peach about a photo.  Peach shared
 4   that information with the defendant.  The defendant responded
 5   and said he didn't think it was Mr. Lambert who shared that
 6   information.
 7          Mr. Lambert then joins the Peaceful White Folk
 8   Telegram channel.  He testified he didn't know that the
 9   defendant was associated with it.  We have no evidence to call
10   that into question.  The defendant, though, I understand sees
11   him there, identifies him with the Bowl Patrol, connects it
12   with the photograph that occurred that was commented on to
13   Peach, and at that point becomes in your view upset again that
14   Lambert is again trying to disrupt his life or interfere with
15   him in ways that he didn't want to be interfered with.
16          MR. WOLPIN:  Yes, and then within the context of
17   how that conversation evolves, there's another reference to
18   Peach, it's another sort of menacing type statement, and
19   that's when we get the statement that really is the crux of --
20          THE COURT:  Right, but you're leaving out the
21   victim trying to deescalate the situation and your client
22   being unwilling to deescalate.
23          MR. WOLPIN:  My -- yes.  I mean, Chris's
24   frustration is he believes there's more going on here and
25   Cheddar Mane is saying, I'm not involved, I'm not involved,
```

J.A. 1177

1    and that's not something that Chris finds credible and that's

2    what's sort of driving that continuing conversation.

3           I do want to address this concept of doxing.  I

4    mean, it's implicit in this case.  It's also in and of itself

5    not an illegal act and commonplace, fortunately or

6    unfortunately, in this group.  It's not a social good

7    question.  We're not arguing that the Court should assign

8    altruistic motives and this is a social good.

9           We're arguing that the inevitability of his doxing

10   was not Chris's doing.  Chris could have taken much more

11   aggressive efforts --

12           THE COURT:  I'm not sentencing him because Mr.

13   Lambert's identity became public, if that's what you're

14   worried about.  I'm sentencing him because he threatened to

15   rape Mr. Lambert's wife in front of his children in order to

16   extort something from him.  That's what he's getting sentenced

17   for and the other crimes which he's --

18           MR. WOLPIN:  Understood.  But my concern is the

19   presentation about impact and how this has impacted Cheddar

20   Mane and his family.  It is very hard to untangle those two

21   things because the hockey business, that's not because of a

22   threat.  That's because ultimately his identity in his own

23   words were revealed, and the community has decided that that's

24   not someone they want in that position.  That's not, you know,

25   Chris's action and, you know, A to B to get to that result.

**J.A. 1178**

```
1   And so I agree that the Court is considering the dispute
2   between these two men for I believe what it is.
3            As to this concept of mitigation and could have
4   deleted it, brings up other concerns obviously with defendants
5   who go about deleting information that relates to their case.
6   I mean there's certainly circumstances as defense attorneys
7   when that's flipped on its head, and the argument is there's
8   hiding, there's deletion -- it could arguably be a crime to
9   tamper with evidence and eliminate evidence.
10           Certainly I don't recall any conversation between
11  the parties, you know, can you do this, are you willing to do
12  this, can you take this down.
13           THE COURT:  I don't think the length of the
14  sentence is going to be determined by whether he took down the
15  information or not.
16           MR. WOLPIN:  All right.
17           I mean, ultimately again, the Court is required and
18  should consider the nature and circumstances of the offense
19  which revolved around this dispute between these two men.  I
20  do believe that mitigates to a significant degree.  We're
21  still looking at a highly -- even time served.  He lost his
22  home.  He sat in jail.  He has gotten COVID in jail.  This is
23  not something where anyone who is sort of thinking about a fly
24  by night threat or saying something like this on online is
25  going to view this as something you just get away with or walk
```

J.A. 1179

1    away from.  This has been seriously impactful on his life,

2    will continue to be through supervision, and certainly will be

3    on the punitive end, and that the whole time I've been working

4    with him he's been in jail.

5              If I could have a moment, your Honor.

6              THE COURT:  Yes.

7              (Attorney Wolpin confers with the defendant)

8              MR. WOLPIN:  I would just reserve -- to the extent

9    I haven't addressed orally arguments in the motion about

10   computer monitoring, about application of the departures, I

11   would just incorporate those within and not address those.

12             THE COURT:  Yeah.  So obviously we're mostly

13   concerned with getting the length of the sentence right here,

14   and I'm sure that's the biggest concern your client has here.

15             MR. WOLPIN:  Of course.

16             THE COURT:  But I am concerned with crafting a

17   monitoring of Internet access as narrowly -- narrowly so that

18   we can to the maximum extent possible preserve the defendant's

19   ability to lawfully use the Internet for work and other things

20   while appropriately allowing supervision of his activities.

21   I'm willing to work with the parties about crafting that, but

22   I'm not sure it makes tremendous sense to devote lengthy

23   argument to it now.

24             I think that clearly there is -- and we can talk

25   about it if necessary, but the government's suggestion I think

**J.A. 1180**

```
 1   is the way this software would operate is that it would keep a
 2   record of what he did, but it wouldn't be subject to
 3   inspection without -- could we craft a condition that allowed
 4   for the monitoring to occur but not routine inspection of the
 5   data that is collected without reasonable suspicion to believe
 6   the defendant has engaged in conduct that would violate, and
 7   perhaps we should do another hearing on that later.  We can do
 8   it by Zoom or something.
 9             But that's -- I'm sensitive to the fact that
10   despite the defendant's use of the computer to commit these
11   crimes a blanket kind of -- certainly a blanket prohibition on
12   use would be problematic, but even a monitoring and routine
13   inspection of routine interactions that the defendant has
14   could impair his ability to use the computer for work-related
15   purposes because certain employers might not be willing to
16   allow that kind of inspection.
17             So I'm aware of the concern, I want to address it,
18   but the most important thing today is to get the sentence
19   right.
20             MR. WOLPIN:  We agree.
21             THE COURT:  So I take your argument.  We can talk
22   about that in a minute if we need to.
23             MR. WOLPIN:  Thank you.
24             THE COURT:  Mr. Cantwell, you have an opportunity
25   to speak.  You don't have to say anything.  I won't hold it
```

**J.A. 1181**

```
 1    against you if you don't.  But if there is anything you want
 2    to say, I'll be happy to hear it.
 3              Do you want to say anything?
 4              THE DEFENDANT:  I do.  There's a couple of things I
 5    want to say.
 6              THE COURT:  Yeah, go right ahead.
 7              MR. WOLPIN:  Your Honor, could I just ask for a
 8    moment?
 9              THE COURT:  Yeah.
10              Mr. Cantwell, if you're more comfortable sitting,
11    you can do that, or stand, whatever you're comfortable doing,
12    but consult with your lawyers first.
13              (Attorney Wolpin confers with the defendant)
14              THE DEFENDANT:  Is this suitable?
15              THE COURT:  I can hear you fine, yes.
16              THE DEFENDANT:  Okay.
17              So the only thing that I want to convey -- I think
18    Mike Tyson is quoted as saying everybody has a plan until they
19    get punched in the face.  And while I certainly haven't been
20    punched in the face today, it's kind of like the metaphors
21    that I'm sort of in the habit of using.
22              THE COURT:  Hang on just one second.
23              Counsel, could you move that microphone a little
24    bit closer to him so that he can be heard?
25              THE DEFENDANT:  And so I had written a pretty
```

**J.A. 1182**

```
 1    lengthy thing, which I am not going to go through today.
 2            I think that what has been lost here and has
 3    frustrated me, and as I've done my best to speak to my
 4    attorneys, is that my lived experience is that this problem
 5    continued perpetually literally every day for eight months and
 6    it consisted of threats of violence against me, but I could
 7    not attribute them to individuals because they behaved
 8    functionally -- I don't know if you're familiar with the term
 9    black block, okay?  This is when you see these anarchists
10    running around in the streets dressed in all black breaking
11    windows and stuff because -- and it's difficult to identify
12    them because they're all dressed the same, okay?  It's a
13    tactic that they use to avoid liability for their crimes, all
14    right?
15            And these guys, this is exactly what they did on
16    the Internet, and this was reflected to some extent in a 302
17    of Cheddar Mane's interview with the FBI or with the
18    prosecution.  I forget.  There were several different 302s
19    that I read.  And he said that he had many different screen
20    names that he used with names as innocuous as FU, but using
21    the full word.  I mean, like that N word was -- like names
22    like this he used.  He created countless fake accounts, as did
23    the entire Bowl Patrol group.
24            And so my lived experience is the Bowl Patrol is
25    perpetually, constantly harassing me, threatening me, trying
```

```
 1   to destroy my business, pretending to be me, defaming me,

 2   telling people -- trying to stir violence against me saying

 3   that I ratted on the Rise Above Movement, guys who were

 4   convicted of fighting down in Charlottesville, which I didn't

 5   do by the way.

 6           I gave video to the FBI in cooperation with their

 7   investigation voluntarily because we were being accused of

 8   things that we didn't do down there and I wanted to do the

 9   right thing.  And I gave them my body camera video and I gave

10   them all the information that I had about what happened down

11   there because what they were under the impression of was

12   false.

13           And so, you know, when the Bowl Patrol is running

14   around saying that I ratted out the Rise Above Movement, they

15   knew that wasn't true.  They were trying to get guys to harm

16   me.  That's my lived experience with this.

17           And I did not attribute any of those threats to

18   Cheddar Mane because I couldn't.  You know, when the FBI asked

19   me, did he threaten you, I said, no, I can't say that he did

20   because I never saw him actually do that, but a lot of this

21   was coming in.

22           And so when Peach sends me this screenshot, okay,

23   she says, is this Cheddar Mane, and, yes, I initially say, I

24   don't think so, why would I think that's Cheddar Mane.

25           Later on in that conversation, I think that we
```

```
 1    glossed over that chat log a little too quickly and I hope
 2    that you'll take another look at it, okay, is that she
 3    explains to me, I took this picture of his kids and he got all
 4    weird about me taking the picture so I never sent it to you.
 5    And so when she sends me this screen cap of the message that
 6    she's getting, my perception is, after it's explained to me,
 7    that has to be Cheddar because nobody else would have known
 8    she took those photos.  Cheddar is super scared that somebody
 9    is going to dox him, that he's going to get identified, he
10    wouldn't run around telling everybody that Katelen has
11    pictures of his kids, okay?
12            So my perception of this is I have a constant
13    stream of nonstop harassment that I've been to law enforcement
14    about repeatedly asking for help.  They're ignoring my cries
15    for help.  And then this guy -- he goes from me to this woman
16    who I asked to marry me and so -- I'm sorry.  When he comes
17    into the chat the next day and then he tells me that he left
18    me alone, I know that that's not true.  I know that he's lying
19    because he was just harassing Katelen earlier that day, and
20    so when it's portrayed as he's trying to deescalate the
21    conflict, that's not my perception of it.
22            My perception is he's continuing this.  He's lying
23    to me.  He's trying to avoid responsibility for what he's been
24    doing, which is a constant pattern that's been going on now
25    for eight months, and this was something that happened because
```

**J.A. 1185**

```
 1    they didn't think I was supportive enough of a guy walking
 2    into a synagogue and killing a bunch of people.  That was what
 3    motivated their vendetta against me, that I said I don't want
 4    you to promote this stuff on my platforms.
 5            And so they -- you know, that was my lived
 6    experience of it in any case, and I don't believe that he was
 7    innocent.  When he showed up in that chat room with that name,
 8    the mistake that he made was that he showed up using an
 9    account that I could identify.
10            Cheddy Blac was not his username in other contexts.
11    That was just something that bore enough resemblance to the
12    Cheddar Mane name that I recognized it that I called him out,
13    and then he got scared and he tried to backpedal and he tried
14    to get his way out of it, you know.
15            And so it is true that I had threatened to dox him
16    previously, it's true that I associated that with Vic, but
17    when I get these photos from Peach -- I had never seen or
18    heard of Mrs. Lambert before that day, okay?  I never -- I'm
19    not even sure I knew if he had kids.  I knew he was
20    married but, like, you know --
21            THE COURT:  Excuse me.  You don't have to answer
22    this if you don't want to but --
23            THE DEFENDANT:  I'm happy to answer your question.
24            THE COURT:  -- given all that you're saying to me,
25    I'm just a little confused about something, and don't answer
```

**J.A. 1186**

```
 1   if you don't want to, but when did you learn Cheddar Mane's
 2   identity?
 3            THE DEFENDANT:  I learned -- Peach had sent me a
 4   photograph of her, Cheddar, and Hard Mouse sitting on a couch
 5   when she went to go visit them in the fall of 2018.  So that's
 6   what I had.
 7            And I knew that Peach had been to his house at that
 8   point because she told me about the visit, and at that time
 9   things were copacetic.  Things were, you know, reasonably
10   friendly or whatever, right?
11            THE COURT:  So you knew at that point that this
12   person she had visited was Cheddar Mane?
13            THE DEFENDANT:  Yeah.  And so I knew that I could
14   identify Cheddar Mane, but at that point I had never gone to,
15   like, get the information, right?
16            THE COURT:  I got it.  I got it.
17            THE DEFENDANT:  And so what happens is when he
18   shows up in the chat, and you could cross reference the
19   timestamps, I say to Peach, give me those photos and the
20   address, okay, and that's when I go to obtain the information.
21            Now, I could have done this forever ago, and the
22   prosecution pointed out that I doxed the guy Mosin-Nagant,
23   another one, okay?  And when I doxed Mosin-Nagant I never
24   said, give me Vic Mackey's identifying information, because
25   there was no doubt that Mosin-Nagant was guilty of what he
```

J.A. 1187

```
 1    did.  That was when Mosin-Nagant posted my address on Twitter
 2    under his own Twitter handle, okay?
 3            So there was no doubt that Mosin-Nagant had
 4    published my address, so I just went ahead and published
 5    Mosin-Nagant's address.  I just published his information.  I
 6    didn't say give me something.
 7            What happened with Cheddar Mane was --
 8            (Attorney Wolpin confers with the defendant)
 9            DEFENDANT:  Okay.  Thank you.
10            When I'm talking to Cheddar Mane, he tells me, I
11    didn't do this, okay?  And I say, well, if you didn't do it,
12    then give me Vic's identity, he's a better target than you.
13    All right?
14            So this emerges -- the point that I'm trying to
15    make is that this emerges spontaneously in that moment for
16    that purpose, okay?  Yeah, I could have doxed this guy anytime
17    I wanted to.  I could have contacted him anytime I wanted to.
18    I could have showed up at his house anytime I wanted to, and I
19    just didn't have any desire to do it.
20            When he comes into the chat room after he had been
21    harassing Peach and he lied to me, you know, yeah, this thing
22    went on for a long time, but that's my lived experience of
23    what happened, and I guess that's all I've got to say.
24            THE COURT:  Okay.
25            THE DEFENDANT:  And I'm happy to answer other
```

**J.A. 1188**

```
 1    questions if you got them.  I'm happy to do that.
 2            THE COURT:  No.  I think I have the gist of your
 3    position down I think and --
 4            THE DEFENDANT:  And I want to -- sorry.  I should
 5    also say I do regret whatever discomfort I've caused Mrs.
 6    Lambert, okay?
 7            I could have had people come in to this courtroom
 8    and say positive things about me.  And when people do that,
 9    they run the risk of people bothering them online, threats of
10    violence.  I recognize that, and I don't want to have anybody
11    come do that for me for that reason.
12            To the best of my knowledge she's an innocent
13    person, so I do feel bad about that.  Again, it wasn't a
14    thought-out thing with her.  This was something that is like
15    -- I'm in the middle of this conversation and I get this
16    picture, and I don't mean to cause her, you know, any trouble.
17    I don't think that Cheddar Mane is an innocent victim,
18    frankly, but to the extent that she is, I'm sorry for whatever
19    discomfort I've caused her because that wasn't my goal.
20            THE COURT:  All right.  Thank you.  I appreciate
21    that.
22            Anything else from the defense counsel before I
23    impose sentence?
24            MR. WOLPIN:  No.
25            THE COURT:  Anything else from the government?
```

**J.A. 1189**

```
 1              MS. KRASINSKI:  No, your Honor.

 2              THE COURT:  All right.  Thank you.

 3              All right.  I'm going to decline the defendant's

 4    motions for departure and variance.  I determine that the

 5    defendant's total offense level is 20, his Criminal History

 6    Category is III, that no departures or variance is warranted.

 7    I'm going to sentence the defendant to a sentence at the

 8    bottom of the applicable range of 41 months.  Let me explain

 9    my thinking.

10              Let me start with the Criminal History Category

11    calculation.  I think it's a close call in my mind.  The

12    defendant does qualify as a Criminal History Category III

13    literally.

14              The defense put forth some arguments that I took

15    very seriously about the age of the one point attributed for

16    the DUI conviction and I carefully considered the defendant's

17    argument that the two points that resulted from the fact that

18    the crimes were committed while the defendant was under a

19    period of supervision is technically a correct adjustment, but

20    when I look at this defendant holistically and his background,

21    it's borderline whether he's a Criminal History Category II or

22    III.  I think he meets it.  I think I can take into account

23    the borderline nature of this by determining where in the

24    range to sentence the defendant, and I have done so and

25    concluded that a sentence at the bottom of the applicable
```

1    range is warranted.

2              I do think that in this case the fact that the

3    defendant threatened the victim's family member is an

4    aggravating circumstance that would ordinarily justify a

5    sentence higher than the bottom of the applicable range.  So

6    why am I sentencing the defendant at the bottom of the range?

7              The threats here that the defendant made are

8    abhorrent, shocking, they are extremely damaging, and I don't

9    diminish those, the seriousness of those threats to any

10   degree.  It's just horrendous threats.  So I want to make that

11   clear right from the outset.

12             Why then would I sentence at the bottom of the

13   range?  I want to evaluate the provocation argument that the

14   defendants put forth for a variance.

15             I don't believe that there was provocation in this

16   case that warrants a downward variance.  I largely accept the

17   revised chronology that the government has produced today as

18   being a correct description of what occurred here, and I do

19   agree with Mr. Cantwell's position to this extent.  I think

20   the members of the Bowl Patrol were trying to drive him crazy.

21   They were trying to deprive him of his ability to earn a

22   living, they were trying to disrupt his program, and Mr.

23   Cantwell chose a criminal and ultimately criminal and

24   certainly irresponsible way to respond to that effort, but I

25   don't believe it warrants a variance for provocation because I

**J.A. 1191**

1   do believe that while the victim in this case was a

2   participant with other Bowl Patrol members in some of the

3   early trolling behavior that occurred here, I'm not satisfied

4   that the immediate incident was precipitated by any

5   provocation by the victim in this case.

6            I don't believe and I'm not persuaded that the

7   communication to Peach about the photo came from the victim.

8   We don't know who communicated with Peach about that, but the

9   defendant according to the screenshots did not believe that

10  Mr. Lambert was the source of that communication.

11           And what happened here, Mr. Lambert entered into

12  the Peaceful White Person site and that in and of itself is

13  not provocation under these circumstances to justify in any

14  way, shape, or form Mr. Cantwell's behavior.

15           I understand from your perspective you thought this

16  guy, you know, was part of a campaign to drive you crazy, and

17  I do not doubt that you were extremely agitated when you saw

18  him there and you disregarded his efforts to deescalate

19  because you determined he was part of a group of people that

20  were still out to get you, but I can't say that you were

21  provoked in any way in the immediate sense by what occurred

22  there.  You engaged in threatening behavior to Mr. Lambert and

23  he responded in a way that was unacceptable in my view and

24  does imply a threat against someone you care deeply about.

25  And then you escalate it further, and that's where you engaged

**J.A. 1192**

```
 1   in the conduct that resulted in your presence here today, and

 2   I don't believe that that is provocation that justifies a

 3   sentence below the bottom of the applicable range.

 4           But I do understand the human circumstances you

 5   were in.  You felt these people were trying to destroy you,

 6   they were trying to drive you crazy, you were extremely

 7   agitated, you thought Mr. Lambert was a part of that group.

 8           And there was a pattern in your interactions with

 9   him in which you both had become desensitized to the

10   horrendous nature of your interactions with each other, and

11   that's the only reason that I'm not giving you a sentence

12   above the top of the range, that I'm not in fact varying

13   upward in this case, because the conduct you engaged in in my

14   mind is so serious and so damaging that it ordinarily warrants

15   an even higher sentence than the one that I have imposed here.

16   But I've tried to understand your circumstances and why you

17   ended up where you did, and I tried to take that into account

18   as best I could, and given the totality of those circumstances

19   I've decided not to sentence you at the top of the range, not

20   to vary above the range, but to give you a guideline sentence

21   which still is a very significant period of incarceration.  I

22   understand that and I believe that the interests of justice

23   require it.

24           In developing a sentence here I have to consider

25   what a just sentence is, and as I said, the nature of your
```

1    behavior is so serious, so egregiously wrong that justice

2    requires a significant prison sentence.

3              And I think both individual and general deterrence

4    require a significant prison sentence here, and that's why I'm

5    imposing it.

6              I believe that I'm avoiding unwarranted sentencing

7    disparity by sentencing the defendant to a term of

8    imprisonment within the guideline range.

9              So I am going to impose a sentence of imprisonment

10   of 41 months, which is the bottom of the applicable range.

11             I want to reserve the right to consult with the

12   parties about the Internet supervision condition in a later

13   telephone conference, because I want to make every effort to

14   craft a condition that serves the government's interests while

15   also protecting the defendant's ability to engage in lawful

16   business activities using the computer when he completes his

17   sentence.

18             Let me read the sentence as I propose to give it:

19             Pursuant to the Sentencing Reform Act of 1984, and

20   having considered the sentencing factors enumerated at 18

21   U.S.C. Section 3553(a), it is the judgment of the Court that

22   the defendant is hereby committed to the custody of the Bureau

23   of Prisons to be imprisoned for a term of 41 months.  This

24   term consists of a term of 41 months on Counts 1 and 2 to be

25   served concurrently.

1          Upon release from imprisonment the defendant shall

2    be placed on supervised release for a term of two years.  This

3    term consists of two years on Count 1 and a term of one year

4    on Count 2, such terms to be served concurrently.

5          Within 72 hours of release from the custody of the

6    Bureau of Prisons the defendant shall report in person to the

7    district to which the defendant is released.

8          While under supervision the defendant must comply

9    with the standard conditions that have been adopted by this

10   court and the defendant must comply with the mandatory and

11   proposed special conditions attached to the presentence report

12   except for the computer monitoring condition which we will

13   have a further discussion about and it will eventually get

14   incorporated in the judgment in an effort to try to address

15   the specific concerns raised in the defendant's memorandum.

16         It is ordered that the defendant shall pay to the

17   United States a special assessment of $200.  It shall be due

18   in full immediately.

19         The Court will waive the fine in this case as the

20   defendant does not appear to have the financial ability to pay

21   one.

22         The defendant is remanded to the custody of the

23   United States Marshal.

24         Are there any objections from the government to

25   this proposed sentence other than the ones raised during the

```
 1  course of this hearing?
 2          MS. KRASINSKI:  Your Honor, I think as it relates
 3  to Count 2 the statutory maximum is 24 months of imprisonment.
 4  So I think -- if I heard the Court correctly --
 5          THE COURT:  Why did I miss that?  I'm sorry.
 6          MS. KRASINSKI:  -- I think you said 41 months of
 7  imprisonment on both, but I think it should be 41 months on
 8  Count 1 and then 24 months on Count 2.
 9          THE COURT:  That I think is a mistake.  I
10  apologize.
11          Yes.  So Count 2 is a 24-month sentence to run
12  concurrently with the 41-month sentence imposed on Count 1.
13          Thank you, counsel, for drawing that to my
14  attention.  I apologize.
15          All of the defendant's objections as stated in his
16  memorandum and during this hearing are preserved for purposes
17  of appeal.
18          Beyond that, is there anything else you need to
19  bring to my attention?
20          MR. WOLPIN:  No, your Honor.
21          THE COURT:  All right.
22          I'll impose the sentence as I've read it.
23          So you went to trial in this case.  You have a
24  right to appeal.  To perfect that appeal, you need to file a
25  Notice of Appeal within 14 days or you lose your right to
```

```
 1   appeal.
 2           You can ask your lawyers to file the notice on your
 3   behalf or you can file it yourself if you want to, you can ask
 4   the clerk's office for help, but it has to be filed within 14
 5   days or you lose your right to appeal.
 6           So unless you're planning to give up your right to
 7   appeal, tell your lawyers, file that notice for me, because
 8   otherwise you'll lose your right to appeal.
 9           All right.  Is there anything else that we need to
10   take up today?  No?  Okay.  Thank you.  That concludes the
11   hearing.
12           (Conclusion of hearing at 1:03 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**J.A. 1197**

```
 1                    C E R T I F I C A T E

 2

 3

 4         I, Susan M. Bateman, do hereby certify that the

 5    foregoing transcript is a true and accurate transcription of

 6    the within proceedings, to the best of my knowledge, skill,

 7    ability and belief.

 8

 9

10    Submitted: 5-4-21        /s/   Susan M. Bateman _____
                               SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | 1:20-cr-00006-01-PB |
| | ] | |
| CHRISTOPHER CANTWELL | ] | |

## NOTICE OF APPEAL

Defendant, Christopher Cantwell, respectfully appeals his conviction and sentence, upon

which judgment was imposed on February 24, 2021, to the First Circuit Court of Appeals.

Respectfully submitted,

Date: March 5, 2021

*/s/ Jeffrey S. Levin*
Jeffrey S. Levin, AFPD
N.H. Bar No. 12901
Federal Defender Office
22 Bridge Street, Box 12
Concord, NH 03301
Tel. (603) 226-7360
E-mail: Jeff_Levin@fd.org

*/s/ Eric Wolpin*
Eric Wolpin, AFPD
N.H. Bar No. 18372
Federal Defender Office
22 Bridge Street, Box 12
Concord, NH 03301
Tel. (603) 226-7360
E-mail: Eric_Wolpin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2021, the above document was electronically served
through CM/ECF upon all counsel of record.

*/s/ Jeffrey S. Levin*
Jeffrey S. Levin

# J.A. 1199